**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

_____
|                                                          )
JACOB BRADLEY, NOAH BRADLEY, KEITH    )
RIDLEY, and JARED THOMAS,                      )
individually and on behalf of a class of            )
similarly situated individuals,                        )
                 Plaintiffs,               )
                                                )
v.                                                               )   Civil Action No. 05-10213-PBS
                                                )
CITY OF LYNN; EDWARD J. CLANCY, JR.,    )
in his capacity as Mayor of the City of Lynn;   )
the COMMONWEALTH OF MASSACHUSETTS,  )
vzDIVISION OF HUMAN RESOURCES; and     )
RUTH BRAMSON, in her capacity as Personnel )
Administrator of the Division of Human Resources )
of the Commonwealth of Massachusetts,         )
                 Defendants.            )
_____)

## PLAINTIFFS' OPPOSITION TO DEFENDANT CITY OF LYNN'S MOTION TO JOIN THE INTERNATIONAL ASSOCIATION OF FIRE FIGHTERS, LOCAL 739, MATTHEW REDDY, PRESIDENT

I.     INTRODUCTION

The Plaintiffs, Jacob Bradley, Noah Bradley, Keith Ridley, and Jared

Thomas, hereby file this opposition to the Defendant City of Lynn's Motion to Join

the International Association of Fire Fighters, Local 739, Matthew Reddy,

President as a party in this action.  In support of this opposition, the Plaintiffs

state that the City's motion borders on the frivolous in that International

Association of Fire Fighters, Local 739, Matthew Reddy, President (the Union) is

clearly not a necessary party to this action pursuant to Rule 19(a) of the Federal

Rules of Civil Procedure and thus should not be joined in this action.

II.    STATEMENT OF RELEVANT FACTS

On February 2, 2005, the Plaintiffs filed a complaint in the above-cashned matter against the City of Lynn and its Mayor (the City Defendants) and the Commonwealth of Massachusetts Human Resources Division (HRD) and its Administrator (the Commonwealth Defendants).  The complaint alleges, in pertinent part, that the Commonwealth Defendants have violated the Plaintiffs' constitutional and statutory rights by administering a civil service *entrance* examination for firefighters that has a significant adverse impact on minority candidates.  [Compl. ¶¶ 12-13, 23-24.]  The complaint further alleges, in pertinent part, that the City of Lynn has violated the Plaintiffs' constitutional and statutory rights by appointing new firefighters using the results of the discriminatory examination as a rank-ordering system.  [Compl. ¶¶ 21, 23-25.]  The complaint does *not* allege any wrongdoing on the part of any of the Defendants with regard to *promotions* of firefighters, as incorrectly stated in the City's motion, but rather focuses solely on the *initial appointment* of new firefighters.  [Compl. ¶¶ 9-13, 23-25.]

III.    ARGUMENT

Because the Union has no interest in or rights regarding the initial appointment of new firefighters, it is not a necessary or appropriate party to this action and should not be joined pursuant to Rule 19(a).

In determining whether a party is necessary under Rule 19(a), this Court considers the three criteria set forth in that rule.  See, e.g., Lambergs v. Total

Health Systems, Inc., 1989 WL 63243 at *3 (D. Mass. Jun. 5, 1989) (citing

cases).  Those three criteria are:

> (1) under subsection 19(a)(1), whether complete relief cannot be accorded
> among the parties in the person's absence;
>
> (2) under subsection 19(a)(2)(i), whether the person claims an interest in
> the subject matter and disposition of the action in his or her absence
> may impair his or her ability to protect that interest; and
>
> (3) under subsection 19(a)(2)(ii), whether the person claims an interest in
> the subject matter and disposition of the action and resolution of the
> case without the person may subject the already existing parties to
> multiple litigation or inconsistent legal obligations.

Fed. R. Civ. P. 19(a); see also Lambergs, 1989 WL 63243 at *3-4.

Here, the Defendant City has failed to show that the Union is a necessary

party under these factors.  The Massachusetts Labor Relations Commission, in

accord with the National Labor Relations Board, has long held that a union has

no right under the state collective bargaining law to represent mere applicants for

employment because they are not yet members of the bargaining unit

represented by the union.  E.g., Boston School Committee and Boston Teachers

Union, Local 66, AFT, 3 MLC 1603, 1608-09 (1977) (attached hereto as Exhibit

A), citing Allied Chemical and Alkali Workers of American, Local 1 v. Pittsburgh

Plate Glass Co., 404 U.S. 157, 92 S.Ct. 383 (1971); Board of Trustees of Lowell

University, 4 MLC 1972, 1976 (1978) (Exhibit B); Brockton School Committee, 21

MLC 1165, 1176-77 (1994) (ALJ Decision) (Exhibit C); City of Haverhill, 16 MLC

1077, 1082 (1989) (H.O. Decision) (Exhibit D).  Accord Int'l Union of Electrical,
Radio and Machine Workers, AFL-CIO-CLC v. NLRB, 650 F.2d 334, 340 n. 8
(D.C. Cir. 1980); Star Tribune, 295 NLRB 543, 545 (1989); American Federation
of Government Employees, Local 2761, 17 FLRA 899, 902 (1985).

   In this case, the Union has no interest in the present matter because the
complaint relates solely to the ***initial appointment*** of firefighters and has no
bearing on the conditions of employment of individuals already in the bargaining
unit.  Since the Union has no right to represent the affected applicants, the
Union's participation in this matter is not necessary to accord full relief to the
parties, and the Union can claim no interest in the subject matter and disposition
of the case.  Therefore, the Defendant City cannot show that the Union is a
necessary party pursuant to Rule 19(a).

IV.     CONCLUSION

Based on the foregoing, this Court should find that the Union is not a

necessary party to this action pursuant to Rule 19(a) and should deny the

Defendant's motion to join the Union as a party.

Respectfully submitted,

JACOB BRADLEY, NOAH BRADLEY,
KEITH RIDLEY, and JARED THOMAS,

By their attorneys,


_s/Alfred Gordon_____
Harold L. Lichten, BBO # 549689
Shannon Liss-Riordan, BBO # 640716
Alfred Gordon, BBO # 630456
Pyle, Rome, Lichten, Ehrenberg &
      Liss-Riordan, P.C.
18 Tremont Street, Suite 500
Boston, MA 02108
Date:  March 18, 2005                    (617) 367-7200


**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served on the
attorneys of record for each party by first class mail on March 18, 2005.


__s/Alfred Gordon_____
Alfred Gordon

EXHIBIT A

"Case 1:05-cv-10213-PBS Document 17-2 Filed 03/18/2005 Page 2 of 11"

BOSTON SCHOOL COMMITTEE AND BOSTON TEACHERS UNION, LOCAL 66, AFT, MUP-2503.
BOSTON SCHOOL COMMITTEE AND BOSTON ASSOCIATION OF SCHOOL ADMINISTRATORS AND
SUPERVISORS, MUP-2528, BOSTON SCHOOL COMMITTEE AND BOSTON PUBLIC SCHOOL BUILD-
INGS CUSTODIANS ASSOCIATION, MUP-2541 (4/15/77).

> (50  Duty To Bargain)
>     54.512 hiring
>     54.513 promotion
>     54.520 residency requirement
>     54.7 permissive subjects
>     54.8 mandatory subjects
> (60  Prohibited Practices By Employer)
>     67.8 unilateral change by employer

Commissioners Participating:  James S. Cooper, Chairman; Garry J. Wooters,
                              Commissioner

Appearances:

| | |
|---|---|
| Philip J. Dunn, Esq. | - Counsel for the Commission |
| John F. McMahon, Esq. | - Counsel for the Boston Teachers Union (Case No. MUP-2503) |
| Richard W. Coleman, Esq.) <br> Karl E. Klare, Esq.      ) | - Counsel for Boston Association of School Administrators and Supervisors (Case No. MUP-2528) |
| James T. Grady, Esq. | - Counsel for the Boston Public School Buildings Custodians Association (Case No. MUP-2541) |
| Joseph W. Ambash, Esq. ) <br> Jonathan D. Canter, Esq.) | - Counsel for the Boston School Committee (Case Nos. MUP-2503, MUP-2528 and MUP-2541) |

## DECISION

### Statement of the Case

On May 14, 1976, a Complaint of Prohibited Practice was filed with the Labor
Relations Commission (Commission) by the Boston Teachers Union, Local 66, Amer-
ican Federation of Teachers, AFL-CIO (BUT) alleging that the Boston School Com-
mittee (School Committee) had engaged in certain practices prohibited by Chapter
150E of the General Laws (the Law).  This Complaint was docketed as Case No.
MUP-2503.  An Amended Complaint was filed on May 17, 1976 by the BTU.

On June 18, 1976, a Complaint of Prohibited Practice was filed with the Com-
mission by the Boston Association of School Administrators and Supervisors (BASAS)
alleging that the School Committee had engaged in similar practices prohibited by
the Law.  This Complaint was docketed as Cast No. MUP-2528.

On June 30, 1976, a Complaint of Prohibited Practice was filed with the Com-
mission by the Boston Public School Buildings Custodians Association (Custodians
Association) alleging that the School Committee had engaged in similar practices
prohibited by the Law.  This Complaint was docketed as Case No. MUP-2541.

The Commission investigated the Complaints pursuant to its authority under
Section 11 of the Law and issued Formal Complaints of Prohibited Practices agains'

Copyright © 1977 by Massachusetts Labor Relations Reporter

Boston School Committee and Boston Teachers Union, Local 66, AFT, et. al.,
3 MLC 1603

the School Committee in MUP-2503 on July 13, 1976, in MUP-2528 on July 21, 1976,
and in MUP-2541 on July 29, 1976.

On July 20, 1976, the Commission consolidated MUP-2503 and MUP-2528.  The
parties to these actions submitted and the Commission accepted a stipulation of
facts, with each party reserving the right to argue in its brief as to the rele-
vancy of any such facts.  Briefs were timely filed by the School Committee, BTU
and BASAS.

On July 20, 1976, the Commission consolidated MUP-2541 solely for the pur-
pose of decision with MUP-2503 and MUP-2538.  MUP-2541 was heard by the Commis-
sion on August 6, 1976.  The parties to this action submitted and the Commis-
sion accepted a stipulation of facts, with each party reserving the right to
argue in its brief as to the relevancy of any such facts.  Briefs were timely
filed by the Custodians Association and the School Committee.

## Findings of Fact

Upon all of the evidence and the record as a whole, the Commission makes
the following findings of fact:

1.  The City of Boston is a municipal corporation situated in the County
of Suffolk, and is a "public employer" within the meaning of Section 1 of the
Law.

2.  The School Committee is the representative of the City of Boston for
purposes of collective bargaining with BTU, BASAS and the Custodians Associa-
tion.

3.  BTU, BASAS, and the Custodians Association are "employee organizations"
within the meaning of Section 1 of the Law.

On May 12, 1976, the School Committee adopted an order with respect to
the household residency of employees and incorporated this order in the Rules
and Regulations of the School Committee and the School Department.  On May 25,
1976, the School Committee substituted the following residency requirements for
the order adopted on May 13, 1976:

> "ORDERED, That all persons hired or promoted by the
> School Department after July 1, 1976 shall within
> three months of such hiring or promotion become
> residents of the City of Boston and file with the
> Secretary of the School Committee an affidavit that
> they are residents.  Failure to do so shall be deemed
> a voluntary termination of employment."

In adopting the residency requirement on May 12, 1976 and revising it on
May 26, 1976, the School Committee acted unilaterally and without prior negotia-
tion with any of the employee organizations that are parties hereto.  Prior to



Copyright © 1977 by Massachusetts Labor Relations Reporter

MASSACHUSETTS LABOR CASES                          CITE AS 3 MLC 1605

Boston School Committee and Boston Teachers Union, Local 66, AFT, et. al.,
3 MLC 1603

the adoption of this residency requirement, the employees represented by these
three employee organizations were unrestricted by any residency requirement.[1]

On June 7, 1976, the School Committee by letter to the Commission clari-
fied the meaning of the residency rule adopted on May 26, 1976 as it related to
promotions. This letter of clarification stated in part:

> The proposed rule would require that employees become
> residents of the City within the time period set forth
> in the rule in order to remain in their new position.
> If they did not become residents they would be entitled
> to return to their former position.

On July 26, 1976, the School Committee voted to delay implementation of
the residency rule until the conclusion of these proceedings. The School Com-
mittee ordered, however, that

> all persons hired or promoted after July 1, 1976, shall
> be hired or promoted subject to [the residency rule]....

### Opinion

As a general rule, a public employer may not unilaterally change the wages,
hours, standards of productivity and performance, or any other terms and condi-
tions of employment of its organized workers without first negotiating with
their union. City of Boston, 3 MLC ___, MUP-2646, 2647 (1977); Town of Marble-
head, 1 MLC 1140 (1974); Town of Andover, 1 MLC 1103 (1974). The Complainants
herein assert that the Committee made such a unilateral change in a condition
of employment when the Committee introduced its residency requirement in May,
1976. The Unions contend that the Committee thereby violated Sections 10(a)(5)
and (1) of the Law.

To support such a charge, the evidence must show some pre-existing condi-
tion of employment, unilaterally altered by the employer, affecting a term or
condition of employment. Town of Andover, supra. It is undisputed in the in-
stant proceeding that the School Committee initiated a unilateral change when
it enacted the residency rule in May, 1976. The only disputed issue is whether
this rule is a term and condition of employment.

In resolving this issue we must determine the precise effect of the resi-
dency rule. A residency rule establishes a condition of continued employment
if an employee is required to reside in the municipality during the term of em-
ployment. In comparison, a residency rule establishes a condition of hire or

---

[1]All of the employee organizations offer, as exhibits numbered 1-7, former
School Committee Rules and Regulations and a vote of the Committee on February
17, 1948 to repeal all residency requirements. The Committee stipulates to the
authenticity of these exhibits, but objects to their relevance. These documents
are relevant to establish whether practice of prior years constituted an estab-
lished procedure with regard to residency, and are accepted into evidence for
that purpose.



Copyright © 1977 by Massachusetts Labor Relations Reporter

Boston School Committee and Boston Teachers Union, Local 66, AFT, et. al.,
3 MLC 1603

recruitment standard if a job applicant will be rejected because of non-resi-
dent status. A residency rule establishes a condition of promotion if resident
status is considered in selecting the individual for promotion.

The residency rule here compels employees of the School Committee hired
or promoted after July 1, 1976 to become residents of the City of Boston within
three months of their hire or promotion, and remain residents thereafter. Em-
ployees subject to the rule who fail to maintain a Boston residence are subject
to discharge or loss of their promotions. This rule, however, does not estab-
lish a prerequisite for hire or promotion, since an applicant for hire or pro-
motion will be considered regardless of his or her residence. Where this resi-
dency rule sets a requirement that must be complied with only in order for em-
ployees to maintain their previously acquired employment or promotion, we con-
clude that the rule establishes a condition of continued employment. See
Detroit Police Officers Association v. City of Detroit, 391 Mich. 44, 215 N.W.
2d 803, 85 LRRM 2536 (1974). The question raised here is quite narrow: is resi-
dency, as a requirement for retaining a job or promotion, a "condition of em-
ployment" within the meaning of the Law?

In the private sector, and mployer need not bargain over managerial deci-
sions which lie at the core of entrepreneurial control, and which are fundamen-
tal to the basic direction of the corporate enterprise. Such core entrepreneur-
ial decisions are not viewed as conditions of employment. Fibreboard Paper Pro-
ducts Corp. v. NLRB, 379 U.S. 203, 57 LRRM 2609 (1964).

> Those managerial decisions which are fundamental to the basic
> direction of a corporate enterprise or which impinge only in-
> directly upon employment security should be excluded from the
> area [of collective bargaining]. 57 LRRM at 2617.

By analogy, this Commission has concluded that certain decisions regard-
ing core educational or governmental policy need not be submitted to the nego-
tiation process. Town of Danvers, ___ MLC ___, MUP-2292, MUP-2299 (1977). In
Groton School Committee, 1 MLC 1221 (1974), we decided that matters pertaining
to curriculum were not conditions of employment that needed to be bargained
over.

This "core educational policy" concept, however, is limited. As the Com-
mission said in Medford School Committee, 1 MLC 1250, 1253 (1975),

> School Committees [have] the right to determine matters
> affecting basic educational policy which lie at the core
> of a school district's governmental control...[But] ob-
> viously, when the Legislature enacted Chapter 149 [and
> later Chapter 150E], it contemplated that certain subjects -
> those relating to "wages, hours, and conditions of employ-
> ment" - would be removed from the sphere of the municipal
> employer's exclusive unilateral control - without thereby
> intending in any manner to undermine the legislative poli-
> cies reflected in Chapter 71, Section 37.

In Medford, we concluded that work weeks, working hours, work load,



Copyright © 1977 by Massachusetts Labor Relations Reporter

Boston School Committee and Boston Teachers Union, Local 66, AFT, et. al.,
3 MLC 1603

seniority, and building evaluations for pay purposes were all conditions of employment over which the parties had to bargain.

The determination of what is a condition of employment, as opposed to a core educational policy matter, is not subject to hard rules. We must balance the competing interests. Is the predominant effect of a decision directly upon the employment relationship, with only limited or speculative impact on core educational policy? Or is the predominant effect upon the level or types of education in a school system, with only a side effect upon the employees? See Town of Danvers, supra, slip opinion p. 20, 21.

The residency rule adopted by the School Committee certainly has a direct and profound impact upon the employment relationship between the School Committee and the bargaining unit members. The rule must be adhered to in order for employees to retain their jobs, and therefore impinges directly on employment security.

Looking to the other side of the equation, the School Committee argues that the newly introduced residency rule involved an educational policy determination, and that the School Committee was therefore entitled to unilaterally impose this requirement without bargaining.[2] Of course, every decision of the School Committee is presumably made with the ultimate goal of providing quality education in the City of Boston. The Legislature in passing G.L. c.150E nevertheless commanded the School Committee to bargain collectively regarding conditions of employment. It must be concluded that a decision by the School Committee does not fall outside of the scope of bargaining merely because that decision is made with an eye toward the interest of the public in a sound educational system. Where a School Committee decision will impact directly on the employment relationship with bargaining unit members, that decision should be insulated from the bargaining process only if the decision goes directly to the issue of level or types of services to be provided in the school system.

Certain School Committee members expressed their view that implementation of this residency rule would have a beneficial effect upon the school system. The residency decision, however, did not involve the basic issue of how much education or what types of educational programs to provide. In view of the direct impact on employees, even assuming that the residency rule would be educationally beneficial, we conclude that the School Committee was obligated to bargain with these unions prior to the introduction of such a rule.

Finally, the Commission is cognizant of decisions from other jurisdictions where it has been decided that residency is a bargainable condition of employment

---

[2] The School Committee offers as its exhibit I an "Excerpt from School Committee meeting [minutes] of May 26, 1976 re: residency requirements." In this Excerpt, certain members of the Committee supported the residency rule and gave their reasons for supporting it. The unions object to the relevancy of this document. The employer answers that the minutes support its position that educational policy underlines the residency rule, and that these minutes are therefore relevant in determining whether the residency rule involves a condition of employment. The minutes are accepted into evidence for the limited purpose of their tendency to show that members of the School Committee considered that the introduction of a residency rule involved an educational policy decision.

Copyright © 1977 by Massachusetts Labor Relations Reporter

MASSACHUSETTS LABOR CASES                                    CITE AS 3 MLC 1608

Boston School Committee and Boston Teachers Union, Local 66, AFT, et. al.,
3 MLC 1603

within the meaning of those jurisdictions' public sector collective bargaining
laws. Detroit Police Officers Association v. City of Detroit, 391 Mich. 44,
214 N.W. 2d 803, 85 LRRM 2536 (1974); City of Brookfield v. Wisconsin Employ-
ment Relations Commission, 87 LRRM 2099 (Wisc. Cir. Ct., Waukesha County, 1974);
Madison Professional Police Officers Association et.al. v. City of Madison,
GERR 696:8, WERC Case XLVI, No. 20976, MP-681, Decision No. 15095 (1976).  See
also, City of Auburn, 9 PERB ¶ 3085, p. 3151 (1976).  While these cases are not
controlling, they provide further support to the Commission's conclusion that
residency is a condition of employment over which a public employer must bar-
gain in good faith, pursuant to Chapter 150E.

As the Commission has concluded that the School Committee unilaterally im-
posed its residency rule and thereby changed a pre-existing condition of em-
ployment, and altered terms and conditions of employment without prior negotia-
tion or agreement with the parties herein, we find that the action by the School
Committee constituted a refusal to bargain in good faith and was in violation
of Section 10(a)(5) of the Law.  We further conclude that the action of the Com-
mittee tended to interfere with, restrain and coerce employees in the exercise
of their right to bargain collectively, and was a further violation of Section
10(a)(1) of the Law.

Our decision here requires that the Boston School Committee bargain in
good faith if it considers introducing a residency rule as a condition of con-
tinued employment for its organized employees. This duty to bargain in good
faith does not compel either party to agree to any proposal or make any conces-
sion.  We express no opinion on the wisdom of a residency rule.

While not raised in these cases, we wish to express our views regarding the
duty to bargain over residency as a condition of hire or promotion. Although
we hold that residency as a condition of continued employment is a mandatory
subject of bargaining, we conclude that residency purely as a condition of hire
is not such a mandatory subject.  In so concluding, we note first that Section
5 of the Law gives the exclusive representative

> the right to act for and negotiate agreements
> covering all employees in the unit....(emphasis
> added).

Mere applicants for hire, who have had no prior employment within the bargain-
ing unit in question, are not "employees in the unit ...." The exclusive rep-
resentative therefore does not have the right under Section 5 to bargain on be-
half of such applicants.

The Michigan Court of Appeals has similarly concluded that residency as a
condition of hire is not a mandatory subject of bargaining, under Michigan's
Public Employment Relations Act (PERA): MCLA 423.201 et. seq., MSA 17.455(1)
et. seq.  Detroit Board of Education v. Detroit Federation of Teachers, 65 Mich.
App. 182, 237 N.W. 2d 238, 92 LRRM 2121 (1975).  See also Detroit Police Offi-
cers Association v. Detroit, 391 Mich. 44, 214 N.W. 2d 803, 85 LRRM 2536 (1974).
The New York Public Employment Relations Board reached the same result in City
of Buffalo, 9 PERB ¶ 3015, p. 3028 (1976).



Copyright © 1977 by Massachusetts Labor Relations Reporter

Boston School Committee and Boston Teachers Union, Local 66, AFT, et. al.,
3 MLC 1603

The U.S. Supreme Court's decision in Allied Chemical and Alkali Workers of America, Local 1 v. Pittsburg Plate Glass Co., 404 U.S. 157, 78 LRRM 2974 (1971) gives added support to our conclusion here. The Court held that a union has no right under the National Labor Relations Act to insist on bargaining over the benefits being paid to current retirees of a company since retirees are not employees within the meaning of the Act. The obligation of the employer to bargain collectively

> extends only to the "terms and conditions of employment"
> of the employer's "employees" in the "unit appropriate
> for such purposes" which the unit represents. (emphasis
> added) Allied Chemical Workers, supra, at 87 LRRM 2976.

We believe that the Supreme Court's analysis regarding retirees pertains as well to applicants for employment.

In a line of cases beginning with Houston Chapter, Associated General Contractors, 143 NLRB 409, 53 LRRM 1299 (1963), enf'd 349 F.2d 449, 59 LRRM 3013 (5th Cir. 1965), cert. den. 382 U.S. 1026, 61 LRRM 2244 (1966), the Board determined that terms of hiring (hiring halls) in the construction industry at least to some extent are mandatory subjects of bargaining. The Board noted that the construction industry is tansitory in nature, with employees moving regularly from job to job and employer to employer. Because of this, there is no job security through seniority with one employer. In enforcing the Board's order, the Court of Appeals noted that employees in the construction industry aim to establish job security and seniority through the negotiation of non-discriminatory hiring halls.

> It seems clear that this aim bears directly on regulating
> relations between the employers and employees in the industry
> involved, and it would settle a term or condition of employ-
> ment. This is a multi-employer situation where the essence
> of employee security would rest on job priority standards
> being established through a common source - the hiring hall.
> In these circumstances we hold that the demand for a non-dis-
> criminatory hiring hall clause...presented a mandatory sub-
> ject of bargaining. NLRB v. Associated General Contractors,
> 349 F.2d 449, 59 LRRM 3013, 3015 (5th Cir. 1965).

To the extent that a similar fact situation exists in the public sector in Massachusetts, certain terms of hire might be mandatory subjects of bargaining under the Law.

A single residency rule could constitute both a condition of hire and continued employment. See Detroit Police Officers Assn. v. City of Detroit, 391 Mich. 44, 214 N.W. 2d 803, 85 LRRM 2536 (1974). A rule requiring that only residents be hired, and that non-residents be terminated, would be such a rule. An employer could unilaterally institute that portion of the rule establishing a condition of hire. But the employer would be bound to negotiate with its employees' exclusive representative before introducing the portion of the rule establishing a condition of continued employment.



Copyright © 1977 by Massachusetts Labor Relations Reporter

Boston School Committee and Boston Teachers Union, Local 66, AFT, et. al.,
3 MLC 1603

Turning to residency as a condition of promotion from one job to another
within the same bargaining unit, we conclude that this is a mandatory subject
of bargaining. See Town of Danvers, supra, slip opinion p. 27, and cases cited
therein. Certainly standards of promotion are a "condition of employment" with-
in the common meaning of that phrase. The promotional opportunities available
to workers are of utmost importance in that the possibilities of increased pay,
benefits and job satisfaction are at issue.

In Detroit Police Officers Assn. v. City of Detroit, 61 Mich. App. 487,
233 N.W. 2d 49, 90 LRRM 2912 (1975), the Michigan Court of Appeals concluded
that the setting of standards of promotion is not a managerial prerogative
under the test established in Fibreboard Paper Products Corp. v. NLRB, 379 U.S.
203, 57 LRRM 2609 (1964).

> The decision concerning the factors to consider in granting
> promotions and the weight to be given each factor is not fun-
> damental to the basic direction of a police department. Man-
> agement prerogative is not threatened by allowing the DPOA
> some input on the subject of promotions. Fundamental police
> department policy is not undermined by a decision granting
> unit members the right to bargain about the conditions under
> which they will be allowed to rise in the ranks of the pro-
> fession of their choice. By the same token, a subject of
> such importance to unit members impinges very directly on
> their employment security, and therefore falls within the
> limits set by section 8(d) of the NLRA and section 15 of
> PERA. 90 LRRM at 2914,5.

The Michigan Court of Appeals held that standards of promotion within the bar-
gaining unit are a mandatory subject of bargaining. Accord, City of Albany,
7 PERB ¶ 3078, p. 3132, 3135 (1974).

The Second Circuit Court of Appeals reached a similar result in NLRB v.
Century Cement Co., 208 F.2d 84, 33 LRRM 2061 (2nd Cir. 1953). The Court
noted that promotion based on seniority is a "proper" subject of bargaining,
and held that the employer's failure to bargain in good faith on this subject
constituted a violation of Section 8(a)(5) of the Act. See also American Gil-
sonite Co., 121 NLRB 1514, 43 LRRM 1011 (1958), supplemented by 122 NLRB 1006,
43 LRRM 1242 (1959), where the Board held that unilateral institution of apti-
tude tests as a condition of transfer to certain bargaining unit assignments
constituted a violation of Section 8(a)(5) of the Act.

We further conclude that residency as a pre-condition of promotion to a
job in a different bargaining unit is a mandatory subject of bargaining, where
the promotional position constitutes a step in an established career ladder
or is a position which is typically filled from within the bargaining unit.
We have already expressed our view that residency as a condition of promotion
within the bargaining unit is a mandatory subject of bargaining. In so ruling,
we noted the importance of promotions to bargaining-unit members because of the
relationship between promotions and increased pay, benefits and prestige. Pro-
motional opportunities are not less important merely because the promotional



Copyright © 1977 by Massachusetts Labor Relations Reporter

MASSACHUSETTS LABOR CASES                           CITE AS  3 MLC  1611

Boston School Committee and Boston Teachers Union, Local 66, AFT, et. al.,
3 MLC 1603

position is within a different bargaining unit. The possibility of promotion
is still a most important condition of employment for those employees who
aspire to the promotional position. We believe that the bargaining unit which
represents the potential promotees has the right under the Law to bargain over
these promotional standards. Detroit Police Officers Assn. v. City of Detroit,
61 Mich. App. 487, 233 N.W.2d 49, 90 LRRM 2912 (1975).[3]

    If the promotional position is "managerial" or "confidential" within the
meaning of the Law, however, the employer is not bound to bargain regarding
the standards of promotion. An employer need not consider the views of a union
in determining what criteria to consider in selecting individuals to fill such
positions. Any other rule would unduly hinder the employer in the conduct of
its labor relations affairs. The employer must be able to select individuals
who the employer views as loyal to it, unfettered by the views of the employees'
collective bargaining agents.

    Finally, it is our view that residency as a condition of promotion to a
position currently unrepresented, but subject to the collective bargaining
process under the Law, is a mandatory subject of bargaining. We again limit
our views here to cases where the promotional position constitutes a step in
a typical career ladder. The fact that employees in the promotional position
are currently unrepresented should not preclude the bargaining representative
of potential promotees from bargaining over the standards of promotion. The
possibility of promotion is equally important to the aspiring promotees,
whether or not the employees in the promotional position are organized. Un-
like the case of promotion to a managerial or confidential position, here
there is no undue infringement upon the employer's choice of persons to assist
it in its policy-making and labor relations function.

                                ORDER

    WHEREFORE, based upon the foregoing, it is hereby ORDERED that the Boston
School Committee shall:

    1. Cease and desist from:

        a. Unilaterally implementing a rule requiring residency as a con-
           dition of continued employment with the Boston Teachers Union,
           Local 66, American Federation of Teachers, AFL-CIO; the Boston
           Association of School Administrators and Supervisors; and Bos-
           ton Public School Buildings Custodians Association.

        b. In any like or related manner, refusing to bargain in good faith
           with the exclusive representatives of its employees.

        c. In any like or related manner interfering with, restraining or
           coercing employees in the exercise of rights guaranteed by the
           Law.

---

[3] It is possible that the "promotional standards" clause negotiated by one
bargaining unit could unduly interfere with the promotional opportunities avail-
able to employees of a second bargaining unit, where employees in each bargain-
ing unit aspire to common promotional positions. We do not reach that issue her.

Copyright © 1977 by Massachusetts Labor Relations Reporter

MASSACHUSETTS LABOR CASES                                CITE AS 3 MLC  1612

Boston School Committee and Boston Teachers Union, Local 66, AFT, et. al.,
                        3 MLC 1603

2.  Take the following affirmative action which will effectuate the
    policies of the Law:

    a.  Rescind the residency rule adopted by the Boston School Com-
        mittee on May 12, 1976 and revised on May 26, 1976.

    b.  Upon request, bargain in good faith with the representatives of
        BTU, BASAS and the Custodians Association before introducing a
        residency condition of employment for employees of the Boston
        School Committee represented by these bargaining agents.

    c.  Post in conspicuous places where employees represented by BTU,
        BASAS and the Custodians Association usually congregate, or
        where notices are usually posted, and for a period of thirty
        (30) days thereafter, copies of the attached Notice to Employees.

    d.  Notify the Commission, in writing, within ten (10) days of the
        service of this Decision and Order of the steps taken to comply
        therewith.

                            SO ORDERED

          NOTICE TO EMPLOYEES OF THE BOSTON SCHOOL COMMITTEE
     POSTED BY ORDER OF THE MASSACHUSETTS LABOR RELATIONS COMMISSION

     The Massachusetts Labor Relations Commission, in a Decision dated April
15, 1977, found that the Boston School Committee committed a prohibited practice
in violation of Section 10(a)(5) and (1) of the General Laws, Chapter 150E.

     Chapter 150E of the General Laws gives public employees the following
rights:

            To engage in self-organization

            To form, join or assist any union.

            To bargain collectively through representatives of their
            own choosing.

            To act together for the purpose of collective bargaining or
            other mutual aid or protection.

            To refrain from all of the above.

     WE WILL NOT do anything that interferes, restrains or coerces employees
in their exercise of these rights.  More specifically,

     WE WILL rescind the residency rule adopted by the Boston School Committee
on May 12, 1976 and revised on May 26, 1976.

     WE WILL upon request bargain in good faith with the representatives of
the Boston Teachers Union, the Boston Association of School Administrators
and Supervisors, and the Boston Public School Buildings Custodians Association
before introducing a residency condition of employment for employees of the
Boston School Committee represented by these bargaining agents.

Copyright © 1977 by Massachusetts Labor Relations Reporter

EXHIBIT B

MASSACHUSETTS LABOR CASES                                    CITE AS 4  MLC 1972

BOARD OF TRUSTEES OF LOWELL UNIVERSITY AND MASSACHUSETTS SOCIETY OF PROFESSO
SUP-2083 (5/24/78)

        (50 Duty to Bargain)
        54.520 residency requirement
        (60 Prohibited Practices by Employer)
            67.    refusal to bargain
            67.15  union waiver of bargaining rights

Commissioners participating:  James S. Cooper, Chairman; Garry J. Wooters,
                               Commissioner

Appearances:

    Mark Grossman, Esq.              - Counsel for the Board of Trustees
    Barry S. CAmson, Esq.             Lowell University

    Brian A. Riley, Esq.            - Counsel for the Massachusetts
                                      Society of Professors

                              DECISION

        On November 19, 1976, the Massachusetts Society of Professors (Society)
filed a Complaint of Prohibited Practice with the Labor Relations Commission
(Commission) alleging that the Board of Trustees for the University of Lowel
(Board of Trustees or Board) had engaged in prohibited practices within the
meaning of Sections 10(a)(1), (2), and (3) of Chapter 150E of the General La
(the Law).

        Pursuant to its authority under Section 11 of the Law, the Commission
conducted an investigation of the charge and issued its own complaint on
March 15, 1977 alleging violations by the Board of Sections 10(a)(5) and (1)
of the Law. Prior to the date set for hearing the aprties submitted a parti
agreed statement of facts, a statement of facts in dispute and joint exhibit
A formal hearing on the facts in dispute was held on December 15, 1977, at t
offices of the Commission before Jean Strauten Driscoll, an agent of the
Commission. Full and fair opportunity to be heard, to examine and cross-
examine witnesses and to introduce evidence was afforded to all parties. Ti
post-hearing briefs submitted by both parties have been considered.

                          Findings of Fact

    1.   The University of Lowell (University) is a public institution crea
         by the Massachusetts General Court pursuant to G.L.c.75A.

    2.   The University is governed by a Board of Trustees established
         pursuant to G.L.c. 75A, Section 1.

    3.   The Board of Trustees is a public employer within the meaning of
         Section 1 of the Law.

    4.   The Massachusetts Society of Professors is an employee organizatio
         within the meaning of Section 1 of the Law.


Copyright © 1978 by Massachusetts Labor Relations Reporter

Board of Trustees of Lowell University and Massachsuetts Society of Professors,
4 MLC 1972

5.   The Massachusetts Society of Professors is the exclusive representative
for the purpose of collective bargaining for certain employees of the
University of Lowell.

The parties agree on the following factual issues:

On October 9, 1973, the Lowell State College Faculty Federation, AFT,
Local 2174, AFL-CIO and the Board of Trustees of State Colleges of the Common-
wealth entered into a collective bargaining agreement covering faculty members
at Lowell State College (Lowell State). The expiration date of this agreement
was June 30, 1976, and it contained the following provision:

ARTICLE XVI
DURATION AND EXTENT

. . .

B.   Extent

The Board and the Federation acknowledge that during the negotiations
which result in this AGreement, each had the unlimited right and
opportunity to make demands and proposals with respect to any subject
matter not removed by law from the applicable area of collective
bargaining, and that the understandings and agreements arrived at
by the parties after the exercise of that right and opportunity are
set forth in this Agreement, and shall constitute the sole Agreement
between the parties for the duration thereof.

Therefore, the Board and the Federation for the life of this Agree-
ment each voluntarily and unqualifiedly waives the rights, and
agrees that the other shall not be obliged to bargain collectively
with respect to any subject matter not specifically referred to or
covered in this Agreement, even though such subject or matter may
not have been within the knowledge or contemplation of either or
both parties at the time they negotiated or signed this Agreement.

On February 27, 1975, the Massachusetts Society of Professors and the Board
of Trustees of Lowell Technological Institute (Lowell Tech) entered into a
collective bargaining agreement covering faculty members. This agreement was
also to expire on June 30, 1976.

Pursuant to G.L.c. 75A, as amended by St.1973, c.1175, Lowell State and
Lowell Tech were to merge prior to July 1, 1975 and become the University of
Lowell (University).

On April 28, 1976, the Society was certified as the collective bargaining
representative for University faculty members. Collective bargaining between
the Society and the Board began shortly thereafter and continued until the
parties executed a collective bargaining agreement on May 22, 1977 covering the
period July 1, 1976 to June 30, 1977.

Prior to September 1, 1976 no residency requirement had been imposed upon
any employee of the University of Lowell. For several months prior to that
date, a residency requirement had been under discussion by a personnel committee



Copyright © 1979 by Massachusetts Labor Relations Reporter

Board of Trustees of Lowell University and Massachusetts Society of Professors,
4 MLC 1972

of the Board of Trustees. Personnel Committee meetings, as well as meetings of
the Board of Trustees, were attended by a faculty member who was also a member
of the Society but who was not acting as the representative of the Society.
However, the Society was aware that a residency requirement was being considered

On September 1, 1976, the Board of Trustees held a special meeting where
the proposed residency requirement was discussed. The Society was given notice
of this meeting both in writing by mail and orally from University President
John Duff to Society President Oliver J. Ford.

During the meeting, Society President Ford was given an opportunity to
speak and express his views and those of the Society on the residency requiremen
He asked that no action be taken by the Board without first bargaining with the
Society, but was informed by the Board that they did not believe that they had
an obligation to bargain with the Society about the residency requirement.

Objectives of the residency requirement were outlined during the discussion
They were: to encourage University employees to live near the City of Lowell
where they would be able to participate in University programs even at odd hours
and have a full relationship with the University; to encourage University
employees to live in and near the City of Lowell; to establish and maintain
stronger community ties; and to encourage Lowell University employees to take
an interest in Massachusetts legislative procedures and in particular to take
an interest in how Massachusetts deals with education programs and policies
and their financing both on a state and local level and specifically in regard
to Lowell University.

The Board of Trustees then adopted the following resolution:

1.  That henceforth, from the effective date of this resolution, any
    person hired by the University as a member of its professional or non-
    professional staff shall be domiciled in the Commonwealth on or
    before the date on which such person's employment by the University
    is to commence, and thereafter shall continue to be domiciled in
    the Commonwealth during the term of such employment.

2.  That, should this requirement produce undue hardship, those affected
    may appeal to the president of the University, and, ultimately, to
    the Personnel Committee of the Board of Trustees.

On September 3, 1976, Society President Ford wrote a ltter to the Chairman
of the Board of Trustees with copies to the University President and labor
negotiator. The letter said in part:

On behalf of the Massachusetts Society of Professors, I wish to object
to the action of the Board of Trustees in adopting a residency requirement
for University of Lowell faculty on September 1, 1976. We firmly assert
that a residency requirement is a mandatory subject for bargaining under
Chapter 150E, as it is under the National Labor Relations Act. Implementa-
tion of the policy without subjecting it to the collective bargaining

 Copyright © 1978 by Massachusetts Labor Relations Reporter

Board of Trustees of Lowell University and Massachusetts Society of Professors,
4 MLC 1972

process now in progress at the University of Lowell may well constitute
an unfair labor practice.

Therefore, we request the Board of Trustees to rescind and not implement
this policy until the Board and the Society have bargained over this
issue, in accordance with Massachusetts law.

Ford received no specific response from the Board to this letter.

On several occasions, the Society was informed that the Board believed it
was under no obligation to bargain on the residency requirement because it was
the prerogative of management, would not affect current employees, and was not
a mandatory subject of bargaining.

On September 15, 1976, the Board of Trustees held a regular meeting to
consider faculty appointments. At this time the Board voted to approve the
recommendation of its personnel committee to appoint five individuals to the
faculty of the University. The Board voted to make the apointment of these
individuals subject to the residency requirement voted by the Board of Trustees
on September 1, 1976. The appointment of the faculty members was to be
effective August 29, 1976 and the employees received compensation as of this
August 29th date. One of the individuals so hired requested a waiver from the
residency requirement which was granted by University President Duff since the
individual's spouse was required to live in a New Hampshire community in which
she taught. An additional situation where a request for a waiver was made
was also granted by University President Duff. No disciplinary action has
been taken against any employee for violation of the residency requirement.

The area of factual dispute between the parties involves the existence and
continuing effect of the collective bargaining agreements between the
representatives of the Lowell State and Lowell Tech faculty and the respective
Boards of Trustees.

University President Duff testified to several factors which support the
University's position that the Lowell State and Lowell Tech contracts survived
the merger of the institutions into the University and were in effect until
the Society and the University signed a successor contract on May 22, 1977.

After Duff became University President on April 1, 1976, he had discussions
with several persons about the continuing existence of the Lowell State and
Lowell Tech contracts, and he took the position that he was bound by their
provisions. In a number of respects procedures under the Lowell State and
Lowell Tech contracts were continued after the merger. For example, the Lowell
State contract required the college president to sit in on all promotional
hearings. Duff complied with this provision when former Lowell State faculty
were being considered for promotion at the University. Different promotional
and tenure procedures for University faculty were employed depending upon
whether the faculty member had previously been employed by Lowell State or
Lowell Tech. These dual procedures caused Duff some difficulties and he spoke
with Society President Ford about the issue to see if some change could be made.
Ford could not work out a viable solution at that time and the two-track
system continued.



Copyright © 1978 by Massachusetts Labor Relations Reporter

Board of Trustees of Lowell University and Massachusetts Society of Professor
4 MLC 1972

Other contractual procedures continued after the Lowell State/Lowell Tec
merger included the methods for election of department chairmen, grievance
procedures, tuition remission for children of prior Lowell Tech faculty and
department chairmen recall procedures for prior Lowell State faculty.

The Society was participating in each of these procedures and was taking
position that the Lowell Tech and Lowell State contracts had been extended
although the parties never signed any extension agreement.

However, starting in the spring of 1976, when the Society and the Board
were in negotiations the Board's negotiator took the position that the Lowell
State and Lowell Tech contracts had expired.  On one occasion President Duff
overheard the negotiator make a statement to that effect and told the negotia
that the Board had to live under the contract.  The negotiator told Duff that
statements that the contract were expired were being used as a bargaining
tool, and the negotiator continued to make such statements until the new cont
between the Society and the Board was executed in May of 1977.

<center>Opinion</center>

In Boston School Committee, 3 MLC 1603, 1608 (1977), we held that reside
as a condition of continued employment is a mandatory subject of bargaining.

The residency requirement adopted for University employees by the Board
requires new employees to become Massachusetts residents and to retain Massa-
chusetts residency while they are employed at the University.  Insofar as the
residency requirement imposes a condition of hire, it is not a mandatory
subject of bargaining.  "Mere applicants for hire...are not 'employees in the
unit'."  Boston School Committee, supra at 1608.

However, once employees are hired, and thus become members of the bar-
gaining unit, their representative has the right to bargain over a residency
requirement which is a condition of their continued employment.  It is not
controlling that the purpose of the residency requirement is to insure optimu
on-the-job performance or the effectiveness and efficiency of personnel in
fulfilling the employer's policies.

...a decision by the [Employer] does not fall outside of the scope of
bargaining merely because that decision is made with an eye toward the
interest of the public in a sound educational system.  Where [an employe
decision will impact directly on the employment relationship with bargai
unit members, only if the decision goes directly to the issue of level
or types of services to be provided... . Boston School Committee, supra
at 1607.

We disagree with the Board that residency requirements are "core entre-
penurial decisions" which should be removed from the bargaining process.  See
Fiberboard Paper Products Corp. v. NLRB, 379 U.S. 203, 57 LRRM 2609 (1964).
Nor do we find persuasive the argument that a state residency requirement
directly affects the level or types of services to be provided.  A residency
requirement has a direct impact upon the employment relationship.  See Town o

 Copyright © 1978 by Massachusetts Labor Relations Reporter

Board of Trustees of Lowell University and Massachusetts Society of Professors, 4 MLC 1972

Danvers, 3 MLC 1559, 1571 (1977); Fiberboard Paper Products Corp. v. NLRB, supra at U.S. 221-23.

We conclude, therefore, that a requirement of continued Massachusetts residency after hire is a mandatory subject of bargaining and that the Board violated the Law by refusing to bargain about its adoption unless it has a valid defense.

The Board asserts that a "zipper clause"[1] in the Lowell State contract constitutes a waiver of the Society's right to bargain about residency. To agree with the Board's argument, we would have to find that Lowell State contract survived the Lowell State/Lowell Tech merger, that it is binding upon the Society, which was not a party; that it survived its own June 30, 1976 expiration date; and that the "zipper clause" constitutes a "clear and unmistakeable waiver" of the right to bargain over residency. See City of Boston, 3 MLC 1450, 1465 (1977).

The Board's alternative reliance upon the management rights clauses in the Lowell State and Lowell Tech contracts must meet similar tests.

In its arguments about waiver, however, the Board has failed to address a crucial issue. Even assuming arguendo that the Lowell State "zipper clause" or the management rights clause in both contracts do meet all of the waiver requirements described above, the fact is that the Board and the Society were engaged in collective bargaining for a new agreement on the date at which the residency requirement was adopted. Society President Ford orally demanded bargaining on the subject prior to the Board's vote, and submitted a written demand shortly thereafter. Nevertheless, the Board refused to negotiate about the matter. Waiver of bargaining rights during the term of a contract does not constitute perpetual waiver for future contracts. Prior to its vote on the residency requirement on September 1, 1976, the Board knew that the Society sought to bargain about any residency requirement before it was adopted. It admits that Society President Ford requested to bargain. A refusal to bargain about a mandatory subject while the parties are in negotiation is an unfair labor practice. City of Boston, 3 MLC 1450, 1463 (1977); NLRB v. Katz, 369 U.S. 736, 50 LRRM 2177 (1962). "A refusal to negotiate in fact as to any subject which is (a mandatory subject of bargaining) and about which the union seeks to negotiate, violates (the Law)." Katz, supra LRRM at 2180. The Board has violated Sections 10(a)(1) and (5) of the Law by its refusal to bargain about the mandatory aspects of a residency requirement during contract negotiations.[2]

## Order

WHEREFORE, based upon the foregoing, it is hereby ORDERED that the Board of Trustees of the University of Lowell shall:

1.  Cease and desist from:

---

[1]See pp. 2 and 3, supra.

[2]Based upon this theory, therefore, we need not reach the issues of contract survival through merger, change of bargaining agents and expiration date.

Copyright © 1979 by Massachusetts Labor Relations Reporter

(a) Failing to and refusing to bargain collectively in good faith with the Society over a residency requirement as a condition of continued employment for bargaining unit members.

(b) Giving effect to that portion of the residency requirement which mandates continued Massachusetts residency for new employees until such time as an agreement or impasse is reached with the Society.

(c) In any like or related manner interfering, restraining or coercing employees in the exercise of their rights under the Law

2. Take the folloiwng affirmative action which will effectuate the policies of the Law:

(a) Upon request, immediately commence bargaining with the Society over the subject of a residency requirement as a condition of continued employment.

(b) Rescind that portion of the residence requirement adopted on September 1, 1976, which mandates that new employees in the bargaining unit represented by the Society continue to be Massachusetts residents during the term of their employment.

(c) Post immediately in conspicuous places in University buildings where faculty members usually congregate or where notices are usually posted, and maintain for a period of thirty (30) days thereafter, copies of the attached notice to employees.

(d) Notify the Commission, in writing within ten (10) days of service of this Decision, of the steps taken to comply with Order.

COMMONWEALTH OF MASSACHUSETTS
LABOR RELATIONS COMMISSION

James S. Cooper, Chairman
Garry J. Wooters, Commissioner

Copyright © 1978 by Massachusetts Labor Relations Reporter

ard of Trustees of Lowell University and Massachusetts Society of Professors,
MLC 1972

### NOTICE TO EMPLOYEES
#### POSTED BY ORDER OF THE MASSACHUSETTS LABOR RELATIONS COMMISSION
#### AN AGENCY OF THE COMMONWEALTH OF MASSACHUSETTS

WE WILL not refuse to bargain collectively in good faith with the
issachusetts Society of Professors concerning a residency requirement for new
iiversity faculty.

WE WILL not implement any further residency requirement for University
culty which includes a condition of continuing Massachusetts residency until
ch time as we reach agreement or impasse with the Massachusetts Society of
ofessors over a residency requirement.

WE WILL, upon request, immediately commence bargaining with the Massa-
usetts Society of Professors over a residency requirement as a condition
continued employment.

WE WILL rescind the residency requirement for new employees adopted on
ptember 1, 1976 as it requires continuing Massachusetts residency as a
ndition of employment.

BY

_____
Chairman, Board of Trustees



Copyright © 1978 by Massachusetts Labor Relations Reporter

EXHIBIT C

## MASSACHUSETTS LABOR CASES            CITE AS 21 MLC 1165

### BROCKTON SCHOOL COMMITTEE AND BROCKTON
### EDUCATION ASSOCIATION, MUP-9131 (8/8/94).

| | |
|---|---|
| 35.7 | supervisory and managerial employees |
| 54.5111 | layoff |
| 54.517 | seniority |
| 67.164 | pre-existing practice |
| 67.44 | failure to consider proposals |

Administrative Law Judge:

    Robert B. McCormack, Esq.

Appearances:

    Edward F. Lenox, Jr., Esq.        - Representing the Brockton School
                                            Committee

    Mark G. Kaplan, Esq.             - Representing the Brockton Education
                                            Association

#### ADMINISTRATIVE LAW JUDGE'S DECISION

##### Statement of the Case

    Very occasionally it has been my practice to adopt certain portions of the briefs of some parties who appear before me, both in my findings of fact and in my rulings, when they are in strict conformance with the evidence and my interpretation of the law, and are so particularly well expressed that I could do no better if I composed my own text. The petitioner's brief is an example of this, and I have set it out verbatim in most respects.

    On September 3, 1992, the Brockton Education Association (Association) filed a charge of prohibited practice against the Brockton School Committee (School Committee) asserting that the School Committee had refused to bargain with it in good faith during the negotiations over the terms of the successor collective bargaining agreement between the parties to take effect on and after September 1, 1992 by continuing to insist, over the objection of the Association, that certain exempt managerial employees of the School

Copyright © 1994 by New England Legal Publishers

committee continue to retain their former positions on the discipline seniority lists of the bargaining unit employees who are represented by the Association. (JX9). The discipline seniority lists are used to determine the order of layoff of teachers in the various subject areas in any reduction in force that is implemented by the School Committee pursuant to the provisions of Article XLI of the collective bargaining agreement between the School Committee and the Association. (JX1).

During the investigation stage of these proceedings, both parties submitted written statements and affidavits in support of their respective positions on the question of whether or not the Commission should issue a formal Complaint against the School Committee based upon the Association's charge. A copy of the affidavit of the Association's attorney was admitted into evidence in this proceeding as Charging Party's Exhibit 1 (CPX1) and a copy of the affidavit of the Superintendent of Schools was admitted into evidence as School Committee Exhibit 1. (SCX1).

On February 23, 1993, the Commission issued a Complaint of Prohibited Practice in this matter formally charging the School Committee with having engaged in a prohibited practice within the meaning of Section 10(a)(5) and (1) of Chapter 150E (the Law).

The original hearing date in this matter was scheduled for July 19, 1993. However, the hearing date was postponed by mutual agreement of the parties who were then involved in negotiations over the terms of the successor contract to the prior collective bargaining agreement which had expired on August 31, 1992.

On November 22, 1993, the School Committee and the Association entered into a Memorandum of Agreement which extended their prior contract for one year through August 31, 1992 and which established the terms of a new three year contract which was to be effective from September 1, 1993 through August 31, 1995. (JX2). Although that agreement did provide for the mutual withdrawal of all of the other proceedings that each of the parties had instituted against the other before the Commission, the Memorandum of Agreement was expressly stated to be without prejudice to the Association's right to continue to prosecute the instant proceedings. (JX2, par. 15B, p. 6).

The hearing in this mater was held before me on February 14, 1994. At that time, the parties submitted their evidence and arguments in support of their respective positions. Subsequent to the hearing, the parties entered into a factual stipulation pertaining to the

Copyright © 1994 by New England Legal Publishers

MASSACHUSETTS LABOR CASES                                    CITE AS 21 MLC 1167

Brockton School Committee and Brockton Education Association, 21 MLC 1165

1989 contract negotiations between the parties which was executed in behalf of both parties and filed with the Hearing Officer together with the Association's 1989 contract proposals which were submitted into evidence in this proceeding. (JX10).

### Findings of Fact

Based upon the testimony and the documentary evidence that was presented at the hearing, together with the various stipulations of the parties, the following facts are warranted.

The Association serves as the exclusive bargaining representative of both the teachers (Unit B) and the administrators (Unit A) in the Brockton Public Schools. At the present time, there are approximately 930 teachers and 130 administrators in the two bargaining units that are represented by the Association for a total of 1060 in all. In recent years, the total number of teachers and administrators in the Brockton Public Schools has ranged from as low as 930 to has high as 1120.

There is a single collective bargaining agreement between the School Committee and the Association which covers both the teaching and the administrative units. The most recent collective bargaining agreement between the parties prior to the institution of the instant proceedings was effective from September 1, 1989 through August 31, 1991. (JX1).

The negotiations for the successor to that contract began in February, 1992 and were not concluded until November 22, 1993. On that date, the parties entered into a memorandum of agreement which extended the contract which had expired on August 31, 1992 for one year and which established the various terms and conditions that were to be incorporated into the new collective bargaining agreement between the parties which was to be effective for the three year period from September 1, 1993 through August 31, 1996. (JX2).

Article XLI of the parties' collective bargaining agreement is entitled "Reduction In Force" and it establishes the layoff and recall procedures that are to be followed in both the teaching and the administrative bargaining units. (JX1, pp. 71-82). There were only minor changes made in the Reduction In Force clause in the most recent round of contract negotiations. (JX2, par. 13, pp. 4-5).

Copyright © 1994 by New England Legal Publishers

## MASSACHUSETTS LABOR CASES          CITE AS 21 MLC 1168

Brockton School Committee and Brockton Education Association, 21 MLC 1165

As the wide range in the total number of teachers and administrators in the Brockton Public Schools in recent years clearly indicates -- i.e. from 930 to 1120 -- the Reduction In Force clause is a rather frequently used and therefore very important part of the contractual agreement between the School Committee and the Association. Association President Joseph O'Sullivan gave testimony as to how the Reduction in Force clause works in Brockton.

In essence, it is based upon the seniority lists for the various subject areas or disciplines in both Units B (the teachers' unit) and A (the administrators' unit). Each teacher must select only a single discipline list on which his/her name will appear. They can select either the discipline list for the subject area that they are actually teaching in at the time of their selection or the discipline list for any other subject in which they had previously taught in the Brockton Public Schools. Their names appear on the discipline list that they select in the order of their "total number of years of continuous service in the Brockton School System." (JX 1, par. 4, a, p. 72). For example, a teacher with 10 years of service as an English teacher and 5 years of service as a Social Studies teacher who chooses Social Studies as his/her discipline would be credited with his/her full fifteen years of service in Brockton on the Social Studies Seniority list.

The School Committee determines the subject areas, or discipline, in which reductions in force are to be made. The necessary reductions or layoffs are then implemented from the bottom name up on the current seniority list for that particular discipline. Except for the statutory right of a tenured teacher to bump a non-tenured teacher pursuant to the applicable provisions of Chapter 71 of the Massachusetts General Laws, teachers who are reduced or laid off from the discipline category that they have selected to be listed in do not have the right to displace or bump less senior teachers in other subject areas or disciplines for which they may be certified or otherwise qualified.

In the case of the administrators in Unit A, their names appear on the seniority list for the particular administrative discipline in which they are actually employed. As in the case of the discipline lists for Unit B, their names appear on their particular administrative discipline lists in the order of their total number of years of continuous service in the Brockton Public Schools which includes their service in the teachers unit, Unit B. In the case of those administrative positions in which there is only one individual -- for example, the High School Principal -- there are no discipline lists as such since there is only one person who would be reduced if that particular position were to be abolished.

Copyright © 1994 by New England Legal Publishers

Brockton School Committee and Brockton Education Association, 21 MLC 1165

On the other hand, reductions in the multiple position administrative classifications take place in the order of the seniority of the persons on the discipline list for the affected administrative classification in the same way that reductions in force are implemented in the teachers unit. For example, an Assistant principal with 10 years of service in that position and 5 years of prior service as a teacher would be reduced from that administrative category before another Assistant Principal with only 5 years of service in that position but with 15 years of prior service as a teacher even though he or she had more experience as an Assistant Principal since his/her seniority -- i.e. his/her total number of years of continuous service in Brockton Public Schools -- would still be less than that of the second Assistant Principal in the foregoing example who had a much longer period of prior service as a teacher.

As in the case of a reduced teacher, a reduced administrator cannot bump into another less senior administrative category. However, all members of Unit A with prior teaching experience in Brockton do have the right to remain in one of the Unit B seniority lists and, in the event of their reduction from their administrative position, they can bump into their former teaching area provided that there is a teacher with fewer overall years of continuous service on the seniority list for that particular discipline.

Thus, as can be seen from the foregoing explanation, the discipline seniority lists are the critical element in determining which teachers and/or administrators are subject to being adversely affected in a reduction in force. And, under the particular system that has been bargained by and between the School Committee and the Association, favorable placement on a Unit B discipline list can provide a considerable degree of job security in very uncertain economic times for professionals in the field of public education in the Commonwealth.

The Recognition clause of the contract is found in Article I. The positions that are included in the administrative unit, Unit A, are expressly spelled out in Article I with "all other employees of the Brockton School Department" being excluded from the bargaining unit. (JX 1, p. 8). The teaching unit, Unit B, is then defined as consisting of "All professional employees of the Brockton School Department, but excluding the Superintendent, Assistant superintendent, Administrative Assistants and substitute teachers." (JX 1, p. 8).

The various Administrative Assistant positions were originally included in Unit A.

Copyright © 1994 by New England Legal Publishers

## MASSACHUSETTS LABOR CASES          CITE AS 21 MLC 1170

Brockton School Committee and Brockton Education Association, 21 MLC 1165

However, over the course of the last 17 years, the School Committee has followed an aggressive policy of seeking to exclude the Administrative Assistants from the Association's administrative unit on the grounds of their claimed managerial or confidential status. (See the Hearing Officer and Commission decisions in MUP-2715, JX 3, and MUP-5050, JX 4 and 5; also see the affidavit of Manthala George, the Superintendent of Schools in Brockton, SCX 1).

At the present time, there are three active Administrative Assistant positions which have been excluded from the administrative bargaining unit -- the Administrative Assistant for personnel (Anthony Luizzi), the Administrative Assistant for Administrative Services (Robert Jones) and the Administrative Assistant for Curriculum and Community Schools (Jane Malatesta). There are also two other administrative positions which the School Committee has sought to remove from Unit A in recent years because of their asserted managerial or confidential status which the Association has consented to based upon the relevant facts. They are the positions of Comptroller (Thomas Smith), the School Committee's Chief Financial Officer, and the two Special Projects Coordinators (Susan Dukess and Eligius Suzedelis).

With respect to the two Special Projects Coordinators, their exclusion from the Association's administrative bargaining unit came about as a result of a proposal by the School Committee in the 1989 negotiations (JX 8, p. 5, par.A under Appendix D) which the Association was able to successfully resist. However, the School Committee then filed a CAS petition with the Commission to exclude "the two positions of Coordinator of Special Projects on the basis that these are confidential and/or managerial positions." (JX 8). Subsequently, the Association agreed, in the spring of 1992, to withdraw its opposition to the School Committee's CAS petition based upon the representations of its attorney as to the scope of their duties and responsibilities. (JX 7). As a result, those two positions were also excluded from Unit A, the administrative bargaining unit in the Brockton Public Schools.

The seniority lists for each discipline were originally prepared in the spring of 1982 after the Reduction In Force clause was first incorporated into the contract between the parties as Article XLI. (See SCX 1, par. 4 and 5, p.2). At that time, only the Superintendent, the Assistant Superintendent and the Administrative Assistant for personnel were specifically excluded from Unit B as managerial employees by the Recognition clause

Copyright © 1994 by New England Legal Publishers

Brockton School Committee and Brockton Education Association, 21 MLC 1165

of the contract.[1]  All of the other Administrative Assistants were still included in the Association's administrative unit at that time. (See JX 4, pp. 2-3).

The Superintendent of Schools in 1982 was Thomas Whalen and the Assistant Superintendent at that time was Joseph Plouffe.  There had never been any question about the exempt status of those two positions and neither of the incumbents in those positions in 1982 had ever been covered by any of the collective bargaining agreements between the School Committee and the Association.  Thus, when the first discipline seniority lists were prepared in 1982, their names were not included on them.

However, the names of all of the Administrative Assistants at that time, including that of the Administrative Assistant for Personnel who had then only recently been found to be an exempt employee, were included on the discipline seniority lists that were prepared in 1982 in the same manner as all other members of the administrative unit (Unit A).  Since all of the Administrative Assistants at that time had previously been members of the teaching unit, Unit B, at some point prior to their appointment of their respective Administrative Assistant positions, their names were included on the Unit B discipline lists that they had originally designated in 1982 and they continued to remain on those lists even after the appointment of the former Administrative Assistant for Personnel (Mr. George) to the position of Superintendent and the appointment of the former Administrative Assistant for Curriculum and Community Schools (Dr. Kulick) to the position of Assistant Superintendent. (SCX 1, par. 6a-f, pp. 3-4).[2]

Over the course of the next several years, all of the Administrative Assistant positions were eventually excluded from the Association's bargaining unit as the incumbents in those positions were assigned sufficient additional responsibilities to bring them all

---

[1]
    The exclusion of the Administrative Assistant for Personnel came about only as a result of the decision of the Hearing Officer in MUP-2715 which was issued on February 19, 1981).

[2]
    The discipline seniority lists for the last three years showing the names of the exempt managerial employees on their respective Unit B discipline seniority lists were submitted into evidence at the hearing as CPX 2, 3, and 4 and as SCX 2.

Copyright © 1994 by New England Legal Publishers

Brockton School Committee and Brockton Education Association, 21 MLC 1165

within the scope of the statutory exemption for managerial and/or confidential employees. These exclusions came about as the result of either Commission determination (JX 4 and 5) or the agreement of the parties. (SCX 1, pp. 3-4). However, the names of the one incumbent who had remained in the Administrative Assistant classification since 1982 (Mr. Jones) and the two successors to the 1982 incumbents in the two other still-existing Administrative Assistant positions who were both appointed to their respective Administrative Assistant positions from other administrative positions in Unit A (Mr. Luizzi and Ms. Malatesta) continued to appear on the particular Unit B discipline lists that they had originally chosen to be placed on. (SCX 2, pp. 3-4).

Similarly, the School Department's Comptroller, who had also previously been a teacher in Brockton (Mr. Smith), and the two Special Projects Coordinators (Ms. Dukess and Mr. Suzedelis), who had both served in other teaching and administrative bargaining unit positions prior to their being appointed to the Coordinator's position which was only determined to be a managerial position in 1992 by agreement of the parties (See SCX 1, par. 8, p.5), continued to maintain their position on their respective teaching discipline seniority lists even after their current status was determined to be managerial and/or confidential and, therefore, beyond the scope of the collective bargaining agreement. (SCX 1, par. 6f and 8, pp. 4-5).

The significance of the names of these managerial employees -- currently, the Superintendent of Schools, the three Administrative Assistants, the two Special Projects Coordinators and the Comptroller -- remaining on their respective Unit B discipline seniority lists is that, if their positions were to be reorganized out of existence or otherwise abolished, they would then retain the right under par.4,d of the contractual Reduction In Force clause to displace the least senior teacher on their respective lists. Thus, the full brunt of any administrative reorganization in the upper echelons of the Brockton School Department's hierarchy would be borne, not by the incumbents in those positions who chose to leave their bargaining unit positions at earlier states in their professional careers, but rather by teachers in the teaching unit in the Brockton Public Schools, Unit B.

At this point, every one of the exempt managerial positions in the Brockton Public Schools is occupied by a former member of Unit B who continues to enjoy the fundamental job security of having the right to bump back into a teaching position -- at the expense of the lowest seniority teacher in their respective discipline areas who would then be subject to being laid off -- in the event that his or her upper level managerial position were to be

Copyright © 1994 by New England Legal Publishers

MASSACHUSETTS LABOR CASES                    CITE AS 21 MLC 1173

Brockton School Committee and Brockton Education Association, 21 MLC 1165

reorganized out of existence or otherwise eliminated. They retain that job security at the expense of full-fledged members of the bargaining unit, notwithstanding the fact that there is absolutely no reference in the collective bargaining agreement either as to how these exempt managerial positions can or are to be reduced or as to their having any such bumping rights back into the teaching ranks after having opted to leave the bargaining unit. (JXI and 2).

As can be inferred from the extensive record that was developed in MUP-2715 before the issuance of the Hearing Officer's 64 page decision in which the Association's opposition to the School Committee's attempt to exclude the six then-existing Administrative Assistants and the High School Principal was upheld in all instances except for the Administrative Assistant for Personnel (JX 3), there was obviously a certain shared element of collegiality between those employed in the highest level administrative positions in Unit A and the membership of the Association as a whole, nearly 90% of which is in the teaching unit, Unit B. As a result, the Association, despite having the contractual right to do so if it wished, never registered any opposition to the continued appearance of their names on their respective discipline seniority lists even after their current positions were either determined to be exempt from the collective bargaining process because of their managerial status or after they were appointed to positions which had always been understood to be exempt -- namely, the positions of Superintendent and Assistant Superintendent of the Brockton Public Schools.

However, in more recent years that spirit of collegiality began to diminish as a result of the increasingly confrontational relationship that developed between the Association and the School Committee. This deterioration in the relationship between the parties was the direct result of the well-documented financial plight of the Brockton Public Schools which led to more continuous bargaining for new contracts,[3] a devastating layoff of nearly 20% of the professional staff in fiscal year 1992 and ultimately, in November 1993, a six day work stoppage[4] by the teachers in Brockton before agreement could be reached on the terms of a new contract. (JX 2).

---

[3]
  See for example Brockton School Committee, MUP-7457,17 MLC 1207, 19 MLC 1220.
  [4] (See page 1174)

Copyright © 1994 by New England Legal Publishers

Brockton School Committee and Brockton Education Association, 21 MLC 1165

Beside increasing the inevitable tension between the members of the Association and the managerial employees who had the responsibility of implementing the School Committee's seemingly harsh policies toward its professional staff, the deterioration in the relationship also began to be reflected in growing concern over the financial commitment that the membership of the Association was required to make in order to protect, wherever possible, what it perceived to be its members' statutory, contractual or other rights and interests. This only served to heighten the frustration of the Association's members who saw the Superintendent and his managerial colleagues, who hold some of the highest paid positions in the school system, as continuing to receive the benefit of the fundamental job security that their continued placement on their respective discipline seniority lists provided without contributing in any way to the increased expenses that the Association was incurring as it struggled to protect its members during some very difficult times while their fellow teachers were experiencing both layoffs in record numbers and stagnant levels of compensation.

As a result of all of these objective and subjective considerations, the Association, when it developed its contract proposals for the negotiations for the successor contract to take effect on September 1, 1992, decided to include, for the first time, a proposal that the names of the exempt managerial employees, who were no longer members of either Unit A or Unit B, be stricken from the discipline lists that determine the order of layoff in a reduction in force. The exact wording of the Association's proposal was, as follows:

> No names shall appear on any of the discipline lists other than the names of current members of either Unit A or Unit B. Upon acceptance of an exempt central administrative position, a teacher's name will be stricken from his discipline list(s) and he will no longer retain any seniority rights under this Article or under the contract.

(CPX 5, par. II, H, p.4).

---

4 (from page 1173)

See Brockton School Committee v. Brockton Education Association et al., SI-247. I have taken administrative notice of this case and the case cited in the footnote immediately above.

Copyright © 1994 by New England Legal Publishers

Brockton School Committee and Brockton Education Association, 21 MLC 1165

This proposal was presented to the School Committee by the Association at the first negotiating meeting for the new contract which was held in February, 1992 and at least 5 subsequent negotiation sessions that were held throughout the spring and summer of that year. The School Committee adamantly opposed the Association's aforesaid proposal and consistently took the position that the names of the exempt central office administrators should continue to remain on the discipline seniority lists in the future as they had in the past.

There being no change in the School Committee's position prior to the expiration of the predecessor contract on August 31, 1992, the Association, immediately thereafter, filed the prohibited practice charge that has given rise to this proceeding. (JX 9). As previously indicated in the Statement of the Case, the issue was not resolved during the nearly 15 months of very difficult and intense contract negotiations that followed and, in fact, the Association's right to prosecute this matter to a conclusion was expressly preserved by the specific language of the settlement agreement which ended those negotiations. (JX 2, par.15B, p.6).

## OPINION

The undisputed evidence in this case demonstrates that the five managerial positions of Superintendent, Assistant Superintendent, Comptroller, Administrative Assistant, and Coordinator of Special Projects have all been excluded from the administrative bargaining unit in the Brockton Public Schools either by contractual agreement, by Commission determination, or by agreement of the parties after the School Committee's filing of a CAS petition with the Commission. The substantive issue that is in dispute in this case concerns the legal propriety of the School Committee's insistence, over the objection of the Association, on retaining, during the term of the new collective bargaining agreement that was being negotiated to take effect on and after September 1, 1992, the names of the eight incumbents in those five exempt managerial positions on the negotiated discipline seniority lists for Unit B which determine the order of layoff of teachers in a reduction in force.

The evidence submitted reveals that, despite over 12 years of previous willingness to include former bargaining unit members who were promoted to exempt managerial positions in the school system up to and including the position of Superintendent on the Unit B discipline seniority lists, the Association, acting in response to the perceived inequity of this arrangement by its membership, proposed at the outset of the contract negotiations in

Copyright © 1994 by New England Legal Publishers

Brockton School Committee and Brockton Education Association, 21 MLC 1165

1992 that the names of all managerial employees by removed from the discipline seniority lists upon their promotion to an exempt position with the resulting loss of their previously acquired seniority protection under the collective bargaining agreement. The School Committee consistently and adamantly opposed the Association's proposal and instead insisted that the names of the exempt managerial employees, who were former bargaining unit members, remain on the discipline seniority lists in the future as they had in the past. Since the School Committee's position on this issue did not change by the expiration of the predecessor contract on August 31, 1992, the Association filed the prohibited practice charge which has given rise to this proceeding immediately after the expiration date of the predecessor contract.

In Allied Chemical Workers v. Pittsburgh Plate Glass Company, 404 U.S. 157, 78 LRRM 2974 (1971), the union attempted, over the objection of the employer, to negotiate improvements in the health insurance for which retirees who were formerly employed in the bargaining unit were eligible. However, the U.S. Supreme court held that the union's exclusive representational rights and responsibilities did not extend to former members of the bargaining unit who were no longer active employees of the Pittsburgh Plate Glass Company. The obligation to bargain, the Court held,

> extends only to the "terms and conditions of employment" of the employer's "employees" in the "unit appropriate for such purposes" which the union represents.

78 LRRM 2976.

This Commission has similarly construed Chapter 150E as limiting a public employee union's right to bargain to persons who are actually employed in the union's bargaining unit. In Boston School Committee, 3 MLC 1063 (1977), the Boston Teachers Union sought to bargain with the School Committee over the imposition of a residency requirement purely as a condition of hire. But, agreeing with the Supreme Court's rationale in Pittsburgh Plate Glass, supra, the Commission held as follows:

> Section 5 of the Law gives the exclusive representative the right to act for and negotiate agreements covering all employees in the unit....Mere applicants for hire, who have not had prior employment within the bargaining unit in question, are not

Copyright © 1994 by New England Legal Publishers

MASSACHUSETTS LABOR CASES          CITE AS 21 MLC 1177

Brockton School Committee and Brockton Education Association, 21 MLC 1165

"employees in the unit..."  The exclusive representative therefore does not have the right
under Section 5 to bargain on behalf of such applicants.

3 MLC 1068.

Under this line of reasoning, the Association would clearly be precluded from
attempting, for example, to negotiate the salary levels of its former members who are
promoted to managerial positions within the school system in order to insure that their
salaries in their new positions were sufficiently greater than the salaries of their former
bargaining unit positions so that a desired salary differential between the top bargaining unit
positions and the exempt central office managerial positions could be maintained.  The
School Committee should similarly be barred from attempting to preserve certain
contractual benefits under the collective bargaining agreement, such as seniority, which
those exempt managerial employees had previously accumulated while they were employed
in bargaining unit positions.

The Commission has previously addressed an analogous issue in its 1981 decision in
Chelmsford School Administrators Association, 8 MLC 1516 (1981).  In that case, there
were separate bargaining units for teachers and administrators which were represented by
unaffiliated bargaining agents.  Many, if not most of the members of the administrators unit
had been promoted to their administrative positions from teaching positions in the same
school system.  The Chelmsford School Administrators Association had sought to negotiate
a provision with the School Committee that would permit an administrator, who was laid off
from the administrators' bargaining unit in a reduction in force and who fell back into a
teaching position, to be credited with full seniority in the teachers' unit for his or her years
of administrative service in the school system which were served outside the bargaining
unit.  Applying the principle of both Pittsburgh Plate Glass, supra, and Boston School
Committee, 7 MLC 1849 (1981), the Commission held in the Chelmsford case that

The [Administrators] Association cannot insist upon bargaining over terms and
conditions of employment of administrators after they leave the unit and become
teachers.  Conversely, the [Teachers] Federation cannot insist upon bargaining over
terms and conditions of employment of teachers once they become members of the
administrative unit represented by the Association.

8 MLC 1517.

Copyright © 1994 by New England Legal Publishers

Brockton School Committee and Brockton Education Association, 21 MLC 1165

Since the Association cannot insist, over the objection of the School Committee, on negotiating contractual rights and benefits for persons who are no longer employed in either Unit A or Unit B, it necessarily follows that the School Committee should similarly be unable to impose upon the Association and its membership, over their objections, favorable job security contractual benefits for persons who are no longer employed in either Unit A or Unit B. In both instances, the violation lies in the attempt to include statutorily excluded employees within the scope of negotiated contractual benefits over the objection of the other party.

One of the School Committee's principal defenses in this proceeding is that it was merely attempting to preserve the status quo and that it was the Association which was seeking to bring about change by its proposal to remove the exempt managerial employees from the discipline seniority lists. However, reliance upon any such "past practice" defense is misplaced in this case.

For as the foregoing analysis of the applicable legal precedents establishes, the terms and conditions of employment of non-bargaining unit personnel do not fall within the scope of what constitute mandatory subjects of bargaining under either the federal or the state labor laws. Rather, they are merely permissive subjects of bargaining which, once having been agreed to, are clearly enforceable for the terms of the contract in which they may have been agreed to, but which must be expressly renewed in a successor agreement in order to remain enforceable thereafter. Cf. Columbus Printing Pressmen, 219 NLRB 268, 89 LRRM 1552, 1557 (1975), enf'd 543 F2d 1161, 93 LRRM 3005 (CA 5, 1976).

But since the Association's proposal was not intended to take effect until after the expiration date of the predecessor collective bargaining contract and since the Association did not seek to diminish the job security and protection provided by the continued inclusion of the exempt managerial employees' names on the discipline seniority lists during the term of the predecessor contract, the School Committee's past practice defense cannot be found to be a valid defense to the allegations of the Charge and Complaint in this case.

Similarly, the School Committee's reliance in its pre-issuance written statement upon the Hearing Officer's decision in City of Beverly and Beverly Police Superior Officer's Association, et al., 18 MLC 1293, is misplaced. The issue in that case was whether a union could properly attempt to protect the work jurisdiction of its members by negotiating a work preservation clause which would necessarily preclude members of another bargaining unit

Copyright © 1994 by New England Legal Publishers

Brockton School Committee and Brockton Education Association, 21 MLC 1165

from infringing upon the work jurisdiction of the members of the affected union. In other words, that case involved the attempt of a party of a collective bargaining agreement to limit an important bargaining unit benefit to members of the bargaining unit covered by that agreement whereas this case involves the attempt of the School Committee to extend an important bargaining unit benefit to non-members of either of the Association's bargaining units A or B.

Thus, rather than being supportive of the School Committee's position in this case, both the Hearing Officer's and the Commission's decision in the Beverly Police case, supra and 19 MLC 1724 (H.O., 1992) are, when viewed in the context of the diametrically opposed factual patterns in the two cases, actually more supportive of the position that is being advanced herein in behalf of the Association. For the issue is not whether the seniority rights of the exempt managerial administrators could be taken away during the term of the predecessor contract, a point which the Association is not contesting in this case, but rather whether the School Committee could properly insist, over the objection of the Association, that its managerial employees continue to enjoy those same seniority rights at the expense of the bargaining unit employees during the term of the successor contract which the parties were in the process of attempting to negotiate when the facts which gave rise to the issuance of the Complaint in this case occurred.

CONCLUSION

For the foregoing reasons, I rule that the School Committee violated §§10(a)(5) and (1) of the Law by its outright rejection of the Association's proposal II, H (CPX5, p.4) and by its continued insistence, over the objections of the Association, that the exempt managerial employees retain their favorable positions on the discipline seniority lists of the bargaining unit employees after the expiration date of the predecessor contract and during any term of the successor contract.

ORDER

Wherefore, on the basis of the foregoing, it is hereby ordered that the Brockton School Committee shall:

1.    Cease and desist from:

Copyright © 1994 by New England Legal Publishers

MASSACHUSETTS LABOR CASES          CITE AS 21 MLC 1181

Brockton School Committee and Brockton Education Association, 21 MLC 1165

NOTICE TO EMPLOYEES
POSTED BY ORDER OF
THE MASSACHUSETTS LABOR RELATIONS COMMISSION
AN AGENCY OF THE COMMONWEALTH OF MASSACHUSETTS

An Administrative Law Judge of the Labor Relations Commission found that the Brockton School Committee has violated §§10(a)(1) and (5) of M.G.L. c.150E by failing and refusing to bargain collectively in good faith with the Brockton Education Association by its rejection of the Association's proposal II, H (CPX5, p.4) and by its continued insistence, over the objection of the Association, that the exempt managerial employees of the Brockton Public Schools retain their favorable positions on the disciplinary seniority lists of the bargaining unit employees after the expiration date of the predecessor contract and during the term of the successor contract.

We will:

a) Remove the names of all eight current exempt central office managerial employees from the respective disciplinary seniority lists on which they presently appear and strike the names of all future exempt central office managerial employees from those lists immediately upon their promotion to such an exempt position.

b) If any member of the bargaining unit is or has been adversely affected by a reduction in force as a result of the continued inclusion of the exempt managerial employees' names on the disciplinary seniority lists at any time after September 1, 1992, then any such member of the bargaining unit will be restored to his or her bargaining unit position forthwith and will be made whole for any lost earnings or other financial or benefit losses incurred as a result thereof. Interest on any sums due shall be computed at the rate specified in M.G.L. c.213, §6(b), with quarterly computation of interest from the date of layoff.

BROCKTON SCHOOL COMMITTEE

By:_____

Copyright © 1994 by New England Legal Publishers

EXHIBIT D

CITY OF HAVERHILL AND HAVERHILL POLICE PATROLMEN'S ASSOCIATION, MUP-7194
(7/6/89).

    54.3        management rights
    54.51154    psychological testing
    54.512      hiring
    54.8        mandatory subjects
    67.15       union waiver of bargaining rights
    67.8        unilateral change by employer

Hearing Officer:  Judith Neumann, Esq.

Appearances:

    Ashod N. Amirian, Esq.          - Representing the City of Haverhill

    Gerard S. McAuliffe, Esq.       - Representing the Haverhill Police
                                      Patrolmen's Association

## HEARING OFFICER'S DECISION

### Statement of the Case

On November 14, 1988, the Haverhill Police Patrolmen's Association (Union)
filed a charge with the Labor Relations Commission (Commission) alleging that the
City of Haverhill (City) had unilaterally implemented a psychological testing
requirement for police officers in violation of Section 10(a)(5) of M.G.L. c.150E
(the Law). After an investigation, the Commission issued a Complaint of Prohibited
Practice on February 21, 1989, alleging that, in terminating three employees on or
about October 28, 1988, on the basis of previously-administered psychological test-
ing, without providing the Union with prior notice or an opportunity to bargain,
the City had unilaterally implemented psychological testing as a condition of
continued employment in violation of Sections 10(a)(5) and (1) of the Law.

On May 18, 1989, the date scheduled for the expedited hearing in this
matter, the City and the Union appeared before the undersigned hearing officer and
agreed to waive the evidentiary hearing in favor of the Stipulation of Facts that
appears below under "Facts."

The issue in this case is whether utilizing the results of a psychological
examination as a condition of continued employment is a mandatory subject of bar-
gaining, even if the test is administered as part of the formal hiring process,
and, if so, whether the City transgressed its bargaining obligations under the Law
by unilaterally imposing such a psychological examination as a condition of con-
tinued employment.



Copyright · 1989 by New England Legal Publishers

MASSACHUSETTS LABOR CASES          CITE AS    16 MLC 1078

City of Haverhill and Haverhill Police Patrolmen's Association, 16 MLC 1077

<u>Facts</u>

The parties stipulated to the following facts:

1. The City is a public employer within the meaning of Section 1 of the Law.

2. The Union is an employee organization within the meaning of Section 1 of the Law and is the exclusive bargaining representative for certain police patrolmen employed by the Respondent.

3. Stephen Iannalfo (Iannalfo), Paul Malone (Malone) and Michael Walukevich (Walukevich) are public employees within the meaning of Section 1 of the Law and at all times relevant herein were members of the bargaining unit referred to in paragraph 2, above.

4. Iannalfo was hired by the City as a patrolman effective September 27, 1987; Walukevich was hired by the City as a patrolman effective March 20, 1988; and Malone was hired by the City as a patrolman effective May 1, 1988.

5. Since at last 1984, the City has utilized the following procedure when hiring police patrolmen: (1) to obtain a Civil Service list; (2) to administer a physical examination to all selected candidates; (3) to interview all selected candidates; (4) to administer a Civil Service-approved psychological examination to all selected candidates; (5) to require all selected candidates to successfully complete training at the Police Academy.

6. Individuals who are attending the Police Academy are employees of the City and members of the bargaining unit referred to in paragraph 2, above.

7. The chief has routinely advised candidates for police employment, during the interview portion of the hiring process, that their employment is conditioned upon successful completion of the psychological examination.

8. The psychological examination portion of the hiring process consists of a five hour written examination by a City-selected psychologist (who has been approved as part of the Civil Service approval of the psychological test) and an interview of the candidates by the psychologist. If the psychologist concludes that a candidate has failed the examination, the candidate is interviewed by a psychiatrist who has been pre-approved as part of the plan and who must confirm the psychologist's recommendation. The results of the psychological examination take approximately three to six months to complete.



Copyright © 1989 by New England Legal Publishers

City of Haverhill and Haverhill Police Patrolmen's Association, 16 MLC 1077

9. Approximately 80% of the employees who have undergone the hiring process referred to in paragraph 5, above, have begun their employment by the City before the results of the psychological portion of the test have been completed.

10. Approximately 28 of the present 70 members of the bargaining unit have been hired pursuant to the hiring process referred to in paragraph 5, above. None of the present officers of the Union have taken the psychological examination.

11. Prior to the situation giving rise to the present case, no candidate for employment as a police patrolman has failed the psychological examination.

12. On April 30, 1988, Iannalfo, Walukevich, and Malone, along with approximately eight other candidates, were administered the written examination portion of the psychological examination.

13. On or about September 30, 1988, the City was notified by the psychologist who had administered the psychological examination that Iannalfo, Malone, and Walukevich had failed the examination.

14. On or about October 28, 1988, the City notified Iannalfo, Malone, and Walukevich that they were being discharged for having failed the psychological examination.

15. October 28, 1988 was Malone and Walukevich's last date of employment by the City. April 28, 1989 was Iannalfo's last date of employment by the City.

16. Prior to on or about October 1, 198, the Union had no notice or knowledge that psychological tests were being administered as a condition of hire or that the results of psychological testing would be used as a basis for terminating any bargaining unit member's employment.

## Opinion

It is well-settled that an employer may not alter terms and conditions of employment without providing the Union representing its employees with prior notice and an opportunity to bargain over the proposed changes.  School Committee of Newton v. Labor Relations Commission, 388 Mass. 557, 574 (1983).  To establish such a violation, the Union must show (1) that the City has changed an existing practice or instituted a new one;  (2) that the change affected employee wages, hours, or working conditions and thus implicated a mandatory subject of bargaining; and (3) the change was implemented without prior notice or an opportunity to bargain.  See Town of North Andover, 1 MLC 1103, 1106 (1974).



Copyright © 1989 by New England Legal Publishers

City of Haverhill and Haverhill Police Patrolmen's Association, 16 MLC 1077

Turning to the first of these elements, the parties have stipulated that the City's practice "since at least 1984" has been to utilize psychological tests in selecting candidates for its police force. The parties also stipulated that 80% of the employees who were hired subject to psychological testing began their employment before the test results were completed, as did the three employees whose terminations led to the instant charge. Finally, the parties' stipulation reflects that, although candidates were often hired before the psychological tests were concluded, such hirings were conditioned upon successful test results. The City's practice since at least 1984, then, was not only to impose psychological testing as part of the job application process, but frequently to condition new employees' continued employment upon successful test results. Thus, the City acted consistently with its established practice since 1984 in conditioning Iannalfo's, Walukevich's, and Malone's continued employment upon the results of their hiring-related psychological tests.

In my view, the City's bargaining obligation, if any, arose in 1984 or thereabouts, when it interposed the psychological examination component into the hiring process and began to condition some new officers' continued employment upon the results of that examination. I must therefore consider whether the Union has waived its right to bargain by failing to object to this practice in the intervening years. The parties have stipulated that, prior to the terminations giving rise to the instant case, the Union knew nothing of the City's practices regarding psychological testing. Although such ignorance of a moderately longstanding practice may be improbable, under the circumstances present here I will credit the parties' stipulation. The City acknowledges that the Union was never specifically apprised of the imposition of a psychological test as a condition of hire or as a condition of newly-hired employees' continued employment. None of the present union officers was subjected to a hiring process that included a psychological examination. Prior to October, 1988, all 28 of the applicants who took the examination "passed" it; consequently, the City had no occasion to terminate any conditionally-hired employee prior to October, 1988, and, by the same token, the Union had no occasion to learn that some employees had been hired conditionally.[1] Accordingly, I have no basis for finding that the Union acquiesced in the City's practice of hiring some police officers conditionally, subject to psychological test results, despite the fact that the practice had existed for some time. I will

---

[1] I find it somewhat difficult to believe that the Union was unaware of the psychological testing as part of the application process prior to October, 1988. However, even if the Union knew that the City was testing applicants, the Union would have had no obligation to protest that requirement, in view of the Commission's case law exempting conditions of hire from the scope of bargaining. See discussion *infra* at page 1082. Unless the Union expressly knew that some employees had been hired conditionally, the Union could plausibly have believed that all hired employees had "passed" the psychological test; therefore I cannot on this record impute to the Union knowledge that any employees' continued employment was conditioned upon successful test results prior to October, 1988.



Copyright = 1989 by New England Legal Publishers

Case 1:05-cv-10213-PBS    Document 17-5    Filed 03/18/2005    Page 6 of 10

MASSACHUSETTS LABOR CASES                    CITE AS  16 MLC 1081

City of Haverhill and Haverhill Police Patrolmen's Association, 16 MLC 1077

therefore proceed to determine whether the second element of a unilateral change
violation has been established here, i.e., whether the City had an obligation to
bargain with the Union before implementing a psychological test as a condition of
continued employment for newly-hired employees.

When determining whether a subject is mandatorily bargainable, the Commis-
sion balances the interest of the public employer in maintaining its managerial
prerogative and the interest of employees in bargaining over terms and conditions
of employment. Town of Danvers, 3 MLC 1559, 1577 (1977). The psychological exam-
ination at issue here, like a physical examination, is a method the City uses to
determine whether individuals are fit for duty as police officers. While the City
may have a nonbargainable managerial prerogative to decide that it will employ only
physically and psychologically healthy persons, the standards and methods by which
it will determine whether individuals are thus fit for employment have a direct and
profound effect on employees' job security and are therefore a quintessential con-
dition of employment, subject to collective bargaining. See Town of Dedham, 10 MLC
1252, 1258 (1983). See also, Boston School Committee, 3 MLC 1603, 1607 (1977).
Whether psychological fitness will be determined through an interview process, a
written or oral examination, or by other means, who should administer the test, and
other aspects of the psychological testing program may all affect whether an indi-
vidual "passes" or "fails." Indeed, the consequences of "passing" or "failing" the
psychological examination are themselves a bargainable aspect of the testing pro-
gram. In this sense, whether and how a psychological test will be administered
affects employees' working conditions, just as a change from an employee-designated
physician to an employer-designated physician may affect whether an employee is fit
to return to work or whether an employee is eligible for sick or injury leave. See
Town of Dedham, 10 MLC at 1258; City of Springfield, 12 MLC 1051, 1054 (1985). A
psychological test as a general condition of employment may also be analogized to
the imposition of drug and alcohol testing, which the National Labor Relations
Board (NLRB) has recently held to be "germane to the working environment" and (as
to current employees) a mandatory subject of bargaining. Johnson-Bateman Company,
295 NLRB No. 26 (Slip Op. June 15, 1989).[2]

---

[2]    In its Johnson-Bateman decision, the Board analogized drug and alcohol
testing to a polygraph testing requirement that the Board had previously held to be
a mandatory subject of bargaining in Medicenter, Mid-South Hospital, 221 NLRB 670,
90 LRRM 1576 (1975). The Commission has not had occasion to decide whether a gen-
eral polygraph testing requirement applied to police officers or other public
employees would be mandatorily bargainable. However, in a decision affirmed by the
Supreme Judicial Court, the Commission held that a public employer was not required
to negotiate with a union over using polygraph examinations in the investigation of
criminal activity by police officers. Town of Ayer, 9 MLC 1376 (1982), Aff'd sub
nom. Local 346, International Brotherhood of Police Officers v. Labor Relations
Commission, 391 Mass. 429 (1984). In those decisions, the Commission and the Court
took pains to limit their reasoning to situations involving allegations of criminal
activity by specific individuals, which, because of the overweening importance of
(continued)



Copyright :: 1989 by New England Legal Publishers

City of Haverhill and Haverhill Police Patrolmen's Association, 16 MLC 1077

Although the psychological tests at issue here were administered as part of the hiring process, I do not view the testing as a condition of hire, but rather as a condition of continued employment. I note that, in the context of residency requirements, the Commission has clearly held that conditions imposed upon applicants for a job, or "conditions of hire," are not subject to a bargaining obligation, because "[m]ere applicants for hire, who have had no prior employment within the bargaining unit in question, are not 'employees in the unit ...'" within the meaning of Section 5 of the Law, which defines the scope of bargaining. Boston School Committee, 3 MLC 1603, 1608 (1977). See also Town of Lee, 11 MLC 1274, 1276 n.5 (1984). Under similar reasoning, the NLRB, in a companion decision to the recent Johnson-Bateman decision, has exempted drug and alcohol tests administered to applicants for employment from the scope of bargaining. Star Tribune, 295 NLRB No. 63 (Slip Op. June 15, 1989). Under this rationale, a testing program used as a basis for refusing to hire an individual does not substantially affect any bargaining unit member and therefore implicates no bargaining obligation.

However, once the employer hires an applicant, even conditionally, and that person begins performing work for wages, the individual has become a bargaining unit member, thus dissipating the "mere applicant" rationale. See Lockheed Shipbuilding Co., 273 NLRB 1711, 118 LRRM 1254 (1984); Lockheed Shipbuilding Co., 278 NLRB 18, 121 LRRM 1211 (1986), cited and distinguished in Star Tribune, 295 NLRB No. 63 (slip op. at 8) (where individuals dispatched to the employer by a hiring hall automatically received four hours' pay, but were then subjected to an application process that included preliminary medical screening and were terminated if problems arose as a result of that screening, the employer was required to bargain before implementing the application-related medical screening). Once the employer has entered into an economic relationship with an employee, the conditions under which that relationship will continue are literally "conditions of continued employment" affecting bargaining unit members, even if only new employees are affected. In the present case, all of the affected individuals had been employed

---

2 (continued)
maintaining public confidence in the integrity of its police force, were deemed to be beyond the scope of the employment relationship. Ayer, 9 MLC at 1385; Local 346, 391 Mass. at 439-440. Both the Court and the Commission were influenced by the existence of a statute (G.L. c.140, Section 19B) specifically exempting polygraphs administered by law enforcement agencies in connection with criminal investigations from an otherwise general proscription on employment-related lie detector tests. The psychological test at issue in the present case is a means of determining general fitness for duty, not an effort to investigate the criminal culpability of individual suspects. Nor is there a specific legislative pronouncement enhancing the weight of the public interest, as existed in the Ayer case. Thus, notwithstanding the City's genuine and legitimate interest in securing a healthy police force, the effects of the psychological test on employee working conditions are not overwhelmed by any core governmental prerogative. Accordingly, Ayer does not supply controlling precedent in determining the bargainability of the psychological test the City has imposed here.



Copyright  1989 by New England Legal Publishers

City of Haverhill and Haverhill Police Patrolmen's Association, 16 MLC 1077

for at least five months at the time they were terminated; two of the three
individuals did not even begin the psychological testing until after they had been
hired by the City. Accordingly, the Union had a right to negotiate before a
psychological test was used to determine whether these employees would continue to
be employed after the tests were completed.

In sum, by imposing a psychological examination as a condition of continued
employment without providing the Union with prior notice or opportunity to bargain,
the City has failed to bargain in good faith with the Union, in violation of
Sections 10(a)(5) and, derivatively, 10(a)(1) of the Law. To remedy this
violation, I issue the standard order in cases of this nature: the City must
restore the status quo that existed prior to its unilateral change, by rescinding
the psychological examination as a condition of continued employment and by
reinstating those employees who have been terminated as a result of the City's
unilateral imposition of that requirement. Further, the City must offer the Union
a full opportunity to negotiate before implementing such a requirement in the
future. See generally, Newton School Committee, 5 MLC 1016, 1027 (1978), aff'd sub
nom, School Committee of Newton v. Labor Relations Commission, 388 Mass. 557
(1983).

### Order

WHEREFORE, pursuant to the foregoing, IT IS HEREBY ORDERED that the City of
Haverhill (City) shall:

1. Cease and desist from:

   a. Failing and refusing to bargain collectively in good faith with the
      Haverhill Police Patrolmen's Association (Union) over the decision
      to impose psychological testing as a condition of continued
      employment and the effects of that decision.

   b. Terminating Stephen Iannalfo (Iannalfo), Paul Malone (Malone), and
      Michael Walukevich (Walukevich) prior to the occurrence of the
      earliest of the following conditions:

      (1) an agreement with the Union on implementing psychological
      testing as a condition of continued employment and the effects of
      that decision;

      (2) a bona fide impasse in the bargaining;

      (3) the failure of the Union to commence bargaining within five
      (5) days of notice of the City's willingness to bargain and
      unconditional offer of reinstatement to Iannalfo, Malone, and
      Walukevich;



Copyright © 1989 by New England Legal Publishers

City of Haverhill and Haverhill Police Patrolmen's Association, 16 MLC 1077

(4)  the subsequent failure of the Union to bargain in good faith.

c.  In any like or similar manner, interfering with, restraining, or coercing any employees in the exercise of their rights guaranteed under G.L. c.150E.

2.  Take the following affirmative action which will effectuate the purposes of the Law:

a.  Post in conspicuous places where employees represented by the Union usually congregate, or where notices are usually posted, and display for a period of thirty (30) days thereafter, signed copies of the attached Notice to Employees.

b.  Offer Iannalfo, Malone, and Walukevich full reinstatement to their former positions without prejudice to their seniority or other rights and privileges, and make them whole for any loss of earnings suffered as a result of their unlawful terminations, together with interest on any sums owing at the rate specified in M.G.L. c.231, Section 6B, compounded quarterly from the date of terminations.

c.  Upon request of the Union, bargain collectively in good faith over the decision to implement psychological testing as a condition of continued employment and the effects of that decision.

d.  Notify the Commission in writing within ten (10) days of the service of this decision and order of the steps taken in compliance therewith.

SO ORDERED.

COMMONWEALTH OF MASSACHUSETTS
LABOR RELATIONS COMMISSION

JUDITH NEUMANN, ESQ.
HEARING OFFICER



Copyright © 1989 by New England Legal Publishers

MASSACHUSETTS LABOR CASES                    CITE AS   16 MLC 1085

City of Haverhill and Haverhill Police Patrolmen's Association, 16 MLC 1077

NOTICE TO EMPLOYEES
POSTED BY ORDER OF
THE MASSACHUSETTS LABOR RELATIONS COMMISSION
AN AGENCY OF THE COMMONWEALTH OF MASSACHUSETTS

After a hearing, a hearing officer of the Labor Relations Commission has
determined that the City of Haverhill (City) failed to bargain in good faith with
the Haverhill Police Patrolmen's Association (Union) in violation of Sections
10(a)(5) and (1) of G.L. c.150E (the Law) when it implemented psychological testing
as a condition of continued employment for police officers without first affording
the Union notice and an opportunity to bargain and when it terminated certain
police officers pursuant to such testing.

WE WILL NOT refuse to bargain in good faith with the Union over a decision
to impose psychological testing as a condition of continued employment and over the
effects of that decision.

WE WILL NOT terminate employees based on the results of psychological test-
ing without first discharging our duty to bargain with the Union over that issue.

WE WILL NOT in any similar manner interfere with, restrain, or coerce any
employees in the exercise of their rights guaranteed under the Law.

WE WILL offer officers Iannalfo, Malone, and Walukevich full reinstatement
to their former positions without prejudice to their seniority or other rights and
privileges, and make them whole for any loss of earnings they have suffered as a
result of their unlawful terminations.

                                                    Police Chief



Copyright   1989 by New England Legal Publishers