## PYLE, ROME, LICHTEN, EHRENBERG & LISS-RIORDAN, P.C.

Attorneys at Law
18 Tremont Street, Suite 500
Boston, MA 02108

----------

Telephone (617) 367-7200
Fax (617) 367-4820

Warren H. Pyle
David B. Rome
Harold L. Lichten*
Betsy Ehrenberg
Shannon Liss-Riordan**
Terence E. Coles
Katherine D. Shea

M. Amy Carlin
Nicole Horberg Decter**
Rebecca G. Pontikes
Alfred Gordon
Leah M. Barrault

*Also admitted in Maine
**Also admitted in New York

Tod A. Cochran
OF COUNSEL

August 4, 2005

The Honorable Patti B. Saris
United States District Court
 for the District of Massachusetts
One Courthouse Way
Boston, MA 02210

Re:    Jacob Bradley, et al. v. City of Lynn, et al.
       U.S. District Court, Civil Action No. 05-CV-10213-PBS

Dear Judge Saris:

At oral argument on the Commonwealth's motion to dismiss, your first question was whether or not the Commonwealth had already been found liable under Title VII of the Civil Rights Act in the original Beecher litigation. At that time, I informed you that the research we had located to date demonstrated that the United States had filed suit under Title VII in the Beecher litigation, and that the court seemed to have adjudicated all of the claims, constitutional and statutory, at the same time. Now, based upon more detailed and careful historical research, the plaintiffs hereby request permission to submit this brief letter demonstrating persuasively that the Commonwealth was in fact held liable under Title VII of the Civil Rights Act in the NAACP v. Beecher litigation and, therefore, the court could properly apply law of the case doctrine to the issue of the Commonwealth's status under Title VII.

The Beecher firefighter litigation was decided in NAACP v. Beecher, et al., U.S. v. City of Boston, et al., 371 F.Supp. 507, 515 (D. Mass. 1973) (Exhibit C). Prior to that, several interim court rulings demonstrate that the Commonwealth was a defendant in the Title VII litigation brought by the United States. In United States v. City of Boston, et al., 1973 WL 300 (D. Mass. 1973) (Exhibit A), the Commonwealth's Civil Service Commissioners and Director of Civil Services filed a motion to dismiss the plaintiff

74

PYLE, ROME, LICHTEN, EHRENBERG & LISS-RIORDAN, P.C.

The Honorable Patti B. Saris
August 4, 2005
Page 2

United States' Title VII lawsuit on the grounds that the complaint did not specify with sufficient particularity the alleged wrongs committed by the Commonwealth. In his ruling, Judge Freedman denied the Commonwealth's motion to dismiss. Id. That ruling came down in April of 1973.

The case was then set for trial and the trial was eventually held from September 11 to 17, 1973. See NAACP v. Beecher, et al., 371 F.Supp. 507, 515 (D. Mass. 1973). Shortly before trial, the United States filed a motion seeking to depose the expert hired by the Civil Service Commission to perform a validation study "apparently anticipating their burden" to validate the firefighter examination under the EEOC guidelines which may "have the force of law in cases brought under Title VII." See U.S. v. City of Boston, et al., NAACP v. Beecher, et al., 1973 WL 301 (D. Mass. 1973) (Exhibit B). See also NAACP v. Beecher, et al., 371 F.Supp. 507, 515 (D. Mass. 1973). The court granted this motion. Id. at 1973 WL 301. Thus, it is clear that the United States deposed Dr. Costa, the Commonwealth's expert, in preparation for its Title VII claim against the Commonwealth defendants. Id. at 510. As this court is aware, Judge Freedman ultimately ruled for the plaintiffs and repeatedly cited Title VII of the Civil Rights Act of 1964 as a basis for his ruling. 371 F.Supp. at 510-513. This is confirmed by the appeal wherein the First Circuit upheld the lower court's ruling over the defendants' argument that "the use of color conscious relief is prohibited by Title VII itself." Thus, the defendants acknowledged that the Title VII claim was central to the case. See NAACP, et al. v. Beecher, et al., Director and Commissioners of Civil Service, 504 F.2d 1017, 1027-28 (1st Cir. 1974) (Exhibit D). In short, a review of both Judge Freedman's ruling and the decision of the First Circuit on appeal demonstrates that the Title VII case was adjudicated as part of Judge Freedman's decision, remained in the case on appeal, and formed the basis for several arguments relating to whether or not Title VII authorized the type of race-conscious relief which was ultimately ordered by the court.

Based on the above, it is clear that the Commonwealth was held liable under Title VII in the case brought by the United States government and that the First Circuit affirmed that ruling. Therefore, the Commonwealth cannot now argue that it is not liable in this case under Title VII.

Finally, the court also inquired at oral argument as to how many circuits have ruled on the issue of whether a governmental entity who provides a broad-based entry level exam or hiring criteria, but who is not the employer, can be found liable under Title VII. In response, we indicated that two circuits, the Second and the Ninth, are clearly on record as establishing liability under Title VII and that no circuits have ruled to the contrary.

PYLE, ROME, LICHTEN, EHRENBERG & LISS-RIORDAN, P.C.

The Honorable Patti B. Saris
August 4, 2005
Page 3


Having conducted further research on this issue, we below report each of the courts that have ruled on this issue. Each has found Title VII liability. By our count, courts in at least five circuits have ruled for the plaintiffs on this issue, although some are district court opinions which have never been reversed. Baranek v. Kelly, 630 F.Supp. 1107, 1113 (D.Mass. 1986); Guardians Association v. Civil Service Commission, 375 F.Supp. 1089, 1091-92 (2d Cir. 1980); U.S. v. City of Yonkers, 592 F.Supp. 570, 590 (S.D.N.Y. 1994); Dumas v. Town of Mt. Vernon, 612 F.2d 974, 980 (5th Cir. 1980) (county personnel board liable as "employer" under Title VII) (overruled on other grounds by Larkin v. Pullman-Standard Div. Pullman, Inc., 854 F.2d 1549 (11th Cir. 1988), rev'd sub nom. Pullman-Standard, Inc. v. Swint, 493 U.S. 929 (1989)); Association of Mexican-American Educators v. State of California, 231 F.3d 572, 583 (9th Cir. 2000); Scott v. City of Topeka Police and Fire Civil Service Commission, 739 F.Supp. 1434, 1439 (D. Kan. 1990).

Sincerely,

Harold L. Lichten

HLL/cjn
Enclosures
cc:     James Lamanna, Esq.
        Ronald F. Kehoe, Esq.
        Nadine Cohen, Esq.
        Mark Selwyn, Esq.

74

Exhibit A



1973 WL 300                                                                                                                                        Page 1

1973 WL 300 (D.Mass.), 7 Fair Empl.Prac.Cas. (BNA) 305, 7 Empl. Prac. Dec. P 9160

(Cite as: 1973 WL 300 (D.Mass.))

United States District Court; D. Massachusetts.
**United States of America, Plaintiff**
v.
**City of Boston et al., Defendants.**
Civil Action No. 73-269-F

April 6, 1973

FREEDMAN, D. J.

*1 Defendants Civil Service Commissioners and defendant Director of Civil Service have brought this motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6) alleging the complaint fails to state a claim upon which relief can be granted. Defendants contend that said complaint is insufficient since there are no "facts" pleaded within the meaning of Federal Rules of Civil Procedure 8(a), and consequently they are unable to frame responsive pleadings or discovery procedures.

After due consideration of oral arguments heard on April 2, 1973 and study of memoranda of law submitted by the parties, the Court orders that defendants' motion to dismiss be, and is denied.

It is well established that the Rules contemplate no more than "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, [33 LC P 71,077] 355 U. S. 41 at 47 (1957).

Plaintiff's complaint clearly conforms to these requirements. The complaint alleges that the defendants have pursued and continue to pursue discriminatory hiring practices with respect to employment opportunities in the City of Boston Fire Department and lists four specific ways these policies have been implemented. No more specific allegations of facts are required under Title VII of the Civil Rights Act of 1964, 42 U. S. C. §§ 2000e et seq., as amended by the Equal Employment

Opportunity Act of 1972, than under the Federal Rules of Civil Procedure Rule 8(a). *United States v. Gustin-Bacon*, [2 EPD P 10,210] 426 F. 2d 539 (10th Cir. 1970).

Since the Court is satisfied that the complaint contains sufficient facts to state a claim upon which relief can be granted, defendants' motion to dismiss is consequently denied.

1973 WL 300 (D.Mass.), 7 Fair Empl.Prac.Cas. (BNA) 305, 7 Empl. Prac. Dec. P 9160

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit B



1973 WL 301                                                                                                    Page 1

1973 WL 301 (D.Mass.), 7 Fair Empl.Prac.Cas. (BNA) 305, 7 Empl. Prac. Dec. P 9161

**(Cite as: 1973 WL 301 (D.Mass.))**

United States District Court; D. Massachusetts.
**United States of America, Plaintiff**
v.
**City of Boston et al., Defendants.**
**Boston Chapter, National Association for the**
**Advancement of Colored People**
**(NAACP), Inc. et al., Plaintiffs**
v.
**Nancy B. Beecher et al., Defendants.**
**Civil Action No. 73-269-F**
**Civil Action No. 72-3060-F**

August 27, 1973

DAVIS, Magistrate.

*1 These consolidated complaints allege that the Civil Service Fire Fighter Entrance Examinations given by the Civil Service Commission of the Commonwealth of Massachusetts discriminate against Black and Spanish-surname persons.

Pursuant to the order of reference of the district judge, the matter came on for a hearing on the motion of the plaintiffs for leave to depose the Civil Service defendant's expert witness. The motion was opposed mainly on the ground of non-compliance by the plaintiffs with Rule 26(b)(4) (A) of the Federal Rules of Civil Procedure. Rule 26(b)(4) and (A) provide as follows:
*Trial Preparation: Experts.* Discovery of facts known and opinions held by experts, otherwise discoverable under the provisions of subdivisions (b)(1) of this rule and acquired or developed in anticipation of litigation or for trial, may be obtained only as follows:
(A)(i) A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a

summary of the grounds for each opinion. (ii) Upon motion, the court may order further discovery by other means, subject to such restrictions as to scope and such provisions, pursuant to subdivision (b)(4)(C) of this rule, concerning fees and expenses as the court may deem appropriate.

The Civil Service Commission takes the position that the plaintiffs must first submit interrogatories and receive answers before they can seek to depose the expert witness.

In support of its position, the Assistant Attorney General of the Commonwealth, representing Civil Service, cited the case of *United States v. John R.-Piquette Corporation*, 52 F. R. D. 370 (E. D. Mich. 1971); and *Rupp v. Vock Werderhold, Inc.*, 52 F. R. D. 111 (N. D. Ohio 1971). If these cases stand for the proposition that interrogatories must precede a request to depose an expert, then I must say that the facts of the instant case justify a departure from those holdings. In the *John R.-Piquette* case the court was concerned about condemnation proceedings, and in the *Rupp* case the court was confronted with a suit for damages resulting from the loss of a hand during the course of the plaintiff's employment. In neither case was time a factor. In the instant case time is of the essence.

On August 3, 1973, the parties appeared before the district judge at which time the matter was set down for a hearing on the preliminary injunction for September 11, 1973. A hearing on the preliminary injunction, for all intents and purposes, could be decisive of the case. Indeed, pursuant to Rule 65(a)(2), the merits of the case could be consolidated with the hearing on the preliminary injunction. In any event, any order resulting from the hearing would be appealable under 28 U. S. C. § 1292(a), and the best possible record for the purpose of review should be made.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1973 WL 301                                                                                                    Page 2

1973 WL 301 (D.Mass.), 7 Fair Empl.Prac.Cas. (BNA) 305, 7 Empl. Prac. Dec. P 9161

**(Cite as: 1973 WL 301 (D.Mass.))**

**\*2** Deposition of the expert would also save time in cross-examination at trial. As the Notes of Advisory Committee on Rules point out:

Effective cross-examination of an expert witness requires advance preparation. The lawyer even with the help of his own experts frequently cannot anticipate the particular approach his adversary's expert will take or the data on which he will base his judgment on the stand. McGlothlin, Some Practical Problems in Proof of Economic, Scientific, and Technical Facts, 23 F. R. D. 467, 478 (1958). A California study of discovery and pretrial in condemnation cases notes that the only substitute for discovery of experts' valuation materials is, "lengthy-and often fruitless-cross-examination during trial," and recommends pretrial exchange of such material. Calif. Law Rev. Comm'n, Discovery in Eminent Domain Proceedings 707-710 (Jan. 1963). Similarly, effective rebuttal requires advance knowledge of the line of testimony of the other side. If the latter is foreclosed by a rule against discovery, then the narrowing of issues and elimination of surprise which discovery normally produces are frustrated.

Here, the amount of time for the hearing is limited. While the matter is set down for September 11, the court and counsel, because of prior commitments, will have only four (4) days to complete the hearing. Thus, any means of reducing the number of issues or curtailing examination of witnesses should be welcomed by all parties.

Given the situation as it presently exists, I am inclined to allow the motion. Therefore, it is Ordered that the expert witness, Dr. Paul Costa, appear for deposition on September 5, 1973, and bring with him all material relating to his validation study of the firefighter entrance examination. It is Further Ordered that the plaintiff, United States of America, pay a reasonable expert witness fee for the attendance of the witness at deposition.

1973 WL 301 (D.Mass.), 7 Fair Empl.Prac.Cas. (BNA) 305, 7 Empl. Prac. Dec. P 9161

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit C



371 F.Supp. 507

Page 1

371 F.Supp. 507, 7 Empl. Prac. Dec. P 9162, 7 Fair Empl.Prac.Cas. (BNA) 307
**(Cite as: 371 F.Supp. 507)**

**H**

371 F.Supp. 507, 7 Empl. Prac. Dec. P 9162, 7 Fair Empl.Prac.Cas. (BNA) 307

United States District Court,D. Massachusetts.
**BOSTON CHAPTER, NAACP, INC., et al.**
v.
**Nancy B. BEECHER et al.**
**UNITED STATES of America**
v.
**CITY OF BOSTON et al.**
**Civ. A. Nos. 72-3060-F, 73-269-F.**

Feb. 8, 1974.
As Amended Feb. 11, 1974.

The United States brought an action against city and NAACP brought action against state civil service department. Both plaintiffs alleged violation of the Civil Rights Act of 1964 with respect to hiring of persons for fire departments. The District Court, Freedman, J., held that plaintiffs made a prima facie showing of discrimination in the use of the entrance examination; that burden was upon defendants to justify the challenged procedures; that results of tests designed to show job relationship of examinations were not sufficient to justify use of the examinations; that a prima facie case of discrimination with respect to recruitment was shown by the government but not by the NAACP; and that state civil service division and city would be required to actively recruit minorities, to cease using the discriminatory examination and, after establishing new eligibility lists on the basis of valid qualifications, to hire one minority group member for each white person hired until the complement of minorities on fire departments was commensurate with the percentage of minorities in the communities.

Order accordingly.

West Headnotes

**[1] Civil Rights 78 ⟲1116(1)**
78k1116(1) Most Cited Cases
(Formerly 78k143, 78k41)
Municipal corporation, which is incorporated pursuant to law and which hires and maintains a fire department, is an "employer" within the meaning of the Civil Rights Act of 1964. Civil Rights Act of 1964, § 701 et seq. as amended 42 U.S.C.A. § 2000e et seq.

**[2] Civil Rights 78 ⟲1536**
78k1536 Most Cited Cases
(Formerly 78k378, 78k43)
Where racial discrimination in employment selection procedures is alleged, plaintiff must first establish a prima facie case of discrimination and the burden then shifts to the defendant to justify challenged procedures. Civil Rights Act of 1964, § 701 et seq. as amended 42 U.S.C.A. § 2000e et seq.; 42 U.S.C.A. §§ 1981 , 1983.

**[3] Civil Rights 78 ⟲1546**
78k1546 Most Cited Cases
(Formerly 78k384, 78k44(2))
Statistics which showed that 55% of the white persons taking fire fighters exam passed while only 39% of the minority group members taking the exam passed was not sufficient to establish a prima facie showing that the exam was discriminatory. Civil Rights Act of 1964, § 701 et seq. as amended 42 U.S.C.A. § 2000e et seq.; 42 U.S.C.A. §§ 1981 , 1983.

**[4] Civil Rights 78 ⟲1546**
78k1546 Most Cited Cases
(Formerly 78k384, 78k44(2))
Fact that one city with minority a population of 23% had less than one percent minority representation on its fire-fighting force and that second city with minority population of 13% had .2% minority representation on its fire-fighting force, when combined with similar ratios for other cities in the state and when considered in light of fact that higher percentage of whites taking fire

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

371 F.Supp. 507                                                                    Page 2

**371 F.Supp. 507, 7 Empl. Prac. Dec. P 9162, 7 Fair Empl.Prac.Cas. (BNA) 307**
**(Cite as: 371 F.Supp. 507)**

fighter exam passed than did minority members taking the exam established prima facie case that the exam, which was used in hiring of fire fighters in all cities, had discriminatory effect on minority group members. Civil Rights Act of 1964, § 701 et seq. as amended 42 U.S.C.A. § 2000e et seq.; 42 U.S.C.A. §§ 1981 , 1983.

**[5] Civil Rights 78** ☞**1546**
78k1546 Most Cited Cases
(Formerly 78k384, 78k44(2))
Where employment examination is shown to have a racially discriminatory impact, the employer must show that the exam is in fact substantially related to job performance by coming forward with convincing facts establishing a fit between the qualifications and the job. Civil Rights Act of 1964, § 701 et seq. as amended 42 U.S.C.A. § 2000e et seq.; 42 U.S.C.A. §§ 1981 , 1983.

**[6] Civil Rights 78** ☞**1142**
78k1142 Most Cited Cases
(Formerly 78k150, 78k9.13)
Employer whose job qualifications are alleged to be discriminatory cannot operate from some expert point of view that the qualifications and tests are doing what they are supposed to do; rather empirical evidence to that effect must be obtained. Civil Rights Act of 1964, § 701 et seq. as amended 42 U.S.C.A. § 2000e et seq.; 42 U.S.C.A. §§ 1981 , 1983.

**[7] Civil Rights 78** ☞**1546**
78k1546 Most Cited Cases
(Formerly 78k384, 78k44(2))
Examination-job correlation study which showed that results of examination were significant predictor of job performance in only two, or perhaps four, areas and that those two areas comprised only a fraction of the duties required on the job was insufficient to show that the examination, which was alleged to be racially discriminatory, was substantially related to job performance. Civil Rights Act of 1964, § 701 et seq. as amended 42 U.S.C.A. § 2000e et seq.; 42 U.S.C.A. §§ 1981 , 1983.

**[8] Civil Rights 78** ☞**1545**
78k1545 Most Cited Cases

(Formerly 78k383, 78k44(1))
Evidence that one city with minority population of 23% had less than one percent minority representation on fire department and that second city with minority population of 13% had only .2% minority representation, when taken in conjunction with similar figures for smaller cities made a prima facie showing of discrimination in the recruitment policies of those responsible for hiring for the fire departments. Civil Rights Act of 1964, § 701 et seq. as amended 42 U.S.C.A. § 2000e et seq.; 42 U.S.C.A. §§ 1981 , 1983.

**[9] Civil Rights 78** ☞**1568**
78k1568 Most Cited Cases
(Formerly 78k399, 78k46(10), 78k46)
Testimony that assistant supervisor of recruitment maintained mailing list of over 200 minority-related organizations to which he sent notices of any upcoming fire fighter examinations, that advertising in the electronic media and newspapers was carried out prior to the exams in an attempt to recruit minority members and that much effort was made in Spanish language indicated that persons alleging that recruitment policies were discriminatory would not succeed on the merits and were thus not entitled to preliminary relief. Civil Rights Act of 1964, § 701 et seq. as amended 42 U.S.C.A. § 2000e et seq.; 42 U.S.C.A. §§ 1981 , 1983.

**[10] Civil Rights 78** ☞**1568**
78k1568 Most Cited Cases
(Formerly 78k399, 78k46(10), 78k46)
Evidence that greatest source of new applicants for fire department was by word of mouth and encouragement from friends and relatives already on the force and evidence that force was 99% white showed that persons alleging that recruitment policies of fire department were discriminatory were likely to succeed on the merits and would suffer irreparable harm in the nature of lack of equal opportunity to compete for jobs on the fire department if injunctive relief was not granted. Civil Rights Act of 1964, § 701 et seq. as amended 42 U.S.C.A. § 2000e et seq.; 42 U.S.C.A. §§ 1981 , 1983.

**[11] Civil Rights 78** ☞**1562**
78k1562 Most Cited Cases

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

371 F.Supp. 507                                                                                           Page 3

371 F.Supp. 507, 7 Empl. Prac. Dec. P 9162, 7 Fair Empl.Prac.Cas. (BNA) 307
**(Cite as: 371 F.Supp. 507)**

(Formerly 78k393, 78k46(4), 78k46)
State civil service division and city, which had been
shown to have discriminated in recruitment policies
and entrance examinations for positions as fire
fighters, would be enjoined from discriminating
against any applicant and from certifying permanent
appointments to the position of fire fighter unless
done in compliance with terms set out in court's
decree. 28 U.S.C.A. §§ 2201 , 2202 ; 42 U.S.C.A.
§§ 1981 , 1983.

**[12] Civil Rights 78 ☞1562**
78k1562 Most Cited Cases
(Formerly 78k393, 78k46(4), 78k46)
Civil service division which had been shown to
have used a racially discriminatory entrance
examination for position of fire fighter would be
enjoined from utilizing that examination and
required to use only such examinations as were
demonstrably    job-related    and    validated    in
accordance with guidelines issued by Equal
Employment Opportunity Commission, or which
could otherwise be shown to have no discriminatory
impact. 28 U.S.C.A. §§ 2201 , 2202 ; 42 U.S.C.A.
§§ 1981 , 1983.

**[13] Civil Rights 78 ☞1562**
78k1562 Most Cited Cases
(Formerly 78k393, 78k46(4), 78k46)
City which had been shown to have engaged in
discriminatory recruitment policies with regard to
positions in fire department was enjoined from
requesting    certification    of    appointments    for
permanent positions on department unless city,
before any examination was given, had contacted all
minority organizations and provided them with
information regarding the availability of positions
and had advertised on radio and television in an
attempt to recruit minority applicants. 28 U.S.C.A.
§§ 2201 , 2202 ; 42 U.S.C.A. §§ 1981 , 1983.

**[14] Civil Rights 78 ☞1562**
78k1562 Most Cited Cases
(Formerly 78k393, 78k46(4), 78k46)
Civil service division which had been shown to
have used a discriminatory examination for
certifying persons eligible for positions as fire
fighters in various cities would be required to
certify at least one minority group member for each

white person certified until each fire department
achieved a complement of minorities commensurate
with the percentage of minorities within the
community. 28 U.S.C.A. §§ 2201 , 2202 ; 42
U.S.C.A. §§ 1981 , 1983.

**\*509** Patrick J. King, Thomas A. Mela, Boston,
Mass., Benjamin Jones, Roxbury, Mass., for
plaintiff in Civ. A. No. 72-3060-F.
James M. Fallon, Dept. of Justice, Civil Rights
Div., Employment Sec., Washington, D. C.,
Raymond Picard, Asst. U. S. Atty., Boston, Mass.,
for plaintiff in Civ. A. No. 73-269-F.
Edward D. Kalman, Walter Mayo III, John F.
McGarry, Asst. Atty. Gen., Thomas F. McKenna,
Asst. Corp. Counsel, Boston, Mass., for defendants.

FREEDMAN, District Judge.
These cases allege discriminatory practices on the
part of the defendants in their qualification
requirements and overall hiring policies for the
position of firefighter in the City of Boston, in
particular, and in other cities and towns of the
Commonwealth of Massachusetts subject to state
Civil Service law. Because of the identity of the i
ssues involved and relief sought, the two cases were
consolidated by the Court with the assent of the
parties. United States v. City of Boston et al. is
brought by the Attorney General to enforce the
provisions of Title VII of the Civil Rights Act of
1964, 42 U.S.C. §§ 2000e et seq., as amended by
the Equal Employment Opportunity Act of 1972,
(Pub.L. 92-261 , March 24, 1972), and pursuant to
42 U.S.C. §§ 1981 , 1983 for alleged deprivations
of constitutionally protected rights. The plaintiff
United States alleges discriminatory practices
against blacks and Spanish-surnamed persons in
recruitment policies, in the utilization of nonjob
predictive tests and qualifications which have a
detrimental    impact    on    **\*510**    blacks    and
Spanish-surnamed persons, and in the refusal to
remedy those practices and correct the present
effects of past racially discriminatory policies and
practices. Plaintiff prays that the defendants be
enjoined from continuing these alleged policies and
ordered to conduct a meaningful minority
recruitment program and to hire sufficient blacks
and Spanish-surnamed persons to overcome the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

371 F.Supp. 507                                                                                              Page 4

371 F.Supp. 507, 7 Empl. Prac. Dec. P 9162, 7 Fair Empl.Prac.Cas. (BNA) 307
**(Cite as: 371 F.Supp. 507)**

effects of alleged past discrimination. The Attorney General also seeks monetary compensation for the loss suffered by those minority persons who were denied employment opportunity because of the alleged discriminatory practices.

Boston Chapter, NAACP, Inc., et al. v. Beecher et al. is brought as a class action. The cause of action is said to arise pursuant to 42 U.S.C. §§ 1981 , 1983 and 28 U.S.C. §§ 2201 , 2202. Plaintiffs allege discrimination in defendants' policies of recruiting and in their use of allegedly discriminatory selection procedures including the written exam, the swim test, and use of police records. The relief requested is similar to that prayed for in the companion case, including the imposition of a one to one hiring ratio and attorneys' fees.

*Certification of a Class*

Pursuant to F.R.Civ.P. 23(c)(1), the Court has ordered that Civil Action No. 72-3060-F be maintained as a class action. The following classes have been certified:

(1) All black or Spanish-surnamed persons who have applied for the position of firefighter in any fire department in the Commonwealth of Massachusetts subject to Massachusetts Civil Service law, but have not become eligible for appointment under existing requirements.

(2) All black or Spanish-surnamed persons who have never applied for the position of firefighter because they have allegedly been deprived of information concerning firefighter employment opportunities as a result of the allegedly discriminatory recruitment practices of the defendants.

Class (2) is represented by plaintiff Howard. Class (1) is represented by all other named plaintiffs.

*Procedural Posture*

Evidence was heard on plaintiffs' request for preliminary relief including evidence on defendants' overall recruiting and testing practices on July 30, 1973 and September 11-17, 1973. It was agreed by the parties that the hearing for preliminary relief

would be treated as a trial on the merits, pursuant to Rule 65(a)(2), as to the written examination only. The issue of recruitment remained at the preliminary injunction stage. The issues of the swim test requirement and use of police records were not raised at this posture.

Partly as the result of a self-imposed freeze and partly on instructions from the Court, the Massachusetts Division of Civil Service (MDCS) has not certified for appointment individuals from the currently existing Civil Service eligible list for the fire service in Boston, Springfield, Worcester, Cambridge, or New Bedford, since the commencement of these actions. By order of the Court, however, MDCS was allowed to certify twenty (20) individuals for the fire service in Boston after the Court determined that an emergency situation existed in that city.

*Present Hiring Procedure*

The following facts have been stipulated to by the parties.

Nancy B. Beecher, Joseph M. Duffy, Richard J. Healey, Wayne Budd, and Helen C. Mitchell are the members of the Massachusetts Civil Service Commission and they are charged with the setting of policy for the Division of Civil Service. From January 22, 1968 to April 5, 1973, Mabel A. Campbell was Director of Civil Service and responsible for the administration and operation of **\*511** the Division of Civil Service, including administering written examinations, medical examinations, strength requirements, and determining the good moral character of all persons seeking employment in the fire services in all cities (39) and in 68 towns in Massachusetts, including Boston. In addition, Ms. Campbell established eligibility lists and certified eligible individuals to those fire departments.

The Director of Civil Service, upon request of a city or town, establishes education requirements pursuant to the provisions of M.G.L. c. 31 § 6A. Approximately 15 fire departments, not including the Boston Fire Department, require applicants to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

371 F.Supp. 507                                                                     Page 5

371 F.Supp. 507, 7 Empl. Prac. Dec. P 9162, 7 Fair Empl.Prac.Cas. (BNA) 307
(Cite as: 371 F.Supp. 507)

have a high school diploma or an equivalency
certificate issued by the Massachusetts Department
of Education. All other fire departments, including
Boston, have no education requirements. The
Director of Civil Service has been required by state
law (M.G.L. c. 31 § 2A(m)) to establish a
recruitment program to recruit persons to fill
vacancies for officers and positions in the classified
civil service, including firefighters, since March
1968. The responsibility of the Director of Civil
Service to establish or conduct a recruitment
program is subject to and dependent upon receiving
sufficient funds for recruitment purposes through
appropriations of the Massachusetts legislature.
William McRell has been acting Director of the
Division of Civil Service from April 5, 1973 to date.

The present Civil Service eligibility requirements
for applicants for the position of firefighter in all
cities (39) and 68 towns of the Commonwealth are
as follows:

a) age 19 to 35 years of age;
b) no height requirements;
c) no weight requirements;
d) good moral character;
e) high school diploma or equivalency certificate
required when requested by a city or town; and
f) average physical requirements. FN1

> FN1. Pursuant to Massachusetts state law
> certain cities and towns, including Boston,
> have residency requirements for firefighter
> service. There is some uncertainty as to
> the present effectiveness of such
> requirements in the Commonwealth as of
> this date. However, this Court notes that
> the Massachusetts Superior Court has
> recently overruled an opinion of the
> Attorney General for the Commonwealth
> and has determined that such requirements
> do exist, are valid, and must be followed.

The written examination for firefighter for all cities
and towns in Massachusetts, including Boston,
contain two parts. The first section is composed of
25 questions of a general intelligence nature. Each
answer in Section I is worth 1 point. The second
section contains 75 questions which are taken from

the "Red Book." Each answer in Section II is worth
1 point. This type of examination has been given
for at least the last twenty years. Of the 25
questions in the general intelligence section of the
written examination there are approximately six
questions from each of the four areas of arithmetic,
spelling, vocabulary, and general knowledge, and
an occasional question on current events or civics.
The "Red Book" is a Fire Manual for the
Instruction of Applicants for Entrance Examinations
in the Fire Service in cities and towns of the
Commonwealth of Massachusetts, prepared by the
Massachusetts Division of Civil Service. This book
has been in circulation for at least 20 years. The
latest publication of the manual was March 3, 1972.

Applicants who achieve a passing score of 70 of the
written examination, referred to above, are then
evaluated for their prior training and experience and
rated on a scale of 70 to 100. The final score for
each candidate is a composite of 70% of the written
examination score and 30% of the training and
experience score. But one must achieve a passing
score of 70 on the written examination to have his
training and experience evaluated. Those
applicants who have a total composite score of both
the written *512 examination and the training and
experience over 70, must then pass a medical
examination, meet certain strength requirements and
the good moral character requirement. There are no
points awarded nor is the total composite score
affected in any way by these requirements;
however, if a candidate does not meet any of these
three requirements, he is not eligible for
certification. Applicants who pass the written
examination and fail any other requirement may
pass those requirements anytime during the life of
the eligibility list and have their name placed on
said list. The final composite score is expressed to
the second decimal place, i.e., "84.26." Disabled
veterans are then placed on the list (100 down to
70), followed by veterans (100 down to 70), who
are then followed by non-veterans (100 down to
70). Within six months of the date of the written
examination, the Division of Civil Service
establishes an eligibility list, and that list exists for a
maximum of 2 years, at which time it expires by
operation of state law, or the list expires by virtue of
its exhaustion within that period of time. Every

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

371 F.Supp. 507                                                                                   Page 6

371 F.Supp. 507, 7 Empl. Prac. Dec. P 9162, 7 Fair Empl.Prac.Cas. (BNA) 307
(Cite as: 371 F.Supp. 507)

firefighter eligibility list for Boston prior to the current one, which was established in April 1972, has expired by virtue of its exhaustion.

In August 1971, the Division of Civil Service administered a statewide firefighter entrance examination, and with the approval of the Massachusetts Commission Against Discrimination, all applicants taking the examination were given the option of identifying their race, color or national origin. A three-page computer compilation of the results of the racial classification of applicants taking that examination revealed that 84% (3181/3790) of all applicants responded to one or more categories of the information requested, relative to race, color or national origin. On the current eligibility list for Boston, established on April 4, 1972, following the written examination of August 1971, there are presently more than 236 individuals; in addition approximately 98 have already been appointed.

[1] The City of Boston is a municipal corporation incorporated pursuant to the laws of the Commonwealth of Massachusetts and is a political subdivision of Massachusetts. The City of Boston is an employer within the meaning of 42 U.S.C. § 2000e(b), as amended. The City of Boston maintains and operates a fire department for the prevention and suppression of fires within its city limits. James D. Kelly is the Commissioner of the Boston Fire Department. In that capacity, he is responsible for the administration and operation of the Boston Fire Department including filling firefighter positions and assigning firemen within the department. Applicants to the Boston Fire Department currently must meet the following requirements:

 a) age 19 to 35 years of age; [Prior to 1971 the minimum age was 21.]

 b) no height or weight requirements;

 c) good moral character;

 d) no specific education requirements; and

 e) average physical requirements.

In order to become eligible for appointment to the Boston Fire Department, an applicant must meet the requirements as administered by the Massachusetts Division of Civil Service.

Each of the four Boston firefighter eligibility lists established as a result of the examinations administered in August 1968, September 1969, January 1970, and September 1970 has expired, and each list was exhausted by the appointment of every individual on the list willing to accept appointment except for two or three candidates. Since January 1, 1969, Commissioner Kelly, appointing authority of the Boston Fire Department, has hired 454 individuals. Persons appointed to firefighter positions in the Boston Fire Department are required to complete a training program of approximately eight weeks at the Boston Fire Academy. Failure to satisfactorily complete that program is *513 ground for terminating a trainee's employment. Persons appointed to the firefighter position in the Boston Fire Department serve a probationary period of six months in accordance with Massachusetts Civil Service law. Performance which is not satisfactory to the appointing authority is ground for terminating a probationary firefighter's employment, in accordance with Civil Service law.

*Burden of Proof*

[2] It is generally accepted that where racial discrimination in employment selection procedures is alleged, the plaintiff must first establish a prima facie case of discrimination. If that is established, the burden shifts to the defendant to justify the challenged procedures. The duty of the Court in such cases has been outlined by the Court of Appeals for this Circuit in Castro v. Beecher, 459 F.2d 725 (1st Cir., 1972). That case involved similar issues relating to hiring procedures in the police departments in the Commonwealth. At page 732, the Court stated:

 "In the general course, a court faced with a claimed denial of equal protection must first ascertain whether the plaintiff has made such a threshold showing as to require a justification, must then identify the classification employed, and must finally determine whether the classification has been justified under governing standards."

In determining whether a plaintiff has made a " threshold showing" of discrimination, this judge has

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

371 F.Supp. 507                                                                                    Page 7

371 F.Supp. 507, 7 Empl. Prac. Dec. P 9162, 7 Fair Empl.Prac.Cas. (BNA) 307
**(Cite as: 371 F.Supp. 507)**

previously accepted statistical evidence of racial imbalance as sufficient to establish such a showing, or, to put it otherwise, as sufficient to establish a prima facie case of past racial discrimination. See Associated General Contractors of Massachusetts, Inc. v. Altshuler, 361 F.Supp. 1293, 1299 (D.Mass., 1973); aff'd 490 F.2d 9, (1 Cir., 1973), p. 18, fn. 15, and cases cited therein. In that case, a significant disparity between the minority population percentage in the City of Boston and the percentage of minorities employed in the construction trades in the Boston area was found to be sufficient to establish a prima facie case of racial discrimination on the part of the construction industry. In cases where a public employer's selection test is being challenged, however, most courts, in finding a prima facie case has been established, have relied on more than a comparison of population and employment statistics. Usually there has been reliable statistical evidence on the percentage of minorities who pass the exam in question as compared with the percentage of whites who pass the same exam. A significant disparity between suc h statistics showing that minorities pass at a lower ratio than whites has been held to establish a prima facie case that the exam is discriminatory. See Bridgeport Guardians, Inc. et al. v. Members of Bridgeport Civil Service Comm. et al., 482 F.2d 1333, 1335-1336 (2nd Cir., 1973) ; Castro v. Beecher, 459 F.2d, at 729; Chance v. Board of Examiners, 458 F.2d 1167, 1171 (2nd Cir., 1972) ; Pennsylvania v. O'Neill, 348 F.Supp. 1084, 1089-1090 (E.D.Pa., 1972). Often the Courts have supported these statistics by referring to a comparison of population and employment statistics, [Bridgeport Guardians, *supra,* at 1335 of 482 F.2d; Castro v. Beecher, 334 F.Supp., at 935-936.] and a few courts have appeared to rely almost exclusively on the latter type of statistical comparison. See Carter v. Gallagher, FN*3 E.P.D. ¶ 8205 (1971), aff'd. 452 F.2d 315, 323 (8th Cir., 1971) ; Fowler v. Schwarzwalder, 351 F.Supp. 721 (D.D.Minn., 1972) ; Western Addition Community Organization v. Alioto, 330 F.Supp. 536, 539 (N.D.Cal., 1971).

FN* Employment Practices Decisions.

[3] As noted previously, applicants taking the August 1971 exam were given the option of identifying their race, color or national origin. Some 84% responded and statistics were compiled as a result thereof. Of the 15 persons who *514 identified themselves as Negroid, eight passed for a figure of approximately 54%. Of the 3,089 applicants identified as Caucasion, 1737 or approximately 56% passed. Eighteen applicants identified themselves as blacks with eight passing or approximately 44.5%, as opposed to a 55% passing rate for those identified as white. Fifteen identified themselves as of Spanish origin. Five passed for a 33.3% passing rate. The combined black and Spanish-origin passing rate was 39%. Plaintiffs suggest these statistics are sufficient to establish a prima facie case that the exam discriminates against blacks and Spanish-surnamed persons. The Court is not impressed by such obviously meager statistics although it does recognize that some courts have indeed relied on such unconvincing statistics. The District Court in Carter v. Gallagher, 3 E.P.D. ¶ 8205 (1971), based a prima facie finding of discrimination on statistics which showed that over a 20-year period 22 blacks took the exam and 6 passed for a 27.27 percentage. In Fowler v. Schwarzwalder, 348 F.Supp. 844, 846 (D.D.Minn., 1972), the Court noted that while 19 out of 26 minorities passed the exam, 202 of 318 whites passed. In later proceedings the Court neglected this statistic and found that a prima facie case was established on the basis of a comparison between population figures and employee figures. 351 F.Supp. 723, 724 (1972).

This Court does not find the available exam statistics sufficient in themselves to establish a prima facie showing that the exam is discriminatory. A comparison of population and employment statistics, however, is much more telling. Boston has a black population of approximately 16%. The combined minority population may exceed 23%. [See *Associated General Contractors, supra.*] The city has a fire force of approximately 1,983 men. Of that total there are 16 blacks and 2 Spanish-surnamed persons who represent approximately 0.9% of the total force. The City of Springfield has a black population of approximately 13%. Of 475 firefighters in that city, one is black

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

371 F.Supp. 507                                                                           Page 8

371 F.Supp. 507, 7 Empl. Prac. Dec. P 9162, 7 Fair Empl.Prac.Cas. (BNA) 307
**(Cite as: 371 F.Supp. 507)**

and none are Spanish-surnamed. The one black represents 0.2% of the total force. The City of Cambridge has a black population of 6.1%, and a fire fighting force of 305 men, four of whom are black; one is Spanish-surnamed. They represent approximately 2% of the total force. New Bedford has a black population of approximately 3.5%. Minorities represent approximately 1% of the fire force. Worcester has a black population of approximately 2%. Minorities represent 1% of the fire force there.

[4] These statistics, especially for the Cities of Boston and Springfield, are most significant. The Court uses them in support of the meager exam statistics and finds that plaintiffs have established a prima facie case that the Fire Fighter Entrance Examination (FFEE) has a discriminatory effect on blacks and Spanish-surnamed persons. As noted in Vulcan Society v. Civil Service Commission, 490 F.2d 387 (2nd Cir. 1973), such a finding is not determinative of the issue but merely shifts the burden to the defendant to justify the use of the exam. This is a burden a public employer should not be unwilling to assume.

*Validation*

[5] [6] The burden has shifted to the defendants to prove a "manifest relationship" between the exam and the job. [Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) .] In Castro v. Beecher, *supra,* at 459 F.2d 732, the Court of Appeals stated that where the suspect classification (here the FFEE) is shown to have a racially discriminatory impact, the employer must show that the exam is in fact "substantially related" to job performance by coming forward with " convincing facts" establishing a fit between the qualifications and the job. Defendants' expert Costa testified that the employer cannot operate from some expert point of view that the tests are doing what they are supposed to do. It was his *515 opinion that the courts and professional psychological standards always require that empirical evidence be obtained. [Tr. 3-22.] The Court agrees.

Where it has been determined that an exam is suspect, the courts have required that a "fit" between the exam and job performance must be established by a study conducted according to professionally accepted standards. The Equal Employment Opportunity Commission Guidelines on Employee Selection Procedures, 29 C.F.R. 1607, et seq., suggest minimum standards for test validity and establish guides to be used in determining the validity of employment tests. "Courts confronted with challenges to public employment examinations predicated upon the equal protection clause of the Fourteenth Amendment have generally agreed that the Guidelines issued by the EEOC provide persuasive standards for evaluating claims of job-relatedness." [Vulcan Society v. Civil Service Commission, 360 F.Supp. 1265, 1273, n. 23 (S.D.N.Y., 1973). See also Western Addition Community Organization v. Alioto, 340 F.Supp. 1351 (N.D.Cal., 1972) , and cases cited in n.3 of 1354.] And as was noted in Officers for Justice v. San Francisco, 371 F.Supp. 1328 (N.D. of Cal., 1973) , at p. 1337, these Guidelines may indeed have the force of law in cases brought under Title VII of the Civil Rights Act of 1964. See *Griggs, supra,* at 433 , of 401 U.S., at 854 of 91 S.Ct. where the Court stated:

> "The Equal Employment Opportunity Commission, having enforcement responsibility, has issued guidelines interpreting § 703(h) to permit only the use of job-related tests. The administrative interpretation of the Act by the enforcing agency is entitled to great deference.... Since the Act and its legislative history support the Commission's construction, this affords good reason to treat the guidelines as expressing the will of Congress."

The Civil Service defendants apparently anticipated their burden and during the pendency of these matters caused a validity study to be undertaken by Dr. Costa, who has been retained as the principal psychological testing consultant to the MDCS and was qualified by the Court to testify as an expert witness on employment testing practices. Some brief remarks about validity study procedures in general may be beneficial at this point.

There are two types of test validation studies recognized by the EEOC Guidelines. The Court

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

371 F.Supp. 507, 7 Empl. Prac. Dec. P 9162, 7 Fair Empl.Prac.Cas. (BNA) 307
**(Cite as: 371 F.Supp. 507)**

will borrow from Judge Weinfeld's clear and concise descriptions of these studies in *Vulcan Society, supra,* 360 F.Supp. 1265, 1273 (1973).

"The preferred method of test validation is criterion-related or empirical validity, which includes what are referred to as the predictive and concurrent methods of validation. Predictive validation consists of a comparison between the examination scores and the subsequent job performance of those applicants who are hired. If there is a sufficient correlation between test scores and job performance, the examination is considered to be a valid or job-related one. Concurrent validation requires the administration of the examination to a group of current employees and a comparison between their relative scores and relative performance on the job."

Predictive validation is preferred where feasible over concurrent validation. A method less preferable than criterion related validity is known as "content validity." Again borrowing from Judge Weinfeld in *Vulcan, supra,* at p. 1274:

"Content validation is less preferable than the criterion-related methods of test validation but nevertheless a professionally accepted means of establishing job-relatedness where the more desirable empirical methods are impractical. [See EEOC Guidelines, 29 C.F.R. § 1607.5(a).] An examination has content validity if the content of the examination matches the content of the job. For a test to be content\*516 valid, the aptitudes and skills required for successful examination performance must be those aptitudes and skills required for successful job performance. It is essential that the examination test these attributes both in proportion to their relative importance on the job and at the level of difficulty demanded by the job."

For either type of study, it is important that a careful job analysis be undertaken. The criteria used for an empirical validation study should be important criteria selected on the basis of a thorough job analysis. Likewise, a thorough knowledge of the job to be tested is necessary when constructing a content valid examination. "A job analysis is a thorough survey of the relative importance of the various skills involved in the job in question and the

degree of competency required in regard to each skill. It is conducted by interviewing workers, supervisors and administrators; consulting training manuals; and closely observing the actual performance of the job." *Vulcan supra,* at 1274.

Dr. Costa conducted what he described as a concurrent criteria-related validity study. A brief discussion of terms as described to the Court is in order. The mathematical relationship between the test scores and the measures of job performance is referred to as the correlation coefficient. A correlation coefficient of .00 means the study shows no relationship between the test and job performance, while a coefficient of 1.00 indicates a perfect relationship between the two. In order for a correlation coefficient to have significance, it must be both statistically and practically significant. Statistical significance means that the possibility of the results being reached by chance are minimal. Practical significance means that the coefficient shows a sufficiently high relationship between success on the test and successful job performance. Both Dr. Costa and plaintiffs' expert, Dr. Hunt, agreed that as a "rule of thumb" a coefficient of .3 would be the minimum level to indicate a satisfactory relationship. A lower coefficient would not be practically significant and would not justify use of the test.

Dr. Costa used two groups of subjects in his study. Group I consisted of 88 white Boston firefighters who had been recently appointed to the force from the list established in April 1972 as a result of the August 1971 FFEE. Group II consisted of 134 men who had been firefighters for approximately two years. The study implemented two "Performance Appraisal Systems." System I tested for job relatedness between the MDCS job predictors; i. e. exam score, training and experience, and the final score (general average mark), and the performance of 13 tasks considered by both experts to be important criteria of the job. The criteria consisted of such tasks as ladder extension, handling a pre-connected hose (both team-type performances consisting of nine sub-tasks with each man being tested at each subtask), and such individual performances as air mask operation, extinguisher selection, securing lines and knots, and hose and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

371 F.Supp. 507                                                                                          Page 10

371 F.Supp. 507, 7 Empl. Prac. Dec. P 9162, 7 Fair Empl.Prac.Cas. (BNA) 307
(Cite as: 371 F.Supp. 507)

hydrant operation. Only Group I was tested in Appraisal System I. The study was not done under actual firefighting conditions, but was conducted at the Boston Fire Department's training camp on Moon Island. Appraisal System II consisted of ratings of job performance obtained from company captains and lieutenants collected under actual firefighting conditions. The men were rated on twelve separate scales including understanding building, constructions, and fire behavior; mechanical ability; holding up under pressure and stress; carrying out orders; and overall job effectiveness. Both Groups I and II were rated in System II.

System II did not reveal any significant correlations between the two test criteria used (written exam score and general average mark) and successful job performance in either group tested. Dr. Costa admitted that if the results of System II were all that he had available upon which to base a conclusion, he would conclude that the exam was not a *517 valid predictor of successful job performance. (Tr. 4-22, 23.)

Dr. Costa concluded that System I revealed seven significant correlations. In three of these, however, the predictor was the general average mark score. Since this score is a composite of the written exam score and the training and experience score, its utility in establishing the validity of the exam itself seems questionable. In addition, two of the significant correlations are based on a comparison of the number of errors made on the four best predicted criteria and the written test score. Frankly, the Court has had difficulty understanding the significance of these correlations. Plaintiff argues it is merely a restatement of the original thirteen criteria, only two of which have been shown to have a significant correlation with the written exam. This may be so. At any rate, the Court does observe that the Air Mask Operation (.346) and the Loop Man Position (.313) are the only two job tasks which show a significant relationship with the written exam score, and Dr. Hunt described these correlations as being barely significant. (Tr. 4-141.)

Experts have interpreted the EEOC Guidelines to

require that at least one relevant criterion be both statistically and practically significant. 29 C.F.R. § 1607.5(c)(1). Dr. Hunt testified that if one significant correlation is to be accepted as evidence that an exam is job related, the one relevant criterion must represent an adequate measure of total job performance factors. If the one criterion only represents a small percentage of the important factors of the job, this should not be considered adequate to support a conclusion of test validity. Although she agreed that the 13 criteria implemented were important, it was Dr. Hunt's opinion that there were only two significant correlations and that those two did not represent an adequate measure of the total factors involved in the job. Based on Dr. Costa's study, she testified that she would not conclude the exam was job related. Dr. Costa is of the opinion that the exam has been shown to be valid according to EEOC Guideline minimum requirements and he has concluded that the exam is a valid predictor of job performance.

The Court has had no little difficulty in examining the testimony of both experts and in interpreting Dr. Costa's study and the results derived therefrom. Nor has the Court relished the thought of determining which expert opinion to accept on a subject about which the Court knows very little. It is easy for a member of the legal profession, however, to understand how two competent professionals can come to different conclusions given the same set of facts. And it appears, as with the law, that the area of psychological testing is not one where elements of preciseness and exactness usually obtain. The EEOC Guidelines, 29 C.F.R. § 1607.5(c)(1), caution that a test should be closely scrutinized when it is valid against only one component of job performance. The Court feels close scrutiny should also be given where the test may be shown to be valid against a few components of job performance where those components represent only a small percentage of the total job. Close scrutiny seems particularly appropriate where the exam was not designed by experts. The evidence indicated that the FFEE was designed by persons with no training in psychological measurement or testing.

[7] The Court has concluded that defendants have

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

371 F.Supp. 507

Page 11

371 F.Supp. 507, 7 Empl. Prac. Dec. P 9162, 7 Fair Empl.Prac.Cas. (BNA) 307
(Cite as: 371 F.Supp. 507)

not met their burden of demonstrating that the exam is "in fact substantially related to job performance." See *Castro, supra,* 459 F.2d at 732. Arguably, the test has been validated according to the EEOC Guidelines' minimum standard. However, the Court cannot conclude that the study provides the "*convincing* facts establishing a fit between the qualification and the job," which *Castro, supra,* requires. The fact that only two, or perhaps four, significant correlations were found between the exam and components of job performance-components which represent only a fraction of those duties a firefighter*518 encounters-and the fact that those correlations were only minimally significant does not constitute "convincing" evidence of job relatedness. There was also some criticism of the way in which the study was conducted, but the Court does not feel such criticism warrants discussion in light of this determination.

The Court does not wish to imply that it is establishing standards apart from those embodied in the EEOC Guidelines. However, these Guidelines must be read in the context of certain precedent binding upon this Court (*Griggs, supra*; *Castro, supra*) which clearly implies that facial compliance with the minimum standards may not be sufficient to meet the "heavy burden" which falls upon a public employer when required to prove the validity of a selection examination which has an adverse racial impact.

*Recruitment*

The parties did not agree to treat the hearing as a trial on the merits as to the recruitment issue. As noted previously, since 1968, M.G.L. c. 31 § 2A has required the Director of Civil Service to establish a recruitment program to fill vacancies in the classified civil service, including positions as firefighter. Apparently, the extent to which the program is operated is dependent upon the amount of funds received through appropriations of the Massachusetts legislature. Prior to 1968, it appears that the only statutory duty was to send posters to the city and town halls throughout the Commonwealth, advising the public of available positions and any up-coming exam.

Although there does not appear to be any statutory duty to recruit on the part of the Boston Fire Department, Commissioner Kelly testified at the taking of his deposition that, as Commissioner, he has direct responsibility for recruiting for the Department. However, he has delegated that job to the officer in charge of the Community Relations Division of the Department and despite the Commissioner's ultimate responsibility, he expressed very little knowledge of what actual efforts have been made in the area of recruiting.

[8] Based on a comparison of the population statistics and minority employment statistics referred to earlier, plaintiffs have made a threshold showing of discrimination in the recruitment policies of the MDCS and of the Boston Fire Department. Defendants have presented some evidence attempting to rebut that inference.

In November of 1971, Barton Graham was employed as Assistant Supervisor of Recruitment for the Division of Civil Service. He testified that the present emphasis of the recruiting effort is in the area of minority recruiting for the fire service and corrections service. The Division has a mailing list of over 200 minority related organizations which receive any notices of up-coming exams. He and his subordinates have visited organizations and schools, and a year ago in anticipation of an up-coming exam there was advertising over the electronic media. Newspaper advertising has been done. In the City of Springfield, Mr. Graham has worked closely with the Springfield Urban League which has contracted with the Division to recruit minorities in that part of the state. Apparently these efforts have been quite successful judging from some 200-plus applications received from minorities from the Springfield area. The Division has made plans to increase these efforts, including continued advertising over the local electronic media and the use of billboards. There has also apparently been much effort to advertise in the Spanish language and one of Mr. Graham's subordinates has concentrated on recruiting Spanish-surnamed persons. Prior to these recent efforts, it appears the Civil Service did little more

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

371 F.Supp. 507

371 F.Supp. 507, 7 Empl. Prac. Dec. P 9162, 7 Fair Empl.Prac.Cas. (BNA) 307
**(Cite as: 371 F.Supp. 507)**

than what was required of them by state law, that is sending posters to city and town clerks.

In light of the lack of any pre-1968 statutory duty to recruit, the lack of any evidence indicating the Division of Civil Service ever did, in fact, engage in any *519 policy of positive recruitment until recently, and the evidence presented by Civil Service defendants as to current recruitment activities, the Court feels the defendants have come very close to rebutting any inference they discriminated in their recruitment policies. In fact, they had no policy in the past other than the statutory requirement. Even if there had been an implied duty or a necessity to recruit and interest persons in joining the fire force, such an obligation would most logically have fallen upon the city or town in need of firemen and not the Civil Service.

[9] The Court finds that it is not probable plaintiffs will succeed on the merits as to the issue of alleged discriminatory recruitment policies on the part of the Civil Service defendants, and preliminary relief is therefore denied. Practically speaking, this determination has little effect as the Court will require, as part of its order, an affirmative recruitment policy to help remedy the present effects of past discrimination on the part of the Civil Service-that discrimination being, the requirement that applicants pass a non-job related examination which has an adverse racial impact on blacks and Spanish-surnamed persons.

The City of Boston also presented evidence attempting to rebut the inference that they have engaged in discriminatory recruitment policies. In 1968, two black Boston firefighters spent one day in Boston's predominantly black neighborhood passing out literature and trying to promote interest in the fire department. One of the men, Robert Powell, testified they approached from 80 to 100 people who indicated interest. The people were told of a training program which would be held to help prepare minority applicants for the FFEE. Such a program was held. It was open to all applicants and few blacks actually attended. There was no evidence indicating what, if any, type of recruiting was done between 1968 and 1972, although the training courses did continue in those years. In

1972, the fire department accelerated somewhat its minority recruitment program. Two black firefighters testified that for a period of weeks they talked to organizations, at high schools and to people on the street trying to promote interest among blacks in the fire department. Each of them had also at different times been sent out of state, at the department's expense, to conferences of black firefighters where recruitment efforts and techniques were apparently discussed. A Spanish-surnamed firefighter testified that he spent approximately two weeks in 1972 doing full-time recruitment work in the predominantly Spanish-speaking neighborhood of Boston. He passed out leaflets and arranged for announcements to be made over a Spanish radio program. About 100 people indicated an interest but he recalls only approximately 30 showed up for the first training class and that number rapidly dwindled.

All witnesses who were asked agreed that the greatest source of new applicants for the fire department is word of mouth and encouragement from friends and relatives already on the force. This was recognized as being true in the police department by Judge Wyzanski in his order approving the consent decree in Castro v. Beecher, 365 F.Supp. 655 (D.Mass., 1973), at 659. This Court is of the opinion that the fire department itself is the entity more closely concerned with getting people to fill vacant positions on the force. If indeed, for so many years those positions have been filled as the result of white firemen encouraging white friends and relatives to join the force, it is no little wonder that blacks and Spanish-surnamed persons represent such an insignificant percentage of the force. It is of course most understandable how this has happened and the Court wishes to make it clear that it is not suggesting such an exclusionary policy has been followed intentionally or by design. Such a finding is not essential for the granting of injunctive relief. [See *Griggs, supra.*] Where, however, the policy has in effect resulted in the exclusion of minorities*520 from the fire department, the policy must be changed and present effects of past discrimination must be remedied.

[10] From these facts the Court has determined that plaintiffs will suffer irreparable harm in the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

371 F.Supp. 507

371 F.Supp. 507, 7 Empl. Prac. Dec. P 9162, 7 Fair Empl.Prac.Cas. (BNA) 307
(Cite as: 371 F.Supp. 507)

Page 13

nature of a lack of equal opportunity to compete for jobs on the Boston Fire Department, that the granting of preliminary relief will not cause irreparable harm to the defendants, that plaintiffs are likely to succeed on the merits, and that the public has an interest in being served by a fire department which offers equal opportunity for employment to all of its citizens.

### Relief

There is a substantial body of case law allowing, and in some instances requiring, affirmative relief to remedy the present effects of past discrimination. " We bear in mind that the court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." Louisiana v. United States, 380 U.S. 145, 154, 85 S.Ct. 817, 822, 13 L.Ed.2d 709 (1964). See also *Associated General Contractors, supra,* and cases cited therein at 361 F.Supp. 1303-1307. Affirmative relief has been granted, in particular, in a number of cases where discriminatory hiring practices have been found in municipal police and fire department hiring policies. See Vulcan Society v. Civil Service Commission, supra, 490 F.2d 387 (Nov. 21, 2nd Cir., 1973); Bridgeport Guardians, *supra;* Commonwealth v. O'Neill, 473 F.2d 1029 (3rd Cir., 1973) ; Castro v. Beecher, *supra,* at 459 F.2d 725; Carter v. Gallagher, *supra;* Officers for Justice, *supra;* Harper v. Mayor and City Council of Baltimore, 359 F.Supp. 1187 (D.Md., 1973).

The Court is vested with broad discretionary power in shaping equity decrees. "Moreover, in constitutional adjudication as elsewhere, equitable remedies are a special blend of what is necessary, what is fair, and what is workable. 'Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs.' [Brown v. Board of Education, 349 U.S. 294, 300, 75 S.Ct. 753, 99 L.Ed. 1083 (1955).]" Lemon v. Kurtzman, 411 U.S. 192, 200, 93 S.Ct. 1463, 1469, 36 L.Ed.2d 151 (1972). In framing its relief this Court has attempted to "eschew rigid absolutes and look to the practical realities and

necessities inescapably involved in reconciling competing interests, notwithstanding [that] those interests have constitutional roots." *Lemon, supra,* at 201, 93 S.Ct., at 1469. Among other things, the Court has considered the importance of preserving morale within the fire departments and avoiding racial discord. It has considered the understandable anxiety of men currently on existing Civil Service eligibility lists and is concerned that they not be dealt with unfairly. It is concerned with the future of plaintiffs who have been discriminated against, though it be unintentional, and who seek an equal opportunity to compete for positions on the fire departments throughout the Commonwealth. And it is concerned with the public which deserves to have a full complement of qualified firefighters protecting the cities and towns of the Commonwealth.

The Court has studied the proposed decrees submitted by the parties and has studied and adopted some thoughts from the final consent decree entered in Castro v. Beecher, *supra.* The Court would like to add that the following decree is subject to amendment where the parties so agree and with the approval of the Court.

### Decree

This case having come before the Court for a hearing on plaintiffs' motion for preliminary injunction and the parties having agreed pursuant to Federal Rule of Civil Procedure 65(a)(2) that the evidence presented on the testing issues should be considered as the *521 evidence on the trial on the merits, and the Court having heard the testimony of the witnesses and the oral arguments of the parties for approximately five and one-half trial days, and the Court having considered the oral and documentary evidence presented, the briefs and arguments of counsel, and having made findings of fact and conclusions of law, and being of the opinion that a decree should be entered; it is hereby ordered, adjudged and decreed:

[11] 1. The defendants City of Boston and Massachusetts Division of Civil Service and their officials, agents, employees, and all persons in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

371 F.Supp. 507, 7 Empl. Prac. Dec. P 9162, 7 Fair Empl.Prac.Cas. (BNA) 307
**(Cite as: 371 F.Supp. 507)**

active concert or participation with them are enjoined from engaging in any act or practice which has the purpose or effect of discriminating against any applicant or potential applicant for employment with the Boston Fire Department or any other fire department in the Commonwealth subject to Civil Service law.

2. No further certifications of permanent appointments shall be made to the position of firefighter for the City of Boston or other cities and towns subject to Civil Service law on the basis of the list completed from the August 1971 firefighter examination unless done in compliance with the terms of this decree.

3. The City of Boston and any other city or town subject to Civil Service law may request Civil Service for immediate certification of candidates who are currently on the existing Civil Service eligibility list to fill, on a provisional basis, existing vacancies or vacancies which may arise prior to full compliance with this decree. The Court further orders that the life of said list shall, if necessary, be extended beyond the time of its expiration under Massachusetts law and until a new eligibility list is established in accordance with this decree. Should the existing list prove insufficient to fill the number of vacancies existing, the cities or towns subject to Civil Service law may hire firefighters on a provisional basis. The method of selection shall be left to defendants' discretion.

[12] 4. The Massachusetts Division of Civil Service shall cease using written firefighter entrance examinations of the type administered by the Division of Civil Service in August 1971, for the purpose of determining qualifications for the selection of firefighters. Should the Division of Civil Service desire to utilize entrance examinations in the future for the purpose of selecting firefighters, such examinations shall be demonstrably job-related and validated in accordance with the "Guidelines on Employees Selection Procedures" issued by the Equal Employment Opportunity Commission, 29 C.F.R. § 1607.1 et seq., or otherwise shown to have no discriminatory impact. If the parties disagree as to whether a written examination has been shown to be

valid within the meaning of the Guidelines, the question of their validity and job relatedness shall be resolved by the Court, and such resolution, whether by the parties' agreement or by the Court, shall be accomplished before any such test is put into use for the purpose of qualifying or selecting. As with the instant study, the Court will scrutinize closely a future study which shows only a minimal level of job-relatedness.

[13] 5. Defendant City of Boston is preliminarily enjoined from requesting certifications of appointments for permanent positions on the fire department unless the following conditions have been complied with. Whenever openings occur in any positions covered by this Decree warranting the giving of an examination, the defendant City of Boston shall contact organizations in the black and Spanish-surnamed communities and high schools and junior colleges with substantial black and Spanish-surnamed enrollments and shall provide them with information regarding such openings, including qualifications and selection procedures, the rates of pay and hours of work and the time, place and method of applying for such vacancies.

6. At least 45 days prior to any examination for firefighter, the defendants**522** City of Boston and Division of Civil Service shall engage in such personal recruiting efforts and such public service and other announcements on radio and television stations and in other media directed at the black and Spanish-surnamed communities as are reasonably necessary in order to provide enough qualified black and Spanish-surnamed American applicants to achieve the goals set forth in this decree.

[14] 7. Subsequent to obtaining the results of a valid examination, the defendant Director of the Massachusetts Division of Civil Service, the defendants Massachusetts Civil Service Commissioners and their successors in office, shall promptly commence certifying firefighter applicants as eligible for appointment for each fire department subject to Civil Service. For each fire department a pool of eligible firefighter candidates shall be established and candidates certified in the following manner:
　(a) Group A shall consist of all black and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

371 F.Supp. 507, 7 Empl. Prac. Dec. P 9162, 7 Fair Empl.Prac.Cas. (BNA) 307
**(Cite as: 371 F.Supp. 507)**

Spanish-surnamed applicants who failed any previous Fire Fighter Entrance Examination but passed the new valid examination and are otherwise qualified for appointment on the basis of existing requirements. Said candidates shall be ranked in accordance with existing Massachusetts law.

(b) Group B shall consist of all persons on the current eligibility list established on April 4, 1972. Said candidates shall be ranked in accordance with existing Massachusetts law except that any such persons who have been appointed to a fire department from said list on a provisional basis shall be listed first.

(c) Group C shall consist of all black and Spanish-surnamed persons, excluding those in Group A who shall pass the new valid examination and are otherwise qualified for appointment on the basis of existing requirements. Said candidates shall be ranked in accordance with existing Massachusetts law.

(d) Group D shall consist of all other persons, excluding those in Groups A, B and C, who pass the new valid examination and are otherwise qualified for appointment on the basis of existing requirements. Said persons shall be ranked in accordance with existing Massachusetts law.

8. In response to requisitions submitted by fire departments, candidates shall be certified to such departments on the basis of one candidate from Group A for every candidate certified from Group B until the list of candidates from Group A is exhausted.

9. Upon the exhaustion of Group A, candidates shall be certified to requisitioning fire departments on the following basis:

(a) For the Cities of Boston and Springfield, one candidate from Group C for each candidate certified from Group B.

(b) For all other cities and towns, one candidate from Group C for every 3 candidates certified from Group B, until the candidates from Groups B and C are exhausted.

(c) If Group B is exhausted prior to Group C, candidates will be certified from Group D in accordance with the ratio established for Group B in paragraphs 8 and 9.

10. Should a candidate qualify to be placed in Groups A, B or C, after exhaustion of the Group for which he is eligible, said Group will be revived for purposes of affording the candidate the position he would have enjoyed.

11. Upon the exhaustion of Groups A, B and C, candidates shall be certified from Group D. Groups C and D shall expire in accordance with Massachusetts law.

12. The above hiring procedure shall apply to all future eligibility lists established subsequent to a valid firefighter **\*523** entrance examination, and shall apply to all cities and towns subject to Civil Service law which have a minority population of 1% or more. Any new list established after the exhaustion of the list described herein shall include a Group of all eligible blacks and Spanish-surnamed persons (as in Group C) and a Group of all other eligible persons (as in Group D). Candidates shall be certified from each Group in accordance with the ratio established in paragraph 9. As a city or town achieves a complement of minorities commensurate with the percentage of minorities within the community, certifications will be made according to existing Massachusetts law.

13. At this time, the Court will make no specific order as to record-keeping or reporting on the part of the defendants. The Court will give the parties 30 days in which to attempt to reach a satisfactory agreement on those issues. The Court would expect the parties to bear in mind such considerations as the administrative burden to the defendants and the necessity of monitoring the implementation of this decree. If, at the expiration of the 30 days, the parties cannot agree on a satisfactory system, the Court will take appropriate action.

14. Plaintiffs' requests for damages and attorneys' fees are denied.

15. The Court shall retain jurisdiction for such further action as may be necessary or appropriate.

*Addendum*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

371 F.Supp. 507

371 F.Supp. 507, 7 Empl. Prac. Dec. P 9162, 7 Fair Empl.Prac.Cas. (BNA) 307
**(Cite as: 371 F.Supp. 507)**

It has come to the Court's attention that the
defendant Civil Service has scheduled an
examination for February 23, 1974. The Court
regrets the effect this decision will have on efforts
that have been made to inform candidates and
prepare them for that examination. However, the
defendants knew well during the pendency of this
action that a determination adverse to them would
most likely result in the Court's refusal to allow
such an exam to go forward. The Court is also
aware that defendants are making efforts to improve
the exam and continue meaningful recruitment
policies. Hopefully, such efforts will continue and,
in the future, result in a satisfactorily validated
exam with a significant number of black and
Spanish-surnamed applicants competing.

D.C.Mass., 1974.
Boston Chapter, NAACP, Inc. v. Beecher
371 F.Supp. 507, 7 Empl. Prac. Dec. P 9162, 7 Fair
Empl.Prac.Cas. (BNA) 307

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit D



504 F.2d 1017                                                                                       Page 1

504 F.2d 1017, 8 Fair Empl.Prac.Cas. (BNA) 855, 8 Empl. Prac. Dec. P 9678, 8 Empl. Prac. Dec. P 9765

**(Cite as: 504 F.2d 1017)**

▷

United States Court of Appeals, First Circuit.
BOSTON CHAPTER, N.A.A.C.P., INC., et al.,
Plaintiffs-Appellees,
v.
Nancy B. BEECHER et al., Defendants-Appellees,
Director and Commissioners of
Civil Service, Defendants-Appellants.
**No. 74-1067.**

Argued May 7, 1974.
Decided Sept. 18, 1974.
Costs Allocated Nov. 8, 1974.

Actions instituted by United States and by NAACP based on violation of civil rights with respect to the hiring of fire fighters, were consolidated. The United States District Court for the District of Massachusetts, Frank H. Freedman, J., entered judgment adverse to defendants, 371 F.Supp. 507, and an appeal was taken. The Court of Appeals, Levin H. Campbell, Circuit Judge, held that uncontroverted expert testimony that black and Spanish surnamed candidates typically performed more poorly on paper-and-pencil tests of multiple-choice type as used in test for fire fighters could be found in conjunction with other evidence to establish a prima facie case that the test had a racially discriminatory impact thus shifting burden to defendant employers to justify test by showing that it was job related; that record supported court's conclusion that defendants had not met burden of showing that written multiple-choice test for fire fighters was sufficiently job-related; and that where written multiple-choice test for fire fighters was found not job-related, court properly enjoined use of eligibles list from most recent test and any further administration of similar test until validated, and court also, in order to remedy past discrimination, properly ordered that a preference be given members of minorities in future hiring.

Affirmed.

West Headnotes

**[1] Civil Rights** ☞**1140**
78k1140 Most Cited Cases
(Formerly 78k153, 78k9.10)
A means of selection of employees may disqualify proportionally more minority candidates than others and thus have a racially disproportionate impact, yet not be discriminatory in the constitutional sense. 42 U.S.C.A. §§ 1981, 1983; U.S.C.A.Const. Amend. 14; Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[2] Civil Rights** ☞**1536**
78k1536 Most Cited Cases
(Formerly 78k378, 78k43)

**[2] Civil Rights** ☞**1546**
78k1546 Most Cited Cases
(Formerly 78k384, 78k44(2))
Uncontroverted expert testimony that black and Spanish surnamed candidates typically performed more poorly on paper-and-pencil tests of multiple-choice type as used in test for fire fighters could be found in conjunction with other evidence to establish a prima facie case that the test had a racially discriminatory impact thus shifting burden to defendant employers to justify test by showing that it was job related. 42 U.S.C.A. §§ 1981, 1983; U.S.C.A.Const. Amend. 14; Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[3] Civil Rights** ☞**1535**
78k1535 Most Cited Cases
(Formerly 78k377.1, 78k377, 78k44(1))
Equitable relief under Civil Rights Act and Fourteenth Amendment requires no proof of malice or fault. U.S.C.A.Const. Amend. 14; 42 U.S.C.A. §
§
1981, 1983; Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[4] Civil Rights** ☞**1127**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

504 F.2d 1017                                                                                               Page 2

504 F.2d 1017, 8 Fair Empl.Prac.Cas. (BNA) 855, 8 Empl. Prac. Dec. P 9678, 8 Empl. Prac. Dec. P 9765

**(Cite as: 504 F.2d 1017)**

78k1127 Most Cited Cases
(Formerly 78k146, 78k38)
Question was whether test for employment as fire
fighter denied applicants equal protection of laws
by creating "built-in headwinds" for those who,
although qualified to perform job, could not pass
test and, if it did, the inequality could be remedied
without regard to official malice, specific intent, or
actionable neglect. U.S.C.A.Const. Amend. 14; 42
U.S.C.A. §§ 1981, 1983; Civil Rights Act of 1964,
§ 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[5] Civil Rights ☜1546**
78k1546 Most Cited Cases
(Formerly 78k384, 78k44(2))
Record supported court's conclusion that defendants
had not met burden of showing that written
multiple-choice test for fire fighters was sufficiently
job-related. U.S.C.A.Const. Amend. 14; 42
U.S.C.A. §§ 1981, 1983; Civil Rights Act of 1964,
§ 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[6] Civil Rights ☜1561**
78k1561 Most Cited Cases
(Formerly 78k392, 78k46(3), 78k46)
Where written multiple-choice test for fire fighters
was found not job-related, court properly enjoined
use of eligibles list from most recent test and any
further administration of similar test until validated,
and court also, in order to remedy past
discrimination, properly ordered color-conscious
relief in form of a preference for members of
minorities in future hiring. 42 U.S.C.A. §§ 1981,
1983; U.S.C.A.Const. Amend. 14; Civil Rights
Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et
seq.

**[7] Civil Rights ☜1560**
78k1560 Most Cited Cases
(Formerly 78k391.1, 78k391, 78k46(2), 78k46)
In civil rights case, color-conscious relief
undertaken in order to redress past discrimination
with respect to employment, whether or not
intentional, is permitted, and is not precluded by
provision of Title VII of Civil Rights Act of 1964
which deals only with those cases in which racial
imbalance has come about completely without
regard to actions of employer. Civil Rights Act of

1964, § 703(j), 42 U.S.C.A. § 2000e-2(j).

**[8] Federal Courts ☜268.1**
170Bk268.1 Most Cited Cases
(Formerly 170BK268, 106k303(2))
Eleventh Amendment did not immunize director
and commissioners of state civil service division
from being taxed for costs of appeal. Fed.Rules
App.Proc. rule 39(a), 28 U.S.C.A.; U.S.C.A.Const.
Amend. 11.
**\*1018** Edward D. Kalman, Asst. Atty. Gen., with
whom Robert H. Quinn, Atty. Gen., and Walter H.
Mayo, III, Asst. Atty. Gen., Boston, Mass., were on
brief, for appellants.

David L. Rose, Atty., Dept. of Justice, with whom
Stanley Pottinger, Asst. Atty. Gen., Washington,
D.C., James Gabriel, U.S. Atty., Boston, Mass., and
James M. Fallon, Atty., Dept. of Justice,
Washington, D.C., were on brief for United States,
appellee.

Patrick J. King, Boston, Mass., with whom Thomas
A. Mela, Boston, Mass., was on brief, for
N.A.A.C.P. et al., appellees.

Before COFFIN, Chief Judge, McENTEE and
CAMPBELL, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

For many years applicants for the position of fire
fighter in the cities and towns of Massachusetts
have had to pass a written multiple-choice test (the
'test'), administered by the Massachusetts Division
of Civil Service. The Division appeals from a
district court decision holding the test insufficiently
related to a fire fighter's duties to justify its
disproportionate impact upon black and Spanish
surnamed applicants and ordering a preference to be
given members of those minorities, in future hiring,
to remedy past discrimination. 371 F.Supp. 507
(D.Mass.1974).

Two actions brought against Boston, its Fire
Commissioner and Massachusetts Civil Service
officials were consolidated in the district court. The
first was brought late in 1972 by the Boston

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

504 F.2d 1017, 8 Fair Empl.Prac.Cas. (BNA) 855, 8 Empl. Prac. Dec. P 9678, 8 Empl. Prac. Dec. P 9765

**(Cite as: 504 F.2d 1017)**

Chapter, N.A.A.C.P., Inc., and by black and Spanish surnamed individuals under 42 U.S.C. §§ 1981, 1983, and the Fourteenth Amendment. [FN1] Plaintiffs alleged that standards and procedures for recruiting and hiring fire fighters had the forseeable effect of discouraging minority *1019 employment. The test, a swim requirement, and the disqualification of those with felony records were all challenged. A second action was brought early in 1973 by the Attorney General of the United States under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as amended by the Equal Employment Opportunity Act of 1972. Both suits sought not only orders forbidding the challenged practices but also remedial hiring of enough minority individuals to offset past discrimination.

> FN1. This was brought and certified as a class action. The first certified class was 'All black or Spanish-surnamed persons who have applied for the position of firefighter in any fire department . . . subject to Massachusetts Civil Service law, but have not become eligible for appointment under existing requirements'. The other class included all who never applied because they were deprived of information concerning fire fighter employment opportunities.

The district court held a hearing at which evidence was introduced concerning the alleged discriminatory hiring practices and the disproportionate racial impact of the test. After the hearing the parties stipulated that it would be treated as one on the merits of the testing issue, but would cover only the 'preliminary injunction stage' of the recruiting challenge. Objections to the felony disqualification and the swim test were not pressed at the hearing, but have not been abandoned. The district court's opinion and judgment enjoined use of the test in its current form, ordered Boston and its Fire Commissioner to engage in additional recruiting of minorities, and awarded minorities a preference in hiring to ameliorate the effects of past discrimination. Boston and its Fire Commissioner took no appeal from the court's adverse rulings.

I

In Castro v. Beecher, 459 F.2d 725, 732 (1st Cir. 1972), we held that an employer may use a means of selection having a 'racially disproportionate impact' only if he can show 'that the means is in fact substantially related to job performance'. See Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). The approach is thus two-pronged: those challenging an employment test must establish its disproportionate impact by demonstrating that, for whatever reason, it is more of a hurdle for minority members than for others; once this is shown, the test's proponents acquire a burden of justification and must 'prove that the disproportionate impact was simply the result of a proper test demonstrating lesser ability of black and Hispanic candidates to perform the job satisfactorily'. Vulcan Society v. CSC, 490 F.2d 387, 392 (2d Cir. 1973).

[1] Some courts, including the court below, describe the showing plaintiffs must make as a 'prima facie case' of 'racial discrimination'. We use 'racially disproportionate impact' because it is a neutral and seemingly more accurate description. A means of selection may disqualify proportionally more minority candidates than others and thus have a racially disproportionate impact, yet not be discriminatory in the constitutional sense. In Castro, for example, we approved a high school diploma requirement for police even while recognizing a disparity between blacks and Spanish surnamed candidates and others in respect to a high school education. [FN2] We thought a high school education was a 'bare minimum for successful performance of the policeman's responsibilities'. Castro, supra 459 F.2d at 735. But we disapproved a paper-and-pencil test which also bore more heavily on blacks and Spanish than others because it was not proven 'convincingly' that there was a 'fit between the qualification and the job'. Id. at 732.

> FN2. Cf. Berkelman v. Unified School Dist., 501 F.2d 1264, pp. 1265-1268 (9th Cir. 1974).

Plaintiffs usually meet their initial burden by

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

504 F.2d 1017, 8 Fair Empl.Prac.Cas. (BNA) 855, 8 Empl. Prac. Dec. P 9678, 8 Empl. Prac. Dec. P 9765

**(Cite as: 504 F.2d 1017)**

demonstrating that minority candidates have a higher test failure rate; defendants are then put to their proof of job-relatedness. Here, however, the district court found inadequate the only available sampling showing how blacks and Spanish have fared on the test, [FN3] although it found much evidence *1020 that blacks and Spanish have held disproportionately few jobs in the fire departments of the major Massachusetts cities where most of them reside. [FN4] Until recently relatively few minority members applied for fire fighting jobs, resulting in a very small sample from which to draw conclusions about their comparative test performance.

> FN3. Applicants taking the August 1971 test were given the option of identifying their race, color or national origin. 84% Did so. Out of 33 individuals self-identified as black or Spanish, 13 or 39% Passed. The court felt the statistics were 'obviously meager' and declined to find that 'in themselves' they established a prima facie case, although, insofar as they went, the statistics showed a disparity, because of 3089 Caucasians, 1737 or 56% Passed. Cf. Chance v. Board of Examiners, 458 F.2d 1167 (2d Cir. 1972); Carter v. Gallagher, 452 F.2d 315 (8th Cir. 1971).

> FN4. 1970 census figures show that in Boston, with a 1970 black population of over 16%, black fire fighters made up less than 1% Of the force; Springfield's black population exceeded 12% But blacks made up less than 0.2% Of the force. And, as the district court pointed out, the combined black and Spanish minority in Boston is today probably closer to 23% Than to 16%. Cambridge shows a lesser discrepancy, although still a very sizable one. New Bedford and Worcester, with smaller minority populations, reflect the least disparity. Census data as to Spanish surnamed individuals show that nearly 3% Of Boston's population, but only 0.1% (two individuals) of the fire department, fit

within that category. Springfield has no Spanish surnamed fire fighters, although Spanish comprise 3.4% Of its population. Cambridge, New Bedford and Worcester had substantial disparities.

We find no error in the district court's reliance on statistics pertaining to the cities proper rather than to metropolitan regions. Cf. Town of Milton v. CSC, Mass.1974, 312 N.E.2d 188. We note that even within the Greater Boston area, with a black population in 1970 of 4.6%, the disparity is substantial; the same is true in Springfield. See also Associated General Contractors of Massachusetts, Inc. v. Altshuler, 361 F.Supp. 1293 (D.Mass.1973), aff'd, 490 F.2d 9 (1st Cir. 1973), cert. denied, 416 U.S. 957, 94 S.Ct. 1971, 40 L.Ed.2d 307 (1974).

It would, of course, be unreasonable to expect perfect correlation between ethnic groupings and the holders of a particular job, but when there is only one minority fireman out of 475 in a city like Springfield with a large black or Spanish surnamed population, the imbalance is obvious.

The district court concluded that the census figures, especially those for Boston and Springfield, when used 'in support of the meager exam statistics', established a prima facie case of the test's discriminatory effect. The court correctly noted that

'such a finding is not determinative of the issue but merely shifts the burden to the defendant to justify the use of the exam. This is a burden a public employer should not be unwilling to assume.' 371 F.Supp. at 514.

We need not decide whether census figures showing a gross disproportionality in the employment of black and Spanish surnamed fire fighters and others are enough, standing alone, to shift the burden of justification to defendants. In Castro, when dealing with a relatively innocuous height requirement, we declined to impose a burden of justification upon defendants in the absence of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

504 F.2d 1017                                                                                                    Page 5

504 F.2d 1017, 8 Fair Empl.Prac.Cas. (BNA) 855, 8 Empl. Prac. Dec. P 9678, 8 Empl. Prac. Dec. P 9765

(Cite as: 504 F.2d 1017)

any evidence that the height requirement adversely affected minority candidates. On the other hand, the present test, given for more than half a century, is a far more salient selection device, and it can be argued that a showing of significant disproportionality in minority employment, coupled with even minimal proof of a higher minority failure rate, is enough to shift to the Division of Civil Service the burden of justification. [FN5] Cf. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Disproportionate impact or prima facie discrimination are simply labels that aid in singling out qualifications which it is reasonable to ask an employer to justify; 'complete mathematical certainty' is not required. Vulcan Society, supra 490 F.2d at 393. When widespread minority underemployment is shown to exist in a given occupation, primary selection devices should not be immunized *1021 from study by placing an unrealistically high threshold burden upon those with least access to relevant data. This seems especially so when the small size of the sample may be traceable to the test's discouraging effect as well as to unequal recruitment practices. [FN6]

> FN5. Mayor of the City of Philadelphia v. Educational Equality League, 415 U.S. 605, 94 S.Ct. 1323, 39 L.Ed.2d 630 (1974) , is not to the contrary. The Court emphasized that in many cases it is proper to infer discriminatory intent or impact from racial statistics. Id. 415 U.S. at 619-621, 94 S.Ct. at 1333. See also Fiss, A Theory of Fair Employment Laws, 38 U.Chi.L.Rev. 235, 270-81 (1971).

> FN6. Plaintiffs argue that the vice of the test is as much its tendency to discourage minority members from applying as that minority applicants may be expected to perform less well. If so, this is a reason for not holding the smallness of the sample against plaintiffs. Moreover, the sample of those minorities who do take the test is self-selected; and, for all we know, only especially motivated and competent minority members took the test. The 39%

Passing rate might be higher than the rate would be from a random sample. In any event where, as here, the minority sample is disproportionately low, it is both dangerous to rely too heavily on the figures and unfair to ignore them entirely.

[2] But we do not decide on this issue alone. What in our view conclusively tips the scale in plaintiffs' favor is the uncontroverted testimony, from experts called by both sides, that black and Spanish surnamed candidates typically perform more poorly on paper-and-pencil tests of this type. See Cooper & Sobol, Seniority & Testing Under Fair Employment Laws: A General Approach to Objective Criteria of Hiring & Promotions, 82 Harv.L.Rev. 1589, 1640 (1969). (Cf. Castro, supra, where black and Spanish police candidates were shown to have performed more poorly than did whites on a test of similar design.) In light of the expert testimony, we cannot say that the district court was clearly erroneous in its ultimate fact finding that plaintiffs had established a prima facie case. [FN7] The burden thus shifted to the defendants to justify the test by showing that it was job-related.

> FN7. Any written test in English would seem obviously harder for persons whose native tongue is Spanish. Other evidence at trial supported the view that the test bore more heavily on minorities. For example, the court found that Boston fire fighters were often recruited by relatives and friends. Minority applicants, lacking access to such sources of aid and advice, might find it harder to absorb the technical subject matter covered in the test. They could try to memorize the 'Red Book', but such information is doubtless more easily absorbed by those exposed to fire fighters and firehouse routines. Such considerations do not, of course, invalidate the test; they are merely additional reasons for inquiring into its utility as a bona fide predictor of job performance.

That Massachusetts did not intentionally

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

504 F.2d 1017

504 F.2d 1017, 8 Fair Empl.Prac.Cas. (BNA) 855, 8 Empl. Prac. Dec. P 9678, 8 Empl. Prac. Dec. P 9765

(Cite as: 504 F.2d 1017)

Page 6

discriminate is immaterial. Title VII proscribes 'standardized testing devices which, however neutral on their face, operated to exclude many blacks who were capable of performing effectively in the desired positions'. McDonnell Douglas Corp., supra, 411 U.S. at 806, 93 S.Ct. at 1826. See Griggs, supra, 401 U.S. at 431-432, 91 S.Ct. 849. Equitable relief under the Civil Rights Act and the Fourteenth Amendment requires no proof of malice or 'fault'. 'The result, not the specific intent, is what matters'. Rozecki v. Gaughan, 459 F.2d 6, 8 (1st Cir. 1972). See Inmates of the Suffolk County Jail v. Eistenstadt, 494 F.2d 1196 (1st Cir. 1974), application for cert. filed, No. 73-1992 (U.S. July 8, 1974). The question is whether the test denied applicants equal protection of the laws by creating 'built-in headwinds' for those who, although qualified to perform the job, cannot pass the test. If it did, the inequality may be remedied without regard to official malice, specific intent, or actionable neglect. [FN8]

> FN8. The standard would, of course, be different were we considering a damages award against individual officials. Cf. Palmigiano v. Mullen, 491 F.2d 978, 980 (1st Cir. 1974).

II

The district court found that defendants had not met their burden. The defendants' major task in doing so was to show a substantial relationship between the test results and job performance. A test fashioned from materials pertaining to the job (here, from a preliminary fire fighters' manual) superficially may seem job-related. But what is at issue is whether it demonstrably selects people who will perform better the required *1022 on-the-job behaviors after they have been hired and trained. The crucial fit is not between test and job lexicon, but between test and job performance.

In fairness to the state, we must not forget that civil service tests were instituted to replace the evils of a subjective hiring process. Little will be gained by minorities if courts so discourage the use of tests that the doors to political selection are reopened.

Moreover, a test, even one the cutoff of which does not demonstrably predict job performance, may serve worthwhile goals in gross by sifting from the pool of potential applicants those without enough motivation even to try to acquire the skills the test demands, and by discarding some few candidates who take the test but whose mental ability is so low that they are obviously unsuitable. Finally, it is virtually impossible for an employer to justify to a mathematical certainty every selection device. Controlled experiments in which applicants are hired without regard to their test scores may be impractical in many cases, and so those who fail the test often are not available to be evaluated on the job. If they are not, it is impossible to prove that they would have performed less competently.

[5] Nonetheless, we think that the judgment of the district court is amply supported by the record, and we agree with it. Too many doubts persist concerning the validity of this test, the format of which has persisted for years, to make a convincing case for its unaltered use in fire departments notable for the absence of minority employees. Although perfect tests are goals as illusory as perfect schools or perfect courts, the evidence justifies compelling defendants to attempt to fashion a more sensitive test, one that will not needlessly serve as a 'built-in headwind' to competent minority members, depriving both them and the Commonwealth of an opportunity for which they are qualified.

The test in recent years has had two parts, one of twenty-five questions covering current events, spelling, vocabulary and arithmetic, and the other of seventy-five questions taken verbatim from the 'Red Book', a fire fighter's preliminary manual available from state officials. A score of 70 is required for qualification. [FN9] Some questions call for considerable verbal skill: an applicant is asked whether 'condense' means '(a) conduct (b) expand (c) evaporate (d) contract' and to recognize that 'pressurised' rather than 'bouyancy' was misspelled. The second part asks questions such as: 'the name given to the fire fighter who carries the play pipe end of the hose up the ladder is (a) engineman (b) pumpman (c) nozzleman (d) hoseman'. In some instances, questions on the second part required

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

504 F.2d 1017                                                                                                    Page 7

504 F.2d 1017, 8 Fair Empl.Prac.Cas. (BNA) 855, 8 Empl. Prac. Dec. P 9678, 8 Empl. Prac. Dec. P 9765

(Cite as: 504 F.2d 1017)

knowledge of apparently obsolete equipment.

> FN9. Applicants with a score of 70 or above were rated for prior training and experience, and this rating was incorporated into a composite rating. The composite was determined 70% By the test and 30% By the training and experience score. A composite score under 70 resulted in rejection. Thereafter the applicant was required to pass a medical, meet certain strength requirements, and demonstrate good moral character (including an absence of felony convictions). Applicants meeting these further requirements are then ranked by their composite scores from 100 down to 70. However, disabled veterans are ranked ahead of veterans, and veterans ahead of non-veterans regardless of score. The list of eligibles thus created continues in force until exhausted or for two years. Previous lists have all expired by exhaustion when all eligibles were offered positions.
> Localities may set their own additional education and residence requirements. Fifteen departments, not including Boston, require a high school diploma or equivalency. All localities require the applicant to be a resident.

The test was not professionally developed. The civil service examiner who wrote the latest versions was without professional training in employment or psychological testing, and did not consult with anyone who had such training. No analysis of required job skills was *1023 conducted, and the author (who was not skilled in fire fighting) relied on the civil service 'poster' setting forth the principal 'duties' of a fire fighter, and on the Red Book. After a test was given, civil service personnel would analyze 50 to 100 answer sheets and, in later versions, eliminate questions that were too easy (because most people got them right) or too hard (because most answers were wrong). [FN10] The 'passing' score of 70 was selected arbitrarily, without reference to the expected or actual distribution of scores.

> FN10. Because the questions often changed it seems possible that the same person in successive administrations of the test would not receive the same or a comparable score. This is a problem in testing even when the questions are constant. See American Psychological Ass'n, Standards for Educational and Psychological Tests & Manuals 25-32 (1966), incorporated by reference in EEOC Guidelines, 29 C.F.R. § 1607.5(a). No reliability study of the tests has ever been conducted.

The general questions in the first part of the test have nothing to do with firefighting, and plaintiffs' expert [FN11] was of the opinion that they were not useful even as an index of general intelligence. Defendants may plan to delete such questions in the future; in any event, unless the correlations discussed below between the overall test scores and the performance of certain groups of tasks by selected fire fighters may be said to validate the first-part questions, there is no evidence at all that they are job-related.

> FN11. The district court committed no abuse of discretion in permitting plaintiffs' expert to testify. She was a psychologist with distinguished credentials who was engaged in a fire fighters' test validation study. The qualifications of experts are largely matters within the district court's discretion. See Texas Instruments, Inc. v. Branch Motor Express Co., 432 F.2d 564, 566 (1st Cir. 1970).

The second-part questions deal with fire fighting, yet there is a difference between memorizing (or absorbing through past experience) fire fighting terminology and being a good fire fighter. If the Boston Red Sox recruited players on the basis of their knowledge of baseball history and vocabulary, the team might acquire authorities like John Kieran but who could not bat, pitch or catch. The test does not examine traits seemingly more relevant to a fire fighter's performance such as agility, stamina, quick thinking under pressure, poise, mechanical aptitude

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

504 F.2d 1017    Page 8

504 F.2d 1017, 8 Fair Empl.Prac.Cas. (BNA) 855, 8 Empl. Prac. Dec. P 9678, 8 Empl. Prac. Dec. P 9765

(Cite as: 504 F.2d 1017)

and the ability to work with others. Experts for both sides agreed that verbal memory is not a very important attribute for the job. And unlike the motor vehicle rules covered in a driver's test, it seems unessential whether the candidate absorbs the tested vocabulary before or after acceptance. Nomenclature and similar matters can be mastered during training and on the job. Testing them before acceptance puts a premium on ability to memorize terms that, at the time, contain only abstract meaning.

Because the test measures a type of achievement not especially relevant to the job, one would not expect it to predict job success. It may be, however, that neither the test designer nor the court can understand how the score on the test successfully predicts. Perhaps, for example, the questions about machines are indirect indicators of mechanical aptitude. Recognizing these possibilities, the district court felt that careful scrutiny of any claimed predictive value was in order. We agree, and now seek to answer whether, against all odds, the test has been shown to be an actual predictor of on-the-job success.

Defendants attempted to establish job-relatedness through an expert engaged to conduct a validation study. See generally the test validation Guidelines of the EEOC, 29 C.F.R. § 1607. The expert stated that, in his opinion, his study established that the test was valid under the Guidelines which, according to Griggs, supra, 401 U.S. at 434, 91 S.Ct. 849, should be treated as 'expressing the will of Congress'.

The validation study conducted by defendants expert had two parts. The first part sampled 'objective' measures of job performance, such as all of the *1024 chores involved in raising a ladder and properly evolving the fire hose and its connections. These chores were further broken down into discrete components, and observers of the test subjects' performance gave either credit or no credit for each component. The total score of each subject was then added and compared to his test score both on an overall basis and on a chore-by-chore basis. It was found that the performance on the test 'predicted' (was correlated to) the performance scores on a number of the chores.

The second part of the validation study involved rating of fire fighters by their superiors on twelve 'subjective' performance scales, including such diverse measures as 'holding up under pressure' and 'overall job effectiveness'. None of these twelve scales, nor the combination of the twelve scales together, correlated significantly to the scores on the test. [FN12]

> FN12. The correlation between the test and all supervisory ratings was $r = 0.078$. Were this statistically significant, it would indicate that the grade 'explained' only approximately 0.6% Of all observed variance in fire fighters' on-the-job performance.

Defendants' expert contended that the test was valid in spite of its failure to correlate to the overall measures of job performance, and suggested that the Guidelines were satisfied by the statistically significant correlation between the test and two of the objective measures. [FN13] The district court, however, concluded that the correlations were 'barely significant' and concluded that defendants had not demonstrated that the test was 'in fact substantially related to job performance'. It stated that:

> FN13. The objective portion of the study produced several correlations that were statistically significant (likely to occur by chance in fewer than five of one hundred similar cases) and practically significant (correlation of ⟵ 0.3 or higher, thus explaining 9% Or more of the observed variation). Of the seven statistically significant correlations, four were not practically significant. Of the remaining three correlations, only two were correlations between the test and an objective measure; the third was a correlation between the composite mark and an objective measure.
> Defendants' expert also found that there

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

504 F.2d 1017, 8 Fair Empl.Prac.Cas. (BNA) 855, 8 Empl. Prac. Dec. P 9678, 8 Empl. Prac. Dec. P 9765

**(Cite as: 504 F.2d 1017)**

was no statistically or practically significant correlation between test scores and all objective criteria taken together.

Thus of all possible measures, the test score produced a meaningful correlation only to air mask operation and to the subject's performance as loop man in the evolution of the hose line.

'The fact that only two . . . significant correlations were found between the exam and components of job performance-- components which represent only a fraction of those duties a firefighter encounters-- and the fact that those correlations were only minimally significant does not constitute 'convincing' evidence of job relatedness.' 371 F.Supp. at 517-518.

The district court's conclusion was not erroneous. Substantial doubt is cast on the test's validity by its failure to correlate at all with any of the subjective ratings or with the overall objective ratings. Only two of the tasks on the objective portion of the study correlated with the test, and the correlation there was not impressive. These rather meager signs of validity do not convince us, nor did they convince the district court, that the test is, as Castro demanded, 'substantially related to job performance'. The state has not come forward with 'convincing facts establishing a fit between the qualification and the job'. Id. 459 F.2d at 732. We do not think the district court was bound to find either compliance with the Guidelines or 'job-relatedness' in a more general sense. The Guidelines are not satisfied by just any correlation to any facet of job performance. They require close scrutiny of 'the use of a single test as a sole selection device . . . when that test is valid against only one component of job performance'. § 1607.5(c). The test here, and the validation study performed by defendants' expert do not survive close scrutiny.

We have already indicated several difficulties with the test: it was not professionally **\*1025** developed; its content does not appear to be job related; the cutoff score of 70 is arbitrary; the validation study reveals no correlation to overall measures, either

subjective or objective, and only minimal correlation to two individual objective tasks. Another significant defect in the evaluation-- a defect that from defendants' point of view is perhaps unavoidable, although see Guidelines § 1607.9(b)-- is that the groups evaluated consisted entirely of fire fighters who had passed the test. No one who had received a score lower than 70 was included. The validation study was therefore 'concurrent' rather than the more useful 'predictive' type. See United States v. Georgia Power Co., 474 F.2d 906 (5th Cir. 1973) (validation study unacceptable because concurrent). Since no one scoring less than 70 was evaluated, there is no evidence that those failing would be less capable as fire fighters than those passing. Although there is probably some score that would reflect substantially deficient motivation or ability to understand or communicate, so that such an applicant would be unsuitable even for a job that does not emphasize paper-end-pencil skills, we do not know where that point may be.

The data which the study did produce is said to reveal that fire fighters who passed and got high scores were superior in a few ways to fire fighters who passed with lower scores. We are then asked to infer that applicants who fail the test would have performed the same tasks more poorly still. The inference is a difficult one to draw. A very high passing score might indicate a special motivation or knowledge. On the other hand, the differences reflected by test scores in the range of 50 to 80 might be altogether negligible. We cannot tell. But a correlation within the range of 70 to 100 can easily be produced by data that would indicate no significance in differences in the 50 to 70 range. Particularly when the data are concurrent, the correlations should be more striking than they were here. [FN14]

> FN14. Another way to make the same point is to say that a test should be valid for the purpose for which it is used. Apparently nearly all those who score over 70 and are placed on an eligibles list are eventually offered employment. Thus, the test is not chiefly used to choose between a score of 70 and a score of 95, and it is not

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

504 F.2d 1017                                                                              Page 10

504 F.2d 1017, 8 Fair Empl.Prac.Cas. (BNA) 855, 8 Empl. Prac. Dec. P 9678, 8 Empl. Prac. Dec. P 9765

**(Cite as: 504 F.2d 1017)**

particularly helpful to know that the applicant with a score of 95 is apt to excel. The test's main use is to choose between the applicant with, for example, a 65 and the applicant with a 71; but because the validation study is concurrent, we do not know whether it is valid in that range.

We also find it significant that the defendants never attempted to demonstrate that alternatives to the test are unavailable. The Guidelines require such proof, § 1607.3. In its absence, we hesitate to approve a test of racially disproportionate impact and slight, if any, validity.

Finally, although we do not find them necessary to the result we reach here, we have doubts about the way in which the validation study was performed. The sample for the study was selected from a single administration of the test. But on average those hired for civil service jobs are selected in their order on the roster of eligibles, which is ranked from highest to lowest (with the exception of veterans) in test score. From any given list the highest ranking persons have been hired the earliest. Therefore, the sample for the study would seem biased; those with higher scores also had additional experience on the job. Could it be that the few observed correlations are explained by on-the-job experience rather than test score?

Moreover, no attempt was made to explain the effects, if any, of filtering that occurred even after the examination. Those who passed the test but would have made poor fire fighters may have been filtered from the sample by the time of the study because of voluntary resignations, release for unsuitability in training or on the job, failure of the physical, etc. Those remaining in the *1026 sample of the study are a select group indeed, while those who failed the test but would perhaps have made good fire fighters are entirely missing from the sample.

Even if the test is minimally valid, we might also doubt its use as an absolute cutoff. A test seemingly should receive no more weight in the selection process than its validity warrants. Use of a

minimally valid test as an absolute cutoff is questionable even if more limited uses of the test are acceptable.

Finally, no effort has been made to include minorities in the sample of the study. The Guidelines so require, §§ 1607.4(a), 1607.5(b)(5). The Georgia Power court has agreed. The challenge leveled at the test is that it has a disproportionate and unwarranted impact on minority group members; it is difficult to quantify this impact-- or to disprove it-- unless some of those who were allegedly adversely affected are included in the study. We understand the practical difficulties, particularly in a job population almost devoid of minorities. But we urge that consideration at least be given to the problem as a new test is evolved.

There are, in sum, too many problems with the test for us to approve it here. The district court was correct in ruling that defendants had not discharged their burden.

III

There remains for discussion the remedy selected by the district court. In Castro we required the district court, as a means of ameliorating the continuing effects of past discrimination, to institute a program of color-conscious relief that included priority pooling of minorities, with choices made from the priority pool until it was exhausted. See 365 F.Supp. 655 (D.Mass.1973) (consent decree on remand).

[6] The relief ordered in the instant case follows this pattern. The court first enjoined use of the eligibles list from the most recent test and enjoined any further administration of any similar test until it was validated. This was the proper course under our decision in Castro. Cf. Vulcan Society, supra; Bridgeport Guardians, Inc. v. Bridgeport CSC, 482 F.2d 1333 (2d Cir. 1973). The court then created four eligibility groups: in Group A will be all black and Spanish surnamed applicants who took and failed any previous test, but who pass any new and valid test. [FN15] In Group B are all persons on the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

504 F.2d 1017                                                                                                          Page 11

504 F.2d 1017, 8 Fair Empl.Prac.Cas. (BNA) 855, 8 Empl. Prac. Dec. P 9678, 8 Empl. Prac. Dec. P 9765

(Cite as: 504 F.2d 1017)

current eligibility list. Group C will contain all black and Spanish surnamed persons who do not belong in Group A but who pass a new examination and are otherwise qualified. Group D will be composed of all other persons who pass the new examination. Any Massachusetts community subject to the Civil Service law and having a minority population of one percent or more must submit requisitions to the Division of Civil Service for any fire fighter openings they may seek to fill. The Division is then to certify candidates to such departments by means of a matching procedure designed to ensure that each Group receives proportional representation in accordance with their qualifications. Groups A and B are to be given initial preference on a one-to-one basis, and the other Groups are to be drawn upon as A and B are exhausted. The ratios to be implemented for Boston and Springfield are slightly different than those for the rest of the state, in recognition of their larger minority populations. In all cases new eligibility lists from successive entrance tests shall be used to replenish Groups C and D. The *1027 decree remains in force, for each local fire department, until that department attains sufficient minority fire fighters to have a percentage on the force approximately equal to the percentage of minorities in the locality. After that point the locality is freed from the decree and may make appointments on any nondiscriminatory basis. In no case must may unqualified minority person be appointed; if no qualified applicants are available, none will be appointed. [FN16]

> FN15. Group A shares with Groups C and D the criterion of passing a new and valid test. It is possible that no such satisfactory examination can be devised and validated within a reasonable time. If this should occur, the district court may of course amend the decree, should a party so request, to provide for placement into groups based on alternative non-discriminatory criterion.
>
> FN16. Nor will the order result in the firing of those who have received provisional appointments pursuant to the

current, but now invalid, eligibility list. Those temporary appointees will be placed at the top of the Group B list, and their appointments made permanent on a one-to-one basis with permanent appointments from Groups A and C. None will be fired.

Defendants contend that the color-conscious relief imposed by the district court is unconstitutional. The argument is without merit. The relief goes no further than to eliminate the lingering effects of previous practices that bore more heavily than was warranted on minorities. [FN17] This court has stated:

> FN17. Theoretically it might be possible for defendants to demonstrate that, even though the test has an unjustified racially disproportionate impact, the disparity in resulting employment is primarily accounted for by neutral means. In the case of many northern cities, this could come about because blacks and Spanish surnamed individuals had arrived in Boston in large numbers only in recent years, so that those fire fighters hired prior to the recent increase in minority population were 'justifiably' predominately white. The data support the contrary hypothesis, however. In spite of the increased percentage of minorities in the Boston area, the Boston Fire Department has since 1960 appointed 805 fire fighters, only six (0.745%) of whom were black and two (0.248%) of whom were Spanish surnamed.

'It would be consistent with the goal of equal opportunity to give first priority to members of a minority that had a previously been denied equal opportunity, if those members were otherwise as qualified as were qualified members of the majority population.' Associated General Contractors of Massachusetts, Inc. v. Altshuler, 490 F.2d 9, 18 (1st Cir. 1973), cert. denied, 416 U.S. 957, 94 S.Ct. 1971, 40 L.Ed.2d 307 (1974).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

504 F.2d 1017, 8 Fair Empl.Prac.Cas. (BNA) 855, 8 Empl. Prac. Dec. P 9678, 8 Empl. Prac. Dec. P 9765

**(Cite as: 504 F.2d 1017)**

See also, e.g., Morrow v. Crisler, 491 F.2d 1053 (5th Cir. en banc 1974) (withholding quota relief is abuse of discretion); NAACP v. Allen, 493 F.2d 614, 618-620, nn. 7-10 (5th Cir. 1974) (collecting cases); United States v. Masonry Contractors Ass'n of Memphis, Inc., 497 F.2d 871 (6th Cir. 1974); Carter v. Gallagher, 452 F.2d 315 (8th Cir. en banc 1974); Rios v. Enterprise Ass'n Steamfitters Local 638, 501 F.2d 622 (2d Cir. 1974). The goal of color blindness, so important to our society in the long run, does not mean looking at the world through glasses that see no color; it means only that all colors are moral equivalents, to be treated on an equal basis. We believe that our society is well served by taking into account color in the fashion used, and carefully limited in extent and duration, by the district court.

[7] Defendants next contend that, even if the use of color-conscious relief is not forbidden by the Constitution, it is prohibited by Title VII itself, which states in § 703(j), 42 U.S.C. § 2000e-2(j):

'Nothing contained in (Title VII) shall be interpreted to require . . . preferential treatment to any individual . . . because of race, color, religion, sex, or national origin of such individual . . . on account of an imbalance which may exist with respect to the total number or percentage of persons of any race, color, religion, sex, or national origin . . . in comparison with the total number of percentage of persons of such race, color, religion, sex, or national origin in any community . . . .'

Defendants contend in effect that, whatever may be the case when a court undertakes to correct the continuing effects *1028 of previous intentional racial discrimination, § 703(j) conclusively withdraws from the district court the power to grant color-conscious relief when the discrimination is unintentional. Although this argument has recently found eloquent support in the dissent of Judge Paul Hays in Rios, supra, we do not accept it. [FN18] We agree with the majority in Rios that relief undertaken in order to redress past discrimination, whether or not intentional, is permitted. Section 703(j) deals only with those cases in which racial imbalance has come about completely without

regard to the actions of the employer. And the dispute over the intent of the framers of Title VII is largely ancient history. [FN19] See generally Comment, The Philadelphia Plan: A Study in the Dynamics of Executive Power, 39 U.Chi.L.Rev. 732 (1972). Title VII was amended in 1972 and the legislative debates at that time, particularly the failure of Congress to pass the Dent Amendment, which would have foreclosed all affirmative action plans and racial balance relief, lend support to an inference that Congress ratified the power of the courts to impose color-conscious relief of the sort that had been approved in several cases at the time the attempts to amend the amendments to Title VII failed. For the history of this episode, see id. at 747-60. We believe that the history of the 1971-72 amendments, and failures to amend, together with the weight of judicial authority, warrant our rejection of defendants' Title VII claim.

> FN18. Compare Blumrosen, Strangers in Paradise: Griggs v. Duke Power Co. and the Concept of Employment Discrimination, 71 Mich.L.Rev. 59 (1972), with Wilson, A second Look at Griggs v. Duke Power Company: Ruminations on Job Testing, Discrimination & The Role of the Federal Courts, 58 Va.L.Rev. 844 (1972); Developments in the Law-- Employment Discrimination & Title VII of the Civil Rights Act of 1964, 84 Harv.L.Rev. 1109 (1971); Note, Employment Testing: The Aftermath of Griggs v. Duke Power Company, 72 Colum.L.Rev. 900 (1972).

> FN19. In the context of this suit the dispute might also be an unnecessary one. Only the suit by the United States is brought under Title VII. The NAACP's § 1893 suit may be completely free of whatever limitations Title VII may contain. In any case, there is no need for us to decide the matter here.

The other arguments raised by defendants have been examined and found to be without merit. The judgment is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

504 F.2d 1017, 8 Fair Empl.Prac.Cas. (BNA) 855, 8 Empl. Prac. Dec. P 9678, 8 Empl. Prac. Dec. P 9765

**(Cite as: 504 F.2d 1017)**

Affirmed.

ON MOTION IN OPPOSITION TO TAXATION
OF COURT COSTS

Edward D. Kalman, Assistant Attorney General,
with whom Robert H. Quinn, Attorney General, and
Walter H. Mayo III, Assistant Attorney General,
were on brief, for appellants.

David L. Rose, Attorney, Department of Justice,
With whom J. Stanley Pottinger, Assistant Attorney
General, James Gabriel, United States Attorney, and
James M. Fallon, Attorney, Department of Justice,
were on brief, for United States, appellee.

Patrick J. King, with whom Thomas A. Mela was
on brief, for N.A.A.C.P. et al., appellees.

PER CURIAM.

[8] In Boston Chapter, N.A.A.C.P., Inc. v.
Beecher, 504 F.2d 1017 (1st Cir., 1974), this court
affirmed the district court's decision, 371 F.Supp.
507 (D.Mass.1974), finding a state-administered
entrance examination for firemen to have a racially
discriminatory impact, and ordering injunctive
relief. Under Rule 39(a) of the Federal Rules of
Appellate Procedure, costs of appeal are to be taxed
against the losing party unless otherwise ordered.
Appellees N.A.A.C.P. et al. filed a bill of costs for
$49.50, and appellants director and commissioners
of the state civil service division oppose a taxation
of these costs against them on the ground that it
would constitute an award of money against the
state in violation of the eleventh amendment. While
the amount in controversy here is relatively
insignificant, the issue raised *1029 is of
importance to the everyday practice before the
federal courts.

Appellants rely on Edelman v. Jordan, 415 U.S.
651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), in
which the Supreme Court held that the eleventh
amendment barred a federal district court from
awarding retroactive benefits under a federal-state
public aid program. The Court in Edelman
distinguished what it found in effect to be a money

judgment payable out of the state treasury directly,
from the prospective injunction upheld in Ex parte
Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714
(1908), even though in the latter case the necessity
for state officials to shape their conduct to the
Court's mandate might have had a substantial
'ancillary effect' on the state treasury. 415 U.S. at
668, 94 S.Ct. 1347. Since Edelman, courts of
appeals have divided on whether a federal court
may award attorneys' fees against an unconsenting
state, an issue which is analytically similar to the
question of awards of costs. An award of attorneys'
fees was upheld in Class v. Norton, 505 F.2d 123
(2d Cir., 1974). Before Edelman, the same result
was reached in Gates v. Collier, 489 F.2d 298 (5th
Cir., 1973), and in Sims v. Amos, 340 F.Supp. 691
(M.D.Ala.1972), aff'd mem., 409 U.S. 942, 93 S.Ct.
290, 34 L.Ed.2d 215 (1973). However, two other
courts of appeals, attaching little precedential
weight to the Supreme Court's summary affirmance
without opinion in Sims, have cited Edelman as
requiring the contrary conclusion. Jordan v.
Gilligan, 500 F.2d 701 (6th Cir., 1974); Skehan v.
Board of Trustees, 501 F.2d 31 (3d Cir., 1974).

As the Court in Edelman observed, 415 U.S. at
667, 94 S.Ct. 1347, the line between permissible
relief and that barred by the eleventh amendment
will not always be clear. And we acknowledge that
an award of court costs cannot be neatly categorized
as either prospective or retroactive. An award of
costs does operate as a direct levy on the state's
general revenues and as a form of compensation to
the winning party. On the other hand, costs are not
awarded for accrued liability, but rather are
assessed for certain litigation expenses in
accordance with the generally mechanical
provisions of Rule 39. The precise purposes behind
this rule and the prior traditional practice of taxing
costs are not clear, but no doubt an award to some
degree serves to discourage litigiousness and
frivolous claims, as well as to induce compliance
with the rulings of the court. In this sense
allocation of costs is an incident to the court's
jurisdiction and judgment in the main action.

In Fairmont Creamery Co. v. Minnesota, 275 U.S.
70, 48 S.Ct. 97, 72 L.Ed. 168 (1928), there is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

504 F.2d 1017                                                                 Page 14

504 F.2d 1017, 8 Fair Empl.Prac.Cas. (BNA) 855, 8 Empl. Prac. Dec. P 9678, 8 Empl. Prac. Dec. P 9765

**(Cite as: 504 F.2d 1017)**

support for the view that the power to tax court costs is to be characterized as an incident to the hearing and not within the scope of a state's sovereign immunity if the federal court's exercise of jurisdiction over the state party in the action in the main is valid. The Court in Fairmont held that sovereign immunity did not protect a state against a judgment for costs in litigation before the Supreme Court on an appeal from the final judgment of the highest state court. While acknowledging that a sovereign is immune from costs awarded by its own courts, the Court stated that a state loses some of its sovereign character when it is forced to appear before the Supreme Court under the Supremacy Clause on a matter of federal and constitutional law. According to the Court the 'incidents of the hearing are those which attach to the regular jurisdiction of this Court,' and the awarding of costs was one such incident that had been 'the invariable practice' in judgments against a state in both civil and criminal cases, before that Court. Id. at 77, 48 S.Ct. at 100. Courts in this circuit have awarded costs and attorneys' fees against state officials when the state was the real party in interest. E.g., Hoitt v. Vitek, 361 F.Supp. 1238, 1255 (D.N.H.1973), aff'd, 495 F.2d 219 (1st Cir. 1974).

In view of the above considerations and precedents, we conclude that the eleventh amendment does not immunize appellants from being taxed for costs.

504 F.2d 1017, 8 Fair Empl.Prac.Cas. (BNA) 855, 8 Empl. Prac. Dec. P 9678, 8 Empl. Prac. Dec. P 9765

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.