```
                 UNITED STATES DISTRICT COURT
                   DISTRICT OF MASSACHUSETTS


                                  )
JACOB BRADLEY, NOAH BRADLEY,      )
   KEITH RIDLEY, and JARED        )
   THOMAS,                        )
                                  )
              Plaintiffs,         )
                                  )     CIVIL ACTION NO. 05-10213-PBS
         v.                       )
                                  )
CITY OF LYNN, et al.,             )
                                  )
              Defendants.         )
                                  )
```

**MEMORANDUM AND ORDER**

December 6, 2005

Saris, U.S.D.J.

In this proposed class action, plaintiffs, who are African-Americans, have sued the City of Lynn, the Human Resources Division of the Commonwealth of Massachusetts (the "HRD"), and various public officials, alleging that the civil service examinations for entry-level firefighters and police officers result in a disparate impact on minority candidates.  Plaintiffs assert that the HRD and the personnel administrator for the HRD ("State defendants") violate Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, and two federal court consent decrees.  State defendants move for judgment on the pleadings, or alternatively for summary judgment.  After hearing and a review of the briefs, State defendants' motion is **DENIED**.

## I. BACKGROUND

### A. Plaintiffs

Plaintiffs Jacob Bradley, Noah Bradley, Keith Ridley, and Jared Thomas are African-American residents of Lynn, Massachusetts. Between 1998 and 2004, all four plaintiffs took the entry-level firefighter examination administered by the HRD. Keith Ridley received scores of 97 in 1998, 89 in 2000, and 90 in 2004. Jacob Bradley received a score of 94 in both 2002 and 2004. Noah Bradley received scores of 84 in 2002 and under 70 in 2004. Jared Thomas received a score of 92 in 2004. In 2003, Keith Ridley and Noah Bradley took the entry-level police officer examination administered by the HRD and received scores of 94 and 89, respectively. To date, the City of Lynn has not hired any of the plaintiffs as entry-level firefighters or police officers.

### B. The Statutory and Administrative Framework

The personnel administrator for the HRD (the "HRD Administrator") has "overall responsibility for establishing entrance-level firefighter and police examinations for Massachusetts' municipalities that are subject to the civil service law, M.G.L. ch. 31, and establishing lists for entry-level hiring thereon." (Pls.' First Am. Compl. ¶ 7.) The HRD and the HRD Administrator are creatures of statute. See Mass. Gen. Laws ch. 7, § 4A (creating the human resources division in the executive office for administration and finance and the

personnel administrator as head of the division); id. ch. 31 (delineating the powers of the personal administrator for the human resources division within the executive office for administration and finance).

Massachusetts civil service law generally requires that "[a]ll positions in all cities shall be subject to the civil service law and rules." Mass. Gen. Laws ch. 31, § 51. Pertinently, "[o]riginal and promotional appointments in police and fire forces of cities . . . shall be made only after competitive examination." Id. § 59. The civil service law empowers the HRD Administrator to conduct, to determine the form, method and subject matter, and to develop examinations, id. §§ 5(e), 16; to prepare and post notices of examinations, id. §§ 18-19; and to determine the passing requirements of examinations, id. § 22. Based on the examinations, the HRD Administrator establishes, maintains and revises "eligible lists," which cities must use in hiring or promoting fire and police forces. See id. §§ 5(h), 6, 7, 25, 59. For a city to bypass higher-ranked individuals on an eligible list to hire or promote lower-ranked individuals, appointing authorities must submit a written statement to the HRD Administrator justifying the bypass. Id. § 27. The HRD Administrator has the right to review and withdraw any bypass appointments. MacHenry v. Civil Serv. Comm'n, 40 Mass. App. Ct. 632, 666 N.E.2d 1029 (App. Ct. Mass. 1996).

In addition, the HRD Administrator is empowered to "establish such mandatory standards . . . as [the HRD Administrator] determines to be necessary"; to "approve or disapprove specifications and qualifications submitted by an appointing authority in a city"; "to establish such specifications and qualifications when, in [the HRD Administrator's] opinion, the appointing authority [of a city] has failed to furnish satisfactory specifications and qualifications"; and to "evaluate the qualifications of applicants." Mass. Gen. Laws ch. 31, § 5(c)-(f). Examples of such qualifications include health and physical fitness standards, id. § 61A, height minimums, see id. § 58, and for firefighters, educational requirements, see id. The law further empowers the HRD Administrator to "establish a recruitment program" and prohibit city treasurers from paying salary or compensation to persons not listed on the HRD's roster. Id. §§ 5(k), 71.

While the law empowers State defendants with extensive control of hiring, however, they do not possess complete control over municipal firefighters and police officers. By statute, appointing authorities may, without approval from State defendants, subject new employees to a probationary period to evaluate their conduct and capacity, grant leaves of absence, impose punishment duty, or discharge, remove or suspend employees. Id. §§ 34, 37, 41, 62A. In addition, the Civil

Service Commission of the Commonwealth of Massachusetts, which is not a party to this case, reviews all rules promulgated by the HRD and adjudicates disputes between employees and their municipal employers. See id. §§ 2-3, 6C, 24, 35, 41-43.

State defendants submit by affidavit that the "HRD does not hire, consider job applications, interview, train, assign, supervise, promote, discipline, fire, pay, or provide fringe benefits, worker compensation insurance or ERISA benefits for, municipal firefighters." (Pls.' Mem. Mot. J. Pleadings 4; see also id. at 16-17 (noting that the HRD does not withhold taxes from earnings or furnish gear).) Based on the Personnel Administration Rules and the HRD Certification Handbook, State defendants point out that appointing authorities, not the HRD, decide which candidates of those on the eligible list to hire and typically base their hiring decisions on candidate education and experience, administration of a drug test, and results of criminal- and driving-history investigations. (Id. at 5.) Lastly, State defendants submit the HRD Selective Certifications Descriptions and Questionnaires to show that appointing authorities may request different eligible lists based on foreign language needs or based on race, color, national origin, or sex to remedy effects of past discrimination pursuant to an affirmative action program. (Id. at 6-7.)

**C.   Federal Court Consent Decrees**

Parties alleging racial discrimination have sued the

5

Commonwealth of Massachusetts in the past for its role in administering civil service examinations.  In <u>Boston Chapter, NAACP, Inc. v. Beecher</u>, 371 F. Supp. 507 (D. Mass. 1974), the Massachusetts Civil Service Commissioners and Director of Civil Service were defendants in a lawsuit alleging discriminatory practices in the hiring of Boston firefighters.  <u>Id.</u> at 509-11 (alleging causes of action under Title VII, 42 U.S.C. §§ 1981, 1983 and 28 U.S.C. §§ 2201, 2202).  Similarly in <u>Castro v. Beecher</u>, 365 F. Supp. 655 (D. Mass. 1973), the Massachusetts Civil Service Commissioners were defendants in a lawsuit alleging discriminatory practices in the hiring of policemen for Massachusetts cities, towns and state agencies.  <u>Id.</u> at 655-56 (alleging causes of action based on the Fourteenth Amendment and 42 U.S.C. § 1983).  Both cases resulted in federal court consent decrees.  <u>NAACP</u>, 371 F. Supp. at 520; <u>Castro</u>, 365 F. Supp. at 660.

## II.  DISCUSSION

**A.  <u>Standard</u>**

"Motions for judgment on the pleadings are governed by Fed. R. Civ. P. 12(c) and ordinarily warrant the same treatment" as motions to dismiss for failure to state an actionable claim under Fed. R. Civ. P. 12(b)(6).  <u>Collier v. City of Chicopee</u>, 158 F.3d 601, 602-03 (1st Cir. 1998) (citations omitted).  Under Rule 12(b)(6), the Court takes as true "the well-pleaded facts as they

appear in the complaint, extending plaintiff every reasonable inference in his favor." Coyne v. City of Somerville, 972 F.2d 440, 442-43 (1st Cir. 1992) (citing Correa-Martinez v. Arrillaga-Belendez, 903 F.2d 49, 51 (1st Cir. 1990)). A complaint should not be dismissed under Fed. R. Civ. P. 12(b)(6) unless "'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" Roeder v. Alpha Indus., Inc., 814 F.2d 22, 25 (1st Cir. 1987) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).

Converting a Rule 12(c) motion for a judgment on the pleadings to a Rule 56 motion for summary judgment is subject to a court's discretion.

> Where a motion for judgment on the pleadings introduces materials dehors the record for the court's consideration, the ground rules change. In that event, the court has broad discretion either to include or to exclude the proffer. So long as the court does not exclude the tendered materials, the summary judgment standard governs the disposition of the motion.

Gulf Coast Bank & Trust Co. v. Reder, 355 F.3d 35, 38 (1st Cir. 2004) (citations omitted).

"Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Barbour v. Dynamics Research Corp., 63 F.3d 32, 36 (1st Cir. 1995) (quoting Fed. R. Civ. P. 56(c)). "To succeed [in a motion for summary

judgment], the moving party must show that there is an absence of evidence to support the nonmoving party's position." Rogers v. Fair, 902 F.2d 140, 143 (1st Cir. 1990); see also Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

"Once the moving party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial.'" Barbour, 63 F.3d at 37 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)). "There must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.'" Rogers, 902 F.2d at 143 (quoting Anderson, 477 U.S. at 249-50). The Court must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." Barbour, 63 F.3d at 36.

While the exhibits submitted by State defendants are arguably admissible as public records in a Rule 12(b)(6) motion, the Court treats this motion as one of summary judgment under Rule 56. See Boateng v. InterAmerican Univ., Inc., 210 F.3d 56, 60 (1st Cir. 2000) (citation omitted).

**B. Title VII Claim**

State defendants contend that they are not subject to Title

VII liability because plaintiffs have no employment relationship with State defendants.[1]

Title VII generally prohibits employment practices that discriminate based on an individual's race, color, religion, sex, or national origin. See 42 U.S.C. § 2000e-2. For Title VII liability to attach, plaintiffs must establish at the threshold that § 2000e-2 governs the conduct of State defendants. See, e.g., Alberty-Vélez v. Corporación de Puerto Rico Para la Difusión Pública, 361 F.3d 1, 6 (1st Cir. 2004) (discussing the "threshold question of employee/independent contractor status"). Title VII applies to "employers," "employment agencies," "labor unions," and any "agents" of these entities. See 42 U.S.C. §§ 2000e(b-d), 2000e-2(a-c).

Plaintiffs in this case assert that State defendants constitute "employers." Title VII defines "employer" as a

---

[1] Plaintiffs argue that the past litigation of NAACP and Castro precludes State defendants from arguing that Title VII does not apply. This argument lacks merit. The law of the case doctrine is inapplicable because the instant litigation is a new case. See 18B Charles A. Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice & Procedure §4478 (2d ed. 2002). In addition, the doctrine of issue preclusion is inapplicable because the past litigation of NAACP and Castro did not explicitly decide the issue of the state's status as an employer under Title VII. Nor can this Court infer that Title VII applied to the state as an "employer" in the past litigation because other civil rights laws were asserted and could have constituted the basis for liability. See NAACP, 371 F. Supp. at 509-10 (alleging causes of action based on Title VII, 42 U.S.C. §§ 1981, 1983 and 28 U.S.C. §§ 2201, 2202); Castro, 365 F. Supp. at 655 (alleging causes of action based on the Fourteenth Amendment and 42 U.S.C. § 1983).

"person engaged in an industry affecting commerce who has fifteen or more employees."  42 U.S.C. § 2000e(b).  For this purpose, the term "person" includes "one or more individuals, governments, [and] governmental agencies."  Id. § 2000e(a).  "The term 'employee' means an individual employed by an employer."  Id. § 2000e(f).

In cases where there is a customary employer-employee relationship, the threshold determination of whether a party is a Title VII "employer" is relatively straightforward.  Unfortunately, the statute offers little help when such a customary relationship is lacking.  See, e.g., Alberty-Vélez, 361 F.3d at 6 (noting that the "definition [of employee] 'is completely circular and explains nothing'" (quoting Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 323 (1992))).  "Given the opacity of the statutory text, courts have been forced to develop their own approaches to determining whether an entity is acting as an employer."  Camacho v. Puerto Rico Ports Authority, 369 F.3d 570, 573-74 (1st Cir. 2004).  In doing so, courts have used caselaw from the Americans with Disabilities Act, the Age Discrimination in Employment Act, and Title VII of the Civil Rights Act interchangeably.  See, e.g., Carparts Distribution Ctr., Inc. v. Auto. Wholesaler's Ass'n of New England, Inc., 37 F.3d 12, 16 (1st Cir. 1994) (using Title VII decisions in an ADA case); Camacho, 369 F.3d at 578 n.5 (using Title VII decisions in an ADEA case).

The First Circuit has recognized that Title VII employer liability may attach to an individual's direct employer or to a party that functions as an individual's de facto employer. Camacho, 369 F.3d at 574 (discussing direct and de facto employer liability). In Camacho, the First Circuit also mentioned with ambivalence a third approach, under which Title VII liability may attach "if an entity interferes with an individual's employment with another employer," describing this theory of interference liability as "dubious." Id. at 574 n.3. However, it is unclear how much weight to put on this dicta as the First Circuit had discussed interference liability earlier as a "possibility" depending on the circumstances. See Carparts, 37 F.3d at 18. Other courts of appeals are split regarding this interference liability approach. See Alexander v. Rush N. Shore Med. Ctr., 101 F.3d 487, 493 n.2 (7th Cir. 1996) (questioning existence); Christopher v. Strouder Mem'l Hosp., 936 F.2d 870 (6th Cir. 1991) (adopting); Bender v. Suburban Hosp., Inc., 159 F.3d 186, 189 (4th Cir. 1988) (rejecting in dicta); Gomez v. Alexian Bros. Hosp. of San Jose, 698 F.2d 1019, 1021 (9th Cir. 1983) (adopting); Sibley Mem'l Hosp. v. Wilson, 488 F.2d 1338, 1341 (D.C. Cir. 1973) (adopting in the seminal interference liability case).

Since the HRD is not a customary employer of entry-level firefighters and police officers in the City of Lynn, under the common sense meaning of the word, the pivotal issue is whether

11

the HRD may be characterized as a Title VII employer within its unique statutory meaning as developed through caselaw. The First Circuit has applied common law agency principles to determine whether a direct employment relationship exists and whether an entity "so extensively controls an aggrieved party's employment relationship as to become that party's de facto employer." See Camacho, 369 F.3d at 574-77. Under this test, courts must consider:

> the hiring party's right to control the manner and means by which the product is accomplished. Among other factors relevant to this inquiry are the skills required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

Alberty-Vélez, 361 F.3d at 7 (quoting Dykes v. DePuy, Inc., 140 F.3d 31, 37-38 (1st Cir. 1998) (quoting Darden, 503 U.S. at 323-24)).

> The test provides no shorthand formula or magic phrase that can be applied to find the answer, . . . all of the incidents of the relationship must be assessed and weighed with no one factor being decisive. However, in most situations, the extent to which the hiring party controls "the manner and means" by which the worker completes her tasks will be the most important factor in the analysis.

Id. (internal quotations and citations omitted). "A court must tailor these factors to the relationship at issue. Often certain

factors will not be relevant to a particular case, and a court should not consider them as favoring either side." Id., 361 F.3d at 7 n.7 (citation omitted).

In Camacho, the First Circuit stated that control over just one factor in the common law test was not necessarily dispositive, using the metaphor that one swallow does not a summer make. 369 F.3d at 577. However, the First Circuit also held that, in certain circumstances, control over one factor may indeed an employer make. In Carparts, on which plaintiffs in this case rely heavily, an employee and a customary employer brought suit against a trade association and its administering trust ("Carparts defendants") alleging discrimination on the basis of disability for instituting a lifetime cap on medical reimbursements for AIDS-related illnesses. 37 F.3d at 14. Reversing the district court's dismissal, the First Circuit stated that "[Carparts] defendants would be 'employers' if they . . . exercised control over an important aspect of the employee's employment," even if they did not control any other aspects. See id. at 17. Applying this principle, the First Circuit held that Carparts defendants were "employers" with respect to employee health care coverage if they existed "solely for the purpose of enabling [customary employers] to delegate their responsibility to provide health insurance." Id. Such circumstances would indicate that Carparts defendants were intertwined with the customary employer on the issue of health

13

coverage for purposes of civil rights laws.  <u>Id.</u>

Asserting that <u>Camacho</u> implicitly overruled <u>Carparts</u>, State defendants claim they are not employers but merely administrators of a test in the exercise of the police power of the state.  In <u>Camacho</u>, a harbor pilot brought suit against the Puerto Rico Ports Authority (the "Authority") alleging age discrimination for revoking his license on his seventieth birthday.  369 F.3d at 572.  The First Circuit held that the Authority was not a de facto employer of harbor pilots.  <u>Id.</u> at 572.  <u>Camacho</u> found that "[a]lthough pilotage is a heavily regulated profession, harbor pilots nonetheless retain important badges of autonomy" and "function as independent contractors."  <u>Id.</u> at 576-77.  Moreover, the First Circuit stated that "the statutory power to license and regulate harbor pilots does not imbue the Authority with the level of control necessary to make it their employer for ADEA purposes."  <u>Id.</u> at 572.

An analysis of <u>Camacho</u> illustrates that it did not pilot a sea change in the Title VII policy of this Circuit.  <u>Camacho</u> is best understood as falling within the "mere licensing" caselaw, which states that "state licensing and regulatory agencies *generally* are not regarded as employers vis-à-vis those whom they license and regulate."  <u>Id.</u> at 578 (emphasis added).  Many circuits hold that entities that only administer examinations for occupational licensing or certification, but do not control the

employee's work, are not employers under Title VII.  See, e.g., Fields v. Hallsville Indep. Sch. Dist., 906 F.2d 1017, 1019 (5th Cir. 1990) (finding that defendant was not employer when the only evidence of control was administration of teacher certification exam); George v. N.J. Bd. of Veterinary Med. Exam'rs, 794 F.2d 113, 114 (3d Cir. 1986) (agreeing that defendant was not an employer for merely exercising state police power in licensing veterinary medical practitioners); Haddock v. Bd. of Dental Exam'rs of Cal., 777 F.2d 462, 464 (9th Cir. 1985) (holding where the only connection between plaintiff and Board was that it gave an examination which he failed, Board was not an employer under Title VII); Woodard v. Va. Bd. of Bar Exam'rs, 598 F.2d 1345, 1346 (4th Cir. 1979).

The "mere licensing" caselaw, however, does not establish a per se rule that state licensing or certification agencies can never be employers under Title VII.  Indeed, Camacho emphasized, and State defendants agree, that in applying the common law agency test that "[n]o one factor is outcome determinative; rather, all the incidents of a given relationship must be weighed in order to reach a conclusion as to whether that relationship fits within the confines of the employer-employee taxonomy."  369 F.3d at 574 (citing Darden, 503 U.S. at 324).   Thus, state entities that administer examinations can constitute Title VII employers when those entities not only administer examinations but also exercise other control over the relationship between the

15

employee and her customary employer.  See, e.g., Ass'n of Mexican-American Educators v. California, 231 F.3d 572, 581-583 (9th Cir. 2000) (en banc) (holding the state liable as an employer for administering a teacher certification examination where the state exerts a high degree of control over the operation of the local school activities); United States v. City of Yonkers, 592 F. Supp. 570, 589-91 (S.D.N.Y. 1984) (denying summary judgment motion of state civil service commission where record indicated that state retained complete control over police examinations and exerted significant control even after eligibility list was promulgated).  Cf. Dumas v. Town of Mount Vernon, Ala., 612 F.2d 974, 980 (5th Cir. 1980) (holding the county liable as an employment agency under 2000e(c) for administering examinations and interviewing candidates).

The difficult question then is whether, under the common law agency framework informed by Camacho and Carparts, an entity that exercises extensive control over hiring but little control over other aspects of the employment relationship is a de facto employer for purposes of Title VII.

As a state entity created by statute pursuant to state police power, the HRD is similar to the Authority in Camacho in that neither entity exercises day-to-day supervisory control over the employee's tasks.  Camacho, 369 F.3d at 576 (concluding that the Authority did not exercise the level of control over pilots'

day-to-day activities to evince "the degree of control and supervision traditionally considered sufficient to create an employer-employee relationship").

However, the Authority's licensing agency relationship with independent contractors in Camacho differs from the HRD's relationship with municipal firefighters and police officers in this case.  The Authority in Camacho did not hire harbor pilots; shipowners could hire any harbor pilot, licensed by the Authority, as an independent contractor.  Id. at 577.  By contrast in this case, municipalities are not free to hire anyone in the pool of eligible candidates.  Instead, Massachusetts civil service law reduces the role that municipalities have in the hiring process to deciding yes or no to the candidates that the HRD provides.  State defendants not only determine the eligible pool of candidates by conducting examinations and setting minimum qualifications but also dictate the order that municipalities evaluate such candidates.  And if a municipality decides to bypass a candidate, the HRD may review and reverse that decision.  Even when municipalities opt to increase minority hiring, to obtain foreign language speakers, or to get specially trained employees (like EMTs), the appointing authorities must justify why such special characteristics are necessary to the HRD and ask State defendants for selective certifications from the eligible lists.

The HRD's critical role in hiring distinguishes this case

from the mere-licensing precedents cited by State defendants. While there is no question that Massachusetts law established the HRD pursuant to a governmental exercise of police power, the HRD does more than merely license and regulate. The HRD acts as a "hiring party" that extensively controls "the manner and means" by which firefighters and police officers are selected. Therefore, Camacho does not control the outcome of this case.

The Court must still decide, however, whether the HRD exercises enough control to constitute a de facto Title VII employer. Carparts held that "defendants would be 'employers' . . . if they exercised control over an important aspect of [the employee's] employment." 37 F.3d at 17. As discussed, State defendants extensively control the hiring of municipal firefighters and police officers, and hiring is an important aspect of the employment relationship. Cf. id. (finding that employee health care coverage to be an important aspect). Moreover, the HRD plays a pervasive role not just in the hiring process but also in other respects of the employment relationship. For example, the HRD plays an extensive role in the promotion process, see Mass. Gen. Laws ch. 31, § 59, determines in-service health and physical fitness standards, id. § 61A, and funds "wellness" programs if accepted by the city, id. § 62A. Accordingly, the current record on summary judgment supports a finding that the HRD constitutes a Title VII employer of plaintiffs with respect to the entry-level hiring of

firefighters and police officers, and the Court denies State defendants' motion.[2]

### **ORDER**

State defendants' motion for judgment on the pleadings, or alternatively for summary judgment, is **DENIED**.  (Docket No. 32.)

**S/PATTI B. SARIS**
United States District Judge

---

[2] The other arguments raised by the state were resolved by the amended complaint.