# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| JACOB BRADLEY, NOAH BRADLEY, KEITH RIDLEY, and JARED THOMAS, individually and on behalf of a class of similarly situated individuals, Plaintiffs, | ) ) ) ) ) ) ) | |
| v. | ) ) | |
| CITY OF LYNN; EDWARD J. CLANCY, JR., in his capacity as Mayor of the City of Lynn; the COMMONWEALTH OF MASSACHUSETTS, DIVISION OF HUMAN RESOURCES; and RUTH BRAMSON, in her capacity as Personnel Administrator of the Division of Human Resources of the Commonwealth of Massachusetts, Defendants, | ) ) ) ) ) ) ) ) ) | Civil Action No. 05-10213-PBS |
| BOSTON SOCIETY OF THE VULCANS and NEW ENGLAND AREA CONFERENCE OF THE NAACP, Interveners | ) ) ) ) ) ) | |

_____)

## PLAINTIFFS' OPPOSITION TO COMMONWEALTH DEFENDANTS' MOTION TO DISMISS

## I.    INTRODUCTION

The Plaintiffs, Jacob Bradley, Noah Bradley, Keith Ridley, and Jared Thomas, hereby file this opposition to the Commonwealth Defendants' Motion to Dismiss.  As described below, the Commonwealth's claim that HRD's mid-litigation announcement that it no longer intends to use the hiring test that Plaintiffs have challenged renders Plaintiffs' claims moot is entirely without merit.  Furthermore, the Commonwealth is also

wrong in its second argument that Plaintiffs do not have standing to challenge that test under the Beecher decree.

## II.    **STATEMENT OF RELEVANT FACTS**

On February 2, 2005, the Plaintiffs filed a class-action complaint in the above-captioned matter against the City of Lynn and its Mayor (the City Defendants) and the Commonwealth of Massachusetts Human Resources Division (HRD) and its Administrator (the Commonwealth Defendants).  The Plaintiffs' subsequently filed amended complaint alleges, in pertinent part, that the Commonwealth Defendants violated the Plaintiffs' constitutional and statutory rights by administering civil service entrance examinations that have a significant adverse impact on minority candidates for public safety positions and that such conduct also violates the terms of certain consent decrees regarding the hiring of municipal public safety employees that were issued and approved by this Court.  To redress these alleged discriminatory hiring practices, Plaintiffs have requested relief including injunctive and declaratory relief, instatement, retroactive back pay, seniority, and other damages.

In Massachusetts, municipalities have the option of accepting the Civil Service Law, Mass. Gen. L. c. 31.  If a municipality accepts Chapter 31, HRD holds much of the responsibility for hiring municipal police and firefighters, and accordingly, this Court previously found that HRD "acts as a 'hiring party' that extensively controls 'the manner and means' by which firefighters and police officers are selected," and that "HRD constitutes a Title VII employer of plaintiffs with respect to the entry-level hiring of firefighters and police officers."  Bradley v. City of Lynn, 403 F.Supp.2d 161, 169 (D. Mass. 2005).

With regard to the allegations in this matter, both in the City of Lynn and elsewhere in the Commonwealth of Massachusetts, the HRD entry-level firefighter and police officer examinations have a shockingly disparate impact on minority candidates, in that, statistically, minority candidates fare far worse on the examinations than do Caucasian candidates.  First Amended Complaint ¶¶ 13-14.  The impact is so significant that in many communities, few, if any, minorities get hired based upon a rank ordering of their scores on the civil service examination.  Id.

## III.    ARGUMENT

### A.    Plaintiffs' Claims Are Not Moot

Although the Commonwealth Defendants argue that Plaintiffs' claims are moot because Defendants have voluntarily announced that they do not intend to use the allegedly discriminatory test in future, this argument lacks merit because Plaintiffs' claims for injunctive and declaratory relief and damages, back pay, and instatement under Title VII still indisputably present an actual case or controversy.  As discussed below, Defendants cannot establish that Plaintiffs' claims for injunctive and declaratory relief are moot, and most importantly, Plaintiffs' claims for damages, retroactive back pay, and instatement are not mooted by Defendants' stated intentions by any stretch of the imagination.  See, e.g., Maher v. Roe, 432 U.S. 464, 468 n. 4 (1977) (even if defendant's revision of regulation had mooted claims for injunctive relief, which it did not, plaintiffs' claims for reimbursement under the pre-revision regulation would not have been mooted).

Because Plaintiffs still suffer the alleged effects of Defendants' discriminatory hiring practices, e.g., they were not hired as firefighters and are currently not earning

seniority and pay as firefighters, and therefore continue to present claims for relief that have not been and cannot be redressed through Defendants' stated intention to change its hiring practices in June 2006, Defendants have not met their burden of establishing mootness.  Although Defendants erroneously suggest, <u>see</u> Defendants' Memo. at 4, that Plaintiffs bear the burden of establishing that their claims are *not* moot, this is entirely backward, as "[t]he burden of establishing mootness rests squarely on the party raising it, and '[t]he burden is a heavy one.'"  <u>Mangual v. Rotger-Sabat</u>, 317 F.3d 45, 60 (1st Cir. 2003) (<u>quoting</u> <u>U.S. v. W.T. Grant Co</u>., 345 U.S. 629, 633 (1953)).  In order to meet this heavy burden, the party arguing mootness must make it "'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'"  <u>Id</u>. (<u>quoting</u> <u>U.S. v. Concentrated Phosphate Export Ass'n</u>, 393 U.S. 199, 203 (1968)).  Defendants clearly fail to meet this heavy burden because their *ad hoc* announcement that they do not intend to use the challenged examination and plan to design and adopt a new test in the future simply does not resolve the plaintiffs' claims.

    In stark opposition to Defendants' assertions that their stated intention not to use the challenged test in future automatically eliminates any "case or controversy" presented by Plaintiffs' claims, the First Circuit recently made clear, in accordance with longstanding Supreme Court precedent, that "'[v]oluntary cessation of allegedly illegal conduct … does not make the case moot.'"  <u>Aroostook Band of Micmacs v. Ryan</u>, 404 F.3d 48, (1st Cir. 2005) (<u>quoting</u> <u>U.S. v. W.T. Grant</u>, 345 U.S. at 632).  In <u>Aroostook</u>, the plaintiff Aroostook Band of Micmacs challenged the Maine Human Rights Commission's filing of EEOC complaints against the Band, despite the fact that the Band is explicitly exempt from Title VII.  404 F.3d at 69.  The Commission stopped filing EEOC

complaints against the Band and admitted in its answer that Title VII did not apply to the

Band, and then argued that this established mootness "because there is no dispute:  all

parties agree that the Band is exempt from Title VII, and hence there is nothing for a

court to resolve."  Id., at 69-70.  The First Circuit disagreed, finding that "[t]he dispute is

not moot because nothing prevents the Commission from resuming its former practice,"

and that "[v]oluntary cessation will only moot a dispute when '(1) it can be said with

assurance that "there is no reasonable expectation …" that the alleged violation will

recur, and (2) *interim relief or events have completely and irrevocably eradicated the*

*effects of the alleged violation.*'"  Id. (quoting Los Angeles County v. Davis, 440 U.S.

625, 631 (1979) (emphasis added)).

    In this case, Defendants' argument that their voluntary cessation establishes

mootness is on even shakier ground than that of the defendant Commission in

Aroostook, as Defendants in this matter, unlike those in Aroostook, have never admitted

to any wrongdoing, and Defendants' assertion that "HRD has no intention of again

administering" the challenged test (see McNeely Dec., ¶ 2) does not constitute a

promise that they will not do so or any significant impediment to their doing so.  See id.,

at 69; see also Adams v. Bowater, 313 F.3d 611, 614 (1st Cir. 2002) (mootness not

established where defendant's refusal "either to admit that its [action] was unlawful or to

say that it will not be reintroduced …. suggests that the possibility of recurrence is not

wholly fanciful"); Phillips v. Pennsylvania Higher Educ. Assistance Agency, 657 F.2d

554 568-70 (request for injunction against state defendants' challenged demands for

attorneys' fees not mooted by defendants' voluntary cessation of such demands

because "[p]resent intentions may not be carried out, and, at any rate, they are not

controlling on the issue of mootness").  Similarly, Defendants' refusal to admit that the challenged test is illegal and to affirmatively represent that they will not use it in the future suggest that Defendants might return to their former practice, and in the absence of the injunctive relief that Plaintiffs request, Defendants will, indeed, be "'free to return to [their] old ways.'"  Aroostook, 404 F.3d at 69 (quoting U.S. v. W.T. Grant, 345 U.S. at 632); Arkansas Medical Society v. Reynolds, 6 F.3d 519, 529 (8th Cir. 1993) (finding that defendants' withdrawal of Medicaid reimbursement cut as to some of the services affected did not establish mootness even as to those services, because the defendants had not met their "heavy burden" of demonstrating no reasonable expectation the conduct would be repeated).[1]

More importantly, whatever the Court makes of Defendants' stated lack of intention[2] to use the challenged test in future, Defendants cannot hope to establish that

---

[1]     Moreover, Defendants contradict themselves by arguing that Plaintiffs' challenge to the 2004 examination is mooted by the planned 2006 examination, that Plaintiffs failed to comply with Beecher by failing to challenge the 2004 examination prior to its administration, as discussed in part C, infra, and that it would be premature for Plaintiffs to challenge the 2006 examination until after it is administered.  On the one hand, Defendants argue that Plaintiffs' challenge to the 2006 examination is too early, and on the other hand, they argue that Plaintiffs' challenge to the 2004 examination is too late, pursuant to Beecher.  However, Defendants' arguments miss the mark because Plaintiffs are of course entitled to challenge the 2004 examination (since they may be entitled to back pay, other damages, and instatement if they are successful in proving that it was discriminatory) and because Plaintiffs were not parties to the Beecher decree, its requirement for a prior challenge does not apply to them.  Furthermore, since Defendants have stated that the 2006 examination will not include the physical agility test as part of the initial screening process, see Exhibit 3, which both Plaintiffs' and Defendants' expert witnesses recommended as necessary to make the test valid and non-discriminatory, Defendants' stated intention of creating a new examination this year will not moot Plaintiffs' request for prospective injunctive relief ordering Defendants to create a non-discriminatory test.  See Expert Reports of Landy and Joel Wiesen (attached hereto as Exhibits 1 and 2).  Therefore, although Plaintiffs were not required to challenge the 2004 examination in advance, they are, in fact, now challenging the 2006 examination prior to its administration.

[2]     Although Defendants claim, at p. 5 n. 4, that "[i]t is 'settled practice' to accept the representations of government officials" with respect to mootness, this is inaccurate and overstated, at best.  In fact, although some courts have tended to find public officials more trustworthy than private defendants, this presumption is not automatic and certainly does not apply where, as here, the defendants' past actions render suspect their promise to comply with the law in future.  See, e.g., Campbell v. Magruder, 580 F.2d 521, 540-44 (D.C. Cir. 1978) (rejecting public defendants' assertion of mootness based on voluntary cessation because of "the history of defendants' grudging resistance, the ineffectiveness of their previous

their stated plans for a new test have somehow "completely and irrevocably eradicated the effects of the alleged violation." L.A. County v. Davis, 440 U.S. at 631. Plaintiffs contend that they represent a class of similarly situated minority firefighter candidates who have suffered and continue to suffer from Defendants' allegedly discriminatory hiring practices. Since these "effects of [Defendants'] alleged violation" are not in any way altered or relieved – let alone "completely and irrevocably eradicated" – by Defendants' stated intentions to adopt a new test, Defendants simply cannot establish, under the First Circuit's holding in Aroostook and the Supreme Court's holding in Davis, that their voluntary cessation moots Plaintiffs' claims. See Aroostook, 404 F.3d at 69-70; Davis, 440 U.S. at 631-32. Moreover, "[a]s a general rule, '[w]hen the suit is one challenging the legality of government action … [and] the plaintiff is himself an object of the action … there is ordinarily little question that the action … has caused him injury, and that a judgment preventing … the action will redress it.'" Aroostook, 404 F.3d at 70 (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 561-62 (1992)). Since Plaintiffs challenge the legality of the Commonwealth Defendants' actions and claim injury, and since Defendants will be free to resume their former illegal conduct and Plaintiffs' claimed injuries will not be redressed in the absence of judgment, this "general rule" clearly applies here, and Defendants' Motion to Dismiss should be denied. Id.; see also Adarand Constructors, Inc. v. Slater, 528 U.S. 216, 224 (2000) ("It is no small matter to

---

efforts at compliance, and the 'flagrant and shocking' character of their past violations"). Defendants' history does not inspire confidence, beginning with the NAACP's challenge to Defendants' discriminatory test in 1971 and the resulting Beecher decree ordering them to adopt a "job-related and validated" test, which Defendants subsequently failed to do when they "ignored the recommendations" of the experts they had retained in 1992 to assist them with the "implementation of entry-level firefighter selection" that complied with the Beecher decree. See NAACP v. Beecher, 371 F.Supp. 507, 521 (D. Mass. 1974); see Expert Report of Frank Landy, Opinion 1 at 12-21 (attached hereto as Exhibit 1). Therefore, in this case, it would not be prudent to extend any presumption of good faith to the defendants' plan to adopt a new test, given "the ineffectiveness of their previous efforts at compliance." See Campbell, 580 F.2d at 540-44.

deprive a litigant of the rewards of its efforts …. Such action on grounds of mootness would be justified only if it were absolutely clear that the litigant no longer had any need of the judicial protection that it sought.").

The above-cited cases regarding the First Circuit's approach to cases involving "voluntary cessation" make clear that Defendants are mistaken in their bold assertion that "[i]t is settled that a challenge to an administrative policy is moot when the agency voluntarily withdraws that policy and implements a new one."  See Defendants' Memo. at 4.  The cases Defendants cite in support of this inaccurate proposition of law actually stand for the more moderate position that voluntary cessation can result in mootness in particular circumstances, and as discussed above, those circumstances simply do not apply here.[3]  In this case, since "'(1) it [cannot] be said with assurance that "there is no reasonable expectation …" that the alleged violation will recur, and (2) interim relief or events have [not] completely and irrevocably eradicated the effects of the alleged

---

[3]      See New England Regional Council of Carpenters v. Kinton, 284 F.3d 9, 18 (1st Cir. 2002) (stating the rule that "'a voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice' [quoting City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 289 (1982)]," but distinguishing City of Mesquite because "there [was] simply no basis for suggesting that the original permit policy [would] be reinstated following the conclusion of the litigation"); D.H.L. Assocs., Inc. v. O'Gorman, 199 F.3d 50, 54 (1st Cir. 1999) (distinguishing City of Mesquite because the challenged "ordinance [had] been recast … to overcome constitutional challenge and it [had] remained unchanged since 1996 …., it would be unreasonable to presume that the Town would return to its prior zoning plan[, and] [t]hus, the voluntary-cessation exception to the mootness doctrine [was] inapplicable"); Oceana, Inc. v. Evans, 2004 WL 1730340, at *3 (D. Mass. 2004) (finding challenge to regulation that had been *superseded* by a new regulation moot but noting that "'where a challenged regulation continues to the extent that it has only been superficially altered by a subsequent regulation, [courts] are capable of meaningful review' [quoting Conservation Law Found. v. Evans, 360 F.3d 21, 26 (1st Cir. 2004)]"); Bahnmiller v. Derwinski, 923 F.2d 1085, 1089 (4th Cir. 1991) (finding that the defendant Department of Veterans' Affairs' change in policy constituted "concession of a large part of the relief sought … [that] render[ed] this controversy moot in part").  Similarly, St. Louis Firefighters Association v. City of St. Louis is distinguishable because in that case, unlike here, the city had cancelled the entire promotion test procedure and explicitly promised not to use the test in future promotions.  96 F.3d 323, 329-30 (8th Cir. 1996).  In that case, the court ruled that the defendants had met their heavy burden of establishing that voluntary cessation mooted the action because (1) it could be said with assurance that the alleged wrongs would not recur, and (2) there were no lingering effects.  Id. Since neither of those prerequisites is met in this case and since Plaintiffs' claims include claims for back pay and other damages, St. Louis Firefighters is inapposite, and Defendants' voluntary cessation does not moot Plaintiffs' claims for injunctive relief.

violation,'" Defendants' purported cessation of the challenged test does not establish

mootness.  Aroostook, 404 F.3d at 70 (quoting Los Angeles County v. Davis, 440 U.S.

at 631).

### B.    The Court Has Authority to Grant Plaintiffs' Claims for Relief

Although Defendants attempt to argue that Plaintiffs' claims for instatement,

"retroactive back pay, seniority, and other damages" would "unfairly impinge on the

interests of the individuals currently on the eligibility list," this is not relevant to

mootness.  First, as discussed above, Plaintiffs' claims for back pay, instatement,

seniority, and other damages are in no way mooted by Defendants' intention to create a

new examination in 2006.  Second, Defendants' argument that Plaintiffs cannot be

granted back pay and other damages because it would be unfair to individuals on the

eligibility list does make sense, as granting these remedies could not conceivably

"impinge on the interests" of individuals on the eligibility list.  Third, the Court could grant

Plaintiffs' requested equitable relief without actually ordering instatement, by ordering,

for example, that Plaintiffs be placed at the top of the next entry-level firefighter eligibility

list, with retroactive back pay and seniority.  Finally, even if Defendants' arguments

concerning the available remedies were correct, which Plaintiffs of course do not

concede, "Plaintiffs are free to bring cases that fly in the face of precedent," and "[w]hen

they do so, those cases should be resolved on the legal or factual merits, not dismissed

for lack of a case or controversy."  Aroostook, 404 F.3d at 71 (holding that the fact that

the Band's "position might be difficult to maintain because another district court has

already answered the legal question in the state's favor does not mean that there is no

case or controversy").

In this case, Defendants' assertion that "this Court could not grant the retroactive relief [Plaintiffs] are seeking" is certainly not correct.  Equitable remedies such as back pay and instatement are "intended to compensate a plaintiff for the effects of the discrimination, both past and future, and to bring the plaintiff to the position which s/he would have occupied but for the illegal act(s)," and where someone has been denied a job opportunity due to discrimination, "the overarching preference is for reinstatement." Selgas v. American Airlines, Inc., 104 F.3d 9, 13 (1st Cir. 1997); see also Feldman v. Philadelphia Housing Authority, 43 F.3d 823, 831 (3d Cir. 1994) ("The equitable remedy of reinstatement is available for discharges that violate [federal anti-discrimination law], … and reinstatement is the preferred remedy to cover the loss of future earnings"); Thurman v. Yellow Freight Systems, Inc., 90 F.3d 1160, 1171 (6th Cir. 1996) ("Victims of discrimination are presumptively entitled to instatement or reinstatement in the usual case"); Roush v. KFC Nat. Management Co., 10 F.3d 392, 398 (stating that "reinstatement is the presumptively favored equitable remedy"); Srail v. RJF Internatl. Corp., 711 N.E.2d 264, 272 (Ohio Ct. App. 1998) (victim of age discrimination presumptively entitled to reinstatement).  In this case, Plaintiffs allege that if it were not for the Defendants' discrimination, they would have been eligible for hire as firefighters, and granting instatement, back pay, seniority, and other damages to redress this harm are proper and could not be mooted by Defendants' planned redesign of the examination.

C.    **Plaintiffs Have Presented Valid Claims Under the <u>Beecher</u> and <u>Castro</u> Decrees Based on the Commonwealth's Failure to Satisfy Its Obligations Under the Decrees Relating to the Creation and Administration of Valid, Non-Discriminatory Public-Safety Entrance Examinations**

1.    <u>Plaintiffs Have Standing to Enforce the Beecher and Castro Consent Decrees Because They Have Been Directly Affected by the Commonwealth's Failure to Follow the Explicit Terms of the Decrees.</u>

The Commonwealth's arguments that the plaintiffs have no standing to enforce the <u>Beecher</u> and <u>Castro</u> decrees are completely misguided, both in terms of the Commonwealth's independent obligations under the consent decrees and in terms of the actual injuries stemming from the Commonwealth's failure to satisfy those obligations. Part (a) of this section will demonstrate how the Commonwealth failed to satisfy its ongoing, independent obligation to the plaintiffs and all other minority applicants create and administer valid, non-discriminatory examinations for public safety positions. Part (b) of this section examines the requirements for constitutional standing and establishes how the Commonwealth's conduct caused the plaintiffs a redressable injury, which the plaintiffs are seeking to redress through this action.

(a)    The Commonwealth Has Failed to Satisfy Its Obligations Toward the Plaintiffs and Class Members, so Those Individuals Have Standing to Bring These Claims for Enforcement.

As noted by the Commonwealth in its motion to dismiss, a consent decree is supposed to be "construed for enforcement purposes basically as a contract." <u>U.S. v. ITT Continental Baking Co.</u>, 420 U.S. 223, 238 (1975). As such, courts should interpret those decrees based upon the language and purpose of such decrees. <u>Id.</u> at 238; <u>Quinn v. City of Boston</u>, 325 F.3d 18, 30 (1st Cir. 2003); <u>Mass. Assoc. for Retarded Citizens v. King</u>, 668 F.2d 602, 607 (1st Cir. 1981).

Although the plaintiffs agree with these legal principles, the plaintiffs completely disagree with the Commonwealth's assessment of the purpose and context of the Castro and Beecher decrees.  Both those decrees were based on findings from the First Circuit and this Court that the public-safety entrance examinations administered by the Commonwealth were themselves discriminatory.  See Castro v. Beecher, 522 F. Supp. 873, 874 (D. Mass. 1981) ("The Court of Appeals held that the civil service examinations were racially discriminatory.").  The Court made these decisions based on extensive findings regarding the manner in which the Commonwealth created and administered the public-safety examinations and the resulting adverse impact on minority candidates in communities with significant minority populations.  Id.; NAACP v. Beecher, 371 F. Supp. 507, 514 (D. Mass. 1974).  Therefore, while the consent decrees the Court issued in both cases required remedial hiring programs for minority candidates in certain communities, such relief was only a portion of that ordered under the decrees.  See Castro v. Beecher, 365 F. Supp. 655, 660-663 (D. Mass. 1973); Beecher 371 F. Supp. at 520-523.

The Court also ordered the Commonwealth to stop using the discriminatory examinations and not to use any examinations in the future unless they were "demonstrably job-related and validated in accordance with the [EEOC Guidelines]." Beecher, 371 F. Supp. at 521 ¶ 4; see also Castro, 365 F. Supp. at 662 ¶ 3.  Such relief benefited not only minority applicants in communities with hiring obligations under the decree but rather benefited **all minority applicants** from **any** civil service community in the Commonwealth.   The Court did not order the Commonwealth to create a non-discriminatory examination only for the communities falling under the consent decrees'

12

remedial hiring program; rather, the Court ordered that the Commonwealth create a non-discriminatory examination for all future public-safety entrance examinations.  In this regard, minority applicants from every civil service community, whether or not falling under the remedial-hiring portion of the decree, were the intended and actual beneficiaries of the non-discriminatory examinations the Commonwealth was required to create and administer.

The Commonwealth failed to satisfy its obligations under the decrees because the tests it administered from 2002 through 2004 (as well as a number previous examinations) could not be found to be valid and job-related under the EEOC Guidelines since the Commonwealth failed to follow the advice of its experts in administering and grading the examination and cannot therefore rely on the validity study for that examination.  See Expert Report of Frank Landy, Opinion 1 at 12-21 (attached hereto as Exhibit 1).  Notably, the Commonwealth's expert witness failed to rebut this contention in his expert report, so the Commonwealth has failed to create a genuine issue of material fact regarding this expert opinion, and it must be accepted as an established fact in this case.  See Fed. R. Civ. P. 26(a)(2)(B) (requiring that expert witness reports contain "a **complete** statement of **all** opinions to be expressed" by the expert witness).

Since the Commonwealth has failed to administer a valid, non-discriminatory exam as required by the consent decree, the Commonwealth's violation of its obligations under the decree have not "abated" and the "pernicious effects" of its discriminatory examinations have not been cured." Mackin v. City of Boston, 969 F.2d 1273, 1276 (1st Cir. 1992) (upholding Beecher decree).  In granting the requested relief

under the decree, the Court is therefore acting directly within the scope of the decree and cannot be said to be extending the decree beyond its own terms.

In this regard, it is immaterial whether the City of Lynn is any longer a community falling under the remedial hiring provisions of the <u>Castro</u> and <u>Beecher</u> decrees. While those provisions of the decrees no longer apply to the City of Lynn, the decrees themselves (including the examination provisions) are both still active by their own terms in other communities.  Therefore, the Lynn applicants, as with all civil service applicants, are entitled to be evaluated using valid and non-discriminatory examinations pursuant to paragraph 4 of the <u>Beecher</u> decree and paragraph 3 of the <u>Castro</u> decree. By failing to satisfy its obligations under the decree, the Commonwealth has failed to satisfy its obligations toward the plaintiffs and the class they seek to represent, and the plaintiffs therefore have standing to raise this challenge.

      (b)      Plaintiffs Have Standing to Enforce the Decrees Because They Have Been Injured in Fact by the Commonwealth's Conduct and Because a Favorable Decision Would Redress Those Injuries.

Moreover, while the plaintiffs may not be entitled to remedial hiring consideration under the direct terms of the <u>Castro</u> and <u>Beecher</u> decrees (since the City of Lynn has been relieved of its obligations under the decree), the plaintiffs and class members do meet the three elements of constitutional standing since (1) they have a cognizable "injury in fact"; (2) there is a "causal connection between the injury and the conduct complained of"; and (3) the injury is likely to "redressed by a favorable decision." <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. at 560.

As noted above, even though the City of Lynn has been relieved of its remedial hiring obligations under the decree, the Commonwealth has never been absolved of its

obligation under this still-active decree to create and administer non-discriminatory civil service examinations. The Commonwealth's failure to administer such valid, non-discriminatory examinations has led to specific and cognizable injuries in that the examinations have had a measurable and significant adverse impact on the plaintiffs, the class they seek to represent, and all other minority applicants in the Commonwealth's civil service communities. See Expert Reports of Landy and Joel Wiesen (attached hereto as Exhibits 1 and 2).

It is ludicrous for the Commonwealth to attack the plaintiffs' standing by asserting that these plaintiffs fall outside of the "zone of interests" sought to be protected by the Castro and Beecher decrees. Defendants' Memo. at 14-17. The plaintiffs and the class they seek to represent are minority candidates who have suffered the adverse impacts of the examinations that the Commonwealth created and administered in direct violation of the consent decrees, which were specifically designed to protect minority candidates from this very harm. The plaintiffs have a right under the two decrees to be evaluated under non-discriminatory examinations, and this is one element of the relief the plaintiffs are seeking. Moreover, the injuries the plaintiffs and class members have suffered are fully redressable by an order from this Court as to the Commonwealth's obligation to satisfy the terms of the decrees in creating and administering an acceptable examination regimen.

As noted above, supra note 2 and part III(C)(1)(a), the Commonwealth has failed to satisfy the previous orders of this Court under the Beecher and Castro decrees to create and administer non-discriminatory examinations, so the Court cannot conceivably accept the representations of the Commonwealth that it intends to

administer valid, non-discriminatory examinations at this juncture.  Furthermore, such

an adverse inference is fully supported by the Commonwealth's recent actions in

releasing the announcement for the upcoming firefighter examination.  <u>See</u> Exhibit 3.

The announcement makes clear that the Commonwealth intends to subject all

candidates to a written examination as the first hurdle in a multiple-hurdle hiring process

and will not administer or score the physical abilities test until after offers of employment

have been made based on the initial written examination.  <u>Id.</u>  Since the

Commonwealth's vendor in this process, Rick R. Jacobs, recommended against such

an approach in 1992 when he and Dr. Landy created the testing approach the

Commonwealth has been using for the past thirteen years, <u>see</u> Landy Report at 11-21,

there is no reason to believe that Dr. Jacobs has changed his position on the use of a

written examination as an initial hurdle without a weighted, scored physical component.

It is therefore highly probable that the Commonwealth is again flouting the advice of its

own expert in the administration of the new firefighter examination, and the Court must

be wary of the Commonwealth's assertions that its examination (as administered) will

be valid and non-discriminatory.

For these reasons, the plaintiffs have validly asserted a cause of action under the

<u>Beecher</u> and <u>Castro</u> decrees raising an injury in fact that is connected to the

Commonwealth's obligations under the decrees and is fully redressable by this Court.

> 2.    <u>Plaintiffs Have Stated a Valid Claim for Relief Under the Beecher
> and Castro Decrees Since They Were Not Parties to the Initial
> Decrees and Could Not Take Advantage of any Internal Resolution
> Procedures Under the Decree.</u>

The Commonwealth correctly notes in its Memorandum that the "parties" to the

original consent decrees had the ability to resolve any concerns about test validity and

job relatedness "before any such test [was] put into use for the purpose of qualifying and selecting." NAACP v. Beecher, 371 F. Supp. at 521, cited in Defendants' Memo. at 18. However, the named Plaintiffs to this matter and the class they seek to represent had no ability to resolve their concerns prior to the administration of the 2002 through 2004 examinations because they are not **parties** to the original decrees. It is therefore immaterial whether the plaintiffs or class members knew or could have known in advance of the examinations that they were invalid or discriminatory, since those individuals had no recourse under the Beecher and Castro decrees except to file suit in Court for enforcement. This is precisely what the plaintiffs have now done, and they have therefore stated a cause of action upon which relief can be granted.

Moreover, the Commonwealth's suggestion that the plaintiffs should have objected to the 2004 examination prior to its administration is completely at odds with the Commonwealth's argument that the current challenge is somehow moot because the 2006 exam has yet to be administered. See supra part III(A). If the plaintiffs do have some right under the Beecher decree to object to an examination before it is given and to bring that matter to the Court for resolution, then the Court must necessarily accept the Beecher/Castro allegations and resolve them prior to the administration of the examination in June 2006.

## IV.   CONCLUSION

Based on the foregoing, this Court should DENY the Commonwealth Defendants'

Motion to Dismiss.

<div style="margin-left: 40%;">

Respectfully submitted,

JACOB BRADLEY, NOAH BRADLEY, KEITH
RIDLEY, and JARED THOMAS,

By their attorneys,


 s/Alfred Gordon                                    
Harold L. Lichten, BBO # 549689
Shannon Liss-Riordan, BBO # 640716
Alfred Gordon, BBO # 630456
Pyle, Rome, Lichten, Ehrenberg
& Liss-Riordan, P.C.
18 Tremont Street, Suite 500
Boston, MA 02108
(617) 367-7200

</div>

Date:  March 6, 2006


### CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served on the
attorneys of record for each party by electronic service on March 6, 2006.

<div style="margin-left: 40%;">

 s/Alfred Gordon                           
Alfred Gordon

</div>

**EXPERT REPORT**

*Jacob Bradley, et al.*

*v.*

*City of Lynn, et al.*

**Civil Action Number 05-10213-PBS**

**August 30, 2005**

**Prepared By:**

**Frank J. Landy, Ph.D.**

**and**

**Mark J. Schmit, Ph.D.**

**SHL USA, Inc.**
**2555 55th Street**
**Suite 201D**
**Boulder, Colorado  80301**

# TABLE OF CONTENTS

List of Tables ................................................................................................................ .ii

List of Figures ............................................................................................................... iv

Executive Summary .......................................................................................................v

Introduction....................................................................................................................1

Background ...............................................................................................................…..3

Opinions ......................................................................................................................12

Summary and Conclusions ..........................................................................................81

Signature Page ...........................................................................................................82

References....................................................................................................................83

Appendices...................................................................................................................88

    A:  Curriculum Vitae .............................................................................................89

    B:  Case Materials...............................................................................................123

## LIST OF TABLES

Table 1.   LJA Firefighter Test Development Projects ....................................................9

Table 2.   Additional Cities in which I have Conducted Job Analyses for Entry-Level

Firefighter Positions ..........................................................................................10

Table 3.   Madison Firefighter Validation Intercorrelations ............................................16

Table 4.   Nominal Cut Score (70) Results for All Commonwealth of Massachusetts

Applicants to the Entry-Level Firefighter Job:  Whites v. African American..32

Table 5.   Nominal Cut Score (70) Results for All Commonwealth of Massachusetts

Applicants to the Entry-Level Firefighter Job:  Whites v. Hispanics/

Other Minorities .................................................................................................33

Table 6.   2002 Adverse Impact Ratios for Cut Scores Set at Each Observed Test

Score ...................................................................................................................34

Table 7.   2004 Adverse Impact Ratios for Cut Scores Set at Each Observed Test

Score ...................................................................................................................36

Table 8.   Effective Cut Score (90) Results for All of Massachusetts Applicants to the

Entry-Level Firefighter Job:  Whites v. African Americans.............................38

Table 9.   Nominal Cut Score (90) Results for All of Massachusetts Applicants to the

Entry-Level Firefighter Job:  Whites v. Hispanics/Other Minorities ...............39

Table 10.  Effective Cut Score (95) Results for All of Massachusetts Applicants to the

Entry-Level Firefighter Job:  Whites v. African Americans.............................40

Table 11.  Nominal Cut Score (95) Results for All of Massachusetts Applicants to the

Entry-Level Firefighter Job:  Whites v. Hispanics/Other Minorities ...............41

Table 12.   Bownas (1988) Firefighter Job Analysis Attributes and Revised

Overall Weights ................................................................................48

Table 13.   1993 Majority and Minority Group Score Comparisons ..................................56

Table 14.   1998 Majority and Minority Group Score Comparisons ..................................57

Table 15.   2000 Majority and Minority Group Score Comparisons ..................................58

Table 16.   2002 Majority and Minority Group Score Comparisons ..................................59

Table 17.   2004 Majority and Minority Group Score Comparisons ..................................60

Table 18.   Uniform Guidelines Guidance .........................................................................75

## LIST OF FIGURES

Figure 1.  Firefighter Duty Areas Predicted by Each Selection Component ..................... 14

Figure 2.  Majority and Minority Group Distribution of Scores ........................................ 53

Figure 3.  2004 White, African American, and Hispanic Group Histograms ................... 62

Figure 4.  2002 White, African American, and Other Minority Group Histograms .......... 63

Figure 5.  Coverage of Job Content Domain ................................................................... 70

## EXECUTIVE SUMMARY

In this report, opinions are presented related to the practice of the Commonwealth of Massachusetts and the City of Lynn, Massachusetts for selecting entry-level firefighters. In general, it is my opinion that the defendants in this action: 1) ignored the recommendations that were made for the implementation of entry-level firefighter selection; 2) failed to maintain job analysis information for the position of entry-level firefighter for purposes of selection, thus calling the job relatedness of the procedure into question; and 3) failed to avail themselves of alternative procedures for entry-level firefighter selection that would have resulted in increased job relatedness and lowered adverse impact against African American and Hispanic candidates while meeting business necessity constraints. The specific opinions are as follows:

## OPINIONS

1. The Commonwealth of Massachusetts ignored the recommendations of Landy, Jacobs and Associates (LJA) in the use of the cognitive ability test (Civil Service examination) and the physical ability test for screening applicants for entry-level firefighter positions.

2. The Commonwealth of Massachusetts failed to meet professional standards in the review and maintenance of its testing program and the underlying job analysis of the position of firefighter.

3. The cut score for the cognitive ability test (Civil Service examination) identified by the Commonwealth of Massachusetts for purposes of calculation of adverse impact is incorrect. The cut score for determining adverse impact should be the effective cut score not a nominal cut score unrelated to actual selection decisions. The effective cut score is the lowest cognitive ability test score observed among chosen candidates.

4. There is pervasive adverse impact against African Americans and Hispanics at both the nominal and the effective cut scores on the written Civil Service examination used in 2002 and 2004 to make employment decisions about entry-level firefighters in the City of Lynn, Massachusetts and most likely in all other communities using a rank-order selection method.

5. The Commonwealth of Massachusetts and the City of Lynn, Massachusetts acknowledge the value of a compensatory / comprehensive strategy in their use of Personnel Administration Rule 8.

6. By implementing Personnel Administration Rule 8 for purposes of selecting candidates fluent in Spanish, the Commonwealth of Massachusetts and the City of Lynn, Massachusetts acknowledge that differences among observed cognitive ability scores (Civil Service examination) are largely irrelevant. This acknowledgement is illustrated by the practice of bypassing higher cognitive ability test scores for purposes of appointment of candidates with Spanish fluency. Similarly, by following the practice of absolute veteran's preference, the Commonwealth of Massachusetts and the City of Lynn, Massachusetts again acknowledge that multi-point differences in cognitive ability test scores are unrelated to successful job performance, at least above the cut score of 70.

7. There has been widespread recognition since the mid-1990's of the concepts of incremental validity, the value of compensatory hiring strategies, and the value of personality testing in public safety.

8. Very small selection ratios exacerbate the adverse impact of the selection strategy chosen by the Commonwealth of Massachusetts for constructing eligibility lists and alternative methods for alleviating this exacerbated adverse impact were not considered.

9. The use of a single predictor to screen applicants for entry-level firefighter jobs by the Commonwealth of Massachusetts provides a very limited assessment of potential for the total job domain and thereby limits the confidence that can be placed on a single score in a very selective top-down system.

10. Many feasible alternative selection strategies were available to the City of Lynn, Massachusetts and the Commonwealth of Massachusetts that would have either maintained or increased the job relatedness of the selection process while reducing adverse impact against African American and Hispanic candidates.

11. There are numerous and serious shortcomings of the 2002 and 2004 procedure employed by the City of Lynn, Massachusetts and the Commonwealth of Massachusetts for the appointment of entry-level firefighters. In light of these violations, it is my professional and scientific opinion that neither the Commonwealth of Massachusetts nor the City of Lynn, Massachusetts can demonstrate that the use of the cognitive ability examination for entry-level firefighter selections in 2002 and 2004 was job related and fair.

**INTRODUCTION**

The SHL Litigation Support group was retained by Pyle, Rome, Lichten, Ehrenberg & Liss-Riordan, P.C. to provide expert testimony in the case styled *Jacob Bradley, et al., v. City of Lynn, et al.* Plaintiffs' counsel has requested opinions relevant to the use of the written cognitive examination (Civil Service examination) for the selection of entry-level firefighters in the City of Lynn, Massachusetts. Specifically, opinions will be presented on the use of the written cognitive examination as an initial hurdle in the selection process, the cutoff score employed, and alternative selection procedures for hiring firefighters that would have equal or greater job relatedness and lesser adverse impact than the method by which the cognitive ability examination was used by the City of Lynn, Massachusetts. I was assisted in writing this report by Dr. Mark J. Schmit, who is a member of my staff. Both his and my curriculum vitae are presented in Appendix A. For this case, we have relied extensively on the scientific literature in the field of industrial and organizational psychology and human resources (HR) management which is cited throughout this report. We have reviewed the case materials listed in Appendix B. Additionally we requested a list of firefighter applicants who were advanced from the cognitive testing phase to the physical testing phase from both the 2002 and 2004 administrations for the City of Lynn, Massachusetts, identified by race and test score for the City of Lynn, as well as all other cities utilizing the cognitive ability examination as a first hurdle for entry-level firefighter selection. We received these data for the City of Lynn, Massachusetts but not from the other municipalities because the Commonwealth of Massachusetts does not appear to retain such data. Specifically, we requested:

1

1. A list of firefighter applicants who were advanced from the cognitive testing phase to the physical testing phase from both the 2002 and 2004 administrations.

    a. Across the entire state, identified by race, and including the cognitive examination score of each applicant.

    b. For the City of Lynn, Massachusetts positions, identified by race, and including the cognitive examination score of each applicant.

    c. An indication of which applicants were part of any Personnel Administration Rule 8 or 10 list.

2. A list of firefighter applicants who were eventually hired from both the 2002 and 2004 administrations.

    a. Across the entire state, identified by race, and including the cognitive examination score of each applicant.

    b. For the City of Lynn, Massachusetts positions, identified by race, and including the cognitive examination score of each applicant.

    c. An indication of which applicants were part of any Personnel Administration Rule 8 or 10 list.

# BACKGROUND

## THE FIELDS OF INDUSTRIAL AND ORGANIZATIONAL PSYCHOLOGY AND HR MANAGEMENT

Industrial and organizational psychology is a specialty field within the broader discipline of psychology.  It is distinct from other subfields such as clinical and counseling psychology, educational psychology, or experimental psychology because it deals specifically with workplace design and worker behavior.  As a result, there are unique tools that are used for analysis, unique scientific literature, and unique theories of worker behavior that are not shared with other branches of psychology or with related disciplines such as sociology, anthropology, industrial engineering, or industrial management.

The field of industrial and organizational psychology has been in existence for slightly more than 100 years.  Courses in the discipline are offered at both the undergraduate and graduate level at the majority of colleges and universities.  Advanced degrees (M.A., M.S., Ph.D., Psy.D.) have been offered in the field for over 90 years.  There have been hundreds of basic texts published in this area, thousands of specialty texts dealing with individual topics, and hundreds of thousands of empirical research studies published in peer-reviewed journals both domestically and internationally.

Industrial and organizational psychology is divided into three main sections:  HR (or personnel) psychology, organizational psychology, and human engineering.  For purposes of this report, topics in HR psychology will be addressed.  HR psychology considers issues related to the human abilities and attributes necessary to complete the

3

essential tasks of a job.  Common topics in HR psychology include job analysis, cutoff scores, selection, training, performance evaluation, discipline, and promotion.

Industrial and organizational psychologists are often involved as expert witnesses in cases concerning allegations of employment discrimination.  The methods of industrial and organizational psychology include analysis of survey data, interviews, content analysis of organizational documents, reviews of scientific literature, and statistical analysis of data.  These methods are commonly used for scientific research in the field as illustrated in the major research journals in the field.

The field of HR management arose from changes in the world of work such as the increased specialization of labor during the industrial revolution, early industrial and organizational psychology, establishment of the federal Civil Service Commission, behavioral sciences, and social legislation beginning in the 1960's (Cascio, 1995).  HR management can be viewed as the application of industrial and organizational psychology theories to the workplace.

In the present case, the areas of industrial and organizational psychology and HR management that hold the greatest relevance are the following:  principles and research findings related to job analysis, cutoff scores, and selection.  In my career, I have done graduate and undergraduate instruction, research, consulting, professional workshops, scientific writing, and provided sworn testimony in all of these areas.

**EXPERIENCE:**

I[1] have a Ph.D. in industrial and organizational psychology and have been conducting and publishing research and consulting in organizational settings for 40 years. I have been actively engaged in consulting with respect to entry-level firefighter selection since 1982. In addition to my background in industrial and organizational psychology, I also have training and have conducted and published scientific research in exercise physiology as it related to the successful performance of firefighters.

**Publications and Research**

I founded and edited the scientific journal entitled "Human Performance," published by Erlbaum. This journal is currently in its seventeenth year of publication and publishes articles related to HR psychology and HR management. I was the Associate Editor of the "Journal of Applied Psychology" (the leading scientific journal in industrial and organizational psychology, published by the American Psychological Association) for six years and currently serve on the editorial board. This journal also publishes research and practice articles in HR psychology and HR management. I am a peer reviewer for many journals related to industrial, organizational, and general psychology, including the "Journal of Occupational Psychology," "The American Psychologist," "The Psychological Bulletin," and others listed on my curriculum vitae in Appendix A. Literature related to the selection of firefighters appears in all of these scientific journals.

I currently have, or in the past have had, appointments to several federal grant and contract review panels. At various points in my career, I have been asked by the National

---

[1] Frank J. Landy was the author of this report and Mark J. Schmit conducted statistical analyses and assisted with certain statistical opinions. Whenever the term "I" or "my" is used, it can be assumed that it refers to Frank Landy.

Academy of Sciences, the United States Department of Transportation, United States Department of State, United States Equal Employment Opportunity Commission, United States Department of Labor, United States Department of Justice, the Office of Federal Contract Compliance Programs (OFCCP), United States Customs Service, United States Secret Service, the Drug Enforcement Agency (DEA) and the Central Intelligence Agency to provide reports on employment discrimination.  I was commissioned by the United States Department of Labor to undertake a study of possible race bias in the performance evaluations of federal employees in 12,000 different job titles over a 20-year period.

I have written textbooks with chapters on performance measurement, training and development, selection and promotion systems, and social dynamics of organizations, as well as invited book chapters (e.g., Landy, 1987; Landy, 1989; Landy & Conte, 2004; Landy, Shankster, & Kohler, 1994; Landy, Shankster-Cawley, & Moran, 1995).  I have published extensively in peer-reviewed scientific journals on topics related to promotion, work assignments, performance evaluation, training, and employment discrimination.  I have recently completed a scholarly text entitled "Employment Discrimination Litigation" (Landy, 2005).  This text was commissioned by the Society of Industrial and Organizational Psychology (SIOP), the major professional and scientific organization for industrial and organizational psychologists, to represent an authoritative survey of issues, representative case law, and professional and scientific practice related to employment discrimination.

**Delivered Papers and Awards**

I have delivered over 600 scientific presentations in conference and non-conference settings. I was on the faculty of The Pennsylvania State University for over 25 years, retiring at the rank of Full Professor, and Director of the Center for Applied Behavioral Sciences. I remain on the faculty of the Colorado State University as well as Griffith University in Brisbane, Australia. I have received two awards for research from SIOP. In 1980, I (and my colleagues) received the Cattell Award for excellence in research design. In 1998, I (and my colleagues) received the M. Scott Myers Award for Applied Research in the Workplace, an award given in recognition of a project or product representing an outstanding example of the practice of industrial and organizational psychology in the workplace. In 2004, I was awarded the Professional Contributions Award by SIOP for developing, refining, and implementing practices, procedures, and methods that have had a major impact on both people in organizational settings and the profession of industrial and organizational psychology.

**Professional Memberships**

I am a Fellow of Divisions 5 (Measurement), 14 (Industrial and Organizational Psychology), 21 (Engineering), 26 (History) and 47 (Sports and Exercise Psychology) of the American Psychological Association (APA). I am also a member of the American College of Sports Medicine. Additionally, I am a past president of SIOP. In that capacity, I provided input to legislators and regulators on the Civil Rights Act of 1991, the Americans with Disabilities Act (ADA), and the Age Discrimination in Employment Act (ADEA). In 1993, research which I directed was used as a foundation for changing the exemptions clauses of the ADEA with respect to public safety employees, including

firefighters.   As is the case for 2005, I am frequently invited by SIOP to conduct workshops on employment discrimination.

**Organizational Consulting**

I have worked as a consultant to private and public sector organizations since 1965. In collaboration with my colleague Rick Jacobs, I founded the consulting firm of Landy, Jacobs and Associates, Inc. (LJA), an organizational consulting firm and remained President of that firm until 1998, when LJA merged with SHL Group plc (Saville & Holdsworth, Ltd).   Both LJA and SHL have been retained by the Commonwealth of Massachusetts at various times in the last two decades to design selection programs, as well as medical standards and fitness programs, for public safety officers, including firefighters.

I am currently employed by SHL Americas.   SHL is an international HR consulting firm.  The Division of SHL for which I work concentrates on serving clients in North and South America.  I am a Vice President in SHL Americas responsible for the Litigation Support Group.  I have consulted on numerous occasions on topics such as promotions, training, discipline, work assignments, and compensation including awards. Further, I have extensive experience in local, state, and federal law enforcement agencies.

In both of these roles at LJA and SHL, I also have testified in employment discrimination lawsuits in federal and state courts and have been admitted as an expert in federal court on issues related to age, race, sex, and disability discrimination, as well as on issues relating to statistics and general organizational and management practice.  As an expert witness, I have worked with lawyers representing both plaintiffs and defendants.

**Public Safety Work**

The firm of LJA has developed, administered, and validated public safety entry-level examinations and promotional examinations since 1982. I have conducted hundreds of job analyses of firefighter and police positions. I have published many of these studies in scholarly journals and books. Some of these examinations have been the subject of judicial investigation when allegations of employment discrimination have arisen. The most extensive treatment of entry-level firefighter examinations occurred in the case captioned *Brunet v. City of Columbus* (1995). LJA has also developed tests as remedies to previous allegations of discriminatory promotional procedures in Denver, Colorado; Grand Rapids, Michigan; New York, New York; Akron, Ohio; Cleveland, Ohio; and Columbus, Ohio. A more extensive list of fire departments for which LJA has developed selection procedures is contained in the following table (Table 1) and a list of additional cities in which I have conducted job analyses for entry-level firefighter positions is presented in Table 2.

**Table 1.        LJA Firefighter Test Development Projects**

| Akron, Ohio | Colorado Springs, Colorado | New York, New York |
|---|---|---|
| Arlington, Texas | Columbus, Ohio | Overland Park, Kansas |
| Austin, Texas | Denver, Colorado | Pittsburgh, Pennsylvania |
| Buffalo, New York | East Cleveland, Ohio | San Antonio, Texas |
| Chicago, Illinois | Grand Rapids, Michigan | St. Louis, Missouri |
| Cincinnati, Ohio | Los Angeles, California | Tulsa, Oklahoma |
| Cleveland, Ohio | Madison, Wisconsin | Washington, D.C. |
| Commonwealth of Massachusetts | Milwaukee, Wisconsin | |

**Table 2.      Additional Cities in which I have Conducted Job Analyses for Entry-Level Firefighter Positions**

| | | |
|---|---|---|
| Altoona, Pennsylvania | Hampton, Virginia | Rochester, New York |
| Boulder, Colorado | Harrisburg, Pennsylvania | Sacramento, California |
| Chesapeake, Virginia | Hollywood, Florida | Santa Fe, New Mexico |
| Daly City, California | Irving, Texas | Seattle, Washington |
| Denton, Texas | Kalamazoo, Michigan | South San Francisco, California |
| East Orange, New Jersey | Newport News, Virginia | Southfield, Michigan |
| Farmington Hills, Michigan | Oxnard, California | Tacoma, Washington |
| Fayetteville, North Carolina | Philadelphia, Pennsylvania | Ventura, California |
| Fort Worth, Texas | Plano, Texas | Virginia Beach, Virginia |
| Fort Lauderdale, Florida | Pueblo, Colorado | West Palm Beach, Florida |

In the 40 years that I have been conducting job analyses and developing tests, I have gathered data related to the tasks of all ranks within fire departments as well as the knowledge, skills, and abilities required to carry out those tasks. In performing this work, I have spent well over 2000 hours observing firefighters. As a result, I have a substantial personal awareness and empirical database regarding the job in question. In fact, my firm conducted the transportability study and developed the examination for firefighter that was the used by the City of Lynn, Massachusetts and other municipalities in the Commonwealth of Massachusetts. I am very familiar with the critical functions of the firefighter job, the most effective methods of testing for the requisite abilities, and the most reasonable methods for establishing final eligibility lists.

In related work, I conducted a nationwide project for the Law Enforcement Assistance Administration (LEAA) of the Department of Justice in which approximately 85 public safety departments participated.  I was appointed by the Equal Employment Opportunity Commission and the Department of Labor to conduct a study for Congress on the effects of aging on physical and mental abilities of public safety officers.  This study, entitled <u>Alternatives to Chronological Age in Determining Standards of Suitability for Public Safety Jobs</u> (1992), was based on job information gathered from over 200 public safety departments.  I was the author of a quarterly newsletter, "TIPS – Trends in Public Safety," first published in 1996 that deals with public safety selection.  I have extensive experience in both the examination and development of fair HR practices such as those at issue in this case and all of this experience was brought to bear in my evaluation of the Commonwealth of Massachusetts and City of Lynn, Massachusetts selection procedures for the position of firefighter.

# OPINIONS

**Opinion 1.    The Commonwealth of Massachusetts ignored the recommendations of Landy, Jacobs and Associates (LJA) in the use of the cognitive ability test (Civil Service examination) and the physical ability test for screening applicants for entry-level firefighter positions.**

Most jobs are a fusion of essential functions that depend on many diverse attributes for successful completion (Landy, 1985; 1989; Landy & Trumbo, 1976; 1980; Pulakos & Schmitt, 1996).  As opposed to the concentration on a single attribute (in the current case, general mental ability – also known as cognitive ability) comprehensive measures provide a broad assessment of a wider array of important skills and abilities required for effective job performance (McHenry, Hough, Toquam, Hanson, & Ashworth, 1990; Pulakos & Schmitt, 1996).   Schmidt and Hunter (1998) have demonstrated that predictors other than cognitive ability, such as a structured interview and integrity test (which measures predominantly the personality construct of conscientiousness), are valid for employee selection and can be used in conjunction with a cognitive predictor to increase validity and decrease adverse impact.  In fact, they found that a combination of general mental ability and conscientiousness had the highest validity for predicting job performance in a range of occupations.

Additionally, in the past 20 years research has demonstrated that both cognitive and non-cognitive attributes (e.g., physical ability, communication skills, and personality) are important for successful performance in public safety positions (e.g., Hirsh, Northrop, & Schmidt, 1986).  The inclusion in selection batteries of measures of non-cognitive

attributes such as personality, physical ability, and communication skills not only expands the content domain of the job that is measured (and thus increases validity) but also helps to minimize adverse impact. The following diagram (Figure 1) illustrates the content domain of the firefighter job which is composed of both cognitive and non-cognitive attributes.

**Figure 1.**

## FIREFIGHTER DUTY AREAS PREDICTED BY EACH SELECTION COMPONENT



1. Watch Duties
2. Initial Response to Incidents
3. Drive/Operate Apparatus
4. Size-Up
5. Aerial Ladder Operations
6. Climbing and Portable Ladder Operations
7. Forcible Entry
8. Ventilation
9. Search
10. Rescue
11. Supplies Water for Hose Operation
12. Hose and Extinguisher Operation
13. Salvage
14. Overhaul
15. Clean Up/Pick Up
16. Equipment Maintenance
17. Station Duties and Chores
18. Inspection of Buildings/Hydrants
19. Extrication
20. Emergency Medical Assistance
21. Training
22. Public Relations

Source:  Hypothetical Examples Based on SHL IJ
Job Analysis Components and Common Testing Components

14

In 1997, my firm was hired by the city of Madison, Wisconsin to develop a selection system for the job of firefighter.  This project is an example of a comprehensive and compensatory firefighter selection system that incorporated a measure of personality as well as physical abilities.  A compensatory system is one in which, assuming that several attributes are required for the job, a relative weakness in one attribute (a low score on test A) may be compensated for by strength in another attribute (a higher score on test B or test C) (Guion, 1998; Landy, 2004; Spector, 2003).  A job analysis was conducted with a sample of 77 incumbents who were randomly selected to be representative of important factors (i.e., location of assignment; age; years in current title; and to over represent women and minority firefighters).  The resultant comprehensive model of job performance included personality, physical, cognitive, and oral communication skill components.

The measures of the selection model components, with the exception of the personality test (the Hogan Personality Inventory, HPI), were developed by my firm.  The concurrent validation phase of the HPI focused on the contribution of the personality measure, as manifested by the HPI scales, to explaining differences among firefighters in job performance.  The HPI was administered to an additional 83 incumbents and job performance ratings were gathered from the incumbents' supervisors on 13 behaviorally anchored performance scales developed by my firm for this phase of the project.

The examination used in Madison consisted of four components:  a cognitive ability test, a personality test, a physical test, and an oral communications exercise.  The correlation between the personality test score and performance for the incumbent sample was .318 (p = .004).  Performance Factor 1 (Fire Suppression) consisted of the following

duty categories:  ladder operations, forcible entry, ventilation, search, rescue, salvage, and overhaul.  Performance Factor 2 (Preparation/Staging) consisted of the following duty categories:  initial response to incidents, drive/operate apparatus, size-up, equipment maintenance, inspection of buildings/hydrants, and emergency medical assistance. In various projects with firefighters conducted first by LJA and then by SHL, it has been reported that the correlation between cognitive ability and personality ranges from .10 to .30.  This figure is similar to figures reported in the scientific literature (Avis, Kudisch, & Fortunato, 2002; Day & Silverman, 1989; Goffin, Rothstein, & Johnston, 1996; Schmitt, Rogers, Chan, Sheppard, & Jennings, 1997).  Given the intercorrelation pattern presented in Table 3, and the modest correlations between cognitive ability and personality, it follows that the personality test contributes incrementally to overall job relatedness.  The same is true for the physical ability test.  Similar analyses for the position of State Trooper support the efficacy of the comprehensive/compensatory model of initial screening for public safety positions (*Final Report on the State of Alabama Entry-Level Trooper Examination*, SHL Landy Jacobs, August 1999).

**Table 3.  Madison Firefighter Validation Intercorrelations**

| Variable | Average Performance | Factor 1 | Factor 2 |
|---|---|---|---|
| Average Performance | | | |
| Performance Factor 1 | .90** | | |
| Performance Factor 2 | .87** | .57** | |
| Personality | .23* | .32** | .08 |

*Significant at the .05 level; **Significant at .01 level

The next question to consider is whether the inclusion of the three non-cognitive components in Madison served to reduce adverse impact against minority applicants. The initial screening phase included the compensatory combination of personality and cognitive tests. If the decision about candidate advancement to the second phase of screening had been based solely on the cognitive test, the adverse impact ratio would have been 26%. However, the adverse impact ratio improved dramatically to 68% with the inclusion of the personality test score in Phase I.

The final Madison list was banded for a composite score weighting the Phase I components 10% each and the oral board and physical ability 40% each. The adverse impact of the full component system versus the use of the cognitive components alone at Phase II are even more dramatic. If the effective selection point in the distribution consisted of the top 100 candidates on the final list, the adverse impact ratio for the full component system was .857. ***Yet, no African Americans would have been selected had the cognitive test alone been used in determining the final rank order of candidates (assuming that selections were made from the top 100 candidates)!*** These data clearly demonstrate the increased job relatedness and reduced adverse impact of a comprehensive, compensatory system for academy appointment in fire departments.

In contrast, the Commonwealth of Massachusetts implemented a multiple hurdle system using the cognitive ability test as the first hurdle. This scheme resulted in substantial adverse impact, as would have been anticipated given existing theory and data regarding cognitive ability tests and adverse impact against minority candidates. The Commonwealth of Massachusetts, through its 30(b)(6) witness Sally McNeely, states that they did not use physical ability testing as part of the first hurdle due to concerns about

the ADA (McNeely Deposition, 6/30/05, p.58, lines 2-13). Interestingly, at the time the Commonwealth of Massachusetts retained LJA for the development of firefighter entry-level tests, we had completed many similar projects for other municipal fire departments (e.g., Columbus, Ohio, Washington, D.C.) in which physical ability tests were part of the first hurdle yet we were never consulted by the Commonwealth of Massachusetts about the advisability of including physical ability tests in the first hurdle with respect to ADA guidelines in the 1992-1993 time period or in any subsequent period. In other municipal settings, this was handled simply with a basic status assessment of candidates by EMT personnel, including blood pressure and heart rate measurement. No ADA problems arose using this procedure. LJA recommended that, at the very least, the Commonwealth of Massachusetts use physical ability tests, weighted at 60%, and cognitive ability tests, weighted at 40%, as the first hurdle in a multiple hurdle system. The Commonwealth of Massachusetts failed to implement this recommendation. We also suggested that personality tests be incorporated into the compensatory system. The Commonwealth of Massachusetts ignored that recommendation as well.

In addition to suggestions regarding the content of the screening battery and the compensatory form of that battery, LJA also suggested that the Commonwealth of Massachusetts conduct a criterion-related validity study using incumbent firefighters as a way to identify a reasonable cut score for the various tests in the battery. The Commonwealth of Massachusetts failed to conduct such a study. In their review of cut scores, Kehoe and Olson (2004) make numerous references to the centrality of incumbent studies in setting cut scores.

- In reference to the following quote from the *Uniform Guidelines On Employee Selection Procedures (1978)*, "Where cutoff scores are used, they should be normally set so as to be reasonable and consistent with normal expectations of acceptable proficiency within the workforce," Kehoe & Olson (2004) state this "clearly establishes the expectation that the defense of challenged cut scores will be grounded in the relationship of the cut score to work proficiency" (p.411). One of the most common and effective methods of "grounding" a cut score to work proficiency is by conducting an incumbent study.

- "A cut score may be higher than scores achieved by some incumbents where there is a rationale showing that low-scoring incumbents perform below a reasonable standard of success" (p.427).

- "The framework consists of five sets of considerations…that arise in a typical process of setting cut scores for employment purposes: …3. Determine the *threshold* level of desired work behavior and the test score corresponding to that threshold" (p.417).

- "Other than the meaning of business necessity, the most commonly considered issue relating to thresholds is whether a cut score may be higher than scores achieved by some incumbents" (p.423) and "In general courts have not required that cut scores be limited to the lowest scores exhibited by incumbents. Courts have been accepting of higher cut scores where a reasonable basis is established for choosing a score higher than the minimum incumbent score" (pp.423-424).

- "Courts have frequently found in Title VII cases that many factors in addition to incumbents' performance on the selection procedure may appropriately influence the choice of a defensible cut score. In a teacher certification case, *National Education Association v. South Carolina* (1978), the Supreme Court upheld a cut score-setting process that considered not only the expected test performance of minimally competent teachers but also the agreement among experts, test reliability, local labor market conditions, and teaching workforce diversity" (p.425).

- They proposed a taxonomy of cut score setting methods in which the empirical group method focuses on the use of incumbent studies.

Thus, the Kehoe and Olson discussion of cut scores clearly describes the value of using incumbents to establish realistic cut scores that are related to job performance. In the case of the Commonwealth of Massachusetts it appears that one or both of the following strategies was used for setting the cut score at 70 on the cognitive ability test:

1) 70 was a score traditionally used by the Commonwealth of Massachusetts for designating a "passing" score.

2) 70 was the score at which adverse impact against minority candidates appeared to be within the guidelines of the federal government known as the 80% rule.

Neither of these strategies demonstrates any relationship to the concept of job performance. And, as will be shown in a subsequent opinion, the second strategy is inappropriate both because the standard applied should be a statistical test of differences

between majority and minority applicant pools, and also should be conducted at the effective cut score not at a nominal cut score.

**Opinion 2.      The Commonwealth of Massachusetts failed to meet professional standards in the review and maintenance of its testing program and the underlying job analysis of the position of firefighter.**

**Job Analysis Updates**

It is axiomatic that jobs change and that one way of tracking these changes is through job analysis at regular intervals.  As the Commonwealth of Massachusetts' 30(b)(6) witness acknowledges (McNeely Deposition, 6/30/05, p.89, line 18; p.90, line 7) during the period 1992 to present, there were likely substantial changes in the job of municipal firefighter, including the nature and treatment of hazardous materials by firefighters, as well as the change in the relative proportion of medical to fire-suppression runs by fire departments.  It is well established in the field of industrial and organizational psychology that the "shelf-life" of a job analysis is approximately 5 years or less (Gatewood & Field, 2001; Landy, 1989; Lefkowitz & Gebbia, 1997; OPM Delegated Examining Operations Handbook, 2003; Sanchez & Levine, 1999).  In spite of both professional/scientific guidance, and a recognition that the job of firefighter was continually changing, the Commonwealth of Massachusetts continued to use a 1992 job analysis as the basis for their testing program, well into the next decade.

This failure to update the job analysis as the foundation for the entry-level testing program becomes even more conspicuous in light of the fact that the Commonwealth of

Massachusetts commissioned two additional job analyses for the firefighter position but for the purposes of establishing medical and fitness standards (*Massachusetts Fire Departments Job Analysis and Physical Fitness Standards Test Development Report*, LJA, December, 1995; *Commonwealth of Massachusetts Entry-Level Firefighter and Police Officer Medical Standards Update Report*, SHL, June, 2002).  These ancillary job analyses affirmed the importance of physical abilities and should have signaled the Commonwealth of Massachusetts to revisit their non-compensatory, non-comprehensive testing model.  But there is no evidence that the entry-level testing unit was aware of, or considered, these job analysis updates.

**Quality Control of Cognitive Ability Tests**

It also appears from the testimony of the Commonwealth of Massachusetts' 30(b)(6) witness that although the Commonwealth of Massachusetts purported to use the LJA "test plan" for the development of multiple subsequent cognitive ability tests, there is no evidence that basic analyses of adverse impact of items, pilot testing, or linkage studies linking new items and item groups to the constructs represented in the LJA test plan were ever done.  With respect to reading level analysis of the newly devised items, it is unclear whether those analyses were ever done.  The Commonwealth of Massachusetts has provided no data related to reading level analyses for 2000, 2002, or 2004.  The 30(b)(6) witness is equivocal about such analyses (McNeely Deposition, 6/30/05, pp.62-63).  The Commonwealth of Massachusetts asserts that an adverse impact analysis of test item subgroups is a conflation of several concepts and has no foundation in psychometrics.  The Commonwealth of Massachusetts created a novel statistic by composing a fraction from the minority average score on a subtest divided by the

majority average score on that subtest. This fraction was then interpreted using the 80% rule. Thus, if the mean score for minority applicants was 70, and the mean score for majority applicants was 80, the "Adverse Impact" was calculated to be 87% (70 divided by 80) and the conclusion drawn that there was no adverse impact. The appropriate test for the effect of a given item or item grouping is either a Fisher's Exact Test of pass/fail percentages at the item level, or a t-test of mean differences at the subtest level. Neither of these tests was used to determine adverse impact. Instead, the Commonwealth of Massachusetts created a "new" statistic with no psychometric foundation. Appropriate item level tests would have certainly indicated adverse impact at the item and subtest level of the cognitive ability test. Such analyses would have then triggered a review of test items for reading level, job relatedness, etc. But instead, the Commonwealth of Massachusetts relied on a faulty statistic and never reviewed item adequacy with respect to minority applicant test performance.

**Opinion 3.**     **The cut score for the cognitive ability test (Civil Service examination) identified by the Commonwealth of Massachusetts for purposes of calculation of adverse impact is incorrect.   The cut score for determining adverse impact should be the effective cut score not a nominal cut score unrelated to actual selection decisions.   The effective cut score is the lowest cognitive ability test score observed among chosen candidates.**

The Commonwealth of Massachusetts set a passing score of 70 for the 2002 and 2004 administrations of the Civil Service written examination for the position of entry-level firefighter.[2]  However, in all communities in the Commonwealth of Massachusetts, except the communities remaining under the Beecher decree, a rank-order system of selection is used with the examination.[3]  Candidates must pass this first hurdle to be considered for physical abilities testing.   A rank-order system of selection ranks applicants from highest to lowest score obtained on the test; then a subset of the highest scoring applicants, starting with the applicant with the highest score and working down the list in order, are passed through to the next phase of the selection process based on the number of candidates that will eventually be hired (e.g., two candidates for each open position plus one) (Guion, 1998).[4]

---

[2] McNeely Deposition, 06/30/2005, Exhibit 7, pp.1, 15.
[3] McNeely Deposition, 06/30/2005, p.30.
[4] Note that strictly top-down selection is not always used as a result of the absolute veteran's preference provision and other statutory provisions provided under Commonwealth law, so all analyses and discussion of top-down selection in this report are based on lists of applicants that are not subject to these provisions. That is, absolute top-down selection happens only after special provision applicants with scores over 70 have first been considered.

Top-down selection of applicants from a rank-ordered list can make a cut score merely a "nominal" cut score and thus irrelevant. The cut score of 70 is the "effective" cut score (as opposed to the "nominal" cut score) only when the list of all applicants is exhausted, that is, when all applicants receiving a 70 or higher are passed on to the next stage of the selection process. However, the *effective* score may be well above the score of 70 if the list is not exhausted in this way. As noted by Siskin and Trippi (2005), "if the test is the only device being used to rank order candidates, the effective passing score is simply the lowest score obtained by anyone selected" (p.130). The formal or *nominal* cut score in this instance becomes meaningless. It does not matter whether the nominal score is 70 or 5, since candidates with either of these scores had an equal chance of being selected (i.e., zero chance).

When conducting adverse impact analyses, it is the effective score that must be considered (Siskin & Trippi, 2005). In this case, the lowest scoring applicant on the Civil Service examination that is otherwise eligible for the City of Lynn, Massachusetts entry-level firefighter job and passed on in the selection process, sets the effective cut score for purposes of calculating adverse impact. Because it appears that most communities within the Commonwealth of Massachusetts seldom pass applicants scoring below 90 on the examination to the next phase of the hiring process,[5] the effective cut score (e.g., 90) is highly unlikely to be equal to the nominal cut score (i.e., 70). Rather, the effective cut score to be considered in adverse impact analyses is likely to be well above 70 in most communities, and in fact, is much more likely to be equal to or greater than 90. In fact, in the data available from the 2004 administration of the Civil Service examination in Lynn, Massachusetts an effective cut score can be derived from a certification of 33 applicants

---

[5] McNeely Deposition, 06/30/2005, pp.68-69.

for 16 positions dated 01/25/05. In this certification, the lowest scoring applicant who would have been passed on to physical ability testing obtained a score of 95 from those certified to the City of Lynn, Massachusetts.[6] Thus, the adverse impact of the examination should be considered at the effective cut score of 95 for 2004 in the City of Lynn, Massachusetts, rather than at the nominal cut score of 70 identified by the Commonwealth of Massachusetts.

**Opinion 4.** **There is pervasive adverse impact against African Americans and Hispanics at both the nominal and the effective cut scores on the written Civil Service examination used in 2002 and 2004 to make employment decisions about entry-level firefighters in the City of Lynn, Massachusetts and most likely in all other communities using a rank-order selection method.**

Applicant data from the 2002 and 2004 written Civil Service examinations for entry-level firefighter were used to test the hypothesis that there was adverse impact against African American and Hispanic applicants. These tests were conducted for both the nominal and effective cut scores.

Two tests were used in the analyses, a statistical test and a practical test of adverse impact. The statistical test used was a chi-square test to assess the significance of differences between two groups (Paetzold & Willborn, 1995). Tests also examined whether there were race differences in outcomes using the *Uniform Guidelines on*

---

[6] Certification Number 250042 Lynn Fire Department 16 Permanent Full-Time Firefighter Positions, 33 Applicants Certified.

*Employee Selection Procedures* "four-fifths rule," which holds that evidence of adverse impact is determined to exist when the selection ratio (the passing rate of the minority group divided by the passing rate of the majority [White] group) is less than 80% (Equal Employment Opportunity Commission, Civil Service Commission, Department of Labor, and Department of Justice, 1978).  Under this practical decision rule, if the selection ratio is less than 80%, there is evidence of adverse impact.

Multiple tests of group differences were conducted.  Tests of group differences were conducted independently for the 2002 and 2004 test administrations.  Group differences were assessed for African Americans versus Whites and Hispanics/Other Minorities[7] versus Whites on both the nominal and effective cut scores.  The results of these tests are presented below.

**Analyses**

The statistical test used in the analyses is a chi-square test to assess the significance of differences between two groups (Paetzold & Willborn, 1995).  The chi-square test provides a method for testing the association between the row and column variables in a two-way table.  The null hypothesis, $H_0$, assumes that there is no association between the variables (in other words, one variable, such as race, does not vary according to the other variable, such as hiring rates), while the alternative hypothesis, $H_a$, claims that some association does exist (e.g., there is a relationship between race and hiring rates indicative of adverse impact).  The chi-square test is based on a test statistic that measures the divergence of the observed data (e.g., passing rates for

---

[7] In some reports on test outcomes, the Commonwealth of Massachusetts reports African American and Hispanic outcomes (i.e., 2004), whereas in other places they report African American and other minority outcomes (i.e., 2002).  We have treated both the Hispanic outcomes and other minority outcomes in a single category because the Commonwealth of Massachusetts has not clearly defined the other minority category in their reports.

different race groups) from the values that would be expected under the null hypothesis of no association (e.g., passing rates are independent of race and there is no evidence of adverse impact). This requires calculation of the expected values based on the data. The expected value for each cell in a two-way table is equal to (row total*column total)/n, where n is the total number of observations included in the table. In other words, the chi-square test assesses whether observed outcomes such as passing rates (i.e., column data) for two race groups are significantly different from what would be expected if both races (i.e., row data) passed at equal rates relative to their representation in the applicant pool.

In the current analyses, the null hypothesis is that there is no relationship between race and passing rates. The alternative hypothesis is that African American and Hispanic applicants pass the test at a disproportionately lower rate than White applicants. To test these hypotheses, actual and expected pass rates must be compared. As an example of actual and expected values, suppose that 1000 Whites and 100 African Americans took the test. The actual pass rate was 10% for the total group or 110 passing. Further suppose that 101 applicants passing the test were Whites and 9 applicants were African Americans. The expected number of passing Whites would be 10% of 1000 or 100, while the expected rate for African Americans would be 10% of 100 or 10. The chi-square test is used to determine whether the actual rates are significantly different from the expected rates. The probability level associated with the chi-square statistic indicates the probability of this difference occurring by chance alone versus being caused by something other than simply random variation. A probability of .05 is traditionally used as the criterion for making this decision, as .05 indicates that the probability that the difference between actual and expected passing rates is occurring by chance alone is less

than 5 in 100 or 5%. For any value less than 5%, the alternative hypothesis is accepted, suggesting that observed differences are not random. Since race may be one explanation for the observed differences, if the probability is calculated to be less than .05, adverse impact is defined to be present. In the example presented above, (101 Whites and 9 African Americans pass the test) actual and expected rates are nearly identical (i.e., one fewer promotion given to African Americans and one more promotion given to Whites) and the chi-square value would be .122, with an associated probability of .727, clearly a level greater than .05, indicating that the observed difference in the promotional rate should be attributed to chance alone. There is no evidence of adverse impact in the example.

Under probability theory, units of standard deviation directly correspond to probability. Therefore, probabilities can be expressed in standard deviation units. Findings of differences greater than two units of standard deviation between race groups have been accepted by the Supreme Court as evidence of adverse impact.[8] Results are provided using differences in units of standard deviation to aid in the interpretation of results.

We also examined whether there were race differences in outcomes using the *Uniform Guidelines on Employee Selection Procedures* "four-fifths rule," which holds that evidence of adverse impact is determined to exist when the selection ratio (the passing rate of the minority group divided by the passing rate of the majority group) is less than 80% (Equal Employment Opportunity Commission, Civil Service Commission, Department of Labor, and Department of Justice, 1978). This method might be thought of as a "practical decision rule" as opposed to a "statistical decision rule." Under this

---

[8] *Hazelwood School District v. United States* (1977).

practical decision rule, if the selection ratio is less than 80%, there is evidence of group differences in promotion rates.  In the example presented above, the promotion rate for African Americans was 9 out of 100 or .09; the selection rate for Whites was 101 out of 1000 or .101.  The selection ratio (i.e., adverse impact ratio) was .09/.101 = .891.  Since this ratio is greater than .80 (i.e., 80%), there is no adverse impact indicated under the 80% rule.  In addition to presenting statistical results, results will also be presented using this practical decision rule.

**Results for the Commonwealth of Massachusetts**

Tables 4 and 5 contain the results of analyses for the nominal pass rate of 70 for all test-takers state-wide.  The practical tests of adverse impact show that African Americans are disadvantaged, while the statistical tests of adverse impact provide evidence of substantial adverse impact against both African Americans and Hispanics/other minorities when the nominal cut score of 70 is used.  The more appropriate statistical test shows dramatic differences in the pass rates, falling well above the "2 or 3 standard deviations" suggested by the Supreme Court in the *Hazelwood School District v. United States* (1977).  In 2002, the value demonstrated a 20 standard deviation difference in the pass rates of Whites versus African Americans and a 23 standard deviation difference for Whites versus Hispanics and other minorities.  In 2004, the value demonstrated a 7 standard deviation difference in the pass rates of Whites versus African Americans and a 15 standard deviation difference for Whites versus Hispanics and other minorities.  These findings represent probability values of less than 1 in 10,000,000 for 2002 and 2004.  The standard threshold for determining adverse impact is "2 or 3 standard deviations or less than 5 chances out of 100" (*Hazelwood School*

*District v. United States,* 1977).  In other words, the relationship between race and test scores in the data provided by the Commonwealth of Massachusetts is so strong that one can conclusively rule out chance as an explanation for the relationship.

Tables 6 and 7 demonstrate that regardless of where the effective cut score falls above 70, there will be even greater adverse impact against African Americans, Hispanics, and other minorities.  Because it appears that most communities within the Commonwealth of Massachusetts seldom pass applicants scoring below 90 on the examination to the next phase of the hiring process,[9] the adverse impact of an effective cut score of 90 was analyzed in the same manner as the nominal cut score of 70.  The results are presented in Tables 8 and 9.  Again, there is evidence of pervasive adverse impact against African Americans, Hispanics, and other minorities when using an effective cut score of 90.

In fact, the lowest scoring non-veteran applicant to be certified on a list of eligible candidates to the City of Lynn, Massachusetts from the 2004 administration was 95.  The results for an effective cut score of 95 are presented in Tables 10 and 11.  The adverse impact associated with the effective cut score of 95 is also conclusive.  There is pervasive adverse impact at the effective cut score level of 95 imposed by the City of Lynn, Massachusetts.

---

[9] McNeely Deposition, 06/30/2005, pp.68-69.

**Table 4.**    **Nominal Cut Score (70) Results for All Commonwealth of Massachusetts Applicants to the Entry-Level Firefighter Job:**

   **Whites v. African American**

| Year | Number Passing | | Number Failing | | Chi Square | Difference in Units of Standard Deviation | Probability | Shortfall | 80% Rule: Ratio of Pass Rates African American/White |
|---|---|---|---|---|---|---|---|---|---|
| | African American | White | African American | White | | | | | |
| **2002** | Actual: 669 | Actual: 9768 | Actual: 166 | Actual: 384 | 420.22 p=2.2E-93[10] | 20.50 | *p < .01* | 124 | .7919 |
| | Expected: 793 | Expected: 9644 | Expected: 42 | Expected: 508 | | | | | |
| **2004** | Actual: 346 | Actual: 5970 | Actual: 41 | Actual: 215 | 49.29 p=2.2E-12[11] | 7.02 | *p < .01* | 26 | .7827 |
| | Expected: 372 | Expected: 5944 | Expected: 15 | Expected: 240 | | | | | |

---

[10] p=2.2E-93 can also be written as .00000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000022.  This value is so small, that there are no terms that can be used to describe it other than scientific notation.

[11] p=2.2E-12 can also be written as .0000000000022.  This value is so small, that there are no terms that can be used to describe it other than scientific notation.

**Table 5.**    **Nominal Cut Score (70) Results for All Commonwealth of Massachusetts Applicants to the Entry-Level Firefighter Job:**

   **Whites v. Hispanics/Other Minorities**

| Year | Number Passing | | Number Failing | | Chi Square | Difference in Units of Standard Deviation | Probability | Shortfall | 80% Rule: Ratio of Pass Rates Hispanic – Other Minorities/White |
|------|----------------|--|----------------|--|------------|-------------------------------------------|-------------|-----------|------------------------------------------------------------------|
|  | Hispanics/ Other Minorities | White | Hispanics/ Other Minorities | White |  |  |  |  |  |
| **2002** | Actual: 651  Expected: 792 | Actual: 9768  Expected: 9627 | Actual: 184  Expected: 43 | Actual: 384  Expected: 525 | 524.36  p=4.8E-116[12] | 22.90 | $p < .01$ | 141 | .8103 |
| **2004** | Actual: 311  Expected: 370 | Actual: 5970  Expected: 5911 | Actual: 76  Expected: 17 | Actual: 215  Expected: 274 | 224.81  p=8.1E-51[13] | 14.99 | $p < .01$ | 59 | .8326 |

---

[12] p=4.8E-116 can also be written as .0000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000048. This value is so small, that there are no terms that can be used to describe it other than scientific notation.

[13] p=8.1E-51 can also be written as .000000000000000000000000000000000000000000000000081. This value is so small, that there are no terms that can be used to describe it other than scientific notation.

**Table 6.**     **2002 Adverse Impact Ratios for Cut Scores Set at Each Observed Test Score**

| Test Score | Majority Applicants | Majority Applicant Passing Rate | African American | African American Passing Rate | Other Minority | Other Minority Passing Rate | Adverse Impact Ratio for African Americans | Adverse Impact Ratio for Other Minorities |
|---|---|---|---|---|---|---|---|---|
| | N =10,152 | | N = 878 | | N = 835 | | | |
| 100 | 55 | 0.0054 | 0 | 0.0000 | 0 | 0.0000 | 0.0000 | 0.0000 |
| 99 | 238 | 0.0289 | 1 | 0.0011 | 1 | 0.0012 | 0.0395 | 0.0415 |
| 98 | 449 | 0.0731 | 8 | 0.0103 | 6 | 0.0084 | 0.1402 | 0.1147 |
| 97 | 630 | 0.1351 | 10 | 0.0216 | 11 | 0.0216 | 0.1601 | 0.1595 |
| 96 | 737 | 0.2077 | 10 | 0.0330 | 17 | 0.0419 | 0.1590 | 0.2018 |
| 95 | 729 | 0.2796 | 21 | 0.0569 | 16 | 0.0611 | 0.2037 | 0.2185 |
| 94 | 778 | 0.3562 | 26 | 0.0866 | 28 | 0.0946 | 0.2430 | 0.2656 |
| 93 | 713 | 0.4264 | 23 | 0.1128 | 33 | 0.1341 | 0.2644 | 0.3146 |
| 92 | 674 | 0.4928 | 20 | 0.1355 | 23 | 0.1617 | 0.2750 | 0.3281 |
| 91 | 575 | 0.5494 | 30 | 0.1697 | 25 | 0.1916 | 0.3089 | 0.3487 |
| 90 | 534 | 0.6020 | 26 | 0.1993 | 29 | 0.2263 | 0.3311 | 0.3760 |
| 89 | 481 | 0.6494 | 27 | 0.2301 | 27 | 0.2587 | 0.3543 | 0.3983 |
| 88 | 438 | 0.6926 | 28 | 0.2620 | 24 | 0.2874 | 0.3782 | 0.4150 |
| 87 | 404 | 0.7324 | 25 | 0.2904 | 23 | 0.3150 | 0.3966 | 0.4301 |
| 86 | 307 | 0.7626 | 28 | 0.3223 | 29 | 0.3497 | 0.4227 | 0.4586 |
| 85 | 276 | 0.7898 | 33 | 0.3599 | 26 | 0.3808 | 0.4557 | 0.4822 |
| 84 | 207 | 0.8102 | 25 | 0.3884 | 20 | 0.4048 | 0.4794 | 0.4996 |
| 83 | 214 | 0.8313 | 37 | 0.4305 | 33 | 0.4443 | 0.5179 | 0.5345 |
| 82 | 185 | 0.8495 | 24 | 0.4579 | 27 | 0.4766 | 0.5390 | 0.5611 |
| 81 | 154 | 0.8647 | 27 | 0.4886 | 31 | 0.5138 | 0.5651 | 0.5942 |
| 80 | 164 | 0.8808 | 24 | 0.5159 | 22 | 0.5401 | 0.5858 | 0.6132 |
| 79 | 138 | 0.8944 | 18 | 0.5364 | 18 | 0.5617 | 0.5998 | 0.6280 |
| 78 | 108 | 0.9050 | 16 | 0.5547 | 34 | 0.6024 | 0.6129 | 0.6656 |
| 77 | 109 | 0.9158 | 25 | 0.5831 | 20 | 0.6263 | 0.6368 | 0.6839 |
| 76 | 89 | 0.9245 | 27 | 0.6139 | 21 | 0.6515 | 0.6640 | 0.7047 |
| 75 | 100 | 0.9344 | 23 | 0.6401 | 22 | 0.6778 | 0.6850 | 0.7254 |
| 74 | 84 | 0.9427 | 22 | 0.6651 | 18 | 0.6994 | 0.7056 | 0.7419 |
| 73 | 61 | 0.9487 | 29 | 0.6982 | 14 | 0.7162 | 0.7359 | 0.7549 |
| 72 | 52 | 0.9538 | 19 | 0.7198 | 26 | 0.7473 | 0.7547 | 0.7835 |
| 71 | 50 | 0.9587 | 18 | 0.7403 | 15 | 0.7653 | 0.7722 | 0.7982 |
| 70 | 35 | 0.9622 | 19 | 0.7620 | 12 | 0.7796 | 0.7919 | 0.8103 |
| 69 | 45 | 0.9666 | 16 | 0.7802 | 12 | 0.7940 | 0.8071 | 0.8214 |
| 68 | 40 | 0.9705 | 13 | 0.7950 | 12 | 0.8084 | 0.8191 | 0.8329 |
| 67 | 36 | 0.9741 | 12 | 0.8087 | 12 | 0.8228 | 0.8302 | 0.8446 |
| 66 | 26 | 0.9767 | 12 | 0.8223 | 14 | 0.8395 | 0.8420 | 0.8596 |
| 65 | 26 | 0.9792 | 20 | 0.8451 | 13 | 0.8551 | 0.8630 | 0.8732 |
| 64 | 29 | 0.9821 | 10 | 0.8565 | 7 | 0.8635 | 0.8721 | 0.8792 |
| 63 | 29 | 0.9849 | 10 | 0.8679 | 10 | 0.8754 | 0.8812 | 0.8888 |
| 62 | 14 | 0.9863 | 14 | 0.8838 | 5 | 0.8814 | 0.8961 | 0.8937 |
| 61 | 12 | 0.9875 | 9 | 0.8941 | 8 | 0.8910 | 0.9054 | 0.9023 |

| Test Score | Majority Applicants | Majority Applicant Passing Rate | African American | African American Passing Rate | Other Minority | Other Minority Passing Rate | Adverse Impact Ratio for African Americans | Adverse Impact Ratio for Other Minorities |
|---|---|---|---|---|---|---|---|---|
| 60 | 12 | 0.9887 | 6 | 0.9009 | 10 | 0.9030 | 0.9112 | 0.9133 |
| 59 | 11 | 0.9898 | 11 | 0.9134 | 8 | 0.9126 | 0.9229 | 0.9220 |
| 58 | 9 | 0.9906 | 9 | 0.9237 | 9 | 0.9234 | 0.9324 | 0.9321 |
| 57 | 9 | 0.9915 | 5 | 0.9294 | 6 | 0.9305 | 0.9373 | 0.9385 |
| 56 | 13 | 0.9928 | 8 | 0.9385 | 3 | 0.9341 | 0.9453 | 0.9409 |
| 55 | 11 | 0.9939 | 4 | 0.9431 | 4 | 0.9389 | 0.9488 | 0.9447 |
| 54 | 4 | 0.9943 | 4 | 0.9476 | 7 | 0.9473 | 0.9531 | 0.9527 |
| 53 | 3 | 0.9946 | 4 | 0.9522 | 4 | 0.9521 | 0.9574 | 0.9573 |
| 52 | 0 | 0.9946 | 4 | 0.9567 | 4 | 0.9569 | 0.9619 | 0.9621 |
| 51 | 1 | 0.9947 | 6 | 0.9636 | 7 | 0.9653 | 0.9687 | 0.9704 |
| 50 | 7 | 0.9954 | 1 | 0.9647 | 3 | 0.9689 | 0.9692 | 0.9734 |
| 49 | 7 | 0.9961 | 2 | 0.9670 | 4 | 0.9737 | 0.9708 | 0.9775 |
| 48 | 6 | 0.9967 | 4 | 0.9715 | 2 | 0.9760 | 0.9748 | 0.9793 |
| 47 | 5 | 0.9971 | 2 | 0.9738 | 2 | 0.9784 | 0.9766 | 0.9812 |
| 46 | 5 | 0.9976 | 5 | 0.9795 | 0 | 0.9784 | 0.9818 | 0.9808 |
| 45 | 4 | 0.9980 | 3 | 0.9829 | 3 | 0.9820 | 0.9849 | 0.9840 |
| 44 | 5 | 0.9985 | 2 | 0.9852 | 4 | 0.9868 | 0.9867 | 0.9883 |
| 43 | 1 | 0.9986 | 2 | 0.9875 | 0 | 0.9868 | 0.9888 | 0.9882 |
| 42 | 2 | 0.9988 | 1 | 0.9886 | 3 | 0.9904 | 0.9898 | 0.9916 |
| 41 | 0 | 0.9988 | 2 | 0.9909 | 0 | 0.9904 | 0.9921 | 0.9916 |
| 40 | 1 | 0.9989 | 1 | 0.9920 | 0 | 0.9904 | 0.9931 | 0.9915 |
| 39 | 1 | 0.9990 | 0 | 0.9920 | 0 | 0.9904 | 0.9930 | 0.9914 |
| 38 | 2 | 0.9992 | 1 | 0.9932 | 2 | 0.9928 | 0.9939 | 0.9936 |
| 37 | 3 | 0.9995 | 1 | 0.9943 | 1 | 0.9940 | 0.9948 | 0.9945 |
| 36 | 0 | 0.9995 | 1 | 0.9954 | 0 | 0.9940 | 0.9959 | 0.9945 |
| 35 | 0 | 0.9995 | 3 | 0.9989 | 0 | 0.9940 | 0.9994 | 0.9945 |
| 34 | 1 | 0.9996 | 1 | 1.0000 | 0 | 0.9940 | 1.0004 | 0.9944 |
| 32 | 1 | 0.9997 | 0 | 1.0000 | 1 | 0.9952 | 1.0003 | 0.9955 |
| 31 | 0 | 0.9997 | 0 | 1.0000 | 1 | 0.9964 | 1.0003 | 0.9967 |
| 30 | 0 | 0.9997 | 0 | 1.0000 | 1 | 0.9976 | 1.0003 | 0.9979 |
| 19 | 1 | 0.9998 | 0 | 1.0000 | 0 | 0.9976 | 1.0002 | 0.9978 |
| 17 | 1 | 0.9999 | 0 | 1.0000 | 0 | 0.9976 | 1.0001 | 0.9977 |
| 13 | 1 | 1.0000 | 0 | 1.0000 | 0 | 0.9976 | 1.0000 | 0.9976 |
| 10 | 0 | 1.0000 | 0 | 1.0000 | 1 | 0.9988 | 1.0000 | 0.9988 |
| 6 | 0 | 1.0000 | 0 | 1.0000 | 1 | 1.0000 | 1.0000 | 1.0000 |
| Total | 10152 | | 878 | | 835 | | | |

35

**Table 7.**     **2004 Adverse Impact Ratios for Cut Scores Set at Each Observed Test Score**

| Test Score | White/ Asian/ Am. Indian | White/ Asian/ Am. Indian Passing Rate | African American | African American Passing Rate | Hispanic | Hispanic Passing Rate | Adverse Impact Ratio for African Americans | Adverse Impact Ratio for Hispanics |
|---|---|---|---|---|---|---|---|---|
| | N =6,185 | | N = 458 | | N = 387 | | | |
| 100 | 17 | 0.0027 | 1 | 0.0022 | 0 | 0.0000 | 0.7944 | 0.0000 |
| 99 | 61 | 0.0126 | 2 | 0.0066 | 0 | 0.0000 | 0.5194 | 0.0000 |
| 98 | 177 | 0.0412 | 3 | 0.0131 | 2 | 0.0052 | 0.3177 | 0.1253 |
| 97 | 265 | 0.0841 | 3 | 0.0197 | 1 | 0.0078 | 0.2337 | 0.0922 |
| 96 | 318 | 0.1355 | 5 | 0.0306 | 3 | 0.0155 | 0.2256 | 0.1144 |
| 95 | 397 | 0.1997 | 6 | 0.0437 | 9 | 0.0388 | 0.2187 | 0.1941 |
| 94 | 425 | 0.2684 | 11 | 0.0677 | 10 | 0.0646 | 0.2522 | 0.2407 |
| 93 | 420 | 0.3363 | 13 | 0.0961 | 11 | 0.0930 | 0.2857 | 0.2766 |
| 92 | 398 | 0.4006 | 11 | 0.1201 | 9 | 0.1163 | 0.2997 | 0.2902 |
| 91 | 410 | 0.4669 | 11 | 0.1441 | 14 | 0.1525 | 0.3086 | 0.3265 |
| 90 | 357 | 0.5247 | 15 | 0.1769 | 15 | 0.1912 | 0.3371 | 0.3645 |
| 89 | 318 | 0.5761 | 15 | 0.2096 | 16 | 0.2326 | 0.3639 | 0.4037 |
| 88 | 319 | 0.6276 | 13 | 0.2380 | 12 | 0.2636 | 0.3792 | 0.4199 |
| 87 | 294 | 0.6752 | 11 | 0.2620 | 16 | 0.3049 | 0.3881 | 0.4516 |
| 86 | 260 | 0.7172 | 13 | 0.2904 | 9 | 0.3282 | 0.4049 | 0.4576 |
| 85 | 232 | 0.7547 | 16 | 0.3253 | 15 | 0.3669 | 0.4311 | 0.4862 |
| 84 | 192 | 0.7858 | 16 | 0.3603 | 18 | 0.4134 | 0.4585 | 0.5262 |
| 83 | 160 | 0.8116 | 12 | 0.3865 | 13 | 0.4470 | 0.4761 | 0.5508 |
| 82 | 131 | 0.8328 | 11 | 0.4105 | 11 | 0.4755 | 0.4929 | 0.5709 |
| 81 | 125 | 0.8530 | 21 | 0.4563 | 15 | 0.5142 | 0.5350 | 0.6028 |
| 80 | 129 | 0.8739 | 19 | 0.4978 | 10 | 0.5401 | 0.5697 | 0.6180 |
| 79 | 102 | 0.8904 | 20 | 0.5415 | 14 | 0.5762 | 0.6082 | 0.6472 |
| 78 | 78 | 0.9030 | 11 | 0.5655 | 10 | 0.6021 | 0.6263 | 0.6667 |
| 77 | 65 | 0.9135 | 11 | 0.5895 | 14 | 0.6382 | 0.6453 | 0.6987 |
| 76 | 71 | 0.9250 | 12 | 0.6157 | 11 | 0.6667 | 0.6657 | 0.7207 |
| 75 | 61 | 0.9348 | 9 | 0.6354 | 8 | 0.6873 | 0.6797 | 0.7352 |
| 74 | 43 | 0.9418 | 13 | 0.6638 | 9 | 0.7106 | 0.7048 | 0.7545 |
| 73 | 49 | 0.9497 | 13 | 0.6921 | 9 | 0.7339 | 0.7288 | 0.7727 |
| 72 | 31 | 0.9547 | 9 | 0.7118 | 15 | 0.7726 | 0.7455 | 0.8092 |
| 71 | 40 | 0.9612 | 10 | 0.7336 | 5 | 0.7855 | 0.7632 | 0.8172 |
| 70 | 25 | 0.9652 | 10 | 0.7555 | 7 | 0.8036 | 0.7827 | 0.8326 |
| 69 | 25 | 0.9693 | 6 | 0.7686 | 6 | 0.8191 | 0.7929 | 0.8451 |
| 68 | 22 | 0.9728 | 13 | 0.7969 | 3 | 0.8269 | 0.8192 | 0.8500 |
| 67 | 18 | 0.9757 | 6 | 0.8100 | 6 | 0.8424 | 0.8302 | 0.8633 |
| 66 | 15 | 0.9782 | 7 | 0.8253 | 5 | 0.8553 | 0.8437 | 0.8744 |
| 65 | 16 | 0.9808 | 6 | 0.8384 | 7 | 0.8734 | 0.8549 | 0.8905 |
| 64 | 22 | 0.9843 | 3 | 0.8450 | 2 | 0.8786 | 0.8584 | 0.8926 |
| 63 | 12 | 0.9863 | 6 | 0.8581 | 9 | 0.9018 | 0.8700 | 0.9144 |
| 62 | 9 | 0.9877 | 5 | 0.8690 | 3 | 0.9096 | 0.8798 | 0.9209 |

| 61 | 9 | 0.9892 | 3 | 0.8755 | 2 | 0.9147 | 0.8851 | 0.9247 |
|----|----|--------|----|--------|----|--------|--------|--------|
| 60 | 4 | 0.9898 | 8 | 0.8930 | 0 | 0.9147 | 0.9022 | 0.9241 |
| 59 | 14 | 0.9921 | 4 | 0.9017 | 3 | 0.9225 | 0.9089 | 0.9298 |
| 58 | 3 | 0.9926 | 2 | 0.9061 | 0 | 0.9225 | 0.9129 | 0.9294 |
| 57 | 6 | 0.9935 | 4 | 0.9148 | 2 | 0.9276 | 0.9208 | 0.9337 |
| 56 | 5 | 0.9943 | 3 | 0.9214 | 5 | 0.9406 | 0.9266 | 0.9459 |
| 55 | 3 | 0.9948 | 1 | 0.9236 | 4 | 0.9509 | 0.9284 | 0.9558 |
| 54 | 1 | 0.9950 | 4 | 0.9323 | 5 | 0.9638 | 0.9370 | 0.9687 |
| 53 | 4 | 0.9956 | 1 | 0.9345 | 2 | 0.9690 | 0.9386 | 0.9732 |
| 52 | 2 | 0.9960 | 5 | 0.9454 | 2 | 0.9742 | 0.9493 | 0.9781 |
| 51 | 2 | 0.9963 | 1 | 0.9476 | 2 | 0.9793 | 0.9511 | 0.9830 |
| 50 | 3 | 0.9968 | 4 | 0.9563 | 1 | 0.9819 | 0.9594 | 0.9851 |
| 49 | 5 | 0.9976 | 0 | 0.9563 | 0 | 0.9819 | 0.9587 | 0.9843 |
| 48 | 1 | 0.9977 | 3 | 0.9629 | 1 | 0.9845 | 0.9651 | 0.9867 |
| 47 | 2 | 0.9981 | 1 | 0.9651 | 0 | 0.9845 | 0.9669 | 0.9864 |
| 46 | 1 | 0.9982 | 0 | 0.9651 | 2 | 0.9897 | 0.9668 | 0.9914 |
| 45 | 2 | 0.9985 | 2 | 0.9694 | 0 | 0.9897 | 0.9708 | 0.9911 |
| 44 | 1 | 0.9987 | 2 | 0.9738 | 3 | 0.9974 | 0.9751 | 0.9987 |
| 43 | 2 | 0.9990 | 1 | 0.9760 | 0 | 0.9974 | 0.9769 | 0.9984 |
| 42 | 1 | 0.9992 | 0 | 0.9760 | 0 | 0.9974 | 0.9768 | 0.9982 |
| 41 | 1 | 0.9994 | 1 | 0.9782 | 0 | 0.9974 | 0.9788 | 0.9981 |
| 40 | 0 | 0.9994 | 4 | 0.9869 | 0 | 0.9974 | 0.9875 | 0.9981 |
| 39 | 0 | 0.9994 | 1 | 0.9891 | 0 | 0.9974 | 0.9897 | 0.9981 |
| 38 | 2 | 0.9997 | 1 | 0.9913 | 0 | 0.9974 | 0.9916 | 0.9977 |
| 37 | 0 | 0.9997 | 2 | 0.9956 | 1 | 1.0000 | 0.9960 | 1.0003 |
| 36 | 0 | 0.9997 | 1 | 0.9978 | 0 | 1.0000 | 0.9981 | 1.0003 |
| 34 | 0 | 0.9997 | 1 | 1.0000 | 0 | 1.0000 | 1.0003 | 1.0003 |
| 31 | 1 | 0.9998 | 0 | 1.0000 | 0 | 1.0000 | 1.0002 | 1.0002 |
| 26 | 1 | 1.0000 | 0 | 1.0000 | 0 | 1.0000 | 1.0000 | 1.0000 |
| Total | 6185 | | 458 | | 387 | | | |

**Table 8.**     **Effective Cut Score (90) Results for All of Massachusetts Applicants to the Entry-Level Firefighter Job:**

**Whites v. African American**

| Year | Number Passing | | Number Failing | | Chi Square | Difference in Units of Standard Deviation | Probability | Shortfall | 80% Rule: Ratio of Pass Rates African American / White |
|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| | African American | White | African American | White | | | | | |
| **2002** | Actual: 175 | Actual: 6112 | Actual: 703 | Actual: 4040 | 534.76 p=2.6E-118[14] | 23.12 | $p < .01$ | 325 | .3760 |
| | Expected: 500 | Expected: 5787 | Expected: 378 | Expected: 4365 | | | | | |
| **2004** | Actual: 81 | Actual: 3245 | Actual: 377 | Actual: 2940 | 206.33 p=8.7E-47[15] | 14.36 | $p < .01$ | 148 | .3371 |
| | Expected: 229 | Expected: 3097 | Expected: 229 | Expected: 3088 | | | | | |

[14] p=2.6E-118 can also be written as .000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000026.  This value is so small, that there are no terms that can be used to describe it other than scientific notation.
[15] p=8.7E-47 can also be written as .000000000000000000000000000000000000000000000087.  This value is so small, that there are no terms that can be used to describe it other than scientific notation.

**Table 9.**    **Nominal Cut Score (90) Results for All Commonwealth of Massachusetts Applicants to the Entry-Level Firefighter Job:**

**Whites v. Hispanics/Other Minorities**

| Year | Number Passing | | Number Failing | | Chi Square | Difference in Units of Standard Deviation | Probability | Shortfall | 80% Rule: Ratio of Pass Rates Hispanic – Other Minorities/White |
|------|------|------|------|------|------|------|------|------|------|
| | Hispanics/ Other Minorities | White | Hispanics/ Other Minorities | White | | | | | |
| **2002** | Actual: 189 <br><br> Expected: 793 | Actual: 6112 <br><br> Expected: 9644 | Actual: 646 <br><br> Expected: 42 | Actual: 4040 <br><br> Expected: 508 | 445.24 <br> p=7.8E-99[16] | 21.10 | $p < .01$ | 290 | .3760 |
| **2004** | Actual: 74 <br><br> Expected: 195 | Actual: 3245 <br><br> Expected: 3124 | Actual: 313 <br><br> Expected: 192 | Actual: 2940 <br><br> Expected: 3061 | 161.99 <br> p=4.2E-37[17] | 12.73 | $p < .01$ | 121 | .3645 |

---

[16] p=7.8E-99 can also be written as .0000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000078.  This value is so small, that there are no terms that can be used to describe it other than scientific notation.

[17] p=4.2E-37 can also be written as .00000000000000000000000000000000000042.  This value is so small, that there are no terms that can be used to describe it other than scientific notation.

**Table 10.**      **Effective Cut Score (95) Results for All of Massachusetts Applicants to the Entry-Level Firefighter Job:**

**Whites v. African Americans**

| Year | Number Passing | | Number Failing | | Chi Square | Difference in Units of Standard Deviation | Probability | Shortfall | 80% Rule: Ratio of Pass Rates African American / White |
|------|----------------|--|----------------|--|------------|---------|-------------|-----------|-------|
| | African American | White | African American | White | | | | | |
| **2002** | Actual: 50  Expected: 230 | Actual: 2838  Expected: 2658 | Actual: 828  Expected: 648 | Actual: 7314  Expected: 7494 | 207.18  p=5.7E-47[18] | 21.10 | $p < .01$ | 180 | .2037 |
| **2004** | Actual: 20  Expected: 87 | Actual: 1235  Expected: 1168 | Actual: 438  Expected: 371 | Actual: 4950  Expected: 5017 | 67.73  p=1.9E-16[19] | 8.23 | $p < .01$ | 67 | .2187 |

---

[18] p=5.7E-47 can also be written as .000000000000000000000000000000000000000000000057.  This value is so small, that there are no terms that can be used to describe it other than scientific notation.

[19] p=1.9E-16 can also be written as .00000000000000019.  This value is so small, that there are no terms that can be used to describe it other than scientific notation.

**Table 11.**     **Nominal Cut Score (95) Results for All of Massachusetts Applicants to the Entry-Level Firefighter Job:**

**Whites v. Hispanics/Other Minorities**

| Year | Number Passing | | Number Failing | | Chi Square | Difference in Units of Standard Deviation | Probability | Shortfall | 80% Rule: Ratio of Pass Rates Hispanic – Other Minorities/ White |
|------|----------------|---|----------------|---|------------|-------------------------------------------|-------------|-----------|------------------------------------------------------------------|
|      | Hispanics/ Other Minorities | White | Hispanics/ Other Minorities | White | | | | | |
| **2002** | Actual: 51 | Actual: 2838 | Actual: 784 | Actual: 7314 | 190.01 p=3.2E-43[20] | 13.78 | *p* < .01 | 169 | .2185 |
|      | Expected: 220 | Expected: 2669 | Expected: 615 | Expected: 7483 | | | | | |
| **2004** | Actual: 15 | Actual: 1235 | Actual: 372 | Actual: 4950 | 61.23 p=5.1E-15[21] | 7.82 | *p* < .01 | 59 | .1941 |
|      | Expected: 74 | Expected: 1176 | Expected: 313 | Expected: 5009 | | | | | |

---

[20] p=3.2E-43 can also be written as .00000000000000000000000000000000000000000032.  This value is so small, that there are no terms that can be used to describe it other than scientific notation.

[21] p=5.1E-15 can also be written as .0000000000000051.  This value is so small, that there are no terms that can be used to describe it other than scientific notation.

**Opinion 5.     The Commonwealth of Massachusetts and the City of Lynn, Massachusetts acknowledge the value of a compensatory/comprehensive strategy in their use of Personnel Administration Rule 8.**

As described by the Commonwealth of Massachusetts' 30(b)(6) witness (McNeely Deposition, 6/30/05, p.37, line 17; p.39, line 9), the Personnel Administration Rules of the Commonwealth of Massachusetts contemplate the identification of compensatory factors for the selection of entry-level firefighters through Rule 8.   In the case of the City of Lynn, Massachusetts they invoked Rule 8 in order to hire firefighters with Spanish fluency.   In so doing, the City of Lynn, Massachusetts provides tacit testimony in direct opposition to any position they or the Commonwealth of Massachusetts might take about the importance of top-down selection from the cognitive ability test.   Thus, Rule 8 and its use by the Commonwealth of Massachusetts and the City of Lynn, Massachusetts in the current instance confirms two important points that were made earlier in this report:

1) There are some applicant attributes as important, if not more important, than cognitive ability in making a decision about who will move on to physical ability testing.   In this case, that attribute was Spanish fluency.   An argument might also be made that physical ability could have been just as easily invoked as a critical attribute allowing this attribute to override the cognitive ability test score.   In fact, since the number of Rule 8 applicants requested was only six (6), the argument for a physical ability list based on Rule 8 would be even stronger.

2) It is clear that by departing from top-down selection on cognitive ability, the Commonwealth of Massachusetts and the City of Lynn, Massachusetts concede that Spanish fluency can compensate for lesser amounts of cognitive ability.

**Opinion 6.** **By implementing Personnel Administration Rule 8 for purposes of selecting candidates fluent in Spanish, the Commonwealth of Massachusetts and the City of Lynn, Massachusetts acknowledge that differences among observed cognitive ability scores (Civil Service examination) are largely irrelevant. This acknowledgement is illustrated by the practice of bypassing higher cognitive ability test scores for purposes of appointment of candidates with Spanish fluency. Similarly, by following the practice of absolute veteran's preference, the Commonwealth of Massachusetts and the City of Lynn, Massachusetts again acknowledge that multi-point differences in cognitive ability test scores are unrelated to successful job performance, at least above the cut score of 70.**

By invoking Personnel Administration Rule 8, the Commonwealth of Massachusetts and the City of Lynn, Massachusetts concede that single or multi-point differences in cognitive ability test scores are easily tolerated. In essence, the Commonwealth of Massachusetts and the City of Lynn, Massachusetts acknowledge that choosing a candidate lower on the ranking list of cognitive ability test scores does not diminish the value of that firefighter candidate to the Lynn Fire Department.

43

Absolute veteran's preference dictates that as long as a veteran[22] achieves a cognitive test score equal to or greater than 70, he or she may be chosen before any non-veteran, regardless of the gap between the veteran and non-veteran score. For the 1/25/2004 administration of the cognitive ability examination, a veteran with a score of 73 was certified as one of 33 applicants certified for the 16 open positions in the City of Lynn, Massachusetts. Since we know that the lowest scoring certified non-veteran achieved a cognitive ability score of 95, it appears that the Commonwealth of Massachusetts is prepared to tolerate score differences of as much as 22 points as unimportant. We are not arguing that veteran's preference is inappropriate as an entitlement. What we are saying is that if a cognitive ability score of 73 would be likely to lead to ineffective or substandard performance, one would assume that the Commonwealth of Massachusetts would challenge the use of absolute veteran's preference for firefighter selection. It is hard to understand why an individual, who happens to be a veteran, and who achieves a cognitive ability score of 73 would be chosen, but another individual, who happens to be African American or Hispanic and achieves a score of 94 (Jacob Bradley), 92 (Jared Thomas), or 90 (Keith Ridley), would

---

[22] According to Chapter 31 of the Commonwealth of Massachusetts Civil Service statute, a Veteran is "any person who: (1) comes within the definition of a veteran appearing in the forty-third clause of <u>section seven of chapter four</u>; or, (2) comes within such definition except that instead of having performed 'wartime service' as defined therein, he has been awarded the Congressional Medal of Honor or one of the following campaign badges: Second Nicaraguan Campaign, Yangtze Service, Navy Occupation Service, Army of Occupation or Medal for Humane Action; or, (3) is a person eligible to receive the Congressional Medal of Honor or one of the campaign badges enumerated in clause (2) of this paragraph and who presents proof of such eligibility which is satisfactory to the administrator. A veteran shall not include active duty for training in the army national guard or air national guard or active duty for training as a reservist in the armed forces of the United States. 'Wartime service', the same meaning as specified in the forty-third clause of <u>section seven of chapter four</u>, or active service in the armed forces of the United States in any campaign for which an award was made of any of the campaign badges enumerated in the definition of 'veteran' in this section."

not be chosen if cognitive ability was as important an attribute as the Commonwealth of Massachusetts would have us believe.

The logic of both Rule 8 and absolute veteran's preference suggest that the concern for small differences among observed scores can be easily ignored for veteran's status or Spanish fluency, but becomes central on other occasions. The Commonwealth of Massachusetts and the City of Lynn, Massachusetts cannot have it both ways – either small differences are important or they are not. Contrary to the position of the Commonwealth of Massachusetts and the City of Lynn, Massachusetts, logic, theory, and statistical reasoning say that these small observed score differences in cognitive ability are not important.

**Opinion 7.    There has been widespread recognition since the mid-1990's of the concept of incremental validity, the value of compensatory hiring strategies, and the value of personality testing in public safety.**

**Incremental Validity**

In addition to multiple studies done both by LJA and SHL (the Commonwealth of Massachusetts' vendor for the firefighter screening process) independent published scientific research has demonstrated that personality measures yield substantial incremental validity related to the prediction of job performance above and beyond what can be predicted by cognitive measures (Avis, Kudisch, & Fortunato, 2002; Day & Silverman, 1989; Goffin, Rothstein, & Johnston, 1996; Schmitt, Rogers, Chan, Sheppard, & Jennings, 1997). McManus and Kelly (1999) also found that personality measures

45

provided significant incremental validity over a biodata instrument in predicting task and contextual dimensions of performance and Pulakos and Schmitt (1996) demonstrated "large increases in criterion-related validity as well as decrements in subgroup differences (i.e., adverse impact) when a traditional multiple-choice measure of verbal ability was supplemented with measures of other job relevant abilities. In fact, the multiple correlation resulting from use of the Situational Judgment Test, Biodata Measure, and Structured Interview was almost identical (albeit a bit smaller) to that resulting from the use of these predictors along with the Verbal Ability Measure" (p.255), suggesting that at least in this instance, the use of the verbal ability measure was actually superfluous and unnecessary in predicting job success.

**Compensatory Hiring Strategies**

It is well accepted (Cascio, 1991; Guion, 1998) that there are few, if any, attributes that cannot be combined in a compensatory manner such that modest deficiencies in one attribute can be compensated for by higher levels of other attributes. In contrast to a multiple hurdle selection model, in a compensatory model, "the information is really averaged together so that a low test score in one area (e.g., cognitive) can be offset (or compensated for) by a high test score in another area (e.g., personality)" (Landy, 1989, p.261). Guion (1998) delineates a compensatory model as one where,

> "scores on predictors can be combined in any of several models. In a linear, additive model – the most common kind of model – scores are summed to form a composite, often with different weights for different variables…Summing scores is *compensatory*, a person's strength in one trait may compensate for relative weakness in another…Candidate A has equal strength in all three traits. Candidate B is weaker than A in Trait 1 but may have enough added strength in Trait 3 to compensate. Candidate C is extremely deficient in Trait 2 but strengths in the other two may compensate. All three form the same composite score by

adding the three component scores.  If one trait is more important than the others, its scores get more weight (i.e., multiplied by a larger value) than the others" (p. 341).

In the model adopted by the Commonwealth of Massachusetts and the City of Lynn, Massachusetts the written cognitive test was used as a single gatekeeper to employment, a gatekeeper that prevented consideration of any other job-related attributes.  Thus, the written cognitive test was not only non-comprehensive, it was also non-compensatory.  The Commonwealth of Massachusetts and the City of Lynn, Massachusetts could have and should have used a compensatory selection model as recommended by LJA in their Massachusetts Firefighter Final Validation Report (June 8, 1992).

**Value of Personality Testing in Public Safety**

There is abundant empirical literature supporting the connection between personality attributes and performance in a broad spectrum of occupations (Cortina, Goldstein, Payne, Davison, & Gilliland, 2000; Mount, Witt, & Barrick, 2000).  There are similar studies specifically targeting public safety jobs that demonstrate the relationship between personality measures and job performance (Barrick & Mount, 1991; Barrett, Miguel, Hurd, Lueke, & Tan, 2003; Cortina, Doherty, Schmitt, Kaufman, & Smith, 1992).  A job analysis of entry-level firefighters performed as early as 1975-1976 and published in a chapter by Bownas (1988) illustrates this point.  As shown in the table below, based on findings from the Bownas chapter (originally labeled Table 10.9.5), the knowledge, skills, and abilities with the highest weights are non-cognitive.  Furthermore, this study shows that Responsibility (defined as being conscientious, universally recognized by psychometricians as a personality characteristic) was tied with the most important attribute Teamwork (also a personality dimension).  This research

demonstrates that as early as 1977, job analysis identified personality components as central to firefighter success.

**Table 12.  Bownas (1988) Firefighter Job Analysis Attributes and Revised Overall Weights**

| ATTRIBUTE | REVISED OVERALL WEIGHT |
|---|---|
| Teamwork | 7.54 |
| Responsibility (Conscientious) | 7.53 |
| Desire to Learn | 7.48 |
| Activity | 7.01 |
| Getting Along with People | 6.75 |
| Honesty | 6.00 |
| Visual Acuity | 5.65 |
| Problem-solving Ability | 4.98 |
| Mechanical Ability | 4.66 |
| Resistance to Stress | 4.63 |
| Cleanliness | 4.24 |
| Quickness | 4.05 |
| General Body Coordination | 3.82 |
| Construction Trade Interest | 3.75 |
| Dexterity | 3.69 |
| Verbal Skills | 3.64 |
| Physical Strength | 3.46 |
| Courage | 3.17 |
| Medical Interests | 1.13 |
| Math Skills | 1.08 |

Today's version of the Dictionary of Occupational Titles is the Occupational Information Network (O*NET), which is produced by the United States Department of Labor.  The O*NET

system was developed by leaders in the field of industrial and organizational psychology using state of the art methods that meet and exceed both professional standards and legal guidelines (Peterson, Mumford, Borman, Jeanneret, & Fleishman, 1999).  The O*NET report for firefighters is similar to the job analysis reported by Bownas.  According to the O*NET report for municipal firefighters (33-2011.01) the most important tasks are not cognitive but physical (or a combination of physical and cognitive).

For example:

- Administer first aid and cardiopulmonary resuscitation to injured persons.

- Rescue victims from burning buildings and accident sites.

- Search burning buildings to locate fire victims.

- Drive and operate fire fighting vehicles and equipment.

- Dress with equipment such as fire resistant clothing and breathing apparatus.

O*NET also identifies additional important skills and abilities for firefighters that are not cognitive in nature.  The following represents some examples:

- customer and personal service

- public safety and security

- active listening

- coordination

- static strength

- multilimb coordination.

49

The data presented earlier in the case of Madison, Wisconsin and similar venues also demonstrates the substantial and incremental validity for personality tests for hiring entry-level firefighters and public safety officers generally.  As was demonstrated in an Alabama State Trooper analysis conducted by LJA, the overall validity of the battery was approximately doubled through the use of non-cognitive measures (and this study did not even include the physical ability attributes so central to the job of firefighter).  This is to be expected, particularly in light of the fact that non-cognitive characteristics such as conscientiousness, emotional stability, and agreeableness can be clearly linked to important tasks and duties for firefighters.

**Opinion 8:     Very small selection ratios exacerbate the adverse impact of the selection strategy chosen by the Commonwealth of Massachusetts for constructing eligibility lists and alternative methods for alleviating this exacerbated adverse impact were not considered.**

A selection ratio is the proportion of applicants selected to those not selected over a specific time period (Gatewood & Feild, 2001; Guion, 1998).  Thus, selection ratios can range from 0.0 to 1.0.  A large selection ratio is indicative of a system that screens out very few applicants.  For example, a selection ratio of .90 indicates that 9 out of every 10 candidates are selected, while only 1 of 10 is screened out.  Alternatively, a very small selection ratio is indicative of a system that screens in a very small number of applicants.  For example, a selection ratio of .015 indicates that only 3 out of 200 applicants are selected.  Typically, selection ratios are calculated for a particular period of time or based on a specific test administration, and can be obtained for any step or hurdle in a larger selection process.

In this case, selection ratios can be defined with regard to the selection hurdle in question: the cognitive ability test (Civil Service examination). The Commonwealth of Massachusetts administers these examinations every two years.[23] Testimony from the Director of Organizational Development for the State of Massachusetts suggests that most communities within the Commonwealth of Massachusetts seldom pass applicants scoring below 90 on the examination to the next phase of the hiring process.[24] Selection of applicants from the top down to score of 90 in the 2002 and 2004 data would suggest a selection ratio of over .60 in 2002 and over .50 in 2004. However, it was previously established by the Commonwealth of Massachusetts that selection ratios were more commonly .15 at the state level and as low as .05 at the community level.[25] These much smaller selection ratios would suggest that the top-down selection of applicants from the 2002 and 2004 examinations groups seldom dipped below applicant scores of 96 or 98 on the test.[26] In fact, the lowest scoring non-veteran applicant to be certified on a list of eligible candidates to the City of Lynn, Massachusetts from the 2004 administration was 95. As such, it can be concluded that very small selection ratios result from the administration of the written Civil Service examination.

When there are racial group score differences on an examination, adverse impact can be exacerbated. Both the mean score differences and the distribution of scores within race group must be considered in demonstrating this phenomenon (Guion, 1998). In a top-down selection system, when the majority group has a higher mean and less score spread (i.e., a smaller standard deviation where scores are more tightly gathered around the mean score) than a minority group,

---

[23] McNeely Deposition, 06/30/2005, Exhibit 8, Affidavit #1 of Sally McNeely, p.1.
[24] McNeely Deposition, 06/30/2005, pp.68-69.
[25] McNeely Deposition, 06/30/2005, Exhibit 6, Department of Personnel Administration Memorandum, p.8.
[26] Note that strictly top-down selection is not always used as a result of Personnel Administration Rules 10 and Personnel Administration Rules 08(4) from the Personnel Administration Rules of the Commonwealth of Massachusetts, as well as the absolute veteran's preference provision, so these effective score points are approximations based on the population of data from 2002 and 2004.

adverse impact tends to be increased. However, when the majority group scores are clustered near the top of the possible score range rather than spread across the score range, adverse impact will be substantially greater. This is called a skewed distribution (i.e., not a standard normal distribution) of scores. When majority group scores are skewed such that they are all near the top of the score range and minority group scores are lower on average and more closely approximate a standard normal distribution (i.e., lower mean, higher standard deviation than skewed majority group) adverse impact will be substantial in a top-down selection system (Guion, 1998).

The figures below show examples of these types of distributions for majority group and minority group scores on a test. As can be seen, most of the majority test takers in this example are scoring at the top end of the score range in a distribution that is called a negatively skewed distribution. The spread of the distribution (i.e., the standard deviation) is small and scores are tightly grouped. On the other hand, the mean of the minority group is lower and the scores are more spread out across the range of possible scores. This distribution of scores more closely resembles a standard normal distribution. This is exactly the situation described by Guion (1998) that results in exaggerated adverse impact. What is clear from these figures is that when small numbers of applicants are selected from the top of the score range in a top-down order and the numbers of individuals selected is small (i.e., a very small selection ratio), adverse impact against the minority group will be severe as the selection ratio for the majority group will be much higher in the top score ranges than it will be for minority group members.

**Figure 2.  Majority and Minority Group Distribution of Scores**





The tables below include the results of analyses of data from the 1993, 1998, 2000, 2002, and 2004 administrations of the written Civil Service examination. The data included all applicants for entry-level firefighter jobs in the Commonwealth of Massachusetts. The tables demonstrate that racial groups differ both on mean score and distribution (as represented by the standard deviations) of scores. The White means are statistically significantly and dramatically higher than the minority group means in all five years. In each year, the probability of the observed differences being due to chance variation as opposed to race is much less than 1 in 10,000,000. In 1993 for Whites v. African Americans $p = 2.47E\text{-}172$[27] and Whites v. Other Minorities $p = 6.96\text{-}78$.[28] In 1998 for Whites v. African Americans $p = 7.17\ E\text{-}89$[29] and Whites v. Other Minorities $p = 3.54\ E\text{-}49$.[30] In 2000 for Whites v. African Americans $p = 1.24\ E\text{-}72$[31] and Whites v. Other Minorities $p = 3.14\ E\text{-}54$.[32] In 2002 for Whites v. African Americans $p = 1.53E\text{-}122$[33] and Whites v. Other Minorities $p = 7.39E\text{-}99$.[34] In 2004 for Whites v. African

---

[27] $p = 2.47E\text{-}172$ can also be written as .000000000000000000000000000000000000000000000000000000000 000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000 0000000000000000000247. This value is so small, that there are no terms that can be used to describe it other than scientific notation.

[28] $p = 6.96\text{-}78$ can also be written as .000000000000000000000000000000000000000000000000000000000 0000000000000000696. This value is so small, that there are no terms that can be used to describe it other than scientific notation.

[29] $p = 7.17\ E\text{-}89$ can also be written as .000000000000000000000000000000000000000000000000000000000 0000000000000000000000000000000717. This value is so small, that there are no terms that can be used to describe it other than scientific notation.

[30] $p = 3.54\ E\text{-}49$ can also be written as .000000000000000000000000000000000000000000000000354. This value is so small, that there are no terms that can be used to describe it other than scientific notation.

[31] $p = 1.24\ E\text{-}72$ can also be written as .000000000000000000000000000000000000000000000000000000000 000000000000124. This value is so small, that there are no terms that can be used to describe it other than scientific notation.

[32] $p = 3.14\ E\text{-}54$ can also be written as .000000000000000000000000000000000000000000000000000000314. This value is so small, that there are no terms that can be used to describe it other than scientific notation.

[33] $p = 1.53E\text{-}122$ can also be written as .000000000000000000000000000000000000000000000000000000000 0000000000000000000000000000000000000000000000000000000153. This value is so small, that there are no terms that can be used to describe it other than scientific notation.

[34] $p = 7.39E\text{-}99$ can also be written as .000000000000000000000000000000000000000000000000000000000 0000000000000000000000000000000000000000000739. This value is so small, that there are no terms that can be used to describe it other than scientific notation.

Americans $p = 4.63E-61$[35] and Whites v. Other Minorities $p = 6.51E-48$.[36]  In addition, the minority groups' standard deviations are statistically and dramatically significantly higher than the majority group standard deviations.  Once again, the differences represent much less than a 1 in 10,000,000 chance the differences are due to random variation rather than race.  In 1998 for African Americans v. Whites $p = 4.7705$ E-143[37] and Other Minorities v. Whites $p = 1.2324$ E-111.[38]  In 2000 for African Americans v. Whites $p = 1.76709$ E-23[39] and Other Minorities v. Whites $p = 4.0415$ E 43.[40]  In 2002 for African Americans v. Whites $p = 4.4272$ E-78[41] and Other Minorities v. Whites $p = 1.41495$ E-72.[42]  In 2004 for African Americans $p = 3.00703$ E-63[43] v. Whites and Other Minorities v. Whites $p = 3.84534$ E-30.[44]  This represents a probability value of less than 1 in 10,000,000 for 1993, 1998, 2000, 2002, and 2004.  Thus, the analysis of these data suggests the strong likelihood for the situation described above to exist, where distribution differences between majority group and minority groups are likely to result in exacerbated adverse impact when selection ratios are very small.

---

[35] $p = 4.63E-61$ can also be written as .00000000000000000000000000000000000000000000000000000000000463.  This value is so small, that there are no terms that can be used to describe it other than scientific notation.

[36] $p = 6.51E-48$ can also be written as .00000000000000000000000000000000000000000000000651.  This value is so small, that there are no terms that can be used to describe it other than scientific notation.

[37] $p = 4.7705$ E-143 can also be written as .0000000000000000000000000000000000000000000000000000000000000000 00 00000000000000000000000000000000000000000000000000000000000000000000000047705.  This value is so small, that there are no terms that can be used to describe it other than scientific notation.

[38] $p = 1.2324$ E-111 can also be written as .0000000000000000000000000000000000000000000000000000000000000000000 00000000000000000000000000000000000000000000000000012324.  This value is so small, that there are no terms that can be used to describe it other than scientific notation.

[39] $p = 1.76709$ E-23 can also be written as .00000000000000000000176709.  This value is so small, that there are no terms that can be used to describe it other than scientific notation.

[40] $p = 4.0415$ E-43 can also be written as .0000000000000000000000000000000000000000000040415.  This value is so small, that there are no terms that can be used to describe it other than scientific notation.

[41] $p = 4.4272$ E-78 can also be written as .00000000000000000000000000000000000000000000000000000000000000000000000000044272.  This value is so small, that there are no terms that can be used to describe it other than scientific notation.

[42] $p = 1.41495$ E-72 can also be written as .0000000000000000000000000000000000000000000000000000000000000000000000000141495.  This value is so small, that there are no terms that can be used to describe it other than scientific notation.

[43] $p = 3.00703$ E-63 can also be written as .000000000000000000000000000000000000000000000000000000000000000300703.  This value is so small, that there are no terms that can be used to describe it other than scientific notation.

[44] $p = 3.84534$ E-30 can also be written as .00000000000000000000000000000384534.  This value is so small, that there are no terms that can be used to describe it other than scientific notation.

**Table 13.  1993 Majority and Minority Group Score Comparisons**

| | Majority | African American | Other Minority |
|---|---|---|---|
| Means | 90.47115 | 81.57494 | 81.99910 |
| Standard Deviations | 9.03636 | 14.04717 | 15.20910 |
| *d* statistic | | 1.41006 | 1.44619 |
| *t* statistic (difference between means) | | -28.93156 | -19.97616 |
| Probability | | $p = 2.47\text{E-}172$[45] | $p = 6.96\text{E-}78$[46] |
| *f* statistic (difference between variances) | | 2.41652 | 2.83282 |
| Probability | | $p = 3.1294\text{E-}71$[47] | $p = 1.3732\text{E-}85$[48] |

---

[45] $p = 2.47\text{E-}172$ can also be written as .00000000000000000000000000000000000000000000000000000000000000 00000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000000 000000000000000000247.  This value is so small, that there are no terms that can be used to describe it other than scientific notation.

[46] $p = 6.96\text{E-}78$ can also be written as .00000000000000000000000000000000000000000000000000000000000000 00000000000000000696.  This value is so small, that there are no terms that can be used to describe it other than scientific notation.

[47] $p = 3.1294\text{E-}71$ can also be written as .00000000000000000000000000000000000000000000000000000000000000 000000000031294.  This value is so small, that there are no terms that can be used to describe it other than scientific notation.

[48] $p = 1.3732\text{E-}85$ can also be written as .00000000000000000000000000000000000000000000000000000000000000 00000000000000000000000013732.  This value is so small, that there are no terms that can be used to describe it other than scientific notation.

**Table 14.  1998 Majority and Minority Group Score Comparisons**

|  | **Majority** | **African American** | **Hispanic** |
|---|---|---|---|
| Means | 90.47115 | 81.57494 | 81.99910 |
| Standard Deviations | 7.50766 | 12.85663 | 13.40802 |
| *d* statistic | | 1.184951 | 1.172409 |
| *t* statistic (difference between means) | | -20.39642 | -15.23026 |
| Probability | | $p = 7.17$ E-89[49] | $p = 3.54$ E-49[50] |
| *f* statistic (difference between variances) | | 2.93254 | 3.18947 |
| Probability | | $p = 4.7705$ E-143[51] | $p = 1.2324$ E-111[52] |

---

[49] $p = 7.17$ E-89 can also be written as .0000000000000000000000000000000000000000000000000000000000 0000000000000000000000000000000717.  This value is so small, that there are no terms that can be used to describe it other than scientific notation.

[50] $p = 3.54$ E-49 can also be written as .0000000000000000000000000000000000000000000000354.  This value is so small, that there are no terms that can be used to describe it other than scientific notation.

[51] $p = 4.7705$ E-143 can also be written as .00000000000000000000000000000000000000000000000000000000000000000 00 0000000000000000000000000000000000000000000000000000000000000000000000000000047705. This value is so small, that there are no terms that can be used to describe it other than scientific notation.

[52] $p = 1.2324$ E-111 can also be written as .0000000000000000000000000000000000000000000000000000000000000000 0000000000000000000000000000000000000000000000000000000000000012324.  This value is so small, that there are no terms that can be used to describe it other than scientific notation.

**Table 15.  2000 Majority and Minority Group Score Comparisons**

|  | **Majority** | **African American** | **Other Minorities** |
|---|---|---|---|
| Means | 90.60592 | 81.51263 | 80.71455 |
| Standard Deviations | 9.62603 | 12.47343 | 14.08977 |
| *d* statistic |  | 0.944657 | 1.027566 |
| *t* statistic (difference between means) |  | -18.52084 | -16.14231 |
| Probability |  | $p = 1.24$ E-72[53] | $p = 3.14$ E-54[54] |
| *f* statistic (difference between variances) |  | 1.67910 | 2.14246 |
| Probability |  | $p = 1.76709$ E-23[55] | $p = 4.0415$ E-43[56] |

---

[53] $p = 1.24$ E-72 can also be written as .0000000000000000000000000000000000000000000000000000000000000000000000000000000124.  This value is so small, that there are no terms that can be used to describe it other than scientific notation.

[54] $p = 3.14$ E-54 can also be written as .000000000000000000000000000000000000000000000000000000314.  This value is so small, that there are no terms that can be used to describe it other than scientific notation.

[55] $p = 1.76709$ E-23 can also be written as .0000000000000000000176709.  This value is so small, that there are no terms that can be used to describe it other than scientific notation.

[56] $p =4.0415$ E-43 can also be written as .00000000000000000000000000000000000000000040415.  This value is so small, that there are no terms that can be used to describe it other than scientific notation.

**Table 16.  2002 Majority and Minority Group Score Comparisons**

|  | **Majority** | **African American** | **Other Minorities** |
|---|---|---|---|
| Means | 89.0594 | 77.766515 | 78.43114 |
| Standard Deviations | 8.583978 | 12.97428 | 12.89906 |
| *d* statistic | | 1.315577 | 1.238151 |
| *t* statistic (difference between means) | | -24.27615 | -21.72542 |
| Probability | | $p = 1.53\text{E-}122$[57] | $p = 7.39\text{E-}99$[58] |
| *f* statistic (difference between variances) | | 2.28449 | 2.25808 |
| Probability | | $p = 4.4272 \text{ E-}78$[59] | $p = 1.41495 \text{ E-}72$[60] |

---

[57] $p = 1.53\text{E-}122$ can also be written as .0000000000000000000000000000000000000000000000000000000000 0000000000000000000000000000000000000000000000000000000000000000000000153.  This value is so small, that there are no terms that can be used to describe it other than scientific notation.

[58] $p = 7.39\text{E-}99$ can also be written as .0000000000000000000000000000000000000000000000000000000000 0000000000000000000000000000000000000000000739.  This value is so small, that there are no terms that can be used to describe it other than scientific notation.

[59] $p = 4.4272 \text{ E -}78$ can also be written as .0000000000000000000000000000000000000000000000000000000000 0000000000000000044272.  This value is so small, that there are no terms that can be used to describe it other than scientific notation.

[60] $p = 1.41495 \text{ E -}72$ can also be written as .0000000000000000000000000000000000000000000000000000000000 00000000000000141495.  This value is so small, that there are no terms that can be used to describe it other than scientific notation.

**Table 17.  2004 Majority and Minority Group Score Comparisons**

|  | **White** | **African American** | **Hispanic** |
|---|---|---|---|
| Means | 88.06322 | 77.00655 | 78.72868 |
| Standard Deviations | 8.139473 | 13.36501 | 11.84600 |
| *d* statistic |  | 1.358401 | 1.146823 |
| *t* statistic (difference between means) |  | -17.46643 | -15.27758 |
| Probability |  | $p = 4.63\text{E-}61$[61] | $p = 6.51\text{E-}48$[62] |
| *f* statistic (difference between variances) |  | 2.69616 | 2.11812 |
| Probability |  | $p = 3.00703\text{ E-}63$[63] | $p = 3.84534\text{ E-}30$[64] |

The possibility of exacerbated adverse impact resulting from the combination of the use of top-down selection, small selection ratios, and skewed distributions can be examined directly by looking at the actual distributions of majority and minority group scores from 2002 and 2004. The following histograms (Figures 3 and 4) show that the actual histograms of 2002 and 2004 scores closely resemble the hypothetical example distributions presented earlier in Figure 2.  The White distribution is skewed while the minority distributions more closely resemble a standard normal distribution.  Accordingly, it can be definitively concluded that very small selection ratios, such as those experienced by the Commonwealth of Massachusetts exacerbate the adverse

---

[61] $p = 4.63\text{E-}61$ can also be written as .0000000000000000000000000000000000000000000000000000000000000 0463.  This value is so small, that there are no terms that can be used to describe it other than scientific notation.

[62] $p = 6.51\text{E-}48$ can also be written as .0000000000000000000000000000000000000000000000000651.  This value is so small, that there are no terms that can be used to describe it other than scientific notation.

[63] $p = 3.00703\text{ E-}63$ can also be written as .00000000000000000000000000000000000000000000000000000000000000000 00000300703.  This value is so small, that there are no terms that can be used to describe it other than scientific notation.

[64] $p = 3.84534\text{ E-}30$ can also be written as .00000000000000000000000000000384534.  This value is so small, that there are no terms that can be used to describe it other than scientific notation.

impact of the selection strategy (i.e., top-down selection) chosen by the Commonwealth of Massachusetts for constructing eligibility lists.

**Figure 3.  2004 White, African American, and Hispanic Group Histograms**







**Figure 4. 2002 White, African American, and Other Minority Group Histograms**







Although top-down selection systems may generally result in higher expected performance of individuals selected when a test is a valid predictor of performance (Guion, 1998), they also tend to result in adverse impact.

> "This rule (i.e. top-down referral) results in the highest expected performance in the referred group and the lowest minority-group proportion referred. The effect is extreme when the referral ratio is low. If the referral ratio is 1 in 5 for the majority group and the applicant group is 30 percent minority, only 4 percent of the majority applicants will be referred, one-seventh of the majority group rate. Yet, when the validity is modest, as it is here, many of the minority applicants excluded would have performed better than many of the majority workers included.
>
> *Conclusion* This rule has an adverse impact on minority applicants that, in our judgment, is out of all proportion to the gains in expected job performance" (Hartigan & Wigdor, 1989, p.266).

The written Civil Service examination used by the Commonwealth of Massachusetts also has a modest validity, and as shown above, a very small selection ratio. Thus, we concur with Hartigan and Wigdor (1989) that the adverse impact on minority applicants in this case is also out of all proportion to the gains in expected job performance.

When a selection ratio is very small and top-down selection procedures are used, one must also be concerned with test score error and small differences between scores. That is, test scores are not infallible, they contain error. So, it is possible that applicants with small differences in score may, or may not, be different on the construct being measured. No test measures personal attributes of applicants perfectly. An estimate of a test's reliability provides an indicator as to how much error there is in a test. Cognitive ability tests that are similar to the Civil Service examination used by the Commonwealth of Massachusetts usually have reliabilities of about .90,[65] meaning that as much as 10% of the score is error or random variation. As such, care must be taken in interpreting small differences between scores.

---

[65] An estimate was used because the actual reliability is not reported by the Commonwealth of Massachusetts and the City of Lynn, Massachusetts in any of the documents produced.

The Commonwealth of Massachusetts did not consider the effects of measurement error when they developed their top-down selection approach. Using a common statistical calculation called the *standard error of the difference* (Casio, 1991; Guion, 1998) it is possible to calculate the range of scores that are not statistically different from the top score on the examination (i.e., 100). A 95% confidence interval is equal to two times the standard error of the difference. That is, we would be 95% confident that the scores within this band did not differ from the top score. Had the Commonwealth of Massachusetts calculated this interval for the 2002 and 2004 examinations, they would have found that this band is close to 8 points wide. In other words, at least all scores of 93 and above are not significantly different. The Commonwealth of Massachusetts could have considered all scores within this band to be equal and passed more African Americans and Hispanics within this score band to the next stage of the selection process and thereby reduced adverse impact (Casio, Outtz, Zedeck, & Goldstein, 1991). However, the Commonwealth of Massachusetts appears not to have considered this alternative approach that takes into consideration measurement error and could alleviate the extreme adverse impact caused by the very low selection ratio and different score distributional of the majority and minority groups.

**Opinion 9.**      **The use of a single predictor to screen applicants for entry-level firefighter jobs by the Commonwealth of Massachusetts provides a very limited assessment of potential for the total job domain and thereby limits the confidence that can be placed on a single score in a very selective top-down system.**

As noted in the previous opinion, the Commonwealth of Massachusetts is placing a very high value on small score differences by virtue of the top-down selection system and very small selection ratios.   However, as noted in Opinion 1, the job of entry-level firefighter requires important and substantial knowledge, skills, abilities, and other personal characteristics (KSAOs) beyond the cognitive abilities assessed by the written Civil Service examination.   Professional standards (i.e., SIOP Principles, 2003) explicitly state that a broader sampling of the content domain of the job should be represented by selection procedures:

> "The process of constructing or choosing the selection procedure requires sampling the work content domain.   Not every element of the work domain needs to be assessed. Rather, a sample of the work behaviors, activities, and worker KSAOs can provide a good estimate of the predicted work performance.   Sampling should have a rationale based on the professional judgment of the researcher and an analysis of work that details important work behaviors and activities, important components of the work context, and KSAOs needed to perform the job" (p. 24).

For the job of entry-level firefighter, at least four content areas of important KSAOs have been established, including cognitive ability, personality, physical ability, and communication skills (see Opinion 1).   Under the current system, the Commonwealth of Massachusetts has identified a single content domain in a very selective step of the process that has more demonstrated adverse impact against minorities than any of the other important content areas not measured in this first step (Hough, Oswald, & Ployhart, 2001).

66

A test measuring just one of four important job content domain areas cannot provide a score that can be confidently construed in the same way a score from a more comprehensive measure could be interpreted.  The report of LJA describing the validity transport study from Columbus, Ohio further demonstrates that the job relatedness of this one component (cognitive ability) is actually less than that of physical abilities, making the choice of cognitive ability as the single selection mechanism even more problematic.[66]  Under the current top-down system used by the Commonwealth of Massachusetts, an applicant with a score of 95 on the written Civil Service examination might get to move on to the next step of the process while an applicant with a 94 may not.  However, the applicant with a score of 95 may not be in physical shape that would allow him or her to competently perform physical tasks required by the firefighter job, nor is it clear if this individual has the communication skills or personality characteristics necessary for successful job performance.  He or she might be low on the personality trait of conscientiousness and will have trouble with attention to details and completing tasks.  He or she might be low on the personality trait of extroversion or agreeableness and will not be a good team worker.  Just the opposite could be true for the applicant with a lower Civil Service examination score such as 94.  He or she could be in excellent physical shape and be higher on both conscientiousness and extroversion.  This brief example shows the fallibility of making one point interpretations of a score on a single job content domain.

Professional standards do note that "not every element of the work domain needs to be assessed" (SIOP Principles, 2003, p. 24), yet, sampling of a single domain is not viewed as best practice by professional standards.  As noted by Guion (1998):

> "The best rule is for multivariate parsimony, the development of predictive hypotheses
> with relatively few predictors chosen from different categories.  Cognitive constructs
> should always be included, but more often than is typical, the hypothesis should include

---

[66] *Massachusetts Firefighter Final Validation Report*, Landy, Jacobs and Associates, June 8, 1992

personality and other noncognitive constructs. And always, the hypothesized predictors ought to make good sense to scientists and managers alike" (p. 155).

In other words, although the use of cognitive ability for firefighter selection is professionally accepted (Barrett, Polomsky, & McDaniel, 1999), it should be just one of several attributes assessed in the predictive selection battery. The Commonwealth of Massachusetts instead, chose to *include only* measures of cognitive ability in the first step of the selection process, which is inconsistent with professional best practice. It is not sufficient to argue that physical ability was measured in a later stage because for most African American candidates (and a substantial portion of majority candidates), the selection process consisted *only* of a cognitive ability measure.

Consider the analogy of betting on a football game between two teams ranked number one and two on offensive productivity. If a person making the bet could only consider offensive productivity he or she would not likely have much confidence in winning the bet. The bettor would want to understand other important content domain information related to other important aspects of the game, such as defensive and special teams play. A team with the best offense and the *worst* defense would be much more likely to be beaten by a team with the second best offense and the *best* defense in the league (the old adage "defense wins games" comes to mind). Similarly, the Commonwealth of Massachusetts is making a bet on very limited knowledge of the total package of KSAOs (i.e., only cognitive ability) that comes with an applicant and is related to performance of important aspects of the job. The confidence placed in such a single domain bet cannot be as great as the confidence that could be placed on a bet made with greater knowledge of the individual differences on multiple job-related domains (e.g., personality, physical abilities, communication skills), particularly when very small differences are being interpreted on the single domain (i.e., cognitive ability). Still, if one were going to bet on a

single domain, one would want to select the domain with the greatest validity (i.e., job relatedness).  The Commonwealth of Massachusetts was aware from the 1992 LJA validation report that the physical ability test had a greater validity (i.e., between .3 and .4) than the cognitive ability test validity (i.e., .23 with the BARS composite from the primary supervisor).  Yet, the Commonwealth of Massachusetts placed its bet on cognitive ability, a strategy that assured a less predictive system.

The figure below graphically depicts the difference between a single domain test (e.g., a cognitive ability test) and a test that includes measures of multiple domains (e.g., personality, cognitive ability, physical ability, communication skills).  It is clear from this figure that more confidence can be placed in a multiple domain test than a single domain test.

**Figure 5.  Coverage of Job Content Domain**



**Opinion 10.**   **Many feasible alternative selection strategies were available to the City of Lynn, Massachusetts and the Commonwealth of Massachusetts that would have either maintained or increased the job relatedness of the selection process while reducing adverse impact against African American and Hispanic candidates.**

Assuming, *ad arguendo,* that the Commonwealth of Massachusetts and the City of Lynn, Massachusetts are able to persuade the Court of the job relatedness of the cognitive ability test (Civil Service examination) and its use as a first screen in a strict rank-ordered multiple hurdle system, there were many alternative strategies open to the City of Lynn, Massachusetts and the Commonwealth of Massachusetts that would have resulted in equal or greater job relatedness and lesser adverse impact.  In addition, all of these alternatives would have been compatible with the business necessity of the employer in selecting entry-level firefighters.   Many of these alternatives were actually recommended by LJA in their final report and recommendations. Among these alternatives were the following:

1. The physical ability test could have been used as the first hurdle with top down selection and the cognitive ability test could have been used as a pass/fail second hurdle with a cut score set through incumbent testing.  As indicated earlier in this report, the Commonwealth of Massachusetts' and the City of Lynn, Massachusetts' concern about running afoul of ADA regulations was unfounded.

2. As recommended by LJA, the cognitive and physical abilities tests could have been combined in a compensatory manner, weighting the physical ability test

71

scores 60% and the cognitive test scores 40%. This would have increased job relatedness and decreased adverse impact against African American and Hispanic applicants. Many researchers and practitioners have identified this strategy – increasing comprehensiveness and allowing for compensation – as one which will reduce adverse impact while increasing job relatedness (Outtz, 2002; Sackett & Ellingson, 1997; Sackett & Roth, 1996; Sackett, Schmitt, Ellingson, & Kabin, 2001).

3. Score bands based on a formula incorporating the reliability of the cognitive ability examination and the standard deviation of applicant test performance could have been established. Candidates could have then been chosen from within bands based on their physical ability score. In this scenario, the physical ability test would be administered in waves corresponding to the score band.

4. The problem of candidate selection based on one or two point score differences is widely recognized as the foundation for adverse impact when using cognitive ability tests (Hartigan & Wigdor, 1989; Outtz, 2002; Wollack, 1994). Given the fact that only one (and not the most important) candidate attribute was being assessed in the first stage of the multi-stage screening process, a much more liberal interpretation of an observed "score" could have been applied to the cognitive ability test score range. In particular, a very broad confidence interval based on a standard error of measurement logic might have been applied, thus granting everyone in that confidence interval equal status. As we have seen above, the effect of very small selection ratios coupled with a paucity of attributes measured and a strict rank-ordered selection strategy had an extremely deleterious

effect on the probability of selection for African American and Hispanic candidates.

5.  The Commonwealth of Massachusetts and the City of Lynn, Massachusetts might have followed the recommendation of the consultant to use incumbent samples to set the cut score for the examination.  This would most certainly have resulted in an effective cut score well below the score currently being used.  In fact, that incumbent-set cut score could have been used to establish a pass/fail list of candidates since the lower scoring incumbents would have still been viewed as effective firefighters.

6.  In a manner similar to what has been suggested immediately above in Point "5," the incumbent firefighters could have been used to set the effective cut score, and candidates above that score could have been randomly (strict or stratified) selected to take part in physical ability testing.  The two scores (cognitive and physical ability) could then have been weighted and combined in a compensatory system (e.g., 40% cognitive and 60% physical as recommended by LJA) allowing the cognitive ability score to continue to have weighted influence on final selection decisions.

7.  The Commonwealth of Massachusetts and the City of Lynn, Massachusetts could have incorporated paper and pencil personality tests and/or biodata instruments in the first stage of testing with no (misplaced) concern about ADA regulations.  The addition of these tests would certainly have increased job relatedness and reduced adverse impact against African American and Hispanic applicants.  The scientific

literature clearly illustrates the efficacy of such an approach (Schmidt & Hunter, 1998; Schmitt, Rogers, Chan, Sheppard, & Jennings, 1997).

In short, there was an abundance of alternative strategies to strict rank-ordered cognitive ability test selection available to the Commonwealth of Massachusetts and the City of Lynn, Massachusetts. Any of these alternatives would have certainly reduced adverse impact while leaving job relatedness intact. Many of these alternatives would have actually *increased* job relatedness, while at the same time reducing adverse impact against African American and Hispanic candidates.

**Opinion 11.   There are numerous and serious shortcomings of the 2002 and 2004 procedure employed by the City of Lynn, Massachusetts and the Commonwealth of Massachusetts for the appointment of entry-level firefighters. In light of these violations, it is my professional and scientific opinion that neither the Commonwealth of Massachusetts nor the City of Lynn, Massachusetts can demonstrate that the use of the cognitive ability examination for entry-level firefighter selections in 2002 and 2004 was job related or fair.**

A standard guideline for the evaluation of the fairness and job relatedness of a selection strategy is provided by the *Uniform Guidelines on Employee Selection Procedures* (Equal Employment Opportunity Commission (EEOC), Civil Service Commission, Department of Labor, and Department of Justice, 1978) known colloquially as the Uniform Guidelines. These guidelines are used by various agencies of the Federal Government (EEOC, Department of

Labor, Department of Justice, etc. - the signatories to 1978 document) to assess the adequacy of selection procedures when examining Title VII challenges and are interpreted by federal courts as having the force of law.  Following the publication of the Uniform Guidelines, the EEOC published approximately 100 "questions and answers" clarifying various section of the Guidelines (Questions and Answers to Clarify and Provide a Common Interpretation of the Uniform Guidelines on Employee Selection Procedures, 1979).  Thus, violations of these guidelines and their clarifying questions and answers may lead to the inference that an employer has not met the burden of demonstrating job relatedness following a determination of adverse impact.  In Table 18, I present a sampling of violations of the Uniform Guidelines and clarifying questions and answers in support of my opinion that neither the Commonwealth of Massachusetts nor the City of Lynn, Massachusetts has adequately demonstrated the job relatedness of the use of the cognitive ability examination as the first hurdle in a multiple hurdle system for the 2002 and 2004 examination administrations and subsequent candidate selections.

**Table 18.  Uniform Guidelines Guidance**

| Uniform Guidelines[67] | Did the Commonwealth of Massachusetts Comply? |
|---|---|
| **Review of Validity Studies for Currency** | |
| • There are no absolutes in the area of determining the currency of a validity study.  All circumstances concerning the study, including the validation strategy used, and changes in the relevant labor market and the job should be considered in the determination of when a validity | • The Commonwealth of Massachusetts failed to update the job analysis for entry-level firefighter after the LJA 1992 job analysis.  There is no link between the job of firefighter in the years 2002 and 2004 and the cognitive ability examination |

---

[67] The specific sections of the Uniform Guidelines are referenced for each violation.

| | |
|---|---|
| study is outdated (Section 60-3.5K). | administered in those years. |

**Cutoff Scores**

| | |
|---|---|
| • Where cutoff scores are used, they should normally be set so as to be reasonable and consistent with normal expectations of acceptable proficiency within the work force (Section 60-3.5H). | • The cutoff score of 70 on the 2002 and 2004 cognitive ability examinations was chosen for reasons other than the desire to be consistent with normal expectations of acceptable proficiency within the work force. |

**Relationship Between the Selection Procedure and the Job**

| | |
|---|---|
| • Evidence demonstrative that the selection procedure is a representative work sample, a representative sample of the work behaviors, or a representative sample of a knowledge, skill, or ability as used as a part of a work behavior and necessary for the behavior should be provided (Section 60-3.15C(5)). | • Knowledge, skills, and abilities measured by the cognitive test are not representative of the most important content domains of the firefighter job. |
| • When one or two work behaviors are the only critical or important ones, the sole use of a selection procedure which is related only to these behaviors may be appropriate.  In most situations, there are many critical and/or important work behaviors or work outcomes.  For these reasons, reliance upon one or two significant relationships will be subject to close review, particularly where they are not the only important or critical ones (Question and Answer #93[68]). | • The job of firefighter includes many important duties and associated attributes. City of Lynn, Massachusetts and the Commonwealth of Massachusets considered only one attribute (cognitive ability) and that attribute is not the most important for firefighter success as demonstrated by the criterion-related validity conducted by LJA in Columbus, Ohio and used to transport the validity to the Commonwealth of Massachusetts. |
| • Was there a pilot test?  If so, description of how the research sample was identified and selected should be included (Section 60-3.15B(6). | • No pilot tests were conducted for the 2002 or 2004 cognitive ability examinations. |
| • Size of each subgroup (Section 60-3.15B(6). | • No pilot test was conducted. |
| • Measures of central tendency (e.g., means) and measures of dispersion (e.g., | • No pilot test was conducted. |

---

[68] The numbers correspond to the number of the question and answer in the Questions and Answers to Clarify and Provide a Common Interpretation of the Uniform Guidelines on Employee Selection Procedures, 1979.

| | |
|---|---|
| standard deviation and ranges) for selection procedure for each race, sex, and ethnic group which constitutes a significant factor in the relevant labor market. – raw scores and banded scores (Section 60-3.15B(8). | |
| • Rationale for choice of original and final test battery (Section 60-3.15C(7). | • No rationale was provided for the multiple hurdle system adopted by the Commonwealth of Massachusetts and the City of Lynn, Massachusetts. |
| • This description should include the rationale for choosing the method for operational use, and the evidence of the validity and utility of the procedure as it is to be used (Section 60-3.15B(10). | • No rationale was provided for the multiple hurdle system adopted by the Commonwealth of Massachusetts and the City of Lynn, Massachusetts. |
| **Consideration of Suitable Alternative Selection Procedures** | |
| • Alternative procedures investigated - Alternative sets of selection procedures, weighting strategies, and cut scores (Section 60-3.3B. <br> • The scope, method, and findings of the investigation, and the conclusions reached in light of the findings, should be fully described (Section 60-3.15C(6). | • No alternative procedures with greater or equal validity and less adverse impact were investigated. Alternatives recommended by LJA that would have increased job relatedness and reduced adverse impact were rejected. |
| • The selection procedures investigated and available evidence of their impact should be identified (Section 60-3.15C(6). | • No alternative procedures with greater or equal validity and less adverse impact were investigated. Alternatives recommended by LJA that would have increased job relatedness and reduced adverse impact were rejected. |
| • If the selection procedure is used with a cutoff score, the user should describe the way in which normal expectations of proficiency within the work force were determined and the way in which the cutoff score was determined (Section 60-3.15C(7). | • The cutoff score of 70 on the 2002 and 2004 cognitive ability examinations was chosen for reasons other than the desire to be consistent with normal expectations of acceptable proficiency within the work force.  The Commonwealth of Massachusetts rejected the recommendation by LJA to conduct a criterion study in order to establish an incumbent-based cut score. |
| • The alternative selection procedure (or method of use) should be used when it | • No alternative procedures with greater or equal validity and less |

| | |
|---|---|
| has less adverse impact and when the evidence shows that its validity is substantially the same or greater for the same job in similar circumstances (Question and Answer #50). | adverse impact were investigated. Alternatives recommended by LJA that would have increased job relatedness and reduced adverse impact were rejected. |
| • In determining whether the validity for one procedure is substantially the same as or greater than that of another procedure, in a criterion-related validity study, the factors include the importance of the criteria for which significant relationships are found, the magnitude of the relationship between selection procedure scores and criterion measures, and the size and composition of the samples used.  For content validity, the strength of validity evidence would depend upon the proportion of critical and/or important job behaviors measured, and the extent to which the selection procedure resembles actual work samples or work behaviors (Question and Answer #51). | • No alternative procedures with greater or equal validity and less adverse impact were investigated. Alternatives recommended by LJA that would have increased job relatedness and reduced adverse impact were rejected. |
| • The Uniform Guidelines call for a reasonable investigation of alternatives for a proposed selection procedure as a part of any validity study.  A reasonable investigation of alternatives would begin with a search of the published literature to develop a list of currently available selection procedures that have in the past been found to be valid for the job in question or for similar jobs.  A further review would then be required of all selection procedures at least as valid as the proposed procedure to determine if any offer the probability of lesser adverse impact.  A survey of the enforcement agencies alone does not constitute a reasonable investigation of alternatives (Question and Answer #91). | • No alternative procedures with greater or equal validity and less adverse impact were investigated. Alternatives recommended by LJA that would have increased job relatedness and reduced adverse impact were rejected. |
| **Total Selection Process** | |
| • The "total selection process" refers to the combined effect of all selection procedures leading to the final | • The combined effect of all selection procedures leading to the final employment decision was not |

| | |
|---|---|
| employment decision such as hiring or promoting (e.g., appraisal of candidates for administrative assistant positions in an organization might include initial screening based upon an application blank and interview, a written test, a medical examination, a background check, and a supervisor's interview. These in combination are the total selection process) (Question and Answer #14). | considered.  In particular, the effective cut score for the cognitive ability examination was ignored in favor of a nominal cut score. |
| **Unfair Selection Procedure** | |
| • The consequences of using unfair selection procedures are severe in terms of discriminating against applicants on the basis of race, sex or ethnic group membership.  Accordingly, fairness studies should be performed (Question and Answer #69). | • No fairness analyses of the 2002 and 2004 selection procedures were conducted. |
| • When a selection procedure is unfair for one or more groups the selection instrument may be replaced by another validated instrument which is fair to all groups, the selection instrument may be revised to eliminate the sources of unfairness or revisions may be made on the method of use of the selection procedure to ensure that the probability of being selected is compatible with the probability of successful job performance (Question and Answer, #70). | • The cognitive ability examination was neither replaced nor revised in spite of continuing evidence of dramatic adverse impact. |
| **Job Analysis** | |
| • The job analysis should describe all important work behaviors and their relative importance and their level of difficulty.  The job analysis should focus on observable work behaviors and, to the extent appropriate, observable work products, and the tasks associated with the important observable work behaviors and/or work products.  The job analysis should identify how the critical or important work behaviors are used in the job, and should support the content of the | • No job analysis was done between the years of 1992 and 2004.  In spite of available evidence regarding important duties and abilities, the Commonwealth of Massachusetts continued to use simply the cognitive ability examination for top-down selection. |

| | |
|---|---|
| selection procedure (Question and Answer #77). | |
| **Documenting a Validity Study** | |
| • Generally, reports of validity studies should contain all the information necessary to permit an enforcement agency to conclude whether a selection procedure has been validated. The major elements for all types of validation studies include the following:<br>• When and where the study was conducted.<br>• A description of the selection procedure, how it is used, and the results by race, sex, and ethnic group.<br>• How the job was analyzed or reviewed and what information was obtained from this job analysis or review.<br>• The evidence demonstrating that the selection procedure is related to the job. The nature of this evidence varies, depending upon the strategy used.<br>• What alternative selection procedures and alternative methods of using the selection procedure were studied and the results of this study.<br>• The name, address and telephone number of a contact person who can provide further information about the study (Question and Answer #89). | • No additional job analyses, validity studies, or considerations of alternative procedures were done subsequent to the validity transport study conducted in 1992 by LJA. |

## SUMMARY AND CONCLUSIONS

The Commonwealth of Massachusetts has the statutory responsibility for providing cities and towns in the Commonwealth of Massachusetts with a method for making entry-level firefighter selections that is fair and job related. They have failed to do that for the 2002 and 2004 test administrations. The roots for this failure are clear and documented. First, they ignored the recommendations of their consultants, LJA in the 1992-1993 time period to institute comprehensive compensatory screening and selection methods. Next, the Commonwealth of Massachusetts failed to correctly monitor the relentless adverse impact of the cognitive ability test used for rank order appointment. Additionally, the Commonwealth of Massachusetts failed to adequately update job analysis information that would have signaled the need for a different screening method. Finally, the Commonwealth of Massachusetts failed to implement alternative procedures for applicant screening that would have both reduced adverse impact while simultaneously increasing job-relatedness. A comparison of the Commonwealth of Massachusetts' responsibilities as articulated in the *Uniform Guidelines on Employee Selection Procedures* (1978) to their actual practice during the period 1992-2004 documents how and why they failed to provide a fair and valid screening procedure and how the screening practice they did adopt worked to the disadvantage of African American and Hispanic applicants for entry-level firefighter positions.

Signed this 30th day of August, 2005

_____
Frank J. Landy, Ph.D.

Signed to before me this 30th day of August, 2005, in the County of Boulder, State of Colorado.

_____
Bonnie Beverly
Notary Public

My Commission expires: 6/1/2009

Seal

Signed this 30th day of August, 2005

_____
Mark J. Schmit, Ph.D.

Signed to before me this 30th day of August, 2005, in the County of Boulder, State of Colorado.

_____
Bonnie Beverly
Notary Public

My Commission expires: 6/1/2009

Seal

# REFERENCES

Avis, J. M., Kudisch, J. D., & Fortunato, V. J. (2002). Examining the incremental validity and adverse impact of cognitive ability and conscientiousness on job performance. *Journal of Business and Psychology, 17*(1), 87-105.

Barrett, G. V., Miguel, R. F., Hurd, J. M., Lueke, S. B., & Tan, J. A. (2003). Practical issues in the use of personality tests in police selection. *Public Personnel Management, 32*(4), 497-517.

Barrett, G. V., Polomsky, M. D., & McDaniel, M.A. (1999). Selection tests for firefighters: A comprehensive review and meta-analysis. *Journal of Business and Psychology, 13*(4), 507-513.

Barrick, M. R. & Mount, M. K. (1991). The Big Five personality dimensions and job performance: A meta-analysis. *Personnel Psychology, 44*, 1-26.

Bownas, D. A. (1988). Firefighter. In S. Gael (Ed.), *The job analysis handbook for business, industry, and government, Volume II* (pp. 1255-1264). New York: John Wiley & Sons.

*Brunet v. City of Columbus*, 58 F.3d 251 (6th Cir. 1995).

Cascio, W. F. (1991). *Applied psychology in personnel management* (4th ed.). Englewood Cliffs, NJ: Prentice Hall.

Cascio, W. F. (1995). Whither industrial and organizational psychology in a changing world of work? *American Psychologist, 50*(11), 928-939.

Cascio, W. F., Outtz, J., Zedeck, S., & Goldstein, I. L. (1991). Statistical implications of six methods of test score use in personnel selection. *Human Performance, 4*(4), 233-264.

Cortina, J. M., Doherty, M. L., Schmitt, N., Kaufman, G., & Smith, R. G. (1992). The "Big Five" personality factors in the IPI and MMPI: Predictors of police performance. *Personnel Psychology, 45*, 119-140.

Cortina, J. M., Goldstein, N. B., Payne, S. C., Davison, H. K, & Gilliland, S. W. (2000). The incremental validity of interview scores over and above cognitive ability and conscientiousness scores. *Personnel Psychology, 53*, 325-351.

Day, D. V. & Silverman, S. B. (1989). Personality and job performance: Evidence of incremental validity. *Personnel Psychology, 42*, 25-36.

Equal Employment Opportunity Commission, Civil Service Commission, Department of Labor, & Department of Justice (1978). Uniform guidelines on employee selection procedures. *Federal Register, 43*(166), 38290-38315.

Equal Employment Opportunity Commission, Office of Personnel Management, Department of Justice, Department of Labor, & Department of the Treasury (1979). Questions and answers to clarify and provide a common interpretation of the Uniform Guidelines on Employee Selection Procedures. *Federal Register, 44*(43), 11996-12009.

Gatewood, R. D. & Feild, H. S. (2001). *Human resource selection* (5th ed.). Mason, OH: South-Western.

Goffin, R. D., Rothstein, M. G., & Johnston, N. G. (1996). Personality testing and the assessment center: Incremental validity for managerial selection. *Journal of Applied Psychology, 81*(6), 746-756.

Guion, R. M. (1998). *Assessment, measurement, and prediction for personnel decisions*. Mahwah, NJ: Lawrence Erlbaum.

Hartigan, J. A. & Wigdor, A. K. (Eds.). (1989). *Fairness in employment testing: Validity generalization, minority issues, and the General Aptitude Test Battery*. Washington, DC: National Academy Press.

*Hazelwood School District v. United States*, 433 U.S. 299 (1977).

Hirsh, H. R., Northrop, L. C., & Schmidt, F. L. (1986). Validity generalization results for law enforcement occupations. *Personnel Psychology, 39*, 399-420.

Hough, L. M., Oswald, F. L., & Ployhart, R. E. (2001). Determinants, detection and amelioration of adverse impact in personnel selection procedures: Issues, evidence and lessons learned. *International Journal of Selection and Assessment, 9*(1-2), 152-194.

Kehoe, J. F. & Olson, A. (2005). Cut scores and employment discrimination litigation. In F. J. Landy (Ed.), *Employment discrimination litigation: Behavioral, quantitative, and legal perspectives* (pp. 410-449). San Francisco: Jossey-Bass.

Landy, F. J. (1976). The validity of the interview in police officer selection. *Journal of Applied Psychology, 61*, 193-198.

Landy, F. J. (1985). *The psychology of work behavior* (3rd ed.). Chicago: Dorsey Press.

Landy, F. J. (1987). *Psychology: The science of people* (2nd ed.). Upper Saddle River, NJ: Prentice Hall.

Landy, F. J. (1989). *The psychology of work behavior* (4th ed.). Pacific Grove, CA: Brooks-Cole.

Landy, F. J. (Ed.). (2005). *Employment discrimination litigation: Behavioral, quantitative, and legal perspectives*. San Francisco: Jossey-Bass.

Landy, F. J., Bland, R. E., Buskirk, E. R., Daly, R. E., DeBusk, R. F., Donovan, E. J., Farr, J. L., Feller, I., Fleishman, E. A., Gebhardt, D. L., Hodgson, J. L., Kenney, W. L., Nesselroade, J. R., Pryor, D. B., Raven, P. B., Schaie, K. W., Sothmann, M. S., Taylor, M. C., Vance, R. J., & Zarit, S. H. (1992). *Alternatives to chronological age in determining standards of suitability for public safety jobs*. Technical Report, The Center for Applied Behavioral Sciences, Penn State University.

Landy, F. J. & Conte, J. (2004). *Work in the 21st century: An introduction to industrial and organizational psychology*. New York: McGraw Hill.

Landy, F. J., Shankster, L. J., & Kohler, S. S. (1994). Personnel selection and placement. *Annual Review of Psychology, 45*, 261-296.

Landy, F. J., Shankster-Crawley, L., & Moran, S. (1995). Advancing personnel selection and placement methods. In A. Howard (Ed.), *The changing nature of work* (pp. 252-289). San Francisco: Jossey-Bass.

Landy, F. J. & Trumbo, D. A. (1976). *Psychology of work behavior*. Homewood, IL: Dorsey Press.

Landy, F. J. & Trumbo, D. A. (1980). *Psychology of work behavior* (Rev. ed.). Homewood, IL: Dorsey Press.

Lefkowitz, J. & Gebbia, M. (1997). The "shelflife" of a test validation study: A survey of expert opinion. *Journal of Business and Psychology, 11*(3), 381-397.

McHenry, J. J., Hough, L. M., Toquam, J., Hanson, M. A., & Ashworth, S. (1990). Project A validity results: The relationship between predictor and criterion domains. *Personnel Psychology, 43*, 335-366.

McManus, M. A. & Kelly, M. L. (1999). Personality measures and biodata: Evidence regarding their incremental predictive value in the life insurance industry. *Personnel Psychology, 52*, 137-148.

Mount, M. K., Witt, L. A., & Barrick, M. R. (2000). Incremental validity of empirically keyed biodata scales over GMA and the five factor personality constructs. *Personnel Psychology, 53*, 299-323.

Office of Personnel Management (2003). *Delegated examining operations handbook: A guide for federal agency examining offices*. Online at: http://www.opm.gov/deu/.

Outtz, J. L. (2002). The role of cognitive ability tests in employment selection. *Human Performance, 15*(1-2), 161-171.

Paetzold, R. L. & Willborn, S. L. (1994). *The statistics of discrimination: Using statistical evidence in discrimination cases*. Colorado Springs, CO: Shepard's/McGraw-Hill.

Peterson, N. G., Mumford, M. D., Borman, W. C., Jeanneret, P. R., & Fleishman, E. A. (Eds.). (2001). *An occupational information system for the 21st century: The development of O\*NET*. Washington, DC: American Psychological Association.

Pulakos, E. D. & Schmitt, N. (1996). An evaluation of two strategies for reducing adverse impact and their effects on criterion-related validity. *Human Performance, 9*(3), 241-258.

Sackett, P. R. & Ellingson, J. E. (1997). The effects of forming multi-predictor composites on group differences and adverse impact. *Personnel Psychology, 50*, 707-721.

Sackett, P. R. & Roth, L. (1996). Multi-stage selection strategies: A Monte Carlo investigation of effects on performance and minority hiring. *Personnel Psychology, 49*, 549-572.

Sackett, P. R., Schmitt, N., Ellingson, J. E., & Kabin, M. B. (2001). High-stakes testing in employment, credentialing, and higher education: Prospects in a post-affirmative-action world. *American Psychologist, 56*(4), 302-318.

Sanchez, J. I. & Levine, E. L. (1999). Is job analysis dead, misunderstood, or both? New forms of work analysis and design. In A. I. Kraut (Ed.), *Evolving Practices in Human Resource Management: Responses to a World of Work* (pp. 43-68). San Francisco: Jossey-Bass.

Schmidt, F. L. & Hunter, J. E. (1998). The validity and utility of selection methods in personnel psychology: Practical and theoretical implications of 85 years of research findings. *Psychological Bulletin, 124,* 262-274.

Schmitt, N., Rogers, W., Chan, D., Sheppard, L., & Jennings, D. (1997). Adverse impact and predictive efficiency of various predictor combinations. *Journal of Applied Psychology, 82*(5), 719-730.

Siskin, B. R. & Trippi, J. (2005). Statistical issues in litigation. In F. J. Landy (Ed.), *Employment discrimination litigation: Behavioral, quantitative, and legal perspectives* (pp. 132-166). San Francisco: Jossey-Bass.

Society for Industrial and Organizational Psychology (SIOP). (2003). *Principles for the validation and use of personnel selection procedures* (4th ed.). Bowling Green, OH:  Author.

Spector, P. E. (2003). *Industrial and organizational psychology: Research and practice* (3rd ed.). Hoboken, NJ: John Wiley & Sons.

Wollack, S. (1994). Confronting adverse impact in cognitive examinations. *Public Personnel Management, 23*(2), 217-224.

**APPENDIX A**

**Curriculum Vitae of Dr. Frank J. Landy and Dr. Mark J. Schmit**

# FRANK J. LANDY, PH.D.

## Address

SHL: LITIGATION SUPPORT GROUP
2555 55th Street, Suite 201D
Boulder, CO 80301
Phone: (303) 442-5607
E-mail: frank.landy@shlgroup.com

RESIDENCE:
149 Beavers Drive
Breckenridge, CO 80424
Phone: (970) 453-4506

## Education

| | | | |
|---|---|---|---|
| Villanova University | Psychology | 1960-1964 | B.A. |
| Bowling Green State University | Psychology | 1964-1966 | M.A. |
| Bowling Green State University | Psychology | 1966-1969 | Ph.D. |

## Employment History

| | |
|---|---|
| **1966-1969** | Associate Investigator, U.S. Department of Labor Grant |
| **1967-1968** | National Science Foundation Fellow |
| **1968-1969** | Principal Investigator, U.S. Department of Labor Grant |
| **1969-1973** | Assistant Professor of Psychology, Penn State |
| **1973-1979** | Associate Professor of Psychology, Penn State |
| **1979-1994** | Professor of Psychology, Penn State |
| **1994-Present** | Professor Emeritus, Penn State |
| **1980-1981** | Acting Head, Department of Psychology |
| **1984** | Visiting Professor, Department of Psychology, Stanford University |
| **1985-1988** | Director: Applied Psychology Institute |
| **1988-1994** | Director: Center for Applied Behavioral Sciences |
| **1997-1999** | Visiting Researcher, Department of Psychology, University of California, Berkeley |
| **1984-1998** | President: Landy, Jacobs and Associates, Inc. |
| **1998-Present** | CEO: SHL Litigation Support Group |
| **2005-2008** | Adjunct Professor, Griffith Business School, Griffith University, Queensland, Australia |

## Membership in Professional Organizations

American Association for the Advancement of Science
American College of Sports Medicine
American Psychological Association (Divisions 5, 14, 21, 26, 47)
Human Factors and Ergonomics Society
Mathematical Association of America
Midwestern Psychological Association
National Fire Protection Association
Personnel Testing Council of Northern and Southern California

Psychometric Society
Sigma Xi (Admissions Committee - 1983-1984)
Society for the Study of Organizational Behavior
Society of Industrial and Organizational Psychology

## Honors, Awards, Appointments

| | |
|---|---|
| **1971** | Diplomat Scholar - U.S. Department of State |
| **1971** | Visiting Scientist - APA and NSF |
| **1973** | Distinguished Alumnus - Bowling Green State University |
| **1975-1980** | H. Thomas Hallowell Faculty Fellow (Funded 5 year Research Chair) |
| **1975** | Fulbright Hays Research Fellow (Sweden) |
| **1975** | NATO Senior Lecturer (Human Factors Panel) (Lectured in Norway, England, Scotland, Denmark, and the Netherlands) |
| **1979** | Senior Fulbright Research Fellow (Sweden) |
| **1979** | Fellow - Division 14 of the APA |
| **1980** | Cattell Award for excellence in research design, Division 14 of APA |
| **1981** | Appointed Associate Editor of the <u>Journal of Applied Psychology</u> |
| **1982** | Invited Workshop Leader at the APA Convention (Performance Evaluation) |
| **1983** | Appointed Seminar organizer for 1984 International Congress of Applied Psychology (Acapulco) by International Association for Applied Psychology |
| **1983** | Appointed to Committee on Performance of Military Personnel, National Academy of Term to run until 1985. |
| **1983** | Guest of Academies of Science of Romania, Yugoslavia, Czechoslovakia and Hungary. Presented invited addresses in Cluj (Romania), Ljubljana (Yugoslavia), Budapest and Szeged (Hungary) and Prague (Czechoslovakia) |
| **1983** | IREX Travel Award for lectures in Eastern Europe |
| **1983** | Guest of Nobel Foundation at Nobel Ceremonies, Stockholm, 1983 |
| **1984** | Reviewer for Transportation Research Board:  National Research Council, National Academy of Sciences |
| **1984** | Reappointed Associate Editor of <u>Journal of Applied Psychology</u> |
| **1985** | Program Committee for Division 14 Mid-Year Convention |
| **1985** | Reappointed to Committee on Performance of Military Personnel, National Academy of Sciences.  Four year term. |
| **1985** | Selected for National Academy of Sciences Exchange Program with Eastern Europe - Appointed for exchange with Romanian Academy of Sciences |
| **1985-1986** | Fellowship Committee of Division 14 of the APA |
| **1985-1986** | Elected to Penn State Faculty Senate |
| **1986** | Recipient of the Social Science Award of the College of Liberal Arts - The Pennsylvania State University |
| **1986** | Elected to Membership in the American College of Sports Medicine |
| **1986** | Elected to Membership in Division 47 of the American Psychological Association |
| **1986-1988** | Fellowship Committee of Division 14 of the APA |
| **1988-1991** | Elected to Council of Representatives of the American Psychological Association representing Division 14 |
| **1988** | Invited workshop leader for APA convention (EEO Issues) |
| **1988** | Senior Fulbright Fellowship to lecture in Ljubljana, Yugoslavia |
| **1988** | Elected Fellow of Division 47 of APA (Exercise and Sport Psychology) |
| **1989** | Invited workshop leader for SIOP Convention, Boston, MA; EEO Issues |
| **1989** | Elected President of Division 14 (SIOP) of the American Psychological Association |

| | |
|---|---|
| **1990** | Co-Chair:  Joint APA/NIOSH Conference on Work and Well Being, Washington, DC, November 15-17 |
| **1990-1993** | Appointed to Board of Directors of the Institute for Policy Research and Evaluation |
| **1991** | Chair:  APS Summit of Social and Behavioral Science Societies; Houston, January |
| **1991** | Appointed to Advisory Committee for the 2nd Annual APA/NIOSH Conference on Stress in the Workplace |
| **1991** | Selected as Master Lecturer for 1992 APA Annual Convention, Washington, DC, August |
| **1992** | Master Lecturer:  APA, Washington, DC, August |
| **1992** | G. Stanley Hall Lecturer:  American Psychological Association |
| **1992** | Selected as G. Stanley Hall Lecturer for 1992 APA Annual Convention, Washington, DC, August |
| **1992-1995** | Appointed to Advisory Board of the Council for the International Exchange of Scholars (Fulbright) Program |
| **1992** | Member SIOP Committee to draft Amicus Brief in Soroka v. Dayton Hudson Corporation |
| **1992** | Elected Fellow of Division 21 of APA (Applied, Experimental and Engineering Psychologists) |
| **1992** | Elected Fellow of Division 5 of APA (Division of Measurement) |
| **1992** | Appointed to Panel of the Transportation Research Board - National Research Council:  Fitness for Duty Testing in Transportation Workplace |
| **1993** | Chosen to author <u>Annual Review in Psychology</u> chapter on personnel selection for 1994 volume |
| **1993** | Invited to present Keynote Address at the International Congress of Applied Psychology in Madrid, Spain, July, 1994 |
| **1993** | Presented research lectures by invitation in Moscow under auspices of Moscow State University and Institute for Youth Development |
| **1993** | Invited to present the Annual Gaudet Lecture at Stevens Institute of Technology |
| **1997** | Invited to present keynote address at Industrial and Organizational Psychology Conference -- Australian Psychological Association, Melbourne, Victoria, Australia, June 28-29 |
| **1997** | Invited as participant in Round Table Conference of Australian Academy of Sciences, Melbourne, Victoria, Australia, June 30-July 1 |
| **1997** | Invited to present keynote address at Industrial and Organizational Psychology Conference -- New Zealand Psychological Association, Auckland, New Zealand, July 2-3 |
| **1997** | Invited to present address "The Roots of Applied Psychology" at American Psychological Association Meeting, Chicago, August 16 |
| **1998** | Invited as Chair of Symposium on Eastern European Psychology, International Association of Applied Psychology Meetings, San Francisco, August 9-14 |
| **2000** | Two-year term on the Determination of Disability Committee by the National Academy of Sciences.  The work of the committee was requested by the Social Security Administration and committee members include physicians specializing in occupational medicine, physiologists, and epidemiologists.  Dr. Landy is the sole industrial and organization psychologist on the committee. |
| **2000** | Appointed to Advisory Panel for 4th edition of the SIOP Principles for Validation and Use of Personnel Selection Procedures |
| **2001** | Appointed Honorary President of the Romanian Industrial and Organizational Psychological Association |
| **2002** | Invited lectures at the Australian Graduate School of Management and the Australian Psychological Society on the "Changing Nature of Work," Sydney, Australia – November 13-15 |
| **2002** | Guest Professor at Giessen University, Giessen, Germany. November 18-22 |

**2003**          Invited seminar at Stockholm University, Department of Psychology, "Work in the 21st Century," May 2003

**2003**          Invited address - Ljubljana University (Slovenia), "The Application of Facet Theory to Industrial and Organizational Psychology," July 2003

**2004**          Invited lecture: Herschel W. and Eileen W. Leibowitz Lecture. Penn State University. "Work in the 21st Century," January 2004

**2004**          SIOP Award for Distinguished Professional Contributions

**2004**          Invited address - International Test Commission 2004 Conference on Equitable Assessment Practices, "The Past, Present and Future of Psychometric Legal Challenges," October 2004

**2004**          Member: Board of Directors - Facet Theory Association

## Editorial Duties

**Occasional Reviewer**:

Organizational Behavior and Human Decision Processing
Psychological Bulletin
American Psychologist
Journal of Personality and Social Psychology
British Journal of Psychology
Journal of Applied Social Psychology
Journal of Management Studies (England)
International Journal of Applied Psychology
Accident Analysis and Prevention
Medicine and Science in Sports and Exercise

**Associate Editor:**

Journal of Applied Psychology (APA) (1981-1987)
Human Performance (Erlbaum and Associates) (1992-Present)

**Editor:** Human Performance (Erlbaum and Associates) (1985-1992)

**International Consulting Editor:**          Journal of Occupational Psychology
(British Psychological Society)

**Editorial Board:** Journal of Occupational Behavior

**Editorial Board:** Human Resource Research

**Series Editor:** Prentice-Hall Series in Applied Psychology

**Editor:** Cases in test validity. Journal of Business Psychology
What I have Learned Along the Way. The Industrial-Organizational Psychologist.          (January 2003 – present)

**Series Editor:** Brooks-Cole Series in Industrial and Organizational Psychology

**Co-Editor:** International Handbook of Industrial and Organizational Psychology
(Hogrefe) with Nigel Nicholson (Sheffield)

92

**Editorial Board:** Journal of Occupational Health Psychology

**Appointed to:**  Ediotrial Board of Psihologia Resurselor Umane – 2003

# Books
The Psychology of Work Behavior (with Don Trumbo).  Dorsey Press, 1976.
The Psychology of Work Behavior - Revised Edition (with Don Trumbo).  Dorsey Press, 1980.
The Psychology of Work Behavior.  Dorsey Press, 1985.
The Measurement of Work Performance (with J. L. Farr).  New York: Academic Press, 1983.
Performance Measurement and Theory (with S. Zedeck and J. Cleveland).  Hillsdale, NJ: Erlbaum, 1983.
Psychology:  The Science of People.  Prentice Hall, 1984.
Psychology of Work Behavior.  Student Workbook.  Dorsey Press, 1985.
Psychology of Work Behavior.  Instructor's Manual.  Dorsey Press, 1985.
Readings of Industrial and Organizational Psychology.  Dorsey Press, 1986.
Psychology: The Science of People (2nd Edition).  Prentice Hall, 1987.
The Psychology of Work Behavior (4th Edition).  Brooks-Cole, 1989.
Work in the 21st Century: An Introduction to Industrial and Organizational Psychology (with J. Conte).  New
        York, NY. McGraw Hill, 2004.
Employment Discrimination Litigation: Behavioral, Quantitative, and Legal Perspectives.  San    Francisco:
Jossy-Bass, 2005
Work in the 21st Century: An Introduction to Industrial and Organizational Psychology (with J. Conte).
        Blackwell Publishing Co. (In Preparation).

# Monographs
Performance appraisal:  Theory, method, and logic.  Police Foundation Monograph Series, 1974.

Landy, F. J., & Farr, J. L.  Police performance appraisal.  JSAS Catalog of Selected Documents in Psychology,
        1976, 6(3), 83.

Landy, F. J., Bland, R. E., Buskirk, E. R., Daly, R. E., DeBusk, R. F., Donovan, E. J., Farr, J. L., Feller, I.,
        Fleishman, E. A., Gebhardt, D. L., Hodgson, J. L., Kenney, W. L., Nesselroade, J. R., Pryor, D. B.,
        Raven, P. B., Schaie, K. W., Sothmann, M. S., Taylor, M. C., Vance, R. J., & Zarit, S. H. (1992).
        Alternatives to chronological age in determining standards of suitability for public safety jobs.
        Technical Report, The Center for Applied Behavioral Sciences, Penn State University.

Landy, F. J. (Ed.).  Special issue:  Test validity yearbook:  Volume 2.  Journal of Business and Psychology, 7(4),
        369-482.

# Chapters
Motivational considerations in environmental design.  In Kohn, Imre (Ed.), Crime prevention and control
        through environmental design.  1976.  Westinghouse Learning Corporation.

Development and use of supervisory and peer scales for police performance appraisal (with Jim Farr).  In C. D.
        Spielberger (Ed.), Police selection and evaluation. (pp. 61-75).  New York: Praeger, 1979.

Models of man: Assumptions of theorists.  In N. Nicholson and T. Wall (Eds.), The theory and practice of
        organizational psychology: A collection of original essays.  London, UK: Academic Press, 1982.

Theory and logic in human resources research (with Joseph Vasey).  In Rowland and Farris (Eds.), <u>Research in personnel and human resources management (Vol. 2)</u>.  (pp. 1-34).  Greenwich, CT: JAIPress, 1984.

Methodological problems and strategies in predicting absence (with Joseph Vasey and Fred Smith).  In Goodman, Atkin,  and Associates (Eds.), <u>Absenteeism: new approaches to understanding, measuring, and managing employee absence</u>.  (pp. 110-157).  San Francisco: Jossey-Bass, 1984.

Motivation theory reconsidered (with Wendy Becker).  In L. Cummings and B. Staw (Eds.), <u>Research in organizational behavior (Vol. 9)</u>.  (pp. 1-38).  Greenwich, CT: JAI Press, 1987.

Human computer interactions in the workplace: Psychosocial aspects of VDT use.  In M. Frese, E. Ulrich and W. Dzida (Eds.), <u>Psychological issues of human-computer interaction in the workplace</u>.  (pp. 3-22).  Amsterdam: North Holland Publishing Co., 1987.

The psychology of prolonged exercise (with Rod Dishman).  <u>Exercise and Sports Sciences Review</u>.  American College of Sports Medicine, 1987.

Criteria for selection (with Haleh Rastegary).  In I. Robertson and M. Smith (Eds.), <u>Advances in personnel selection and assessment</u> (pp. 47-65).  Chichester, UK: Wiley, 1989.

Selection of abilities in job analysis.  In S. Gael (Ed.), <u>The job analysis handbook for business, industry, and government.</u>  (pp. 271-189).  New York:  Wiley, 1988.

Some characteristics of "action research."  In A. Enander, B. Gustavsson, J. Ch. Karlsson, & B. Starrin (Eds.), <u>Work and welfare:  Papers from the Second Karlstad Symposium on Work</u> (pp. 257-271).  Karlstad, Sweden:  Research Unit for Work and Working Life, 1991.

Job design and well being.  In G. Keita and S. Sauter (Eds.), <u>Work and well being: An agenda for the 1990s</u>.  (pp. 119-158).  Washington, D.C.: American Psychological Association, 1992.

The concept of validity.  In N. Schmitt and W. Borman (Eds.), <u>Frontiers of Industrial and Organizational Psychology:  Volume 4 - Personnel Selection in Organizations</u>.  (pp. 275-309).  San Francisco:  Jossey Bass, 1992.

The roots of I/O psychology:  Master Lecture Series.  Washington, DC:  APA Publications, 1992.

Job analysis and job evaluation:  The respondent's perspective.  In H. Schuler, J. Farr, and M. Smith (Eds.), <u>Personnel Selection and Assessment</u> (pp. 75-90).  Hillsdale, NJ:  Lawrence Erlbaum, 1993.

The interactions among time urgency, uncertainty, and time pressure (with Haleh Rastegary).  In O. Svenson & J. Maule (Eds.), <u>Time pressure and stress in human judgment and decision making.</u>  (pp. 217-239).  New York:  Plenum, 1993.

Early influences on the development of industrial/organizational psychology.  In T. Fagan and G. VandenBos (Eds.), <u>Exploring applied psychology: Origins and critical analyses.  Master lectures in psychology</u>.  (pp. 83-118).  Washington, D.C.: American Psychological Association, 1993.

Advancing Personnel Selection and Placement Methods (with Laura Shankster-Cawley and Stacey Kohler).  In A. Howard (Ed.), <u>The Changing Nature of Work</u> (pp. 252-289).  San Francisco: Jossey-Bass, 1995.

Foreword to Robert Guion's <u>Assessment, Measurement and Prediction for Personnel Decisions</u>.  Mahwah, NY:  Erlbaum and Associates, 1998.

Charles S. Myers.  In <u>Encyclopedia of Psychology</u>.  Washington, D.C.:  American Psychological Association, in press.

Edwin E. Ghiselli.  In <u>Encyclopedia of Psychology</u>.  Washington, D.C.:  American Psychological Association, in press.

Job analysis.  In B. Green and S. Wigdor (Eds.), <u>Joint service project</u>.  National Academy Press, in production.

Papinchock, J. M. & Landy, F. J. (In Press). The influence of *Daubert* on expert witness testimony -- the human factors context. In Y. Ian Noy and Wademar Karkowski (Eds.) <u>Handbook of Human Factors in Litigation</u>. Boca Raton, FL: Taylor & Francis Books.

Landy, F. J. Preface. In F. J. Landy (Ed.) <u>Employment Discrimination Litigation</u>: Behavioral, Quantitative, and Legal Perspectives.  San Francisco: Jossy-Bass (pp. xv-xix), 2005.

Landy, F. J. Phases of Employment Litigation. In F. J. Landy (Ed.) <u>Employment Discrimination Litigation: Behavioral, Quantitative, and Legal Perspectives</u>.  San Francisco: Jossey-Bass (pp. 3-19), 2005.

Landy, F. J.  A Judge's View: Interviews with Federal Judges about Expert Witness Testimony. In F. J. Landy (Ed.) <u>Employment Discrimination Litigation: Behavioral, Quantitative, and Legal Perspectives</u>.  San Francisco: Jossey-Bass (pp.503-572), 2005.

Outtz, J. L. and Landy, F. J.  Concluding Thoughts. In F. J. Landy (Ed.) <u>Employment Discrimination Litigation: Behavioral, Quantitative, and Legal Perspectives</u>.  San Francisco: Jossey-Bass (pp.575-590), 2005.

Landy, F. J. The Long, Frustrating, and Fruitless Search for Social Intelligence.  In K. R. Murphy (Ed.) <u>A Critique of Emotional Intelligence:  What are the Problems and How can They be Fixed</u>? Mahwah, NJ: Lawrence Erlbaum and Associates, 2005.

Landy, F. J. Ten Answers in Search of a Question. In W. Bilsky and D. Elizur (Eds.) <u>Facet Theory: Design, Analysis, and Applications</u>. Prague, CZ: Zeithamlova Milena, Ing - Agentura Action M. (pp.123-135), 2005.

Landy, F. J. Post-modernism in applied psychology. In Petho, B. (Ed.) <u>Essays in Honor of Bertalan Petho</u>. Budapest: Budapest University Press, (2005)

## <u>Articles</u>

Landy, F. J., & Elbert, A. J. (1967).  Scaling assumptions underlying weighting in job classification systems. <u>Journal of Applied Psychology</u>, <u>51</u>, 442-443.

Sutton-Smith, B., Rosenberg, B. G., & Landy, F. J. (1968).  Father absence effects in families of differing sibling compositions.  <u>Child Development</u>, <u>39</u>, 1213-1221.

Landy, F. J., Rosenberg, B. G., & Sutton-Smith, B. (1969).  The effect of limited father absence on the cognitive development of children.  <u>Child Development</u>, <u>40</u>, 941-944.

Smith, O. W., & Landy, F. J. (1969).  A note on the visual recognition of words.  <u>Perceptual and Motor Skills</u>, <u>29</u>, 83-86.

Smith, O. W., & Landy, F. J. (1969).  Grid vs. graphic scaling of importance and presence of some college experiences.  <u>Perceptual and Motor Skills</u>, <u>29</u>, 146.

Landy, F. J., & Guion, R. M. (1970).  The development of scales for the measurement of work motivation. <u>Organizational Behavior and Human Performance</u>, <u>5</u>, 93-103.

Landy, F. J., & Stern, R. M. (1971).  Factor analysis of a somatic perception questionnaire.  Journal of Psychosomatic Research, 15, 179-181.

Landy, F. J., & Gaupp, L. (1971).  Factor analysis of the FSS-III.  Behavior Research and Therapy, 9, 89-93.

Landy, F. J. (1971).  Motivational type as a moderator of the satisfaction/performance relationship.  Journal of Applied Psychology, 55, 406-413.

Landy, F. J. (1972).  A procedure for occupational clustering.  Organizational Behavior and Human Performance, 8, 109-117.

Guion, R. M., & Landy, F. J. (1972).  The meaning of work and the motivation to work.  Organizational Behavior and Human Performance, 7, 308-339.

Landy, F. J., & Bates, F. (1973).  The non-effect of three variables in mail survey response rate.  Journal of Applied Psychology, 58, 147-148.

Rhoads, R., & Landy, F. J. (1973).  The measurement of attitudes of industrial work groups toward psychology and testing.  Journal of Applied Psychology, 58, 197-202.

Landy, F. J., & Bates, F. (1973).  Another look at contrast effects in the employment interview.  Journal of Applied Psychology, 58, 141-144.

Landy, F. J.  (1974).  The development of scales for the measurement of updating.  American Society for Engineering Education Monograph, 47-54.

Landy, F. J., & Goodin, C.  (1975).  Performance appraisal.  Police Personnel Administration, 165-184.

Landy, F. J. (1976).  The validity of the interview in police officer selection.  Journal of Applied Psychology, 61, 193-198.

Landy, F. J., Farr, J. L., Saal, F. E., & Freytag, W. R. (1976).  Behaviorally anchored scales for rating the performance of police officers.  Journal of Applied Psychology, 61, 548-557.

Saal, F., & Landy, F. J. (1977).  The mixed standard rating scale: An evaluation.  Organizational Behavior and Human Performance, 18, 19-35.

Landy, F. J., & Landy, A. R. (1978).  Dimensions of teacher behavior.  Journal of Applied Psychology, 63, 522-526.

Landy, F. J. (1978).  On the value of true negatives.  American Psychologist, 33, 756-760.

Landy, F. J. (1978).  An opponent process theory of job satisfaction.  Journal of Applied Psychology, 63, 533-547.

Landy, F. J., Barnes, J. L., & Murphy, K. (1978).  Correlates of perceived fairness and accuracy of performance appraisals.  Journal of Applied Psychology, 63, 751-754.

Landy, F. J., & Barnes, J. L. (1979).  Scaling assumptions in behavioral anchoring.  Applied Psychological Measurement, 3, 193-200.

Landy, F. J., & Farr, J. L. (1980).  Performance rating.  Psychological Bulletin, 87, 72-107.

Landy, F. J., Barnes-Farrell, J., & Cleveland, J. (1980).  Perceived fairness and accuracy of performance evaluation: A follow-up.  Journal of Applied Psychology, 65, 355-356.

Landy, F. J., Vance, R. J., Barnes-Farrell, J., & Steele, J. W. (1980).  Statistical control of halo error in performance ratings.  Journal of Applied Psychology, 65, 501-506.

Cleveland, J., & Landy, F. J. (1981).  The influence of rater age and ratee age on two performance judgments.  Personnel Psychology, 34, 19-29.

Landy, F. J., Farr, J. L., & Jacobs, R. R. (1982).  Utility concepts in performance appraisal.  Organizational Behavior and Human Performance, 30, 15-40.

Landy, F. J., Vance, R. J., & Barnes-Farrell, J. (1982).  Statistical control of halo error: A reply.  Journal of Applied Psychology, 67, 177-180.

Landy, F. J. (1982).  What have you done for me lately?  A review of Pay and Organizational Development by E. E. Lawler.  Contemporary Psychology, 27, 282-284.

Landy, F. J., Farr, J. L., & Jacobs, R. R. (1982).  The bottom line in performance evaluation.  Public Productivity Review, VI, 78-92.

Cleveland, J. N., & Landy, F. J. (1983).  The effects of person and job stereotypes on two personnel decisions.  Journal of Applied Psychology, 68, 609-619.

Landy, F. J. (1984).  Industrial psychology.  (Entry in the Social Science Encyclopedia - Routledge and Kegan Paul.)

Committee on Performance of Military Personnel, National Research Council. (1984).  Job performance measurement in the military: Report of a workshop.  Washington, DC: National Academy Press.

Pitariu, H., Landy, F. J., & Becker, W. (1986).  The utility of the Holtzman test as a screening device for long-haul truck drivers.  Romania Psychological Review, 32, 96-103.

Landy, F. J. (1986).  Stamp collecting versus science: Validation as hypothesis testing.  American Psychologist, 41(11), 1183-1192.

Landy, F. J. (1986).  Psychology in Romania.  The Industrial-Organizational Psychologist, 24, 21-25.

Landy, F. J. (1988).  The early years of I/O:  "Dr." Mayo.  The Industrial-Organizational Psychologist, 25, 53-55.

Landy, F. J. (1988).  The early years of I/O:  Hugo Munsterberg and the polygraph.  The Industrial-Organizational Psychologist, 25, 54-56.

Landy, F. J. (1989).  The early years of I/O:  J. D. Houser and J.D.I.  The Industrial-Organizational Psychologist, 26, 63-65.

Sothmann, M., Saupe, K., Jasenof, D., Blaney, J., Fuhrman, S., Woulfe, T., Raven, P., Pawelczyk, J., Dotson, C., Landy, F., Smith, J., & Davis, P. (1990). Advancing age and the cardiorespiratory stress of fire suppression: Determining a minimum standard for aerobic fitness. Human Performance, 3, 217-236.

Pitariu, H. D., & Landy, F. J. (1990). Performance rating of data processing personnel. Man and Work: Journal in Labor Studies, 2, 103-114.

Landy, F. J., & Vasey, J. (1991). Job analysis: The composition of SME samples. Personnel Psychology, 44, 27-50.

Landy, F. J., Rastegary, H., Thayer, J. F., & Colvin, C. (1991). Time urgency: The construct and its measurement. Journal of Applied Psychology, 96, 644-657.

Sothmann, M. S., Saupe, K., Raven, P., Pawelczyk, J., Davis, P., Dotson, C., Landy, F., & Siliunas, M. (1991). Oxygen consumption during fire suppression: Error of heart rate estimation. Ergonomics, 34(12), 1469-1474.

Landy, F. J. (1991). The I/O family tree. The Industrial-Organizational Psychologist, 29, 31-34.

Sothmann, M. S., Landy, F. J., & Saupe, K. (1992). Age as a bona fide occupational qualification for firefighting: A review on the importance of measuring aerobic power. Journal of Occupational Medicine, 34(1), 26-33.

Landy, F. J. (1992). Hugo Munsterberg: Visionary or victim. Journal of Applied Psychology, 77, 787-802.

Landy, F. J. (September, 1992). Eliminating bias in performance ratings. Commissioned by Department of Labor.

Jacobs, R., Mathieu, J., Landy, F., Baratta, T., Robinson, G., Hofmann, D., & Ringenbach, K. (1993). Organizational Processes and Nuclear Power Plant Safety. Report to Proceedings of the International Topical Meeting on Probabilistic Safety Assessment, 211-215.

Landy, F. J. (1993). Basic applied psychology: Which is the cart and which is the horse? Applied Psychology: An International Review, 42(1), 49-51.

Pitariu, H., & Landy, F. J. (1993). Some personality correlates of time urgency. The Review of Romanian Psychology, 37, 15-26.

Landy, F. J., Quick, J. C., & Kasl, S. (1994). Work, stress, and well-being. International Journal of Stress Management, 1(1), 33-73.

Landy, F. J., Shankster, L. J., & Kohler, S. S. (1994). Personnel selection and placement. Annual Review of Psychology, 45, 261-296.

Hofmann, D. A., Jacobs, R. R., & Landy, F. J. (1995). High reliability process industries: Individual, micro, and macro organizational influences on safety performance. Journal of Safety Research, 26(3), 131-149.

Conte, J. M., Landy, F. J., & Mathieu, J. E. (1995). Time urgency: Conceptual and construct development. Journal of Applied Psychology, 80(1), 178-185.

Landy, F. J., (1996). Commentary. Human Performance, 9(3), 297-302.

Landy, F. J., (1997).  Early Influences on the Development of I/O Psychology.
    Journal Of Applied Psychology, 82(4), 467-477.

Conte, J. M., Mathieu, J. E., & Landy, F. J. (1998).  The nomological and predictive validity of time urgency.
    Journal of Organizational Behavior, 19, 1-13.

Kenney, W. L., FACSM, & Landy, F. J. (1998).  Fitness Testing for Firefighters.  ACSM s Health & Fitness
    Journal, 2(4), 12-17.

Landy, F. J. (1998). Fitness Testing and the ADA. IPMA News, October 1998, 18-19.

Landy, F. J. (2001).  Age, race, and gender in organizations.  International Encyclopedia of the
    Social and Behavioral Sciences.  In press.

Landy,  F. J. (2001). Low Ceiling, Poor Visibility. Contemporary Psychology. In press.

Griffin, M. A., Landy, F. J., & Mayocchi, L. (2002) Australian influences on Elton Mayo: The Construct of
    Revery in Industrial Society. History of Psychology, 5(4), 356-375.

Conte, J. M., Dean, M. A., Ringenbach, K. L., Moran, S. K., & Landy, F. L. (2003) The relationship between
    work attitudes and job analysis ratings: Do task rating scale type and task discretion matter?  Human
    Performance. In press.

Landy, F. J. (2003). People Like Us. Intercultural Management Quarterly. Fall, 2003, 3, 8.

Landy, F.J. (2003). People Like Us. Atlantic Monthly. November 2003.

Landy, F. J. (2004). Professional Standards for the Practice of I-O Psychology. The Romanian Journal of
    Industrial and Organizational Psychology. In press.

Landy, F. J. (2005). Some Historical and Scientific Issues Related to Research on Emotional Intelligence.
    Journal of Organizational Behavior, 26, 411-424.

Landy, F. J. (2004). Taking the "or" out of Predictor: A Consideration of the Incremental Validity of Multiple
    Predictors. www.HRM.net (September).

Conte, J. M., Dean, M. A., Ringenbach, K. L., Moran, S.K., & Landy, F. J. (2005). The Relationship Between
    Work Attitudes and Job Analysis Ratings: Do Rating Scale Type and Task Discretion Matter? Human
    Performance, 18, 1-21.

Landy, F. J. (2005). Post-modernism and applied psychology. The Industrial-Organizational Psychologist, 43(1),
    16-24.

Landy, F. J. (2005). That Woman. Psychological Observer. In press.

Landy, F. J. (2005) The Americans with Disabilities Act. Encyclopedia of Industrial/Organizational Psychology.
    In press.

Landy, F. J. (2005) The Equal Pay Act Of 1963. Encyclopedia of Industrial/Organizational Psychology. In
    press.

## *Research Grants/Contracts*

| | |
|---|---|
| **1968** | U.S. Dept. of Labor.  Motivation and Satisfaction of Professional Engineers.  ($14,349) |
| **1970** | National Science Foundation.  Anticipated Satisfaction of Engineering Students.  ($4,600) |
| **1971** | U.S. Department of Justice.  Police Performance Measurement.  ($81,051) |
| **1972** | U.S. Department of Justice Police Performance Measurement.  ($129,782) |
| **1973** | Penn State Instructional Development Grant.  Personalized Instruction System Development for Introductory Psychology.  ($4,100) |
| **1975** | H. Thomas Hallowell Chair in Industrial Psychology (through 1980).  ($75,000) |
| **1976** | Swedish National Board of Education Teacher Style and Student Behavior.  ($4,000) |
| **1977-1981** | Grants from industries for Industrial and Organizational Research and Training Program at Penn State.  ($115,000) |
| **1980** | Office of Naval Research/Office of Personnel Management Conference on Performance Theory and Measurement.  ($31,081) |
| **1980-1984** | Office of Naval Research Developmental Motivation Theory.  ($238,070) |
| **1982** | Office of Naval Research.  Funds for Administering the High School Research Intern Program at Penn State for the Summer of 1982. |
| **1986-1987** | Funding for Applied Psychology Institute from the College of Liberal Arts, Graduate School, West Penn Power Co., Academic Assistance Program (PSU), Pennsylvania State Police, McDevitt and Street.  (Total approximately $70,000) |
| | Continuing Funding for Applied Psychology Institute from State Attorney General's Office, Pennsylvania State Police, Academic Assistance Program.  ($273,000) |
| | Boeing Corporation to Applied Psychology Institute for Study of Cognitive Ability Demands of Middle Level Managers.  ($92,000) |
| | NIOSH - Data Collection on Time Urgency Scales.  ($4,000) |
| **1989-1994** | U.S. Department of Agriculture - Evaluation of OPM Demonstration Project. ($1.8 Million) |
| | Pennsylvania State Police - Special Assignment Placement System.  ($79,000) |
| | Boeing Corporation - Training Program for Management Assessment.  ($46,000) |
| **1990** | Equal Employment Opportunity Commission - Study of Aging and Public Safety.  ($900,000) |
| **1990-1991** | Nuclear Regulatory Commission - Study of Safety in Nuclear Power Plants.  ($600,000) |
| **1991-1992** | American Dietetics Association - In Collaboration with Planning Studies - Development of Self-Assessment Modules:  Phase I.  ($800,000) |

Boeing Helicopters - Work Sample Testing.  ($64,000)

**1992**     Corning - Asahi - Organizational Diagnosis.  ($25,000)

**1992**     Pennsylvania Department of Transportation - Evaluation of Employee Involvement Program.  ($77,000)

**1992**     American Dietetics Association - In Collaboration with Planning Studies - Development of Self-Assessment Modules:  Phase II.  ($770,000)

**1993**     Training and delivery of highway information systems (with Pennsylvania Transportation Institute).  ($69,000)

**1993**     U.S. Department of Defense - Defense conversion initiative in Philadelphia Naval Shipyard.  ($219,000)

## Papers and Presentations

Approximately 600 presentations at conventions, professional meetings, and non-Penn State University Colloquia in the past 30 years.

## External Consulting and Research Contacts

Philadelphia Electric Co.
General Public Utilities:
      Three Mile Island Nuclear Facility
      Oyster Creek Nuclear Facility
PARADE Magazine
Pittsburgh Plate Glass
World Bank
City of New York Personnel Department
New York City Police Department
Personnel Department, City of Philadelphia
RCA
Johnson and Johnson:
      Echo-Ultrasound
      IREX
      Technicare-Denver
CitiBank of New York
CertainTeed Corporation
Stouffer's Frozen Foods Co.
King, Ballow and Little - Law Firm
Pennsylvania State Civil Service Commission
Mexican American Legal Defense Fund
Lewistown Hospital
New Jersey State Civil Service Commission
New Jersey State Attorney General's Office
Gordon, Scheckman and Gordon - Law Firm
Brown-Boveri Corp.
SPS Technologies, Inc.
New York State Civil Service Commission

Foreman and Wickes - Law Firm
City of Columbus (Ohio) Department of Police
City of Columbus (Ohio) Fire Department
City of Columbus (Ohio) City Attorney's Office
City of Akron Department of Law
City of Wilmington (Delaware) Department of Public Safety
State of Maryland
General Public Utility Nuclear Corporation
New York State Department of Law - Attorney General's Office
Minitab
Armstrong World Industries
City of Cleveland - Department of Law
Photomedica - Division of Johnson and Johnson
City of Cleveland - Civil Service Commission
City of Cleveland - Division of Fire
Westmark - A Division of Squibb, Inc.
West Penn Power Co.
City of Denver
State Attorney General's Office of Pennsylvania
Pennsylvania State Police
Eichorn, Eichorn, and Link - Law Firm
Northern Indiana Public Service Co. (NIPSCO)
Gentry and Phillips - Law Firm
Edwin H. Sty - Law Firm
Kraft Foods, Inc.
District of Columbia - Division of Fire
City of Chicago - Division of Law
City of Grand Rapids - City Attorney's Office
Communications Workers of America
Old Bridge Township, New Jersey
Bell Atlantic Corporation
Advanced Technology Laboratories
Swedish Nuclear Inspection Agency
Liquor Enforcement Bureau of Pennsylvania State Police
C. Itoh, Inc.
City of Cincinnati
Commonwealth Court:  Philadelphia
St. Paul Firefighters Union
Illinois State Police
Illinois Attorney General
City of Chicago Police Department
City of Chicago Fire Department
City of Tulsa Civil Service Commission
City of Austin Police Department
Pennsylvania Human Relations Commission
City of Colorado Springs
US West
City of Kansas City, KS, Police Department
City of New York Tests and Measurement
Denver, Colorado City Attorney
SEPTA

Target Stores
Leahy Law Offices
New York City Law Department - Arluck
City of Columbus Bio Data
Communications Workers of America
Lightman Law Offices
City of Buffalo-Department of Law
Stella D'Oro
Heidrick and Struggles
Port Authority of New York and New Jersey
City of Austin - Police Recruitment
City of Tulsa - Civil Service Commission
Lemon Growers
Ethan Allen
United Mine Workers
City of Buffalo Civil Service Commission
NYNEX
Department of Justice
Massachusetts Department of Personnel Administration
EEOC
Computer Science Corporation
Hollington Law Offices
Norfolk Southern
Conybeare Law Offices
City of Franklin, TN
San Mateo County
DuPont
Ceridian
Borough of Juneau, Alaska
City of Sheboygan
PG&E
Monument Mortgage
First Data Corporation
New York State Supervisor Test Assessment
INRTEK
Honda of America Manufacturing, Inc.

## **Litigation Services Consulting and Testimony**

1980   Police Women's Endowment Association v. City of New York (United States District Court)

1981   Guardians v. City of New York (Newman for 2nd Circuit)

1984   Contreras v. Bolger (United States District Court)

1985   United States v. State of New Jersey (United States District Court)

1985   Brunet v. City of Columbus (United States District Court)

1985   McGowan v. State of New York Civil Service Commission (New York State Supreme Court)

1985   Chilles v. State of New York Civil Service Commission (New York State Supreme Court)

1985   United Black Firefighters v. City of Akron (United States District Court)

1985   Dozier v. Chupka (United States District Court)

1986   Brunet v. City of Columbus (United States District Court)

1986    Police Officers for Equal Rights v. City of Columbus (United States District Court)

1987    Brunet v. City of Columbus (United States District Court)

1987    Police Officers for Equal Rights v. City of Columbus (United States District Court)

1987    Brunet v. City of Columbus (United States Circuit Court of Appeals, 6th Circuit)

1987    United States v. City of Philadelphia and the Commonwealth of Pennsylvania (United States District Court)

1987    Dunkle/Rizor/Rice v. West Penn Power Co. (Common Pleas Court of Pennsylvania)

1987    Dennis v. NIPSCO (State Court: South Bend, Indiana)

1987    BLEOA v. City of Akron (United States District Court)

1987    ZAMLEN v. City of Cleveland (United States District Court)

1987    Harris v. City of Jacksonville (State Court: Jacksonville, Florida)

1988    Bailey v. NIPSCO (United States District Court)

1988    Pinder v. Civil Service Commission, City and County of Denver (United States District Court)

1988    Lorandi v. Civil Service Commission, City and County of Denver (United States District Court)

1989    Dunbar v. Cote (Massachusetts Superior Court)

1989    Duffy et al. v. C. Itoh (United States District Court)

1989    Police Officers for Equal Rights v. City of Columbus (United States District Court)

1989    Minnesota Human Relations Commission v. St. Paul (Administrative Law Hearings)

1989    Knight v. Sycamore Manor (United States District Court)

1989    Dowling v. Commonwealth of Pennsylvania (United States District Court)

1990    Dixon v. Margolis (United States District Court)

1990    Frazier v. SEPTA (United States District Court)

1990    Tye et al. v. City of Cincinnati (United States District Court)

1990    Soroka v. Target Stores (California Superior Court)

1991    Youngblood v. City of Cincinnati (United States District Court)

1991    Tucker v. City of Columbus (United States District Court)

1991    Upper Dublin Police Benevolent Assoc. v. Upper Dublin Civil Service Commission (Court of Common Pleas)

1991    Massie et al. v. City of Columbus et al. (Court of Common Pleas)

1991    EEOC v. Stella D'oro Biscuit Co. (United States District Court)

1991    Arluck v. Levitt (Supreme Court of the State of New York, County of New York)

1991    Hispanic Society v. City of New York (United States District Court)

1991    Johnnie v. Penelec

1991    Kinder v. Domino's Pizza, Inc. (Circuit Court, St. Louis, MO)

1991    Wauchop v. Domino's Pizza, Inc.  (United States District Court)

1991    Braxton v. Domino's Pizza, Inc. (Court of Common Pleas)

1992    Gilchrist v. HRA

1992    Runyon v. Belknap ( Circuit Court, Washtenaw, MI)

1993    Beehive v. Domino's Pizza, Inc. (United States District Court)

1993    Vreeland et al v. Ethan Allen Inc. (United States District Court)

1993    Zupo v. Pizza Hut, Inc. (Georgia State Court of Fulton County)

1994    Tiano v. City of Philadelphia.

1994    O'Connor v. Baxter Medical Co.

1994    St. Louis Firefighters Association v. City of St. Louis (United States District Court)

1994  Hatley v. Domino's Pizza, Inc. (Supreme Court of California for the County of Orange)

1994  Serrao v. Teer (Circuit Court of the Third Circuit, Hawaii)

1994  Marcinko v. Domino's Pizza, Inc. (Court of Common Pleas of Luzerne County)

1994  Marrazzo v. Domino's Pizza, Inc. (United States District Court)

1994  Igegneri v. Domino's Pizza, Inc. (Circuit Court of the 17th Judicial Circuit, FL)

1995  Branger v. Trinity Industries (Texas District Court)

1995  Nashville Peace Officers v. Metropolitan Government of Nashville and Davidson County and Fraternal Order of Police (United States District Court)

1995  King v. Domino's Pizza, Inc. (Court of Common Pleas, Ohio)

1995  Burns et al. v. E-Systems, Inc. (United States District Court)

1995  Norris v. DCA (United States District Court)

1995  Krueger v. New York Telephone and NYNEX (United States District Court)

1995  Tourville v. Presbyterian Healthcare Systems et al. (Second Judicial District Court, New Mexico)

1995  Ethical Society of Police v. Board of Commissions and City of St. Louis (United States District Court)

1996  USA v. City of Pontiac (United States District Court)

1996  Moore et al. v. Norfolk Southern Corp. (United States District Court)

1996  Hopkins v. City of Franklin (United States District Court)

1996  Watson v. N.P.C. International et al. (Missouri Circuit Court)

1996  Clymer v. Dueco (Michigan Circuit Court)

1996  Anderson v. Troyer Manufacturing, Inc. et al. (Michigan Circuit Court)

1996  Norris v. Dynamics Corporation of America et al.  (Michigan Circuit Court)

1996  Conde v. County of San Mateo (United States District Court)

1996  Barnes v. Domino's Pizza, Inc. and Corder (Florida Circuit Court)

1996  Bailey v. Spain and NIPSCO (Indiana Superior Court)

1996  Santos et al. v. DuPont (United States District Court)

1996  Leonhartt et al. v. DuPont (United States District Court)

1996  McClinton v. City and Borough of Juneau et al.  (United States District Court)

1996  Miller v. Domino's Pizza, Inc. (District Court of Texas)

1996  Mack v. Domino's Pizza, Inc. (Pennsylvania Court of Common Pleas)

1996  Walker v. UPS (New York Supreme Court)

1996  Cole v. Tiremart et al. (Missouri Circuit Court)

1996  Warfe v. Pizza Hut, Inc. (West Virginia Circuit Court)

1996  Bacon v. Evans and Domino's Pizza, Inc. (Delaware Superior Court)

1996  Epps v. Winn-Dixie Stores et al. (Florida Circuit Court)

1996  Barrentine v. Albritton et al. (Florida Circuit Court)

1996  U.S. Department of Justice v. City of Pontiac (United States District Court)

1996  EEOC v. North Knox School District (United States District Court)

1996  Pryce v. D. Jackson and Associates, Inc. (United States District Court)

1996  Tau Aupiu v. SeaEscape, Ltd. (Florida Circuit Court)

1996  Stauffer v. Metro Edison (Pennsylvania Court of Common Pleas)

1996  USA v. The City of Buffalo (United States District Court)

1996  Burns et al. v. Ceridian (formerly Control Data Corporation) (United States District Court)

1996   Cole v. Tire Mart (United States District Court)

1996   Gately et al. and EEOC v. Commonwealth of Massachusetts et al. (United States District Court)

1996   Van De Weghe v. City of Sheboygan (United States District Court)

1996   Waters v. Georgia-Pacific (United States District Court)

1996   Barr v. Connerty (Florida Circuit Court)

1996   Birth v. J.J.'s Mae et al. (United States District Court)

1996   Rice et al. v. Southern California Edison (United States District Court)

1996   Watson v. Pizza Hut (Missouri Circuit Court)

1997   Griffin v. City of Tulsa (United States District Court)

1997   Nicholas et al. v. NYNEX (United States District Court)

1997   Taylor v. Cline et al. (United States District Court)

1997   Butler et al. v. Home Depot, Inc. (United States District Court)

1997   Gentry et al. v. Nightrider Overnight Copy Service Corporation

1997   Cortazzo v. University of Pittsburg School of Medicine et al. (United States District Court)

1997   McArthur v. Turner et al. (United States District Court)

1997   Postlethwaite v. Robbie Stadium et al. (Florida Circuit Court)

1997   Edwards v. City of Houston v. Houston Police Patrolmen s Union (United States District Court)

1997   Elam v. Emro Marketing Company et al. (Georgia State Court)

1997   Elisha v. Gibbons and Donatos Pizza, Inc. (Indiana Superior Court)

1997   EEOC v. Allen-Bradley Company, Inc. (United States District Court)

1997   Richard et al. v. Bell Atlantic Corporation (United States District Court)

1997   Didion et al. v. United Airlines, Inc. (United States District Court)

1997   Segar et al. v. Reno et al. (United States District Court)

1997   Finelli v. Domino's Pizza, Inc. et al. (Superior Court for the District of Columbia)

1997   Van Dyne v. Domino's Pizza, Inc. et al. (United States District Court)

1997   Ballard v. Carolina Freight et al. (Florida Circuit Court)

1997   Winger v. Bootheel Area Rapid Transportation, Inc. et al. (Illinois Circuit Court)

1997   EEOC v. Groome Transportation Inc. (United States District Court)

1998   Mayfield v. Pizza Hut of St. Louis (Circuit Court for the City of St. Louis)

1998   Shaffer v. Takeout Taxi et al. (Circuit Court of Tennessee)

1998   Jordon v. City of New London (United States District Court)

1998   Osgood v. Florida Power and Light Co. (Florida Circuit Court)

1998   White v. Credit Lyonnais North America, Inc. et al. (United States District Court)

1998   McCullough v. Hubbard Construction Company et al. (Florida Circuit Court)

1998   Adams v. Brookshire Grocery Company (United States District Court)

1998   Hartnett v. Time Life, Inc. et al. (United States District Court)

1998   EEOC v. Adams Marks Hotel (United States District Court)

1998   Arbitration between City of Livonia, Michigan and Livonia Firefighters

1998   Shields v. Domino's (District Court, Clark County, Nevada)

1998   Axtell v. Northwest Airlines (United States District Court)

1998   In Re: Employment Discrimination Litigation Against the State of Alabama et al.; Crum et al. v. State of Alabama et al. (United States District Court)

106

1998    Cameron et al. v. Los Angeles Fire Department (United States District Court)

1998    Magnuson v. Kellogg (United States District Court)

1998    Gutierrez v. Kelly-Springfield/Goodyear (Superior Court of the State of Arizona in and for the County of Maricopa)

1998    EEOC v. Hesco, Inc. (United States District Court)

1998    Betts v. United Air Lines, Inc. (United States District Court)

1998    United States v. City of Garland, TX (United States District Court, Northern District of Texas, Dallas Division)

1999    Doumouras v. Northwest Airlines (United States District Court)

1999    Meacham et al. v. KAPL et al. (United States District Court)

1999    Massey v. NPC/Pizza Hut (Circuit Court of Jefferson County)

1999    Lott v. Pritchett Trucking, Inc. and William M. Wenz

1999    Quintanar et al. v. Reno (United States District Court)

1999    McMenemy v. City of Rochester et al. (United States District Court, Western District of New York)

1999    McTiernan v. City of Rochester et al. (United States District Court, Western District of New York)

1999    Alcorn v. Amtrak et al. (Circuit Court of Jackson County, Missouri at Kansas City)

1999    Blue v. Amtrak et al. (Circuit Court of Jackson County, Missouri at Kansas City)

1999    Lueder v. NIPSCO (Newton Superior Court, Kentland, Indiana)

1999    U.S. v. City of Milwaukee et al. (United States District Court, Eastern District of Milwaukee)

1999    Deuble v. N.A.D., Inc., et al. (Superior Court of Chatham County, State of Georgia)

1999    Butcher v. Tosco Refining Company (United States District Court, Eastern District of Pennsylvania)

1999    Abrams et al. v. General Electric Company (United States District Court, Northern District of New York)

1999    Schwed et al. v. General Electric Company (United States District Court, Northern District of New York)

1999    Hearn et al. v. City of Jackson, MS (United States District, Southern District of Mississippi)

1999    U.S. v. Southeastern Pennsylvania Transportation Authority (United States District Court, Eastern District of Pennsylvania)

1999    Cremin et al. v. Merrill Lynch  (United States District Court, Northern District of Illinois Eastern Division)

2000    EEOC v. Ian Schrager Hotels, Inc. (United States District Court, Central District of California)

2000    Burmeister v. Automatic Data Processing (United States District Court, Northern District of California)

2000    Dorsey v. Sekisui America Corporation, et al.  (Missouri Circuit Court, 22nd Judicial Circuit, St. Louis City)

2000    Dold v. City of Cincinnati (United States District Court)

2000    Woodland v. Tosco Refining Company (United States District Court, Eastern District of Pennsylvania)

2000    Twenter v. Union Pacific et al. (United States District Court, Western District of Missouri)

2000    Bush et al. v. Ogihara America Corp. (United States District Court, Northern District of Alabama, Southern Division)

2000    Bacon et al. v. Honda of America Manufacturing, Inc. (United States District Court, Southern District of Ohio, Eastern Division at Columbus)

2000    Hoffman v. Honda of America Manufacturing, Inc. (United States District Court, Southern District of Ohio, Western Division at Dayton)

2000    Alonso v. Makita USA, Inc., and Home Depot USA, Inc. (United States District Court, Southern District Of Florida, Miami Division)

2000    Reier v. Isuzu Motors America, Inc. (Circuit Court, Fourth Judicial Circuit In and For Duval County, Florida)

2000    Rotolo v. The Planned Industrial Expansion Authority of Kansas City, Missouri (Circuit Court of Jackson County, Missouri at Kansas City)

2000    Drug Enforcement Administration Disciplinary Study - Report

2000    State of New York – Department of Civil Service – Promotion Test Batteries Study

2001   EEOC v. Venator (United States District Court, Southern District of New York)

2001   Carl Tucker et al. v. Taco Bell (United States District Court, Northern District of Alabama, Northeastern Division)

2001   Yarbrough et al. v. Lockheed Martin et al. (United States District Court, Northern District of Georgia, Atlanta Division)

2001   Miami v. Morris & McDaniel, Inc.  (United States District Court, Southern District of Florida)

2001   Barnes v. NYNEX, Inc.  (United States District Court, Southern District of New York)

2001   Gulino v. Board of Education of the City School District of the City of New York (United States District Court, Southern District of New York)

2001   Johnson v. Sherwood Construction Co., Inc.,) United States District Court for the Western District of Missouri

2001   Holtmann v. Meyers (Circuit Court of the City of St. Louis, State of Missouri)

2001   Cotter et al. v. City of Boston (United States District Court – District of Massachusetts)

2001   Bates et al. v. UPS (United States District Court, N.D. California)

2001   Bacon et al. v. Honda of America Manufacturing, Inc. (Exempt) (United States District Court, Southern District of Ohio, Eastern Division at Columbus).

2001   Alonso v. Makita U.S.A., Inc. and Home Depot U.S.A., Inc. (United States District Court)

2002   Simpson v. The Home Depot, Inc. (United States District Court, Eastern District of Kansas, Kansas City Division).

2002   Rodolico v. Unisys Corporation (United States District Court, Eastern District of New York).

2002   King, et al v. MGM Grand Detroit, LLC (Circuit Court for the County of Wayne, 3rd Judicial District, State of Michigan)

2002   U.S. v. The State of Delaware, The Delaware Department of Public Safety, and the Delaware Division of State Police (United States District Court for the District of Delaware)

2002   National Treasury Employees Union v. Internal Revenue Service

2002   Prater v. Waste Management of Missouri, Inc. (Circuit Court of the City of St. Louis, State of Missouri)

2002   Denhof, et al v. Grand Rapids Police Department, et al (17th Judicial Circuit Kent County Circuit Court, State of Michigan)

2002   Garcia, v. Viratec Thin Films, Inc. (United States District Court for the District of Minnesota)

2002   Arnold v. Cargill, Inc. (United States District Court for the District of Minnesota 4th Division)

2002   Lohrenz v. M.M., a minor child (Montana Thirteenth Judicial District Court, Yellowstone County)

2002   Hollifield v. Applewhite; and United Parcel Services, Inc. (District Court of the Fifth Judicial District of the State of Idaho, County of Twin Falls)

2002   EEOC v. TIC  (United States District Court, Eastern District of Louisiana)

2002   Miller, et al. v. Baltimore Gas and Electric Company, et al. (United States District Court, For the District of Maryland, Northern Division)

2003   EEOC v. Burlington Northern Santa Fe Railroad

2003   Garrison, et al. v. Gambro, Inc. and Gambro BCT, Inc., (United States District Court, For the District of Colorado)

2003   Heidlage, v. River Associates, LLC et al. (Circuit Court of Newton County, State of Missouri)

2003   Internal Revenue Service Expert Witness for Tax Specialist Occupation - Report and Arbitration

2003   Office of Federal Contract Compliance Programs, United States Department of Labor v. Whirlpool Corporation, (United States Department of Labor Office of Administrative Law Judges)

2003    Maynard v. Waste Management, Inc., (Court of Common Pleas, Franklin County, Ohio)

2004    Internal Revenue Service Quality Step Increase Arbitration

2004    Gonzalez, et al., v. Abercrombie & Fitch (United States District Court Northern District of California San Francisco/Oakland
        Division)

2004    Medley v. Union Pacific Railroad Company (Circuit Court of the City of St. Louis State of Missouri)

2004    Dalke v. Titan Travel Limited (United States District Court Northern District of California)

2004    Mata v. Illinois State Police (United States District Court Northern District of Illinois, Eastern Division

2004    Longmire v. Los Alamos National Laboratory (United States District Court District of New Mexico)

2005    Cupp v. Fluor Fernald, Inc.  (United States District Court Southern District of Ohio, Western Division)

2005    Contreras v. Thomas Ridge, Secretary, Department of Homeland Security (United States District Court, District of Columbia)

2005    Bradley v. City of Lynn, et al. (United States District Court, District of Massachusetts)

2005    Whitaker v. 3M Company (District Court, Second Judicial District, State of Minnesota)

2005    Moore v. Michael Chertoff, Department of Homeland Security (United States District Court, District of Columbia) Defendant.

2005    Remien v. EMC Corporation (United States District Court, Northern District of Illinois, Eastern Division) Defendant.

# MARK J. SCHMIT, Ph.D.

Senior Testifying Expert
SHL USA Inc.

ADDRESS
SHL USA Inc., Litigation Support Group
2555 55th St. Suite 201D                          Work Phone:  303-998-4310
Boulder, CO  80301-5729                           Cell Phone:    303-521-3190
E-mail: mark.schmit@shlgroup.com

RESIDENCE
1321 Allen Ave.                                   Home Phone:  303-828-4238
Erie, CO  80516

## EDUCATION:

Ph.D., BOWLING GREEN STATE UNIVERSITY, Bowling Green, OH, 1994

Major:          Industrial and Organizational Psychology
Minor:          Quantitative Methods
    Dissertation:   Pre-Employment Processes and Outcomes, Applicant Belief Systems, and Minority-Majority Group Differences.
    Honors:         Charles E. Shanklin Award for Research Excellence, 1993, 1994; BGSU Ph.D. Fellowship, 1994; Freeburne Teaching Award, 1993.

M.A., BOWLING GREEN STATE UNIVERSITY, Bowling Green, OH, 1991
Major:          Industrial and Organizational Psychology
Minor:          Quantitative Methods
    Thesis:         Personality testing for personnel selection: A test of theory and practical issues.
    Honors:         Honorable Mention, National Science Foundation Graduate Fellowship Competition, 1990 & 1991; Charles E. Shanklin Award for Research Excellence, 1992.

B.A., ST. NORBERT COLLEGE, DePere, WI
Major:          Psychology
Minor:          Personnel Administration
    Honors:         Summa cum laude, Presidential Scholarship, Psi Chi Honor Society, William James Award for Outstanding Research, Joseph E. Dorff Award in Psychology, Distinguished Scholastic Achievement Award.

**EMPLOYMENT HISTORY:**

SHL USA INC., Boulder, CO                                         2003 - Present
Senior Testifying Expert
- o   Expert witness for employment discrimination and workplace accident cases.
- o   Write reports for the court describing employer practices as compared to legal guidelines, professional standards, and industry best practices.  Topic areas include personnel selection, promotion, training and development, performance management, compensation, organizational culture, workplace safety, and general management practices.
- o   Conduct psychometric and statistical analysis on tests (and other measurement tools) and data.
- o   Testify in depositions and court hearings providing opinions based on written reports.

COLORADO STATE UNIVERSITY, Fort Collins, CO                      2003 - Present
Affiliate Faculty, Dept. of Psychology
- o   Provide research work and experiential opportunities for Industrial/Organizational Psychology graduate students.  Provide and manage internships.
- o   Present workshops and seminars on expert witness work, personnel selection, promotion, training and development, performance management, compensation, organizational culture, workplace safety, and management practices.
- o   Sit on student dissertation committees.

GANTZ WILEY RESEARCH, Minneapolis, MN                            2002 - 2003
Executive Director Employee Surveys
- o   Managed 15 employees, including 5 psychologists; Responsible for $5 Million P&L.
- o   Managed all phases of operations, including teams of project consultants, project managers, data analysts, IT experts, production and shipping, sales and marketing.
- o   Developed custom and standard employee surveys as diagnostic tools for organizations.
- o   Conducted psychometric and statistical analyses on survey measures and related data.
- o   Presented results of surveys to senior management and worked with them to design organizational action plans and interventions to improve organizational effectiveness and employee satisfaction.
- o   Conducted organizational effectiveness consulting with Fortune 1000 companies.  Trained internal HR staff of client organizations to be organizational effectiveness consultants.

PERSONNEL DECISIONS INTERNATIONAL (PDI) and ePREDIX, INC., Minneapolis, MN
    1997- 2002
Vice President/General Manager- ePredix                          2000 – 2002
- o   Managed M&A search and implementation process for the roll-up of PDI Assessment Solutions (intellectual property provider) and ePredix (technology provider).  Following merger of PDI Assessment Solutions and ePredix – Managed 75 employees including 10 psychologists. Responsible for $10 Million P&L.  Increased sales by 25% over two years.
- o   Managed all phases of operations including teams of consultants, project managers, IT developers and analysts, call center representatives, test scorers, sales, and marketing.
- o   Conducted sales calls as technical expert with account managers.

o  Conducted consulting with organizations on recruitment, selection, promotion, and retention systems.

<u>Vice President – Assessment Solutions - PDI</u>                                    1999 – 2000
   o  Managed 35 employees including 10 psychologists; Responsible for $8 Million P&L.
   o  Managed all phases of operations (excluding IT) including teams of consultants, project managers, call center representatives, test scorers, sales, and marketing.  Two divisions reported to me- Product (Director- Selection Systems) and Custom Consulting (Director- Selection Consulting)
   o  Led the development of pre-employment and promotion tests and assessment centers for client organizations.  Approximately 60% of these assessment tools were custom and 40% product or packaged services.
   o  Conducted psychometric and statistical analyses with measures and related data.
   o  Conducted sales calls as technical expert with account managers.
   o  Conducted consulting with organizations on recruitment, selection, promotion, and retention systems.

<u>Director – Selection Systems - PDI</u>                                            1998 – 1999
   o  Managed 15 employees including 6 psychologists.  Responsible for $3.5 Million P&L. This management position was primarily focused on recruitment, selection, promotion, and retention products.  This position was one of two directors reporting to the VP of Assessment Solutions.  The other director was responsible for custom client offerings.
   o  Led the development of pre-employment and promotion tests (including job/industry-specific knowledge, skill, cognitive ability, situational judgment, leadership personality, general personality, and workplace safety tests,  behavioral interviews, culture fit assessments, and assessment centers) for use as standard product offerings and as part of packaged services.
   o  Conducted psychometric and statistical analyses on assessment measures and related data.
   o  Conducted sales calls as technical expert with account managers.
   o  Conducted consulting with organizations on recruitment, selection, promotion, and retention systems.

<u>Consultant and Senior Consultant- PDI</u>                                        1997 – 1998
   o  Conducted consulting with organizations on recruitment, selection, promotion, and retention systems.  Developed and validated new systems where appropriate.  Conducted training sessions with new system users in client organizations.
   o  Worked on new product development team creating selection tools and conducting validation research on them.  Conducted psychometric and statistical analyses on assessment measures and related data.

PAYLESS SHOE SOURCE, Corporate Office, Topeka, KS                        1996 - 1997
<u>Manager, HR Development</u>
   o  Managed team of 5 employees, including 2 Master's level psychologists.
   o  Managed the training and development function for stores and corporate office.  Developed store manager training modules.  Developed and delivered corporate manager development programs.

    o  Developed buyer/merchandising manager training with President of Payless, Dick Jolosky.

UNIVERSITY OF FLORIDA, Warrington College of Business, Gainesville, FL    1994 - 1996
<u>Assistant Professor of Management</u>
    o  Taught human resources, organizational behavior, and various management courses.
    o  Served as undergraduate advisor.

HUMAN RESOURCE RESEARCH CENTER, University of Florida, Gainesville, FL 1994 - 1996
<u>Research Director</u> – The HRRC was affiliated with Center for Retailing Education and Research at the Warrington College of Business.
    o  Provided HR consulting to national retailers who were members of the Center for Retailing.
    o  Developed and implemented selection, performance management, and training and development systems.

INSTITUTE FOR PSYCHOLOGICAL RESEARCH AND APPLICATION    1990 - 1994
Bowling Green State University, Department of Psychology, Bowling Green, OH
<u>Associate Consultant</u>
    o  Conducted HR and organizational effectiveness consulting under the supervision of my graduate advisor.
    o  Developed and implemented employee orientation programs, selection/promotion systems, employee surveys, performance management, and training and development systems.

EMPLOYERS HEALTH INSURANCE    1984 - 1990
<u>Human Resource Generalist</u>    1988 - 1990
<u>HR Assistant/Intern - Unpaid</u>    1984 - 1988

**MEMBERSHIP IN PROFESSIONAL ORGANIZATIONS**
    American Psychological Association (APA)
    Society for Human Resource Management (SHRM)
    Society for Industrial and Organizational Psychology (SIOP)

**RESEARCH**

**Refereed Publications**:

Schmit, M. J., & Hardy, R. R. (1991). Contingent incentives, education, and peer support: An ecobehavioral program to improve safety belt use among high school students. Journal of Psychology and the Behavioral Sciences, 6, 1-8.

Schmit, M. J., & Ryan, A. M. (1992). Test taking dispositions: A missing link? Journal of Applied Psychology, 77, 629-637.

Schmit, M. J., Amel, E. L., & Ryan, A. M. (1993). Self-reported assertive job seeking behaviors of minimally educated job hunters. Personnel Psychology, 46, 105-124.

Schmit, M. J., & Ryan, A. M. (1993). The Big Five in personnel selection: Factor comparisons of applicant and non-applicant populations. Journal of Applied Psychology, 78, 966-974.

Schmit, M. J., Ryan, A. M., Stierwalt, S. L., & Powell, A. B. (1995). Frame-of-reference effects on personality scale scores and criterion-related validity. Journal of Applied Psychology, 80, 607-620.

Schmit, M. J., & Allscheid, S. P. (1995). Employee attitudes and customer satisfaction: Making theoretical and empirical connections. Personnel Psychology, 48, 521-536.

Ryan, A. M., & Schmit, M. J. (1996). Calculating EEO statistics in the temporary help industry. Personnel Psychology, 49, 167-180.

Schmit, M. J., & Stanard, S. J. (1996). The utility of personality inventories in the employee assistance process: A study of problem police officers. Employee Assistance Quarterly, 11, 21-42.

Ryan, A. M., Schmit, M. J., & Johnson, R. H. (1996). Attitudes and effectiveness: Examining relations at an organizational level. Personnel Psychology, 49, 853-882.

Ryan, A. M., & Schmit, M. J. (1996). An assessment of organizational climate and P-E fit: A tool for organizational change. International Journal of Organizational Analysis, 4, 75-95.

Motowidlo, S. J., Borman, W. C., & Schmit, M. J. (1997). A theory of individual differences in task and contextual performance. Human Performance, 10, 71-83.

Ryan, A. M., Schmit, M. J., Daum, D. L., Brutus, S., McCormick, S. A., & Brodke, M. H. (1997). Workplace integrity: Differences in perceptions of behaviors and situational factors. Journal of Business and Psychology, 12, 67-83.

Raymark, P. H., Schmit, M. J., & Guion, R. M. (1997). Development of an instrument to identify personality-related position requirements. Personnel Psychology, 50, 723-736.

Schmit, M. J., & Ryan, A. M. (1997). Applicant withdrawal: The role of test-taking attitudes and racial differences. Personnel Psychology, 50, 855-876.

Ryan, A. M., Ployhart, R. E., Greguras, G. J., & Schmit, M. J. (1998). Test preparation programs in selection contexts: Self-selection and program effectiveness. Personnel Psychology, 51, 599-621.

Schmit, M. J., Kihm, J. A., & Robie, C., (2000). The development of a global measure of personality. Personnel Psychology, 53, 153-193.

Robie, C., Schmit, M. J., Ryan, A. M., & Zickar, M. J. (2000). Effects of item context specificity on the measurement equivalence of a personality inventory. Organizational Research Methods, 3, 348-365.

Robie, C., Zickar, M. J., & Schmit, M. J. (2001). Measurement equivalence between applicant and incumbent groups: An IRT analysis of personality scales. Human Performance, 14, 187-207.

Robie, C., Born, M. P., & Schmit, M. J. (2001). Personal and situational determinants of personality responses: A partial reanalysis and reinterpretation of the Schmit et al. (1995) data. Journal of Business and Psychology, 16, 101-117.

Naglieri, J. A., Drasgow, F., Schmit, M. J., Handler, L., Prifitera, A., Margolis, A., Velasquez, R. (2004). Psychological testing on the internet: New problems, old issues. American Psychologist, 59, 150-162.

**Book Chapters:**

Motowidlo, S. J., & Schmit, M. J. (1999). Performance assessment in unique jobs. In D. R. Ilgen & E. D. Pulakos (Eds.) The changing nature of work performance: Implications for staffing, personnel actions, and development. San Francisco, CA: Jossey-Bass.

Schmit, M. J., Kihm, J. A., & Robie, C. (2002). The Global Personality Inventory. In B. De Raad & M. Perugini (Eds.), Big Five Assessment. Göttingen, Germany: Hogrefe & Huber.

Schmit, M. J. (in press). Emotional intelligence in the business world. In K. R. Murphy (Ed.), A critique of Emotional Intelligence: What are the problems and how can they be fixed? Mahwah, NJ: Lawrence Erlbaum Associates.

**Papers Under Development/Review:**

Schmit, M. J., Goldman, B., Slaughter, J., Wiley, J. W., & Brooks, S. M. Deontic justice and perceptions of a litigious organizational climate.

McLellan, R. A., Amundson, M., Schmit, M. J., & Robie, C.. Secret shopper ratings as an individual-level criterion for validation studies.

**Presentations:**

Schmit, M. J., Amel, E. L., & Ryan, A. M. (1992, May). Low-skilled job hunters and assertive job-seeking behavior. Paper presented at the 7th Annual Conference of the Society of Industrial and Organizational Psychology, Montreal, Quebec.

Schmit, M. J., & Ryan, A. M. (1992, May). Test taking motivation: A moderator of criterion-related validity. Paper presented at the 7th Annual Conference of the Society of Industrial and Organizational Psychology, Montreal, Quebec.

Schmit, M. J., & Ryan, A. M., & Hazucha, J. F. (1992, May). Personality testing for personnel selection: An integrative theory and empirical evidence. In L. M. Hough (Chair), Incremental validity of personality over ability in predicting job performance. Symposium conducted at the

7th Annual Conference of the Society of Industrial and Organizational Psychology, Montreal, Quebec.

Ryan, A. M., & Schmit, M. J. (1992, July). Validation of an organizational fit instrument. Paper presented at XXV International Congress of Psychology, Brussels, Belgium.

Schmit, M. J., & Ryan, A. M. (1993, April). The big five factor structure in applicant and non-applicant populations. Paper presented at the 8th Annual Conference of the Society of Industrial and Organizational Psychology, San Francisco, CA.

Ryan, A. M., & Schmit, M. J. (1993, April). Assessing organizational fit in employee selection. Paper presented at the 8th Annual Conference of the Society of Industrial and Organizational Psychology, San Francisco, CA.

Hakel, M., Delaney, P., Grisez, M., Hahn, S., Kruger, T., Parker, T., Schmit, M., Volmer, S., & Woods, J. (1993, April). Beyond the classroom: Implementing a graduate student development center. Master tutorial presented at the 8th Annual Conference of the Society of Industrial and Organizational Psychology, San Francisco, CA.

Schmit, M. J., & Hammer, S. L. (1994, April). Personnel selection and the Big Five: Bandwidth and fidelity explorations. Paper presented at the 9th Annual Conference of the Society of Industrial and Organizational Psychology, Nashville, TN.

Johnson, R. H., Ryan, A. M., & Schmit, M. J. (1994, April). Employee attitudes and branch performance at Ford Motor Credit. In N. Rotchford (Chair), Linking Employee Survey Data to Organizational Outcome Measures. Practitioner Forum conducted at the 9th Annual Conference of the Society of Industrial and Organizational Psychology, Nashville, TN.

Ryan, A. M., Brutus, S. Daum, D. L., Schmit, M. J., & Larson, J. R. (1994, April). Effects of negative feedback source on motivation and perceived competence. Paper presented at the 9th Annual Conference of the Society of Industrial and Organizational Psychology, Nashville, TN.

Ryan, A. M., Brutus, S., Daum, D. L., Half-Brodke, M., Schmit, M. J., & Volmer, S. A., (1994, August). Workplace integrity: Differences in perceptions of behavioral and situational factors. Paper presented at the 102nd Annual Convention of the American Psychological Association, Los Angeles, CA.

Hammer, S. L., Schmit, M. J., Ryan, A. M., & Powell, A. B. (1994, August). Frame-of reference effects on personality scale scores and affective reactions. In R. Hogan (Chair), Personality assessment in personnel selection. Paper session conducted at the 102nd Annual Convention of the American Psychological Association, Los Angeles, CA.

Schmit, M. J., Stanard, S. J., & Robie, C. (1995, May). The utility of personality inventories in the employee assistance process. Paper presented at the 10th Annual Conference of the Society of Industrial and Organizational Psychology, Orlando, FL.

Schmit, M. J., & Allscheid, S. P. (1995, May). Employee attitudes and customer perceptions of product-service quality. Paper presented at the 10th Annual Conference of the Society of Industrial and Organizational Psychology, Orlando, FL.

Schmit, M. J., Ryan, A. M., & Powell, A. B. (1995, August). Personality item context effects on criterion-related validity. In L. G. Weiss (Chair), Specifying personality variables in employment contexts. Paper session conducted at the 103rd Annual Convention of the American Psychological Association, New York, NY.

Schmit, M. J., & Motowidlo, S. J. (1996, April). Situational-specificity of interviews and personality tests: Implications for criterion-related validities. In J. A. Collins (Chair), Personality predictors of job performance: Controversial issues. Symposium conducted at the 11th Annual Conference of the Society of Industrial and Organizational Psychology, San Diego, CA.

Ryan, A. M., Ployhart, R. E., Greguras, G. J., & Schmit, M. J., (1997, April). Predicting applicant withdrawal from applicant attitudes. Paper presented at the 12th Annual Conference of the Society of Industrial and Organizational Psychology, St. Louis, MO.

Schmit, M. J., & Ryan, A. M. (1997, April). Frame-of-reference effects in personality testing: An IRT analysis. In T. A. Judge (Chair), Personality: Measurement and conceptual issues and controversy surrounding predictive and constructive validity. Symposium conducted at the 12th Annual Conference of the Society of Industrial and Organizational Psychology, St. Louis, MO.

Schmit, M. J. (1998, April). The development of a global measure of personality. In A.M. Ryan (Chair), Global implication of selection practices: The influence of cultural context. Symposium conducted at the 13th Annual Conference of the Society for Industrial-Organizational Psychology, Dallas, Texas.

McLellan, R. A., Schmit, M. J., Hansen, T., & Olsen, H. E. (1998, April). Issues with personality tests used for personnel selection: Mean difference, adverse impact, and test fairness. In P. R. Sackett (Chair), Race and gender differences on personality measures used in selection. Symposium conducted at the 13th Annual Conference of the Society for Industrial-Organizational Psychology, Dallas, Texas.

McLellan, R. A., Amundson, M., Schmit, M. J., & Blake, R. (1998, April). Shopper ratings as an individual-level criterion for validation studies. In J. I. Sanchez (Chair), Customer service: predictors, criterion, and theory. Symposium conducted at the 13th Annual Conference of the Society for Industrial-Organizational Psychology, Dallas, Texas.

Motowidlo, S. J., Brownless, A. L., & Schmit, M. J. (1998, April). Relations between individual differences in personality, ability, and experience and knowledge, skill, and performance in servicing retail customers. In J. C. Hogan (Chair), Meaning and models of the personality-job performance relation. Symposium conducted at the 13th Annual Conference of the Society for Industrial-Organizational Psychology, Dallas, Texas.

Robie, C., Born, M. Ph., & Schmit, M. J. (1998, July). Personal and situational determinants of personality responses: A partial reanalysis and reinterpretation of the Schmit et al. (1995) data. Paper presented at the 9th European Conference on Personality, Guildford, UK.

Schmit, M. J., Kihm, J. A., & Robie, C. (1999, April). Refining a personality test to be used in selection across several cultures. In W. C. Borman (Chair), Personality and performance: Boundary conditions for measurement and structural models. Symposium conducted at the 14th Annual Conference of the Society for Industrial-Organizational Psychology, Atlanta, GA.

Robie, C., Schmit, M. J., Ryan, A. M., & Zickar, M. (1999, April). Item response theory and frame of reference. In F. Drasgow (Chair), The modeling of personality data in I-O psychology. Symposium conducted at the 14th Annual Conference of the Society for Industrial-Organizational Psychology, Atlanta, GA.

Robie, C., Zickar, M. J., & Schmit, M. J. (1999, May). Measurement equivalence between applicant and incumbent groups on a work-oriented measure of personality. Paper presented at the conference of Applied Personality Psychology: The Intersection of Personality and I/O Psychology, Tulsa, OK.

Schmit, M. J. (2000, April).  Personality testing innovations and development. In P. Roth (Chair), Ask the selection experts.  Roundtable discussion conducted at the 15th Annual Conference of the Society for Industrial-Organizational Psychology, New Orleans, LA.

Schmit, M. J. (2000, April). Evaluating multi-rater data and value from a firm-level perspective. Symposium conducted at the 15th Annual Conference of the Society for Industrial-Organizational Psychology, New Orleans, LA.

Schmit, M. J. (2001, April). Assessments on the Internet. In M. Harris (Chair), The Internet and I-O Psychology: Applications and issues. Symposium conducted at the 16th Annual Conference of the Society for Industrial-Organizational Psychology, San Diego, CA.

Schmit, M. J. (2001, April). Conceptual challenges in cross-cultural testing. Developing and deploying global selection programs: Conceptual and practical challenges. Roundtable discussion conducted at the 16th Annual Conference of the Society for Industrial-Organizational Psychology, San Diego, CA.

Schmit, M. J. (2001, April).  Personality testing for personnel selection. In P. Roth (Chair), Ask the selection experts.  Roundtable discussion conducted at the 16th Annual Conference of the Society for Industrial-Organizational Psychology, San Diego, CA.

Schmit, M. J. (2001, September). Use of psychological measures for online recruitment and pre-employment selection.  In L. Frumkin (Chair), Internet-based assessment: State of the art in testing. Symposium conducted at the 109th Annual Conference of the American Psychological Association, San Francisco, CA.

Hazucha, J. F., Schmit, M. J., & Goff, M. (2002, April). Variations in personality across cultures. In D. Ones (Chair), Personality at work in a cross-cultural context. Symposium conducted at the 17th Annual Conference of the Society for Industrial-Organizational Psychology, Toronto, Ontario, Canada.

Schmit, M. J., Tenopyr, M. L., Barrett, G. V., Campbell, W. J., Arnold, D. W. (2002, April). Women as CEOs: Challenges of Crisis Management. Chair of panel discussion conducted at the 17th Annual Conference of the Society for Industrial-Organizational Psychology, Toronto, Ontario, Canada.

Sari, L. M., Rotolo, C. T., Baker, K. Q., Cohen, D. J., Schmit, M. J., Reynolds, D. H., Scott, J. C. (2003, April). SIOP Committees' Focus: Enhancing the visibility and Brand of I-O Psychology: Visibility and Professional Practice Committees. Roundtable conducted at the 18th Annual Conference of the Society for Industrial-Organizational Psychology, Orlando, FL.

Arad, S., Velez, P., Schmit, M. J, (2003, April). Country liaisons: Providing a conduit between US and International I-O Psychologists. Roundtable conducted at the 18th Annual Conference of the Society for Industrial-Organizational Psychology, Orlando, FL.

Maranto, D. B., Jeanneret, P. R., Kralj, M. M., Schmit, M. J., Scott, J. C. (2003, April). Psychologists consulting in organizations: Can I-O and clinical work together? Conversation Hour conducted at the 18th Annual Conference of the Society for Industrial-Organizational Psychology, Orlando, FL.

Schmit, M. J., Cascio, W. F., Lefkowitz, J. M., Landy, F. J., Sharf, J. C., Murphy, K. R., Seberhagen, L. W. (2004, April). Expert witness discussion hour. Panel discussion conducted at the 17th Annual Conference of the Society for Industrial-Organizational Psychology, Chicago, IL.

Schmit, M. J., Goldman, B., Slaughter, J., Wiley, J. W., & Brooks, S. M. (2005, April). Relationship of organizational fairness and intent to file discrimination charges. In L.A. Snyder (Chair), Predicting diversity-related outcomes: Examining the roles of justice. Symposium conducted at the 20th Annual Conference of the Society for Industrial and Organizational Psychology, Los Angeles, CA.

Schmit, M. J., Pulakos, E. D., Farr, J. L., Denning, D. L., Gutman, A., & Kirkpatrick, M. (2005, April). Retrospective research in complex organizations for legal defensibility. Panel discussion conducted at the 20th Annual Conference of the Society for Industrial and Organizational Psychology, Los Angeles, CA.

Reynolds, D. H., Beaty, J. C., Fallaw, S. S., Mondragon, N. G., Schmit, M. J., Sinar, E. F. (2005, April). You want me to do what? Internet age consulting challenges. Panel discussion conducted at the 20th Annual Conference of the Society for Industrial and Organizational Psychology, Los Angeles, CA.

**SERVICE CONTRIBUTIONS**

Society for Industrial and Organizational Psychology, Membership Committee, 1995-1996; Annual Conference Program Committee (Reviewer), 1994-2004; Core Program Committee, 1998 – 1999, Chair, Professional Practice Committee 2002-2004.

American Psychological Association, Special Advisory Committee to the Boards, Committee on Internet-based Testing, 2002-2004

University of Florida, Athletic Advisory Committee, 1995 – 1996; College of Business Administration, Minority Affairs Committee, 1995 - 1997; Teaching and Advising Awards Committee, 1996; Undergraduate Advisor, 1995-1997.

Society for Human Resource Management, Advisor for local student chapter, University of Florida, College of Business Administration, 1994-1996.

Minnesota Professionals in Psychology Applied to Work, Member of founding Steering Committee, 1998; Secretary, 1998.

Personnel Psychology, Reviewer, 1992 – 2002; Editorial Board, 2002 - present.

International Journal of Selection and Assessment, Reviewer, 1999 – present.  Editorial Board, 2002 - present

Journal of Applied Psychology, Reviewer, 1993 - present.

Human Performance, Reviewer, 1995 – present.

Society of Industrial and Organizational Psychology, May, 1995, Orlando, FL.  Conducted a practitioner pre-conference workshop at the SIOP Annual Conference with R. Guion, entitled "Selecting people with personality."

Society of Industrial and Organizational Psychology,  April, 2000, San Diego, CA.  Conducting a practitioner pre-conference workshop at the SIOP Annual Conference with A. M. Ryan, entitled "Beyond the validation study: Avoiding practical pitfalls when implementing a personnel selection system."

Department of Management & Organizations, University of Iowa,  Advisor Council Member, 2001 - Present.

**CLIENT ORGANIZATIONS (Past or Current)**

ADT
American Health Care Association
Anheuser-Busch
Applebee's International
Bank of America (NationsBank)
Bank One
Big Y Foods
Burlington Northern Santa Fe
Cargill
Charles Schwab & Co.
Children's World
Cooperative Personnel Services (CPS)
Delta Airlines
Deluxe Financial Services, Inc.
U.S. Department of Energy (DOE)
U.S. Drug Enforcement Agency (DEA)
Emergency Medical Corporation
Fifth-Third Bank
Ford
General Mills
Gillette Children's Hospital
Herman Miller
Home Depot
Internal Revenue Service (IRS)
JC Penny
Kelly Services
Key Bank
Kids R Us
Kmart
Lenscrafters
Medica
Medtronic
Northwest Airlines
Novartis
Porter Memorial Hospitals and Clinics
Procter & Gamble
Safeway
S.C. Johnson Wax
Schwan's Sales Enterprises
Sears, Roebuck, and Company
Sprint
State of Florida – Dept of Children & Families
State of Alabama
Stein Mart

Super Valu
Target Corporation
Telstra - Australia
Toys R US
Triangle Plastics
United Technologies
Walgreens
Wal-Mart
Wells Fargo
Zales

**ASSESSMENT PRODUCTS DEVELOPED**
**(Marketed by PDI, ePredix, and many other test distributors world-wide)**

Global Personality Inventory – Omnibus work-related personality test based on Five
        Factor Model – non-culture biased – 12 languages – used world-wide for
        individual assessment of managers and executives
Global Cognitive Ability Test – Cognitive ability test for world-wide individual
assessment
Leadership Inventory (LI) – Test based on personality and leadership behaviors
Leadership Inventory Plus (LI+) – Test based on cognitive ability, personality, and
        leadership behaviors
Leadership Interview Guide (LIG) – Structured behavioral interview guide for selection
        first and second line leaders

**APPENDIX B**

**Case Materials List**

I.    **Client Correspondence**

II.   **Legal Documents**
A.    Complaint, Preliminary and Permanent Injunctive Relief Requested, 2/2/05
B.    Defendant City of Lynn's Answer, Jury Demand and Affirmative Defenses, 2/17/05
C.    Answer of the State Defendants, 3/10/05
D.    Scheduling Order, 3/25/05
E.    Plaintiffs' Rule 26 Disclosure Statement, 4/8/05
F.    Plaintiffs' First Request for Production of Documents to Defendant City of Lynn, 4/8/05
G.    Plaintiffs' First Request for Production of Documents to Defendant Commonwealth of Massachusetts, Division of Human Resources, 4/8/05
H.    Letter to Shannon Liss-Rirodan from Victoria Cole Assistant Attorney General re: Defendant's filing Motion for judgment on the pleadings or for summary judgment, 5/4/05

III.  **Depositions**
A.    Sally McNeely 30(b)(6) taken 6/30/05
1.    Exhibit 3: Personnel Administration Rules, 2/28/03
2.    Exhibit 4: Municipal PAR .10 Certifications, 1996-2005
3.    Exhibit 6: Department of Personnel Administration Memorandum re: Report on the Proposed Passing Point for the Firefighter Entry-Level Exam, 6/16/93
4.    Exhibit 7: Letter to Toni Wolfman from Ruth Bramson re: Report on the Proposed Passing Point for the Firefighter Entry-Level Written Examination Administered on 4/24/04, 8/10/04 (000001-000007)
a.    Attachment F: Codes for Special Responses (000008-000009)
b.    Attachment G: Adverse Impact Ratio for the Overall Examination (000010)
c.    Attachment H: Adverse Impact Quotient by Subject Area (000011-000014)
d.    Letter to Toni Wolman re: Examination Administered on 4/27/02, 8/16/02 (000015-000019)
i.    Attachment H: Adverse Impact Quotient by Subject Area (000020-000021)
ii.   Attachment I: Adverse Impact Analysis by Score (000022-000023)

     iii.  Attachment J: Item Adverse Impact by Exam Subject (000024-000026)

   e.  Massachusetts Fire Departments Job Analysis and Physical Fitness Standards Test Development Report, 12/1995 (000027-000041)

   f.  Commonwealth of Massachusetts Entry-Level Firefighter and Police Officer Medical Standards Update Report, 6/2002 (000042-000064)

   g.  Massachusetts Firefighter Final Validation Report, 6/8/92 (000065-000090)

  5.  Exhibit 8: Affidavit #1 of Sally McNeely, 6/6/05

  6.  Exhibit 9: Mass.gov website Lynn Firefighter Rankings, 1/14/05

  7.  Exhibit 10: 1992 Correspondence to Joel Wiesen from Cathy Cline


**IV. Firefighter Written Examination Documents**

 A.  Letter to Toni Wolfman from Patricia Wada Personnel Administrator re: Report on the Proposed Passing Point for the Firefighter Entry-Level Written Examination Administered on 4/27/02, 8/16/02

  1.  Attachment H: Codes for Special Responses

  2.  Attachment I: Adverse Impact Analysis by Score

 B.  Letter to Harold Lichten from Ronald Kehoe Assistant Attorney General re: enclosed documents for 4/28 meeting, 4/26/05

  1.  Letter from Ruth Bramson Chief Human Resources Officer to Toni Wolfman re: Report on the Proposed Passing Point for the Firefighter Entry-Level Written Examination Administered on 4/24/04, 8/10/04

   a.  Attachment F: Codes for Special Responses

   b.  Attachment G: Adverse Impact Analysis by Total Performance

   c.  Attachment H: Adverse Impact Quotient by Subject Area

  2.  Commonwealth of Massachusetts Entry-Level Firefighter and Police Officer Medical Standards Update Report, SHL USA, Inc., 6/2002

  3.  Massachusetts Firefighter Final Validation Report, Landy, Jacobs and Associates, Inc., 6/8/92

  4.  Massachusetts Fire Departments Job Analysis and Physical Fitness Standards Test Development Report, Landy, Jacobs and Associates, 12/1995

 C.  Firefighter Examinations and Adverse Impact Analyses

  1.  Firefighter Examination, 5/22/93

   a.  Attachment H: Adverse Impact by Score

  2.  Firefighter Examination, 5/9/98

   a.  Attachment H: Corresponding Codes to Request TIA

   b.  Attachment I: Adverse Impact Analysis by Score

   c.  Attachment J: Results by Item

  3.  Firefighter Examination, 4/29/00

a. Attachment I: Adverse Impact Analysis by Score
b. Attachment J: Item Adverse Impact by Exam Subject
4. Firefighter Examination, 4/27/02
a. Attachment I: Adverse Impact Analysis by Score
5. Firefighter Examination, 4/24/04
a. Attachment G: Adverse Impact Analysis by Total Performance
b. Attachment H: Adverse Impact Quotient by Subject Area
D. Firefighter/paramedic certification from 2002 exam issued 5/10/04
1. Name and Address of Applicants Notified to Report for Interview, 5/10/04
2. Letter from Joseph Driscoll Personnel Director re: requesting 60 day extension on certifications, 7/27/04
3. Letter from Joseph Driscoll Personnel Director re: documents to allow appointment of six firefighter/paramedics, 9/14/04
4. Recommendations not to appoint candidates Laura DiFranco, Daniel Quist, David Iarrobino
5. Certification Verifications for Emergency Medical Technician
E. Firefighter rankings with 2002 exam scores
1. Certification from 2002 exam issued 5/21/04
2. Authorization of Employment form for hired firefighters, employment date of 11/29/04
3. Name and Address of Applicants Notified to Report for Interview, 5/21/04
4. Letter from Joseph Driscoll Personnel Director re: candidates selected for appointment, 11/17/04
5. Letter re: John Potenza and Joseph Manzo by-passed for firefighter position with attached reasons, 7/28/04
F. Open Lynn Firefighter List Established 11/1/04 with 2004 exam scores
1. Certification from 2004 exam issued 1/25/05
2. Name and Address of Applicants Notified to Report for Interview, 1/25/05

**V.    Boston Municipality Fire Department Case Documents**
A. Moran Exhibit 6: certification list, 3/11/02
B. Moran Exhibit 7: additional names to certification list, 3/11/02
C. Moran Exhibit 13: certification report, 3/11/02
1. Moran Exhibit 13 marked-up copy
D. Westlaw document *Quinn v. City of Boston*, 325 F.3d 18

**VI.    Expert Reports**
A. Joel Wiesen, Ph.D. Draft Expert Report with attachments, 8/2005

**Expert Report in the Matter of Bradley, et al. v. City of Lynn, et al.**

Joel P. Wiesen, Ph.D.
August 31, 2005

## Table of Contents

1.  My Professional Background and Some Related Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 1

2.  Materials Reviewed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 5

3.  Adverse Impact Calculated by the State Does Not Follow the Method Set Forth in the *Uniform Guidelines* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 6

4.  The Adverse Impact in Hiring is High and Is Greater than the Adverse Impact in Passing. . . . . . . . . . . . . Page 7

5.  The 2002 and 2004 Firefighter Exams Show Adverse Impact as Defined in the *Uniform Guidelines* . . . . . . Page 8

6.  There is Statistically Significant Adverse Impact at the Passing Point . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 9

7.  The High Level of Adverse Impact of the 2002 and 2004 Firefighter Exams Is Part of a Pattern. . . . . . . . . . Page 9

8.  The Item-Level, Post-Test Statistical Analyses Done by the State Were Not Properly Interpreted. . . . . . . . . Page 9

9.  The State Seems to Have Been Unaware of the Adverse Impact of the 2002 and 2004 Firefighter Exams . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 10

10. There is Insufficient Evidence of Examination Validity. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 11

11. The *Uniform Guidelines* Explicitly Rule Out Assumptions of Validity. . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 11

12. The State Did Not Report Average Exam Scores for White and Minority Applicants. . . . . . . . . . . . . . . . . . Page 12

13. It Has Not Been Shown that the 2002 and 2004 Exams Measure the Same Areas as Landy's 1993 Exam. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 12

14. The Firefighter Task List Shows Apparent Gaps in Content. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 13

15. There Would Have Been Less Adverse Impact if the State Used Landy's Suggestion to Rank Based on a Combination of the Physical Performance and Written Tests. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 14

16. The Estimated Adverse Impact of Ranking Based on a Combination of the Physical Performance and Written Tests. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 14

17. There Is No Indication that Alternative Selection Procedures Were Considered. . . . . . . . . . . . . . . . . . . . . . Page 14

18. The Orientation Materials Are Likely to Confuse the Less Test-Wise Applicants. . . . . . . . . . . . . . . . . . . . Page 15

19. Advances in the Field, 1993 to 2003 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 16

20. There Are Alternative Selection Procedures with Less Adverse Impact . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 17

21. Some State and Local Jurisdictions Use Alternative Selection Procedures for Firefighter. . . . . . . . . . . . . . Page 17

22. Alternative Selection Procedures Can Be Practical to Implement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 18

**Expert Report in the Matter of Bradley, et al. v. City of Lynn, et al.**

Joel P. Wiesen, Ph.D.
August 31, 2005

1. **My Professional Background and Some Related Information**
    A. **Education, Professional Experience and Qualifications**
        I was awarded a Ph.D. in Psychology from Lehigh University in 1975. My major field of doctoral study was psychology and my minor field of study was psychometrics. Since 1975, I have worked in that area of psychology known as industrial psychology, particularly in the development of fair, valid personnel assessment methods and instruments for the assessment, selection and promotion of employees. I have taught college courses industrial psychology, experimental methods, and statistics at the undergraduate and graduate levels. For over 15 years I worked for the Department of Personnel Administration, later called the Human Resources Division, of the Commonwealth of Massachusetts. I was hired to lead the program to validate all civil service examinations, and for some of my tenure I was in charge of all test development and validation. Also while employed there I was charged with developing two job performance evaluation systems, one for all state managers (covering about 3,000 employees) and the other for all non-managerial state employees (covering perhaps 50,000 employees). Since I left the employ of the Commonwealth of Massachusetts, my professional work has consisted mainly of consulting to large organizations and municipalities on personnel assessment and selection matters, and developing new written tests for government, business/industry and education. I have served as President of the International Personnel Management Association Assessment Council (IPMAAC), an organization of over 500 testing professionals, and as President of the New England Society for Applied Psychology (NESAP), a Boston-area association of applied psychologists. From 1989 to 2005 I served on the Program Committee for at least seven conferences of the annual conference of the Society for Industrial and Organizational Psychology, a national, professional group of several thousand members. I have served as an expert in employment discrimination cases, including age, race, and sex discrimination cases, a few of which have gone to trial. I have served as an expert consultant on testing matters for the Massachusetts Attorney General's Office, the Connecticut Department of Administrative Services, the Connecticut Attorney General's Office, and the US Department of Justice, as well as several large private sector organizations. I have lectured and published in the areas of personnel assessment, employment discrimination, and civil service examining. I have made presentations before professional groups, including several invited addresses. I am licensed as a psychologist in Massachusetts and Pennsylvania. A copy of my resume is attached to

this report. (See Attachment A.)

## B. Publications and Papers

What follows is a list of the publications I have authored and the papers presented at professional meetings in the past ten years. Where these were authored with others, it is so noted.

(1995, September) *Firefighter Selection With Low Adverse Impact*. Paper presented at the Mid-Atlantic Personnel Assessment Council Conference, New York, NY.

(1996, June) *Firefighter Selection With Low Adverse Impact: A Validation Study*. Paper presented at the annual meeting of the International Personnel Management Association's Assessment Council, Boston, MA.

(1996, June) *A Crash Course in Personnel Selection*. Pre-conference training program presented at the annual meeting of the International Personnel Management Association's Assessment Council, Boston, MA. (with T. R. Lin, Ph.D. and K. Shultz, Ph.D.)

(1996, June) *Illusive Teamwork KSAPs [knowledges, skills, abilities, and personal characteristics], A Second Validation Study*. Paper presented at the annual meeting of the International Personnel Management Association's Assessment Council, Boston, MA. (with M. McDaniel, Ph.D.)

(1996, September) *Two Case Histories in Personnel Selection Involving Work Force Diversity and Selecting Team Members*. Invited presentation to the New England Society of Applied Psychologists (NESAP) in Newton, MA.

(1997) Adverse Impact and Testing, *NESAP News*, vol. 2, Issue 1.

(1997, June) *A New Approach to Measuring Mechanical Aptitude*. Paper presented at the annual meeting of the International Personnel Management Association's Assessment Council, Newport Beach, CA.

(1997, June) *A Crash Course in Personnel Selection*. Pre-conference training program presented at the annual meeting of the International Personnel Management Association's Assessment Council, Newport Beach, CA. (with T. R. Lin, Ph.D. and K. Shultz, Ph.D.)

(1997, June) *Firefighter Selection With Low Adverse Impact: A Replication*. Paper presented at the annual meeting of the International Personnel Management Association's Assessment Council, Newport Beach, CA.

(1998, May) *Development of a New Test of Mechanical Aptitude.* Invited presentation to the New England Society of Applied Psychologists (NESAP), Newton, MA.

(1999, June) *A Review and Critique of Published Aptitude Tests for Computer Programmer.* Paper presented at the annual meeting of the International Personnel Management Association's Assessment Council, Trade Winds Resort, FL.

(1999, June) *The WTMA: a Measure of Mechanical Aptitude With Reduced Adverse Impact.* Paper presented at the annual meeting of the International Personnel Management Association's Assessment Council, Trade Winds Resort, FL.

(2000, June) *Content-Oriented Cultural Bias Review of Test Questions.* Paper presented at the annual meeting of the International Personnel Management Association's Assessment Council, Arlington, VA.

(2001) *Technical Manual for the Diagnostic Test of Pre-Algebra Math (DT-PAM).* Applied Personnel Research, Newton, MA.

(2001, April) *Reducing Adverse Impact While Maintaining Validity; The Public Sector Experience: Some Possible Reasons for Adverse Impact.* Paper presented at the Annual Conference of the Society for Industrial and Organizational Psychology, San Diego, CA.

(2001, May) *Using Tests to Minimize Adverse Impact While Maintaining Validity.* Invited presentation to the Recruitment and Hiring Seminar of the Massachusetts Chiefs of Police Association Westborough, MA.

(2001, June) *Development of a New Test for Computer Programmer/Analyst Aptitude.* Paper presented at the annual meeting of the International Personnel Management Association's Assessment Council, Newport Beach, CA.

(2001, June) *Tutorial: Review of Multiple-Choice Test Items, With Emphasis on Cultural Bias.* Presented at the annual meeting of the International Personnel Management Association's Assessment Council, Newport Beach, CA.

(2002, April) *Review of Written, Multiple-Choice Test Items, With Some Emphasis on Cultural Bias.* Paper presented at the Annual Conference of the Society for Industrial and Organizational Psychology, Toronto, Canada.

(2002, July) *Developing Defensible Written Test Questions: Art, Science, and Some Guidelines* (with I. Gast, Ph.D. and D. Hamill). Paper presented at the annual meeting of the International Personnel Management Association's Assessment Council, New Orleans, LA.

(2002, July) *The PCBS: A Quantified, Public Safety Candidate Background Self-Report Instrument.* Paper presented at the annual meeting of the International Personnel Management Association's Assessment Council, New Orleans, LA.

(2002, October) *Some Possible Reasons for the Black-White Mean Score Differences Seen With Many Cognitive Ability Tests.* Paper presented at the annual meeting of the Institute for the Study and Promotion of Race and Cultures, Boston, MA.

(2003) *How to Prepare for the Mechanical Aptitude and Spatial Relations Tests.* Barrons Educational Series, Hauppauge, NY.

(2003) *Technical Manual For The Diagnostic Test for High School Math (DT-HSM),* Applied Personnel Research, Newton, MA.

(2003) *Technical Manual For The Language-Free Computer Programmer/Analyst Aptitude Test (LPAT),* Applied Personnel Research, Newton, MA.

(2003) *Technical Manual For The Police Candidate Background Self-Report (PCBS),* Applied Personnel Research, Newton, MA.

(2003) *Guidelines and Suggestions for Avoiding Cultural Bias in Multiple-Choice Test Questions.* Reprinted by the ERIC Clearinghouse on Counseling & Student Services (ERIC/CASS), in the 2003 ERIC/CASS publication, Measuring Up: Assessment Issues for Teachers, Counselors, and Administrators, edited by Janet Wall and Garry Walz.

(2003, June) *An In Depth, Content Review of Spatial Ability Tests.* Paper presented at the annual meeting of the International Personnel Management Association's Assessment Council, Baltimore, MD.

(2003, June) *The Potential of Diagnostic Math Tests.* Paper presented at the annual meeting of the International Personnel Management Association's Assessment Council, Baltimore, MD.

(2004, October) Adverse Impact: Theory & Practical Approaches
Invited Address to the MAPAC Training Workshop, New York, NY.

Page 4

(2005, June)  Innovative, Psychometrically Sound Approaches to Hiring Firefighters, Member Showcase Presentation to the New England Society for Applied Psychology, Weston, MA.

(2005, June) *Statistical Support of Test Fairness Reconsidered*.  Paper presented at the annual meeting of the International Personnel Management Association's Assessment Council, Orlando, FL.

(2005, June) *Minimizing Adverse Impact: Learning from some Serious Flaws in the Wonderlic Personnel Test*.  Paper presented at the annual meeting of the International Personnel Management Association's Assessment Council, Orlando, FL.

### C. Compensation
I am being compensated at my usual rate of $185/hour for all work on this matter.

### D. Court Appearances and Deposition
Within the past four years I have appeared as an expert at trial or by deposition in connection with the following matter.

> Terry Urban vs. Haliburton Energy Services, Inc., February, 2004
> Charleston, West Virginia
> I testified for the claimant at a binding arbitration hearing.

2. **Materials Reviewed**
In preparing this report I reviewed the following written documents concerning the Massachusetts Firefighter examinations.  Items a through s were provided to me by Attorney Lichten. The other two items were located by me on the HRD website.

    a.  Exhibit 3: Personnel Administration Rules dated February 28, 2003, PAR 10. Special Certifications in the Civil Service
    b.  Exhibit 4: Municipal PAR-10 Certifications 1996-2005
    c.  Exhibit 6: Department of Personnel Administration Memorandum from Dennis to Dumont via Hartnett dated June 6, 1993
    d.  Exhibit 7: Letter from Bramson to Wolfman dated August 10, 2004
    e.  Attachment F, Codes for Special Responses, Bates stamped pages 000008
    f.  Attachment G, Firefighter Examination-April 24, 2004; Adverse Impact Analysis by Total Performance, Bates stamped pages 000009-000010
    g.  Attachment H, Firefighter Examination-April 24, 2004; Adverse Impact Quotient by Subject Area, Bates stamped pages 000011-000014
    h.  Letter from Wada to Wolfman dated August 16, 2002, Bates stamped pages 000015-000019

I.  Attachment H, Bates stamped pages 000020-000021

j.  Attachment I, Firefighter-April 27, 2002; Adverse Impact Analysis by Score, Bates stamped pages 000022-000023

k.  Attachment J, Firefighter Entry Level Examination (April 27, 2002); Item Adverse Impact by Exam Subject, Bates stamped pages 000024-000026

l.  Massachusetts Fire Departments Job Analysis and Physical Fitness Standards Test Development Report, Bates stamped pages 000027-000041

m.  Commonwealth of Massachusetts Entry-Level Firefighter and Police Officer Medical Standards Update Report, Bates stamped pages 000042-000064

n.  Massachusetts Firefighter Final Validation Report, June 8, 1992, Bates stamped pages 000065-000090

o.  Exhibit 8: Exhibit A-Affidavit #1 of Sally McNeely, June 6, 2005

p.  Exhibit 9: Public Safety Standings as of Friday, January 14, 2005; Firefighter Rankings; Lynn

q.  Exhibit 10: Letter from Landy to Wiesen dated April 17, 1992, with stapled comments and additions

r.  Transcript and Testimony of 30 (b) (6) of Sally McNeely; June 30, 2005

s.  Frank Landy and Mark Schmit's Expert Report in Bradley et al. v. City of Lynn et al.

t.  Massachusetts Fire Departments Task List
File name: fire_fighter_essential_functions.htm
Downloaded on 12/28/04 from the Massachusetts government website
(See Attachment B.)

u.  2004 Entry Level Firefighter Examination Orientation and Preparation Guide
File name: 2004_firefighter_examination_orientation_and_preparation_guide.pdf
(See Attachment C.)

3.  **Adverse Impact Calculated by the State Does Not Follow the Method Set Forth in the *Uniform Guidelines* .**

In several documents, the State reports "adverse impact" of the 2002 and 2004 Firefighter exams based on dividing the applicants for each exam into two groups, those who pass the exam and those who fail the exam. (See, for example, paragraph 5 on Bates stamped page 000005 of Exhibit 7: Letter from Bramson to Wolfman dated August 10, 2004, which is referenced in the paragraph numbered 2, above.) However, the federal *Uniform Guidelines on Employee Selection Procedures* (Section 60-3, U.G.E.S.P. (1978); 43 FR 38295 (August 25, 1978)), referred to below as the *Uniform Guidelines,* envision calculating adverse impact based on dividing applicants into a different two groups, those who are hired and those who are not hired.

Two approaches to evaluating the bottom line are given in the *Uniform Guidelines*, in Section 3.4, 4D, titled, "Adverse impact and the 'four-fifths rule'." First, this part of the *Uniform Guidelines* describes the four-fifths (4/5, or eighty percent) rule of thumb. According to this rule of thumb, adverse impact is present if the hiring rate of the protected class is less than 80% the hiring rate of the group with the highest rate. (A hiring rate is

simply the number of people hired divided by the number of job applicants. For example, if 15 Hispanics applied for a job and 3 of them were hired, the hiring rate would be 3 divided by 15, or one-fifth or 20%.) Determination of adverse impact was clarified in a set of questions and answers issued in March, 1979 (Federal Register, March 2, 1979) by the federal agencies that enforce Title VII of the 1964 Civil Rights Act, as amended. Specifically Question 12 is titled, "How is adverse impact determined?" The answer to Question 12 shows the well-known ratio of the percent of protected class applicants hired (referred to there as the selection rate) to the percent of white applicants hired. This and other parts of the *Uniform Guidelines* indicate that adverse impact is first and foremost evaluated based on applicants hired, the so-called "bottom line."

Second, Section 3.4, 4D of the *Uniform Guidelines* goes on to say that smaller differences in hiring rates may constitute adverse impact if the differences are significant in both statistical and practical terms.

Using the passing and failing applicants to calculate adverse impact is not the same as using the hired and not hired applicants to calculate adverse impact. The numbers that go into the calculations are different and the resulting adverse impact ratios will almost always be different.

4. **The Adverse Impact in Hiring is High and Is Greater than the Adverse Impact in Passing.**

The level of adverse impact of the Massachusetts Firefighter examination is high when calculated based on persons hired or not hired, despite the relatively lower adverse impact calculated based on persons who pass or fail the examination. For example, for the 2004 Firefighter examination, if the effective cut score is 95 then the adverse impact is .2074, while the adverse impact at a score of 70 is .8055 (these figures are taken from the document referred to above as Attachment G, Bates stamp number 000009- 000010). (The effective passing point, or cut score, is the lowest exam score for a person appointed from the exam, absent special preferences granted by MGL Chapter 31 or the PARs.) As another example, for the 2002 Firefighter examination, if the effective cut score is 95 then the adverse impact is .2109, while the adverse impact at a score of 70 is .8009 (these figures are taken from the document referred to above as Attachment I, Firefighter-April 27, 2002; Adverse Impact Analysis by Score, Bates stamped pages 000022-000023).

In the past, when the court order in NAACP v Beecher was in effect, the adverse impact calculated at the passing point was important since black and Hispanic applicants who passed the exam were given certain preference in the certifications. Now the (lower) adverse impact calculated at the passing point is of little practical use, since all appointments are made in rank order, other than appointments of certain veterans and other groups granted special certification privileges under MGL Chapter 31 or the PARs.

As described above, as defined in the *Uniform Guidelines* adverse impact primarily

concerns the bottom line (i.e, applicants hired or not hired). Absent veterans' and other similar preferences, the adverse impact calculated at the passing point would be completely irrelevant, since then no people at or near the passing point would be appointed, due to the large number of applicants scoring well above the passing point.

If adverse impact is calculated at the passing score, it is always possible to make the adverse impact of an exam satisfy the 80% rule simply by lowering the passing score. (If the lowered passing score has little or no impact on hiring, then this is an artificial, misleading approach to lowering the adverse impact.) If the passing score is lowered sufficiently, 100% of both minority and non-minority candidates will pass, with a resulting adverse impact ratio of 1.0, which satisfies the 80% rule. Similarly, if the passing score is lowered to a point where 80% of the minority applicants pass, then the even if 100% of non-minority candidates pass, the adverse impact ratio will be no lower than .8, which satisfies the 80% rule. The very high passing rate on the 2004 Firefighter examination, 94.3% (see Exhibit 7: Letter from Bramson to Wolfman dated August 10, 2004, paragraph 2), and the passing rate of minority candidates of .7775 (see Attachment G, Firefighter Examination-April 24, 2004; Adverse Impact Analysis by Total Performance, Bates stamped page 000009) are consistent with this misleading approach to reducing adverse impact.

5. **The 2002 and 2004 Firefighter Exams Show Adverse Impact as Defined in the *Uniform Guidelines***

When adverse impact is evaluated using either or both of the approaches (80% rule of thumb and test of statistical significance) described in the federal *Uniform Guidelines*, both the 2002 and 2004 Firefighter exams show adverse impact.

Using the four-fifths (or .80 or 80%) rule, there is adverse impact seen with both the 2002 and 2004 exams. Tables 8 through 11 of Frank Landy and Mark Schmit's Expert Report in Bradley et al. v. City of Lynn et al. (referenced in the paragraph numbered 2, above) show that the adverse impact in hiring for the 2002 and 2004 exams at the examination scores which reflect hiring decisions (the "effective cut score") is less than .4, which is less than the 4/5 rule of thumb.

Using the statistical significance approach, there is adverse impact seen with both the 2002 and 2004 exams. Tables 8 through 11 of Frank Landy and Mark Schmit's Expert Report in Bradley et al. v. City of Lynn et al. (referenced in the paragraph numbered 2, above) show that the adverse impact in hiring for the 2002 and 2004 exams calculated at the exam scores which reflect hiring decisions (the "effective cut score") is highly statistically significant, a finding I replicated myself using the widely used statistical software known as SPSS.

Parenthetically, I mention that Landy defines effective and nominal passing points, and I will only briefly note, again, that the effective passing point is the lowest examination score for a person appointed from an examination absent special preferences granted by MGL

Chapter 31 or the PARs, and the nominal passing score, set by the state for both the 2002 and 2004 exams, is 70%.

In summary, whites are hired at disproportionately higher rate than blacks or Hispanics separately or together, and this difference constitutes adverse impact as defined by the *Uniform Guidelines*.

6.  **There is Statistically Significant Adverse Impact at the Passing Point**
    The state says the 2002 and 2004 exams for Firefighter do not run afoul of the 80% rule of thumb (calculated based on the passing point) and so do not show adverse impact. However, the *Uniform Guidelines* suggest this rule of thumb as only one of two approaches. The *Uniform Guidelines*, in Section 3.4, 4D, says that differences in hiring rates smaller than 4/5 may constitute adverse impact if the differences are significant in both statistical and practical terms. The adverse impact at the passing point is statistical significant, and the practical significance is obvious, as no one who fails may be hired.

    Using the statistical significance approach, there is adverse impact seen with both the 2002 and 2004 exams. Tables 4 and 5 of Frank Landy and Mark Schmit's Expert Report in Bradley et al. v. City of Lynn et al. (referenced in the paragraph numbered 2, above) show that the adverse impact in hiring for the 2002 and 2004 exams calculated at the passing point of 70% (the "nominal cut score") is highly statistically significant, a finding I replicated myself using the widely used statistical software known as SPSS.

7.  **The High Level of Adverse Impact of the 2002 and 2004 Firefighter Exams Is Part of a Pattern.**
    Previously administered entry-level Firefighter examinations in Massachusetts going back to before NAACP v Beecher have had adverse impact in appointments, absent hiring preferences under NAACP v Beecher. For example, the 2002 exam had an effective adverse impact of .376 on blacks, as may be seen in Table 8 of Frank Landy and Mark Schmit's Expert Report in Bradley et al. v. City of Lynn et al. (referenced in the paragraph numbered 2, above). Given this pattern of adverse impact, the state should have anticipated that the 2002 and 2004 written examinations would have adverse impact in hiring, absent a substantial change in the format and content of the examination. In not deviating from its past practice of using this type of written exam for ranking, the state was virtually assuring adverse impact in hiring would occur with the 2002 and 2004 examinations.

8.  **The Item-Level, Post-Test Statistical Analyses Done by the State Were Not Properly Interpreted.**
    The state conducted some post-test statistical analyses on individual test items. (A set of these analyses are reported in Attachment H, Firefighter Examination-April 24, 2004; Adverse Impact Quotient by Subject Area, Bates stamped pages 000011-000014, and Exhibit 7: Letter from Bramson to Wolfman dated August 10, 2004, in the last paragraph of page 5, both documents referenced in the paragraph numbered 2, above.) (The professional testing

Page 9

literature often uses the terms "test item" or "item" to refer to a test question, and I also use these terms synonymously here. Similarly, I use the terms test, examination and exam synonymously in this report.) Although these analyses were non-standard, and although they use the term adverse impact to refer to ratios of difficulties for a single item for various subgroups of applicants, which is not the way the *Uniform Guidelines* uses the term, the analyses could be interpreted in a meaningful fashion. However, the state seemingly misinterpreted the analyses to mean the test items did not have much adverse impact, since the ratios they calculated were more than .8 (i.e., more than the 80% rule of thumb); a misleading interpretation. First, this type of an interpretation seems to imply some sort of equivalence between the adverse impact ratio calculated for test items and the adverse impact of the hiring based on the exam. But such an equivalence is an incorrect interpretation. The item ratios and the adverse impact ratio of the hiring rates measure different things, and are not related in any simple mathematical fashion. Second, it is important to note that each of the item-level ratios was less than unity (1.0). The proper interpretation of the state's analysis is that it reflects severe adverse impact, for the following reason. When one adds up the "little" adverse impact on each of 100 test questions, one gets a total score with large adverse impact: since all the differences are in the same direction and in the favor of whites, the sum will show a large difference in the favor of whites. A simplified example will clarify how this works. If each test question had 95% of the white applicants correctly answering the question and 85% of the minority applicants correctly answering the question, the adverse impact ratio for each item would be .89 (since .85 divided by .95 equals .89). The state would seem to interpret this as meaning each and every test item is showing no adverse impact. However, the corresponding average score on a 100 item examination would be expected to be 95 for whites and 85 for minority applicants. That is a difference of 10 points. A difference of 10 points is average score is large enough to cause severe adverse impact against minority applicants in hiring. In any case, there is no indication that the state correctly interpreted the ratios reported in Attachment H as cause for serious concern about the adverse impact of the examination. Although I discuss here the 2004 examination, the same comments apply to the parallel analyses conduced by the State on the results of the 2002 examination.

A similarly non-standard statistical analysis is reported in the last paragraph of page 6 of Exhibit 6: Department of Personnel Administration Memorandum from Dennis to Dumont via Hartnett dated June 6, 1993, which is referenced in the paragraph numbered 2, above. Dennis claims there is no adverse impact because the ratios of the means of white and minorities in the various sub areas of the exam had an average of .84, which is greater than .80. This shows a misunderstanding of adverse impact as just described.

9. **The State Seems to Have Been Unaware of the Adverse Impact of the 2002 and 2004 Firefighter Exams**

McNeely said in deposition (Transcript and Testimony of 30 (b) (6) of Sally McNeely; June 30, 2005, page 29, lines 15-16 and 18-21), that there was no disparate impact on the [Firefighter] examination. That is clearly in error, as explained above. McNeely said in

Page 10

deposition (Transcript and Testimony of 30 (b) (6) of Sally McNeely; June 30, 2005, page 30, lines 6-9), that the state only looked at adverse impact at a cut point of 70, not at the examination as it is actually used, as a ranking device. Perhaps it was because the state was unaware of the adverse impact of the examinations that it did not search for alternative selection procedures for use in the 2002 and 2004 Firefighter exams (see the sections numbered 17, 20 and 21 below on alternative selection procedures).

The term "disparate impact" used by McNeely does not appear in the *Uniform Guidelines*. The terms disparate impact and adverse impact may be seen as synonymous, or adverse impact may be seen as a measure or indicator of disparate impact. In any case, I understand McNeely to be talking about adverse impact in her testimony just referenced.

10. **There is Insufficient Evidence of Examination Validity.**
The documentation provided by the state in discovery is not detailed nor complete enough to allow for an evaluation of the validity of the 2002 or 2004 written examination for Firefighter. No validation study was provided by the state for the 2002 or the 2004 Firefighter exams. The only validation report produced in response to interrogatories is the Massachusetts Firefighter Final Validation Report, June 8, 1992, Bates stamped pages 000065-000090, which is referenced in the paragraph numbered 2, above. Even this report is basically a transportability study (see Bates stamped pages 000068-000069). The criterion-related validation study that is the ultimate basis for the 1993 Landy exam was done in Columbus, Ohio (see Bates stamp page number 000067), and the state did not provide a copy of the validation report for the Columbus examination during the discovery phase of this proceeding. Without a copy of the validation report for the Columbus examination it is impossible for me to evaluate the validity of that exam. This is very serious because the validity of that exam is crucial to this matter, as the state says the validity of the 2002 and 2004 exams is based on the 1993 Landy exam (which is why the state produced the 1993 Landy report), which is in turn based on the Columbus exam. The documentation provided by the state concerning exam validity falls far short of the documentation required by the *Uniform Guidelines*. For example, Section 15 A, titled "Required Information" reads, in part (3)(b): "Form of report. This evidence [of validity] should be compiled in a reasonably complete and organized manner to permit direct evaluation of the validity of the selection procedure." In any case, and in particular, it is impossible to evaluate whether or not the 2002 and the 2004 exams meet the requirements of the *Uniform Guidelines*.

Further, in evaluating the validation of the 2002 and 2004 Firefighter exams, originally I had planned to go beyond the validation requirements in the *Uniform Guidelines*, which were developed by federal enforcement agencies many years ago and are becoming somewhat dated, and to evaluate the exams in terms of currently accepted professional practice, but the State provided insufficient documentation for such a review.

11. **The *Uniform Guidelines* Explicitly Rule Out Assumptions of Validity.**
In addition to the standards for the documentation of validation, just described, the

*Uniform Guidelines* specifically rules out the assumption of validity. For example, the *Uniform Guidelines* says that the credentials of a consultant are not acceptable evidence of validity. The *Uniform Guidelines*, in Section 3.9, titled, "No Assumption of Validity" says, in part:

> Unacceptable substitutes for evidence of validity. Under no circumstances will the general reputation of a test or other selection procedures, its author or its publisher, or casual reports of its validity be accepted in lieu of evidence of validity. Specifically ruled out are: assumptions of validity based on a procedure's name or descriptive labels; all forms of promotional literature; data bearing on the frequency of a procedure's usage; testimonial statements and credentials of sellers, users, or consultants; and other nonempirical or anecdotal accounts of selection practices or selection outcomes.

12. **The State Did Not Report Average Exam Scores for White and Minority Applicants.**
    The most basic indication of the level of performance on a test is the average score. None of the material I reviewed contained reports of the average scores of applicants for the 2002 or 2004 Firefighter exams overall and broken down by ethnic or racial group.

    The second most basic descriptive statistic about test performance is the standard deviation. The standard deviation is an index or measure of the variability in test scores (are the test scores bunched up or spread out). None of the material I reviewed contained reports of the standard deviations of applicants' scores for the 2002 or 2004 Firefighter exams overall and broken down by ethnic or racial group.

    With respect to the means and standard deviations overall and for blacks, whites, and Hispanics for the 2002 and 2004 exams, even though it is still possible for the state to calculate these and provide this information, based on the material I reviewed it appears the State did not calculate these, even to this day. The State should have calculated these because knowing the means and standard deviations for applicants from protected and majority groups, overall and for each part of the test, is important to detecting and understanding the differences in test performance underlying adverse impact.

13. **It Has Not Been Shown that the 2002 and 2004 Exams Measure the Same Areas as Landy's 1993 Exam.**
    The state has claimed (see the last paragraph on page 1 of the Letter from Wada to Wolfman dated August 16, 2002, Bates stamped page 000015) that the validity of the Landy Firefighter exams in 1993, 1996 and 1998 indicates the 2002 and 2004 Firefighter exams are valid. However, the state provided only one validation report concerning the written examination (i.e, the Massachusetts Firefighter Final Validation Report, June 8, 1992, Bates stamped pages 000065-000090, which is referenced in the paragraph numbered 2, above.) So it is not clear what the state is referring to when it refers to the validity of the 1996 and 1998 Firefighter examinations. In any case, the state did not provide any description of the steps taken in developing the 2002 and 2004 exams, and in particular the steps taken to try to

assure that the new exam measures the same areas as the 1993 Landy test or other Landy tests. Since the exam development was not described in the materials provided by the state, it is not clear what steps were taken by the state to try to insure that the new exam actually measures the same areas as Landy's 1993 exam, which is the test the state relies on to show the validity of its firefighter exam. Importantly, the state has not provided any empirical data to support the claim that the 2002 or 2004 Firefighter exams measure the same areas as the 1993 Landy exam.

Several empirical approaches to evaluating the comparability of two tests are both possible and practical. For example, the state could have included some of Landy's 1993 questions on the 2002 and 2004 exams, on a research basis, and correlated the scores on Landy's questions with the scores on each of the new tests. Alternatively, the state could have had a group of people take pairs of tests: Landy's test and either the 2002 or the 2004 test, and correlated the scores on the pairs of tests. Absent any documentation that the 2002 and 2004 tests measure the same areas as the 1993 Landy examination, the validity of the 1993 Landy exam cannot be taken to support the validity of the 2002 and 2004 exams.

**14. The Firefighter Task List Shows Apparent Gaps in Content.**
    The HRD task list for Firefighter is one basis for the content validity of the state's entry-level Firefighter examinations. However, this task list has some weaknesses that may contribute to adverse impact.

    I presume the task list used for the 2004 examination, and earlier examinations, is basically the same as the list I downloaded from the HRD website, titled *Massachusetts Fire Departments Task List*, which is referenced in the paragraph numbered 2, above.

    This task list seems to be designed to serve as the basis for a cognitive ability test, not for a non-cognitive test such as a personality (or work-style) test. Tasks that might lead the test developer to include a non-cognitive test are lacking or little emphasized. For example:
    1. A task list for a non-cognitive test would include more task detail involving interacting with distraught adults and children in various settings (e.g., rescue, overhaul, missing persons, victims), including situations involving panic, disorientation, distress, and loss. For example, it might include tasks that would support the need for clear oral communication: calming people in various situations, interacting with people of various backgrounds (e.g., young children, vagrants, non-English speakers), etc.
    2. The tasks involved in supporting other members of the fire company and fire department in life-threatening situations are not explicitly listed.
    3. The tasks associated with living for 24+ continuous hours with a team of Firefighters, including cooking and cleaning, are not mentioned.
    4. Tasks involving honesty are not mentioned, despite the frequent opportunity for dishonest behavior, such as theft, in situations of confusion and disorientation.
    5. Tasks under public relations could be more detailed in terms of the groups a

Firefighter interacts with in making presentations at schools, old age homes, etc.
6. The task list does not use any of the following words: honesty, integrity, secure, safeguard, interpersonal, get along, obey, talk, oral, communication, communicate, citizen, distraught, calm, child, caution, courage, or team.

**15. There Would Have Been Less Adverse Impact if the State Used Landy's Suggestion to Rank Based on a Combination of the Physical Performance and Written Tests.**

There would have been substantially less adverse impact on minorities if the state used the test as Landy suggested, combining the scores on the Physical Performance Test and the written, cognitive ability test. This is discussed more immediately below.

**16. The Estimated Adverse Impact of Ranking Based on a Combination of the Physical Performance and Written Tests.**

It is possible to predict the level of adverse impact that will result when combining two components into a final score, as in Landy's suggestion to weight the written test 40% and the Physical Performance Test 60%. The prediction is based on well understood and agreed upon principles of probability and statistics concerning the mean and variance of such sums of scores (see, for example, Appendix B of the textbook titled "Statistics," the 4th edition, by William L. Hays, copyright 1988 by Holt, Rinehart and Winston; or pages 140 and 145 of the textbook titled "Probability: the Science of Uncertainty" by Michael A. Bean, copyright 2001 by Brooks/Cole Publishing Company).

If scores from a written test with a white-minority difference in mean (i.e., average) test score of one standard deviation (like the typical cognitive ability test) were to be combined with scores from a test with no adverse impact (as may well be in the case of the Physical Performance Test) using 40-60 weighting, the adverse impact for hiring applicants would have been about .4 if the top 15% of the applicants were hired. I used the top 15% of the applicants because that figure was given in the Dennis memorandum, in the third paragraph on page 8, as being typical of previous Firefighter exams. If somewhat higher or lower selection ratios are used, the resulting adverse impact would still be severe; more severe when a lower percentage of applicants is hired and less severe when a higher percentage of applicants is hired. Now an adverse impact of .4 is much less severe than the adverse impact of the written exam alone, which would be about .14. However, even .4 is far from equity and also fails the 80% rule of thumb described in the *Uniform Guidelines*. So this exact approach is not a complete solution to the adverse impact problem.

**17. There Is No Indication that Alternative Selection Procedures Were Considered.**

The state should have anticipated that holding a written multiple-choice test of cognitive ability would result in severe adverse impact at and near the effective passing point, and the hiring of relatively few minority applicants. This should have led the state to consider alternative selection procedures for inclusion in the 2002 and 2004 Firefighter exams, as called for by the *Uniform Guidelines*. For example, Section 3.3 B of the Uniform Guidelines says, in part,

Page 14

"Accordingly, whenever a validity study is called for by these guidelines, the user should include, as a part of the validity study, an investigation of suitable alternative selection procedures and suitable alternative methods of using the selection procedure which have as little adverse impact as possible, to determine the appropriateness of using or validating them in accord with these guidelines."

Ms. McNeeley has said that she was not aware of any efforts of HRD, since 1996, to consider alternatives to the multiple-choice cognitive ability tests for past exams for Firefighter (Transcript and Testimony of 30 (b) (6) of Sally McNeely; June 30, 2005, page 26, lines 5 through 16). With respect to written material, no document was produced with a title such as, "Possible Alternative Selection Procedures for Fire Fighter" nor any document containing discussions of alternative selection procedures, other than Landy's 1992 validity report (see page 4 of that report) and the 1993 memorandum from Dennis to Dumont via Hartnett (which discusses a weighted, graded physical performance test), and Exhibit 10 (especially the 1992 memo from Cline to Wiesen), all referenced in the paragraph numbered 2, above. So, it appears from the material produced in response to the interrogatories and from the depositions that the state did not consider alternative selection procedures for Firefighter after 1996 and perhaps not after 1993, through the 2004 exam for Firefighter. McNeely's deposition indicates that recently the state has researched the use of personality tests for selecting Firefighters (page 86, lines 4-19).

18. **The Orientation Materials Are Likely to Confuse the Less Test-Wise Applicants.**
The candidate orientation material provided by the state to help applicants prepare for the examination may not serve its intended purpose well, and may have been counterproductive. Exhibit 7 ( Letter from Bramson to Wolfman dated August 10, 2004), which is referenced in the paragraph numbered 2, above, says on page 2 that *Orientation and Preparation Guide* provided to the applicants is posted on the HRD website. I downloaded this document from the HRD website. It is titled "2004 Entry Level Firefighter Examination Orientation and Preparation Guide" and is referenced in the paragraph numbered 2, above.

This candidate guide contains narrative that is not well-organized and is unnecessarily difficult to read. It is widely known that it is possible to craft reading material that has a relatively low readability score but is still difficult to read. That is because of the way the readability scores are calculated. In this case, the candidate material is difficult to read; harder than indicated by the Flesch reading ease scores of grades 11-13 for the several sections of the guide I reviewed. As a result, applicants with weaker reading skills will find it more difficult to prepare for the exam. It might be that this candidate orientation guide will serve to increase rather than reduce adverse impact (especially if minority applicants in Lynn tend to go to lower achieving city schools and whites to higher achieving private schools, and if the minority applicants have weaker reading skills).

For example, here is a paragraph from page 21 of the *2004 Entry Level Firefighter Examination Orientation and Preparation Guide*, followed by a suggested rewrite that I

authored for the sake of this report.  The original paragraph below is unwieldy and contains 86 words, with an average of 17 words per sentence:

> Sample questions 7 and 8 measure the ability of verbal comprehension. To test verbal comprehension, you will be given a passage of one or more paragraphs describing either a fire-related incident or a set of firefighting procedures. These passages will be about ½ page in length and will be followed by one or more questions. The questions will test your understanding of the passage. For the most part, such questions test reading comprehension so to improve your verbal comprehension skills, you need to improve your reading skills.

My rewrite below consists of three short paragraphs totaling 48 words, with an average of 9 words per sentence:

Sample questions 7 and 8 test reading ability.

First read the paragraph printed before the questions.  Then answer the questions based on what you read.

You can prepare for this part of the exam by improving your reading ability.  Read newspaper and magazine articles and books about firefighting.

19. **Advances in the Field, 1993 to 2003.**
   We knew more in 2002 and 2004 than we knew in 1993 about selecting firefighters validly while reducing adverse impact.  The use of personality measures for personnel selection was receiving more attention (see, for example, pages 79-80 of the textbook titled "Assessment, Measurement, and Prediction for Personnel Decisions," by Robert M. Guion, copyright 1998 by Lawrence Erlbaum Associates.  Research on methods of reducing adverse impact while maintaining validity has been presented at national conferences annually (see, for example, Robert Ployhart's conference paper titled "Strategies for Reducing Adverse Impact," presented at the 1992 Annual Conference of the International Personnel Management's Assessment Council; available on the web at http:/ipmaac.org/conf02/).  Some of the things that we knew in 2002 and 2004 but did not know in 1993, or which were more widely known and understood in 2002 and 2004, include:
   a.  Oral examinations, when carefully developed and administered, generally are valid and show little or no adverse impact.
   b.  Work-style tests (commonly referred to as personality tests) are valid for most jobs, including firefighter, and generally show little or no adverse impact.
   c.  The adverse impact of a sum of several exam components will be about equal to the largest adverse impact of these components and, if each component has some adverse impact, the adverse impact of the total may be greater than the adverse impact of any of the components.
   d.  Even tests with "small" B-W differences in mean scores will have high adverse impact when only 15% of applicants are hired.  In general, as a smaller proportion of applicants

are hired, the adverse impact becomes greater.

There is no indication in the material provided by the state that these and similar advances in the field were considered in developing the 2002 and 2004 firefighter examinations.

20. **There Are Alternative Selection Procedures with Less Adverse Impact.**
   There are alternatives to simply using a multiple choice test of cognitive ability to select firefighters. Some of these alternatives have less adverse impact than a traditional written test of cognitive ability.

21. **Some State and Local Jurisdictions Use Alternative Selection Procedures for Firefighter.**
   Some state and local jurisdictions across the country have used various alternatives to complete reliance on the traditional written test and have had some success in reducing adverse impact while maintaining validity in the selection on entry-level firefighters and police officers. I will mention and briefly outline just a few here.

A. Columbus, Ohio (firefighter) 2002 exam
   Phase 1 - M/C personality test (P/F)
   Phase 2 - M/C cognitive test (P/F)
   Phase 3 - Physical capability test (P/F)
   Phase 4 - Oral exam based on video scenes - rank is based on this
       - Scheduled orals for 1,365 candidates

B. Los Angeles (firefighter) from the current website (see http://Lacity.org/per/lafd.htm)
   Step 1. Preliminary background application (P/F)
   Step 2. Written test: cognitive and personality (P/F)
   Step 3. Panel Interview - rank is based on this

C. Oklahoma City (firefighter) 1994 and 1996 (see Attachment D)
   Step 1 - M/C personality test (P/F)
   Step 2 - M/C cognitive test (P/F)
       Note: steps 1 and 2 were accomplished simultaneously
   Step 3 - Oral panel interview - rank is based on this
       - 413 took the oral panel interview in 1996; 438 in 1994
   Step 4 - Miniature Training and Evaluation (pass/fail)
       - Approximately 40 hour training program given to highest ranked candidates

D. The Michigan Municipal League
   The Michigan Municipal League for many years offered entry-level and promotional testing services to municipalities in Michigan. Their entry-level exam for Firefighter included a personality test known as the GPPI (Gordon Personal Profile and Inventory).

E.  California Commission on Peace Officer Standards and Training (POST)
Many jurisdictions in California use the structured interview process promulgated by the California POST in selecting police officers.  A copy of their extensive training manual for persons conducting this process is available on the web at:
http://www.post.ca.gov/selection/S&E/interviewguide-print.pdf

The oral examination or structured oral panel interview approach (these are virtually synonymous terms) and the personality tests have resulted in virtually no adverse impact.  The means and the standard deviations for whites, blacks, and Hispanics on these types of tests were almost the same, sometimes with the white mean scores lower than the minority mean scores.  The test development, content validity research indicates that these tests add incremental validity to the selection process.  There is little criterion-related validation evidence (as is true for validation research for most jobs).  In the Oklahoma City firefighter selection process in 1996, the overall adverse impact was .73 (and the adverse impact was due to the cognitive ability test), and the mean score in the academy was the same as in prior years when only a cognitive ability test was used for personnel selection (see Attachment D).

In addition, as reported at recent professional conferences, various state and municipal jurisdictions nationwide, and various consulting firms that service them, have developed and are developing new tests for Firefighter to reduce adverse impact and maintain validity.

22. **Alternative Selection Procedures Can Be Practical to Implement**.
Some (but not all) alternative selection procedures may require test administration procedures different from those of a multiple choice, cognitive ability test, but all the alternative selection procedures mentioned above have been shown to be practical to implement in public sector settings (see the numbered section immediately above).

Signature: _____        Date: August 31, 2005
Joel P. Wiesen, Ph.D.

**MASSACHUSETTS HUMAN RESOURCES DIVISION**
OPEN COMPETITIVE EXAMINATION                    ANNOUNCEMENT NUMBER: 8012

## *FIREFIGHTER*
## *MUNICIPAL SERVICE*

**Examination Date: June 10, 2006          Application Deadline: April 24, 2006\***
**Examination Fee $75**

**Apply on-line with Visa or MasterCard at: www.mass.gov/civilservice**

\*Please note: There will be an additional $25 dollar processing fee for applications received after this date.
Applications will not be accepted after May 15, 2006.

**DUTIES:** Firefighters often perform risky and physically demanding duties under emergency conditions. Firefighters work under supervision, often as a member of a team, to respond to fire and other emergencies. Firefighter duties may include, for example: connecting, pulling and operating hose lines; operating a pump; positioning and climbing ladders; emergency rescue and lifesaving; ventilating smoke-filled areas; using and maintaining tools and equipment; training; and fire station activities. For a more detailed listing of duties, see the essential functions of a Massachusetts Firefighter.

**SALARY:** Each jurisdiction sets its own salary for Firefighter positions. Questions about salary should be directed to the appropriate city or town.

### MINIMUM QUALIFICATIONS

**AGE REQUIREMENT:** As of the printing of this notice, you must be at least age **19 as of May 15, 2006**, to take the examination.

You must also be **younger than age 32 as of May 15, 2006**, to be appointed as a Firefighter in the following civil service municipalities: Acushnet, Arlington, Bedford, Billerica, Burlington, Canton, Chelmsford, Dracut, Easthampton, Easton, Hanover, Haverhill, Hingham, Hudson, Ipswich, Leominster, Malden, Mansfield, Marblehead, Methuen, Milford, Newton, North Andover, North Attleboro, Norton, Norwood, Stoneham, Ware, Watertown, Wellesley, Westfield, West Springfield, and Wilmington.

You must be **younger than age 32 as of June 10, 2006**, to be appointed as a Firefighter in the following civil service municipalities: Andover, Belmont, Boston, Bourne, Dedham, Falmouth, Fitchburg, Holbrook, Natick, Shrewsbury, Swampscott, Taunton, Westwood, Winchester, and Worcester. Check our website for the most current listing

There is **no upper age limit** for appointment in the following civil service municipalities: Abington, Agawam, Amesbury, Athol, Attleboro, Beverly, Brockton, Brookline, Cambridge, Chelsea, Chicopee, Clinton, Cohasset, Danvers, Everett, Fairhaven, Fall River, Framingham, Franklin, Gardner, Gloucester, Greenfield, Holyoke, Hopedale, Hull, Lawrence, Lowell, Ludlow, Lynn, Marlborough, Marshfield, Medford, Melrose, Milton, Nahant, Needham, New Bedford, Newburyport, North Adams, North Reading, Peabody, Pittsfield, Plainville, Plymouth, Quincy, Randolph, Reading, Revere, Rockland, Salem, Saugus, Scituate, Somerville, Springfield, Stoughton, Tewksbury, Wakefield, Waltham, Weymouth, Whitman, Winthrop, and Woburn. In these communities, as current law requires, candidates will have to meet physical fitness and medical standards and once hired, will be tested regularly during their employment to be sure that they meet certain medical and physical fitness standards. Copies of the medical standards are available for review at the Human Resources Division (HRD) website, under the Medical and Physical Standards section. Any questions about status changes should be directed to the communities in question.

**Women, minorities, veterans, and people with disabilities are encouraged to apply.**

| FIREFIGHTER | EXAMINATION DATE: JUNE 10, 2006 | ANNOUNCEMENT NUMBER: 8012 |

## SELECTION AND HIRING PROCESS
**You must take and pass a written examination to be placed on the eligibility list for appointment as a Firefighter.**

**Written Examination:** The written examination consists of three subtests: the Written Ability Test (WAT), the Life Experience Survey (LES), and the Work Styles Questionnaire (WSQ). The WAT is administered to measure cognitive abilities that have been identified as essential to performing the duties of a Firefighter. The WAT includes areas of verbal expression, verbal comprehension, problem sensitivity, deductive reasoning, inductive reasoning, and information ordering. The LES consists of a series of multiple-choice questions related to candidates' past history and experience of potential relevance to successful performance of entry-level firefighters. The WSQ is designed to assess certain motivational, value-related and attitudinal characteristics that are of potential relevance to successful performance of entry-level firefighters. An *Orientation and Preparation Guide*, which describes the written examination in more detail, will be available and posted in the Firefighter Exam Preparation & Appointment Process Information section by March 31, 2006.

**Credit for Employment/Experience as a Firefighter:** Pursuant to the provisions of section 22 of Chapter 31, individuals may apply to receive credit for employment or experience in the position title of Firefighter. Information on how to apply for this credit will be included with your notice to appear for the examination. On the day of the examination, you will be asked to provide specific details of any employment or experience you have in the examination title as the result of service on a city or town fire force, including dates of service and number of hours worked per week. You must submit documentation supporting these claims. Please note, credit for employment or experience is applicable only to individuals who achieve a passing score on the written examination, and cannot be added to a failing written score in an attempt to achieve an overall passing score.

Applicants who pass the written examination **AND** receive a conditional offer of employment from a municipality will be instructed on how to apply for the Physical Abilities Test and other screening processes:

1. **Medical Exam:** Candidates must pass a medical examination before they will be allowed to take the Physical Abilities Test. Some municipalities may also require candidates to pass a psychological evaluation before they are appointed.

2. **Physical Abilities Test (PAT):** This will test aerobic capacity and physical capability necessary to perform tasks such as: dragging a person, raising a ladder, gaining forcible entry using a sledgehammer, advancing a fire hose, tearing open a ceiling or wall using a plaster hook, carrying equipment upstairs, and crawling through a darkened enclosed area to search for victims. Applicants who pass the written examination and receive a conditional offer of employment from a municipality are informed about applying for a PAT at that time. A separate fee (currently $150) will be charged to take the PAT. For additional information about the PAT and to download a copy of the PAT Preparation Guide, visit the HRD website Firefighter Exam Preparation & Appointment Process Information section.

3. **Character:** A candidate may be disqualified for evidence of character clearly unsuited for fire services. Most municipalities conduct a comprehensive background check prior to appointment.

4. **Job Interview:** A municipality may conduct an oral interview prior to appointment.

**DRIVER'S LICENSE:** Most municipalities require you to possess a valid Massachusetts motor vehicle operator's license prior to appointment.

**SMOKING PROHIBITED:** Firefighters hired from the eligible list resulting from this examination are prohibited from smoking tobacco products at the time of and after appointment, pursuant to Chapter 41, Section 101A, of the Massachusetts General Laws.

For further information about other qualifications as they apply to a specific jurisdiction, please contact the city or town directly.

**PRIVATE SCHOOL OR SERVICE:** The Human Resources Division does not recommend or endorse any private school, service, or publisher offering preparation and/or publications for examinations and is not responsible for their advertising claims.

## CLAIMS FOR PREFERENCE

YOU WILL BE ADVISED AT THE EXAMINATION SITE HOW TO CLAIM ANY OF THE PREFERENCES LISTED BELOW.

**VETERANS' PREFERENCE:** If you are claiming veterans' preference and if your eligibility for veterans' preference has not been approved before by HRD, you must submit a copy of your DD Form 214 (Release From Active Duty) in order to receive proper credit. Your notice to appear for the examination will indicate whether or not you are already classified as a veteran. Qualifying service must have been in the Army, Navy, Marine Corps, Coast Guard, or Air Force of the United States. Please note that active duty exclusively for training in the National Guard or Reserves does **NOT** qualify you for veterans' preference. **Guard Members** must have 180 days and have been activated under Title 10 of the U.S. Code - OR- if activated under Title 10 or Title 32 of the U.S. Code or <u>Massachusetts General Laws</u>, chapter 33, sections 38, 40, and 41, must have 90 days, at least one of which was during wartime, per the chart below. The Members' last discharge or release must be under honorable conditions.

**DEFINITION OF MASSACHUSETTS VETERAN M.G.L. c. 4, sec. 7, cl. 43rd as amended by the Acts of 2004 Effective August 30, 2004:** To be a "veteran" under Massachusetts law, a person is required to have either 180 days of regular active duty service and a last discharge or release under honorable conditions **OR** 90 days of active duty service, one (1) day of which is during "wartime" and a last discharge or release under honorable conditions. <u>A chart defining "wartime" service</u> is available on-line on the <u>Veterans' Services website</u>. Claims for status as a disabled veteran require written confirmation from the US Veterans Administration of a continuing service-connected disability rated 10% or higher. Applicants wishing to claim status as disabled veterans will get the opportunity to claim such at the test site with further instructions to follow. (See Clause 43, Section 7 of Chapter 4 and Section 1 of Chapter 31 of the Massachusetts General Laws for a full definition of a qualifying veteran.)

Those who otherwise qualify for veterans' preference, but are still in military service may, as of July 1, 1998, claim such credit by supplying proof, on official letterhead with appropriate signature, of their military service to date, including the dates of active duty, current assignment, and estimated time of separation. The individual must provide official documentation of honorable discharge at the time of appointment. [See 1998 Amendment to MGL, Chapter 31, Section 3, Clause (f)].

**CURRENT MILITARY PERSONNEL:** ALL military personnel who, in connection with current service, **CANNOT** be in Massachusetts on June 10, 2006 should contact the Human Resources Division to request a make up examination. To request a make up, you must file an application and processing fee by the last filing date and request such accommodation in writing, with a copy of your military orders attached. Please include in your letter either your daytime base phone number and/or name and phone number of a Massachusetts resident with whom you are in <u>regular</u> contact.

**PREFERENCE FOR THE CHILDREN OF CERTAIN POLICE OFFICERS/FIREFIGHTERS:** The son or daughter of a Police Officer or Firefighter employed in Massachusetts who was killed or died of injuries received in the performance of duty, or who was permanently disabled as a result of injuries received in the performance of duty, is entitled to certification preference under the provisions of Chapter 402 of the Acts of 1985.

**RESIDENCY PREFERENCE:** If residency preference is requested by a municipality, applicants who have resided in that municipality for the entire twelve-month period immediately preceding the date of the examination are entitled to be placed on the eligible list for that community ahead of any non-residents. Applicants who have had a break in residence or have moved from one community to another within the twelve-month period preceding the date of the examination will not be entitled to claim residency preference in any community. Applicants will complete a residency preference form at the test site. Verification of residency will be made by the municipality.

**RACIAL/ETHNIC PREFERENCE:** Due to a federal consent decree, African-American (Black) and Hispanic applicants are given certification preference in a number of communities, whether or not they are residents of those communities. As of the printing of this notice, the following communities are included in this consent decree: Cambridge, Chelsea, Fitchburg, Framingham, Holyoke, Lawrence, Lowell, Somerville, and Springfield. This list of communities is subject to change. The definition of Hispanic, for the purposes of the decree, includes any person born in a Spanish-speaking country or any person who grew up in a household in which the predominant language spoken was Spanish.

**SELECTIVE CERTIFICATION FOR EMERGENCY MEDICAL TECHNICIANS:** If a position in a municipality requires that a Firefighter hold Emergency Medical Technician certification at the Basic, Intermediate, or Paramedic level prior to appointment, the local appointing authority may request that competition for that vacancy be limited to persons holding such certifications. On the date of the examination, you will have the opportunity to register as a certified Emergency Medical Technician. Proof of possession of a current certification as an Emergency Medical Technician, issued by the Massachusetts Department of Public Health, Office of Emergency Medical Services must be submitted in order to qualify for this selective certification. Although you may supply this proof at any time during the life of the eligible list, it is recommended that you submit it at the time of the examination so that you do not miss out on a potential opportunity.

**SELECTIVE CERTIFICATION FOR BILINGUAL FIREFIGHTERS:** If a position in a municipality requires that a Firefighter be fluent in a second language (e.g., Spanish, Vietnamese, Haitian Creole, etc.), the local appointing authority may request that candidates for that position be limited to persons who have such skills. You will have the opportunity at the test site to indicate the foreign language(s) in which you are fluent. You will need to prove your language fluency at the time of appointment.

| FIREFIGHTER | EXAMINATION DATE: JUNE 10, 2066 | ANNOUNCEMENT NUMBER: 8012 |

**IMPORTANT NOTIFICATION INFORMATION FOR APPLICANTS:**
**Notice to Appear**

Notices to appear to the assigned examination site will be mailed to applicants for this examination. You will be able to get a copy of your notice after May 26, 2006, by logging on to the Human Resources Division <u>Standings and On-line Applicant Record Information</u> system. Please follow the instructions provided: <u>How to Get a Copy of Your Notice to Appear for an Exam</u>.

## HOW TO APPLY

You may apply for this examination, using a Visa or Mastercard, on-line at the Human Resources Division website: <u>https://www.csexam.hrd.state.ma.us/hrd/</u>. A confirmation number for each successful transaction will be issued to the applicant.

You may also obtain a paper application form, and file it along with the examination-processing fee (or <u>fee waiver form</u>) in person or by mail at HRD (see address below). Applications and fee waiver forms may also be available at city and town clerks' offices and civil service fire stations across the state. If you mail your application, send all correspondence by certified mail with "return receipt requested," if possible.

**EXAMINATION FEE:** All applications must be accompanied by a money order, certified bank check, credit card payment, or by a completed fee waiver form. The examination-processing fee is **$75** for applications received by midnight **April 24, 2006.** The fee for applications filed after that date is **$100.** Applications will not be accepted after **May 15, 2006.** Payment by money order or bank check should be **made payable to the Commonwealth of Massachusetts**. Please print your name, address, social security number, and the examination announcement number on the front of the money order or certified bank check. Payments by Master Card and VISA are also accepted when applying via the web site or in person. **NO CASH OR PERSONAL CHECKS**.

**FEE WAIVER:** The examination fee may be waived for applicants receiving certain state or federal public assistance, unemployment insurance, or workers' compensation. <u>Fee waiver forms</u> are available from and must be filed with the Massachusetts Human Resources Division, Test Administration, One Ashburton Place, Boston, MA 02108. Fee waiver forms may be downloaded from the <u>Applicant Forms section</u> of the HRD website. Waiver forms must be accompanied by proof of eligibility, for the subject time period, in the form of signed and dated receipts, check stubs and/or other documentation from the agency providing assistance. If you are claiming a fee waiver, please make sure to fill in item #16 on your application.

**SPANISH-SPEAKING APPLICANTS:** You may take the examination in the Spanish language. If you do, you must, on the same day, take another written examination that tests your ability to read and understand English. If you wish to take the examination in the Spanish language, you must submit a separate letter requesting this along with your application and examination processing fee or fee waiver form.

**TESTING ACCOMMODATIONS FOR PEOPLE WITH DISABILITIES:** If you need special testing accommodations due to a documented impairment such as a hearing, learning, physical, mental or visual disability, fill in the circle in item 15 of your application, and include a letter detailing what type of accommodation you require at the exam site. *You must also include a letter of support from a qualified professional*. Without such a letter, we cannot guarantee that we will be able to grant your accommodation. This information is requested only to provide reasonable accommodation for exams, and will not be used for any other purposes.

**NO MAKE-UP EXAMINATION:** With the exception of current military personnel who cannot be in Massachusetts on June 10, 2006, no applicant has a right to a make-up examination due to personal or professional conflicts on the testing date and applicants are advised to consider this BEFORE applying for the examination.

**REFUNDS:** There will be **NO REFUND** of the examination-processing fee unless the examination is cancelled by HRD.

**CHANGE OF ADDRESS:** Applicants are responsible for notifying HRD in writing of any change of address after applying for the examination. Applicants may submit changes of address on-line at: **https://www.csexam.hrd.state.ma.us/standings/**, or by sending a written request, including former address, new address, effective date of new address, and social security number to HRD. Failure to keep your records up-to-date may jeopardize opportunities for employment.

---

For more information about this and other civil service examinations, see <u>www.mass.gov/civilservice</u> or email the Civil Service Unit at <u>CivilService@hrd.state.ma.us</u>. The Human Resources Division's office hours are Monday through Friday, 8:45 a.m. - 5:00 p.m. except holidays. Inquiries may also be made to the Division during these hours at the following numbers:

**In the Boston area: (617) 878-9895**    **Outside the Boston area (within Mass. only): 1-800-392-6178**

**TTY Number: (617) 878-9762**    **FAX Number: (617) 727-0399**