UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JACOB BRADLEY, *et al.*,

                Plaintiffs,

         v.

CITY OF LYNN, *et al.*,

                Defendants.

BOSTON SOCIETY OF THE VULCANS and
NEW ENGLAND AREA CONFERENCE OF THE
NAACP,

                Intervenors.

CIVIL ACTION
NO. 05-10213-PBS

**STATE DEFENDANTS' REPLY MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(1) FOR LACK OF
SUBJECT MATTER JURISDICTION OR UNDER FED. R. CIV. P. 12(b)(6) FOR
FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.**

      The State defendants, the Commonwealth of Massachusetts, Human Resources Division ("HRD"), and Ruth Bramson, in her capacity as Personnel Administrator of HRD (together, "defendants"), submit this reply memorandum of law in support of their motion to dismiss under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction or under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. As discussed below and in defendants' opening memorandum ("Defs.' Mem."), plaintiffs' complaint should be dismissed in its entirety as moot because HRD has abandoned any use of the administrative practices that plaintiffs are challenging. Alternatively, Count IV of the complaint—asserting violations of the consent decrees in NAACP v. Beecher, 371 F. Supp. 507 (D. Mass. 1974) (firefighter), and Castro v. Beecher, 365 F. Supp. 655 (D. Mass. 1973) (police officer)—should be dismissed for

lack of standing.  Finally, even assuming plaintiffs have standing, Count IV as it relates to the Beecher decree should be dismissed for failure to state a claim upon which relief can be granted.

## ARGUMENT

**I.   PLAINTIFFS' COMPLAINT SHOULD BE DISMISSED IN ITS ENTIRETY AS MOOT.**

As this Court has observed, "[w]hether adjudication of the issues in a case can result in meaningful relief is the 'core question' compelled by Article III's requirement of a 'case' or 'controversy.'"  Oceana, Inc. v. Evans, No. 03-10570, 2004 WL 1730340, at *4 (D. Mass. July 30, 2004).  Plaintiffs—as the party moving for an injunction—have the burden of showing that "meaningful relief" is possible.  See United States v. W.T. Grant Co., 345 U.S. 629, 633 (1953); accord Lovell v. Brennan, 728 F.2d 560, 563 (1st Cir. 1984).  Although plaintiffs claim that the burden is on defendants, see Plaintiffs' Opposition to Commonwealth Defendants' Motion to Dismiss ("Pls.' Opp.") at 4, they are incorrect.  Once defendants have shown, as they have here, that the challenged practice has been discontinued, plaintiffs must demonstrate that "relief is needed" in that "there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive."  W.T. Grant Co., 345 U.S. at 633; see Lovell, 728 F.3d at 563 (burden of persuasion lies with plaintiffs to demonstrate that "circumstances warrant injunctive relief"); Committee in Solidarity With the People of El Salvador v. Sessions, 929 F.2d 742, 744 (D.C. Cir. 1991) ("In injunction suits, plaintiffs usually must establish that the allegedly illegal actions of the past are causing or threatening to cause them present injuries.").

Here, plaintiffs argue that their case is not moot for two reasons. First, they claim categorically that "voluntary cessation" of allegedly illegal conduct does not render a case moot. See Pls.' Opp. at 4-6. Second, they maintain that defendants' "voluntary cessation" has not eradicated the effects of the alleged violation, and so meaningful relief is still possible. See id. at 6-10. As explained below, both of these arguments lack merit and should be rejected.

> **A.    The "Voluntary Cessation" Exception To Mootness Does Not Apply Because There Is No Reasonable Expectation That The Challenged Conduct Will Recur.**

In City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283 (1982), the Supreme Court held that, in certain situations, "a voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." 455 U.S. at 289. The First Circuit has described the City of Mesquite holding as an "exception to the mootness doctrine" that only applies "when there is a reasonable expectation that the challenged conduct will be repeated following dismissal of the case." D.H.L. Assocs., Inc. v. O'Gorman, 199 F.3d 50, 55 (1st Cir. 1999); accord New England Regional Council of Carpenters v. Kinton, 284 F.3d 9, 18 (1st Cir. 2002).

Here, the "voluntary cessation" exception is not applicable because there is simply no basis to believe that HRD would revert to using the old examinations upon dismissal of this suit. As discussed previously, it is "settled practice" to accept the representations of government officials that challenged conduct has been discontinued. DeFunis v. Odegaard, 416 U.S. 312, 317 (1974); Kiedos v. Apfel, 43 F. Supp. 2d 80, 85-86 (D. Mass. 1999); see Defs.' Mem. at 5 n.4. This is particularly true where, as here, the government has invested substantial time and expense to effectuate the voluntary changes. See Defs.' Mem. at 5 n.4. In light of the efforts

3

HRD has already put into creating the new examinations, see id. at 3, there is no "reasonable expectation" that it will return to its former practices. D.H.L. Assocs., 199 F.3d at 55. Indeed, HRD "would gain nothing" by doing so. Hudson v. Robinson, 678 F.2d 462, 465 (3d Cir. 1982).

In arguing otherwise, plaintiffs cite the First Circuit's decisions in Aroostook Band of Micmacs v. Ryan, 404 F.3d 48 (1st Cir. 2005), and Adams v. Bowater, 313 F.3d 611 (1st Cir. 2002), but their reliance on those cases is misplaced. Both Aroostook and Adams involved the factual situation where the defendant's representations fell short of showing that the challenged activity would not be continued. Specifically, the holding in Aroostook was based on two critical facts: (1) the defendant had continued the challenged practice even after the district court had found that practice to be unlawful; and (2) the defendant's "concession [was] qualified" in that it had "reserve[d] the right" to continue its old practice. 404 F.3d at 70. Likewise, in Adams—a case involving private, not governmental, defendants—the court found the "voluntary cessation" exception to apply because defendants could not say that the challenged practice would not be reintroduced following the conclusion of litigation. 313 F.3d at 613-14.[1]

Here, in contrast to Aroostook and Adams, the State defendants have represented that they have no intent of administering the examinations that plaintiffs challenge as unlawful. See Defs.' Mem. at 3 (citing McNeely Decl. ¶¶ 2-9). Moreover, as mentioned, defendants have already begun the process of implementing the new examinations—at substantial time and cost—and would gain nothing by undoing their efforts. On these facts there is no reason to

---

[1] The Eighth Circuit reached the same conclusion on similar facts in Arkansas Medical Society, Inc. v. Reynolds, 6 F.3d 519 (8th Cir. 1993), another case relied on by plaintiffs. See Pls.' Opp. at 6. Specifically, the Eighth Circuit held that voluntary cessation did not render the case moot where defendant had "reserve[d] the right" to return to the challenged practice. Arkansas Medical, 6 F.3d at 529.

believe that the old examinations will be reinstated following the conclusion of litigation. See New England Regional Council of Carpenters, 284 F.3d at 18 ("bare possibility" that objectionable conduct may recur is insufficient to save case from determination of mootness); St. Louis Fire Fighters Ass'n v. City of St. Louis, 96 F.3d 323, 329 (8th Cir. 1996) ("attenuated possibility of future misdeeds" is not "sufficient to warrant [the court's] continued jurisdiction"); Quincy Oil, Inc. v. Federal Energy Administration, 620 F.2d 890, 895 (Temp. Emer. Ct. App. 1980) ("fact that [government defendant] has the power to change its policy and could abandon its present position poses a possibility of recurrence too speculative and remote" to defeat a finding of mootness).

In a last-ditch effort, plaintiffs suggest that defendants are acting in bad faith because they "'ignored the recommendations' of the experts they had retained in 1992 to assist them with the 'implementation of entry-level firefighter selection.'" Pls.' Opp. at 6-7 n.2 (quoting Expert Report of Frank Landy at 12-21); see also id. at 13 ("the Commonwealth failed to follow the advice of its experts"); id. at 16 ("It is . . . highly probable that the Commonwealth is again flouting the advice of its own expert . . . ."). This assertion is both irresponsible and incorrect. The quoted passage from Dr. Landy's report refers to his recommendation, back in 1992, that HRD administer a physical abilities test ("PAT") in connection with the firefighter testing process. Contrary to plaintiffs' allegations, HRD did not "ignore" this recommendation. In fact HRD incorporated the PAT as part of the 1992 firefighter examination, and Dr. Landy was involved throughout the testing process. See Declaration of Marc Chavanne (attached as Exh. A) ¶ 2. Ultimately, however, HRD discontinued the PAT for the following reasons, among others:

(1) due to difficulty in securing sites and constructing courses, administration of the PAT delayed establishment of the certification list for a year and a half;

(2) a large number of applicants, including 48% of the minorities, opted not to take the PAT after passing the written examination but instead dropped out of the process altogether;

(3) the PAT, if anything, <u>increased</u> adverse impact (only 61.3% of minorities received the two highest scores of 95 or 100, versus 79% of nonminorities); and

(4) several candidates developed serious illnesses as a result of the PAT, leading to at least eight cases of hospitalization and one case of dialysis.

See <u>id.</u> ¶¶ 3-6. In light of these facts, plaintiffs' claim that HRD simply "ignored" Dr. Landy's recommendations in bad faith is unfounded and should be rejected. See <u>Federation of Adver. Indus. Representatives, Inc. v. City of Chicago</u>, 326 F.3d 924, 929 (7th Cir. 2003) ("To adopt [plaintiff's] view that mere repeal is insufficient to moot a case would essentially put this court in the position of presuming that the City has acted in bad faith—harboring hidden motives to reenact the statute after we have dismissed the case—something we ordinarily do not presume.").

In sum, there is no reasonable basis for assuming that HRD will revert to using the old examinations upon dismissal of this suit. See <u>Mosley v. Hairston</u>, 920 F.2d 409, 415 (6th Cir. 1991) (where government defendants are involved, "self-correction provides a secure foundation for a dismissal based on mootness so long as it appears genuine"). Accordingly, the "voluntary

cessation" exception does not save plaintiffs' case from a finding of mootness.[2]  See D.H.L. Assocs., 199 F.3d at 55.

### B. Even Assuming The New Examination Has Not Eradicated The Effects Of The Alleged Violation, Plaintiffs Have Failed To Demonstrate That Meaningful Relief Is Possible.

Plaintiffs' second argument is that, because HRD's "stated plans for a new test" have not "'completely and irrevocably eradicated the effects of the alleged violation,'" their case is not moot under Los Angeles County v. Davis, 440 U.S. 625, 631 (1979).  Pls.' Opp. at 7.  This claim also lacks merit.  The Los Angeles County "standard does not enable complainants to garner more from an eliminated policy than they would have gained had their lawsuit been successful." Kiedos, 45 F. Supp. 2d at 88.  Here, noticeably missing from plaintiffs' analysis is any explanation of what "meaningful relief" this Court could grant to remedy the alleged continuing effects of HRD's former testing processes.

Specifically, plaintiffs fail to address HRD's argument that their claim for compelled hiring, with retroactive back pay, seniority, and other damages, is relevant only to the City of Lynn, the actual hiring authority.  See Defs.' Mem. at 8-9.  Plaintiffs also fail to consider the fact that ordering instatement would unfairly impinge on the interests of individuals currently on the certification list.  See id. at 9-10.  In this regard plaintiffs baldly assert that such considerations

---

[2] The First Circuit has noted that, even where the exception is applicable, "the [Supreme] Court has made clear that . . . the granting of equitable relief is discretionary." New England Regional Council of Carpenters, 284 F.3d at 18 n.3; cf. Southern Utah Wilderness Alliance v. Smith, 110 F.3d 724, 727 (10th Cir. 1997) ("In some circumstances, a controversy, though not moot in the strict Article III sense, is so attenuated that considerations of prudence and comity for coordinate branches of government counsel the court to stay its hand, and to withhold relief it has the power to grant.").  Here, as in New England Regional Council, the Court should avoid constitutional "adjudication addressed to a policy that no longer applies." 284 F.3d at 18 n.3.

are "not relevant to mootness," Pls.' Opp. at 9, but, to the contrary, whether this Court can grant the equitable relief plaintiffs are seeking is "the 'core question' compelled by Article III's requirement of a 'case' or 'controversy.'" Oceana, 2004 WL 1730340, at *4. And, as explained earlier, plaintiffs' request that they "be hired . . . with retroactive back pay, seniority, and other damages," if granted, would violate the equitable considerations detailed in Beecher. See Defs.' Mem. at 9-10.

In arguing otherwise, plaintiffs maintain that "where someone has been denied a job opportunity due to discrimination, 'the overarching preference is for reinstatement.'" Pls.' Opp. at 10. This case, however, involves a request for instatement. With one exception, all of the cases plaintiffs cite involve reinstatement—in the context of a traditional employer-employee relationship—where the rights of other individuals were not implicated. See id. The one exception is Thurman v. Yellow Freight Systems, Inc., 90 F.3d 1160 (6th Cir. 1996), but there, the court found that instatement was not an appropriate remedy because plaintiff failed to show that he was qualified for the job in question. 90 F.3d at 1171-72. Similarly, here, due to the numerous other hurdles in the process, it is not reasonably clear that, even absent the alleged discrimination, plaintiffs would have been hired as firefighters by the City of Lynn. See Defs.' Mem. at 10. Plaintiffs have not disputed, or even addressed, this point in their opposition.

Finally, plaintiffs assert that "the Court could grant Plaintiffs' requested equitable relief without actually ordering instatement, by ordering, for example, that Plaintiffs be placed at the top of the next entry-level firefighter eligibility list, with retroactive back pay and seniority." Pls.' Opp. at 9. But even assuming that plaintiffs could lawfully be placed at the top of the next list, that remedy is not included in plaintiffs' "requested equitable relief." Id.; see Plaintiffs' First

Amended Complaint at 11.  Plaintiffs cannot, at this late stage, "wait[] until after [HRD] ha[s] made substantial changes in its hiring practices . . . before requesting a broad range of new remedies, the source of which was not obvious in [their] original pleadings and prosecution of [their] cause."  St. Louis Fire Fighters, 96 F.3d at 330 n.6.  In St. Louis Fire Fighters the court held that plaintiffs' belated request for "injunctive relief promoting individual plaintiffs, compensatory damages, or other additional relief" did not save their case from mootness where such remedies had not been specified in the complaint.  Id.  The same conclusion obtains here.  Because the "mere potential of unrequested remedies" does not justify the Court's continued jurisdiction in this matter, id., plaintiffs' complaint should be dismissed in its entirety as moot.

## II.    PLAINTIFFS LACK STANDING TO ENFORCE THE BEECHER AND CASTRO DECREES.

In an attempt to establish standing under the Beecher and Castro decrees, plaintiffs contend that "minority applicants from every civil service community, whether or not falling under the remedial-hiring portion of the decree, were the intended and actual beneficiaries of the non-discriminatory examinations the Commonwealth was required to create and administer."  Pls.' Opp. at 13.  Plaintiffs further contend that, "[s]ince the Commonwealth has failed to administer a valid, non-discriminatory exam as required by the consent decree, the Commonwealth's violation of its obligations under the decree have not 'abated' and the 'pernicious effects' of its discriminatory examinations have not been cured."  Id. (quoting Mackin v. City of Boston, 969 F.2d 1273, 1276 (1st Cir. 1992)).

Plaintiffs' reading of the consent decrees is overly broad and misguided.  As defendants explained in their motion, the decrees were "carefully limited in extent and duration" to go no

9

further than necessary "to eliminate the lingering effects of previous practices that bore more heavily than was warranted on minorities." NAACP v. Beecher, 504 F.2d 1017, 1027 (1st Cir. 1974); see Defs.' Mem. at 13. Thus, if plaintiffs are correct that the Commonwealth owes an obligation to minorities in all civil-service communities—regardless whether the parity target established in the consent decrees has been reached—the decrees would go beyond their "agreed objects." Navarro-Ayala v. Hernandez-Colon, 951 F.2d 1325, 1343 (1st Cir. 1991); see Mackin, 969 F.2d at 1276. Such a result cannot be sustained because it would contravene the original parties' intent and extend the life of the decrees past the point that is constitutionally permissible. See Mackin, 969 F.2d at 1278.

Indeed, the logical extension of plaintiffs' argument is that the Commonwealth's obligations under the decrees would never cease. Plaintiffs reason that, because HRD has allegedly "failed to administer a valid, non-discriminatory exam as required by the consent decree," the "'pernicious' effects" of the Commonwealth's conduct has "not been cured." Pls.' Opp. at 13. Under this rationale, however, the decrees would illegally "operate in perpetuity." Quinn v. City of Boston, 325 F.3d 18, 24 (1st Cir. 2003). If plaintiffs are correct that they have an absolute "right under the two decrees to be evaluated under non-discriminatory examinations," Pls.' Opp. at 15, there is no identifiable ending point to HRD's duties under the decrees. Although plaintiffs seem to suggest that HRD's obligations will cease once every civil-service community in the state has attained parity,[3] this is not a logical result if plaintiffs buy their own argument. Plaintiffs' entire position is based on the proposition that the obligations of

---

[3] See, e.g., Pls.' Opp. at 14 ("the decrees themselves (including the examination provisions) are both still active by their own terms in other communities").

10


the Commonwealth and those of the municipalities do not operate in parallel under the decrees. If this is so, there is no logical reason why, under plaintiffs' rationale, the Commonwealth would not have continuing duties even after every civil-service community has reached the parity target.

Plaintiffs' reading would therefore result in decrees that illegally "operate in perpetuity," and it cannot be sustained. Quinn, 325 F.3d at 24. Plaintiffs can bring a fresh claim if they believe they were victims of discrimination. The consent decrees, however, were only intended to remedy the effects of past discrimination as they existed when the decrees were entered over 30 years ago. Because the City of Lynn has long since attained parity, plaintiffs have no rights under the decrees and no standing to sue for their enforcement.[4]  See Defs.' Mem. at 11-18.

### III.  EVEN ASSUMING PLAINTIFFS HAVE STANDING, THEY FAIL TO STATE A CLAIM FOR RELIEF UNDER THE BEECHER DECREE.

As plaintiffs concede, the Beecher decree expressly requires resolution of any issues regarding the contents of a proposed test "before any such test is put into use for the purpose of qualifying or selecting." NAACP v. Beecher, 371 F. Supp. at 521; see Pls.' Opp. at 16-17. Plaintiffs claim, however, that they are not bound by this provision "because they are not parties to the original decrees." Pls.' Opp. at 17; see also id. at 6. n.1 ("because Plaintiffs were not parties to the Beecher decree, its requirement for a prior challenge does not apply to them"). Plaintiffs' arguments are internally inconsistent. On the one hand, plaintiffs contend that they have standing to enforce the decrees, and on the other, they contend that they are not bound by the decrees' express terms. Plaintiffs cannot have it both ways. Assuming arguendo that they

---

[4] Defendants demonstrated in their motion to dismiss that the intervenor-plaintiffs also lack standing under the consent decrees due to lack of a redressable injury. See Defs.' Mem. at 17-18. The intervenors have filed no opposition to defendants' motion.

have standing under the decrees, plaintiffs were required to raise any concerns over the 2000, 2002, and 2004 firefighter exams prior to the respective examination dates. By failing to do so, they have waived any right to bring their claims now.[5]

Contrary to plaintiffs' argument, this result is not inconsistent with defendants' position regarding mootness. See Pls.' Opp. at 6 n.1 ("On the one hand, Defendants argue that Plaintiffs' challenge to the 2006 examination is too early, and on the other hand, they argue that Plaintiffs' challenge to the 2004 examination is too late, pursuant to Beecher."); see also id. at 17. The Beecher decree is a monitoring mechanism that allows for judicial oversight if a disagreement arises as to the contents of a proposed exam. NAACP v. Beecher, 371 F. Supp. at 521. The whole purpose of the decree is for the monitor to raise such issues, as a continuation of the Beecher litigation itself, before the test is administered; this is compelled by the terms of the decree, which must be construed under ordinary contract principles. Quinn, 325 F.3d at 30. But plaintiffs' claim that the 2006 examination is unconstitutionally discriminatory presents a vastly different question.[6] Plaintiffs do not explain how this Court can determine whether the new examination will result in adverse impact if the examination has not even been completed. Thus, the appropriate time to raise such a challenge is after completion and administration of the exam; until then, "it is simply impossible to anticipate whether there will be any state action which runs afoul of constitutional mandates." Mannington Mills, Inc. v. Shinn, 877 F. Supp. 921, 929 (D.N.J. 1995).

---

[5] For the same reason, the intervenor-plaintiffs also fail to state a claim for relief under the Beecher decree.

[6] Plaintiffs have recently moved to supplement their complaint to include a challenge to the 2006 examination. The State defendants intend to oppose that belated motion.

Accordingly, Count IV of the amended complaint, as it relates to the <u>Beecher</u> decree, should be dismissed for failure to state a claim upon which relief can be granted.

## CONCLUSION

For the reasons stated, the State defendants respectfully request that the Court dismiss all counts of the Amended Complaint as moot. In the alternative defendants request that the Court dismiss Count IV of the Amended Complaint for lack of standing or, with regard to the <u>Beecher</u> decree, for failure to state a claim upon which relief can be granted.

        Respectfully submitted,

        COMMONWEALTH OF MASSACHUSETTS, HUMAN RESOURCES DIVISION, and RUTH BRAMSON, in her capacity as Personnel Administrator of the Human Resources Division,

        By their attorney,

        THOMAS F. REILLY
        ATTORNEY GENERAL

        /s/ Sookyoung Shin
        Ronald F. Kehoe, BBO # 264260
        Sookyoung Shin, BBO # 643713
        Assistant Attorneys General
        Government Bureau
        One Ashburton Place, Room 2019
        Boston, MA 02108-1698
        (617) 727-2200, ext. 3221 (Kehoe), ext. 2052 (Shin)

Dated: March 13, 2006

**Certificate of Service**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as nonregistered participants on March 13, 2006.

/s/ Sookyoung Shin
Sookyoung Shin
Assistant Attorney General

# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JACOB BRADLEY, *et al.*,

        Plaintiffs,

v.

CITY OF LYNN, *et al.*,

        Defendants.

CIVIL ACTION
NO. 05-10213-PBS

### DECLARATION OF MARC CHAVANNE

I, Marc Chavanne, do hereby state under the pains and penalties of perjury:

    1.    Since October 2003 I have worked as a project manager at the Human Resources Division ("HRD"), an agency of the Commonwealth of Massachusetts. Prior to this position, I spent 26 years in HRD and its predecessor in a variety of capacities, including classification and compensation analyst and manager, appeals hearing officer, research and development manager, and most relevant to this case, deputy director of selection and director of test development.

    2.    From 1993 to 1994, HRD administered a physical ability test ("PAT") in conjunction with the April 1992 written firefighter examination. HRD incorporated the PAT as part of the firefighter testing process on the advice of Dr. Frank Landy, who was HRD's consultant at the time. Dr. Landy was involved throughout the testing and had on staff exercise physiologists who contributed in the development of the PAT events.

    3.    Due to difficulty in securing sites and constructing courses, the PAT process did not begin until Spring 1993 and ultimately concluded in Fall 1994. As a result, establishment of the certification list from the April 1992 written examination was delayed until November 1994.

Normally, the certification list is created in September or October of the same year following late April administration.

4.      Approximately 5000 firefighter applicants took the PAT in 1993 and 1994. Far greater numbers had taken the written examination in April 1992, but many of the applicants who passed the examination did not end up taking the PAT. With regard to minorities, 48% of the applicants who passed the written test did not take the PAT. This factored out to 540 of the total 1124 minority candidates removing themselves from the hiring process.

5.      Moreover, following administration of the test, HRD learned that minorities did not fare any better on the PAT than nonminorities. The PAT was scored in five-point increments, and only 38% of minorities (220 applicants) received a score of 100, versus 60% of nonminorities (2590 applicants). Minorities fared better at the next highest score of 95—23.3% of minorities (135 applicants) versus 19% of nonminorities (825 applicants)—but overall only 61.3% of minorities (355 applicants) scored either 100 or 95 versus 79% of nonminorities (3415 applicants). Thus, because an applicant needed to score in the 90s to have a realistic chance of being reached for hiring, the PAT did not appreciably diminish adverse impact and, if anything, actually increased adverse impact.

6.      The PAT also posed serious medical issues. During and following the PAT, several candidates developed severe illnesses, including renal conditions such as rhabdomyolysis, which in one case led to the need for dialysis. I am aware of at least eight cases where firefighter applicants were hospitalized as a result of the PAT testing in 1993 and 1994.

7.  Due to these and other issues, the PAT was ultimately incorporated into the firefighter hiring process as a pass/fail element administered only to candidates who have actually received job offers.


PURSUANT TO 28 U.S.C. § 1746, I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

EXECUTED ON THIS 10TH DAY OF MARCH 2006.

/s/ Marc Chavanne\_\_\_\_\_
Marc Chavanne