## PYLE, ROME, LICHTEN, EHRENBERG & LISS-RIORDAN, P.C.

Attorneys at Law
18 Tremont Street, Suite 500
Boston, MA 02108

Tod A. Cochran
Of COUNSEL

Warren H. Pyle
David B. Rome
Harold L. Lichten*
Betsy Ehrenberg
Shannon Liss-Riordan**
Terence E. Coles
Katherine D. Shea
Alfred Gordon

Nicole Horberg Decter**
Rebecca G. Pontikes
Leah M. Barrault
Stephen Young
David Conforto
Hillary Schwab**

*Also admitted in Maine
**Also admitted in New York

Telephone (617) 367-7200
Fax (617) 367-4820

April 10, 2006

**BY ELECTRONIC FILING**
The Honorable Patti B. Saris
United States District Court
One Courthouse Way
Boston, MA 02210

RE:    Jacob Bradley et al. v. City of Lynn et al.
U.S. District Court, Civil Action No. 05-CV-10213-PBS

Dear Judge Saris:

At the conference on Friday, your Honor requested that we send you some primer on statistics to help prepare for the testimony in this trial. We are providing you several short materials that the plaintiffs believe will assist with your understanding of the concepts to be discussed at the trial. These include (1) Judge Freedman's decision in the Beecher case, which utilizes the statistical concepts presented in this case in a lay fashion; (2) the EEOC Uniform Guidelines on Employee Selection Procedures, which describe the process for validation of a selection process under Title VII; and (3) a chapter from a text by Dr. Frank Landy, An Introduction to Industrial and Organizational Psychology, which introduces some of the statistical concepts that will be discussed.

**PYLE, ROME, LICHTEN, EHRENBERG & LISS-RIORDAN, P.C.**

We hope that these materials will be helpful to your consideration of this case.

Sincerely,

Shannon Liss-Riordan

cc:    Ron Kehoe, Esq.
       Sookyoung Shin, Esq.
       George S. Markopoulos, Esq.
       Nadine Cohen, Esq
       Mark D. Selwyn, Esq.
       Harold Lichten, Esq.
       Alfred Gordon, Esq.

Westlaw.

371 F.Supp. 507

371 F.Supp. 507, 7 Fair Empl.Prac.Cas. (BNA) 307, 7 Empl. Prac. Dec. P 9162

(Cite as: 371 F.Supp. 507)

Page 1

**H**

United States District Court,
D. Massachusetts.
**BOSTON CHAPTER, NAACP, INC., et al.**
v.
**Nancy B. BEECHER et al.**
**UNITED STATES of America**
v.
**CITY OF BOSTON et al.**
Civ. A. Nos. 72-3060-F, 73-269-F.

Feb. 8, 1974.
As Amended Feb. 11, 1974.

The United States brought an action against city and NAACP brought action against state civil service department. Both plaintiffs alleged violation of the Civil Rights Act of 1964 with respect to hiring of persons for fire departments. The District Court, Freedman, J., held that plaintiffs made a prima facie showing of discrimination in the use of the entrance examination; that burden was upon defendants to justify the challenged procedures; that results of tests designed to show job relationship of examinations were not sufficient to justify use of the examinations; that a prima facie case of discrimination with respect to recruitment was shown by the government but not by the NAACP; and that state civil service division and city would be required to actively recruit minorities, to cease using the discriminatory examination and, after establishing new eligibility lists on the basis of valid qualifications, to hire one minority group member for each white person hired until the complement of minorities on fire departments was commensurate with the percentage of minorities in the communities.

Order accordingly.

West Headnotes

**[1] Civil Rights ☞1116(1)**

78k1116(1) Most Cited Cases
    (Formerly 78k143, 78k41)
Municipal corporation, which is incorporated pursuant to law and which hires and maintains a fire department, is an "employer" within the meaning of the Civil Rights Act of 1964. Civil Rights Act of 1964, § 701 et seq. as amended 42 U.S.C.A. § 2000e et seq.

**[2] Civil Rights ☞1536**
78k1536 Most Cited Cases
    (Formerly 78k378, 78k43)
Where racial discrimination in employment selection procedures is alleged, plaintiff must first establish a prima facie case of discrimination and the burden then shifts to the defendant to justify challenged procedures. Civil Rights Act of 1964, § 701 et seq. as amended 42 U.S.C.A. § 2000e et seq.;
42 U.S.C.A. §§ 1981, 1983.

**[3] Civil Rights ☞1546**
78k1546 Most Cited Cases
    (Formerly 78k384, 78k44(2))
Statistics which showed that 55% of the white persons taking fire fighters exam passed while only 39% of the minority group members taking the exam passed was not sufficient to establish a prima facie showing that the exam was discriminatory. Civil Rights Act of 1964, § 701 et seq. as amended 42 U.S.C.A. § 2000e et seq.; 42 U.S.C.A. §§ 1981, 1983.

**[4] Civil Rights ☞1546**
78k1546 Most Cited Cases
    (Formerly 78k384, 78k44(2))
Fact that one city with minority a population of 23% had less than one percent minority representation on its fire-fighting force and that second city with minority population of 13% had .2% minority representation on its fire-fighting force, when combined with similar ratios for other cities in the state and when considered in light of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

371 F.Supp. 507                                                                              Page 2

371 F.Supp. 507, 7 Fair Empl.Prac.Cas. (BNA) 307, 7 Empl. Prac. Dec. P 9162

**(Cite as: 371 F.Supp. 507)**

fact that higher percentage of whites taking fire fighter exam passed than did minority members taking the exam established prima facie case that the exam, which was used in hiring of fire fighters in all cities, had discriminatory effect on minority group members. Civil Rights Act of 1964, § 701 et seq. as amended 42 U.S.C.A. § 2000e et seq.; 42 U.S.C.A. §§ 1981, 1983.

**[5] Civil Rights ☞1546**
78k1546 Most Cited Cases
    (Formerly 78k384, 78k44(2))
Where employment examination is shown to have a racially discriminatory impact, the employer must show that the exam is in fact substantially related to job performance by coming forward with convincing facts establishing a fit between the qualifications and the job. Civil Rights Act of 1964, § 701 et seq. as amended 42 U.S.C.A. § 2000e et seq.; 42 U.S.C.A. §§ 1981, 1983.

**[6] Civil Rights ☞1142**
78k1142 Most Cited Cases
    (Formerly 78k150, 78k9.13)
Employer whose job qualifications are alleged to be discriminatory cannot operate from some expert point of view that the qualifications and tests are doing what they are supposed to do; rather empirical evidence to that effect must be obtained. Civil Rights Act of 1964, § 701 et seq. as amended 42 U.S.C.A. § 2000e et seq.; 42 U.S.C.A. §§ 1981, 1983.

**[7] Civil Rights ☞1546**
78k1546 Most Cited Cases
    (Formerly 78k384, 78k44(2))
Examination-job correlation study which showed that results of examination were significant predictor of job performance in only two, or perhaps four, areas and that those two areas comprised only a fraction of the duties required on the job was insufficient to show that the examination, which was alleged to be racially discriminatory, was substantially related to job performance. Civil Rights Act of 1964, § 701 et seq. as amended 42 U.S.C.A. § 2000e et seq.; 42 U.S.C.A. §§ 1981, 1983.

**[8] Civil Rights ☞1545**
78k1545 Most Cited Cases
    (Formerly 78k383, 78k44(1))
Evidence that one city with minority population of 23% had less than one percent minority representation on fire department and that second city with minority population of 13% had only .2% minority representation, when taken in conjunction with similar figures for smaller cities made a prima facie showing of discrimination in the recruitment policies of those responsible for hiring for the fire departments. Civil Rights Act of 1964, § 701 et seq. as amended 42 U.S.C.A. § 2000e et seq.; 42 U.S.C.A. §§ 1981, 1983.

**[9] Civil Rights ☞1568**
78k1568 Most Cited Cases
    (Formerly 78k399, 78k46(10), 78k46)
Testimony that assistant supervisor of recruitment maintained mailing list of over 200 minority-related organizations to which he sent notices of any upcoming fire fighter examinations, that advertising in the electronic media and newspapers was carried out prior to the exams in an attempt to recruit minority members and that much effort was made in Spanish language indicated that persons alleging that recruitment policies were discriminatory would not succeed on the merits and were thus not entitled to preliminary relief. Civil Rights Act of 1964, § 701 et seq. as amended 42 U.S.C.A. § 2000e et seq.; 42 U.S.C.A. §§ 1981, 1983.

**[10] Civil Rights ☞1568**
78k1568 Most Cited Cases
    (Formerly 78k399, 78k46(10), 78k46)
Evidence that greatest source of new applicants for fire department was by word of mouth and encouragement from friends and relatives already on the force and evidence that force was 99% white showed that persons alleging that recruitment policies of fire department were discriminatory were likely to succeed on the merits and would suffer irreparable harm in the nature of lack of equal opportunity to compete for jobs on the fire department if injunctive relief was not granted. Civil Rights Act of 1964, § 701 et seq. as amended 42 U.S.C.A. § 2000e et seq.; 42 U.S.C.A. §§ 1981, 1983.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

371 F.Supp. 507, 7 Fair Empl.Prac.Cas. (BNA) 307, 7 Empl. Prac. Dec. P 9162

**(Cite as: 371 F.Supp. 507)**

**[11] Civil Rights ☞1562**
78k1562 Most Cited Cases
    (Formerly 78k393, 78k46(4), 78k46)
State civil service division and city, which had been shown to have discriminated in recruitment policies and entrance examinations for positions as fire fighters, would be enjoined from discriminating against any applicant and from certifying permanent appointments to the position of fire fighter unless done in compliance with terms set out in court's decree. 28 U.S.C.A. §§ 2201, 2202; 42 U.S.C.A. § § 1981, 1983.

**[12] Civil Rights ☞1562**
78k1562 Most Cited Cases
    (Formerly 78k393, 78k46(4), 78k46)
Civil service division which had been shown to have used a racially discriminatory entrance examination for position of fire fighter would be enjoined from utilizing that examination and required to use only such examinations as were demonstrably job-related and validated in accordance with guidelines issued by Equal Employment Opportunity Commission, or which could otherwise be shown to have no discriminatory impact. 28 U.S.C.A. §§ 2201, 2202; 42 U.S.C.A. § § 1981, 1983.

**[13] Civil Rights ☞1562**
78k1562 Most Cited Cases
    (Formerly 78k393, 78k46(4), 78k46)
City which had been shown to have engaged in discriminatory recruitment policies with regard to positions in fire department was enjoined from requesting certification of appointments for permanent positions on department unless city, before any examination was given, had contacted all minority organizations and provided them with information regarding the availability of positions and had advertised on radio and television in an attempt to recruit minority applicants. 28 U.S.C.A. §§ 2201, 2202; 42 U.S.C.A. §§ 1981, 1983.

**[14] Civil Rights ☞1562**
78k1562 Most Cited Cases
    (Formerly 78k393, 78k46(4), 78k46)
Civil service division which had been shown to have used a discriminatory examination for

certifying persons eligible for positions as fire fighters in various cities would be required to certify at least one minority group member for each white person certified until each fire department achieved a complement of minorities commensurate with the percentage of minorities within the community. 28 U.S.C.A. §§ 2201, 2202; 42 U.S.C.A. §§ 1981, 1983.

*509 Patrick J. King, Thomas A. Mela, Boston, Mass., Benjamin Jones, Roxbury, Mass., for plaintiff in Civ. A. No. 72-3060-F.

James M. Fallon, Dept. of Justice, Civil Rights Div., Employment Sec., Washington, D. C., Raymond Picard, Asst. U. S. Atty., Boston, Mass., for plaintiff in Civ. A. No. 73-269-F.

Edward D. Kalman, Walter Mayo III, John F. McGarry, Asst. Atty. Gen., Thomas F. McKenna, Asst. Corp. Counsel, Boston, Mass., for defendants.

FREEDMAN, District Judge.

These cases allege discriminatory practices on the part of the defendants in their qualification requirements and overall hiring policies for the position of firefighter in the City of Boston, in particular, and in other cities and towns of the Commonwealth of Massachusetts subject to state Civil Service law. Because of the identity of the issues involved and relief sought, the two cases were consolidated by the Court with the assent of the parties. United States v. City of Boston et al. is brought by the Attorney General to enforce the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., as amended by the Equal Employment Opportunity Act of 1972, (Pub.L. 92-261, March 24, 1972), and pursuant to 42 U.S.C. §§ 1981, 1983 for alleged deprivations of constitutionally protected rights. The plaintiff United States alleges discriminatory practices against blacks and Spanish-surnamed persons in recruitment policies, in the utilization of nonjob predictive tests and qualifications which have a detrimental impact on **510** blacks and Spanish-surnamed persons, and in the refusal to remedy those practices and correct the present effects of past racially discriminatory policies and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

371 F.Supp. 507, 7 Fair Empl.Prac.Cas. (BNA) 307, 7 Empl. Prac. Dec. P 9162

**(Cite as: 371 F.Supp. 507)**

practices. Plaintiff prays that the defendants be enjoined from continuing these alleged policies and ordered to conduct a meaningful minority recruitment program and to hire sufficient blacks and Spanish-surnamed persons to overcome the effects of alleged past discrimination. The Attorney General also seeks monetary compensation for the loss suffered by those minority persons who were denied employment opportunity because of the alleged discriminatory practices.

Boston Chapter, NAACP, Inc., et al. v. Beecher et al. is brought as a class action. The cause of action is said to arise pursuant to 42 U.S.C. §§ 1981, 1983 and 28 U.S.C. §§ 2201, 2202. Plaintiffs allege discrimination in defendants' policies of recruiting and in their use of allegedly discriminatory selection procedures including the written exam, the swim test, and use of police records. The relief requested is similar to that prayed for in the companion case, including the imposition of a one to one hiring ratio and attorneys' fees.

*Certification of a Class*
Pursuant to F.R.Civ.P. 23(c)(1), the Court has ordered that Civil Action No. 72-3060-F be maintained as a class action. The following classes have been certified:

(1) All black or Spanish-surnamed persons who have applied for the position of firefighter in any fire department in the Commonwealth of Massachusetts subject to Massachusetts Civil Service law, but have not become eligible for appointment under existing requirements.

(2) All black or Spanish-surnamed persons who have never applied for the position of firefighter because they have allegedly been deprived of information concerning firefighter employment opportunities as a result of the allegedly discriminatory recruitment practices of the defendants.

Class (2) is represented by plaintiff Howard. Class (1) is represented by all other named plaintiffs.

*Procedural Posture*
Evidence was heard on plaintiffs' request for preliminary relief including evidence on defendants' overall recruiting and testing practices on July 30,

1973 and September 11-17, 1973. It was agreed by the parties that the hearing for preliminary relief would be treated as a trial on the merits, pursuant to Rule 65(a)(2), as to the written examination only. The issue of recruitment remained at the preliminary injunction stage. The issues of the swim test requirement and use of police records were not raised at this posture.

Partly as the result of a self-imposed freeze and partly on instructions from the Court, the Massachusetts Division of Civil Service (MDCS) has not certified for appointment individuals from the currently existing Civil Service eligible list for the fire service in Boston, Springfield, Worcester, Cambridge, or New Bedford, since the commencement of these actions. By order of the Court, however, MDCS was allowed to certify twenty (20) individuals for the fire service in Boston after the Court determined that an emergency situation existed in that city.

*Present Hiring Procedure*
The following facts have been stipulated to by the parties.

Nancy B. Beecher, Joseph M. Duffy, Richard J. Healey, Wayne Budd, and Helen C. Mitchell are the members of the Massachusetts Civil Service Commission and they are charged with the setting of policy for the Division of Civil Service. From January 22, 1968 to April 5, 1973, Mabel A. Campbell was Director of Civil Service and responsible for the administration and operation of *511 the Division of Civil Service, including administering written examinations, medical examinations, strength requirements, and determining the good moral character of all persons seeking employment in the fire services in all cities (39) and in 68 towns in Massachusetts, including Boston. In addition, Ms. Campbell established eligibility lists and certified eligible individuals to those fire departments.

The Director of Civil Service, upon request of a city or town, establishes education requirements pursuant to the provisions of M.G.L. c. 31 § 6A. Approximately 15 fire departments, not including

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

371 F.Supp. 507                                                                                                    Page 5

371 F.Supp. 507, 7 Fair Empl.Prac.Cas. (BNA) 307, 7 Empl. Prac. Dec. P 9162

**(Cite as: 371 F.Supp. 507)**

the Boston Fire Department, require applicants to have a high school diploma or an equivalency certificate issued by the Massachusetts Department of Education. All other fire departments, including Boston, have no education requirements. The Director of Civil Service has been required by state law (M.G.L. c. 31 § 2A(m)) to establish a recruitment program to recruit persons to fill vacancies for officers and positions in the classified civil service, including firefighters, since March 1968. The responsibility of the Director of Civil Service to establish or conduct a recruitment program is subject to and dependent upon receiving sufficient funds for recruitment purposes through appropriations of the Massachusetts legislature. William McRell has been acting Director of the Division of Civil Service from April 5, 1973 to date.

The present Civil Service eligibility requirements for applicants for the position of firefighter in all cities (39) and 68 towns of the Commonwealth are as follows:
  a) age 19 to 35 years of age;
  b) no height requirements;
  c) no weight requirements;
  d) good moral character;
  e) high school diploma or equivalency certificate required when requested by a city or town; and
  f) average physical requirements. [FN1]

> FN1. Pursuant to Massachusetts state law certain cities and towns, including Boston, have residency requirements for firefighter service. There is some uncertainty as to the present effectiveness of such requirements in the Commonwealth as of this date. However, this Court notes that the Massachusetts Superior Court has recently overruled an opinion of the Attorney General for the Commonwealth and has determined that such requirements do exist, are valid, and must be followed.

The written examination for firefighter for all cities and towns in Massachusetts, including Boston, contain two parts. The first section is composed of 25 questions of a general intelligence nature. Each answer in Section I is worth 1 point.

The second section contains 75 questions which are taken from the "Red Book." Each answer in Section II is worth 1 point. This type of examination has been given for at least the last twenty years. Of the 25 questions in the general intelligence section of the written examination there are approximately six questions from each of the four areas of arithmetic, spelling, vocabulary, and general knowledge, and an occasional question on current events or civics. The "Red Book" is a Fire Manual for the Instruction of Applicants for Entrance Examinations in the Fire Service in cities and towns of the Commonwealth of Massachusetts, prepared by the Massachusetts Division of Civil Service. This book has been in circulation for at least 20 years. The latest publication of the manual was March 3, 1972.

Applicants who achieve a passing score of 70 of the written examination, referred to above, are then evaluated for their prior training and experience and rated on a scale of 70 to 100. The final score for each candidate is a composite of 70% of the written examination score and 30% of the training and experience score. But one must achieve a passing score of 70 on the written examination to have his training and experience evaluated. Those applicants who have a total composite score of both the written *512 examination and the training and experience over 70, must then pass a medical examination, meet certain strength requirements and the good moral character requirement. There are no points awarded nor is the total composite score affected in any way by these requirements; however, if a candidate does not meet any of these three requirements, he is not eligible for certification. Applicants who pass the written examination and fail any other requirement may pass those requirements anytime during the life of the eligibility list and have their name placed on said list. The final composite score is expressed to the second decimal place, i.e., "84.26." Disabled veterans are then placed on the list (100 down to 70), followed by veterans (100 down to 70), who are then followed by non-veterans (100 down to 70). Within six months of the date of the written examination, the Division of Civil Service establishes an eligibility list, and that list exists for a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

371 F.Supp. 507                                                                          Page 6

371 F.Supp. 507, 7 Fair Empl.Prac.Cas. (BNA) 307, 7 Empl. Prac. Dec. P 9162

**(Cite as: 371 F.Supp. 507)**

maximum of 2 years, at which time it expires by operation of state law, or the list expires by virtue of its exhaustion within that period of time. Every firefighter eligibility list for Boston prior to the current one, which was established in April 1972, has expired by virtue of its exhaustion.

In August 1971, the Division of Civil Service administered a statewide firefighter entrance examination, and with the approval of the Massachusetts Commission Against Discrimination, all applicants taking the examination were given the option of identifying their race, color or national origin. A three-page computer compilation of the results of the racial classification of applicants taking that examination revealed that 84% (3181/3790) of all applicants responded to one or more categories of the information requested, relative to race, color or national origin. On the current eligibility list for Boston, established on April 4, 1972, following the written examination of August 1971, there are presently more than 236 individuals; in addition approximately 98 have already been appointed.

[1] The City of Boston is a municipal corporation incorporated pursuant to the laws of the Commonwealth of Massachusetts and is a political subdivision of Massachusetts. The City of Boston is an employer within the meaning of 42 U.S.C. § 2000e(b), as amended. The City of Boston maintains and operates a fire department for the prevention and suppression of fires within its city limits. James D. Kelly is the Commissioner of the Boston Fire Department. In that capacity, he is responsible for the administration and operation of the Boston Fire Department including filling firefighter positions and assigning firemen within the department. Applicants to the Boston Fire Department currently must meet the following requirements:
   a) age 19 to 35 years of age; [Prior to 1971 the minimum age was 21.]
   b) no height or weight requirements;
   c) good moral character;
   d) no specific education requirements; and
   e) average physical requirements.
In order to become eligible for appointment to the

Boston Fire Department, an applicant must meet the requirements as administered by the Massachusetts Division of Civil Service.

Each of the four Boston firefighter eligibility lists established as a result of the examinations administered in August 1968, September 1969, January 1970, and September 1970 has expired, and each list was exhausted by the appointment of every individual on the list willing to accept appointment except for two or three candidates. Since January 1, 1969, Commissioner Kelly, appointing authority of the Boston Fire Department, has hired 454 individuals. Persons appointed to firefighter positions in the Boston Fire Department are required to complete a training program of approximately eight weeks at the Boston Fire Academy. Failure to satisfactorily complete that program is *513 ground for terminating a trainee's employment. Persons appointed to the firefighter position in the Boston Fire Department serve a probationary period of six months in accordance with Massachusetts Civil Service law. Performance which is not satisfactory to the appointing authority is ground for terminating a probationary firefighter's employment, in accordance with Civil Service law.

*Burden of Proof*

[2] It is generally accepted that where racial discrimination in employment selection procedures is alleged, the plaintiff must first establish a prima facie case of discrimination. If that is established, the burden shifts to the defendant to justify the challenged procedures. The duty of the Court in such cases has been outlined by the Court of Appeals for this Circuit in Castro v. Beecher, 459 F.2d 725 (1st Cir., 1972). That case involved similar issues relating to hiring procedures for the police departments in the Commonwealth. At page 732, the Court stated:
   "In the general course, a court faced with a claimed denial of equal protection must first ascertain whether the plaintiff has made such a threshold showing as to require a justification, must then identify the classification employed, and must finally determine whether the classification has been justified under governing standards."

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

371 F.Supp. 507                                                                              Page 7

371 F.Supp. 507, 7 Fair Empl.Prac.Cas. (BNA) 307, 7 Empl. Prac. Dec. P 9162

(Cite as: 371 F.Supp. 507)

In determining whether a plaintiff has made a "threshold showing" of discrimination, this judge has previously accepted statistical evidence of racial imbalance as sufficient to establish such a showing, or, to put it otherwise, as sufficient to establish a prima facie case of past racial discrimination. See Associated General Contractors of Massachusetts, Inc. v. Altshuler, 361 F.Supp. 1293, 1299 (D.Mass., 1973); aff'd 490 F.2d 9, (1 Cir., 1973), p. 18, fn. 15, and cases cited therein. In that case, a significant disparity between the minority population percentage in the City of Boston and the percentage of minorities employed in the construction trades in the Boston area was found to be sufficient to establish a prima facie case of racial discrimination on the part of the construction industry. In cases where a public employer's selection test is being challenged, however, most courts, in finding a prima facie case has been established, have relied on more than a comparison of population and employment statistics. Usually there has been reliable statistical evidence on the percentage of minorities who pass the exam in question as compared with the percentage of whites who pass the same exam. A significant disparity between such statistics showing that minorities pass at a lower ratio than whites has been held to establish a prima facie case that the exam is discriminatory. See Bridgeport Guardians, Inc. et al. v. Members of Bridgeport Civil Service Comm. et al., 482 F.2d 1333, 1335-1336 (2nd Cir., 1973); Castro v. Beecher, 459 F.2d, at 729; Chance v. Board of Examiners, 458 F.2d 1167, 1171 (2nd Cir., 1972); Pennsylvania v. O'Neill, 348 F.Supp. 1084, 1089-1090 (E.D.Pa., 1972). Often the Courts have supported these statistics by referring to a comparison of population and employment statistics, [Bridgeport Guardians, supra, at 1335 of 482 F.2d; Castro v. Beecher, 334 F.Supp., at 935-936.] and a few courts have appeared to rely almost exclusively on the latter type of statistical comparison. See Carter v. Gallagher, [FN*]3 E.P.D. ¶ 8205 (1971), aff'd. 452 F.2d 315, 323 (8th Cir., 1971); Fowler v. Schwarzwalder, 351 F.Supp. 721 (D.D.Minn., 1972); Western Addition Community Organization v. Alioto, 330 F.Supp. 536, 539 (N.D.Cal., 1971).

FN* Employment Practices Decisions.

[3] As noted previously, applicants taking the August 1971 exam were given the option of identifying their race, color or national origin. Some 84% responded and statistics were compiled as a result thereof. Of the 15 persons who *514 identified themselves as Negroid, eight passed for a figure of approximately 54%. Of the 3,089 applicants identified as Caucasion, 1737 or approximately 56% passed. Eighteen applicants identified themselves as blacks with eight passing or approximately 44.5%, as opposed to a 55% passing rate for those identified as white. Fifteen identified themselves as of Spanish origin. Five passed for a 33.3% passing rate. The combined black and Spanish-origin passing rate was 39%. Plaintiffs suggest these statistics are sufficient to establish a prima facie case that the exam discriminates against blacks and Spanish-surnamed persons. The Court is not impressed by such obviously meager statistics although it does recognize that some courts have indeed relied on such unconvincing statistics. The District Court in Carter v. Gallagher, 3 E.P.D. ¶ 8205 (1971), based a prima facie finding of discrimination on statistics which showed that over a 20-year period 22 blacks took the exam and 6 passed for a 27.27 percentage. In Fowler v. Schwarzwalder, 348 F.Supp. 844, 846 (D.D.Minn., 1972), the Court noted that while 19 out of 26 minorities passed the exam, 202 of 318 whites passed. In later proceedings the Court neglected this statistic and found that a prima facie case was established on the basis of a comparison between population figures and employee figures. 351 F.Supp. 723, 724 (1972).

This Court does not find the available exam statistics sufficient in themselves to establish a prima facie case showing that the exam is discriminatory. A comparison of population and employment statistics, however, is much more telling. Boston has a black population of approximately 16%. The combined minority population may exceed 23%. [See Associated General Contractors, supra.] The city has a fire force of approximately 1,983 men. Of that total there are 16 blacks and 2 Spanish-surnamed persons who represent

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

371 F.Supp. 507                                                                                          Page 8

371 F.Supp. 507, 7 Fair Empl.Prac.Cas. (BNA) 307, 7 Empl. Prac. Dec. P 9162

**(Cite as: 371 F.Supp. 507)**

approximately 0.9% of the total force. The City of Springfield has a black population of approximately 13%. Of 475 firefighters in that city, one is black and none are Spanish-surnamed. The one black represents 0.2% of the total force. The City of Cambridge has a black population of 6.1%, and a fire fighting force of 305 men, four of whom are black; one is Spanish-surnamed. They represent approximately 2% of the total force. New Bedford has a black population of approximately 3.5%. Minorities represent approximately 1% of the fire force. Worcester has a black population of approximately 2%. Minorities represent 1% of the fire force there.

[4] These statistics, especially for the Cities of Boston and Springfield, are most significant. The Court uses them in support of the meager exam statistics and finds that plaintiffs have established a prima facie case that the Fire Fighter Entrance Examination (FFEE) has a discriminatory effect on blacks and Spanish-surnamed persons. As noted in Vulcan Society v. Civil Service Commission, 490 F.2d 387 (2nd Cir. 1973), such a finding is not determinative of the issue but merely shifts the burden to the defendant to justify the use of the exam. This is a burden a public employer should not be unwilling to assume.

*Validation*

[5][6] The burden has shifted to the defendants to prove a "manifest relationship" between the exam and the job. [Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).] In Castro v. Beecher, *supra*, at 459 F.2d 732, the Court of Appeals stated that where the suspect classification (here the FFEE) is shown to have a racially discriminatory impact, the employer must show that the exam is in fact "substantially related" to job performance by coming forward with "convincing facts" establishing a fit between the qualifications and the job. Defendants' expert Costa testified that the employer cannot operate from some expert point of view that the tests are doing what they are supposed to do. It was his *515 opinion that the courts and professional psychological standards always require that empirical evidence be obtained. [Tr. 3-22.] The

Court agrees.

Where it has been determined that an exam is suspect, the courts have required that a "fit" between the exam and job performance must be established by a study conducted according to professionally accepted standards. The Equal Employment Opportunity Commission Guidelines on Employee Selection Procedures, 29 C.F.R. 1607, et seq., suggest minimum standards for test validity and establish guides to be used in determining the validity of employment tests. "Courts confronted with challenges to public employment examinations predicated upon the equal protection clause of the Fourteenth Amendment have generally agreed that the Guidelines issued by the EEOC provide persuasive standards for evaluating claims of job-relatedness." [Vulcan Society v. Civil Service Commission, 360 F.Supp. 1265, 1273, n. 23 (S.D.N.Y., 1973). See also Western Addition Community Organization v. Alioto, 340 F.Supp. 1351 (N.D.Cal., 1972), and cases cited in n.3 of 1354.] And as was noted in Officers for Justice v. San Francisco, 371 F.Supp. 1328 (N.D. of Cal., 1973), at p. 1337, these Guidelines may indeed have the force of law in cases brought under Title VII of the Civil Rights Act of 1964. See *Griggs, supra,* at 433, of 401 U.S., at 854 of 91 S.Ct. where the Court stated:

"The Equal Employment Opportunity Commission, having enforcement responsibility, has issued guidelines interpreting § 703(h) to permit only the use of job-related tests. The administrative interpretation of the Act by the enforcing agency is entitled to great deference.... Since the Act and its legislative history support the Commission's construction, this affords good reason to treat the guidelines as expressing the will of Congress."

The Civil Service defendants apparently anticipated their burden and during the pendency of these matters caused a validity study to be undertaken by Dr. Costa, who has been retained as the principal psychological testing consultant to the MDCS and was qualified by the Court to testify as an expert witness on employment testing practices. Some brief remarks about validity study procedures in general may be beneficial at this point.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

371 F.Supp. 507                                                                                      Page 9

371 F.Supp. 507, 7 Fair Empl.Prac.Cas. (BNA) 307, 7 Empl. Prac. Dec. P 9162

(Cite as: 371 F.Supp. 507)

There are two types of test validation studies recognized by the EEOC Guidelines. The Court will borrow from Judge Weinfeld's clear and concise descriptions of these studies in *Vulcan Society, supra,* 360 F.Supp. 1265, 1273 (1973).
"The preferred method of test validation is criterion-related or empirical validity, which includes what are referred to as the predictive and concurrent methods of validation. Predictive validation consists of a comparison between the examination scores and the subsequent job performance of those applicants who are hired. If there is a sufficient correlation between test scores and job performance, the examination is considered to be a valid or job-related one. Concurrent validation requires the administration of the examination to a group of current employees and a comparison between their relative scores and relative performance on the job."
Predictive validation is preferred where feasible over concurrent validation. A method less preferable than criterion related validity is known as "content validity." Again borrowing from Judge Weinfeld in *Vulcan, supra,* at p. 1274:
"Content validation is less preferable than the criterion-related methods of test validation but nevertheless a professionally accepted means of establishing job-relatedness where the more desirable empirical methods are impractical. [See EEOC Guidelines, 29 C.F.R. § 1607.5(a).] An examination has content validity if the content of the examination matches the content of the job. For a test to be content *516 valid, the aptitudes and skills required for successful examination performance must be those aptitudes and skills required for successful job performance. It is essential that the examination test these attributes both in proportion to their relative importance on the job and at the level of difficulty demanded by the job."

For either type of study, it is important that a careful job analysis be undertaken. The criteria used for an empirical validation study should be important criteria selected on the basis of a thorough job analysis. Likewise, a thorough knowledge of the job to be tested is necessary when constructing a content valid examination. "A job analysis is a thorough survey of the relative importance of the various skills involved in the job in question and the degree of competency required in regard to each skill. It is conducted by interviewing workers, supervisors and administrators; consulting training manuals; and closely observing the actual performance of the job." *Vulcan supra,* at 1274.

Dr. Costa conducted what he described as a concurrent criteria-related validity study. A brief discussion of terms as described to the Court is in order. The mathematical relationship between the test scores and the measures of job performance is referred to as the correlation coefficient. A correlation coefficient of .00 means the study shows no relationship between the test and job performance, while a coefficient of 1.00 indicates a perfect relationship between the two. In order for a correlation coefficient to have significance, it must be both statistically and practically significant. Statistical significance means that the possibility of the results being reached by chance are minimal. Practical significance means that the coefficient shows a sufficiently high relationship between success on the test and successful job performance. Both Dr. Costa and plaintiffs' expert, Dr. Hunt, agreed that as a "rule of thumb" a coefficient of .3 would be the minimum level to indicate a satisfactory relationship. A lower coefficient would not be practically significant and would not justify use of the test.

Dr. Costa used two groups of subjects in his study. Group I consisted of 88 white Boston firefighters who had been recently appointed to the force from the list established in April 1972 as a result of the August 1971 FFEE. Group II consisted of 134 men who had been firefighters for approximately two years. The study implemented two "Performance Appraisal Systems." System I tested for job relatedness between the MDCS job predictors; i. e. exam score, training and experience, and the final score (general average mark), and the performance of 13 tasks considered by both experts to be important criteria of the job. The criteria consisted of such tasks as ladder extension, handling a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

371 F.Supp. 507                                                                    Page 10

371 F.Supp. 507, 7 Fair Empl.Prac.Cas. (BNA) 307, 7 Empl. Prac. Dec. P 9162

**(Cite as: 371 F.Supp. 507)**

pre-connected hose (both team-type performances consisting of nine sub-tasks with each man being tested at each subtask), and such individual performances as air mask operation, extinguisher selection, securing lines and knots, and hose and hydrant operation. Only Group I was tested in Appraisal System I. The study was not done under actual firefighting conditions, but was conducted at the Boston Fire Department's training camp on Moon Island. Appraisal System II consisted of ratings of job performance obtained from company captains and lieutenants collected under actual firefighting conditions. The men were rated on twelve separate scales including understanding building, constructions, and fire behavior; mechanical ability; holding up under pressure and stress; carrying out orders; and overall job effectiveness. Both Groups I and II were rated in System II.

System II did not reveal any significant correlations between the two test criteria used (written exam score and general average mark) and successful job performance in either group tested. Dr. Costa admitted that if the results of System II were all that he had available upon which to base a conclusion, he would conclude that the exam was not a *517 valid predictor of successful job performance. (Tr. 4-22, 23.)

Dr. Costa concluded that System I revealed seven significant correlations. In three of these, however, the predictor was the general average mark score. Since this score is a composite of the written exam score and the training and experience score, its utility in establishing the validity of the exam itself seems questionable. In addition, two of the significant correlations are based on a comparison of the number of errors made on the four best predicted criteria and the written test score. Frankly, the Court has had difficulty understanding the significance of these correlations. Plaintiff argues it is merely a restatement of the original thirteen criteria, only two of which have been shown to have a significant correlation with the written exam. This may be so. At any rate, the Court does observe that the Air Mask Operation (.346) and the Loop Man Position (.313) are the

only two job tasks which show a significant relationship with the written exam score, and Dr. Hunt described these correlations as being barely significant. (Tr. 4-141.)

Experts have interpreted the EEOC Guidelines to require that at least one relevant criterion be both statistically and practically significant. 29 C.F.R. § 1607.5(c)(1). Dr. Hunt testified that if one significant correlation is to be accepted as evidence that an exam is job related, the one relevant criterion must represent an adequate measure of total job performance factors. If the one criterion only represents a small percentage of the important factors of the job, this should not be considered adequate to support a conclusion of test validity. Although she agreed that the 13 criteria implemented were important, it was Dr. Hunt's opinion that there were only two significant correlations and that those two did not represent an adequate measure of the total factors involved in the job. Based on Dr. Costa's study, she testified that she would not conclude the exam was job related. Dr. Costa is of the opinion that the exam has been shown to be valid according to EEOC Guideline minimum requirements and he has concluded that the exam is a valid predictor of job performance.

The Court has had no little difficulty in examining the testimony of both experts and in interpreting Dr. Costa's study and the results derived therefrom. Nor has the Court relished the thought of determining which expert opinion to accept on a subject about which the Court knows very little. It is easy for a member of the legal profession, however, to understand how two competent professionals can come to different conclusions given the same set of facts. And it appears, as with the law, that the area of psychological testing is not one where elements of preciseness and exactness usually obtain. The EEOC Guidelines, 29 C.F.R. § 1607.5(c)(1), caution that a test should be closely scrutinized when it is valid against only one component of job performance. The Court feels close scrutiny should also be given where the test may be shown to be valid against a few components of job performance where those components represent only a small percentage of the total job.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

371 F.Supp. 507                                                                                      Page 11

371 F.Supp. 507, 7 Fair Empl.Prac.Cas. (BNA) 307, 7 Empl. Prac. Dec. P 9162

(Cite as: 371 F.Supp. 507)

Close scrutiny seems particularly appropriate where the exam was not designed by experts. The evidence indicated that the FFEE was designed by persons with no training in psychological measurement or testing.

[7] The Court has concluded that defendants have not met their burden of demonstrating that the exam is "in fact substantially related to job performance." See *Castro, supra,* 459 F.2d at 732. Arguably, the test has been validated according to the EEOC Guidelines' minimum standard. However, the Court cannot conclude that the study provides the "*convincing* facts establishing a fit between the qualification and the job," which *Castro, supra,* requires. The fact that only two, or perhaps four, significant correlations were found between the exam and components of job performance-components which represent only a fraction of those duties a firefighter *518 encounters-and the fact that those correlations were only minimally significant does not constitute "convincing" evidence of job relatedness. There was also some criticism of the way in which the study was conducted, but the Court does not feel such criticism warrants discussion in light of this determination.

The Court does not wish to imply that it is establishing standards apart from those embodied in the EEOC Guidelines. However, these Guidelines must be read in the context of certain precedent binding upon this Court (*Griggs, supra; Castro, supra*) which clearly implies that facial compliance with the minimum standards may not be sufficient to meet the "heavy burden" which falls upon a public employer when required to prove the validity of a selection examination which has an adverse racial impact.

*Recruitment*
The parties did not agree to treat the hearing as a trial on the merits as to the recruitment issue. As noted previously, since 1968, M.G.L. c. 31 § 2A has required the Director of Civil Service to establish a recruitment program to fill vacancies in the classified civil service, including positions as firefighter. Apparently, the extent to which the

program is operated is dependent upon the amount of funds received through appropriations of the Massachusetts legislature. Prior to 1968, it appears that the only statutory duty was to send posters to the city and town halls throughout the Commonwealth, advising the public of available positions and any up-coming exam.

Although there does not appear to be any statutory duty to recruit on the part of the Boston Fire Department, Commissioner Kelly testified at the taking of his deposition that, as Commissioner, he has direct responsibility for recruiting for the Department. However, he has delegated that job to the officer in charge of the Community Relations Division of the Department and despite the Commissioner's ultimate responsibility, he expressed very little knowledge of what actual efforts have been made in the area of recruiting.

[8] Based on a comparison of the population statistics and minority employment statistics referred to earlier, plaintiffs have made a threshold showing of discrimination in the recruitment policies of the MDCS and of the Boston Fire Department. Defendants have presented some evidence attempting to rebut that inference.

In November of 1971, Barton Graham was employed as Assistant Supervisor of Recruitment for the Division of Civil Service. He testified that the present emphasis of the recruiting effort is in the area of minority recruiting for the fire service and corrections service. The Division has a mailing list of over 200 minority related organizations which receive any notices of up-coming exams. He and his subordinates have visited organizations and schools, and a year ago in anticipation of an up-coming exam there was advertising over the electronic media. Newspaper advertising has been done. In the City of Springfield, Mr. Graham has worked closely with the Springfield Urban League which has contracted with the Division to recruit minorities in that part of the state. Apparently these efforts have been quite successful judging from some 200-plus applications received from minorities from the Springfield area. The Division has made plans to increase these efforts, including

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

371 F.Supp. 507, 7 Fair Empl.Prac.Cas. (BNA) 307, 7 Empl. Prac. Dec. P 9162

**(Cite as: 371 F.Supp. 507)**

continued advertising over the local electronic media and the use of billboards. There has also apparently been much effort to advertise in the Spanish language and one of Mr. Graham's subordinates has concentrated on recruiting Spanish-surnamed persons. Prior to these recent efforts, it appears the Civil Service did little more than what was required of them by state law, that is sending posters to city and town clerks.

In light of the lack of any pre-1968 statutory duty to recruit, the lack of any evidence indicating the Division of Civil Service ever did, in fact, engage in any *519 policy of positive recruitment until recently, and the evidence presented by Civil Service defendants as to current recruitment activities, the Court feels the defendants have come very close to rebutting any inference they discriminated in their recruitment policies. In fact, they had no policy in the past other than the statutory requirement. Even if there had been an implied duty or a necessity to recruit and interest persons in joining the fire force, such an obligation would most logically have fallen upon the city or town in need of firemen and not the Civil Service.

[9] The Court finds that it is not probable plaintiffs will succeed on the merits as to the issue of alleged discriminatory recruitment policies on the part of the Civil Service defendants, and preliminary relief is therefore denied. Practically speaking, this determination has little effect as the Court will require, as part of its order, an affirmative recruitment policy to help remedy the present effects of past discrimination on the part of the Civil Service-that discrimination being, the requirement that applicants pass a non-job related examination which has an adverse racial impact on blacks and Spanish-surnamed persons.

The City of Boston also presented evidence attempting to rebut the inference that they have engaged in discriminatory recruitment policies. In 1968, two black Boston firefighters spent one day in Boston's predominantly black neighborhood passing out literature and trying to promote interest in the fire department. One of the men, Robert Powell, testified they approached from 80 to 100 people

who indicated interest. The people were told of a training program which would be held to help prepare minority applicants for the FFEE. Such a program was held. It was open to all applicants and few blacks actually attended. There was no evidence indicating what, if any, type of recruiting was done between 1968 and 1972, although the training courses did continue in those years. In 1972, the fire department accelerated somewhat its minority recruitment program. Two black firefighters testified that for a period of weeks they talked to organizations, at high schools and to people on the street trying to promote interest among blacks in the fire department. Each of them had also at different times been sent out of state, at the department's expense, to conferences of black firefighters where recruitment efforts and techniques were apparently discussed. A Spanish-surnamed firefighter testified that he spent approximately two weeks in 1972 doing full-time recruitment work in the predominantly Spanish-speaking neighborhood of Boston. He passed out leaflets and arranged for announcements to be made over a Spanish radio program. About 100 people indicated an interest but he recalls only approximately 30 showed up for the first training class and that number rapidly dwindled.

All witnesses who were asked agreed that the greatest source of new applicants for the fire department is word of mouth and encouragement from friends and relatives already on the force. This was recognized as being true in the police department by Judge Wyzanski in his order approving the consent decree in Castro v. Beecher, 365 F.Supp. 655 (D.Mass., 1973), at 659. This Court is of the opinion that the fire department itself is the entity more closely concerned with getting people to fill vacant positions on the force. If indeed, for so many years those positions have been filled as the result of white firemen encouraging white friends and relatives to join the force, it is no little wonder that blacks and Spanish-surnamed persons represent such an insignificant percentage of the force. It is of course most understandable how this has happened and the Court wishes to make it clear that it is not suggesting such an exclusionary policy has been followed intentionally

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

371 F.Supp. 507                                                                                            Page 13

371 F.Supp. 507, 7 Fair Empl.Prac.Cas. (BNA) 307, 7 Empl. Prac. Dec. P 9162

**(Cite as: 371 F.Supp. 507)**

or by design. Such a finding is not essential for the granting of injunctive relief. [See *Griggs, supra.*] Where, however, the policy has in effect resulted in the exclusion of minorities **\*520** from the fire department, the policy must be changed and present effects of past discrimination must be remedied.

[10] From these facts the Court has determined that plaintiffs will suffer irreparable harm in the nature of a lack of equal opportunity to compete for jobs on the Boston Fire Department, that the granting of preliminary relief will not cause irreparable harm to the defendants, that plaintiffs are likely to succeed on the merits, and that the public has an interest in being served by a fire department which offers equal opportunity for employment to all of its citizens.

*Relief*

There is a substantial body of case law allowing, and in some instances requiring, affirmative relief to remedy the present effects of past discrimination. "We bear in mind that the court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." Louisiana v. United States, 380 U.S. 145, 154, 85 S.Ct. 817, 822, 13 L.Ed.2d 709 (1964). See also *Associated General Contractors, supra,* and cases cited therein at 361 F.Supp. 1303-1307. Affirmative relief has been granted, in particular, in a number of cases where discriminatory hiring practices have been found in municipal police and fire department hiring policies. See Vulcan Society v. Civil Service Commission, supra, 490 F.2d 387 (Nov. 21, 2nd Cir., 1973); Bridgeport Guardians, *supra;* Commonwealth v. O'Neill, 473 F.2d 1029 (3rd Cir., 1973); Castro v. Beecher, *supra,* at 459 F.2d 725; Carter v. Gallagher, *supra;* Officers for Justice, *supra;* Harper v. Mayor and City Council of Baltimore, 359 F.Supp. 1187 (D.Md., 1973).

The Court is vested with broad discretionary power in shaping equity decrees. "Moreover, in constitutional adjudication as elsewhere, equitable remedies are a special blend of what is necessary, what is fair, and what is workable. 'Traditionally, equity has been characterized by a practical

flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs.' [Brown v. Board of Education, 349 U.S. 294, 300, 75 S.Ct. 753, 99 L.Ed. 1083 (1955).]" Lemon v. Kurtzman, 411 U.S. 192, 200, 93 S.Ct. 1463, 1469, 36 L.Ed.2d 151 (1972). In framing its relief this Court has attempted to "eschew rigid absolutes and look to the practical realities and necessities inescapably involved in reconciling competing interests, notwithstanding [that] those interests have constitutional roots." *Lemon, supra,* at 201, 93 S.Ct., at 1469. Among other things, the Court has considered the importance of preserving morale within the fire departments and avoiding racial discord. It has considered the understandable anxiety of men currently on existing Civil Service eligibility lists and is concerned that they not be dealt with unfairly. It is concerned with the future of plaintiffs who have been discriminated against, though it be unintentional, and who seek an equal opportunity to compete for positions on the fire departments throughout the Commonwealth. And it is concerned with the public which deserves to have a full complement of qualified firefighters protecting the cities and towns of the Commonwealth.

The Court has studied the proposed decrees submitted by the parties and has studied and adopted some thoughts from the final consent decree entered in Castro v. Beecher, *supra.* The Court would like to add that the following decree is subject to amendment where the parties so agree and with the approval of the Court.

*Decree*

This case having come before the Court for a hearing on plaintiffs' motion for preliminary injunction and the parties having agreed pursuant to Federal Rule of Civil Procedure 65(a)(2) that the evidence presented on the testing issues should be considered as the **\*521** evidence on the trial on the merits, and the Court having heard the testimony of the witnesses and the oral arguments of the parties for approximately five and one-half trial days, and the Court having considered the oral and documentary evidence presented, the briefs and arguments of counsel, and having made findings of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

371 F.Supp. 507                                                                                     Page 14

371 F.Supp. 507, 7 Fair Empl.Prac.Cas. (BNA) 307, 7 Empl. Prac. Dec. P 9162

(Cite as: 371 F.Supp. 507)

fact and conclusions of law, and being of the opinion that a decree should be entered; it is hereby ordered, adjudged and decreed:

[11] 1. The defendants City of Boston and Massachusetts Division of Civil Service and their officials, agents, employees, and all persons in active concert or participation with them are enjoined from engaging in any act or practice which has the purpose or effect of discriminating against any applicant or potential applicant for employment with the Boston Fire Department or any other fire department in the Commonwealth subject to Civil Service law.

2. No further certifications of permanent appointments shall be made to the position of firefighter for the City of Boston or other cities and towns subject to Civil Service law on the basis of the list completed from the August 1971 firefighter examination unless done in compliance with the terms of this decree.

3. The City of Boston and any other city or town subject to Civil Service law may request Civil Service for immediate certification of candidates who are currently on the existing Civil Service eligibility list to fill, on a provisional basis, existing vacancies or vacancies which may arise prior to full compliance with this decree. The Court further orders that the life of said list shall, if necessary, be extended beyond the time of its expiration under Massachusetts law and until a new eligibility list is established in accordance with this decree. Should the existing list prove insufficient to fill the number of vacancies existing, the cities or towns subject to Civil Service law may hire firefighters on a provisional basis. The method of selection shall be left to defendants' discretion.

[12] 4. The Massachusetts Division of Civil Service shall cease using written firefighter entrance examinations of the type administered by the Division of Civil Service in August 1971, for the purpose of determining qualifications for the selection of firefighters. Should the Division of Civil Service desire to utilize entrance examinations in the future for the purpose of selecting

firefighters, such examinations shall be demonstrably job-related and validated in accordance with the "Guidelines on Employees Selection Procedures" issued by the Equal Employment Opportunity Commission, 29 C.F.R. § 1607.1 et seq., or otherwise shown to have no discriminatory impact. If the parties disagree as to whether a written examination has been shown to be valid within the meaning of the Guidelines, the question of their validity and job relatedness shall be resolved by the Court, and such resolution, whether by the parties' agreement or by the Court, shall be accomplished before any such test is put into use for the purpose of qualifying or selecting. As with the instant study, the Court will scrutinize closely a future study which shows only a minimal level of job-relatedness.

[13] 5. Defendant City of Boston is preliminarily enjoined from requesting certifications of appointments for permanent positions on the fire department unless the following conditions have been complied with. Whenever openings occur in any positions covered by this Decree warranting the giving of an examination, the defendant City of Boston shall contact organizations in the black and Spanish-surnamed communities and high schools and junior colleges with substantial black and Spanish-surnamed enrollments and shall provide them with information regarding such openings, including qualifications and selection procedures, the rates of pay and hours of work and the time, place and method of applying for such vacancies.

6. At least 45 days prior to any examination for firefighter, the defendants *522 City of Boston and Division of Civil Service shall engage in such personal recruiting efforts and such public service and other announcements on radio and television stations and in other media directed at the black and Spanish-surnamed communities as are reasonably necessary in order to provide enough qualified black and Spanish-surnamed American applicants to achieve the goals set forth in this decree.

[14] 7. Subsequent to obtaining the results of a valid examination, the defendant Director of the Massachusetts Division of Civil Service, the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

371 F.Supp. 507                                                                                                                    Page 15

371 F.Supp. 507, 7 Fair Empl.Prac.Cas. (BNA) 307, 7 Empl. Prac. Dec. P 9162

(Cite as: 371 F.Supp. 507)

defendants Massachusetts Civil Service Commissioners and their successors in office, shall promptly commence certifying firefighter applicants as eligible for appointment for each fire department subject to Civil Service. For each fire department a pool of eligible firefighter candidates shall be established and candidates certified in the following manner:

(a) Group A shall consist of all black and Spanish-surnamed applicants who failed any previous Fire Fighter Entrance Examination but passed the new valid examination and are otherwise qualified for appointment on the basis of existing requirements. Said candidates shall be ranked in accordance with existing Massachusetts law.

(b) Group B shall consist of all persons on the current eligibility list established on April 4, 1972. Said candidates shall be ranked in accordance with existing Massachusetts law except that any such persons who have been appointed to a fire department from said list on a provisional basis shall be listed first.

(c) Group C shall consist of all black and Spanish-surnamed persons, excluding those in Group A who shall pass the new valid examination and are otherwise qualified for appointment on the basis of existing requirements. Said candidates shall be ranked in accordance with existing Massachusetts law.

(d) Group D shall consist of all other persons, excluding those in Groups A, B and C, who pass the new valid examination and are otherwise qualified for appointment on the basis of existing requirements. Said persons shall be ranked in accordance with existing Massachusetts law.

8. In response to requisitions submitted by fire departments, candidates shall be certified to such departments on the basis of one candidate from Group A for every candidate certified from Group B until the list of candidates from Group A is exhausted.

9. Upon the exhaustion of Group A, candidates shall be certified to requisitioning fire departments on the following basis:

(a) For the Cities of Boston and Springfield, one

candidate from Group C for each candidate certified from Group B.

(b) For all other cities and towns, one candidate from Group C for every 3 candidates certified from Group B, until the candidates from Groups B and C are exhausted.

(c) If Group B is exhausted prior to Group C, candidates will be certified from Group D in accordance with the ratio established for Group B in paragraphs 8 and 9.

10. Should a candidate qualify to be placed in Groups A, B or C, after exhaustion of the Group for which he is eligible, said Group will be revived for purposes of affording the candidate the position he would have enjoyed.

11. Upon the exhaustion of Groups A, B and C, candidates shall be certified from Group D. Groups C and D shall expire in accordance with Massachusetts law.

12. The above hiring procedure shall apply to all future eligibility lists established subsequent to a valid firefighter *523 entrance examination, and shall apply to all cities and towns subject to Civil Service law which have a minority population of 1% or more. Any new list established after the exhaustion of the list described herein shall include a Group of all eligible blacks and Spanish-surnamed persons (as in Group C) and a Group of all other eligible persons (as in Group D). Candidates shall be certified from each Group in accordance with the ratio established in paragraph 9. As a city or town achieves a complement of minorities commensurate with the percentage of minorities within the community, certifications will be made according to existing Massachusetts law.

13. At this time, the Court will make no specific order as to record-keeping or reporting on the part of the defendants. The Court will give the parties 30 days in which to attempt to reach a satisfactory agreement on those issues. The Court would expect the parties to bear in mind such considerations as the administrative burden to the defendants and the necessity of monitoring the implementation of this decree. If, at the expiration of the 30 days, the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

371 F.Supp. 507                                                                     Page 16

371 F.Supp. 507, 7 Fair Empl.Prac.Cas. (BNA) 307, 7 Empl. Prac. Dec. P 9162

**(Cite as: 371 F.Supp. 507)**

parties cannot agree on a satisfactory system, the Court will take appropriate action.

14. Plaintiffs' requests for damages and attorneys' fees are denied.

15. The Court shall retain jurisdiction for such further action as may be necessary or appropriate.

*Addendum*

It has come to the Court's attention that the defendant Civil Service has scheduled an examination for February 23, 1974. The Court regrets the effect this decision will have on efforts that have been made to inform candidates and prepare them for that examination. However, the defendants knew well during the pendency of this action that a determination adverse to them would most likely result in the Court's refusal to allow such an exam to go forward. The Court is also aware that defendants are making efforts to improve the exam and continue meaningful recruitment policies. Hopefully, such efforts will continue and, in the future, result in a satisfactorily validated exam with a significant number of black and Spanish-surnamed applicants competing.

371 F.Supp. 507, 7 Fair Empl.Prac.Cas. (BNA) 307, 7 Empl. Prac. Dec. P 9162

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Citation: 29 CFR s 1607

CITATION: 29 CFR s 1607.18

18 documents were found with this citation.

1. 29 C.F.R. § 1607.1  CODE OF FEDERAL REGULATIONS  TITLE 29--LABOR  SUBTITLE B--REGULATIONS RELATING TO LABOR  CHAPTER XIV--EQUAL EMPLOYMENT OPPORTUNITY COMMISSION  PART 1607--UNIFORM GUIDELINES ON EMPLOYEE SELECTION PROCEDURES (1978)  § 1607.1 Statement of purpose.

2. 29 C.F.R. § 1607.2  CODE OF FEDERAL REGULATIONS  TITLE 29--LABOR  SUBTITLE B--REGULATIONS RELATING TO LABOR  CHAPTER XIV--EQUAL EMPLOYMENT OPPORTUNITY COMMISSION  PART 1607--UNIFORM GUIDELINES ON EMPLOYEE SELECTION PROCEDURES (1978)  § 1607.2 Scope.

3. 29 C.F.R. § 1607.3  CODE OF FEDERAL REGULATIONS  TITLE 29--LABOR  SUBTITLE B--REGULATIONS RELATING TO LABOR  CHAPTER XIV--EQUAL EMPLOYMENT OPPORTUNITY COMMISSION  PART 1607--UNIFORM GUIDELINES ON EMPLOYEE SELECTION PROCEDURES (1978)  § 1607.3 Discrimination defined: Relationship between use of selection procedures and discrimination.

4. 29 C.F.R. § 1607.4  CODE OF FEDERAL REGULATIONS  TITLE 29--LABOR  SUBTITLE B--REGULATIONS RELATING TO LABOR  CHAPTER XIV--EQUAL EMPLOYMENT OPPORTUNITY COMMISSION  PART 1607--UNIFORM GUIDELINES ON EMPLOYEE SELECTION PROCEDURES (1978)  § 1607.4 Information on impact.

5. 29 C.F.R. § 1607.5  CODE OF FEDERAL REGULATIONS  TITLE 29--LABOR  SUBTITLE B--REGULATIONS RELATING TO LABOR  CHAPTER XIV--EQUAL EMPLOYMENT OPPORTUNITY COMMISSION  PART 1607--UNIFORM GUIDELINES ON EMPLOYEE SELECTION PROCEDURES (1978)  § 1607.5 General standards for validity studies.

6. 29 C.F.R. § 1607.6  CODE OF FEDERAL REGULATIONS  TITLE 29--LABOR  SUBTITLE B--REGULATIONS RELATING TO LABOR  CHAPTER XIV--EQUAL EMPLOYMENT OPPORTUNITY COMMISSION  PART 1607--UNIFORM GUIDELINES ON EMPLOYEE SELECTION PROCEDURES (1978)  § 1607.6 Use of selection procedures which have not been validated.

7. 29 C.F.R. § 1607.7  CODE OF FEDERAL REGULATIONS  TITLE 29--LABOR  SUBTITLE B--REGULATIONS RELATING TO LABOR  CHAPTER XIV--EQUAL EMPLOYMENT OPPORTUNITY COMMISSION  PART 1607--UNIFORM GUIDELINES ON EMPLOYEE SELECTION PROCEDURES (1978)  § 1607.7 Use of other validity studies.

8. 29 C.F.R. § 1607.8  CODE OF FEDERAL REGULATIONS  TITLE 29--LABOR  SUBTITLE B--REGULATIONS RELATING TO LABOR  CHAPTER XIV--EQUAL EMPLOYMENT OPPORTUNITY COMMISSION  PART 1607--UNIFORM GUIDELINES ON EMPLOYEE SELECTION PROCEDURES (1978)  § 1607.8 Cooperative studies.

9. 29 C.F.R. § 1607.9  CODE OF FEDERAL REGULATIONS  TITLE 29--LABOR  SUBTITLE B--REGULATIONS RELATING TO LABOR  CHAPTER XIV--EQUAL EMPLOYMENT OPPORTUNITY COMMISSION  PART 1607--UNIFORM GUIDELINES ON EMPLOYEE SELECTION PROCEDURES (1978)  § 1607.9 No assumption of validity.

10. 29 C.F.R. § 1607.10  CODE OF FEDERAL REGULATIONS  TITLE 29--LABOR  SUBTITLE B--REGULATIONS RELATING TO LABOR  CHAPTER XIV--EQUAL EMPLOYMENT OPPORTUNITY COMMISSION  PART 1607--

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

UNIFORM GUIDELINES ON EMPLOYEE SELECTION PROCEDURES (1978)  § 1607.10 Employment agencies and employment services.

11.  29 C.F.R. § 1607.11   CODE OF FEDERAL REGULATIONS   TITLE 29--LABOR   SUBTITLE B--REGULATIONS RELATING TO LABOR   CHAPTER XIV--EQUAL EMPLOYMENT OPPORTUNITY COMMISSION   PART 1607-- UNIFORM GUIDELINES ON EMPLOYEE SELECTION PROCEDURES (1978)  § 1607.11 Disparate treatment.

12.  29 C.F.R. § 1607.12   CODE OF FEDERAL REGULATIONS   TITLE 29--LABOR   SUBTITLE B--REGULATIONS RELATING TO LABOR   CHAPTER XIV--EQUAL EMPLOYMENT OPPORTUNITY COMMISSION   PART 1607-- UNIFORM GUIDELINES ON EMPLOYEE SELECTION PROCEDURES (1978)  § 1607.12 Retesting of applicants.

13.  29 C.F.R. § 1607.13   CODE OF FEDERAL REGULATIONS   TITLE 29--LABOR   SUBTITLE B--REGULATIONS RELATING TO LABOR   CHAPTER XIV--EQUAL EMPLOYMENT OPPORTUNITY COMMISSION   PART 1607-- UNIFORM GUIDELINES ON EMPLOYEE SELECTION PROCEDURES (1978)  § 1607.13 Affirmative action.

14.  29 C.F.R. § 1607.14   CODE OF FEDERAL REGULATIONS   TITLE 29--LABOR   SUBTITLE B--REGULATIONS RELATING TO LABOR   CHAPTER XIV--EQUAL EMPLOYMENT OPPORTUNITY COMMISSION   PART 1607-- UNIFORM GUIDELINES ON EMPLOYEE SELECTION PROCEDURES (1978)  § 1607.14 Technical standards for validity studies.

15.  29 C.F.R. § 1607.15   CODE OF FEDERAL REGULATIONS   TITLE 29--LABOR   SUBTITLE B--REGULATIONS RELATING TO LABOR   CHAPTER XIV--EQUAL EMPLOYMENT OPPORTUNITY COMMISSION   PART 1607-- UNIFORM GUIDELINES ON EMPLOYEE SELECTION PROCEDURES (1978)  § 1607.15 Documentation of impact and validity evidence.

16.  29 C.F.R. § 1607.16   CODE OF FEDERAL REGULATIONS   TITLE 29--LABOR   SUBTITLE B--REGULATIONS RELATING TO LABOR   CHAPTER XIV--EQUAL EMPLOYMENT OPPORTUNITY COMMISSION   PART 1607-- UNIFORM GUIDELINES ON EMPLOYEE SELECTION PROCEDURES (1978)  § 1607.16 Definitions.

17.  29 C.F.R. § 1607.17   CODE OF FEDERAL REGULATIONS   TITLE 29--LABOR   SUBTITLE B--REGULATIONS RELATING TO LABOR   CHAPTER XIV--EQUAL EMPLOYMENT OPPORTUNITY COMMISSION   PART 1607-- UNIFORM GUIDELINES ON EMPLOYEE SELECTION PROCEDURES (1978)  § 1607.17 Policy statement on affirmative action (see section 13B).

18.  29 C.F.R. § 1607.18   CODE OF FEDERAL REGULATIONS   TITLE 29--LABOR   SUBTITLE B--REGULATIONS RELATING TO LABOR   CHAPTER XIV--EQUAL EMPLOYMENT OPPORTUNITY COMMISSION   PART 1607-- UNIFORM GUIDELINES ON EMPLOYEE SELECTION PROCEDURES (1978)  § 1607.18 Citations.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

29 CFR S 1607.1
29 C.F.R. § 1607.1
**C**

Effective: [See Text Amendments]

CODE OF FEDERAL REGULATIONS
TITLE 29--LABOR
SUBTITLE B--REGULATIONS RELATING TO LABOR
CHAPTER XIV--EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
PART 1607--UNIFORM GUIDELINES ON EMPLOYEE SELECTION PROCEDURES (1978)
GENERAL PRINCIPLES
§ 1607.1 Statement of purpose.

A. Need for uniformity--Issuing agencies. The Federal government's need for a uniform set of principles on the question of the use of tests and other selection procedures has long been recognized. The Equal Employment Opportunity Commission, the Civil Service Commission, the Department of Labor, and the Department of Justice jointly have adopted these uniform guidelines to meet that need, and to apply the same principles to the Federal Government as are applied to other employers.

B. Purpose of guidelines. These guidelines incorporate a single set of principles which are designed to assist employers, labor organizations, employment agencies, and licensing and certification boards to comply with requirements of Federal law prohibiting employment practices which discriminate on grounds of race, color, religion, sex, and national origin. They are designed to provide a framework for determining the proper use of tests and other selection procedures. These guidelines do not require a user to conduct validity studies of selection procedures where no adverse impact results. However, all users are encouraged to use selection procedures which are valid, especially users operating under merit principles.

C. Relation to prior guidelines. These guidelines are based upon and supersede previously issued guidelines on employee selection procedures. These guidelines have been built upon court decisions, the previously issued guidelines of the agencies, and the practical experience of the agencies, as well as the standards of the psychological profession. These guidelines are intended to be consistent with existing law.

<General Materials (GM) - References, Annotations, or Tables>

SOURCE: 43 FR 38295 and 43 FR 38312, Aug. 25, 1978, unless otherwise noted.

AUTHORITY: Secs. 709 and 713, Civil Rights Act of 1964 (78 Stat. 265) as amended by the Equal Employment Opportunity Act of 1972(Pub.L. 92-261); 42 U.S.C. 2000e-8, 2000e-12.

29 C. F. R. § 1607.1, **29 CFR § 1607.1**

Current through March 30, 2006; 71 FR 16060

Copr. © 2006 Thomson/West

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

29 C.F.R. § 1607.2

**c**

Effective: [See Text Amendments]

CODE OF FEDERAL REGULATIONS
TITLE 29--LABOR
SUBTITLE B--REGULATIONS RELATING TO LABOR
CHAPTER XIV--EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
PART 1607--UNIFORM GUIDELINES ON EMPLOYEE SELECTION PROCEDURES (1978)
GENERAL PRINCIPLES
§ 1607.2 Scope.

A. Application of guidelines. These guidelines will be applied by the Equal Employment Opportunity Commission in the enforcement of title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972 (hereinafter "Title VII"); by the Department of Labor, and the contract compliance agencies until the transfer of authority contemplated by the President's Reorganization Plan No. 1 of 1978, in the administration and enforcement of Executive Order 11246, as amended by Executive Order 11375 (hereinafter "Executive Order 11246"); by the Civil Service Commission and other Federal agencies subject to section 717 of Title VII; by the Civil Service Commission in exercising its responsibilities toward State and local governments under section 208(b)(1) of the Intergovernmental-Personnel Act; by the Department of Justice in exercising its responsibilities under Federal law; by the Office of Revenue Sharing of the Department of the Treasury under the State and Local Fiscal Assistance Act of 1972, as amended; and by any other Federal agency which adopts them.

B. Employment decisions. These guidelines apply to tests and other selection procedures which are used as a basis for any employment decision. Employment decisions include but are not limited to hiring, promotion, demotion, membership (for example, in a labor organization), referral, retention, and licensing and certification, to the extent that licensing and certification may be covered by Federal equal employment opportunity law. Other selection decisions, such as selection for training or transfer, may also be considered employment decisions if they lead to any of the decisions listed above.

C. Selection procedures. These guidelines apply only to selection procedures which are used as a basis for making employment decisions. For example, the use of recruiting procedures designed to attract members of a particular race, sex, or ethnic group, which were previously denied employment opportunities or which are currently underutilized, may be necessary to bring an employer into compliance with Federal law, and is frequently an essential element of any effective affirmative action program; but recruitment practices are not considered by these guidelines to be selection procedures. Similarly, these guidelines do not pertain to the question of the lawfulness of a seniority system within the meaning of section 703(h), Executive Order 11246 or other provisions of Federal law or regulation, except to the extent that such systems utilize selection procedures to determine qualifications or abilities to perform the job. Nothing in these guidelines is intended or should be interpreted as discouraging the use of a selection procedure for the purpose of determining qualifications or for the purpose of selection on the basis of relative qualifications, if the selection procedure had been validated in accord with these guidelines for each such purpose for which it is to be used.

D. Limitations. These guidelines apply only to persons subject to Title VII, Executive Order 11246, or other equal employment opportunity requirements of Federal law. These guidelines do not apply to responsibilities under the Age Discrimination in Employment Act of 1967, as amended, not to discriminate on the basis of age, or under sections 501, 503, and 504 of the Rehabilitation Act of 1973, not to discriminate on the basis of handicap.

E. Indian preference not affected. These guidelines do not restrict any obligation imposed or right granted by Federal law to users to extend a preference in employment to Indians living on or near an Indian reservation in connection with employment opportunities on or near an Indian reservation.

< General Materials (GM) - References, Annotations, or Tables >

SOURCE: 43 FR 38295 and 43 FR 38312, Aug. 25, 1978, unless otherwise noted.

AUTHORITY: Secs. 709 and 713, Civil Rights Act of 1964 (78 Stat. 265) as amended by the Equal Employment Opportunity Act of 1972(Pub.L. 92-261); 42 U.S.C. 2000e-8, 2000e-12.

29 C. F. R. § 1607.2, **29 CFR § 1607.2**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

29 CFR S 1607.3

29 C.F.R. § 1607.3

**c**

Effective: [See Text Amendments]

CODE OF FEDERAL REGULATIONS
TITLE 29--LABOR
SUBTITLE B--REGULATIONS RELATING TO LABOR
CHAPTER XIV--EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
PART 1607--UNIFORM GUIDELINES ON EMPLOYEE SELECTION PROCEDURES (1978)
GENERAL PRINCIPLES
§ 1607.3 Discrimination defined: Relationship between use of selection procedures and discrimination.

A. Procedure having adverse impact constitutes discrimination unless justified. The use of any selection procedure which has an adverse impact on the hiring, promotion, or other employment or membership opportunities of members of any race, sex, or ethnic group will be considered to be discriminatory and inconsistent with these guidelines, unless the procedure has been validated in accordance with these guidelines, or the provisions of section 6 below are satisfied.

B. Consideration of suitable alternative selection procedures. Where two or more selection procedures are available which serve the user's legitimate interest in efficient and trustworthy workmanship, and which are substantially equally valid for a given purpose, the user should use the procedure which has been demonstrated to have the lesser adverse impact. Accordingly, whenever a validity study is called for by these guidelines, the user should include, as a part of the validity study, an investigation of suitable alternative selection procedures and suitable alternative methods of using the selection procedure

which have as little adverse impact as possible, to determine the appropriateness of using or validating them in accord with these guidelines. If a user has made a reasonable effort to become aware of such alternative procedures and validity has been demonstrated in accord with these guidelines, the use of the test or other selection procedure may continue until such time as it should reasonably be reviewed for currency. Whenever the user is shown an alternative selection procedure with evidence of less adverse impact and substantial evidence of validity for the same job in similar circumstances, the user should investigate it to determine the appropriateness of using or validating it in accord with these guidelines. This subsection is not intended to preclude the combination of procedures into a significantly more valid procedure, if the use of such a combination has been shown to be in compliance with the guidelines.

< General Materials (GM) - References, Annotations, or Tables >

SOURCE: 43 FR 38295 and 43 FR 38312, Aug. 25, 1978, unless otherwise noted.

AUTHORITY: Secs. 709 and 713, Civil Rights Act of 1964 (78 Stat. 265) as amended by the Equal Employment Opportunity Act of 1972(Pub.L. 92-261); 42 U.S.C. 2000e-8, 2000e-12.

29 C. F. R. § 1607.3, **29 CFR § 1607.3**

Current through March 30, 2006; 71 FR 16060

Copr. © 2006 Thomson/West

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Effective: [See Text Amendments]

CODE OF FEDERAL REGULATIONS
TITLE 29--LABOR
SUBTITLE B--REGULATIONS RELATING TO LABOR
CHAPTER XIV--EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
PART 1607--UNIFORM GUIDELINES ON EMPLOYEE SELECTION PROCEDURES (1978)
GENERAL PRINCIPLES
§ 1607.4 Information on impact.

A. Records concerning impact. Each user should maintain and have available for inspection records or other information which will disclose the impact which its tests and other selection procedures have upon employment opportunities of persons by identifiable race, sex, or ethnic group as set forth in paragraph B of this section in order to determine compliance with these guidelines. Where there are large numbers of applicants and procedures are administered frequently, such information may be retained on a sample basis, provided that the sample is appropriate in terms of the applicant population and adequate in size.

B. Applicable race, sex, and ethnic groups for recordkeeping. The records called for by this section are to be maintained by sex, and the following races and ethnic groups: Blacks (Negroes), American Indians (including Alaskan Natives), Asians (including Pacific Islanders), Hispanic (including persons of Mexican, Puerto Rican, Cuban, Central or South American, or other Spanish origin or culture regardless of race), whites (Caucasians) other than Hispanic, and totals. The race, sex, and ethnic classifications called for by this section are consistent with the Equal Employment Opportunity Standard Form 100, Employer Information Report EEO-1 series of reports. The user should adopt safeguards to insure that the records required by this paragraph are used for appropriate purposes such as determining adverse impact, or (where required) for developing and monitoring affirmative action programs, and that such records are not used improperly. See sections 4E and 17(4), below.

C. Evaluation of selection rates. The "bottom line." If the information called for by sections 4A and B above shows that the total selection process for a job has an adverse impact, the individual components of the selection process should be evaluated for adverse impact. If this information shows that the total selection process does not have an adverse impact, the Federal enforcement agencies, in the exercise of their administrative and prosecutorial discretion, in usual circumstances, will not expect a user to evaluate the individual components for adverse impact, or to validate such individual components, and will not take enforcement action based upon adverse impact of any component of that process, including the separate parts of a multipart selection procedure or any separate procedure that is used as an alternative method of selection. However, in the following circumstances the Federal enforcement agencies will expect a user to evaluate the individual components for adverse impact and may, where appropriate, take enforcement action with respect to the individual components:

(1) Where the selection procedure is a significant factor in the continuation of patterns of assignments of incumbent employees caused by prior discriminatory employment practices,

(2) where the weight of court decisions or administrative interpretations hold that a specific procedure (such as height or weight requirements or no-arrest records) is not job related in the same or similar circumstances. In unusual circumstances, other than those listed in (1) and (2) of this paragraph, the Federal enforcement agencies may request a user to evaluate the individual components for adverse impact and may, where appropriate, take enforcement action with respect to the individual component.

D. Adverse impact and the "four-fifths rule." A selection rate for any race, sex, or ethnic group which is less than four-fifths ( 4/5 ) (or eighty percent) of the rate for the group with the highest rate will generally be regarded by the Federal enforcement agencies as evidence of adverse impact, while a greater than four-fifths rate will generally not be regarded by Federal enforcement agencies as evidence of adverse impact. Smaller differences in selection rate may nevertheless constitute adverse impact, where they are significant in both statistical and practical terms or where a user's actions have discouraged applicants disproportionately on grounds of race, sex, or ethnic group. Greater differences in selection rate may not constitute adverse impact where the differences are based on small numbers and are not statistically significant, or where special recruiting or other programs cause the pool of minority or female candidates to be atypical of the normal pool of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

applicants from that group. Where the user's evidence concerning the impact of a selection procedure indicates adverse impact but is based upon numbers which are too small to be reliable, evidence concerning the impact of the procedure over a longer period of time and/or evidence concerning the impact which the selection procedure had when used in the same manner in similar circumstances elsewhere may be considered in determining adverse impact. Where the user has not maintained data on adverse impact as required by the documentation section of applicable guidelines, the Federal enforcement agencies may draw an inference of adverse impact of the selection process from the failure of the user to maintain such data, if the user has an underutilization of a group in the job category, as compared to the group's representation in the relevant labor market or, in the case of jobs filled from within, the applicable work force.

E. Consideration of user's equal employment opportunity posture. In carrying out their obligations, the Federal enforcement agencies will consider the general posture of the user with respect to equal employment opportunity for the job or group of jobs in question. Where a user has adopted an affirmative action program, the Federal enforcement agencies will consider the provisions of that program, including the goals and timetables which the user has adopted and the progress which the user has made in carrying out that program and in meeting the goals and timetables. While such affirmative action programs may in design

and execution be race, color, sex, or ethnic conscious, selection procedures under such programs should be based upon the ability or relative ability to do the work.

(Approved by the Office of Management and Budget under control number 3046- 0017)

(Authority: Pub.L. No. 96-511, 94 Stat. 2812 (44 U.S.C. 3501 et seq.))

[43 FR 38295, 38312, Aug. 25, 1978, as amended at 46 FR 63268, Dec. 31, 1981]

<General Materials (GM) - References, Annotations, or Tables>

SOURCE: 43 FR 38295 and 43 FR 38312, Aug. 25, 1978, unless otherwise noted.

AUTHORITY: Secs. 709 and 713, Civil Rights Act of 1964 (78 Stat. 265) as amended by the Equal Employment Opportunity Act of 1972(Pub.L. 92-261); 42 U.S.C. 2000e-8, 2000e-12.

29 C. F. R. § 1607.4, **29 CFR § 1607.4**

Current through March 30, 2006; 71 FR 16060

Copr. © 2006 Thomson/West

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

29 CFR S 1607.5                                                 **Page 7**
 29 C.F.R. § 1607.5
**C**

Effective: [See Text Amendments]

CODE OF FEDERAL REGULATIONS
TITLE 29--LABOR
SUBTITLE B--REGULATIONS RELATING TO
LABOR
CHAPTER    XIV--EQUAL    EMPLOYMENT
OPPORTUNITY COMMISSION
PART    1607--UNIFORM    GUIDELINES    ON
EMPLOYEE SELECTION PROCEDURES (1978)
GENERAL PRINCIPLES
§ 1607.5 General standards for validity studies.

A. Acceptable types of validity studies. For the purposes of satisfying these guidelines, users may rely upon criterion-related validity studies, content validity studies or construct validity studies, in accordance with the standards set forth in the technical standards of these guidelines, section 14 below. New strategies for showing the validity of selection procedures will be evaluated as they become accepted by the psychological profession.

B. Criterion-related, content, and construct validity. Evidence of the validity of a test or other selection procedure by a criterion-related validity study should consist of empirical data demonstrating that the selection procedure is predictive of or significantly correlated with important elements of job performance. See section 14B below. Evidence of the validity of a test or other selection procedure by a content validity study should consist of data showing that the content of the selection procedure is representative of important aspects of performance on the job for which the candidates are to be evaluated. See 14C below. Evidence of the validity of a test or other selection procedure through a construct validity study should consist of data showing that the procedure measures the degree to which candidates have identifiable characteristics which have been determined to be important in successful performance in the job for which the candidates are to be evaluated. See section 14D below.

C. Guidelines are consistent with professional standards. The provisions of these guidelines relating to validation of selection procedures are intended to be consistent with generally accepted professional standards for evaluating standardized tests and other selection procedures, such as those described in the Standards for Educational and Psychological Tests prepared by a joint committee of the American Psychological Association, the American Educational Research Association, and the National Council on Measurement in Education (American Psychological Association, Washington, D.C., 1974)(hereinafter "A.P.A. Standards") and standard textbooks and journals in the field of personnel selection.

D. Need for documentation of validity. For any selection procedure which is part of a selection process which has an adverse impact and which selection procedure has an adverse impact, each user should maintain and have available such documentation as is described in section 15 below.

E. Accuracy and standardization. Validity studies should be carried out under conditions which assure insofar as possible the adequacy and accuracy of the research and the report. Selection procedures should be administered and scored under standardized conditions.

F. Caution against selection on basis of knowledge, skills, or ability learned in brief orientation period. In general, users should avoid making employment decisions on the basis of measures of knowledge, skills, or abilities which are normally learned in a brief orientation period, and which have an adverse impact.

G. Method of use of selection procedures. The evidence of both the validity and utility of a selection procedure should support the method the user chooses for operational use of the procedure, if that method of use has a greater adverse impact than another method of use. Evidence which may be sufficient to support the use of a selection procedure on a pass/fail (screening) basis may be insufficient to support the use of the same procedure on a ranking basis under these guidelines. Thus, if a user decides to use a selection procedure on a ranking basis, and that method of use has a greater adverse impact than use on an appropriate pass/fail basis (see section 5H below), the user should have sufficient evidence of validity and utility to support the use on a ranking basis. See sections 3B, 14B (5) and (6), and 14C (8) and (9).

H. Cutoff scores. Where cutoff scores are used, they should normally be set so as to be reasonable and consistent with normal expectations of acceptable proficiency within the work force. Where applicants are ranked on the basis of properly validated selection procedures and those applicants scoring below a higher cutoff score than appropriate in light of such

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

expectations have little or no chance of being selected for employment, the higher cutoff score may be appropriate, but the degree of adverse impact should be considered.

I. Use of selection procedures for higher level jobs. If job progression structures are so established that employees will probably, within a reasonable period of time and in a majority of cases, progress to a higher level, it may be considered that the applicants are being evaluated for a job or jobs at the higher level. However, where job progression is not so nearly automatic, or the time span is such that higher level jobs or employees' potential may be expected to change in significant ways, it should be considered that applicants are being evaluated for a job at or near the entry level. A "reasonable period of time" will vary for different jobs and employment situations but will seldom be more than 5 years. Use of selection procedures to evaluate applicants for a higher level job would not be appropriate:

(1) If the majority of those remaining employed do not progress to the higher level job;

(2) If there is a reason to doubt that the higher level job will continue to require essentially similar skills during the progression period; or

(3) If the selection procedures measure knowledge, skills, or abilities required for advancement which would be expected to develop principally from the training or experience on the job.

J. Interim use of selection procedures. Users may continue the use of a selection procedure which is not at the moment fully supported by the required evidence of validity, provided: (1) The user has available substantial evidence of validity, and (2) the user has in progress, when technically feasible, a

study which is designed to produce the additional evidence required by these guidelines within a reasonable time. If such a study is not technically feasible, see section 6B. If the study does not demonstrate validity, this provision of these guidelines for interim use shall not constitute a defense in any action, nor shall it relieve the user of any obligations arising under Federal law.

K. Review of validity studies for currency. Whenever validity has been shown in accord with these guidelines for the use of a particular selection procedure for a job or group of jobs, additional studies need not be performed until such time as the validity study is subject to review as provided in section 3B above. There are no absolutes in the area of determining the currency of a validity study. All circumstances concerning the study, including the validation strategy used, and changes in the relevant labor market and the job should be considered in the determination of when a validity study is outdated.

< General Materials (GM) - References, Annotations, or Tables >

SOURCE: 43 FR 38295 and 43 FR 38312, Aug. 25, 1978, unless otherwise noted.

AUTHORITY: Secs. 709 and 713, Civil Rights Act of 1964 (78 Stat. 265) as amended by the Equal Employment Opportunity Act of 1972(Pub.L. 92-261); 42 U.S.C. 2000e-8, 2000e-12.

29 C. F. R. § 1607.5, **29 CFR § 1607.5**

Current through March 30, 2006; 71 FR 16060

Copr. © 2006 Thomson/West

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

29 CFR S 1607.6                                                      Page 9
29 C.F.R. § 1607.6
**C**

Effective: [See Text Amendments]

CODE OF FEDERAL REGULATIONS
TITLE 29--LABOR
SUBTITLE B--REGULATIONS RELATING TO
LABOR
CHAPTER    XIV--EQUAL    EMPLOYMENT
OPPORTUNITY COMMISSION
PART   1607--UNIFORM   GUIDELINES   ON
EMPLOYEE SELECTION PROCEDURES (1978)
GENERAL PRINCIPLES
§ 1607.6 Use of selection procedures which have not
been validated.

A. Use of alternate selection procedures to eliminate
adverse impact.   A user may choose to utilize
alternative selection procedures in order to eliminate
adverse impact or as part of an affirmative action
program.   See section 13 below.   Such alternative
procedures should eliminate the adverse impact in the
total selection process, should be lawful and should be
as job related as possible.

B. Where validity studies cannot or need not be
performed.  There are circumstances in which a user
cannot or need not utilize the validation techniques
contemplated by these guidelines.    In such
circumstances, the user should utilize selection
procedures which are as job related as possible and
which will minimize or eliminate adverse impact, as
set forth below.

(1) Where informal or unscored procedures are used.
When an informal or unscored selection procedure
which has an adverse impact is utilized, the user
should eliminate the adverse impact, or modify the
procedure to one which is a formal, scored or
quantified measure or combination of measures and
then validate the procedure in accord with these
guidelines, or otherwise justify continued use of the
procedure in accord with Federal law.

(2) Where formal and scored procedures are used.
When a formal and scored selection procedure is used
which has an adverse impact, the validation
techniques contemplated by these guidelines usually
should be followed if technically feasible.  Where the
user cannot or need not follow the validation
techniques anticipated by these guidelines, the user
should either modify the procedure to eliminate
adverse impact or otherwise justify continued use of
the procedure in accord with Federal law.

< General Materials (GM) - References, Annotations,
or Tables >

SOURCE:  43 FR 38295 and 43 FR 38312, Aug. 25,
1978, unless otherwise noted.

AUTHORITY:  Secs. 709 and 713, Civil Rights Act
of 1964 (78 Stat. 265) as amended by the Equal
Employment  Opportunity  Act  of  1972(Pub.L.
92-261); 42 U.S.C. 2000e-8, 2000e-12.

29 C. F. R. § 1607.6, **29 CFR § 1607**.6

Current through March 30, 2006; 71 FR 16060

Copr. © 2006 Thomson/West

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

29 CFR S 1607.7                                                          **Page 10**
 29 C.F.R. § 1607.7
**C**

Effective: [See Text Amendments]

CODE OF FEDERAL REGULATIONS
TITLE 29--LABOR
SUBTITLE B--REGULATIONS RELATING TO
LABOR
CHAPTER    XIV--EQUAL    EMPLOYMENT
OPPORTUNITY COMMISSION
PART   1607--UNIFORM   GUIDELINES   ON
EMPLOYEE SELECTION PROCEDURES (1978)
GENERAL PRINCIPLES
§ 1607.7 Use of other validity studies.

A. Validity studies not conducted by the user. Users may, under certain circumstances, support the use of selection procedures by validity studies conducted by other users or conducted by test publishers or distributors and described in test manuals. While publishers of selection procedures have a professional obligation to provide evidence of validity which meets generally accepted professional standards (see section 5C above), users are cautioned that they are responsible for compliance with these guidelines. Accordingly, users seeking to obtain selection procedures from publishers and distributors should be careful to determine that, in the event the user becomes subject to the validity requirements of these guidelines, the necessary information to support validity has been determined and will be made available to the user.

B. Use of criterion-related validity evidence from other sources. Criterion-related validity studies conducted by one test user, or described in test manuals and the professional literature, will be considered acceptable for use by another user when the following requirements are met:

(1) Validity evidence. Evidence from the available studies meeting the standards of section 14B below clearly demonstrates that the selection procedure is valid;

(2) Job similarity. The incumbents in the user's job and the incumbents in the job or group of jobs on which the validity study was conducted perform substantially the same major work behaviors, as shown by appropriate job analyses both on the job or group of jobs on which the validity study was performed and on the job for which the selection procedure is to be used; and

(3) Fairness evidence. The studies include a study of test fairness for each race, sex, and ethnic group which constitutes a significant factor in the borrowing user's relevant labor market for the job or jobs in question. If the studies under consideration satisfy (1) and (2) above but do not contain an investigation of test fairness, and it is not technically feasible for the borrowing user to conduct an internal study of test fairness, the borrowing user may utilize the study until studies conducted elsewhere meeting the requirements of these guidelines show test unfairness, or until such time as it becomes technically feasible to conduct an internal study of test fairness and the results of that study can be acted upon. Users obtaining selection procedures from publishers should consider, as one factor in the decision to purchase a particular selection procedure, the availability of evidence concerning test fairness.

C. Validity evidence from multiunit study. if validity evidence from a study covering more than one unit within an organization satisfies the requirements of section 14B below, evidence of validity specific to each unit will not be required unless there are variables which are likely to affect validity significantly.

D. Other significant variables. If there are variables in the other studies which are likely to affect validity significantly, the user may not rely upon such studies, but will be expected either to conduct an internal validity study or to comply with section 6 above.

< General Materials (GM) - References, Annotations, or Tables >

SOURCE: 43 FR 38295 and 43 FR 38312, Aug. 25, 1978, unless otherwise noted.

AUTHORITY: Secs. 709 and 713, Civil Rights Act of 1964 (78 Stat. 265) as amended by the Equal Employment Opportunity Act of 1972(Pub.L. 92-261); 42 U.S.C. 2000e-8, 2000e-12.

29 C. F. R. § 1607.7, **29 CFR § 1607.7**

Current through March 30, 2006; 71 FR 16060

Copr. © 2006 Thomson/West

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

29 CFR S 1607.8

29 C.F.R. § 1607.8

C

Effective: [See Text Amendments]

CODE OF FEDERAL REGULATIONS
TITLE 29--LABOR
SUBTITLE B--REGULATIONS RELATING TO LABOR
CHAPTER XIV--EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
PART 1607--UNIFORM GUIDELINES ON EMPLOYEE SELECTION PROCEDURES (1978)
GENERAL PRINCIPLES
§ 1607.8 Cooperative studies.

A. Encouragement of cooperative studies. The agencies issuing these guidelines encourage employers, labor organizations, and employment agencies to cooperate in research, development, search for lawful alternatives, and validity studies in order to achieve procedures which are consistent with these guidelines.

B. Standards for use of cooperative studies. If validity evidence from a cooperative study satisfies the requirements of section 14 below, evidence of validity specific to each user will not be required unless there are variables in the user's situation which are likely to affect validity significantly.

<General Materials (GM) - References, Annotations, or Tables>

SOURCE: 43 FR 38295 and 43 FR 38312, Aug. 25, 1978, unless otherwise noted.

AUTHORITY: Secs. 709 and 713, Civil Rights Act of 1964 (78 Stat. 265) as amended by the Equal Employment Opportunity Act of 1972(Pub.L. 92-261); 42 U.S.C. 2000e-8, 2000e-12.

29 C. F. R. § 1607.8, **29 CFR § 1607.8**

Current through March 30, 2006; 71 FR 16060

Copr. © 2006 Thomson/West

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Effective: [See Text Amendments]

CODE OF FEDERAL REGULATIONS
TITLE 29--LABOR
SUBTITLE B--REGULATIONS RELATING TO LABOR
CHAPTER XIV--EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
PART 1607--UNIFORM GUIDELINES ON EMPLOYEE SELECTION PROCEDURES (1978)
GENERAL PRINCIPLES
§ 1607.9 No assumption of validity.

A. Unacceptable substitutes for evidence of validity. Under no circumstances will the general reputation of a test or other selection procedures, its author or its publisher, or casual reports of it's validity be accepted in lieu of evidence of validity. Specifically ruled out are: assumptions of validity based on a procedure's name or descriptive labels; all forms of promotional literature; data bearing on the frequency of a procedure's usage; testimonial statements and credentials of sellers, users, or consultants; and other nonempirical or anecdotal accounts of selection practices or selection outcomes.

B. Encouragement of professional supervision.

Professional supervision of selection activities is encouraged but is not a substitute for documented evidence of validity. The enforcement agencies will take into account the fact that a thorough job analysis was conducted and that careful development and use of a selection procedure in accordance with professional standards enhance the probability that the selection procedure is valid for the job.

< General Materials (GM) - References, Annotations, or Tables >

SOURCE: 43 FR 38295 and 43 FR 38312, Aug. 25, 1978, unless otherwise noted.

AUTHORITY: Secs. 709 and 713, Civil Rights Act of 1964 (78 Stat. 265) as amended by the Equal Employment Opportunity Act of 1972(Pub.L. 92-261); 42 U.S.C. 2000e-8, 2000e-12.

29 C. F. R. § 1607.9, **29 CFR § 1607.9**

Current through March 30, 2006; 71 FR 16060

Copr. © 2006 Thomson/West

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

29 CFR S 1607.10                                                              **Page 13**
29 C.F.R. § 1607.10
**C**

Effective: [See Text Amendments]

CODE OF FEDERAL REGULATIONS
TITLE 29--LABOR
SUBTITLE B--REGULATIONS RELATING TO
LABOR
CHAPTER      XIV--EQUAL      EMPLOYMENT
OPPORTUNITY COMMISSION
PART    1607--UNIFORM    GUIDELINES    ON
EMPLOYEE SELECTION PROCEDURES (1978)
GENERAL PRINCIPLES
§ 1607.10 Employment agencies and employment
services.

A. Where selection procedures are devised by
agency. An employment agency, including private
employment agencies and State employment agencies,
which agrees to a request by an employer or labor
organization to device and utilize a selection
procedure should follow the standards in these
guidelines for determining adverse impact. If adverse
impact exists the agency should comply with these
guidelines. An employment agency is not relieved of
its obligation herein because the user did not request
such validation or has requested the use of some lesser
standard of validation than is provided in these
guidelines. The use of an employment agency does
not relieve an employer or labor organization or other
user of its responsibilities under Federal law to
provide equal employment opportunity or its
obligations as a user under these guidelines.

B. Where selection procedures are devised elsewhere.
Where an employment agency or service is requested
to administer a selection procedure which has been
devised elsewhere and to make referrals pursuant to
the results, the employment agency or service should
maintain and have available evidence of the impact of
the selection and referral procedures which it
administers. If adverse impact results the agency or
service should comply with these guidelines. If the
agency or service seeks to comply with these
guidelines by reliance upon validity studies or other
data in the possession of the employer, it should
obtain and have available such information.

< General Materials (GM) - References, Annotations,
or Tables >

SOURCE: 43 FR 38295 and 43 FR 38312, Aug. 25,
1978, unless otherwise noted.

AUTHORITY: Secs. 709 and 713, Civil Rights Act
of 1964 (78 Stat. 265) as amended by the Equal
Employment Opportunity Act of 1972(Pub.L.
92-261); 42 U.S.C. 2000e-8, 2000e-12.

29 C. F. R. § 1607.10, **29 CFR § 1607**.10

Current through March 30, 2006; 71 FR 16060

Copr. © 2006 Thomson/West

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Effective: [See Text Amendments]

CODE OF FEDERAL REGULATIONS
TITLE 29--LABOR
SUBTITLE B--REGULATIONS RELATING TO LABOR
CHAPTER XIV--EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
PART 1607--UNIFORM GUIDELINES ON EMPLOYEE SELECTION PROCEDURES (1978)
GENERAL PRINCIPLES
§ 1607.11 Disparate treatment.

The principles of disparate or unequal treatment must be distinguished from the concepts of validation. A selection procedure--even though validated against job performance in accordance with these guidelines-- cannot be imposed upon members of a race, sex, or ethnic group where other employees, applicants, or members have not been subjected to that standard. Disparate treatment occurs where members of a race, sex, or ethnic group have been denied the same employment, promotion, membership, or other employment opportunities as have been available to other employees or applicants. Those employees or applicants who have been denied equal treatment, because of prior discriminatory practices or policies, must at least be afforded the same opportunities as had existed for other employees or applicants during the period of discrimination. Thus, the persons who were in the class of persons discriminated against during the period the user followed the discriminatory practices should be allowed the opportunity to qualify under less stringent selection procedures previously followed, unless the user demonstrates that the increased standards are required by business necessity. This section does not prohibit a user who has not previously followed merit standards from adopting merit standards which are in compliance with these guidelines; nor does it preclude a user who has previously used invalid or unvalidated selection procedures from developing and using procedures which are in accord with these guidelines.

<General Materials (GM) - References, Annotations, or Tables>

SOURCE:  43 FR 38295 and 43 FR 38312, Aug. 25, 1978, unless otherwise noted.

AUTHORITY:  Secs. 709 and 713, Civil Rights Act of 1964 (78 Stat. 265) as amended by the Equal Employment Opportunity Act of 1972(Pub.L. 92-261); 42 U.S.C. 2000e-8, 2000e-12.

29 C. F. R. § 1607.11, **29 CFR § 1607.**11

Current through March 30, 2006; 71 FR 16060

Copr. © 2006 Thomson/West

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

29 CFR S 1607.12                                                    **Page 15**
29 C.F.R. § 1607.12
**C**

Effective: [See Text Amendments]

CODE OF FEDERAL REGULATIONS
TITLE 29--LABOR
SUBTITLE B--REGULATIONS RELATING TO
LABOR
CHAPTER    XIV--EQUAL    EMPLOYMENT
OPPORTUNITY COMMISSION
PART    1607--UNIFORM    GUIDELINES    ON
EMPLOYEE SELECTION PROCEDURES (1978)
GENERAL PRINCIPLES
§ 1607.12 Retesting of applicants.

Users should provide a reasonable opportunity for
retesting and reconsideration.  Where examinations
are administered periodically with public notice, such
reasonable opportunity exists, unless persons who
have previously been tested are precluded from
retesting.  The user may however take reasonable
steps to preserve the security of its procedures.

< General Materials (GM) - References, Annotations,
or Tables >

SOURCE:  43 FR 38295 and 43 FR 38312, Aug. 25,
1978, unless otherwise noted.

AUTHORITY:  Secs. 709 and 713, Civil Rights Act
of 1964 (78 Stat. 265) as amended by the Equal
Employment    Opportunity    Act    of    1972(Pub.L.
92-261); 42 U.S.C. 2000e-8, 2000e-12.

29 C. F. R. § 1607.12, **29 CFR** § **1607**.12

Current through March 30, 2006; 71 FR 16060

Copr. © 2006 Thomson/West

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Effective: [See Text Amendments]

CODE OF FEDERAL REGULATIONS
TITLE 29--LABOR
SUBTITLE B--REGULATIONS RELATING TO
LABOR
CHAPTER    XIV--EQUAL    EMPLOYMENT
OPPORTUNITY COMMISSION
PART    1607--UNIFORM    GUIDELINES    ON
EMPLOYEE SELECTION PROCEDURES (1978)
GENERAL PRINCIPLES
§ 1607.13 Affirmative action.

A. Affirmative action obligations. The use of selection procedures which have been validated pursuant to these guidelines does not relieve users of any obligations they may have to undertake affirmative action to assure equal employment opportunity. Nothing in these guidelines is intended to preclude the use of lawful selection procedures which assist in remedying the effects of prior discriminatory practices, or the achievement of affirmative action objectives.

B. Encouragement of voluntary affirmative action programs. These guidelines are also intended to encourage the adoption and implementation of voluntary affirmative action programs by users who have no obligation under Federal law to adopt them; but are not intended to impose any new obligations in that regard. The agencies issuing and endorsing these guidelines endorse for all private employers and reaffirm for all governmental employers the Equal Employment Opportunity Coordinating Council's "Policy Statement on Affirmative Action Programs for State and Local Government Agencies" (41 FR 38814, September 13, 1976). That policy statement is attached hereto as appendix, section 17.

<General Materials (GM) - References, Annotations, or Tables>

SOURCE: 43 FR 38295 and 43 FR 38312, Aug. 25, 1978, unless otherwise noted.

AUTHORITY: Secs. 709 and 713, Civil Rights Act of 1964 (78 Stat. 265) as amended by the Equal Employment Opportunity Act of 1972(Pub.L. 92-261); 42 U.S.C. 2000e-8, 2000e-12.

29 C. F. R. § 1607.13, **29 CFR § 1607**.13

Current through March 30, 2006; 71 FR 16060

Copr. © 2006 Thomson/West

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Effective: [See Text Amendments]

CODE OF FEDERAL REGULATIONS
TITLE 29--LABOR
SUBTITLE B--REGULATIONS RELATING TO LABOR
CHAPTER XIV--EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
PART 1607--UNIFORM GUIDELINES ON EMPLOYEE SELECTION PROCEDURES (1978)
TECHNICAL STANDARDS
§ 1607.14 Technical standards for validity studies.

The following minimum standards, as applicable, should be met in conducting a validity study. Nothing in these guidelines is intended to preclude the development and use of other professionally acceptable techniques with respect to validation of selection procedures. Where it is not technically feasible for a user to conduct a validity study, the user has the obligation otherwise to comply with these guidelines. See sections 6 and 7 above.

A. Validity studies should be based on review of information about the job. Any validity study should be based upon a review of information about the job for which the selection procedure is to be used. The review should include a job analysis except as provided in section 14B(3) below with respect to criterion-related validity. Any method of job analysis may be used if it provides the information required for the specific validation strategy used.

B. Technical standards for criterion-related validity studies--

(1) Technical feasibility. Users choosing to validate a selection procedure by a criterion-related validity strategy should determine whether it is technically feasible (as defined in section 16) to conduct such a study in the particular employment context. The determination of the number of persons necessary to permit the conduct of a meaningful criterion-related study should be made by the user on the basis of all relevant information concerning the selection procedure, the potential sample and the employment situation. Where appropriate, jobs with substantially the same major work behaviors may be grouped together for validity studies, in order to obtain an adequate sample. These guidelines do not require a user to hire or promote persons for the purpose of making it possible to conduct a criterion-related study.

(2) Analysis of the job. There should be a review of job information to determine measures of work behavior(s) or performance that are relevant to the job or group of jobs in question. These measures or criteria are relevant to the extent that they represent critical or important job duties, work behaviors or work outcomes as developed from the review of job information. The possibility of bias should be considered both in selection of the criterion measures and their application. In view of the possibility of bias in subjective evaluations, supervisory rating techniques and instructions to raters should be carefully developed. All criterion measures and the methods for gathering data need to be examined for freedom from factors which would unfairly alter scores of members of any group. The relevance of criteria and their freedom from bias are of particular concern when there are significant differences in measures of job performance for different groups.

(3) Criterion measures. Proper safeguards should be taken to insure that scores on selection procedures do not enter into any judgments of employee adequacy that are to be used as criterion measures. Whatever criteria are used should represent important or critical work behavior(s) or work outcomes. Certain criteria may be used without a full job analysis if the user can show the importance of the criteria to the particular employment context. These criteria include but are not limited to production rate, error rate, tardiness, absenteeism, and length of service. A standardized rating of overall work performance may be used where a study of the job shows that it is an appropriate criterion. Where performance in training is used as a criterion, success in training should be properly measured and the relevance of the training should be shown either through a comparison of the content of the training program with the critical or important work behavior(s) of the job(s), or through a demonstration of the relationship between measures of performance in training and measures of job performance. Measures of relative success in training include but are not limited to instructor evaluations, performance samples, or tests. Criterion measures consisting of paper and pencil tests will be closely reviewed for job relevance.

(4) Representativeness of the sample. Whether the study is predictive or concurrent, the sample subjects should insofar as feasible be representative of the candidates normally available in the relevant labor market for the job or group of jobs in question, and should insofar as feasible include the races, sexes, and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ethnic groups normally available in the relevant job market. In determining the representativeness of the sample in a concurrent validity study, the user should take into account the extent to which the specific knowledge or skills which are the primary focus of the test are those which employees learn on the job.

Where samples are combined or compared, attention should be given to see that such samples are comparable in terms of the actual job they perform, the length of time on the job where time on the job is likely to affect performance, and other relevant factors likely to affect validity differences; or that these factors are included in the design of the study and their effects identified.

(5) Statistical relationships. The degree of relationship between selection procedure scores and criterion measures should be examined and computed, using professionally acceptable statistical procedures. Generally, a selection procedure is considered related to the criterion, for the purposes of these guidelines, when the relationship between performance on the procedure and performance on the criterion measure is statistically significant at the 0.05 level of significance, which means that it is sufficiently high as to have a probability of no more than one (1) in twenty (20) to have occurred by chance. Absence of a statistically significant relationship between a selection procedure and job performance should not necessarily discourage other investigations of the validity of that selection procedure.

(6) Operational use of selection procedures. Users should evaluate each selection procedure to assure that it is appropriate for operational use, including establishment of cutoff scores or rank ordering. Generally, if other factors remain the same, the greater the magnitude of the relationship (e.g., correlation coefficient) between performance on a selection procedure and one or more criteria of performance on the job, and the greater the importance and number of aspects of job performance covered by the criteria, the more likely it is that the procedure will be appropriate for use. Reliance upon a selection procedure which is significantly related to a criterion measure, but which is based upon a study involving a large number of subjects and has a low correlation coefficient will be subject to close review if it has a large adverse impact. Sole reliance upon a single selection instrument which is related to only one of many job duties or aspects of job performance will also be subject to close review. The appropriateness of a selection procedure is best evaluated in each particular situation and there are no

minimum correlation coefficients applicable to all employment situations. In determining whether a selection procedure is appropriate for operational use the following considerations should also be taken into account: The degree of adverse impact of the procedure, the availability of other selection procedures of greater or substantially equal validity.

(7) Overstatement of validity findings. Users should avoid reliance upon techniques which tend to overestimate validity findings as a result of capitalization on chance unless an appropriate safeguard is taken. Reliance upon a few selection procedures or criteria of successful job performance when many selection procedures or criteria of performance have been studied, or the use of optimal statistical weights for selection procedures computed in one sample, are techniques which tend to inflate validity estimates as a result of chance. Use of a large sample is one safeguard: cross-validation is another.

(8) Fairness. This section generally calls for studies of unfairness where technically feasible. The concept of fairness or unfairness of selection procedures is a developing concept. In addition, fairness studies generally require substantial numbers of employees in the job or group of jobs being studied. For these reasons, the Federal enforcement agencies recognize that the obligation to conduct studies of fairness imposed by the guidelines generally will be upon users or groups of users with a large number of persons in a a job class, or test developers; and that small users utilizing their own selection procedures will generally not be obligated to conduct such studies because it will be technically infeasible for them to do so.

(a) Unfairness defined. When members of one race, sex, or ethnic group characteristically obtain lower scores on a selection procedure than members of another group, and the differences in scores are not reflected in differences in a measure of job performance, use of the selection procedure may unfairly deny opportunities to members of the group that obtains the lower scores.

(b) Investigation of fairness. Where a selection procedure results in an adverse impact on a race, sex, or ethnic group identified in accordance with the classifications set forth in section 4 above and that group is a significant factor in the relevant labor market, the user generally should investigate the possible existence of unfairness for that group if it is technically feasible to do so. The greater the severity of the adverse impact on a group, the greater the need

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to investigate the possible existence of unfairness. Where the weight of evidence from other studies shows that the selection procedure predicts fairly for the group in question and for the same or similar jobs, such evidence may be relied on in connection with the selection procedure at issue.

(c) General considerations in fairness investigations. Users conducting a study of fairness should review the A.P.A. Standards regarding investigation of possible bias in testing. An investigation of fairness of a selection procedure depends on both evidence of validity and the manner in which the selection procedure is to be used in a particular employment context. Fairness of a selection procedure cannot necessarily be specified in advance without investigating these factors. Investigation of fairness of a selection procedure in samples where the range of scores on selection procedures or criterion measures is severely restricted for any subgroup sample (as compared to other subgroup samples) may produce misleading evidence of unfairness. That factor should accordingly be taken into account in conducting such studies and before reliance is placed on the results.

(d) When unfairness is shown. If unfairness is demonstrated through a showing that members of a particular group perform better or poorer on the job than their scores on the selection procedure would indicate through comparison with how members of other groups perform, the user may either revise or replace the selection instrument in accordance with these guidelines, or may continue to use the selection instrument operationally with appropriate revisions in its use to assure compatibility between the probability of successful job performance and the probability of being selected.

(e) Technical feasibility of fairness studies. In addition to the general conditions needed for technical feasibility for the conduct of a criterion-related study (see section 16, below) an investigation of fairness requires the following:

(i) An adequate sample of persons in each group available for the study to achieve findings of statistical significance. Guidelines do not require a user to hire or promote persons on the basis of group classifications for the purpose of making it possible to conduct a study of fairness; but the user has the obligation otherwise to comply with these guidelines.

(ii) The samples for each group should be comparable in terms of the actual job they perform, length of time on the job where time on the job is likely to affect

performance, and other relevant factors likely to affect validity differences; or such factors should be included in the design of the study and their effects identified.

(f) Continued use of selection procedures when fairness studies not feasible. If a study of fairness should otherwise be performed, but is not technically feasible, a selection procedure may be used which has otherwise met the validity standards of these guidelines, unless the technical infeasibility resulted from discriminatory employment practices which are demonstrated by facts other than past failure to conform with requirements for validation of selection procedures. However, when it becomes technically feasible for the user to perform a study of fairness and such a study is otherwise called for, the user should conduct the study of fairness.

C. Technical standards for content validity studies--

(1) Appropriateness of content validity studies. Users choosing to validate a selection procedure by a content validity strategy should determine whether it is appropriate to conduct such a study in the particular employment context. A selection procedure can be supported by a content validity strategy to the extent that it is a representative sample of the content of the job. Selection procedures which purport to measure knowledge, skills, or abilities may in certain circumstances be justified by content validity, although they may not be representative samples, if the knowledge, skill, or ability measured by the selection procedure can be operationally defined as provided in section 14C(4) below, and if that knowledge, skill, or ability is a necessary prerequisite to successful job performance.

A selection procedure based upon inferences about mental processes cannot be supported solely or primarily on the basis of content validity. Thus, a content strategy is not appropriate for demonstrating the validity of selection procedures which purport to measure traits or constructs, such as intelligence, aptitude, personality, commonsense, judgment, leadership, and spatial ability. Content validity is also not an appropriate strategy when the selection procedure involves knowledge, skills, or abilities which an employee will be expected to learn on the job.

(2) Job analysis for content validity. There should be a job analysis which includes an analysis of the important work behavior(s) required for successful performance and their relative importance and, if the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

behavior results in work product(s), an analysis of the work product(s). Any job analysis should focus on the work behavior(s) and the tasks associated with them. If work behavior(s) are not observable, the job analysis should identify and analyze those aspects of the behavior(s) that can be observed and the observed work products. The work behavior(s) selected for measurement should be critical work behavior(s) and/or important work behavior(s) constituting most of the job.

(3) Development of selection procedures. A selection procedure designed to measure the work behavior may be developed specifically from the job and job analysis in question, or may have been previously developed by the user, or by other users or by a test publisher.

(4) Standards for demonstrating content validity. To demonstrate the content validity of a selection procedure, a user should show that the behavior(s) demonstrated in the selection procedure are a representative sample of the behavior(s) of the job in question or that the selection procedure provides a representative sample of the work product of the job. In the case of a selection procedure measuring a knowledge, skill, or ability, the knowledge, skill, or ability being measured should be operationally defined. In the case of a selection procedure measuring a knowledge, the knowledge being measured should be operationally defined as that body of learned information which is used in and is a necessary prerequisite for observable aspects of work behavior of the job. In the case of skills or abilities, the skill or ability being measured should be operationally defined in terms of observable aspects of work behavior of the job. For any selection procedure measuring a knowledge, skill, or ability the user should show that (a) the selection procedure measures and is a representative sample of that knowledge, skill, or ability; and (b) that knowledge, skill, or ability is used in and is a necessary prerequisite to performance of critical or important work behavior(s). In addition, to be content valid, a selection procedure measuring a skill or ability should either closely approximate an observable work behavior, or its product should closely approximate an observable work product. If a test purports to sample a work behavior or to provide a sample of a work product, the manner and setting of the selection procedure and its level and complexity should closely approximate the work situation. The closer the content and the context of the selection procedure are to work samples or work behaviors, the stronger is the basis for showing content validity. As the content

of the selection procedure less resembles a work behavior, or the setting and manner of the administration of the selection procedure less resemble the work situation, or the result less resembles a work product, the less likely the selection procedure is to be content valid, and the greater the need for other evidence of validity.

(5) Reliability. The reliability of selection procedures justified on the basis of content validity should be a matter of concern to the user. Whenever it is feasible, appropriate statistical estimates should be made of the reliability of the selection procedure.

(6) Prior training or experience. A requirement for or evaluation of specific prior training or experience based on content validity, including a specification of level or amount of training or experience, should be justified on the basis of the relationship between the content of the training or experience and the content of the job for which the training or experience is to be required or evaluated. The critical consideration is the resemblance between the specific behaviors, products, knowledge, skills, or abilities in the experience or training and the specific behaviors, products, knowledge, skills, or abilities required on the job, whether or not there is close resemblance between the experience or training as a whole and the job as a whole.

(7) Content validity of training success. Where a measure of success in a training program is used as a selection procedure and the content of a training program is justified on the basis of content validity, the use should be justified on the relationship between the content of the training program and the content of the job.

(8) Operational use. A selection procedure which is supported on the basis of content validity may be used for a job if it represents a critical work behavior (i.e., a behavior which is necessary for performance of the job) or work behaviors which constitute most of the important parts of the job.

(9) Ranking based on content validity studies. If a user can show, by a job analysis or otherwise, that a higher score on a content valid selection procedure is likely to result in better job performance, the results may be used to rank persons who score above minimum levels. Where a selection procedure supported solely or primarily by content validity is used to rank job candidates, the selection procedure should measure those aspects of performance which differentiate among levels of job performance.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

D. Technical standards for construct validity studies--

(1) Appropriateness of construct validity studies. Construct validity is a more complex strategy than either criterion-related or content validity. Construct validation is a relatively new and developing procedure in the employment field, and there is at present a lack of substantial literature extending the concept to employment practices. The user should be aware that the effort to obtain sufficient empirical support for construct validity is both an extensive and arduous effort involving a series of research studies, which include criterion related validity studies and which may include content validity studies. Users choosing to justify use of a selection procedure by this strategy should therefore take particular care to assure that the validity study meets the standards set forth below.

(2) Job analysis for construct validity studies. There should be a job analysis. This job analysis should show the work behavior(s) required for successful performance of the job, or the groups of jobs being studied, the critical or important work behavior(s) in the job or group of jobs being studied, and an identification of the construct(s) believed to underlie successful performance of these critical or important work behaviors in the job or jobs in question. Each construct should be named and defined, so as to distinguish it from other constructs. If a group of jobs is being studied the jobs should have in common one or more critical or important work behaviors at a comparable level of complexity.

(3) Relationship to the job. A selection procedure should then be identified or developed which measures the construct identified in accord with subparagraph (2) above. The user should show by empirical evidence that the selection procedure is validly related to the construct and that the construct is validly related to the performance of critical or important work behavior(s). The relationship between the construct as measured by the selection procedure and the related work behavior(s) should be supported by empirical evidence from one or more criterion-related studies involving the job or jobs in question which satisfy the provisions of section 14B above.

(4) Use of construct validity study without new criterion-related evidence--

(a) Standards for use. Until such time as professional literature provides more guidance on the use of construct validity in employment situations, the Federal agencies will accept a claim of construct validity without a criterion-related study which satisfies section 14B above only when the selection procedure has been used elsewhere in a situation in which a criterion-related study has been conducted and the use of a criterion-related validity study in this context meets the standards for transportability of criterion-related validity studies as set forth above in section 7. However, if a study pertains to a number of jobs having common critical or important work behaviors at a comparable level of complexity, and the evidence satisfies subparagraphs 14B (2) and (3) above for those jobs with criterion-related validity evidence for those jobs, the selection procedure may be used for all the jobs to which the study pertains. If construct validity is to be generalized to other jobs or groups of jobs not in the group studied, the Federal enforcement agencies will expect at a minimum additional empirical research evidence meeting the standards of subparagraphs section 14B (2) and (3) above for the additional jobs or groups of jobs.

(b) Determination of common work behaviors. In determining whether two or more jobs have one or more work behavior(s) in common, the user should compare the observed work behavior(s) in each of the jobs and should compare the observed work product(s) in each of the jobs. If neither the observed work behavior(s) in each of the jobs nor the observed work product(s) in each of the jobs are the same, the Federal enforcement agencies will presume that the work behavior(s) in each job are different. If the work behaviors are not observable, then evidence of similarity of work products and any other relevant research evidence will be considered in determining whether the work behavior(s) in the two jobs are the same.

<General Materials (GM) - References, Annotations, or Tables>

SOURCE: 43 FR 38295 and 43 FR 38312, Aug. 25, 1978, unless otherwise noted.

AUTHORITY: Secs. 709 and 713, Civil Rights Act of 1964 (78 Stat. 265) as amended by the Equal Employment Opportunity Act of 1972(Pub.L. 92-261); 42 U.S.C. 2000e-8, 2000e-12.

29 C. F. R. § 1607.14, **29 CFR § 1607**.14

Current through March 30, 2006; 71 FR 16060

Copr. © 2006 Thomson/West

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Effective: [See Text Amendments]

CODE OF FEDERAL REGULATIONS
TITLE 29--LABOR
SUBTITLE B--REGULATIONS RELATING TO LABOR
CHAPTER XIV--EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
PART 1607--UNIFORM GUIDELINES ON EMPLOYEE SELECTION PROCEDURES (1978)
DOCUMENTATION OF IMPACT AND VALIDITY EVIDENCE
§ 1607.15 Documentation of impact and validity evidence.

A. Required information. Users of selection procedures other than those users complying with section 15A(1) below should maintain and have available for each job information on adverse impact of the selection process for that job and, where it is determined a selection process has an adverse impact, evidence of validity as set forth below.

(1) Simplified recordkeeping for users with less than 100 employees. In order to minimize recordkeeping burdens on employers who employ one hundred (100) or fewer employees, and other users not required to file EEO-1, et seq., reports, such users may satisfy the requirements of this section 15 if they maintain and have available records showing, for each year:

(a) The number of persons hired, promoted, and terminated for each job, by sex, and where appropriate by race and national origin;

(b) The number of applicants for hire and promotion by sex and where appropriate by race and national origin; and

(c) The selection procedures utilized (either standardized or not standardized).

These records should be maintained for each race or national origin group (see section 4 above) constituting more than two percent (2%) of the labor force in the relevant labor area. However, it is not necessary to maintain records by race and/or national origin (see § 4 above) if one race or national origin group in the relevant labor area constitutes more than ninety-eight percent (98%) of the labor force in the area. If the user has reason to believe that a selection procedure has an adverse impact, the user should maintain any available evidence of validity for that

procedure (see sections 7A and 8).

(2) Information on impact--

(a) Collection of information on impact. Users of selection procedures other than those complying with section 15A(1) above should maintain and have available for each job records or other information showing whether the total selection process for that job has an adverse impact on any of the groups for which records are called for by sections 4B above. Adverse impact determinations should be made at least annually for each such group which constitutes at least 2 percent of the labor force in the relevant labor area or 2 percent of the applicable workforce. Where a total selection process for a job has an adverse impact, the user should maintain and have available records or other information showing which components have an adverse impact. Where the total selection process for a job does not have an adverse impact, information need not be maintained for individual components except in circumstances set forth in subsection 15A(2) (b) below. If the determination of adverse impact is made using a procedure other than the "four-fifths rule," as defined in the first sentence of section 4D above, a justification, consistent with section 4D above, for the procedure used to determine adverse impact should be available.

(b) When adverse impact has been eliminated in the total selection process. Whenever the total selection process for a particular job has had an adverse impact, as defined in section 4 above, in any year, but no longer has an adverse impact, the user should maintain and have available the information on individual components of the selection process required in the preceding paragraph for the period in which there was adverse impact. In addition, the user should continue to collect such information for at least two (2) years after the adverse impact has been eliminated.

(c) When data insufficient to determine impact. Where there has been an insufficient number of selections to determine whether there is an adverse impact of the total selection process for a particular job, the user should continue to collect, maintain and have available the information on individual components of the selection process required in section 15(A) (2) (a) above until the information is sufficient to determine that the overall selection process does not have an adverse impact as defined in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

section 4 above, or until the job has changed substantially.

(3) Documentation of validity evidence--

(a) Types of evidence.    Where a total selection process has an adverse impact (see section 4 above) the user should maintain and have available for each component of that process which has an adverse impact, one or more of the following types of documentation evidence:

(i) Documentation evidence showing criterion-related validity of the selection procedure (see section 15B, below).

(ii) Documentation evidence showing content validity of the selection procedure (see section 15C, below).

(iii) Documentation evidence showing construct validity of the selection procedure (see section 15D, below).

(iv) Documentation evidence from other studies showing validity of the selection procedure in the user's facility (see section 15E, below).

(v) Documentation evidence showing why a validity study cannot or need not be performed and why continued use of the procedure is consistent with Federal law.

(b) Form of report. This evidence should be compiled in a reasonably complete and organized manner to permit direct evaluation of the validity of the selection procedure. Previously written employer or consultant reports of validity, or reports describing validity studies completed before the issuance of these guidelines are acceptable if they are complete in regard to the documentation requirements contained in this section, or if they satisfied requirements of guidelines which were in effect when the validity study was completed. If they are not complete, the required additional documentation should be appended. If necessary information is not available the report of the validity study may still be used as documentation, but its adequacy will be evaluated in terms of compliance with the requirements of these guidelines.

(c) Completeness.    In the event that evidence of validity is reviewed by an enforcement agency, the validation reports completed after the effective date of these guidelines are expected to contain the information set forth below. Evidence denoted by use of the word "(Essential)" is considered critical.    If information denoted essential is not included, the report will be considered incomplete unless the user affirmatively demonstrates either its unavailability due to circumstances beyond the user's control or special circumstances of the user's study which make the information irrelevant.    Evidence not so denoted is desirable but its absence will not be a basis for considering a report incomplete.    The user should maintain and have available the information called for under the heading "Source Data" in sections 15B(11) and 15D(11).    While it is a necessary part of the study, it need not be submitted with the report. All statistical results should be organized and presented in tabular or graphic form to the extent feasible.

B.    Criterion-related validity studies.    Reports of criterion-related validity for a selection procedure should include the following information:

(1) User(s), location(s), and date(s) of study.    Dates and location(s) of the job analysis or review of job information, the date(s) and location(s) of the administration of the selection procedures and collection of criterion data, and the time between collection of data on selection procedures and criterion measures should be provided (Essential).    If the study was conducted at several locations, the address of each location, including city and State, should be shown.

(2) Problem and setting.    An explicit definition of the purpose(s) of the study and the circumstances in which the study was conducted should be provided.    A description of existing selection procedures and cutoff scores, if any, should be provided.

(3) Job analysis or review of job information.    A description of the procedure used to analyze the job or group of jobs, or to review the job information should be provided (Essential).    Where a review of job information results in criteria which may be used without a full job analysis (see section 14B(3) ), the basis for the selection of these criteria should be reported (Essential). Where a job analysis is required a complete description of the work behavior(s) or work outcome(s), and measures of their criticality or importance should be provided (Essential).    The report should describe the basis on which the behavior(s) or outcome(s) were determined to be critical or important, such as the proportion of time spent on the respective behaviors, their level of difficulty, their frequency of performance, the consequences of error, or other appropriate factors (Essential).    Where two or more jobs are grouped for

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

a validity study, the information called for in this subsection should be provided for each of the jobs, and the justification for the grouping (see section 14B(1) ) should be provided (Essential).

(4) Job titles and codes. It is desirable to provide the user's job title(s) for the job(s) in question and the corresponding job title(s) and code(s) from U.S. Employment Service's Dictionary of Occupational Titles.

(5) Criterion measures. The bases for the selection of the criterion measures should be provided, together with references to the evidence considered in making the selection of criterion measures (essential). A full description of all criteria on which data were collected and means by which they were observed, recorded, evaluated, and quantified, should be provided (essential). If rating techniques are used as criterion measures, the appraisal form(s) and instructions to the rater(s) should be included as part of the validation evidence, or should be explicitly described and available (essential). All steps taken to insure that criterion measures are free from factors which would unfairly alter the scores of members of any group should be described (essential).

(6) Sample description. A description of how the research sample was identified and selected should be included (essential). The race, sex, and ethnic composition of the sample, including those groups set forth in section 4A above, should be described (essential). This description should include the size of each subgroup (essential). A description of how the research sample compares with the relevant labor market or work force, the method by which the relevant labor market or work force was defined, and a discussion of the likely effects on validity of differences between the sample and the relevant labor market or work force, are also desirable. Descriptions of educational levels, length of service, and age are also desirable.

(7) Description of selection procedures. Any measure, combination of measures, or procedure studied should be completely and explicitly described or attached (essential). If commercially available selection procedures are studied, they should be described by title, form, and publisher (essential). Reports of reliability estimates and how they were established are desirable.

(8) Techniques and results. Methods used in analyzing data should be described (essential). Measures of central tendency (e.g., means) and

measures of dispersion (e.g., standard deviations and ranges) for all selection procedures and all criteria should be reported for each race, sex, and ethnic group which constitutes a significant factor in the relevant labor market (essential). The magnitude and direction of all relationships between selection procedures and criterion measures investigated should be reported for each relevant race, sex, and ethnic group and for the total group (essential). Where groups are too small to obtain reliable evidence of the magnitude of the relationship, need not be reported separately. Statements regarding the statistical significance of results should be made (essential). Any statistical adjustments, such as for less than perfect reliability or for restriction of score range in the selection procedure or criterion should be described and explained; and uncorrected correlation coefficients should also be shown (essential). Where the statistical technique categorizes continuous data, such as biserial correlation and the phi coefficient, the categories and the bases on which they were determined should be described and explained (essential). Studies of test fairness should be included where called for by the requirements of section 14B(8) (essential). These studies should include the rationale by which a selection procedure was determined to be fair to the group(s) in question. Where test fairness or unfairness has been demonstrated on the basis of other studies, a bibliography of the relevant studies should be included (essential). If the bibliography includes unpublished studies, copies of these studies, or adequate abstracts or summaries, should be attached (essential). Where revisions have been made in a selection procedure to assure compatibility between successful job performance and the probability of being selected, the studies underlying such revisions should be included (essential). All statistical results should be organized and presented by relevant race, sex, and ethnic group (essential).

(9) Alternative procedures investigated. The selection procedures investigated and available evidence of their impact should be identified (essential). The scope, method, and findings of the investigation, and the conclusions reached in light of the findings should be fully described (essential).

(10) Uses and applications. The methods considered for use of the selection procedure (e.g., as a screening device with a cutoff score, for grouping or ranking, or combined with other procedures in a battery) and available evidence of their impact should be described (essential). This description should include the rationale for choosing the method for operational use,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and the evidence of the validity and utility of the procedure as it is to be used (essential). The purpose for which the procedure is to be used (e.g., hiring, transfer, promotion) should be described (essential). If weights are assigned to different parts of the selection procedure, these weights and the validity of the weighted composite should be reported (essential). If the selection procedure is used with a cutoff score, the user should describe the way in which normal expectations of proficiency within the work force were determined and the way in which the cutoff score was determined (essential).

(11) Source data. Each user should maintain records showing all pertinent information about individual sample members and raters where they are used, in studies involving the validation of selection procedures. These records should be made available upon request of a compliance agency. In the case of individual sample members these data should include scores on the selection procedure(s), scores on criterion measures, age, sex, race, or ethnic group status, and experience on the specific job on which the validation study was conducted, and may also include such things as education, training, and prior job experience, but should not include names and social security numbers. Records should be maintained which show the ratings given to each sample member by each rater.

(12) Contact person. The name, mailing address, and telephone number of the person who may be contacted for further information about the validity study should be provided (essential).

(13) Accuracy and completeness. The report should describe the steps taken to assure the accuracy and completeness of the collection, analysis, and report of data and results.

C. Content validity studies. Reports of content validity for a selection procedure should include the following information:

(1) User(s), location(s) and date(s) of study. Dates and location(s) of the job analysis should be shown (essential).

(2) Problem and setting. An explicit definition of the purpose(s) of the study and the circumstances in which the study was conducted should be provided. A description of existing selection procedures and cutoff scores, if any, should be provided.

(3) Job analysis--Content of the job. A description of

the method used to analyze the job should be provided (essential). The work behavior(s), the associated tasks, and, if the behavior results in a work product, the work products should be completely described (essential). Measures of criticality and/or importance of the work behavior(s) and the method of determining these measures should be provided (essential). Where the job analysis also identified the knowledge, skills, and abilities used in work behavior(s), an operational definition for each knowledge in terms of a body of learned information and for each skill and ability in terms of observable behaviors and outcomes, and the relationship between each knowledge, skill, or ability and each work behavior, as well as the method used to determine this relationship, should be provided (essential). The work situation should be described, including the setting in which work behavior(s) are performed, and where appropriate, the manner in which knowledge, skills, or abilities are used, and the complexity and difficulty of the knowledge, skill, or ability as used in the work behavior(s).

(4) Selection procedure and its content. Selection procedures, including those constructed by or for the user, specific training requirements, composites of selection procedures, and any other procedure supported by content validity, should be completely and explicitly described or attached (essential). If commercially available selection procedures are used, they should be described by title, form, and publisher (essential). The behaviors measured or sampled by the selection procedure should be explicitly described (essential). Where the selection procedure purports to measure a knowledge, skill, or ability, evidence that the selection procedure measures and is a representative sample of the knowledge, skill, or ability should be provided (essential).

(5) Relationship between the selection procedure and the job. The evidence demonstrating that the selection procedure is a representative work sample, a representative sample of the work behavior(s), or a representative sample of a knowledge, skill, or ability as used as a part of a work behavior and necessary for that behavior should be provided (essential). The user should identify the work behavior(s) which each item or part of the selection procedure is intended to sample or measure (essential). Where the selection procedure purports to sample a work behavior or to provide a sample of a work product, a comparison should be provided of the manner, setting, and the level of complexity of the selection procedure with those of the work situation (essential). If any steps were taken to reduce adverse impact on a race, sex,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

or ethnic group in the content of the procedure or in its administration, these steps should be described. Establishment of time limits, if any, and how these limits are related to the speed with which duties must be performed on the job, should be explained. Measures of central tendency (e.g., means) and measures of dispersion (e.g., standard deviations) and estimates of reliability should be reported for all selection procedures if available. Such reports should be made for relevant race, sex, and ethnic subgroups, at least on a statistically reliable sample basis.

(6) Alternative procedures investigated. The alternative selection procedures investigated and available evidence of their impact should be identified (essential). The scope, method, and findings of the investigation, and the conclusions reached in light of the findings, should be fully described (essential).

(7) Uses and applications. The methods considered for use of the selection procedure (e.g., as a screening device with a cutoff score, for grouping or ranking, or combined with other procedures in a battery) and available evidence of their impact should be described (essential). This description should include the rationale for choosing the method for operational use, and the evidence of the validity and utility of the procedure as it is to be used (essential). The purpose for which the procedure is to be used (e.g., hiring, transfer, promotion) should be described (essential). If the selection procedure is used with a cutoff score, the user should describe the way in which normal expectations of proficiency within the work force were determined and the way in which the cutoff score was determined (essential). In addition, if the selection procedure is to be used for ranking, the user should specify the evidence showing that a higher score on the selection procedure is likely to result in better job performance.

(8) Contact person. The name, mailing address, and telephone number of the person who may be contacted for further information about the validity study should be provided (essential).

(9) Accuracy and completeness. The report should describe the steps taken to assure the accuracy and completeness of the collection, analysis, and report of data and results.

D. Construct validity studies. Reports of construct validity for a selection procedure should include the following information:

(1) User(s), location(s), and date(s) of study. Date(s)

and location(s) of the job analysis and the gathering of other evidence called for by these guidelines should be provided (essential).

(2) Problem and setting. An explicit definition of the purpose(s) of the study and the circumstances in which the study was conducted should be provided. A description of existing selection procedures and cutoff scores, if any, should be provided.

(3) Construct definition. A clear definition of the construct(s) which are believed to underlie successful performance of the critical or important work behavior(s) should be provided (essential). This definition should include the levels of construct performance relevant to the job(s) for which the selection procedure is to be used (essential). There should be a summary of the position of the construct in the psychological literature, or in the absence of such a position, a description of the way in which the definition and measurement of the construct was developed and the psychological theory underlying it (essential). Any quantitative data which identify or define the job constructs, such as factor analyses, should be provided (essential).

(4) Job analysis. A description of the method used to analyze the job should be provided (essential). A complete description of the work behavior(s) and, to the extent appropriate, work outcomes and measures of their criticality and/or importance should be provided (essential). The report should also describe the basis on which the behavior(s) or outcomes were determined to be important, such as their level of difficulty, their frequency of performance, the consequences of error or other appropriate factors (essential). Where jobs are grouped or compared for the purposes of generalizing validity evidence, the work behavior(s) and work product(s) for each of the jobs should be described, and conclusions concerning the similarity of the jobs in terms of observable work behaviors or work products should be made (essential).

(5) Job titles and codes. It is desirable to provide the selection procedure user's job title(s) for the job(s) in question and the corresponding job title(s) and code(s) from the United States Employment Service's dictionary of occupational titles.

(6) Selection procedure. The selection procedure used as a measure of the construct should be completely and explicitly described or attached (essential). If commercially available selection procedures are used, they should be identified by title, form and publisher

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(essential). The research evidence of the relationship between the selection procedure and the construct, such as factor structure, should be included (essential). Measures of central tendency, variability and reliability of the selection procedure should be provided (essential). Whenever feasible, these measures should be provided separately for each relevant race, sex and ethnic group.

(7) Relationship to job performance. The criterion-related study(ies) and other empirical evidence of the relationship between the construct measured by the selection procedure and the related work behavior(s) for the job or jobs in question should be provided (essential). Documentation of the criterion-related study(ies) should satisfy the provisions of section 15B above or section 15E(1) below, except for studies conducted prior to the effective date of these guidelines (essential). Where a study pertains to a group of jobs, and, on the basis of the study, validity is asserted for a job in the group, the observed work behaviors and the observed work products for each of the jobs should be described (essential). Any other evidence used in determining whether the work behavior(s) in each of the jobs is the same should be fully described (essential).

(8) Alternative procedures investigated. The alternative selection procedures investigated and available evidence of their impact should be identified (essential). The scope, method, and findings of the investigation, and the conclusions reached in light of the findings should be fully described (essential).

(9) Uses and applications. The methods considered for use of the selection procedure (e.g., as a screening device with a cutoff score, for grouping or ranking, or combined with other procedures in a battery) and available evidence of their impact should be described (essential). This description should include the rationale for choosing the method for operational use, and the evidence of the validity and utility of the procedure as it is to be used (essential). The purpose for which the procedure is to be used (e.g., hiring, transfer, promotion) should be described (essential). If weights are assigned to different parts of the selection procedure, these weights and the validity of the weighted composite should be reported (essential). If the selection procedure is used with a cutoff score, the user should describe the way in which normal expectations of proficiency within the work force were determined and the way in which the cutoff score was determined (essential).

(10) Accuracy and completeness. The report should describe the steps taken to assure the accuracy and completeness of the collection, analysis, and report of data and results.

(11) Source data. Each user should maintain records showing all pertinent information relating to its study of construct validity.

(12) Contact person. The name, mailing address, and telephone number of the individual who may be contacted for further information about the validity study should be provided (essential).

E. Evidence of validity from other studies. When validity of a selection procedure is supported by studies not done by the user, the evidence from the original study or studies should be compiled in a manner similar to that required in the appropriate section of this section 15 above. In addition, the following evidence should be supplied:

(1) Evidence from criterion-related validity studies.--

a. Job information. A description of the important job behavior(s) of the user's job and the basis on which the behaviors were determined to be important should be provided (essential). A full description of the basis for determining that these important work behaviors are the same as those of the job in the original study (or studies) should be provided (essential).

b. Relevance of criteria. A full description of the basis on which the criteria used in the original studies are determined to be relevant for the user should be provided (essential).

c. Other variables. The similarity of important applicant pool or sample characteristics reported in the original studies to those of the user should be described (essential). A description of the comparison between the race, sex and ethnic composition of the user's relevant labor market and the sample in the original validity studies should be provided (essential).

d. Use of the selection procedure. A full description should be provided showing that the use to be made of the selection procedure is consistent with the findings of the original validity studies (essential).

e. Bibliography. A bibliography of reports of validity of the selection procedure for the job or jobs in question should be provided (essential). Where any of the studies included an investigation of test fairness, the results of this investigation should be provided (essential). Copies of reports published in journals

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that are not commonly available should be described in detail or attached (essential). Where a user is relying upon unpublished studies, a reasonable effort should be made to obtain these studies. If these unpublished studies are the sole source of validity evidence they should be described in detail or attached (essential). If these studies are not available, the name and address of the source, an adequate abstract or summary of the validity study and data, and a contact person in the source organization should be provided (essential).

(2) Evidence from content validity studies. See section 14C(3) and section 15C above.

(3) Evidence from construct validity studies. See sections 14D(2) and 15D above.

F. Evidence of validity from cooperative studies. Where a selection procedure has been validated through a cooperative study, evidence that the study satisfies the requirements of sections 7, 8 and 15E should be provided (essential).

G. Selection for higher level job. If a selection procedure is used to evaluate candidates for jobs at a higher level than those for which they will initially be employed, the validity evidence should satisfy the documentation provisions of this section 15 for the higher level job or jobs, and in addition, the user should provide: (1) a description of the job progression structure, formal or informal; (2) the data showing how many employees progress to the higher level job and the length of time needed to make this progression; and (3) an identification of any anticipated changes in the higher level job. In addition, if the test measures a knowledge, skill or ability, the user should provide evidence that the knowledge, skill or ability is required for the higher level job and the basis for the conclusion that the knowledge, skill or ability is not expected to develop

from the training or experience on the job.

H. Interim use of selection procedures. If a selection procedure is being used on an interim basis because the procedure is not fully supported by the required evidence of validity, the user should maintain and have available (1) substantial evidence of validity for the procedure, and (2) a report showing the date on which the study to gather the additional evidence commenced, the estimated completion date of the study, and a description of the data to be collected (essential).

Approved by the Office of Management and Budget under control number 3046-0017

(Authority: Pub.L. No. 96-511, 94 Stat. 2812 (44 U.S.C. 3501 et seq.))

[43 FR 38295, 38312, Aug. 25, 1978, as amended at 46 FR 63268, Dec. 31, 1981]

&lt; General Materials (GM) - References, Annotations, or Tables &gt;

SOURCE: 43 FR 38295 and 43 FR 38312, Aug. 25, 1978, unless otherwise noted.

AUTHORITY: Secs. 709 and 713, Civil Rights Act of 1964 (78 Stat. 265) as amended by the Equal Employment Opportunity Act of 1972(Pub.L. 92-261); 42 U.S.C. 2000e-8, 2000e-12.

29 C. F. R. § 1607.15, 29 CFR § 1607.15

Current through March 30, 2006; 71 FR 16060

Copr. © 2006 Thomson/West

END OF DOCUMENT

29 CFR S 1607.16
29 C.F.R. § 1607.16
c

Effective: [See Text Amendments]

CODE OF FEDERAL REGULATIONS
TITLE 29--LABOR
SUBTITLE B--REGULATIONS RELATING TO LABOR
CHAPTER XIV--EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
PART 1607--UNIFORM GUIDELINES ON EMPLOYEE SELECTION PROCEDURES (1978)
DEFINITIONS
§ 1607.16 Definitions.

The following definitions shall apply throughout these guidelines:

A. Ability. A present competence to perform an observable behavior or a behavior which results in an observable product.

B. Adverse impact. A substantially different rate of selection in hiring, promotion, or other employment decision which works to the disadvantage of members of a race, sex, or ethnic group. See section 4 of these guidelines.

C. Compliance with these guidelines. Use of a selection procedure is in compliance with these guidelines if such use has been validated in accord with these guidelines (as defined below), or if such use does not result in adverse impact on any race, sex, or ethnic group (see section 4, above), or, in unusual circumstances, if use of the procedure is otherwise justified in accord with Federal law. See section 6B, above.

D. Content validity. Demonstrated by data showing that the content of a selection procedure is representative of important aspects of performance on the job. See section 5B and section 14C.

E. Construct validity. Demonstrated by data showing that the selection procedure measures the degree to which candidates have identifiable characteristics which have been determined to be important for successful job performance. See section 5B and section 14D.

F. Criterion-related validity. Demonstrated by empirical data showing that the selection procedure is predictive of or significantly correlated with important elements of work behavior. See sections 5B and 14B.

G. Employer. Any employer subject to the provisions of the Civil Rights Act of 1964, as amended, including State or local governments and any Federal agency subject to the provisions of section 717 of the Civil Rights Act of 1964, as amended, and any Federal contractor or subcontractor or federally assisted construction contractor or subcontractor covered by Executive Order 11246, as amended.

H. Employment agency. Any employment agency subject to the provisions of the Civil Rights Act of 1964, as amended.

I. Enforcement action. For the purposes of section 4 a proceeding by a Federal enforcement agency such as a lawsuit or an administrative proceeding leading to debarment from or withholding, suspension, or termination of Federal Government contracts or the suspension or withholding of Federal Government funds; but not a finding of reasonable cause or a conciliation process or the issuance of right to sue letters under title VII or under Executive Order 11246 where such finding, conciliation, or issuance of notice of right to sue is based upon an individual complaint.

J. Enforcement agency. Any agency of the executive branch of the Federal Government which adopts these guidelines for purposes of the enforcement of the equal employment opportunity laws or which has responsibility for securing compliance with them.

K. Job analysis. A detailed statement of work behaviors and other information relevant to the job.

L. Job description. A general statement of job duties and responsibilities.

M. Knowledge. A body of information applied directly to the performance of a function.

N. Labor organization. Any labor organization subject to the provisions of the Civil Rights Act of 1964, as amended, and any committee subject thereto controlling apprenticeship or other training.

O. Observable. Able to be seen, heard, or otherwise perceived by a person other than the person performing the action.

P. Race, sex, or ethnic group. Any group of persons identifiable on the grounds of race, color, religion, sex, or national origin.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

29 CFR S 1607.16

Q. Selection procedure. Any measure, combination of measures, or procedure used as a basis for any employment decision. Selection procedures include the full range of assessment techniques from traditional paper and pencil tests, performance tests, training programs, or probationary periods and physical, educational, and work experience requirements through informal or casual interviews and unscored application forms.

R. Selection rate. The proportion of applicants or candidates who are hired, promoted, or otherwise selected.

S. Should. The term "should" as used in these guidelines is intended to connote action which is necessary to achieve compliance with the guidelines, while recognizing that there are circumstances where alternative courses of action are open to users.

T. Skill. A present, observable competence to perform a learned psychomotor act.

U. Technical feasibility. The existence of conditions permitting the conduct of meaningful criterion-related validity studies. These conditions include: (1) An adequate sample of persons available for the study to achieve findings of statistical significance; (2) having or being able to obtain a sufficient range of scores on the selection procedure and job performance measures to produce validity results which can be expected to be representative of the results if the ranges normally expected were utilized; and (3) having or being able to devise unbiased, reliable and relevant measures of job performance or other criteria of employee adequacy. See section 14B(2). With respect to investigation of possible unfairness, the same considerations are applicable to each group for which the study is made. See section 14B(8).

V. Unfairness of selection procedure. A condition in which members of one race, sex, or ethnic group characteristically obtain lower scores on a selection procedure than members of another group, and the differences are not reflected in differences in measures of job performance. See section 14B(7).

W. User. Any employer, labor organization, employment agency, or licensing or certification board, to the extent it may be covered by Federal equal employment opportunity law, which uses a selection procedure as a basis for any employment decision. Whenever an employer, labor organization, or employment agency is required by law to restrict recruitment for any occupation to those applicants who have met licensing or certification requirements, the licensing or certifying authority to the extent it may be covered by Federal equal employment opportunity law will be considered the user with respect to those licensing or certification requirements. Whenever a State employment agency or service does no more than administer or monitor a procedure as permitted by Department of Labor regulations, and does so without making referrals or taking any other action on the basis of the results, the State employment agency will not be deemed to be a user.

X. Validated in accord with these guidelines or properly validated. A demonstration that one or more validity study or studies meeting the standards of these guidelines has been conducted, including investigation and, where appropriate, use of suitable alternative selection procedures as contemplated by section 3B, and has produced evidence of validity sufficient to warrant use of the procedure for the intended purpose under the standards of these guidelines.

Y. Work behavior. An activity performed to achieve the objectives of the job. Work behaviors involve observable (physical) components and unobservable (mental) components. A work behavior consists of the performance of one or more tasks. Knowledge, skills, and abilities are not behaviors, although they may be applied in work behaviors.

< General Materials (GM) - References, Annotations, or Tables >

SOURCE: 43 FR 38295 and 43 FR 38312, Aug. 25, 1978, unless otherwise noted.

AUTHORITY: Secs. 709 and 713, Civil Rights Act of 1964 (78 Stat. 265) as amended by the Equal Employment Opportunity Act of 1972(Pub.L. 92-261); 42 U.S.C. 2000e-8, 2000e-12.

29 C. F. R. § 1607.16, **29 CFR § 1607**.16

Current through March 30, 2006; 71 FR 16060

Copr. © 2006 Thomson/West

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Effective: [See Text Amendments]

CODE OF FEDERAL REGULATIONS
TITLE 29--LABOR
SUBTITLE B--REGULATIONS RELATING TO LABOR
CHAPTER XIV--EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
PART 1607--UNIFORM GUIDELINES ON EMPLOYEE SELECTION PROCEDURES (1978)
APPENDIX
§ 1607.17 Policy statement on affirmative action (see section 13B).

The Equal Employment Opportunity Coordinating Council was established by act of Congress in 1972, and charged with responsibility for developing and implementing agreements and policies designed, among other things, to eliminate conflict and inconsistency among the agencies of the Federal Government responsible for administering Federal law prohibiting discrimination on grounds of race, color, sex, religion, and national origin. This statement is issued as an initial response to the requests of a number of State and local officials for clarification of the Government's policies concerning the role of affirmative action in the overall equal employment opportunity program. While the Coordinating Council's adoption of this statement expresses only the views of the signatory agencies concerning this important subject, the principles set forth below should serve as policy guidance for other Federal agencies as well.

(1) Equal employment opportunity is the law of the land. In the public sector of our society this means that all persons, regardless of race, color, religion, sex, or national origin shall have equal access to positions in the public service limited only by their ability to do the job. There is ample evidence in all sectors of our society that such equal access frequently has been denied to members of certain groups because of their sex, racial, or ethnic characteristics. The remedy for such past and present discrimination is twofold.

On the one hand, vigorous enforcement of the laws against discrimination is essential. But equally, and perhaps even more important are affirmative, voluntary efforts on the part of public employers to assure that positions in the public service are genuinely and equally accessible to qualified persons, without regard to their sex, racial, or ethnic characteristics. Without such efforts equal employment opportunity is no more than a wish. The importance of voluntary affirmative action on the part of employers is underscored by title VII of the Civil Rights Act of 1964, Executive Order 11246, and related laws and regulations--all of which emphasize voluntary action to achieve equal employment opportunity.

As with most management objectives, a systematic plan based on sound organizational analysis and problem identification is crucial to the accomplishment of affirmative action objectives. For this reason, the Council urges all State and local governments to develop and implement results oriented affirmative action plans which deal with the problems so identified.

The following paragraphs are intended to assist State and local governments by illustrating the kinds of analyses and activities which may be appropriate for a public employer's voluntary affirmative action plan. This statement does not address remedies imposed after a finding of unlawful discrimination.

(2) Voluntary affirmative action to assure equal employment opportunity is appropriate at any stage of the employment process. The first step in the construction of any affirmative action plan should be an analysis of the employer's work force to determine whether percentages of sex, race, or ethnic groups in individual job classifications are substantially similar to the percentages of those groups available in the relevant job market who possess the basic job-related qualifications.

When substantial disparities are found through such analyses, each element of the overall selection process should be examined to determine which elements operate to exclude persons on the basis of sex, race, or ethnic group. Such elements include, but are not limited to, recruitment, testing, ranking certification, interview, recommendations for selection, hiring, promotion, etc. The examination of each element of the selection process should at a minimum include a determination of its validity in predicting job performance.

(3) When an employer has reason to believe that its selection procedures have the exclusionary effect described in paragraph 2 above, it should initiate affirmative steps to remedy the situation. Such steps, which in design and execution may be race, color,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

sex, or ethnic "conscious," include, but are not limited to, the following:

(a) The establishment of a long-term goal, and short-range, interim goals and timetables for the specific job classifications, all of which should take into account the availability of basically qualified persons in the relevant job market;

(b) A recruitment program designed to attract qualified members of the group in question;

(c) A systematic effort to organize work and redesign jobs in ways that provide opportunities for persons lacking "journeyman" level knowledge or skills to enter and, with appropriate training, to progress in a career field;

(d) Revamping selection instruments or procedures which have not yet been validated in order to reduce or eliminate exclusionary effects on particular groups in particular job classifications;

(e) The initiation of measures designed to assure that members of the affected group who are qualified to perform the job are included within the pool of persons from which the selecting official makes the selection;

(f) A systematic effort to provide career advancement training, both classroom and on-the-job, to employees locked into dead end jobs; and

(g) The establishment of a system for regularly monitoring the effectiveness of the particular affirmative action program, and procedures for making timely adjustments in this program where effectiveness is not demonstrated.

(4) The goal of any affirmative action plan should be achievement of genuine equal employment opportunity for all qualified persons. Selection under such plans should be based upon the ability of the applicant(s) to do the work. Such plans should not require the selection of the unqualified, or the unneeded, nor should they require the selection of persons on the basis of race, color, sex, religion, or national origin. Moreover, while the Council believes that this statement should serve to assist State and local employers, as well as Federal agencies, it recognizes that affirmative action cannot be viewed as a standardized program which must be accomplished in the same way at all times in all places.

Accordingly, the Council has not attempted to set

forth here either the minimum or maximum voluntary steps that employers may take to deal with their respective situations. Rather, the Council recognizes that under applicable authorities, State and local employers have flexibility to formulate affirmative action plans that are best suited to their particular situations. In this manner, the Council believes that affirmative action programs will best serve the goal of equal employment opportunity.

Respectfully submitted,

Harold R. Tyler, Jr.,

Deputy Attorney General and Chairman of the Equal Employment Coordinating Council.

Michael H. Moskow,

Under Secretary of Labor.

Ethel Bent Walsh,

Acting Chairman, Equal Employment Opportunity Commission.

Robert E. Hampton,

Chairman, Civil Service Commission.

Arthur E. Flemming,

Chairman, Commission on Civil Rights.

Because of its equal employment opportunity responsibilities under the State and Local Government Fiscal Assistance Act of 1972 (the revenue sharing act), the Department of Treasury was invited to participate in the formulation of this policy statement; and it concurs and joins in the adoption of this policy statement.

Done this 26th day of August 1976.

Richard Albrecht,

General Counsel,

Department of the Treasury.

< General Materials (GM) - References, Annotations, or Tables >

SOURCE:  43 FR 38295 and 43 FR 38312, Aug. 25,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

29 CFR S 1607.17                                                    **Page 33**

1978, unless otherwise noted.

AUTHORITY: Secs. 709 and 713, Civil Rights Act of 1964 (78 Stat. 265) as amended by the Equal Employment Opportunity Act of 1972(Pub.L. 92-261); 42 U.S.C. 2000e-8, 2000e-12.

29 C. F. R. § 1607.17, **29 CFR § 1607.**17

Current through March 30, 2006; 71 FR 16060

Copr. © 2006 Thomson/West

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 34

Effective: [See Text Amendments]

CODE OF FEDERAL REGULATIONS
TITLE 29--LABOR
SUBTITLE B--REGULATIONS RELATING TO LABOR
CHAPTER XIV--EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
PART 1607--UNIFORM GUIDELINES ON EMPLOYEE SELECTION PROCEDURES (1978)
APPENDIX
§ 1607.18 Citations.

The official title of these guidelines is "Uniform Guidelines on Employee Selection Procedures (1978)". The Uniform Guidelines on Employee Selection Procedures (1978) are intended to establish a uniform Federal position in the area of prohibiting discrimination in employment practices on grounds of race, color, religion, sex, or national origin. These guidelines have been adopted by the Equal Employment Opportunity Commission, the Department of Labor, the Department of Justice, and the Civil Service Commission.

The official citation is:

Section __, Uniform Guidelines on Employee Selection Procedure (1978); 43 FR __ (August 25, 1978).

The short form citation is:

Section __, U.G.E.S.P. (1978); 43 FR __ (August 25, 1978).

When the guidelines are cited in connection with the activities of one of the issuing agencies, a specific citation to the regulations of that agency can be added at the end of the above citation. The specific additional citations are as follows:

Equal Employment Opportunity Commission

29 CFR Part 1607

Department of Labor

Office of Federal Contract Compliance Programs

41 CFR Part 60-3

Department of Justice

28 CFR 50.14

Civil Service Commission

5 CFR 300.103(c)

Normally when citing these guidelines, the section number immediately preceding the title of the guidelines will be from these guidelines series 1-18. If a section number from the codification for an individual agency is needed it can also be added at the end of the agency citation. For example, section 6A of these guidelines could be cited for EEOC as follows:

Section 6A, Uniform Guidelines on Employee Selection Procedures (1978); 43 FR __, (August 25, 1978); 29 CFR Part 1607, section 6A.

< General Materials (GM) - References, Annotations, or Tables >

SOURCE: 43 FR 38295 and 43 FR 38312, Aug. 25, 1978, unless otherwise noted.

AUTHORITY: Secs. 709 and 713, Civil Rights Act of 1964 (78 Stat. 265) as amended by the Equal Employment Opportunity Act of 1972(Pub.L. 92-261); 42 U.S.C. 2000e-8, 2000e-12.

29 C. F. R. § 1607.18, **29 CFR § 1607.**18

Current through March 30, 2006; 71 FR 16060

Copr. © 2006 Thomson/West

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# WORK IN THE 21ST CENTURY

## AN INTRODUCTION TO INDUSTRIAL AND ORGANIZATIONAL PSYCHOLOGY

**Frank J. Landy**
*SHL North America*

**Jeffrey M. Conte**
*San Diego State University*



Boston  Burr Ridge, IL  Dubuque, IA  Madison, WI  New York
San Francisco  St. Louis  Bangkok  Bogotá  Caracas  Kuala Lumpur
Lisbon  London  Madrid  Mexico City  Milan  Montreal  New Delhi
Santiago  Seoul  Singapore  Sydney  Taipei  Toronto



The McGraw-Hill Companies

## Higher Education

WORK IN THE 21ST CENTURY: AN INTRODUCTION TO INDUSTRIAL AND ORGANIZATIONAL PSYCHOLOGY
Published by McGraw-Hill, an imprint of The McGraw-Hill Companies, Inc. 1221 Avenue of the Americas, New York, NY, 10020. Copyright 2004 by The McGraw-Hill Companies, Inc. All rights reserved. No part of this publication may be reproduced or distributed in any form or by any means, or stored in a database or retrieval system, without the prior written consent of The McGraw-Hill Companies, Inc., including, but not limited to, in any network or other electronic storage or transmission, or broadcast for distance learning.

Some ancillaries, including electronic and print components, may not be available to customers outside the United States.

This book is printed on acid-free paper.

domestic    2 3 4 5 6 7 8 9 0 DOW/DOW 0 9 8 7 6 5 4
international  1 2 3 4 5 6 7 8 9 0 DOW/DOW 0 9 8 7 6 5 4

ISBN 0-07-283022-0

Publisher: *Steve D. Rutter*
Sponsoring editors: *Ken King/John Wannemacher*
Developmental editor: *Elsa Peterson*
Marketing manager: *Melissa S. Caughlin*
Senior media producer: *Sean Crowley*
Senior project manager: *Christina Thornton-Villagomez*
Production supervisor: *Janean Utley*
Senior designer: *Gino Cieslik*
Lead supplement producer: *Marc Mattson*
Photo research coordinator: *Nora Agbayani*
Art editor: *Jennifer DeVere*
Photo researcher: *David A. Tietz*
Permissions: *Judi Kincaid*
Cover and interior design: *Kay Fulton*
Typeface: *10/12 Minion*
Compositor: *The GTS Companies/York, PA Campus*
Printer: *R.R. Donnelley and Sons Inc.*

Library of Congress Cataloging-in-Publication Data

Landy, Frank J.
    Work in the 21st century : an introduction to industrial and organizational  psychology /
  Frank J. Landy, Jeffrey M. Conte.
      p. cm.
    Includes index.
    ISBN 0-07-283022-0 (hc. : alk. paper)
    1. Psychology, Industrial. 2. Organization    Research. 3. Organizational behavior. 4.
  Work. 5. Twenty-first century. I. Title: Work in the twenty first century. II. Conte, Jeffrey
  M. III. Title.
  HF5548.8.L254 2004
  158.7  dc21
                                                       2003054092

INTERNATIONAL EDITION ISBN 0-07-121480-1
Copyright 2004. Exclusive rights by The McGraw-Hill Companies, Inc. for manufacture and export. This book cannot be re-exported from the country to which it is sold by McGraw-Hill. The International Edition is not available in North America.

www.mhhe.com





## DESCRIPTIVE AND INFERENTIAL STATISTICS
### Descriptive Statistics

In our discussion of research, we have considered two issues thus far: how to design a study to collect data, and how to collect those data. Assuming we have been successful at both of those tasks, we now need to analyze those data to determine what they may tell us about our initial theory, hypothesis, or speculation. We can analyze the data we have gathered for two purposes. The first is simply to describe the distribution of scores or numbers we have collected. A distribution of numbers simply means that the numbers are arrayed along two axes. The horizontal axis is the score or number axis running from low to high scores. The vertical axis is usually the frequency axis, which indicates how many individuals achieved each score on the horizontal axis. The statistical methods to accomplish such a description are referred to as **descriptive statistics**. You have probably encountered this type of statistical analysis in other courses, so we will simply summarize the more important characteristics for you. Consider the two distributions of test scores in Figure 2.2. Look at the overall shapes of those distributions. One distribution is high and narrow; the other is lower and wider. In the left graph, the distribution's center (48) is easy to determine; in the right graph, the

**DESCRIPTIVE STATISTICS**

*Summarize, organize, and describe a sample of data.*



FIGURE 2.2  Two Score Distributions (N = 30)

52



THE STAT FAMILY

Source: © The New Yorker Collection 1989 Mick Stevens from cartoonbank.com. All Rights Reserved.

distribution's center is not as clear unless we specify the central tendency measure of interest. One distribution is bell shaped or symmetric, while the other is lopsided. Three measures or characteristics can be used to describe any score distribution—**measures of central tendency, variability,** and lopsidedness (technically called skew).

Measures of central tendency include the **mean,** the **mode,** and the **median.** The mean is the arithmetic average of the scores, the mode is the most frequently occurring score, and the median is the middle score (the score which 50 percent of the remaining scores fall above, and the other 50 percent of the remaining scores fall below). As you can see, the two distributions have different means, modes, and medians. In addition, the two distributions vary on their lopsidedness or skewness. The left distribution has no skew; the right distribution is positively skewed, with some high scores pulling the mean to the positive (right) side.

Another common descriptive statistic is the standard deviation or the variance of a distribution. In Figure 2.3, you can see that one distribution covers a larger score range

**MEASURE OF CENTRAL TENDENCY**

*Statistic that indicates where the center of a distribution is located. Mean, median, and mode are measures of central tendency.*

**VARIABILITY**

*The extent to which scores in a distribution vary.*

**SKEW**

*The extent to which scores in a distribution are lopsided or tend to fall on the left or right side of the distribution.*

**MEAN**

*The arithmetic average of the scores in a distribution; obtained by summing all of the scores in a distribution and dividing by the sample size.*

**MODE**

*The most common or frequently occurring score in a distribution.*

**MEDIAN**

*The middle score in a distribution.*





**FIGURE 2.3  Two Score Distributions (N = 10)**

and is wider than the other. We can characterize a distribution by looking at the extent to which the scores deviate from the mean score. The typical amount of deviation from a mean score is the standard deviation. Since distributions often vary from each other simply as a result of the units of measure (e.g., one distribution is a measure of inches, while another is a measure of loudness), sometimes it is desirable to standardize the distribution so that they all have means = .00 and standard (or average) deviations = 1.00. The variance of a distribution is simply the squared standard deviation.

## Inferential Statistics

In the studies that you will encounter in the rest of this text, the types of analyses used are not descriptive, but inferential. When we conduct a research study, we do it for a reason. We have a theory or hypothesis to examine. It may be a hypothesis that accidents are related to personality characteristics, or that people with higher mental ability test scores perform their jobs better than those with lower scores, or that team members in small teams are happier with their work than team members in large teams. In each of these cases, we design a study and collect data in order to come to some conclusion, to draw an inference about a relationship. Once again, in other courses, you have likely been introduced to some basic **inferential statistics**. Statistical tests such as the t-test, analysis of variance or F-test, or chi-square test can be used to see if two or more groups of participants (e.g., an experimental and a control group) tend to differ on some variable of interest. For example, we can examine the means of two groups of scores in Figure 2.3 to see if they are different beyond what we might expect as a result of chance. If I tell you that the group with the lower mean score represents high school graduates and the group with the higher mean score represents college graduates, and I further tell you that the means are statistically significantly different from what would be found with simple random or chance variation, you might draw the inference that education is associated with higher test scores. The statistical test used to support that conclusion (e.g., a t-test of mean differences) would be considered an inferential test.

INFERENTIAL STATISTICS

Used to aid the researcher in testing hypotheses and making inferences from sample data to a larger sample or population.

## Statistical Significance

Two scores, derived from two different groups, might be different, even at the third decimal place. How can we be sure that the difference is a "real" one—that it exceeds a difference we might expect as a function of chance alone? If we examined the mean scores of many different test groups, such as the two displayed in Figure 2.3, we would almost never find that the means were *exactly* the same. A convention has been adopted to define when a difference or an inferential statistic is significant. **Statistical significance** is defined in terms of a probability statement. To say that a finding of difference between two groups is significant at the 5 percent level, or a probability of .05, is to say that a difference that large would be expected to occur only 5 times out of 100 as a result of chance alone. If the difference between the means was even larger, we might conclude that a difference this large might be expected to occur only 1 time out of 100 as a result of chance alone. This latter result would be reported as a difference at the 1 percent level, or a probability of .01. As the probability goes down (e.g., from .05 to .01), we become more confident that the difference is a real difference. It is important to keep in mind that the significance level addresses only the confidence that we can have that a result is not due to chance. It says nothing about the strength of an association or the practical importance of the result. The standard, or threshold, for significance has been set at .05 or lower as a rule of thumb. Thus, unless a result would occur only five or fewer times out of a hundred as a result of chance alone, we do not label the difference as statistically significant.

STATISTICAL SIGNIFICANCE

Indicates that the probability of the observed statistic is less than the stated significance level adopted by the researcher (commonly $p = .05$). A statistically significant finding indicates that, if the null hypothesis were true, the results found are unlikely to occur by chance, and the null hypothesis is rejected.

In recent years I-O psychologists have vigorously debated the value of significance testing (Krueger, 2001; Murphy, 1997; Schmidt, 1992, 1996). Critics argue that the .05 level

is arbitrary and that even higher levels—up to .10, for example—can still be practically important. This is a very complex statistical debate that we will not cover here, but it is important to remember that you are unlikely to encounter studies in scientific journals with probability values higher than .05. The critics argue that there are many interesting findings and theories that never see the scientific light of day because of this arbitrary criterion for statistical significance.

## The Concept of Statistical Power

Many studies have a very small number of participants in them. This makes it very difficult to find statistical significance even when there is a "true" relationship among variables. In Figure 2.3 we have reduced our two samples in Figure 2.2 from 30 to 10 by randomly dropping 20 participants from each group. The differences are no longer statistically significant. But from our original study with 30 participants, we know that the differences between means are not due to chance. Nevertheless, the convention we have adopted for defining significance prevents us from considering the new difference to be significant, even though the mean values and the differences between those means are identical to what they were in Figure 2.2.

The concept of **statistical power** deals with the likelihood of finding a statistically significant difference when a true difference exists. The smaller the sample size, the lower the power to *detect* a true or real difference. In practice, this means that researchers may be drawing the wrong inferences (e.g., that there is no association) when sample sizes are too small. The issue of power is often used by the critics of significance testing to illustrate what is wrong with such conventions. Schmidt and Hunter (2002b) argued that the typical power of a psychological study is low enough that more than 50 percent of the studies in the literature do not detect a difference between groups or an effect of a treatment or independent variable on a dependent variable when one exists. Thus, adopting a convention that requires an effect to be "statistically significant" at the .05 level greatly distorts what we read in journals and how we interpret what we do read.

Power calculations can be done before a study is ever initiated, informing the researcher of the number of participants that should be included in the study in order to have a reasonable chance of detecting an association (Cohen, 1988, 1994; Murphy & Myors, 1998). Research studies can be time consuming and expensive. It would be silly to conduct a study that could not detect an association even if one were there. The power concept also provides a warning against casually dismissing studies that do not achieve "statistical significance" before looking at sample sizes. If the sample sizes are small, we may never know whether or not there is a real effect or difference between groups.

> **STATISTICAL POWER**
> *The likelihood of finding a statistically significant difference when a true difference exists.*

## CORRELATION AND REGRESSION

As we saw in the discussion about research design, there are many situations in which experiments are not feasible. This is particularly true in I-O psychology. It would be unethical, for example, to manipulate a variable that would influence well-being at work, with some conditions expected to reduce well-being and others to enhance well-being. The most common form of research is to observe and measure natural variation in the variables of interest and look for associations among those variables. Through the process of **measurement**, we can assign numbers to individuals. These numbers represent the person's standing on a variable of interest. Examples of these numbers are a test score, an index of stress or job satisfaction, a performance rating, or a grade in a training program. We may wish to examine the relationship between two of these variables to predict one variable from the other. For example, if we are interested in the association between an individual's cognitive ability and training success, we can calculate the association between

> **MEASUREMENT**
> *Assigning numbers to characteristics of individuals or objects according to rules.*

56    CHAPTER 2 STUDYING AND INTERPRETING WORKER BEHAVIOR

FIGURE 2.4

**Correlation between Test Scores and Training Grades**



CORRELATION
COEFFICIENT

*Statistic assessing the bivariate, linear association between two variables. Provides information about both the magnitude (numerical value) and the direction (+ or −) of the relationship between two variables.*

SCATTERPLOT

*Graph used to plot the scatter of scores on two variables; used to display the correlational relationship between two variables.*

REGRESSION LINE

*Straight line that best "fits" the scatterplot and describes the relationship between the variables in the graph; can also be presented as an equation that specifies where the line intersects the vertical axis and what the angle or slope of the line is.*

those two variables for a group of participants. If the association is statistically significant, then we can predict training success from cognitive ability. The stronger the association between the two variables, the better the prediction we are able to make from one variable to another. The statistic or measure of association most commonly used is the **correlation coefficient.**

## The Concept of Correlation

The best way to appreciate the concept of correlation is graphically. Look at the hypothetical data in Figure 2.4. The vertical axis of that graph represents training grades. The horizontal axis represents a score on a test of cognitive ability. For both axes, higher numbers represent higher scores. This graph is called a **scatterplot** because it plots the scatter of the scores. Each dot represents the two scores achieved by an individual. The 40 dots represent 40 people. Notice the association between test scores and training grades. As test scores increase, training grades tend to increase as well. In high school algebra, this association would have been noted as the slope or "rise over run" meaning how much rise (increase on the vertical axis) is associated with one unit of run (increase on the horizontal axis). In statistics, the name for this form of association is correlation, and the index of correlation or association is called the correlation coefficient. You will also notice that we have drawn a solid straight line that goes through the scatterplot. This line (technically known as the **regression line**) is the straight line that best "fits" the scatterplot. The line can also be presented as an equation that specifies where the line intersects the vertical axis and what the angle or slope of the line is.

As you can see from Figure 2.4, the actual angle of the line that depicts the association is influenced by the units of measurement. If we plotted training grades against years of formal education, the angle or slope of the line might look quite different, as is depicted in Figure 2.5 where the slope of the line is much less steep or severe. For practical purposes, the regression line can be quite useful. It can be used to predict what value on the Y variable (in Figure 2.4, training grades) might be expected for someone with a particular score on the X variable (here, ability test scores). Using the scatterplot that appears in Figure 2.4, we might predict that an individual who achieved a test score of 75 could be expected to also get a training grade of 75 percent. We might use that prediction to make decisions about whom to enroll in a training program. Since we would not want to enroll someone who might be expected to fail the training

FIGURE 2.5

**Correlation between Years of Education and Training Grades**



program (in our case, receive a training grade of less than 60 percent), we might limit enrollment to only those applicants who achieve a score of 54 or better on the cognitive ability test.

## The Correlation Coefficient

For ease of communication and for purposes of further analysis, the correlation coefficient is calculated in such a way that it always permits the same inference, regardless of the variables that are used. Its absolute value will always range between 0.00 and 1.00. A high value (e.g., .85) represents a strong association and a lower value (e.g., .15) represents a weaker association. A value of .00 means that there is no association between two variables.

Correlation coefficients have two distinct parts. The first part is the actual value or magnitude of the correlation (ranging from .00 to 1.00). The second part is the *sign* (+ or −) which precedes the numerical value. A positive (+) correlation means that there is a positive association between the variables. In our examples, as test scores and years of education go up, so do training grades. A negative (−) correlation means that as one variable goes up, the other variable tends to go down. An example of a negative correlation would be the association between age and visual acuity. As people get older, their uncorrected vision tends to get worse. In I-O psychology, we often find negative correlations between measures of commitment and absence from work. As commitment goes up, absence tends to go down, and vice versa. Figure 2.6 presents examples of the scatterplots that represent various degrees of positive and negative correlation. You will notice that we have again drawn straight lines to indicate the best fit straight line that represents the data points. By examining the scatterplots and the corresponding regression lines, you will notice something else about correlation. As the data points more closely approach the straight line, the correlation coefficients get higher. If all of the data points fell exactly on the line, the correlation coefficient would be 1.00 and there would be a "perfect" correlation between the two variables. We would be able to perfectly predict one variable from another. As the data points depart more from the straight line, the correlation coefficient gets lower until it reaches .00, indicating no relationship at all between the two variables.

Up to this point, we have been assuming that the relationship between two variables is **linear** (i.e., it can be depicted by a straight line). But the relationship might be **nonlinear**

LINEAR
*Relationship between two variables that can be depicted by a straight line.*

NONLINEAR
*Relationship between two variables that cannot be depicted by a straight line; sometimes called "curvilinear" and most easily identified by examining a scatterplot.*

58    CHAPTER 2 STUDYING AND INTERPRETING WORKER BEHAVIOR



FIGURE 2.6

**Scatterplots Representing Various Degrees of Correlation**

(sometimes called "curvilinear"). Consider the scatterplot depicted in Figure 2.7. In this case a straight line does not represent the shape of the scatterplot at all. But a curved line does an excellent job. In this case, although the correlation coefficient might be .00, one cannot conclude that there is *no* association between the variables. We can conclude only that there is no *linear* association.

FIGURE 2.7

**An Example of a Curvilinear Relationship**





An officer directing traffic at a congested intersection is likely to experience information overload.

In this figure we have identified the two variables in question as "stimulation" and "performance." This scatterplot would tell us that stimulation and performance *are* related to each other, but in a unique way. Up to a point, stimulation aids in successful performance by keeping the employee alert, awake, and engaged. But beyond that point, stimulation makes performance more difficult by turning into information overload, which makes it difficult to keep track of relevant information and to choose appropriate actions. Most statistics texts that deal with correlation offer detailed descriptions of the methods for calculating the strength of a nonlinear correlation or association. But for the purposes of the present discussion, you merely need to know that one of the best ways to detect nonlinear relationships is to look at the scatterplots. As in Figure 2.7, this nonlinear trend will be very apparent if it is strong one. In I-O psychology, many if not most of the associations that interest us are linear.

## Multiple Correlation

As we will see in later chapters, there are many situations in which more than one variable is associated with a particular aspect of behavior. For example, you will see that although cognitive ability is an important predictor of job performance, it is not the only predictor. Job performance is multiply determined. Other variables that might play a role are personality, experience, and motivation. If we were trying to predict job performance, we would want to examine the correlation between performance and all of those variables simultaneously, allowing for the fact that each variable might make an independent contribution to understanding job performance. Statistically, we could accomplish this through an analysis known as multiple correlation. The **multiple correlation coefficient** would represent the overall linear association between several variables (e.g., cognitive ability, personality, experience, motivation) on the one hand, and a single variable (e.g., job performance) on the other hand. As you can imagine, these calculations are so complex that their study is appropriate for an advanced course in prediction or statistics. For our purposes in this text, you will simply want to be aware that techniques are available for examining relationships involving multiple predictor variables.

MULTIPLE CORRELATION COEFFICIENT

*Statistic that represents the overall linear association between several variables (e.g., cognitive ability, personality, experience) on the one hand, and a single variable (e.g., job performance) on the other hand.*

## 2.1  EXPERIMENTAL DESIGN AND CAUSATION

It is not always easy to separate causes and effects. The experimental design that you use often determines what conclusions you can draw. A story is told of the researcher who interviewed the inhabitants of a particular neighborhood. He noted that the young people spoke fluent English. In speaking with the middle-aged people who would be the parent generation of the younger people, he found that they spoke English with a slight Italian accent. Finally, he spoke with older people (who would represent the grandparent generation of the youngest group) and heard a heavy Italian accent. The researcher concluded that as you grow older, you develop an Italian accent. It is a safe bet that had the researcher studied a group of people as they aged, he would have come to a very different conclusion, perhaps even an opposite one.

Source: Adapted from N. Charness, ed., *Aging and Human Performance* (New York: John Wiley, 1985), p. xvii.

## CORRELATION AND CAUSATION

Correlation coefficients simply represent the extent to which two variables are associated. They do not signal any cause-effect relationship. Consider the example of height and weight. They are positively correlated. The taller you are, the heavier you tend to be. But you would hardly conclude that weight *causes* height. If that were the case, we could all be as tall as we wish simply by gaining weight.

The question of correlation and causality has important bearing on many of the topics that we will consider in this book. For example, there are many studies that show a positive correlation between the extent to which a leader acts in a considerate manner and the satisfaction of the subordinates of that leader. Because of this correlation, we might be tempted to conclude that consideration *causes* satisfaction. But we might be wrong. Consider two possible alternative explanations for the positive correlation.

1. Do we know that considerate behavior causes satisfaction rather than the other way around? It is possible that satisfied subordinates actually elicit considerate behavior on the part of a leader (and conversely, that a leader might "crack down" on dissatisfied work group members).

2. Can we be sure that the positive correlation is not due to a third variable? What if work group productivity were high because of a particularly able and motivated group? High levels of productivity are likely to be associated with satisfaction in workers, and high levels of productivity are likely to allow a leader to concentrate on considerate behaviors instead of pressuring workers for higher production. Thus, a third variable might actually be responsible for the positive correlation between two other variables.

## META-ANALYSIS

Cancer researchers, clinicians, and patient advocates have recently engaged in a vigorous debate over whether women aged 40 to 70 can decrease their chances of dying from breast cancer by having an annual mammogram. One expert asserts that the earlier cancer can be detected, the greater the chance of a cure, and that an annual mammogram is the only reliable means of early detection. Another argues that this is not necessarily true and, furthermore, because mammograms deliver potentially harmful radiation, they should be used only every two or three years unless a patient has significant risk factors for the disease. Still another says that mammograms give a false sense of security and may discourage patients from



A key characteristic of leaders is that they influence followers.