**Response of Dr. Rick Jacobs to Testimony and Reports of Dr. Frank Landy and Dr. Joel Wiesen in Bradley v. Lynn**

*OVERVIEW:*

At first glance hiring firefighters in the Commonwealth of Massachusetts appears to be a simple process. A candidate takes a test, designates what jurisdictions he/she wishes to work for, and awaits the decision made by each jurisdiction regarding who will be selected from the established certification list. Unfortunately, the analyses of the decisions in terms of how the selections are made, the degree to which the processes are fair to all groups, and the factors that might be contributing to potentially unfair selection are very involved and highly complicated. In any selection process like this one the most suspect step and the easiest to investigate is the test, especially if the test is one that focuses exclusively on cognitive abilities.

As this case has unfolded, as testimony has been presented, and as data have been made available, one fact has become exceedingly clear -- the selection of firefighters in the Commonwealth of Massachusetts is a function of multiple factors and the test score appears to have limited or no impact on the final outcome of who becomes a firefighter. As I have testified and as has been made clear through the testimony and reports of myself and others, factors such as residency, veteran's status, and what happens after initial selection has been made and individuals are placed on the certification list (i.e., drop out rate following placement on the certification list) relegate the test score to a minor factor in the overall selection process.

*DISTORTIONS RESULTING FROM AGGREGATION:*

We see much of what has been presented by the plaintiffs in this case regarding adverse impact as being flawed due to the fact that all jurisdictions are aggregated into a single decision process and their analyses move forward following that faulty premise. This would not be a problem if all candidates were

1

considered by all jurisdictions or if candidates were shared across municipalities such that vacancies in one community could be filled by anyone in the candidate pool.  More to the point, aggregating results in such a fashion allows one single jurisdiction to have a major influence on the entire system leading to a conclusion of adverse impact for the entire Commonwealth when a single community is responsible for the outcome.  It is not that all forms of aggregation are wrong rather it is the way the results are being aggregated by the Plaintiff's experts that is problematic.  We propose that results be aggregated but only after they are examined within each jurisdiction.  We present several approaches to this type of analysis including our shortfall data.

In 2004 as depicted in Dr. Wiesen's report of April 11, 2006 (Exhibit 33F) he looks at the aggregated adverse impact for the Commonwealth's veteran candidates which inherently and incorrectly assumes all candidates are competing for all jobs and concludes that the adverse impact ratio is .65.  We agree with his calculation as it is presented but it proves our point in that 15 jurisdictions, even when aggregated following the plaintiff's faulty methodology, are within the 80% rule.  We removed Boston from his analysis and found the overall adverse impact ratio to be .91.  We did this by removing the 7 minority and 92 majority hires in Boston along with the 27 minority and 180 majority candidates in Boston.  Our table for the 15 other jurisdictions in his analysis is presented below.  We based these figures on the same file titled "firevets 2004-takers.doc" used by Dr. Wiesen.

---

|  | Number of Takers | Number Appointed | Selection Ratio |
|---|---|---|---|
| Minority | 23 | 8 | .348 |
| Non-Minority | 123 | 47 | .382 |

Disparate Impact Ratio = .348/.382 = .911

---

We believe that aggregating data without first examining the results within each jurisdiction can obscure very important outcomes and is inappropriate for a number of reasons that we further elaborate in this report. This example is a simple and direct demonstration of our point.

To this same point, the rationale that Dr. Landy uses in his report of May 3, 2006 is only appropriate when there is an extremely large number of "communities" and at a minimum the proportion of minorities in each community is relatively high such as in his coin toss example (where each outcome has a 0.50 probability). However, in many communities with minority applicants there were only 3 or fewer minority applicants compared to a much larger number of White applicants. If there are 10 such communities where minorities are represented at just 5% of the candidate pool and only one applicant is appointed to the position of firefighter, the straight probability of appointing no minority applicants across all of the 10 communities is 60% (i.e., 0.95 raised to the 10th power) <u>even when there is no difference in the average test score for minorities versus non-minorities</u>.

Said a different way, even if candidates were selected at random, the expected outcome would qualify as adverse impact even though no selection system was in place other than drawing names from a hat. One could then roll-up those results across the 10 communities and state that even rolled up (i.e., more stable) there is clearly adverse impact when it resulted merely from a low minority applicant rate and a very low selection rate. In reality there would have been no adverse impact – merely the appearance of adverse impact due to a low minority applicant rate and a low selection rate within each of these communities. The reality is that we do not have minorities all rolled up when making decisions within a community and we cannot choose an analysis approach that assumes we do. When this is done the reality of the selection process is misrepresented and conclusions about the process are misleading.

We believe that given the low minority representation in most of the jurisdiction applicant pools and the low selection rate in most jurisdictions, it makes more sense to examine the shortfalls within each jurisdiction and add them up across all jurisdictions.  Although such an approach is not specified in the guidelines, the guidelines did not anticipate all selection situations and the logic of our approach is wholly consistent with calculations of adverse impact and fairness.  The adverse impact rates based on aggregation across multiple jurisdictions prior to examining the results within each jurisdiction distorts the results and misrepresents the issue because it incorrectly assumes the sharing of applicants across jurisdictions.

In my testimony we presented data for the shortfall analysis looking at hiring outcomes for both 2002 and 2004.  In 2002 we had data from 52 municipalities hiring one or more firefighters.  Applying our analysis on a municipality by municipality basis we found a shortfall of just over 7 minority hires.  Looking at this figure across the Commonwealth it appears that if 14% of the communities (7/52) had simply hired one more minority there would be no shortfall at all.  In 2004 the parallel analysis revealed a shortfall across the Commonwealth of just under 22 minority firefighters hired across 30 municipalities.  This shortfall is roughly equivalent to the shortfall in Boston alone meaning that across the remaining 29 jurisdictions there is no shortfall.

As has been pointed out above and what will be discussed below, there are many reasons including differential minority/non-minority rates of both veteran's status and drop out rates that accounts for a substantial difference in minority hiring within Boston.  Our data show that aggregation as a first step in the data analysis process obscures the facts of this case and that the deficit in minority hiring is clearly a multifaceted issue, not one that is singular in cause.  We believe statutory factors such as residency and veteran's status along with drop out rate play a far greater role than any other factor including test scores.

Our analysis that combines results on a jurisdiction by jurisdiction basis and looks at the average is also an issue with Dr. Landy who argues that we erroneously equally weight each of the communities whereas he argues that each community should be weighted in proportion to the number of applicants and hires of each community. Thus, as documented above, even though 15 communities with small numbers of candidates and/or number of selected firefighters show no adverse impact in 2004 and one large one does -- he would have us overshadow the positive results of the 15 communities by weighting one community more. Similarly with all the municipalities hiring in 2004, 29 of 30 municipalities appear to be selecting within the 80% rule but that is not considered enough. We believe that a non-weighted approach best represents the true picture of hiring in the Commonwealth across the municipalities because the results of one community do not overshadow the results in other communities.

**BEECHER COMMUNITIES:**

Dr. Landy also argues that it is inappropriate to include Beecher communities in any analysis looking at adverse impact. We do not agree. We have included all communities in our analyses because multiple factors impact who gets the job of a firefighter within the Commonwealth. We have demonstrated that there is a statutory bias in terms of veteran's preference that works against minority applicants. We have shown and the plaintiffs agree that it is virtually impossible to become a firefighter in any other community other than the one in which the candidate has established residency. More specifically, in our analysis of the 2002 and 2004 hiring data we found large differences in veteran's status as a function of race. In 2002 veteran status was achieved for 4.5% of the minority candidates and 8.2% of the non-minority candidates. Those figures were 9.0% and 13.3%, respectively in 2004.

Said another way, non minority candidates enjoyed an advantage of 82.2% in 2002 and 47.7% in 2004 when it came to this key factor in the hiring

5

decision.  The data for Boston are even more favorable for non-minorities with advantages of 435.3% (1.7 for minorities and 9.1 for non-minorities) in 2002 and 189.3% (7. 5 for minorities and 21.7 for non-minorities) in 2004.  Clearly this advantage for non-minorities is part of the overall selection process and difficult to fully remove.

Even more to the point is the fact that in 2002 there were 7 Beecher communities including Cambridge, Chelsea, Fitchburg, Holyoke, Lawrence, Lowell and Newton.  Ironically, in 5 of these communities, which had optimal conditions to hire the most minorities, hiring took place but not a single minority became a firefighter; only Holyoke and Lowell hired minority firefighters.  Even more amazing is the fact that if you conduct an adverse impact analysis similar to the ones conducted by the plaintiffs these 7 Beecher communities show an adverse impact ratio of .55, well below the desired .80. In 2004 the 4 Beecher communities were Cambridge, Chelsea, Framingham and Holyoke and yet Cambridge and Holyoke did not hire a minority firefighter (even though there were 2 minority applicants and 7 firefighters were hired).  Clearly there is more to the hiring process than the test score when even minority preference irrespective of test scores cannot achieve an adverse impact ratio above 0.80 in Beecher communities.

**THE HIRING PROCESS-MORE THAN JUST A TEST SCORE:**

Dr. Landy stated that the definition of "hiring authority" is a legal question.  We do not disagree but the practical fact is that hiring decisions are made at the local level.  Certification lists are given to each jurisdiction containing the names of those individuals who have applied for a job in that jurisdiction and according to residency, veteran's status and test score.  We have shown that the first hurdle to employment is having residence status for that jurisdiction.  Next, in many of the jurisdictions it is a de facto requirement that a candidate has veteran's status as only veterans receive job offers.  Finally we have also seen that candidates drop out of the process for a variety of reasons

and as my testimony indicated and I have since confirmed with data specific to Boston, the very same data used by Dr. Landy, that drop out rate is substantially different for the group of non-minority candidates as compared to the group of minority candidates.

In Boston in 2004 the drop out rate for minority candidates was 58.8% while the non-minorities dropped out of the process at a much lower rate of 41%. To be specific as to how these numbers were computed, we looked at the lowest test score achieved by a candidate who became a firefighter and, following the rule of the use of the list, concluded that all those above that score were offered a job but for one reason or another did not accept the job or dropped out of the process. This factor alone points to the potential for huge variations in how jurisdictions select and ultimately hire firefighters. We believe this factor in the selection process needs much greater attention. Aggregation across all jurisdictions first and treating the result as if all hiring was derived from a single system does not allow for the investigation of the impact of specific drop out rates within jurisdictions and ultimately distorts the conclusions about firefighter selection across the Commonwealth.

Returning to the Boston example, we used the drop out rate cited above to adjust the results of the first two waves of hiring in Boston (classes of 6/13/2005 and 1/30/2006). Overall there were 7 minority and 95 non-minority firefighters hired in Boston while we calculated a total of 17 minority and 161 non-minority candidates on the certification list at or above the score corresponding to the lowest scoring candidate hired. All 178 candidates, according to the hiring rules, would have been eligible for the job at the point of the process following the test. If the minority drop out rate had simply matched that of the non-minority drop out rate, we would have had 3 more minority hires (i.e., 17 x .41 = 6.97 drop outs instead of the observed 10 drop outs). That simple change would have resulted in near parity of minority and non-minority hiring with an adverse impact ratio from 99.7% (minority rate = 10/17=58.8% and non-minority rate = 95/161=59.0%). The excessive drop out rate for

minorities results in a corresponding figure of 67.0%. Clearly the drop out rate is another major factor in the adverse impact results being presented by the plaintiffs. We have no way of looking at all these complicating factors when data are aggregated across all jurisdictions in the manner recommended by the plaintiffs.

Given these complications we opted to take another approach, one that looked at each jurisdiction's data, one that considered the total number of minority and non-minority applicants and one that is not specifically outlined in the guidelines but is clearly a direct extension of the logic for calculating selection rates and adverse impact. With our shortfall analysis the issue of small numbers adjustments is not relevant and the resulting numbers can be further investigated including or excluding Beecher communities, including or excluding jurisdictions where anomalies such as only hiring veterans or not hiring any veterans can be better evaluated.

### *SHORTFALL ANALYSIS:*

We believe our shortfall analysis it is not only an appropriate approach but it sheds light on the entire process taking into account each and every jurisdiction's unique situation. Dr. Landy argues that a shortfall cannot be computed by applying an 80% multiplier. He argues that there is nothing in the Uniform Guidelines on Employee Selection Procedures that indicates that the 4/5ths or 80% rule should be used to calculate a shortfall. There is nothing in the Guidelines that argues against it either. In fact, the 80% multiplier on shortfall is merely a rational and reasonable extension of the 80% rule. For example, suppose you have 1,000 White applicants and 50 minority applicants and 100 Whites (i.e., 10%) are appointed, then it would be expected by the 80% rule that 8% of the minority applicants (i.e., 80% of 10%) or 4 minority applicants (i.e., 8% of the 50 minority applicants) would be appointed resulting in a finding of no adverse impact -- what is being done follows the definition of

adverse impact as applied to shortfalls.  Four is the necessary number of minority appointments to avoid a finding of adverse impact in our example.

More specifically, if the adverse impact ratio here was computed on the four minority hire shortfalls, the adverse impact would be computed as 4/50 divided by 100/1000 and would result in a value of .80.  Thus the four represents the minimum number of minority hires needed to avoid an adverse impact finding.  If there were only three hires then the shortfall would have been one minority hire.  This is a direct extension of the adverse impact rule in the Uniform Guidelines on Employee Selection Procedures.

Dr. Landy's argument seems to ignore the fact that whether you multiply the end numbers by 80% or multiply each number contributing to the total by 80% you get the same result.  This can be demonstrated with actual data or more simply we can cite the "commutative property" in mathematics that specifies exactly this fact (Webster defines *commutative* as, "in logic, a law stating that the order in which elements of certain operations are given is immaterial, as in arithmetic, 6 times 9 is the same as 9 times 6").  Our application in this context is correct, appropriate and backed by mathematical fact.  Dr. Landy's criticism is simply wrong.

### DROP OUT RATES:

Dr. Landy's takes issue with my testimony regarding drop out rates.  We only have data from two classes in Boston and those data are clear and unequivocal.  His testimony during trial regarding drop out rates being about equal was inaccurate.  We can see, as further elaborated above beginning on page 7 that minorities drop out of the system post certification at a rate 43.4% higher than non-minorities.  This is a simple calculation and it is based on the same Boston 2004 Candidate List he used during the trial.  This differential drop out rate is enough to create adverse impact where otherwise there would be none.

***CONCLUDING COMMENT:***

Our analyses point to a very simple conclusion. The hiring process for firefighters in the Commonwealth is a function of multiple factors including residency, veteran's status, drop out rate once candidates reach the certification list and finally test scores. We find far more impact of the first three factors than the last one when it comes to who ultimately is selected to become a firefighter.

In conclusion I return to the named plaintiff in this case, Jacob Bradley. It is suggested that Mr. Bradley was denied a job as a firefighter in the city of Lynn because of his race. I believe that his race had little to do with his being unable to secure a position as a firefighter. Rather it appears that Mr. Bradley was denied the job because he was not a veteran and/or because he resides in Lynn rather than in one of the many jurisdictions where his test score of 94 would have resulted in successfully achieving his goal of becoming a firefighter for the Commonwealth. In fact, had he been a veteran it appears that based on his test score he would have received a job offer in Lynn because a veteran with a score as low as 85 was offered a firefighter position in Lynn. Race was not the reason for his being denied the position in Lynn. His lack of veteran status was the primary reason in Lynn and, had he resided in one of many other communities, his test score would have put him in a position to secure a firefighting job.

_____
Rick Jacobs, PhD
President & CEO EB Jacobs

19 May 2006