# RESPONSE TO THE REPORT OF DR. RICK JACOBS OF MAY 19, 2006

Frank J. Landy, Ph.D.
Landy Litigation Support Group

## DROP OUT RATES: BOSTON

Dr. Jacobs calculates the drop out rate for the Boston 2004 firefighter certification list to be 41% for whites and 58% for minority. It appears that Dr. Jacobs has included 3 individuals whose race is not indicated and one individual whose race is indicated to be "I" for native American in his minority group. I have not included those 4 individuals in the minority group but have only included individuals coded as African American or Hispanic. I agree with Dr. Jacobs drop out rate for whites but the correct drop out rate for minorities (excluding the 4 individuals mentioned above) is 53%.

A Chi Square test of the significance of the difference between the 41% white drop out rate and the 53% minority drop out rate is non-significant at the p=.05 level (Chi Square = .77) indicating that there is no statistical association between race and drop out rate in Boston in 2004. I also calculated the Chi Square value for the difference between the drop out rate calculated by Dr. Jacobs for the minority group (58%) and the white group (41%). That Chi square value was 1.84. This value is similarly non-significant at the p=.05 level.

Thus regardless of whether you use the correct minority drop out rate of 53% or the incorrect minority drop out rate of 58%, the difference is non-significant, supporting the conclusion and my opinion that in Boston for the 2004 list, there was no significant difference between the drop out rates of whites and minorities. As a result, the Commonwealth's contention, through the testimony of Dr. Jacobs, that differential drop out rates cause adverse impact can not be supported by the data. We are left with the inescapable conclusion that adverse impact is the result of the test and cannot be explained away by veterans status (as my oral testimony and earlier reports demonstrated) nor by differential drop out rates, as I have shown above.

## DROP OUT RATES: STATEWIDE

Working from trial Exhibit 20 (Updated Certification Data for All Communities from 2004 Firefighter Exam), I was able to examine the drop out rate for whites and minorities (defined as African American and Hispanic applicants) for each community that appointed regular full time fire fighters from the 2004 test. I excluded EMT, Paramedic, and reserve or part time from this calculation, as well as any communities that made no appointments from a certification list that they had requested. These data represent the most current data available to me and to the court. These lists included both veteran and non-veteran applicants, as well as residents and non-residents.

Working from these lists, community by community, I was able to determine the lowest score for anyone appointed to that community, and thus determine by looking at al scores above that score, the drop out rate for white and minority applicants. For purposes of this calculation, I did not consider an individual with the same score as the lowest appointed candidate to be a drop out since I have no way of knowing which if a number of tied individuals would have been first offered the position. I then aggregated the white and minority drop outs across all communities. There were 34 communities in which appointments were made from certification lists based on the 2004 examination. Most of these communities made no minority appointments but I was still able to assess the white drop out rate for those communities. Since the issue at hand is drop out rate, the presence or absence of minority drops outs would not influence the white drop out rate.

Using this technique, I was able to determine that state-wide (but excluding Boston) the drop out rate for 42% for minorities (6 drops from 14 opportunities) and 51% for whites (121 drops from 239 opportunities). The conclusion is that if there is any difference in drop out rates, it is that minority applicants drop out statewide at a lower rate than white applicants. I did not calculate a Chi Square for this value since on their face, the observed statistics rebut the Commonwealth's argument that higher minority drop out rates account for adverse impact.

For the sake of completion, I also examined the drop out rates for white and minority applicants with Boston included. The minority drop out rate statewide, including Boston, is 48%. The drop out rate for whites statewide, including Boston was 47%. They are virtually identical, once again rebutting the Commonwealth's argument that higher drop out rates for minority candidates are driving adverse impact.

## SCIENTIFIC LITERATURE RELATED TO DIFFERENTIAL DROP OUT RATES

The scientific literature on differential drop out rates is sparse. While there has been limited research related to why white and minority applicants drop out of consideration for a position, most of it deals with self-selection out and does not address the issue of disqualification as a result of other screening devices. Additionally, this research is focused on *why* applicants choose to drop out. Finally, the research related specifically to public safety employers (police and fire) is even more limi9ted.

The current debate about drop out rates is a very particular one: it addresses the issues of those candidates who drop out of the process *after* having passed the cognitive ability screening test. There are two questions to the debate between the Commonwealth and the plaintiffs:
    a) Do white and minority applicants drop out of the process at differential rates
    b) If there was a differential drop out rate suggesting that minority applicants drop out more frequently, can this account for the observed adverse impact in the Commonwealth's statistics.

**Ryan, Sacco, McFarland, & Kriska Study: 2000**

A study by Ryan, Sacco, McFarland, & Kriska (2000) addresses the first question. In a study of 3550 police applicants for municipal positions, the authors observed that of the 1822 who actually passed the written examination, 294 dropped out of the hiring process at that point. While the drop out rates were considerably lower than we see in the Commonwealth for 2004 (possibly due to the fact that these positions were police and not fire positions), the drop out rate for whites (9.4%) was higher than the drop out rate for minority applicants (6.1%). Another reasons suggested by the authors that might explain the substantial difference in drop out rates for this study versus the Commonwealth experience is that the length of time an applicant has to wait before appointment (white or minority) has a substantial impact on drop out likelihood – the longer you wait for appointment, the more likely it is that you will have taken another job or lost interest in the job in question if and when the employment offer comes.

As was the case with the statewide data from the Commonwealth (excluding Boston), Ryan et al find that white candidates for public safety positions who have passed the initial screening examination drop out at a higher rate than their minority counterparts.

**Tam, Murphy, & Lyall: 2004**

Tam, Murphy & Lyall directly address the issue of whether differential drop out rates drive adverse impact in public safety hiring. They used 12 years of appointment data (1988-2000) from the Pennsylvania State Police to develop a computer simulation that would permit the examination of the effect of differential drop out rate on adverse impact. As was the case with the Ryan et al study cited above, they fond the overall drop out rate after having passed a written examination to be lower than has been the Commonwealth's experience in fire from the 204 list. Overall, the drop out rate was 13.5% with a white rate of 13% and a minority rate of 18.5%. On the average, 6100 individuals participated in the application process over the 12 year period resulting in a total data base of almost 43,000 individuals (approximately 5600 minority and 37,400 majority applicants).

Based on these data, Tam, Murphy, & Lyall were able to demonstrate that even when the drop out rate was varied to make the drop out rates of minority applicants considerably higher than that of their white counterparts, adverse impact as a result of the written examination was still largely driven by test scores. They state their conclusions as follows:

"Results from both studies showed that mean test scores differences between white and minority applicants have the largest influence on adverse impact."

"The effects of self-selection seem quite small compared to the effects of test score differences.."

"…we concluded that when there are moderate differences (of the magnitude of 3 test score points) in the initial test score distributions of white and minority applicants, plausible changes in drop out rates are simply not enough to completely eliminate adverse impact."

"If the organization's goal is to eliminate adverse impact, reducing subgroup test score differences should probably take priority over interventions aimed at influencing drop out decisions."

"..variation in the drop out rates of minority applicants as compared to white applicants does not have a large effect (on adverse impact), at least if the drop out decisions are random within groups."

"…drop out processes…are unlikely to completely undo the adverse effects of the use of cognitive ability tests on the employment opportunities of minority applicants."

In essence, the Tam, Murphy & Lyall (2004) study provides a direct test of the implied "model" of the Commonwealth. In a slightly different form, this study shows that if one were to do a regression analysis of the Comonwealth's data set and control for differential drop out rates of white and minority applicants (and as I have shown earlier veteran's status), one would still expect to find adverse impact as a result of the cognitive ability examination.

**OVERALL ADVERSE IMPACT**

In my first report submitted in this litigation, I demonstrated the substantial association between race and test scores for the Commonwealth's cognitive ability screening examination. The Commonwealth contends that they need not consider applicants who scored below 70 in the discussions of the magnitude of adverse impact associated with the tests n question. In my opinion the Commonwealth's position massively underestimates the actual impact of test score on adverse impact. There is little doubt in my mind that were all test takers to be included in the discussions, the adverse impact would be substantially higher than the values currently under discussion. It is my position that the tests in question have not been properly validated, and as a result, even the cut score chosen by the Commonwealth (70) can have no meaning and thus is an inappropriate foundation for excluding applicants who received scores lower than 70 on the examination. This is particularly true since Dr. Jacobs concedes that the test has adverse impact and he and I would both agree that the largest percentage of test scorers falling below 70 are minority applicants. This, it is axiomatic that if we exclude from our discussions those applicants who scored lower than 70, we are substantially underestimating the actual adverse impact of the tests in question.

FRANK J. LANDY, PH.D.
May 31, 2006