## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

JACOB BRADLEY, *et al.*,

                                        Plaintiffs,

                    v.

CITY OF LYNN, *et al.*,

                                        Defendants.

CIVIL ACTION
NO. 05-10213-PBS

## STATE DEFENDANTS' POST-TRIAL BRIEF

As demonstrated by the testimony at trial, the Commonwealth's civil service system for hiring of entry-level firefighters is a complex method of selection that is affected by a combination of multiple factors, including veterans' and residents' preferences, the written examination, dropout rates, disqualification factors, selection and applicant rates, special certifications, and exercises of discretion by each municipal appointing authority. It is extremely difficult to sift through these various components to assess the possible influence of each of them on the claimed disparity in hiring. The difficulty of the endeavor, however, should not hold plaintiffs to a lesser standard of proof. For it is not the employer's burden to "eliminate, or discover and explain, the myriad of innocent causes that may lead to statistical imbalances in the composition of [its] work forces." Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 992 (1988) (plurality). Rather, the burden is squarely on plaintiffs to prove specific causation by "demonstrat[ing] that the disparity they complain of is the result of . . . the employment practice[] that they are attacking." Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 657 (1989). Plaintiffs have failed to meet that burden here.

Further, even if plaintiffs had met their burden, HRD has demonstrated that the

challenged examinations are "job related."  The experts all agree that cognitive tests, such as the one administered by HRD, are valid predictors of an individual's ability to perform the essential duties of a firefighter.  HRD also offered a formal validity study showing that its cognitive test was validated by plaintiffs' own expert, Dr. Landy, for use as a rank-order device.  Moreover, contrary to plaintiffs' apparent belief, HRD was not required to submit a formal validity study to show that the exam was "job related."  "[E]mployers are not required, even when defending standardized or objective tests, to introduce formal 'validation studies' showing that particular criteria predict actual on-the-job performance."  Watson, 487 U.S. at 998 (plurality).  HRD has thus presented more than enough evidence to meet its burden on this issue.

Finally, plaintiffs have failed to come forward with any alternative method of selection that would be "equally as effective" as the challenged procedure and that would achieve "legitimate employment goals."  Wards Cove, 490 U.S. at 661.  Plaintiffs have alluded to numerous other testing components as possibilities, but they have never proposed how those various components should be combined, weighted, and scored, nor have they shown that any particular combination would be valid as an overall testing method.  As plaintiffs' own expert Dr. Wiesen testified, there is no expert consensus regarding the respective merits of one testing mechanism over another.  Indeed, plaintiffs have in effect challenged two of their proposed, hypothetical alternatives—personality and biodata testing—as invalid in this very lawsuit.

For these reasons and those detailed below, plaintiffs have failed to prove disparate impact under Title VII.  Plaintiffs' claim under Beecher fails for the same reasons and on the additional grounds of lack of standing and failure to state a claim.  Judgment should therefore enter for the State defendants on both counts.

<u>**ARGUMENT**</u>

**I.    PLAINTIFFS HAVE FAILED TO PROVE THEIR CLAIM UNDER TITLE VII.**

Resolving a disparate impact case is a three-step process, with shifting burdens.  Initially, the plaintiff must make the prima facie showing that a "particular employment practice" causes a significantly discriminatory impact.  42 U.S.C. § 2000e-2(k)(1)(A)(i); <u>see</u> <u>id.</u> § 2000e-2(k)(1)(B)(i); <u>Watson</u>, 487 U.S. at 995 (plurality).  If this prima facie showing is made, the employer must demonstrate that the challenged practice is "job related" and "consistent with business necessity."  42 U.S.C. § 2000e-2(k)(1)(A)(i).  Then, the burden shifts back to the plaintiff to prove that there is an alternative method of evaluation that would be less discriminatory and would be "equally as effective" as the challenged practice in serving the employer's "legitimate employment goals."  <u>Wards Cove</u>, 490 U.S. at 661; <u>see</u> 42 U.S.C. § 2000e-2(k)(1)(A)(ii) (requiring plaintiff to show the availability of "an alternative employment practice and [that] the [employer] refuses to adopt such alternative employment practice").

Ultimately, the plaintiff bears the burden "to conduct a systemic analysis of [the challenged] employment practices" in order to establish each element of his or her case.  <u>United States of America v. City of Garland</u>, No. 3:98-CV-0307-L, 2004 WL 741295, at *8 (N.D. Tex. Mar. 31, 2004).  Plaintiffs here have not met this burden for the reasons explained below.

**A.    <u>Plaintiffs Have Failed to Prove A Prima Facie Case of Disprate Impact.</u>**

To prevail under a disparate-impact theory, plaintiffs must do more than prove "merely circumstances raising an inference of discriminatory impact"—they must make "a persuasive statistical showing of <u>actual</u> discriminatory impact."  <u>Robinson v. Polaroid Corp.</u>, 732 F.2d 1010, 1015 (1st Cir. 1984) (emphasis added; quotation marks & alteration omitted).  More specifically,

plaintiffs "must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs . . . because of their membership in a protected group." Watson, 487 U.S. at 994 (plurality).  In the absence of such a showing, a prima facie case has not been established.  Robinson, 732 F.2d at 1015.

The Court is not "obliged to assume that plaintiffs' statistical evidence is reliable." Watson, 487 U.S. at 996 (plurality).  In fact, statistical evidence may be deficient for a variety of reasons, including "small or incomplete data sets," "inadequate statistical techniques," and failure to establish the required causal connection between the challenged employment practice and the alleged discrimination.  Id. at 996-97.  Here, plaintiffs' statistical evidence suffers from a number of fatal flaws.  First, the original expert reports of Dr. Landy and Dr. Wiesen improperly analyze scores and not hires.  Second, much of plaintiffs' statistical evidence is based on 2004 data, but it is premature to assess adverse impact from the 2004 list until hiring from that list has been completed.  Third, several of plaintiffs' statistical analyses fail to account for statutory preferences.  Fourth, with insignificant exceptions, all of plaintiffs' expert reports and analyses improperly aggregate data across communities.  Finally, all the reports and analyses fail to consider the numerous factors other than the written examination that can affect hiring decisions.

**1.     Dr. Landy's and Dr. Wiesen's Initial Reports Should Be Disregarded Because They Improperly Analyze Scores and Not Hires.**

As Dr. Landy and Dr. Wiesen conceded at trial, their original expert reports did not analyze adverse impact in terms of jobs; rather, their analyses are limited to test scores.  Trial Transcript ("T.") 4-63, line 22, to 4-64, line 2; 5-122, line 4, to 5-123, line 11; see Exh. 1 (8/30/05 Landy Report); Exh. 2 (8/31/05 Wiesen Report).  These analyses should be disregarded because, in the context of this case, adverse impact is about jobs, not scores.  All the experts

4

agree on this point. See, e.g., T. 1-71, lines 22-24 (Landy: "[T]he critical issue is not really with respect to the actual score. It has to do with the relationship between scores and hires."); 5-122, lines 12-14 (Q: "Adverse impact is about getting hired, not scoring high; isn't that right? [Wiesen]: Correct."); see also T. 2-47, lines 9-11; Exh. 26 (10/14/05 Jacobs Report). This result is also consistent with statements from the Supreme Court and with the EEOC Guidelines. See, e.g., Watson, 487 U.S. at 994 (plurality) (plaintiffs must prove that "the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group"); accord Albemarle Paper Co. v. Moody, 422 U.S. 405, 425 (1975); see also 29 C.F.R. § 1607.16B (adverse impact means "[a] substantially different rate of selection in hiring, promotion, or other employment decision which works to the disadvantage of members of a race, sex, or ethnic group"); Uniform Employee Selection Guidelines Interpretation & Clarification ("EEOC Q&A"), available at www.uniformguidelines.com/qandaprint.html, Q. 6 ("The Guidelines apply to employee selection procedures which are used in making employment decisions, such as hiring, retention, promotion, transfer, demotion, dismissal or referral.").

Plaintiffs may seek to rely on Connecticut v. Teal, 457 U.S. 440 (1982), as holding that adverse impact should be analyzed on the basis of scores, and not jobs. But if Teal is applicable at all in this case, it would only affect the analysis at the passing point of 70, at which there is no adverse impact. The precise holding in Teal was that, notwithstanding the employer's nondiscriminatory "bottom line" in hiring,[1] the plaintiffs' "claim of disparate impact from the

---

[1] One month before trial, the employer in Teal instituted an affirmative-action program, which resulted in a greater proportion of blacks being promoted than whites. Id. at 444. For this reason alone, the employer was able to claim a nondiscriminatory "bottom line" in the composition of its workforce. See id.

examination, <u>a pass-fail barrier to employment opportunity</u>, states a prima facie case of employment discrimination." <u>Id.</u> at 452 (emphasis added). Based on this language, courts have repeatedly held that <u>Teal</u> is "limited by its terms to a pass/fail barrier." <u>Brunet v. City of Columbus</u>, 642 F. Supp. 1214, 1226 (S.D. Ohio 1986), <u>rev'd on other grounds</u>, 1 F.3d 390 (6th Cir. 1993); <u>see also, e.g.</u>, <u>Reynolds v. Alabama Dep't of Transp.</u>, 295 F. Supp. 2d 1298, 1315 (M.D. Ala. 2003) (<u>Teal</u> is not applicable where exams "do not work on a pass/fail basis"). Here, Dr. Landy acknowledged that he had not calculated adverse impact at the passing score of 70 for African Americans and Hispanics collectively. T. 3-62, line 7, to 3-64, line 3. This omission is fatal to his analysis because the class is comprised of both groups, as Dr. Landy consistently recognized elsewhere in his testimony and reports. T. 3-63, lines 22-24. In any event, Dr. Landy effectively conceded in his direct testimony that there was no adverse impact at the score of 70. <u>See</u> T. 1-77, lines 1-2 (Landy: "Unless the effective cut score was [below] 70, there will be adverse impact."); <u>see also</u> Exhs. 33B & 33C. <u>Teal</u> therefore does not help plaintiffs' cause.

Because <u>Teal</u> is limited by its terms to "pass-fail barrier[s]" to further consideration, 457 U.S. at 452, it is inapplicable to what plaintiffs consider the "effective cut score."[2] Other than at the passing point of 70, the examinations did not serve as an absolute barrier to employment opportunity; every candidate who passed the examination was eligible for further consideration in the process. Moreover, many factors other than the examination—such as veterans' preference, special certifications, and municipality discretion, T. 5-123, line 13, to 5-125, line 20—can determine who actually gets hired. <u>See</u> T. 5-123, lines 5-11 (Wiesen: conceding that

---

[2] According to Dr. Landy, the "effective cut score means the lowest score someone obtained who was hired." T. 1-77, lines 4-5.

6

equating cut scores with hires overlooks these factors). A candidate who received a low score on the examination could therefore still be hired as a firefighter. Indeed, as Dr. Landy acknowledged, a veteran scoring as low as 70 could still be hired, and one veteran was in fact hired at the score of 72. T. 2-90, lines 11-24.

Teal is thus distinguishable because, at scores of 70 and above, the written examinations administered by HRD did not serve as absolute barriers to employment opportunities. The court in Reynolds reached the same conclusion under strikingly similar facts. In Reynolds the plaintiffs challenged written examinations given by the State employer, claiming that the differences in scores between white and black candidates proved that the testing system was discriminatory. 295 F. Supp. 2d at 1314-15. The court, however, held that the difference in scores showed only "potential" adverse impact but not "actual" adverse impact resulting from the examination. Id. In so holding, the court rejected the plaintiffs' argument that focusing on proof of "actual" adverse impact would allow the employer to use the type of "bottom-line" defense prohibited by Teal. See id. at 1315-16. The court reasoned that Teal was inapplicable because the exams at issue were used on a rank-order (i.e., not pass-fail) basis, and because "much more than the test score can go into whether a person gets the job for which he applied: geographic preference, willingness to travel overnight, willingness to work part-time/full-time, willingness to do shift work, the veterans' preference, the interview, and the application of [a no-bypass] rule." Id. at 1315. Thus, because "a person who had the lowest score on one of the exams at issue could still be hired . . ., it [could] not be said that [the] exams deprive[d] any individuals of employment opportunities." Id.; see also Arnold v. United States Postal Serv., 863 F.2d 994, 999 (D.C. Cir. 1988) (distinguishing Teal because the challenged employment

practice "was not a free-standing element of an employment program").

Teal therefore does not apply to multicomponent selection schemes, such as the one here, where candidates must pass all the hurdles before being selected for hire. Indeed, the four dissenting Justices in Teal interpreted the majority opinion in this manner:

> Another possibility is that employers may integrate consideration of test results into one overall hiring decision based on that "factor" and additional factors. Such a process would not, even under the Court's reasoning, result in a finding of discrimination on the basis of disparate impact unless the actual hiring decision had a disparate impact on the minority group.

457 U.S. at 463 n.8 (Powell, J., dissenting). This language makes clear that Teal has no application in this case, and in particular, the Court should reject any argument by plaintiffs that Teal establishes disparate impact at the effective cut score.

**2.     It Is Too Early to Assess Whether There Was Adverse Impact in Hiring from the 2004 List.**

Shortly before and during trial, plaintiffs submitted new expert reports and analyses that for the first time analyzed hiring data rather than scores. Several of these new reports and analyses are based on hiring data from the list established for the 2004 examination. See Exhs. 33D, 33F, 33G & 33R, point 6. Such analyses are premature because hiring from the 2004 list has not been completed. As Dr. Landy testified, until the municipalities "finish appointing" from the 2004 list, he "could not calculate in terms of those who were appointed compared to all test takers what the adverse impact was." T. 1-103, lines 5-7. Dr. Landy further conceded that he does not know "what the openings are," "what the retirements are," and "what the budget is," T. 2-71, lines 14-15; that the effective cut score is moving, T. 2-92, lines 1-7; and that it was possible that adverse impact could go away "tomorrow" if hiring were to continue from the 2004 list, T. 2-72, lines 13-15; see also T. 2-92, lines 1-23.

Accordingly, until the 2004 list expires, it is too early to assess whether there has been adverse impact in hiring.  This is cogently illustrated by the fact that, since trial began, all three named plaintiffs who passed the exam have been certified on the most recent list that HRD sent to the City of Lynn.  T. 6-79, lines 7-17; see Exh. 33P.  Further illustrating the point, at the start of trial, Dr. Landy purported to find adverse impact among Boston veterans, see Ex. 33D, p. 2, but it has since become clear that the exam is likely to have no adverse impact on Boston minority veterans.  This is because Boston will almost certainly exhaust its veterans list, see T. 5-133, lines 17-22; 6-71, line 17, to 6-72, line 2, which would eliminate any adverse impact within the veteran group, see T. 5-133, line 23, to 5-134, line 19.  Thus, as these examples show, plaintiffs' analyses of the 2004 hiring data are premature and should be disregarded.

**3.**     **Dr. Landy's and Dr. Wiesen's Original Reports and Portions of Their Later Reports Are Fatally Flawed Because They Fail to Account for Statutory Preferences.**

      *a.*     *Several of the Reports Fail to Differentiate Between Veterans and Nonveterans.*

Dr. Landy's and Dr. Wiesen's initial reports, and several of their later analyses and reports,[3] combine veterans and nonveterans into one pool.  This approach does not isolate any disparate impact resulting from the examination because it fails to take into account the veterans' preference mandated by M.G.L. ch. 31, § 26.  As Dr. Jacobs testified without contradiction, the veterans' preference has affected minorities and nonminorities in a disproportionate ratio.  Specifically, in 2002, only 4.5% of minority test-takers across the Commonwealth were veterans,

---

[3] See Exh. 5, Table 1 (purporting to find adverse impact from the 2004 examination for all test-takers across the Commonwealth); Exh. 6, Table 1 (conducting same analysis for the 2002 examination); Exh. 33G (combining veterans and nonveterans in Boston and purporting to find adverse impact resulting from 30 hypothetical, additional appointments).

as opposed to 8.2% of nonminority test-takers, and in 2004, only 9.0% of minority test-takers were veterans, as opposed to 13.3% of nonminorities.  <u>See</u> Exh. 33I, p. 6; <u>see also</u> T. 3-116, line 24, to 3-118, line 8.  In Boston the differences were even greater: 1.7% of minorities versus 9.1% of nonminorities in 2002, and 7.5% of minorities versus 21.7% of nonminorities in 2004.  <u>See</u> Exh. 33I, p. 6; <u>see also</u> T. 3-117, line 22, to 3-118, line 8.

   According to Dr. Jacobs's undisputed testimony, failure to account for this disparity in veteran status significantly skews plaintiffs' adverse-impact analysis.  Dr. Jacobs illustrated this point at trial through a hypothetical that assumed complete parity in nonveteran hiring off the 2004 list in Boston.  Even with 192 new hires under this system of absolute parity, Dr. Jacobs calculated that there would still be adverse impact overall due <u>solely</u> to the differential in veteran status.  T. 4-5, line 1, to 4-19, line 14; <u>see</u> Exh. 33K.

   Because of this differential, the veteran and nonveteran pools cannot be merged when attempting to isolate the adverse impact resulting from the examination.  <u>See</u> T. 4-5, line 1, to 4-19, line 14.  Thus, by failing to account for the differential, plaintiffs' analyses are improperly based on an over-inclusive candidate pool.  Such an "inflated pool" "undermine[s] the validity of a statistical study to determine imbalances."  <u>Smith v. Virginia Commonwealth Univ.</u>, 84 F.3d 672, 677 (4th Cir. 1996) (citing <u>Johnson v. Transp. Agency</u>, 480 U.S. 616, 636 (1987)).  For this reason Dr. Landy's and Dr. Wiesen's initial reports, and several of their later reports, <u>see</u> <u>supra</u> at 9 n.3, should be disregarded.

   ***b.      Dr. Landy's Analysis of the "Delay" in Hiring Fails to Account for the Disabled Veterans' Preference.***

   During trial Dr. Landy attempted to show for the first time that minorities suffer adverse impact in terms of "delay" in hiring.  <u>See</u> Exh 33D, p. 3.  Even assuming that delay can

constitute adverse impact,[4] Dr. Landy's analysis should be rejected because it too is based on an inflated pool. Specifically, Dr. Landy fails to consider that, even within the veterans' group, there is a further statutory preference for disabled veterans. See M.G.L. ch. 31, § 26; T. 4-20, lines 8-14. And as Dr. Jacobs testified, again without contradiction, of the 55 disabled veterans on the 2004 list in Boston, 52 were white and only three were minorities. T. 4-20, lines 17-25. Thus, the statutory preference for disabled veterans has disproportionally favored nonminorities over minorites, and this disparity must therefore be taken into account in attempting to isolate the impact of the examination on the timing of hiring decisions. See Smith, 84 F.3d at 677. Because Dr. Landy failed to consider this factor, his analysis should be disregarded.

### 4.   Dr. Landy's and Dr. Wiesen's Analyses Improperly Aggregate Data Across Communities.

Other than Dr. Landy's analyses of Boston's 2004 hiring,[5] all the statistical evidence submitted by plaintiffs is based on aggregated data across every jurisdiction participating in the civil-service system. This evidence is flawed because it improperly assumes that all hiring is derived from a single decisional process when, in reality, hiring decisions are made individually by each municipality at the local level. See generally Exh. 33S (5/19/06 Jacobs Response). As Dr. Jacobs concluded, aggregating the data in this manner misrepresents the selection process and "allows one single jurisdiction to have a major influence on the entire system leading to a conclusion of adverse impact for the entire Commonwealth when a single community is

---

[4] Dr. Landy conceded that the EEOC Guidelines do not address delay. T. 4-73, lines 13-20.

[5] See Exhs. 33D, 33G & 33R, point 6. As mentioned, these analyses are premature because they are based on 2004 data. Further, as will be discussed, they are also deficient because they fail to account for the numerous other factors that can influence hiring decisions.

11

responsible for the outcome." Id., p. 2.  For example, based on aggregated data across 16 municipalities, Dr. Wiesen concluded that the 2004 examination had adverse impact among veterans.  See Exh. 33F, Table 1.  But if Boston is removed from the calculation, the adverse impact ratio becomes 0.91, well above the 80% rule.  See Exh 33S, p. 2.  This example vividly illustrates the flaw in the aggregation method, especially given that Dr. Wiesen conceded that he would have to remove Boston from the analysis if it were to exhaust its veterans list (as it likely will), thereby eliminating any adverse impact within the veteran group.  See T. 5-133, line 17, to 5-134, line 19.

Plaintiffs' aggregation method also disregards the various factors other than the examination—such as dropout and selection rates, municipality discretion, and demographics—that can influence hiring decisions.  See generally Exh. 33S.  This omission disregards the reality of the selection process and further distorts the calculation of adverse impact.  For instance, as Dr. Jacobs demonstrated, if each of ten communities has a minority-applicant pool that is just 5% of the total, and each community appoints only one candidate, the expected outcome would not meet the 80% rule even if candidates were selected at random.  Id., p. 3.  Plaintiffs' method, however, would still allow aggregation of data across the ten communities to show adverse impact from the exam, when in fact the effect was due solely to low minority-applicant and selection rates.  Id.; see also T. 4-26, line 22, to 4-27, line 3 (Jacobs: "[Wiesen's analysis] is in the aggregate form, but in one jurisdiction it could be that there were one or two minorities who even applied for the job. . . .  It's going to vary by selection rate, by all sorts of characteristics that are not taken into account in this aggregation of the data.").  This example illustrates why, as Dr. Jacobs testified, it is "extremely unfair" to apply the rule of small

numbers "across 37 different agencies," instead of at each individual hiring level.[6] T. 4-28, lines 4 to 11; see Exh. 33J (EEOC Q&A, Q. 21) ("[I]t is inappropriate to require validity evidence or to take enforcement action where the number of persons and the difference in selection rates are so small that the selection of one different person for one job would shift the result . . . .") (emphasis added).

Similarly, plaintiffs' method ignores the differentials in dropout rates. Exh. 33S, p. 7. In Boston, for example, if the minority dropout rate had matched that of nonminorities, the adverse impact ratio from the first two waves of hiring in 2004 would have been 99.7%. Id. Yet despite this significant effect on hiring, plaintiffs' aggregation analysis disregards the differential along with all the other complicating factors in the selection process. See T. 4-25, line 25, to 4-26, line 9 (Jacobs: "[Wiesen's analysis is] aggregated against 12 jurisdictions that make independent decisions about who is hired and who is not. . . . [T]here's no guarantee that they follow the same rules for disqualification, that the candidates in each of the twelve municipalities are equally motivated to take the job when it's given to them. . . .").

As Dr. Jacobs's examples illustrate, plaintiffs' method does not portray the true picture of firefighter selection, and their efforts to aggregate the data lead to misleading and unfair results. The reality is that each municipality is an independent decisionmaker, with its own unique applicant list. See T. 2-76, lines 17-19; 3-99, line 25, to 3-100, line 20; 5-109, lines 21-25. Thus, the examination may or may not make a significant difference in hiring, depending on each community's individual circumstances. See T. 5-110 (Q: "[F]actors other than test scores

---

[6] Under Dr. Jacobs's "shortfall" analysis, there was a shortfall in 2002 of just over seven minority hires across 52 municipalities. Exh. 33S, p. 4. If the rule of small numbers is applied to just 14% of those communities, there would have been no shortfall. Id.; T. 3-111, lines 7-8.

could come into play in the individual hiring decisions of the municipalities; isn't that right? [Wiesen]: Yes."); 5-124, line 1, to 5-125, line 23 (similar); see generally Exh. 33S.

In similar circumstances courts have held that aggregation is improper in assessing adverse impact.  Particularly instructive is this Court's decision in Langlois v. Abington Housing Authority, No. 98-12336, 1998 WL 1029207 (D. Mass. Dec. 30, 1998).  There, minority plaintiffs brought suit against eight public-housing authorities ("PHAs"), claiming that recent changes to certain resident preference policies had a discriminatory impact on minority applicants.  Id. at *1.  In attempting to prove disparity in minority-selection rates, the plaintiffs aggregated selection data from the PHAs, asserting that such an approach was proper because "the PHAs jointly conceived and adopted identical residency preferences policies" and "acted in concert to devise identical and simultaneous application processes, and then advertised them jointly in the same public notice."  Id. at *7.  The Court rejected this argument, however, and declined to consider the PHAs as a single actor.  The Court reasoned that, "[a]lthough their planning and initial organizational tactics may have been the same, the PHAs [were] administratively independent."  Id.  For example, each PHA "conducted its own lottery" and "created its own waiting list with various numbers of applicant[s]."  Id.  Further, each PHA had "varying numbers of applicants who [were] low-income and minority," "varying numbers of resident applicants on [its] list[] who [would] be eligible under the preferences policy," and "varying numbers of available certificates."  Id.  Because of these differences, the Court held that aggregating data across the PHAs was improper.  See id.

The court in Bailey v. Southeastern Area Joint Apprenticeship Committee, 561 F. Supp. 895 (N.D. W. Va. 1983), reached a similar conclusion.  In that case two female applicants sued a

14

joint labor management committee, claiming that its apprenticeship program had a disparate impact on women.  In support of their claim, plaintiffs offered a statistical analysis that aggregated selection data from all of the locals in the defendant's jurisdiction.  Id. at 910.  The aggregation was done "for the avowed purpose of having a large enough data base so as to be able to derive some meaningful comparisons by way of statistical analysis."  Id.  The court concluded, however, that aggregation was improper because "each local in the Defendant's jurisdiction [was] autonomous, in that each gather[ed] and maintain[ed] its own applicant list and that an applicant on one local's list may not cross over to another local's applicant list."  Id.  The court therefore rejected the plaintiffs' statistical evidence as "irrelevant."  Id.

Here, as in Langlois and Bailey, each municipality in the civil-service system maintains its own applicant list, and candidates are not shared across jurisdictions.  See T. 2-76, lines 17-19; 3-99, line 25, to 3-100, line 20; 5-109, lines 21-25; Exh. 33S, pp. 1-2, 6.  Further, similar to the situation in Langlois, each municipality has "varying numbers" of minority applicants and "varying numbers" of available positions.  1998 WL 1029207, at *7.  Each municipality, in other words, is "administratively independent" and "autonomous," rendering aggregation improper. Id.; Bailey, 561 F. Supp. at 910; cf. Fudge v. City of Providence Fire Dep't, 766 F.2d 650, 657 (1st Cir. 1985) (district court erred by aggregating results of written firefighter examination with results from prior years, where the later exam was "sufficiently different to require that its impact be assessed independently").

This result is not changed by plaintiffs' difficulty in otherwise obtaining large enough numbers to do a meaningful statistical analysis.  See T. 2-7, lines 4-6 (Landy: "the reason we looked only at Boston is because that was the only municipality where we had sufficient

numbers to actually do a statistical test"). As the First Circuit has held, "such difficulties cannot justify imposing liability on any particular employer for a disparity in impact when there is a failure of proof of the disparity." Fudge, 766 F.2d at 657 n.7. By improperly aggregating data across jurisdictions, plaintiffs here have failed to prove disparity resulting from the challenged examination, and so a prima facie case of discriminatory impact has not been established.

### 5. All of Dr. Landy's and Dr. Wiesen's Analyses Are Fatally Flawed Because They Fail to Consider the Numerous Other Factors That Can Influence Hiring Decisions.

To make their prima facie showing, plaintiffs must prove specific causation—that is, they must "demonstrate that the disparity they complain of is the result of . . . the employment practice[] that they are attacking." Wards Cove, 490 U.S. at 657. Causation is not proved if the statistics require speculation by the court. See McNeil v. McDonough, 648 F.2d 178, 182 (3d Cir. 1981). Otherwise, employers would be held to the "unrealistic" burden of "eliminat[ing], or discover[ing] and explain[ing], the myriad of innocent causes that may lead to statistical imbalances in the composition of their work forces." Watson, 487 U.S. at 992 (plurality).

Plaintiffs have not come close to establishing the causation aspect of their prima facie case. As mentioned, the selection of entry-level firefighters is influenced by numerous factors other than the written examination, including, for example, bypass/dropout factors. T. 1-89, line 1, to 1-91, line 7; 2-84, lines 10-19; 5-122, lines 15-20; 5-123, line 8, to 5-125, line 20; 6-72, line 24, to 6-74, line 22. Notably, Dr. Jacobs was the only expert who analyzed the influence of these factors on hiring, and he determined that they "relegate the test score to a minor factor in the overall selection process." Exh. 33S, p. 1. In contrast Drs. Landy and Wiesen admitted that they did not consider the bypass/dropout factors in their analyses. T. 1-88, line 20, to 1-89, line

16

10; 5-125, lines 17 to 23; 5-127, lines 1-10; 5-129, line 5, to 5-130, line 16.

Although Dr. Landy belatedly attempted to show that the bypass/dropout rates are roughly equal for minorities and nonminorities, see T. 3-74, lines 1-8; Exh. 33R, pp. 3-4, the Court should reject his analysis on this point. Dr. Landy acknowledged that his calculation was only an "approximat[ion]" and was undertaken "simply to determine how far down the Boston certification list for non-veterans [he] would need to go to 'appoint' a class of 50 new firefighters." Exh. 33R, p. 4. Moreover, Dr. Landy's calculation is factually wrong. As Dr. Jacobs explained, the "data are clear and unequivocal" that "minorities drop out of the system post certification at a rate 43.4% higher than non-minorities."[7] Exh. 33S, p. 9. This calculation is a "simple" one and was "based on the same Boston 2004 Candidate List [Dr. Landy] used during the trial." Id.; see T. 3-70, line 21, to 3-74, line 8 (Landy's testimony discussing Exhs. 33G & 3H). Significantly, Dr. Landy has never claimed that Dr. Jacobs's numbers are wrong, nor has he offered any recalculation confirming his own results, although he could easily have done so. Instead, he states only that he "cannot comment" on the discrepancy because "Dr. Jacobs did not present the foundation for his calculation of differential drop-out rates." Exh. 33R, p. 4. This assertion is also wrong, however, because Dr. Jacobs made it "very clear" at trial how he derived his results. T. 4-73, line 16, to 4-74, line 25.

This Court should therefore reject Dr. Landy's belated and misguided attempt to compensate for his failure to consider the bypass/dropout factors in his analyses. As Dr. Wiesen candidly admitted at trial, plaintiffs' statistical analyses could be "completely inappropriate and

---

[7] Specifically, in 2004, the bypass/dropout rate for minorities in Boston was 58.8%, compared to 41% for nonminorities. Exh. 33S, p. 7.

wrong" as a result of this "significant" omission.  T. 5-129, lines 16-20.  Plaintiffs have thus failed to prove an essential element of their prima facie case.

Indeed, in similar circumstances, courts have routinely found a failure of proof in establishing the requisite causal link between the challenged employment practice and the alleged discrimination.  For example, in <u>Donnelly v. Rhode Island Board of Governors for Higher Education</u>, 110 F.3d 2 (1st Cir. 1997), the First Circuit concluded that the plaintiffs had failed to prove causation where the evidence indicated that "the professors' choice of academic field and the workings of the national market"—and not the challenged salary plan—were "basically responsible" for the claimed disparities in compensation.  <u>Id.</u> at 5.  Similarly, in <u>Robinson v. Polaroid Corp.</u>, 732 F.2d 1010 (1st Cir. 1984), the First Circuit held that the plaintiffs had failed to establish that the challenged personnel rule caused any adverse impact in layoffs, where there was no evidence that the plaintiffs were laid off because of the rule or that they would have escaped layoff if the rule did not exist.  <u>Id.</u> at 1016.

Also instructive is <u>Carroll v. Sears, Roebuck & Co.</u>, 708 F.2d 183 (5th Cir. 1983), in which black employees brought suit under Title VII challenging an employment test as discriminatory.  The court held that plaintiffs had failed to establish their prima facie case, reasoning that, "[b]ecause the test does not have a cut-off and is only one of many factors in decisions to hire or promote," plaintiffs had failed to show "through their statistics that the lower scores of blacks [was] a factor in employment decisions that cause[d] fewer blacks to be selected."  <u>Id.</u>  Although the plaintiffs claimed that the disparity resulted "both from testing and the use of subjective hiring criteria," the court found it dispositive that they failed to offer a method to determine what influence, if any, the test had on the selection process:

> The plaintiffs simply have not shown that testing, independent of other factors that may affect the racial balance of the workforce, is causally related to discrimination in the number of blacks hired or promoted. The causal requirement recognizes that underrepresentation of blacks might result from any number of factors, and it places an initial burden on the plaintiff to show that the specific factor challenged under the disparate impact model results in the discriminatory impact. The plaintiffs, by failing to isolate the discriminatory effect of the practice they challenged, did not meet this burden.

Id. at 189-90.

Numerous other courts have similarly held that, to prove causation as required by Wards Cove and Watson, the plaintiff is required to isolate the effect of the challenged employment practice on the claimed disparity in the workforce.[8] Failure to do so is fatal to the plaintiff's prima facie case.

---

[8] See, e.g., Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 266 (4th Cir. 2005) (plaintiffs' statistical evidence did not prove causation because it failed to consider other factors that may have accounted for the disparate impact in the interview process); Smith, 84 F.3d at 676 (multiple-regression analysis purporting to show connection between gender and salaries was deficient because it failed to consider other factors that could account for the salary differential; such an analysis "must include all the major factors" that influence the challenged action); Ortega v. Safeway Stores, Inc., 943 F.2d 1230, 1245 (10th Cir. 1991) (plaintiffs' statistical analysis failed to prove adverse impact against women because, among other things, it did not account for factors such as women removing themselves from consideration); Lopez v. Metropolitan Life Ins. Co., 930 F.2d 157, 160 (2d Cir. 1991) (disparate-impact claim was properly dismissed where plaintiff failed to show that the training practices at issue bore "any causal relationship to the dearth of black employees" in the workforce, and the evidence showed that there were other reasons that could account for the disparity); Hill v. Mississippi State Employment Serv., 918 F.2d 1233, 1240 (5th Cir. 1990) (plaintiff failed to prove disparate impact in referrals where her statistical analysis "neglected the education and experience factors critical to referral decisions"); Foxworth v. Pennsylvania State Police, 402 F. Supp. 2d 523, 535 (E.D. Pa. 2005) (plaintiffs did not prove causation because their statistical analysis did not show that the employment practice at issue (disqualification factors) was responsible for the disparity in hiring); Carpenter v. The Boeing Co., No. 02-1019, 2004 WL 2661691, at *11 (D. Kan. Feb. 24, 2004) ("A statistical analysis which fails to control for equally plausible non-discriminatory factors overstates the comparison group and . . . cannot raise a question of fact for trial regarding discriminatory impact."); Diehl v. Xerox Corp., 933 F. Supp. 1157, 1167-68 (W.D.N.Y. 1996) (plaintiffs' statistical analysis was "fatally flawed" because it failed to rule out factors other than age and gender that could influence the selection process).

19

This Court should follow this well-established line of cases and hold that plaintiffs failed to establish the requisite causal link between the written examination and the alleged disparity in firefighter hiring.  Again, the difficulty of the endeavor does not lessen plaintiffs' burden. Plaintiffs could have done a regression analysis to try to prove their claim, but they did not do so. Sobel v. Yeshiva Univ., 839 F.2d 18, 35 (2d Cir.1988) ("as a device designed to sift through various factors in order to assess as accurately as possible the influence of any one of them, the multiple regression analysis is the accepted means for performing this difficult task"), quoted in Diehl, 933 F. Supp. at 1169.  Thus, because plaintiffs' statistical evidence did not account for the myriad factors other than the examination that significantly influence the selection process, they have failed to prove specific causation, a required element of their prima facie case.

### B.    HRD Has Shown That the Challenged Examinations Are Job Related.

Even if plaintiffs had made a prima facie showing of disparate impact, they still could not prevail under Title VII because HRD has proven that the challenged examinations are "job related" and "consistent with business necessity."  42. U.S.C. § 2000e-2(k)(1)(A)(i).  In assessing whether an exam is job related, the relevant standard is reasonableness—that is, employment tests with a disparate impact are acceptable if "they are demonstrably a reasonable measure of job performance."  Griggs v. Duke Power Co., 401 U.S. 424, 436 (1971); see Bryant v. City of Chicago, 200 F.3d 1092, 1098-99 (7th Cir. 2000) ("It would be unrealistic to require more than a reasonable measure of job performance.").  In this case HRD has offered a formal content-validity study and presented expert testimony showing that the cognitive examination is a reasonable measure of an individual's ability to perform the essential duties of a firefighter. HRD has therefore met its burden on this prong of the Title VII analysis.

20

1.    **The 1992 Content-Validity Study Demonstrates That the Cognitive Exam Is Job Related.**

A content-validity study is used to demonstrate that "the content of a selection procedure is representative of important aspects of performance on the job." 29 C.F.R. §1607.5.B; EEOC Q&A, Q. 32. This is an accepted method of proving job-relatedness. See 29 C.F.R. §1607.5; EEOC Q&A, Q. 32; Zamlen v. City of Cleveland, 906 F.2d 209, 218 (6th Cir. 1990).

Here, it is undisputed that, in 1992, Dr. Landy's own firm, Landy Jacobs & Associates ("LJA"), conducted a content-validity study on HRD's cognitive examination and determined that it was a reasonable measure of firefighter performance. See Exh. 27; T. 1-121, lines 11-12 (Landy: stating that he formally validated the exam in 1992 after determining that it "was a reasonable test of cognitive abilities"). It is also undisputed that SHL USA ("SHL")[9] updated the HRD firefighter job analysis in 1995 and again in 2002 and concluded that "the existing cognitive and physical examinations should continue to have great relevancy in their current form, with only slight enhancements based on the 2002 job analysis results." Exh. 38, p. 24; see T. 5-112, lines 7-18 (Wiesen: stating that HRD staff who were writing the questions for the 2004 firefighter examination could reasonably have relied on this language in the 2002 report). Plaintiffs have not challenged the methodology or substance of these studies, and so HRD has carried its burden of showing that the cognitive examination was a reasonable measure of job performance. See Zamlen, 906 F.2d at 218-19; Garland, 2004 WL 741295, at *9-*12.

This Court should reject Dr. Landy's attempts to minimize the relevance of the 1992 validity study because his testimony on this point is not credible. For instance, Dr. Landy

---

[9] After SHL purchased LJA in 1998, both Dr. Landy and Dr. Jacobs continued to work at SHL for several more years. T. 3-94, lines 15-19; 3-95, lines 10-20.

testified that he recommended in the study that the cognitive exam be used in a banded, and not rank-ordered, fashion, T. 1-128, lines 4-19, but this assertion is flatly contradicted by the official validation report that was issued to HRD by Dr. Landy's firm.  See Exh. 27, p. 5 (cognitive exam met the criterion for ranking); id., p. 7 ("The use of rank-order selection is defensible for these examinations . . . ."); see T. 3-4, line 18, to 3-5, line 7; 3-6, line 20, to 3-7, line 17.  Dr. Landy further stated that he told HRD that alternate tests, such as personality and biodata inventories, needed to be added to the exam to make it valid, T. 1-120, lines 12-20, but again, his allegation finds no support in the validation report.  T. 3-7, line 22, to 3-8, line 14; 3-33, lines 1-4; 5-59, lines 2-8.  As Dr. Wiesen testified, the 1992 report did not recommend that these components actually be integrated into the selection process.  T. 5-78, lines 8-12.  Rather, at best, the report "suggested considering those and undertaking some research."  T. 5-78, lines 12-13; see EEOC Q&A, Q. 49 ("There is no requirement for continual investigation [into alternatives].").

In addition, Dr. Landy faults HRD for allegedly failing to update the firefighter job analysis since 1992.  T. 1-116, lines 21-24.  But to the contrary, the job analysis was timely updated in 1995 and again in 2002.  See Exhs. 36 & 38.  Although Dr. Landy claimed that these analyses did not pertain to the cognitive exam, the reports themselves once again belie his assertion.  See, e.g., Exh. 38, pp. 12-13, 22-24 (analyzing the cognitive abilities required to perform firefighter tasks and concluding that the existing test "should continue to have great relevancy").  As Dr. Jacobs testified, "the purpose of the updates that were done on the job analysis in '95 and 2002 [was] to show that the requirements were substantially the same, and that the test used earlier would stand under content scrutiny back to '92."  T. 4-94, lines 10-14.  Plaintiffs' witness Betty Dennis testified similarly.  T. 5-47, lines 16-20 (Q: "So would this [the

22

2002 analysis] be the kind of validity update that you were talking about that should be done every four to six years?  [Dennis]: Something very similar to this, yes, yes.").

Dr. Landy also suggested that the validation study cannot be applied to the 2002 and 2004 examinations because some of the questions have since been rewritten.  The Court should reject this line of argument because the only evidence on the issue shows that HRD made only minor changes that did not affect the examinations' validity.[10]  Dr. Jacobs testified without contradiction that the 2002 and 2004 exams "look very much like the exam that [LJA] created for the Commonwealth in 1992 and all the exams we produced for firefighting agencies across the country," and that the examination questions were "reasonably constructed" to test for the ability to perform the "essential job functions" of a firefighter.  T. 4-43, lines 17-24.  Both Dr. Landy and Dr. Wiesen stated that they have no basis for disagreeing with this opinion.  T. 3-22, lines 14-19; 5-113, lines 3-9.  Moreover, as mentioned, the 2002 job-analysis report prepared by SHL states that "the existing cognitive . . . examination[] should continue to have great relevancy in [its] current form, with only slight enhancements based on the 2002 job analysis results."  Exh. 38, p. 24 (emphasis added).  The undisputed evidence thus shows that the examination has not been substantially changed over time, and so it is appropriate to rely on the 1992 study as proof of the validity of the 2002 and 2004 versions of the exam.  See Garland, 2004 WL 741295, at *11 (rejecting plaintiff's argument that changes made to the exam rendered an earlier validity study inapplicable, where the evidence indicated that the changes were not "substantial").

---

[10]  Dr. Landy conceded that it is necessary to write new test items each year to prevent applicants from memorizing or leaking the answers.  T. 3-21, line 21, to 3-22, line 13.

## 2.     The Expert Testimony Shows That the Exams Are Job Related.

Drs. Landy and Wiesen make much of the fact that HRD did not submit formal validity

studies pertaining specifically to the 2002 and 2004 examinations.  This is of no moment,

however, because "employers are not required, even when defending standardized or objective

tests, to introduce formal 'validation studies' showing that particular criteria predict actual on-

the-job performance."  Watson, 487 U.S. at 998 (plurality).  Rather, to meet its burden, an

employer can rely on "the results of studies, the presentation of expert testimony, or prior

successful experience."  Bernard v. Gulf Oil Corp., 890 F.2d 735, 742-43 (5th Cir. 1989).  Thus,

in Bernard, the court found that the employer had demonstrated validity through expert

testimony explaining why the challenged tests were job related and through studies showing that

the tests had a correlation coefficient ranging from 0.22 to 0.32.  See 890 F.2d at 743.  Likewise,

in Reynolds, the court concluded that the exams at issue were job related because "all of the

experts agreed that, in general," the exams were valid, and because plaintiffs' experts "approved

of the relationship between the content of [the] exams and the content of the underlying jobs."

295 F. Supp. 2d at 1307.

As in Bernard and Reynolds, the experts here agree that a cognitive test is in general a

valid predictor of important firefighter skills.  See, e.g., T. 4-30, lines 23-24 (Landy: "I think

there is a role for cognitive abilities in assessment."); 4-42, lines 5-6 (Jacobs: "[C]ognitive

ability tests predict job performance in public safety positions, period."); see also T. 1-115, lines

6-8; 2-17, lines 7-10 (similar).  This is consistent with Dr. Landy's testimony in previous cases.

See Garland, 2004 WL 741295, at *13 n.36 ("Dr. Landy agreed that . . . comprehension, table

interpretation and mechanical comprehension are necessary skills for a firefighter and thus

24

measuring these cognitive skills during the selection process is appropriate."). Dr. Jacobs's and Dr. Landy's testimony further shows that cognitive exams have a correlation coefficient that ranges from 0.2 to about 0.35, comparable to that in <u>Bernard</u>. T. 4-58, lines 8-20; <u>see also</u> Exh. 27, p. 7 (scores on the cognitive exam were "significantly correlated with firefighter job performance in Columbus").

The totality of this evidence demonstrates that the cognitive exam administered by HRD reasonably measures the performance of a firefighter: the experts agree that a cognitive component is a necessary part of the firefighter selection process; cognitive tests have a proven correlation to firefighter performance; and HRD's exam was formally validated in 1992 by plaintiffs' own expert, with only minor changes being made to it since then. For these reasons the Court should find that HRD has met its burden on the second prong of the Title VII analysis.

C.    <u>Plaintiffs Have Not Proven That There Is An Appropriate Alternative Method of Selection.</u>

In order to prevail on the third prong of the analysis, plaintiffs must come forward with an alternative method of selection that would be "equally as effective" as the challenged procedure and that would achieve "legitimate employment goals." <u>Wards Cove</u>, 490 U.S. at 661. Plaintiffs have failed to meet this burden. Although they alluded to myriad testing components as hypothetical possibilities, they have never proposed how those components should be combined, weighted, and scored. This failure is fatal to their case. As courts have held, "[a]t a minimum, challengers in [disparate impact] cases must specify a <u>particular alternative practice</u> to create a triable issue of fact." <u>Allen v. City of Chicago</u>, No. 98 C 7673, 2002 WL 31176003, at *5 (N.D. Ill. Sept. 30, 2002) (emphasis added), <u>aff'd</u>, 351 F.3d 306 (7th Cir. 2003). A "vague and indefinite" proposal does not qualify as an appropriate alternative employment practice

under Title VII.  Allen, 351 F.3d at 313 (quotation marks omitted); see also id. ("[T]he statutory

scheme requires plaintiffs to demonstrate a viable alternative and give the employer an

opportunity to adopt it.  See 42 U.S.C. § 2000e-2(k)(1)(A).  A vague or fluctuating proposed

alternative ordinarily would frustrate this statutory scheme.").  Holding plaintiffs to this burden

is especially appropriate here because, as Dr. Wiesen stated, there is no standard in the field

about how to combine the various components for firefighter selection, and "[p]eople are still

struggling to find the best approach."  T. 5-89, line 19, to 5-90, line 2; see also Exhs. 33L, 33N,

33O (surveying fire departments across the country).[11]

   Because plaintiffs have not proposed any specific combination of testing components,

they have not shown that there is an available, alternative method of selection that would be

"equally as effective" as the challenged practice.  Wards Cove, 490 U.S. at 661.  As Dr. Landy

emphasized at trial, a proper validation study should be conducted on the selection process, not

on individual testing components.  T. 3-77, lines 7-22.  If this is true, then plaintiffs have not met

their burden on the alternatives prong of the analysis because they have failed to come forward

with, and validate, a specific alternative selection method.  In Garland, the plaintiff had proposed

particular alternative methods to the challenged firefighter examination—combining various

inventories such as cognitive, personality, and biodata—and had submitted formal studies

validating those alternatives.  2004 WL 741295, at *15-*18.  Nonetheless, the court found that

the plaintiff had failed to show the availability of "equally effective" alternatives because of

statistical deficiencies in its validation studies.  Id.  Here, plaintiffs have not even proposed an

---

   [11] As Dr. Wiesen testified, the approaches used in Baltimore and Chicago are
comparable to that of HRD.  T. 5-109, lines 12-14.

alternative testing method, let alone prove that that method would be valid.  This failure defeats their claim.  See Allen, 351 F.3d at 314 (plaintiffs' argument that they "'should not be required to come forward with evidence to show a correlation between their alternative procedure and job performance' . . . directly contradicts their burden under the [statutory] framework"); EEOC Q&A, Q. 52 ("The burden is . . . on the person challenging the procedure to show that there is another procedure with better or substantially equal validity which will accomplish the same legitimate business purposes with less adverse impact.").

Moreover, even when assessed individually, the alternative testing components alluded to by plaintiffs are not "equally as effective" as the current testing method or would not achieve "legitimate employment goals," Wards Cove, 490 U.S. at 661:

*Personality and Biodata*.  Plaintiffs have not proven that personality and biodata tests would be "equally as effective."  Dr. Wiesen testified that personality and biodata are "fairly new development[s]," T. 5-94, lines 2-3; that "[p]ersonality instruments have not been widely used in the United States for personnel selection," T. 5-94, lines 3-4; and that "[t]he field is somewhat split" and "there's no full consensus" regarding whether applicants can "fake" on these tests, T. 5-94, line 20; 5-95, lines 5-6.  Indeed, plaintiffs have in effect challenged the biodata and personality tests as invalid in this very lawsuit.[12]  See Amended Compl. (Document 91).  It is "disingenuous" for plaintiffs "to point to [these tests] as a valid alternative on one hand and portray [them] as unlawful on the other hand."  Garland, 2004 WL 741295, at *13; see Hamer v. City of Atlanta, 872 F.2d 1521, 1533 (11th Cir. 1989) (plaintiff bears the "burden of

---

[12]  The biodata component has also been challenged in a lawsuit in New Jersey.  See Antonelli v. New Jersey, 310 F. Supp. 2d 700 (D.N.J. 2004).

demonstrating the usefulness of alternatives").

    *Oral Board and Video Examination*.  Plaintiffs failed to provide any evidence regarding the validity of these tests, other than anecdotal evidence from Dr. Wiesen that he used an oral board in Oklahoma City with positive results.[13]  <u>See</u> T. 5-83, line 20, to 5-85, line 10.  In any event, the tests would not meet legitimate employment goals because of prohibitive cost and because it would be difficult, if not impossible, to ensure standardization.  T. 6-94, line 13, to 6-96, line 3; <u>see</u> <u>Ward's Cove</u>, 490 U.S. at 661 ("'[f]actors such as the cost or other burdens of proposed alternative selection devices are relevant in determining whether they would be equally as effective as the challenged practice in serving the employer's legitimate business goals'");  <u>Allen</u>, 351 F.3d at 314-15 (proposed alternative for promoting police officers would not be equally as effective in serving employer's legitimate business goals, where it would require review of nearly twice the number of applications as in previous years).

    *Weighted/Graded Physical Abilities Test ("PAT")*.  Plaintiffs have failed to show that a weighted/graded PAT would be equally as effective as HRD's current scheme.  As Dr. Wiesen stated, there is no consensus in the field regarding how the PAT should be scored and weighted.  T. 5-89, line 17, to 5-90, line 2; <u>see</u> Exhs. 33L, 33N, 33O.  Indeed, Dr. Landy himself has changed his opinion on the issue, recommending back in 1992 that HRD use the PAT as a scored and ranked device, T. 6-16, lines 7-18; 6-32, lines 16-25, while currently recommending that each event be graded pass-fail, T. 3-52, lines 7-20.[14]  Further, when HRD followed Dr. Landy's

---

    [13]  Dr. Wiesen admitted that the method he used in Oklahoma City "was a fairly novel approach."  T. 5-85, lines 3-4.

    [14]  Dr. Landy's recommendation of grading each event pass-fail differs little from HRD's current testing method.  If each event is graded pass-fail, the entire PAT becomes a de facto

1992 recommendation and used the PAT as a weighted/graded device, the results were decidedly negative: (1) the weighted/graded test did not diminish adverse impact, T. 5-69, lines 1-6; 6-24, lines 20-24; (2) due to the number of candidates to be tested, the process required securing additional sites and constructing test courses, delaying establishment of the certification lists for over a year, T. 5-63, line 17, to 5-64, line 8; 6-10, line 15, to 6-11, line 7; 6-16, line 19, to 6-17, line 4; (3) the weighted/graded test decreased the chances of recruiting qualified candidates because many of the applicants who passed the written exam—including 48% of the minorities—dropped out of the process before the PAT stage, T. 6-23, lines 1-6;[15] and (4) the test caused serious medical problems for some candidates, T. 5-62, lines 11-19; 6-17, line 11, to 6-19, line 25.  In addition, plaintiffs' witness Betty Dennis testified that, if the PAT were given again as a weighted/graded device, it would be "equally as difficult, and it would . . . take[] as much time, perhaps even more time."  T. 5-69, lines 10-11.  The cost and "other burdens" of the weighted/graded PAT, and its failure to diminish adverse impact, thus render it unsuitable as an alternative selection device.  Ward's Cove, 490 U.S. at 661.

In sum, plaintiffs have not offered, and HRD has not rejected, any proposal regarding how the testing components should be combined, weighted, and scored; they have failed to show that any particular combination of components would be valid as an overall testing method; and they have failed to show that the alternatives would individually be "equally as effective" as HRD's current scheme and would achieve "legitimate employment goals."  Id.  Accordingly, this

---

pass-fail because, realistically, a candidate would need to get close to a maximum score of 100 to have any chance of being hired.  T. 6-28, line 20, to 6-29, line 7.

[15]  See Clady v. County of Los Angeles, 770 F.2d 1421, 1433 (9th Cir. 1985) ("improv[ing] the chances of selecting qualified recruits" is a legitimate need of the employer).

Court should hold that plaintiffs have failed to meet their burden on the third prong of the Title VII analysis.

**II.     PLAINTIFFS' <u>BEECHER</u> CLAIM SHOULD BE DISMISSED.**

The State defendants respectfully request a ruling from the Court on the <u>Beecher</u> issues raised in their February 6, 2006, Motion to Dismiss Under Fed. R. Civ. P. 12(b)(1) for Lack of Subject Matter Jurisdiction (Document 65), which is incorporated by reference.[16]  As discussed at length in pages 11 to 18 of the accompanying Memorandum, neither plaintiffs nor intervenors have standing to enforce the <u>Beecher</u> decree.  Indeed, in their trial brief, plaintiffs state that, because they "are not parties to the decree," they "have no . . . standing to challenge the test prior to its administration."  Pls.' Trial Brief (Document 96), p. 10 n.3.  It is illogical for plaintiffs to assert that they have standing to enforce certain provisions of the decree, and then claim that they are not bound by other provisions due to <u>lack</u> of standing.  Moreover, as explained in pages 18 to 19 of the Memorandum, plaintiffs and intervenors have waived any <u>Beecher</u> claim because they failed to object to the tests prior to their administration.  <u>See</u> T. 5-65, lines 13 to 23; 6-55, lines 14 to 18.

Finally, if the Court concludes that dismissal is inappropriate, judgment should still enter for the State defendants on Count IV for all the reasons discussed above in the Title VII analysis.

---

[16]  This brief also incorporates by reference the accompanying Memorandum of Law (Document 66) and the March 13, 2006, Reply Memorandum of Law (Document 76).

Respectfully submitted,

COMMONWEALTH OF MASSACHUSETTS,
HUMAN RESOURCES DIVISION, and RUTH
BRAMSON, in her capacity as Personnel
Administrator of the Human Resources Division,

By their attorney,

THOMAS F. REILLY
ATTORNEY GENERAL

 /s/ Sookyoung Shin
Ronald F. Kehoe, BBO # 264260
Sookyoung Shin, BBO # 643713
Assistant Attorneys General
Government Bureau
One Ashburton Place
Boston, MA 02108-1698
(617) 727-2200, ext. 2619 (Kehoe)
                    ext. 2052 (Shin)

Dated: June 1, 2006

## Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as nonregistered participants on June 1, 2006.


/s/ Sookyoung Shin
Sookyoung Shin
Assistant Attorney General