# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| JACOB BRADLEY, NOAH BRADLEY, KEITH RIDLEY, and JARED THOMAS, individually and on behalf of a class of similarly situated individuals,<br>　　　　　　Plaintiffs, | ) ) ) ) ) ) ) |  |
| v. | ) ) | Civil Action No. 05-10213-PBS |
| CITY OF LYNN; EDWARD J. CLANCY, JR., in his capacity as Mayor of the City of Lynn; the COMMONWEALTH OF MASSACHUSETTS, DIVISION OF HUMAN RESOURCES; and RUTH BRAMSON, in her capacity as Personnel Administrator of the Division of Human Resources of the Commonwealth of Massachusetts,<br>　　　　　　Defendants,<br><br>BOSTON SOCIETY OF THE VULCANS and NEW ENGLAND AREA CONFERENCE OF THE NAACP,<br>　　　　　　Intervenors. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |  |

_____

## PLAINTIFFS' POST-TRIAL PROPOSED FINDINGS OF FACT

Harold L. Lichten, BBO # 549689
Shannon Liss-Riordan, BBO # 640716
Alfred Gordon, BBO # 630456
Pyle, Rome, Lichten, Ehrenberg &
　　Liss-Riordan, P.C.
18 Tremont Street, Suite 500
Boston, MA 02108
(617) 367-7200

Date:  June 1, 2006

# TABLE OF CONTENTS

Page No.

A.    The Hiring Process For Fire Fighters In Civil
Service Communities In Massachusetts. . . . . . . . . . . . .    3

B.    HRD's 2002 And 2004 Entry-Level Fire Fighter
Exams Had A Discriminatory Adverse Impact on
Minority Candidates. . . . . . . . . . . . . . . . . . . . . . . . . . .    8

    1.    The Adverse Impact Is Clearly Established Through
An Analysis Of Candidates' Test Scores. . . . . . . .    8

    2.    The Adverse Impact is Further Confirmed
Through An Analysis Of Hiring That Resulted
From The Exams. . . . . . . . . . . . . . . . . . . . . . . . . .    10

    3.    Focusing On Lynn, Where The Named
Plaintiffs Resided, The Adverse Impact Of the
Exam Is Especially Stark. . . . . . . . . . . . . . . . . . . .    15

    4.    The Adverse Impact Of The Exam Also Has
A Particularly Large Effect In Boston, As
Shown From The Hiring To Date From The
2004 Exam. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    17

C.    Facts Relating to Validation Of The Examination. . . . . . . .    20

D.    Facts Relating To Utilization Of Cognitive Ability Test As
A Rank Order Scored Exam. . . . . . . . . . . . . . . . . . . . . . . .    29

E.    Facts Relating To Alternative Selection Devices Available
In 2002 And 2004. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    32

F.    The Alternative Of Using The Cognitive Abilities Test
As Pass/Fail. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    36

**A.**    **The Hiring Process For Firefighters In Civil Service Communities In Massachusetts.**

1.    The process for hiring entry-level firefighters and police officers is well documented in a number of prior court decisions, Quinn v. City of Boston, 325 F.3d 18 (1st Cir. 2003), DeLeo v. City of Boston, Case No. 03-12538-PBS (D. Mass. 2004), Donahue v. City of Boston, 304 F.3d 110 (1st Cir. 2002). In the Quinn case, the defendant Human Resources Division (HRD) argued that maintenance of the Beecher consent decree was required in order to prevent the City of Boston from sliding back into an entry-level hiring pattern that would disfavor minorities.[1] Quinn, supra, at p. 32.

2.    Every two years, in the spring, HRD issues a written announcement that it will be administering the entry-level civil service examination for firefighter in the Commonwealth of Massachusetts. All civil service municipalities (approximately 113) are subject to this examination process; the remaining communities (many of whom do not even have full-time fire departments) are permitted to use their own selection process. The examination announcement describes the minimum requirements to be a firefighter (such as a driver's license, etc.) and it describes in general the examination to be given. On the Internet, one can download a description of the examination and a sample test. (See Exhibits 14, 20, 28, 29, 30, 33P and 35.)

3.    Since as far back as the 1960s, and continuing to the present (notwithstanding the decision of the Court in Beecher), the civil service examination has consisted of a written, 100-question, multiple-choice cognitive

---

[1]    As demonstrated herein, that prediction came true quite quickly.

ability test.  While the test questions have changed somewhat over the years, the format has not changed appreciably with the exception of 1993.[2]  (See Exhibit 1, pp. 12-28; see also Exhibits 34 and 35.)

4.      After the exam is given to candidates, the test is scored ranging from a high score of 100 downward to well below 70.  (See Exhibit 24, Tab 6; see also Exhibits 20-24 and Exhibit 1, pp. 31-36.)

5.      Next, for each civil service municipality, a list is created utilizing the following order:  First on the list are all disabled veterans who are residents of the municipality, ranked by order of their examination score; that group is followed by all resident veterans, again ranked by their civil service score.  Both disabled and non-disabled veterans will only be ranked if they receive a passing mark (a score of 70) on the examination.  Next, all non-veteran residents of the municipality are ranked by civil service score, followed by all non-residents ranked by category and civil service score as described above.  Again, no one who does not receive a passing mark of 70 can be hired.  (See Exhibits 18, 19, and 20; testimony of McNeely, Vol. 6, pp. 52-55.)

6.      As evidenced by the exhibits in this case, and the Quinn and DeLeo litigation, non-veteran residents have virtually no chance of being selected as a firefighter unless they have achieved a score on the exam above 90.  (See Discussion below and Landy Report, Exhibit 1, pp. 31-40; testimony of Landy, Vol. 1, pp. 71-80.)

---

[2]      The only time the test was given differently was in 1993, when 60% of the score was the result of the scored and ranked physical abilities test, with 40% being attributed to the written examination.  Other than this one test, all other tests have been solely written multiple choice cognitive ability tests.

7.      The civil service firefighter list described above is a dynamic document, constantly changing over time.  For example, after the exam is given in the spring of every two years, there is a make-up exam in October for individuals who could not take the exam because they were in military service. (Testimony of McNeely, Vol. 6, pp. 120-124.)  Further, a number of individuals take the exam and are ranked as non-veterans because they have not yet entered the military or are in the military but have not yet become an honorably discharged veteran.  (Testimony of McNeely, Id.)  Upon being honorably discharged, an individual who was originally ranked as a non-veteran will automatically be moved up the list and be placed as a veteran or disabled veteran in accordance with their respective exam score.  Thus, for example, a non-veteran with a score of 99 can actually see their ranking on the civil service list continually go down as others are placed above them as veterans. (Testimony of McNeely, Vol. 6, pp. 136-138.)

8.      When a civil service municipality decides to hire entry-level firefighters, it first determines the number of firefighter vacancies for which it intends to hire and fills out a requisition which it sends to HRD.  Upon receiving the requisition, HRD sends out a certification list which normally contains two times the number of candidates plus one (the so-called *2n+1* rule) that are being sought to be hired, ranked as described above.  If several candidates are tied in written exam score for the last place on the certification, all of their names are normally included.  (Testimony of McNeely, Vol. 6, pp. 64-69.)

9.     The next step in the process is for each such candidate who is on the certification to be sent a card by HRD at their last known address.  If they remain interested in going forward as a candidate for the firefighter position, they are required to sign the card and return it to HRD, or come in to HRD and sign the list.  Although Ms. McNeely was vague in her testimony on the point, if it appears that a substantial number of candidates on a certification list are not signing up to indicate a continuing interest, the community may ask for a supplemental certification containing more names so as to ensure that the number of candidates ultimately considered will equal *2n+1*.  (Testimony of McNeely, Vol. 6, pp. 64-69.)

10.     However, by statute, the municipality may only consider for selection two times the number of candidates plus one who indicate an interest in the position by signing the card sent to them.  (Testimony of McNeely, Vol. 6, pp. 65-68; G.L. ch.31, §§ 25-27, 58-59.)

11.     Once a *2n+1* list is established, a municipality must make selections for the position from such list.  Thus, for example, as evidenced by the City of Lynn's recent requisition, where the City wants to hire four (4) individuals for the position of firefighter, it must make that selection from the nine (9) highest ranking candidates on that list who sign the form and return it.  (Id.; testimony of McNeely, Vol. 6, pp. 89-91.)

12.     Municipalities may then require candidates to go through a background check or interview, or both, and the municipality may bypass a higher ranked candidate for a lower ranked candidate on the *2n+1* list if such

municipality has a justifiable reason for doing so, such as failure to pass the background check or medical exam.  This is also known as a so-called bypass under the civil service law, and the candidate can challenge his or her bypass before the state Civil Service Commission.  See City of Cambridge v. Civil Service Commission, 43 Mass.Ap.Ct. 300 (1997); Mass. Assn of Minority Law Enforcement Officers v. Abban, 434 Mass. 256 (2001); Cotter v. City of Boston, 323 F.3d 160 (2003).

13.    After the candidate has been given a conditional offer of employment, the applicant can be required to undergo a medical examination, in which case they must meet the HRD medical standards.  (See Exhibits 36 and 37.)  Finally, and just before hire, such candidates must pass the physical agility test administered by HRD.  (Testimony of Chavanne, Vol. 6, pp. 27-30.)  The physical agility test is a pass/fail test given after the medical examination and after a conditional offer of employment has been made.  (Testimony of Chavanne, Vol. 6, pp. 28-31.)

14.    While it is true that a municipality may pick and choose from among qualified candidates on the *2n+1* list and thus bypass candidates in favor of others, in most large cities and towns, selection is done strictly by rank order (except for disqualifications for cause).  Indeed, in the cases of DeLeo v. City of Boston, supra, and Quinn v. City of Boston, supra, it is evident that the City of Boston hires strictly by going down the *2n+1* list, except for disqualifications, which are then subject to a Civil Service Commission appeal.  Further, from a review of many of the hiring lists (see Exhibits 15, 16 and 33H) introduced in this

case, it is apparent that in many cities, hiring is done in rank order off the certification list.  Moreover, in many of these cities and towns there is no interview process.  (Testimony of McNeely, Vol. 6, pp. 134-135.)

**B.    HRD's 2002 and 2004 Entry-Level Firefighter Exams Had a Discriminatory Adverse Impact on Minority Candidates**

15.    Minorities have consistently scored significantly lower on the HRD's entry-level firefighter exam than whites.  For the exams given in 1993, 1998, 2000, 2002, and 2004, minority candidates' scores have been significantly lower than white candidates' scores.  (See Exhibit 33A; Vol. 1, pp. 74-75.)

16.    In 2002, whites scored an average (mean) of 89.1 on the exam, while Blacks scored an average of 77.8 and Hispanics 78.4.  In 2004, whites scored an average of 88.1 on the exam, while Blacks scored an average of 77.0 and Hispanics 78.7.  (Exhibit 33A.)

**1.    The Adverse Impact is Clearly Established Through an Analysis of Candidates' Test Scores**

17.    The 2002 and 2004 exams had an adverse impact on Black candidates even at the nominal passing score of 70.  The proportion of Blacks who scored at or above 70 compared to the proportion of whites who scored at or above 70 (the adverse impact ratio) was .79 for 2002 and .78 for 2004.  Both of these ratios violate the EEOC 80% rule.  Further, the adverse impact at the nominal passing score for both years' exams is statistically significant, as shown by a chi-square statistical analysis.  (Landy Expert Report, Exhibit 1, p. 32.)[3]

---

[3]    Both the 2002 and 2004 exams just met the 80% rule at the nominal passing score of 70 when Black and Hispanic applicants are combined.  Indeed, HRD staff "gerry rigged" the exam each year (by deleting questions, adjusting the scoring, etc.) so that the adverse impact ratio

18.    As shown below, the 2002 and 2004 exams had a much greater adverse impact on minority applicants (Black and Hispanic combined) at the higher effective cutoff scores.

19.    At a score of 90, the 2002 exam had an adverse impact ratio of .38 for Blacks and Hispanics, in violation of the EEOC 80% rule.  This adverse impact is statistically significant, as shown by a chi-square statistical analysis. (See Exhibit 1, Landy Expert Report, pp. 38-39.)

20.    At a score of 90, the 2004 exam had an adverse impact ratio of .34 for Blacks and .36 for Hispanics, in violation of the EEOC 80% rule.  This adverse impact is statistically significant, as shown by a chi-square statistical analysis. (See Exhibit 1, Landy Expert Report, pp. 38-39.)

21.    At a score of 95, the 2002 exam had an adverse impact ratio of .20 for Blacks and .22 for Hispanics, in violation of the EEOC 80% rule.  This adverse impact is statistically significant, as shown by a chi-square statistical analysis. (See Exhibit 1, Landy Expert Report, pp. 39-40.)

22.    At a score of 95, the 2004 exam had an adverse impact ratio of .22 for Blacks and .19 for Hispanics, in violation of the EEOC 80% rule.  This adverse impact is statistically significant, as shown by a chi-square statistical analysis. (See Exhibit 1, Landy Expert Report, pp. 39-40.)

23.    Indeed, the 2002 exam had an adverse impact on Black and Hispanic applicants at *every* score between 70 and 100.  This adverse impact

---

would be almost exactly at 80% at a score of 70 when Black and Hispanic candidates are combined.  (Testimony of McNeely, Vol. 6, pp. 144-45.)

violated the 80% rule and was statistically significant. (See Exhibit 1, Landy Expert Report, p. 34; Vol. 1, pp. 68-69, 75-77; see also Exhibit 33B.)

24.    Likewise, the 2004 exam had an adverse impact at *every* score between 70 and 100.  This adverse impact violated the 80% rule and was statistically significant.  (See Exhibit 1, Landy Expert Report, p. 36; Vol. 1, pp. 68-69, 75-77; see also Exhibit 33C.)

25.    Because the exam has an adverse impact at every passing score, with increasingly large adverse impact at the higher scores as compared to the lower scores, it is evident that the exam's use as a rank-order initial hurdle selection device will have adverse impact in hiring.  (Testimony of Jacobs, Vol. 4, p. 80; testimony of Landy, Vol. 2, p. 42.)

26.    Because of the severe adverse impact of the exam and the perception that one must score very high in order be hired, it is also evident that many minorities who may be interested in becoming a firefighter may self-select out and choose not to take the exam, or give up trying the exam again, because they do not believe they can do well on it.  Dr. Jacobs admitted that this was an unfortunate fact.  (Testimony of Jacobs, Vol. 4, pp. 117-18.)

**2.    The Adverse Impact is Further Confirmed Through an Analysis of Hiring That Resulted from the Exams.**

27.    The data in this case show that the 2002 and 2004 exams had an adverse impact on minorities, not only as seen in raw test scores, but also in actual hiring as well.  This adverse impact can be seen first through overall comparison of the percentage of exam passers who were minorities to the percentage of firefighter appointments who were minorities.  In 2002, minorities

comprised 12% of exam passers, but only 6.1% of firefighter appointments.  In 2004, minorities comprised 9.9% of exam passers, but only 5.8% of firefighter appointments.  Thus, both years, minorities were appointed as firefighters at just more than half the rate (51% for 2002 and 59% for 2004) that they passed the exam.  (See Exhibit 35B, pp. 2 and 3.)[4]

28.    The adverse impact in hiring can also be seen through an analysis under the EEOC Guidelines' 80% rule.  In 2002, the ratio of minorities who were appointed to a firefighter position was .034, as compared to whites' selection rate of .073, which yields an adverse impact ratio of .47, in substantial violation of the 80% rule.  (Exhibit 6.)  Similarly, in 2004, the ratio of minorities who were appointed to a firefighter position was .032, as compared to whites' selection rate of .10, which yields an adverse impact ratio of .32, also in violation of the 80% rule.  (See Exhibit 5.)

29.    The analyses described above and below only consider candidates who actually passed the exam.  When factoring in that minorities failed the exam at a much higher rate than whites (see Exhibit 1, pp. 32-33), this adverse impact described above and below would be significantly greater.  (See Exhibit 33T, last paragraph.)

30.    As shown below, this adverse impact cannot be explained away by the veteran preference, since adverse impact in hiring can be measured even by

---

[4]    These overall results for 2002 and 2004 were quite different from the previous ten years (1990-2000), when statewide minority firefighters were appointed at rates higher than the percentage of minorities who passed the exam.  (Exhibit 35B, pp. 2 and 3).  Notably, the 2002 exam was the first exam in which Boston was no longer under the Beecher hiring decree, and so it is evident that the Beecher hiring quotas masked the adverse impact of the exam until the largest city in Massachusetts was relieved of the Beecher hiring obligations.

holding veteran status constant.  (Testimony of Wiesen, Vol. 5, pp. 102-04.)
Among non-veterans in communities that hired non-veterans (i.e. communities
that got past veterans on their lists), minority non-veterans were hired at
significantly lower rates than white non-veterans.  In communities that hired only
veterans, minority veterans were hired at significantly lower rates than white
veterans.  Looking at the civil service lists, it is evident that lower rates of
minorities were hired, among non-veterans and among veterans, because
minorities in general scored lower on the exam, and thus were ranked lower on
the lists, than white candidates.  (See Exhibits 5, 6, 33E, and 33F; see also
Exhibit 4; see also Vol. 5, pp. 102-04.)

     31.     With respect to communities that got past veterans on their civil
service lists, analysis of municipalities' actual hiring from the 2002 and 2004
exams shows an adverse impact on hiring of non-veteran minorities.  Looking at
the data for statewide hiring from the 2002 exam for municipalities that got past
veterans in their hiring, the ratio of minority non-veterans who were appointed to
a firefighter position was .036, as compared to white non-veterans' selection rate
of .061, which yields an adverse impact ratio of .59, in violation of the 80% rule.
(See Exhibit 6.)  For hiring from the 2004 exam for municipalities that got past
veterans in their hiring, the ratio of minority non-veterans who were appointed to
a firefighter position was .059, as compared to white non-veterans' selection rate
of .088, which yields an adverse impact ratio of .67, also in violation of the 80%
rule.  (See Exhibit 5.)

32.    When the municipalities that were still under <u>Beecher</u> hiring requirements are removed from this analysis (since these hiring quotas somewhat mask the adverse impact of the exam itself), the adverse impact is even more striking.  (Testimony of Landy, Vol. 1, p. 87; testimony of Wiesen, Vol. 5, p. 104.)  For hiring from the 2002 exam, the adverse impact ratio for non-veterans in non-<u>Beecher</u> communities is .49, and for the 2004 exam, it is .54, both of which violate the 80% rule.  (See Exhibits 5 and 6.)  In addition to violating the 80% rule in the aggregate, the hiring data show independent 80% rule violations in *every* non-<u>Beecher</u> community but one (Revere) from the 2004 exam.  (See Exhibit 4.)

33.    As for communities that did not get past veterans in their hiring, the 2002 and 2004 exams had an adverse impact on minority veterans.  (Vol. 1, p. 107; testimony of Landy, Vol. 2, p. 11; see also Exhibits 33E and 33F.)

34.    The adverse impact ratio for veteran candidates in these municipalities from the 2002 exam, aggregated across the state, was .38, which violated the 80% rule and is statistically significant.  (See Exhibit 33E.)  For hiring from the 2004 exam, the adverse impact ratio for veteran candidates was .65, also in violation of the 80% rule and statistically significant.  (See Exhibit 33F.)

35.    Again, when municipalities still operating under the <u>Beecher</u> hiring requirements are removed from the analysis, the adverse impact is even more severe.  For hiring from the 2002 exam, the adverse impact with respect to veteran candidates in communities that hired only veterans was .30, which violated the 80% rule and is statistically significant.  (Exhibit 33E.)  For hiring

from the 2004 exam in non-<u>Beecher</u> municipalities, the adverse impact ratio for

veteran candidates was .58, also in violation of the 80% rule and statistically

significant.  (See Exhibit 33F.)[5]

      36.    The adverse impact also cannot be explained away by a differential

"drop-out" or bypass rate[6] between minority and white candidates.[7]  Although

minority candidates dropped off of the 2004 Boston hiring list at a marginally

higher rate than whites,[8] the difference is not statistically significant.[9]  Statewide

(excluding Boston), whites dropped off the lists at a higher rate (51%) than

minorities (42%).  Statewide (including Boston), minorities and whites dropped off

the lists at practically the same rate (48% compared to 47%).   (See Exhibit 33T,

Dr. Landy's Response to the Report of Dr. Rick Jacobs of May 19, 2006; Exhibit

---

[5]      This adverse impact ratio becomes .55 if Winthrop is removed, the one municipality which reached all its veterans.  (See Exhibit 33F.)

[6]      At trial, the witnesses referred to the "drop-out" rate as the rate at which candidates are not selected for hire based on the rank order of the civil service lists.  "Dropping out," however, as used this way, encompasses not only candidates voluntarily removing themselves from the hiring process but also candidates being selected or screened out for any reason, for instance, being bypassed, not passing the physical or medical exam, not passing the drug test or background check, or having already been hired by another municipality.  (Testimony of Landy, Vol. 1, pp. 88-89.)

[7]      On the last day of trial, the Commonwealth attempted to introduce evidence through Sally McNeely that statewide minorities are bypassed at a higher rate than whites.  The Court ruled that this point would not be considered unless the plaintiffs had the opportunity to challenge this assertion.  (Vol. 6, pp. 74-77.)  The plaintiffs have done so through a new affidavit from Dr. Landy.  (See Exhibit 33T.)

[8]      Dr. Landy found that whites dropped out at the rate of 41%, and minorities dropped out at the rate of 53%.  Dr. Jacobs agreed that whites dropped out at the rate of 41%, but testified that minorities dropped out at the rate of 58%.  This discrepancy appeared to be because Dr. Jacobs included in his minority calculation three candidates who were not identified as Black or Hispanic.  (See Exhibit 33T.)

[9]      Dr. Landy has calculated that the difference in drop-out rates between minorities and whites in Boston is not statistically significant, regardless of whether one uses Dr. Landy's 53% figure or Dr. Jacobs' 58% figure.  (See Exhibit 33T.)  The Commonwealth has presented no evidence that the differences in drop-out rates between minorities and whites is statistically significant.

33H, Applicants on the 2004 Boston Firefighter List; see also Exhibit 20, Updated

Certification Data for All Communities from 2004 Firefighter Exam.)

### 3.    Focusing on Lynn, Where the Named Plaintiffs Resided, the Adverse Impact of the Exam is Especially Stark

37.    The City of Lynn was released from the <u>Beecher</u> hiring decree

requirements in 1986.  (Testimony of Bradley, Vol. 6, p. 158.).

38.    Since that time, approximately 106 firefighters have been hired in

Lynn.  (Vol. 6, p. 159.)

39.    Of those hired prior to the filing of this lawsuit, only 4 have been

minorities (two Black and two Hispanic).  (Vol. 6, pp. 158-59.)[10]

40.    Plaintiff Jacob Bradley scored 94 on the 2002 exam but was not

reached for hire.  (*See* First Amended Complaint, ¶ 17, undisputed in

Commonwealth's Answer.)

41.    Veteran candidates who scored as low as 92 on the 2002 exam

were reached for hire in Lynn.  (See Exhibit 17, Lynn certs from 2002 list.)

42.    By the date of the trial, Lynn had gotten through its veteran list,

including hiring a veteran who has scored 85 on the exam.  (See Exhibit 18, Lynn

certs from 2004 list; Vol. 2, pp. 19-20.)

43.    Although Jacob Bradley scored 94 on the 2004 exam, as of the

date of the trial he had still not been hired.  (Vol. 6, p. 80.)

---

[10]    The Court may take judicial notice of the fact that Lynn has a large minority population. According to the 2000 census, Lynn has the fourth highest proportion minority population of any city or town in Massachusetts (after Boston, Springfield, and Brockton).

44.    By the time of the trial, the candidate directly above Jacob Bradley on the Lynn civil service list, Edward Power, who had scored a 95, had been hired.  (See Exhibits 14 and 18; Vol. 2, p. 20; Vol. 6, p. 130.)[11]

45.    There is no meaningful difference between Edward Power's score of 95 and Jacob Bradley's score of 94, but because of their respective exam scores, Edward Power was hired and Jacob Bradley was not.  (Vol. 2, pp. 20-21.)

46.    On May 3, 2006, (on the second to last day of trial), HRD issued a new certification list for Lynn to hire 4 new firefighters.  (See Exhibit 33P; see also Vol. 6, pp. 77-78.)[12]

47.    Although Jacob Bradley had previously been the next candidate on the Lynn civil service list (see Exhibit 14), when the new certification was issued in May 2006, Jacob Bradley was far from the first name on that list.  Instead, there were 19 candidates ahead of him.  (See Exhibit 33P.)  (This is because

---

[11]    After this lawsuit was filed, Lynn requested in May 2005, a special PAR 8 certification list for six Spanish-speaking firefighters.  (Vol. 6, p. 77.)  In a supplemental complaint (which will be addressed in a later proceeding), the plaintiffs have claimed that this request was a specific intentional act of retaliation by the City of Lynn against the named plaintiffs, so that Lynn could avoid hiring the named plaintiffs.

[12]    Curiously, that list contained 37 names, although Sally McNeely had testified that HRD generally certifies *2n+1* candidates, which means that ordinarily the list would only include 9 names.  McNeely testified that HRD departed from its usual practice of certifying more than *2n+1* names for this recent Lynn certification in part because all of the candidates ahead of Jacob Bradley had been "recycled" (i.e. screened previously and not hired despite already having been certified in the past).  (Vol. 6, pp. 86-87.)  However, this assertion was incorrect.  On cross-examination, she agreed that not all of the candidates ahead of Jacob Bradley were "recycled."  (Vol. 6, pp. 132-33.)
    McNeely also testified that HRD certified additional names for Lynn based upon its belief that some Lynn firefighters would resign or be terminated due to a tightening up of the residency requirement, Vol. 6, pp. 87-88, but on cross-examination, she admitted that collective bargaining is currently ongoing on this issue and she was not aware that any Lynn firefighters had in fact resigned because of this issue and the only requisition HRD had received from Lynn was for four firefighter positions.  (Vol. 6, pp. 131-32.)

when firefighter candidates return from military duty, they are moved up on the civil service lists to reflect their new veteran status.  (Vol. 6, p. 137.)

48.     All nineteen of the candidates ahead of Jacob Bradley on the May 2006 Lynn certification list are white.  (Vol. 6, pp. 136-37.)

49.     As of the time of trial, it was still far from certain that Jacob Bradley would be selected for hire as a Lynn firefighter from the 2004 exam, since only three of the nineteen candidates ahead of him on the certification list had been previously rejected by Lynn, and Lynn had only requisitioned four new firefighters.  (Vol. 6, pp. 136-38.)[13]

**4.     The Adverse Impact of The Exam Also has a Particularly Large Effect in Boston, as Shown from the Hiring to Date from the 2004 Exam**

50.     Since Boston was released from the Beecher hiring requirements several years ago (in 2003), very few minorities have been hired as firefighters in Boston.  (Vol. 6, p. 115; see also Exhibits 33D and 33H.)

51.     Following the 2002 exam, Boston hired only white firefighters as a result of the court ruling in the Quinn v. City of Boston case, which resulted in Boston being lifted from the Beecher minority hiring requirements.  (Vol. 6, p. 115.)

---

[13]     In addition, McNeely admitted that she had included in her definition of "recycled" candidates (describing those who were ahead of Jacob Bradley on the list) those candidates who were not hired earlier because they were at the time still overseas serving on military duty, although they may since have returned and be willing and able to accept a firefighter appointment.  (Vol. 6, pp. 137-38.)

52.    Two classes of firefighters have been hired by Boston off of the 2004 list – one in June 2005 and one in January 2006.  All of these hires were veterans.  (See Exhibits 33D and 33H.)

53.    The June 2005 class had 50 white veterans and 2 minority veterans.  (Vol. 2, p. 5; see also Exhibits 33D and 33H.)

54.    The January 2006 class had 40 white veterans and 5 minority veterans.  (Vol. 2, p. 5; see also Exhibits 33D and 33H.)

55.    The combined adverse impact ratio for minority veterans with respect to both the June 2005 and January 2006 hiring is .51, which is in violation of the 80% rule and is statistically significant.  (Vol. 2, pp. 6-7; see also Exhibit 33D.)

56.    In addition, of the minority veterans hired from the 2004 Boston list, they faced an increased delay in appointment, as compared to white veterans due to their lower exam scores.  This delay can be measured by an adverse impact ratio of .51, which is in violation of the 80% rule.  (Vol. 2, pp. 7-8; see also Exhibit 33D.)

57.    Further, an adverse impact analysis of the candidates who were "reached" for hire by Boston in June 2005, as compared to those certified,[14]

---

[14]    Plaintiffs have made here their own calculation of the adverse impact ratio with respect to candidates "reached" for hire by looking at the candidates certified for each hiring and calculating the number of candidates (white and minority) before and after the last candidate hired in each of those two certifications.  (As seen in Exhibit 20, at 89, the last candidate certified for the June 2005 hiring was Mark Williams, a Black veteran who scored 90; the last candidate certified for the January 2006 hiring was Donald Wightman, a white non-veteran who scored 98.  As seen in Exhibit 33H, the last candidate reached in the June 2005 hiring was Phillip Skrabut, a white veteran who scored 93; the last candidate reached in the January 2006 hiring was Daniel McDevitt, a white veteran who scored 84.)  In this way, Plaintiffs can show yet another way that the rank ordering of exam scores affects minority hiring.  In other words, even looking at those candidates reached on the certification list, one can see from this analysis that a smaller

shows that minority veterans were reached at a rate of .71 of the rate that white veterans were reached.  (See Exhibit 33H.)[15]  Adding in the hirings from January 2006, the adverse impact ratio of veterans reached was .68.  (See Exhibit 33H.)[16] Both of these ratios violate the 80% rule.

58.    On April 11, 2006, HRD issued a new certification list for the City of Boston, which had requested a requisition for an additional 50 firefighters. Exhibit 33M.  This list certified candidates down to all but the last seven veterans on the 2004 Boston list.  (See Exhibits 33H and 33M.)  Of these seven veterans, five were minorities.  (See Exhibit 33H.)[17]

59.    On April 21, 2006, HRD certified an additional 55 candidates for the upcoming Boston hiring, based on its assertion that Boston would not have enough candidates to fill the 50 positions from the April 11, 2006, certification. (See Exhibit 33Q; Vol. 6, p. 119.)  The nine veterans on this list include 3 out of

proportion of minorities even get the *opportunity* to be hired because hiring is done in rank order off of the certification list.  This analysis therefore calculates the number of minorities who have the opportunity to be hired, regardless of who actually "drops out."

[15]    As seen in Exhibit 33H, the number of white candidates reached in June 2005 (i.e. white candidates up to Phillip Skrabut) was 100, and there were 30 additional white candidates certified but not reached (i.e. white candidates ahead of Mark Williams).  The number of minority candidates reached was 6, and there were 5 additional minority candidates certified but not reached.  Thus, the proportion of minority certified candidates reached was .55, while the proportion of white certified candidates reached was .77, which results in an adverse impact ratio of .71.

[16]    As seen in Exhibit 33H, the number of white candidates reached through January 2006 (i.e. white candidates up to Daniel McDevitt) was 158, and there were 57 additional white candidates certified but not reached (i.e. white candidates up to Donald Wightman).  The number of minority candidates reached through January 2006 was 14, and there were 14 additional minority candidates certified but not reached.  Thus, the proportion of minority certified candidates reached was .50, while the proportion of white certified candidates reached was .73, which results in an adverse impact ratio of .68.

[17]    As shown on Exhibit 33M, the last certified veteran was David Foley.  Exhibit 33H shows that seven veterans were below David Foley on the 2004 Boston list and that five of these veterans are minorities.

the earlier 5 non-certified minorities.  Of the 46 non-veterans on this list, only 3

are minorities.  (See Exhibits 33H and 33Q; Vol. 6, p. 125.)[18]

60.     If Boston exhausts its veteran list and begins hiring from its non-

veteran list, as Sally McNeely testifies that she expects it will,[19] it will be hiring

only non-veteran candidates who scored in the upper 90s on the exam.  Indeed,

the last candidate on the April 21, 2006, certification list is Patrick Woods, who

scored a 97 on the exam.  (See Exhibits 33Q and 33H; Vol. 6, p. 123.)  It is thus

evident that, no matter what point on its list Boston reaches in its hiring, there will

be adverse impact against minority firefighters.

**C.     Facts Relating To Validation Of The Examination.**

61.     In 1974, after holding that the Commonwealth was in violation of

Title VII for administering an examination that had a discriminatory impact and

was not job-related as required by the Uniform Guidelines on Employee

Selection, the court entered a remedial hiring formula, and also ordered the

Commonwealth to ensure either that any subsequent examinations did not have

adverse impact or were otherwise properly validated.  See NAACP v. Beecher,

307 F.Supp. at 521.

62.     It appears that from 1975 until 1993, a period of 18 years, the

Commonwealth continued to use an entry-level written examination that had

disparate impact, but ameliorated the effects of such examination by relying on

---

[18]     Exhibit 33Q shows the names of the newly certified candidates, and Exhibit 33H indicates their races.

[19]     McNeely testified that she did not know how many of the original 101 certified candidates from the April 11, 2006, list had signed up to continue in the hiring process.  (Vol. 6, pp. 120-21.)

the remedial hiring required by the consent decree in numerous so-called
Beecher communities.  See, for example, Mackin v. City of Boston, 969 F.2d
1273 (1st Cir. 1992); Quinn v. City of Boston, 325 F.3d 18 (2003).

63.    HRD's first attempt at coming up with an exam that had been
properly validated under EEOC standards occurred in 1992.  In that year, the
Commonwealth hired Landy/Jacobs to design an entry-level
examination/selection process that was job related under the Uniform Guidelines.
(See Exhibit 27; see also Exhibit 1, pp. 12-15.)  After studying the job of a
firefighter in Massachusetts, Landy/Jacobs concluded that 40% of the job
required good cognitive ability skills, and 60% required certain physical ability
skills.  (See Exhibit 27.)  Landy/Jacobs therefore recommended a selection
process that had both a scored cognitive ability test equaling 40% of the overall
score, and a scored physical abilities test equaling 60% of the score.  The two
results would be combined to create final rankings on the list.  Id.

64.    Significantly, Landy/Jacobs did not do its own validity study in
Massachusetts to supports its conclusions.  Rather, it performed only a
transportability study in order to justify transporting a study which it had done in
Columbus, Ohio, to support the results and recommendation it made for
Massachusetts.  (See Exhibit 27, pp. 9-12.)  In other words, to justify the validity
or job-relatedness of the 1992 Landy/Jacobs recommendations, Landy/Jacobs
utilized a study which it had performed in 1986, some 20 years ago.[20]  Indeed,

---

[20]    Significantly, the data from the Columbus study has never been produced.  (Deposition of
McNeely, Exhibit 24, pp. 24-28; see also request for production of documents, Exhibit 24, Tab 2.)
There is a several page summary report from Landy/Jacobs summarizing the results of the
Columbus study.  (See Exhibit 27.)

the Columbus data was actually generated from a 1976 study entitled "Job

Analysis of the Entry-Level Firefighter Position" (Exhibit 27, p. 1.) and more

importantly from a 1986 criterion validity study conducted of new Columbus

firefighters.  (Exhibit 27, p. 9.)[21]

65.    Landy/Jacobs utilized a so-called criterion validity study to measure

the validity of its Columbus examination.  In a criterion validity study, incumbents

in the job are asked to take the examination, and at the same time their

performance in the job is evaluated and measured.  A coefficient of correlation is

then calculated to determine whether a higher score on the examination

correlates with performance on the job.  As Dr. Landy explained, a perfect

correlation would be 1.0, and no correlation would be 0.  (Vol. 1, pp. 108-112.)

As Betty Dennis, Director of Testing for HRD, explained in her memo back in

1992, and as Dr. Landy testified, industrial psychologists like to see at least a

correlation of 0.3 to 0.4 to have real statistical significance.  (See Exhibit 24, Tab

6, p. 2; see also NAACP v. Beecher, 371 F.Supp. at 516 (". . . 3 would be the

minimum level to indicate a satisfactory relationship").)

66.    In their Columbus study, Landy and Jacobs performed their

criterion validity study by looking at both incumbent Columbus firefighters and

those who had just graduated from the City's fire academy.  They found a

statistically significant, but fairly low, correlation with the cognitive ability exam.

The overall coefficient of correlation was approximately 0.25; a correlation of 0.3

---

[21]    All that is available from the Columbus criterion validity study is a document at page 9 of
Exhibit 27 which is titled "Highlights of Criterion-Related Validity Data for the Columbus Firefighter
Written and Physical Examinations."

being the level that most experts agree is necessary for real validity.  (See Exhibit 27, p. 9; see NAACP v. Beecher, supra, at 516..)  All of the experts have described this as a fairly low correlation, yet one which is statistically significant. In order words, the cognitive ability test was found to only have a low correlation with job performance.  (Testimony of Landy, Vol. 1, pp. 64-68; testimony of Jacobs, Vol. 4, pp. 84-90.)

67.    In contrast, the physical abilities test was found to have a much more significant correlation to job performance – between 0.3 and 0.4.  (See Exhibit 27, p. 9; Exhibit 1, pp. 68-71.)  Indeed, this was one of the reasons that Landy/Jacobs believed that the physical agility test should comprise 60% of the total score.  Id.  Landy/Jacobs never validated the cognitive test alone as a selection device, and as Landy's testimony and report make clear, they would never have done so.  (See Exhibit 27, pp. 8-9.)

68.    Moreover, back in 1986 Landy/Jacobs did not even study the question of to what extent certain personality factors comprised the job of a firefighter, such as the ability to work as a team, the ability to obey commands, the ability to get along with others, etc.  (See Exhibit 27.)  In the 1980s, these questions were simply not asked.  As Dr. Landy stated, if when a job analysis questionnaire is being devised and distributed to incumbents, questions were not asked about personal behaviors necessary for the firefighter position, then such qualities will not be (and were not in HRD's case) listed among the important attributes for the job and, thus, will not be tested.  (See Exhibit 1, pp. 66-67.) Since HRD never did an updated job analysis asking these questions, it never

assessed the importance of these personality traits.  Yet, the thinking of industrial

psychologists has changed significantly on this issue since 1986.  Now, those

personality factors are regularly tested and made part of any entry-level

firefighter exam.  (Testimony of Wiesen, Vol. 5, pp. 17-22.)

69.    In their 1992 report, and in other memos and reports between HRD

and Landy/Jacobs in 1992, Landy/Jacobs recommended that HRD explore and

implement alternative job-related tests, particularly so-called personality or bio-

data tests into the selection process.  (See Exhibit 27, pp. 3-4.)  The reason for

this recommendation was three-fold.  First, by 1992, industrial psychologists had

recognized the validity of personality tests as having important predictive value

for the attributes needed to be a firefighter, such as teamwork, ability to get along

with others, etc.  (Testimony of Wiesen, Vol. 5, pp. 77-81.)  Second, personality

tests, unlike cognitive ability tests, had very little if any adverse impact.

(Testimony of Jacobs, Vol. 4, pp. 83-87.)  Third, the inclusion of personality tests

could enhance the validity of an examination, because cognitive ability and

physical ability tests simply did not test for these additional attributes necessary

to be a firefighter.  (Testimony of Wiesen, Vol. 5, pp. 76-82; testimony of Jacobs,

Vol. 4, pp. 81-90.)

70.    In 1992, HRD administered first the cognitive ability test and then

the physical abilities test, both as part of the weighted, graded scoring

mechanism.  (A further discussion of the physical abilities test will be contained in

the section on less discriminatory alternatives.)  Significantly, from 1992 on, the

Commonwealth never once attempted to perform any criterion validity study to

ascertain to what extent there was a correlation between the cognitive ability and physical abilities tests, and job performance. (Testimony of McNeely, Vol. 6, pp. 118-122, 143-146.) In fact, no validity testing was ever done after HRD administered the 1992 examination, even though, as pointed out in cross-examination of Ms. McNeely, this could have been done through a variety of methods, including utilizing the results of performance at the state fire academy (which is run by the Commonwealth),. (Vol. 6, pp. 119-123.)

71.    In addition, after HRD gave the 1992 examination, the Commonwealth, because it found the physical abilities tests inconvenient, simply eliminated the physical abilities test as part of the scored mechanism and decided to go solely with the cognitive test, even though Landy/Jacobs had never validated the cognitive ability test as a single hurdle hiring tool. (See Exhibit 35; testimony of Landy, Vol. 2, pp. 22-28.)

72.    In 1993, 1995, and 1998, the Commonwealth continued to purchase the Landy/Jacobs cognitive ability exam. Then, in 2000, 2002, and 2004, the Commonwealth stopped even utilizing the Landy/Jacobs cognitive ability exam and, instead, utilized its in-house staff to simulate the Landy/Jacobs format without utilizing many of the safeguards that Landy/Jacobs had requested. (Testimony of Landy, Vol. 2, pp. 22-27; deposition of McNeely, Exhibit 24, pp. 87-93.) For example, the test was never shown to outside psychologists to verify the appropriateness of the questions. (Testimony of McNeely, Vol. 6, pp. 141-144.)[22]

---

[22]    At times during the trial, HRD attempted to insinuate that work that Landy/Jacobs did for it in 1995 and 2002 (Landy/Jacobs was then SHL) somehow demonstrated the validity of the

73.    Dr. Jacobs admitted that when he had recently been retained by

Suffolk County, New York, to devise an entry-level test for police officers, he did

a very detailed validity study and found the coefficient of correlation for the

cognitive ability test to be extremely low.  (Vol. IV. pp. 90-91, 96-99.)  In an

affidavit filed in court in that case to sustain the exam in the face of a challenge

by white applicants who were arguing that the cognitive ability test had been

downplayed in order to create less adverse impact, Dr. Jacobs submitted an

affidavit.  In this affidavit he stated that "the results of [his] study indicated that

both the biographical and work style scales were extremely important for the

prediction of police officer performance."  Id. at 96.  Most importantly, Dr. Jacobs

states in his affidavit, "it was also found that cognitive abilities in the Suffolk

---

cognitive ability test.  Yet, in fact, no one testified regarding this matter.  Dr. Jacobs never testified that he had done an updated validity study, and neither did anyone from HRD.  Moreover, the reports in question (Exhibits 36 and 37) do not demonstrate such validity.  (Testimony of Wiesen, Vol. 5, pp. 97-100.)

At trial, the Commonwealth tried to suggest through witness Betty Dennis that it had done a further content study in 2002 when studying the new medical standards for the position of police officer and firefighter in the Commonwealth, that constituted an updated content validity study.  Of course, there is nothing to indicate that a real content validity study was done, simply that there was some evaluation of the knowledge, skills, and ability of a firefighter.  Perhaps more importantly, even that report states (Exhibit 38, p. 22) "in terms of results for specific abilities for both positions, the two cognitive abilities viewed as most important are oral comprehension and oral expression."  (Exhibit 38.)  Dr. Wiesen pointed out in his testimony that theses two most important cognitive abilities were never tested for in either the 2002 or 2004 exam.  Thus, a finding of validity cannot be made.  (Testimony of Wiesen, Vol. V, p. 99.)

Moreover, Dr. Wiesen testified persuasively that the 2002 medical standards update could not possibly constitute a validation study of any type.  While he acknowledged that the 2002 update identified tasks that were performed on the job and the knowledge and abilities that are required to perform those tasks:

The next part of a content validation study which is not here is a link between the areas that were identified as being necessary to perform the job and the content of the test.  So I don't see that link at all, there's no chapter or section that says: These are the important parts of the job that we've just identified. . . .

(Vol. V, pp. 98-99.)  For all of these reasons and many others, Dr. Wiesen testified that the 2002 and 2004 exam could not pass muster under any validation concept.  Id. at 98-103.

County study had only a small, non-significant relationship to job performance."

Id. at 98.  When asked what the relationship was, Dr. Jacobs said that the

coefficient of correlation was only 0.08.  Id. at 96-97.  Based upon the validity

study that he did, Dr. Jacobs had recommended, and Suffolk County had agreed

with his recommendation, to use the cognitive ability test comprising only 5% to

10% of the total score of the examination.  Id. at 97.  In other words, Dr. Jacobs

is on record as conceding that (1) a cognitive ability test has a relatively low

correlation with job performance; and (2) should be used sparingly or not at all as

a ranked instrument in a test selection process for entry-level police or

firefighter.[23]

74.     Indeed, in his expert witness report, Dr. Jacobs essentially

conceded the lack of validity to the 2002 and 2004 firefighter examination.  On

page five of his report (see Exhibit 26), Dr. Jacobs states:

> The test appears to be limited in its coverage of key areas found to
> be related to performance in many public safety positions including
> both police and firefighters the test has an exclusive focus on the
> assessment of cognitive abilities. . . .  Relying strictly on cognitive
> abilities assessment does run the risk of inflating group differences
> and limiting validity.  This, too, is consistent with data we have
> collected and data more widely circulated in the scientific journals.

(Exhibit 26.)

75.     Similarly, in his comprehensive report (Exhibit 1), Dr. Landy states

emphatically that the 2002 and 2004 firefighter examination has no demonstrated

---

[23]     Nearly all of the experts agreed that physical ability plays a far more important role in fire
work than police work for understandable reasons, since the main duty of firefighters is to rescue
and save while police officers have a more nuanced job involving a larger combination of
cognitive and personality traits.  Thus, it is hard to imagine that Dr. Jacobs could suggest that the
cognitive ability test has an extremely low correlation with being a good police officer, but a higher
correlation with being a firefighter.

validity and he lists multiple reasons why that is so, including (1) the failure to update the job analysis, which he finds conspicuous in light of the fact that the Commonwealth commissioned two additional job analyses for the firefighter position but for the purpose of establishing medical and fitness standards (Exhibit 1, p. 22); (2) the fact there was absolutely no quality control of the cognitive ability tests which HRD administered which although claiming to use the Landy/Jacobs "test plan," no evidence was provided regarding the analysis of adverse impact of test items, pilot testing, or linkage of studies linking new items and item groups to the constructs represented in the Landy/Jacobs test (Id. at 22); (3) the fact that no evidence was presented that a proper reading level analysis of HRD's newly devised items were ever done (Id. at 22); (4) the fact that the use of only a cognitive ability test which doesn't measure either oral comprehension or oral communication or personality qualities or physical abilities, means there was only a very narrow "sampling of the content domain of the job," and this significantly impairs validity. Id. at 66.[24] (5) the fact that no pilot testing was conducted to see whether or not the test actually measured firefighter performance (Id. at 76); (6) the fact that there was no documentation of any validity study and no data which an expert could study (Id. at 80); and (7) finally, the conclusion that the exam could not be valid as a rank order system because there was no evidence that a difference in score of up to ten points had any

---

[24]     In sum, Landy found that the firefighter test which fails to measure oral skills, physical ability, personality traits, only certain cognitive abilities, could not be "confidently construed in the same a score from a more comprehensive measure could be interpreted." Id. at 67.  See also Report at pp. 67-73.

meaningful way of distinguishing who would be the better firefighters. (Exhibit 1, pp. 64-65.)

D.    **Facts Relating to Utilization of Cognitive Ability Test As a Rank Order Scored Exam.**

76.    It is extremely important to distinguish between using a cognitive ability test (which neither party disputes is relevant to being a firefighter) as a pass/fail or banded system, as opposed to using a cognitive ability test as a rank-order system. Unlike almost all other major cities and towns in the country, HRD uses a cognitive ability test as a rank-order tool as the exclusive determinant of rank on the civil service list.

77.    Dr. Landy testified without contradiction, and indeed with support from Dr. Jacobs, that "test reliability" must be used to determine to what extent any test can have predictive value. Test reliability means that the test must be able to be replicated time and time again and have the same results.[25] Dr. Landy testified without contradiction, indeed with support from Dr. Jacobs, that the test reliability for the 1992 cognitive test was 0.92. (See Exhibit 1, pp. 61-74.) He testified that, in statistical terms, this means that within an 8 or 9 point spread (for example between 100 and 92), one's test score has no significant difference or predictive value between the spread. (Vol. 2, pp. 13-16.) Further, Dr. Landy opined in his 1992 report, and testified, that to the extent HRD utilized his examination by recreating – making up new exam questions – there is the very

---

[25]    Dr. Landy testified repeatedly on this subject. The concept of "test reliability" must be distinguished from the concept of validity. While validity tests the predictive value of an examination for job performance, test reliability only measures the ability to repeat the same results time and time again. In other words, test reliability simply measures whether if individuals are given a test time and time again, their test results would be the same.

real possibility that the exam in 2002 and 2004 had less reliability than the 1992 exam.  (Testimony of McNeely, Vol. 6, pp. 141-148.)  More importantly, Dr. Landy stated clearly in his report (see Exhibit 27, pp. 4-5) that to the extent that the administrators of the examination eliminated or double keyed[26] any questions so as to avoid adverse impact, the reliability of such exam is significantly lessened.  (See Landy/Jacobs report, Id.; Exhibits 10 and 12.)

78.    The Commonwealth admits to regularly (to use the Court's phrase) "gerry rigging" the exam so as to accomplish no adverse impact at the pass/fail score of 70.[27]  (Testimony of McNeely, Vol. 6, pp. 142-148.)  Thus, Exhibits 10 and 12 show conclusively that each year, a number of questions are either eliminated or double or triple keyed in order to lessen adverse impact.  Putting aside other questions as the appropriateness of such conduct, it is clear that when several questions are "gerry rigged" in this fashion, reliability, according to Dr. Landy, is thereby lessened.  (See Exhibit 27, pp. 4-5.)

79.    Back in 1992, Dr. Landy warned the Commonwealth that there were "certain threats to validity" and stated that these threats include "reduction of reliability through elimination of certain test items or test portions which have perceived or actual greater impact on protective classes.  He stated that if the

---

[26]    Double keying is a process used to lessen adverse impact in which a question that is found to have significant adverse impact is double or triple keyed to allow several answers to constitute the correct answer.  (Testimony of McNeely, pp. 142-146.)

[27]    This can be seen by an examination of Exhibit 10, the report on the 2002 exam.  On page 3, the Commonwealth conceded that it had made changes to eight of the 100 questions.  (Exhibit 10, p. 3.)  Similarly, in the 2004 examination (Exhibit 12), because two questions "were found to favor the non-protected group . . . all responses were subsequently credited as correct."  In addition, based upon "the four-fifths rule," two responses were coded correct for question 20 and all responses were credited correct for questions 83 and 97.  As stated herein, these unilateral changes by HRD damaged both the reliability and validity of the examination.

Commonwealth were to eliminate questions which it believed were "biased," it "can reduce the reliability of the test."  (Exhibit 27, p. 5.)  In addition, in 1992 he recommended that all of the test materials be reviewed by a psychologist with experience in factors which might present problems for bias, the use of a "reading analysis to ensure test questions did not artificially depend upon reading comprehension and speed," etc.  Id.

80.    Dr. Jacobs concedes that to his knowledge there was no validity study done of the 2002 or 2004 cognitive ability entry-level fire test in Massachusetts.  Further, Dr. Jacobs admitted on cross-examination in response to a question from the court that he did not believe it to constitute "good industrial psychologist practice" for a jurisdiction to rely on a transported validity study done over 15 years ago and that he would "not recommend" such a practice.  (Vol. IV, p. 94.)[28]

81.    Moreover, the Commonwealth failed to satisfy the requirements of the Uniform Guidelines by relying on the results of the 1992 job analysis to support its administration of the firefighter exams nearly 15 years after the analysis was conducted.[29]  The Uniform Guidelines state that a validated exam may be used only "until such time as it should reasonably be reviewed for currency."  29 C.F.R. § 1607.3(B).  In this regard, changes to the relevant labor

---

[28]    He also conceded that in Brunet v. City of Columbus, 58 F.3d 215 (6th Cir. 1995), the Sixth Circuit U.S. Court of Appeals had upheld the validity of a physical ability test against a challenge by female candidates.

[29]    Although the Commonwealth seeks to rely on the 1995 and 2002 job analyses to support its use of the outdated examinations, those analyses only revisited the issues of physical fitness and medical standards and did not completely assess the cognitive, psychological, and other factors that are an integral part of the job of firefighter.

market and to the job itself should be considered in determining when a validity study is outdated.  Id. § 1607.5(K).

82.     Accordingly, when one considers the facts that the 2002 and 2004 exam were not created by professional industrial psychologists, but were put together by in-house staff with no outside expert input, that several of the questions on each exam were changed to avoid adverse impact, and that the reliability of a cognitive ability test is itself 0.92, even under the best of circumstances, it is clear that the reliability of the 2002 and 2004 exam, utilized as a rank-order system, is seriously in question.  Indeed, there is no evidence, neither from Dr. Jacobs reports or testimony or from any other source, that the 2002 and 2004 tests meet any validity standard when used as a rank-order system (even if the test might have some minimal validity as a pass/fail mechanism).

**E.     Facts Relating to Alternative Selection Devices Available in 2002 and 2004.**

83.     Once the plaintiffs have demonstrated adverse impact, the defendants bear the burden of proving that the examination and resulting selection process meets the EEOC guidelines for validity.  As set forth above, the defendants cannot make this showing.  But even if they could, plaintiffs can still prevail if they can demonstrate that there were less discriminatory alternatives available to the Commonwealth that would have resulted in less disparate impact.  As described below, the plaintiffs have presented overwhelming evidence of less discriminatory alternatives with a lesser discriminatory impact.

84.    First, as described above, it is undeniable that fire fighting is a combination of three attributes: (1) cognitive ability, (2) certain personal qualities, and (3) physical ability.  With respect to rank ordering candidates for selection, the Commonwealth only tests for cognitive ability, while not testing at all for personality.  Physical ability is only tested after an offer of hired is made.[30]

85.    In his cross-examination, Dr. Jacobs admitted that the cognitive ability test standing alone had low correlation, "somewhere between 0.2 and 0.3." (Vol. IV, p. 80.)  However, he admitted that when the cognitive ability test is combined with a "work style" or "personality/bio data" instrument such as he uses one can improve that coefficient to well over 0.3.  Id. at 80.  Further, Dr. Jacobs agrees that physical ability comprises "50%" of a firefighter's job.  (Vol. IV, p. 81.)  Further, Dr. Jacobs readily agreed "the more different components one can add, the more valid the test."  He admitted that if one was using only cognitive ability, "it's just not as valid as one that adds personality and bio-data."  Id. at 83.

86.    The plaintiffs presented overwhelming evidence that reputable personality tests, with good coefficients of correlation and little adverse impact, have been readily available for the last ten years.  Indeed, the former Director of Testing for HRD, Betty Dennis, testified that such a test was used as the entry-level police exam back in the mid-1990s. (Vol. 5, pp. 19-21.)  Moreover, in 1992 the Commonwealth, along with Landy/Jacobs, was already exploring the use of personality tests.  (Exhibit 27, p. 3; testimony of Landy, Vol. 2, pp. 42-45.)  Most

---

[30]    Moreover, all of the experts agreed that personality tests have virtually no disparate impact whatsoever, and physical ability tests similarly have little or no disparate impact.  (See Exhibit 1, pp. 71-78.)  In addition, as described above, personality tests have good coefficients of correlation with predictions for future job performance, as do physical ability tests.  (Testimony of Jacobs, Vol. 4, pp. 76-82.)

importantly, Dr. Jacobs testified that for the last ten years, he has had an entry-level fire test of his own that has both a personality and bio-data component. (Vol. 5, pp. 77-80.)  Dr. Landy testified that he has studied the validity of such testing instruments and found that they have good coefficients of correlation to job performance and have little adverse impact.  (Vol. 5, pp. 80-89.)  He has had these tests available for a relatively low price for ten years.  Thus, it is beyond question that such personality and bio-data tests were readily available as a less discriminatory alternative to the Commonwealth by the time of the 2002 and 2004 exam.  Id.

87.     By 1992, the Commonwealth had what appeared to be a validated physical agilities test that directly simulated the actual duties of a firefighter, including stair climbs, simulation of dragging a body out of a building, and simulation of using an axe.  (Testimony of Chavanne, Vol. 5, pp. 13-16; see also Exhibits 35 and 36.)  Yet, it is undisputed that the Commonwealth decided to eliminate the physical agilities test as a scored and ranked part of the selection process after 1993.  (See Exhibit 35.)

88.     The Commonwealth has claimed that it eliminated the physical abilities test as a scored selection device because of many difficulties with its administration, including medical problems, delays, etc.  In fact, the Commonwealth's own evidence proved just the opposite.  Mark Chavanne, who ran the physical abilities test at the time, testified for HRD that initially they did have problems with the physical abilities test caused by lack of water at the test stations, lack of training and failure to monitor applicants, and other factors.  In

the summer of 1993, in the middle of administering the test, the tests were stopped for several months and a review panel was convened to go over the problems.  The panel made recommendations, and in the fall of 1993, the physical abilities tests were again administered and completed.  Chavanne testified that after the study committee had completed its work and the tests began again, few problems arose, and the test ran smoothly.  (Testimony of Chavanne, Vol. 5, pp. 17-23.)  Thus, the evidence in the record demonstrates that the physical abilities test eventually proved successful once the Commonwealth worked out the kinks.  Accordingly, there is no evidence on the record that adding a physical agility test as a scored, ranked component created an undue burden for the Commonwealth or was otherwise unfeasible.  Id. (Testimony of Landy, Vol. 2, pp. 41-43.)

89.     The Commonwealth has also asserted that the use of the physical abilities test as a scored, ranked component would be unfair to women.  This argument is ironic since the cognitive ability test is clearly unfair to minorities, yet the Commonwealth continues to use it as a scored, ranked item; in deference to concerns about women firefighters, the physical abilities test has been made pass/fail.  In any event, the evidence on this demonstrated several points.  First, regardless of whether a scored physical abilities test would have an adverse impact upon women, adverse impact currently exists anyway even using the physical ability test as a pass/fail test, since the number of female failures is over 50% while the number of male failures is between 10% and 13%.  (See Exhibit 35.)  Thus, the adverse impact already exists.  Second, it is undisputed that the

physical abilities component tests directly for attributes needed of a firefighter regardless of whether one is a man or a woman; the correlation is clear and much stronger than for the cognitive ability test.  (See Exhibit 27; testimony of Chavanne, pp. 13-16; see also Exhibit 36.)

90.    Third, Dr. Landy testified without contradiction that the Commonwealth could make up for the adverse impact upon women by conducting a pre-physical abilities test training for candidates wishing to enhance their physical abilities and score well on the test.  In other words, unlike the cognitive ability test, where one cannot know what the questions are until the test is given, it is perfectly permissible, and indeed is preferred, that candidates be given the specifics of the physical abilities test and that they practice.  (Vol. 3, pp. 75-78.)  Further, Dr. Landy testified without contradiction that, in many communities, he has worked with the employer to develop training programs for female applicants and that he has been able to significantly reduce adverse impact on the scored part of the physical agilities test by working with female candidates in a good training program.  (Vol. 3, pp. 75-78.)

F.    **The Alternative of Using The Cognitive Abilities Test as Pass/Fail.**

91.    As the plaintiffs here have made clear throughout this case, they are not asserting that the cognitive ability test should be eliminated (although this is one possibility), but rather that it would be more appropriately used as a pass/fail mechanism.  As demonstrated herein, such use is perfectly feasible and would not unduly impact the Commonwealth's ability to select qualified

candidates.  Indeed, such an approach might even enhance the ability to select qualified candidates.

92.    First, the defendants have practically conceded that utilizing the entry-level examination as a pass/fail mechanism creates no burden, since the Commonwealth, with the consent of the NAACP, has basically been taking this approach for 30 years in the Beecher communities.  (See Exhibits 10 and 12.) Specifically, since the mid- to late-1970s, after the written examination for firefighter has been administered, HRD has been setting the pass/fail cut-off score at 70 (using a variety of methods to do so) and has then deemed anyone receiving a passing score to be eligible for hire as a firefighter.  Under the Beecher decree, particularly in cities such as Springfield and Boston where the hiring was done on a one-for-one pairing (see Quinn v. City of Boston, supra), a municipality could hire a minority candidate whose score was in the 70s, although non-minorities were rarely hired with a score below 90.  (See Landy Report, Exhibit 1, pp. 31-38.)  Indeed, veterans are routinely hired with scores in the 70s.  (See Exhibit 33H.)  Significantly, the record fails to demonstrate in any way that firefighters hired with scores on the cognitive ability test in the 70s have had any difficulty being firefighters or that their job performance was impaired in any way.  In short, minorities and veterans have been hired as firefighters based upon their passing the cognitive ability test and have gone on to become successful firefighters.  There is no evidence to suggest that their performance has been in any way a problem.  Thus, when used as a pass/fail exam, the cognitive ability test seems to produce good firefighters.

93.    Thus, the record before this court indicates that the use of the cognitive ability test as a pass/fail mechanism is a reasonable alternative to using the cognitive test as a scored component, and, in fact, the Commonwealth has been using the cognitive ability test more or less as a pass/fail mechanism for minorities in <u>Beecher</u> communities and for veterans.[31]

94.    Thus, on this record, there exists persuasive evidence that there are a number of reasonable less discriminatory alternatives to the use of the cognitive ability test as a ranked, scored selection device, such as (1) using a personality test as a component; (2) using a bio-data test as a component; (3) using the physical agilities test as a graded, weighted component; and (4) using the cognitive ability test as a pass/fail device.

Respectfully submitted,

JACOB BRADLEY, NOAH BRADLEY, KEITH RIDLEY, and JARED THOMAS, individually and on behalf of a class of similarly situated individuals,

By their attorneys,


   /s/ Shannon Liss-Riordan
Harold L. Lichten, BBO # 549689
Shannon Liss-Riordan, BBO # 640716
Alfred Gordon, BBO # 630456
Pyle, Rome, Lichten, Ehrenberg &
   Liss-Riordan, P.C.
18 Tremont Street, Suite 500
Boston, MA 02108
Date:  June 1, 2006                    (617) 367-7200

---

[31]    However, as described *infra*, even for veterans, selection and ranking still occurs by exam score; therefore, lower scoring minority veterans are hired, if at all, much later than white veterans who generally score higher on the entry-level exam.

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served on the attorneys of record for each party by electronic notice on June 1, 2006.

   /s/ Shannon Liss-Riordan
Shannon Liss-Riordan, Esq.