# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| JACOB BRADLEY, NOAH BRADLEY, KEITH RIDLEY, and JARED THOMAS, individually and on behalf of a class of similarly situated individuals, | ) ) ) ) ) |  |
| Plaintiffs, | ) ) |  |
| v. | ) ) | Civil Action No. 05-10213-PBS |
| CITY OF LYNN; EDWARD J. CLANCY, JR., in his capacity as Mayor of the City of Lynn; the COMMONWEALTH OF MASSACHUSETTS, DIVISION OF HUMAN RESOURCES; and RUTH BRAMSON, in her capacity as Personnel Administrator of the Division of Human Resources of the Commonwealth of Massachusetts, | ) ) ) ) ) ) ) ) |  |
| Defendants, | ) ) |  |
| BOSTON SOCIETY OF THE VULCANS and NEW ENGLAND AREA CONFERENCE OF THE NAACP, | ) ) ) |  |
| Intervenors. | ) |  |

_____)

## PLAINTIFFS' POST-TRIAL MEMORANDUM/

## PROPOSED CONCLUSIONS OF LAW

Harold L. Lichten, BBO # 549689
Shannon Liss-Riordan, BBO # 640716
Alfred Gordon, BBO # 630456
Pyle, Rome, Lichten, Ehrenberg &
    Liss-Riordan, P.C.
18 Tremont Street, Suite 500
Boston, MA 02108
(617) 367-7200

Date:  June 1, 2006

## TABLE OF CONTENTS

Page No.

I.      Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .         3

II.     Legal Standard For Proving Disparate Impact Discrimination. . .         5

III.    Plaintiffs Have Overwhelmingly Satisfied Their Prima
        Facie Burden of Proving That HRD's 2002 And 2004
        Entry-Level Firefighter Examinations Had Adverse Impact
        Against Minorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .         6

IV.     HRD Has Utterly Failed to Carry Its Burden of Proof That
        The 2002 and 2004 Entry-Level Firefighter Examinations
        Were Valid. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        17

V.      The Evidence Demonstrates That an Equally Valid And
        Less Discriminatory Alternative Was Available To The
        Commonwealth. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        25

VI.     Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        30

I.    **INTRODUCTION.**

In 1974 the Commonwealth of Massachusetts was ordered by this Court to:

Cease using written firefighter entrance examinations of the type
administered in 1971 for . . . the selecting of firefighters.  Should the
Division of Civil Service desire to utilize entrance examinations in the
future . . .  such examinations shall be job-related and validated in
accordance with 29 C.F.R. §1607.1 et. seq. [The Uniform Guidelines]

NAACP v. Beecher, 371 F.Supp. 507, 521 (D. Mass. 1974).

Thirty years later, the Court's command has not been obeyed.  As the evidence

at trial proves conclusively, the written multiple choice so-called "cognitive ability" test

used by the Commonwealth in civil service communities has a severe disparate impact

on minority test takers.  Moreover, this severe disparity has resulted in significant

disparate impact as defined by the EEOC guidelines, both with respect to the selection

and consideration of minority candidates for hire as fire fighters.  Sadly, this disparity (or

adverse impact) has significantly increased with respect to the 2002 and 2004 fire

fighter examination as a result of the continued elimination of communities subject to

the preferential hiring requirements of the so-called Beecher Consent Decree.

The plaintiffs have demonstrated adverse impact under the EEOC's *Uniform*

*Guidelines on Employee Selection Procedures* ("Uniform Guidelines") in at least six

different ways, any one of which would be sufficient to trigger liability under Title VII.  As

set forth herein, not only has the disputed examination resulted in adverse impact in

both 2002 and 2004 in specific towns and cities in Massachusetts, it has also resulted in

significant disparate impact when aggregated statewide.  Further, even if only veterans

are considered, there has been significant disparate impact affecting selection rates

between majority and minority candidates.  Further, just looking at the Commonwealth's

largest city, Boston, there has been significant disparate impact in the hiring of minorities and non-minorities, attributable to the examination, as a result of the 2004 examination. Moreover, even with recent hiring which will take the City of Boston beyond veterans, there is huge disparate impact with respect to the non-veteran candidates who will be reached for consideration. Indeed, even HRD's own expert, Dr. Jacobs, has conceded disparate impact in the City of Boston in 2004, calling such disparate impact "unfortunate." Indeed, Dr. Jacobs conceded that there has been disparate impact in Boston with respect to the veteran hires that took place both in June of 2005 and January of 2006, and he agreed that when a minority veteran fire fighter candidate failed to be hired as a result of their examination score, that delay could constitute disparate impact under Title VII.[1]

Since the plaintiffs have demonstrated adverse impact in the selection procedures for 2002 and 2004, they must prevail on liability because the defendant has not even attempted to prove, through expert testimony, that the 2002 and 2004 examination met the validity standards required by the Uniform Guidelines on employee selection, nor could they based upon the facts in this case. However, even if somehow HRD could prove that the 2002 and 2004 examinations were valid under the strict Uniform Guidelines, still the plaintiffs would prevail because all of the experts, and particularly HRD's expert, Rick Jacobs, have persuasively demonstrated that there were less discriminatory alternative methods for selecting capable fire fighters that would have had significantly less adverse impact. Moreover, even if HRD could prove that the

---

[1]      Even if, as the Commonwealth has suggested, one determines disparate impact not from selections (because the Commonwealth argues selections at the local level is subject to too many variables), but only by resort to those actually reached for consideration through so-called "certification lists," still plaintiffs have demonstrated overwhelming disparate impact.

cognitive ability test has validity as a pass/fail mechanism, it has utterly failed to

demonstrate, nor refute, plaintiffs' evidence that the test has no validity as a strict rank

order system, where one or two point differences can be outcome determinative.

Although intent is not an issue in a disparate impact case, the fact is that the

Commonwealth has been aware of the huge adverse impact caused by its multiple

choice cognitive ability examination for well more than 20 years, and until this lawsuit,

did nothing to address the situation.  Indeed, as more and more communities got out of

the Beecher Decree, HRD sat back while the problem got worse and worse and the

disparate impact of the examination became more profound.  Even as HRD, in order to

comply with a new pension reform act, revised its medical and physical fitness

standards for entry-level fire fighters and police, it did nothing to address the cognitive

ability multiple choice exam, which serves as the sole rank order test for both vets and

non-vets.  For all of these reasons, the Court must rule in plaintiffs' favor.

## II.    LEGAL STANDARD FOR PROVING DISPARATE IMPACT DISCRIMINATION

A.    The plaintiffs have brought this class action as a disparate impact claim.

A disparate impact claim arises when an employer's otherwise neutral policy has a

"significantly disproportionate impact" on a protected class.  See 42 U.S.C. §2000(e)-

2(k)(1)(A)(i); see also Albemarle Paper Company v. Moody, 422 U.S. 405 (1975).

Disparate impact claims do not require proof of intent to discriminate.  Munoz v. Orr,

200 F.3d 291 (5th Cir. 2000).

B.    In challenging an entrance examination such as the plaintiffs are

challenging in this case, a plaintiff can establish a prima facie case of disparate impact

by showing "that the tests in question select applicants for hire . . . in a racial pattern significantly different from that of the pool of applicants." Albemarle, 422 U.S. at 425.

C.      Once the plaintiffs make out a prima facie case of disparate impact with respect to an entry-level hiring examination, the defendant is required "to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity." See 42 U.S.C. §2000(e)-2(k)(1)(A); see also Lanning v. SEPTA, 181 F.3d 478, 485 (3d Cir. 1999).

D.      Finally, even if the employer can show that the examination utilized is "job related and consistent with business necessity," the plaintiffs can still prevail by demonstrating "the availability of alternative practices to achieve the same business ends with less racial impact." See generally Frazier v. Independent School District, 980 F.2d 1514, 1524 (5th Cir. 1993); Albemarle, 422 U.S. at 425; see also 42 U.S.C. §2000(e)-2(k)(1)(A)(ii). The alternatives must be able to achieve the same business purpose, though they need not be the same type of tests as those challenged. Id.

III.    **PLAINTIFFS HAVE OVERWHELMINGLY SATISFIED THEIR PRIMA FACIE BURDEN OF PROVING THAT HRD'S 2002 AND 2004 ENTRY-LEVEL FIREFIGHTER EXAMINATIONS HAD ADVERSE IMPACT AGAINST MINORITIES**

E.      At trial, the plaintiffs provided overwhelming proof that HRD's 2002 and 2004 entry-level firefighter hiring exams had an adverse impact on minority candidates. Practically every possible way the data could be analyzed showed adverse impact.

F.      Looking at scores alone, the exams had severe adverse impact at the effective cutoff scores, which for most municipalities is in the 90s, if not high 90s, for non-veterans. The exams also had statistically significant, although more moderate,

adverse impact against Black candidates even at the nominal passing score of 70. See Plaintiffs' Post-Trial Proposed Findings of Fact ("Facts"), at 7-9.

G.      Even though the evidence plainly demonstrates that minority firefighter candidates suffered adverse impact in the actual selection of candidates for hire, the plaintiffs could establish liability in this matter merely by demonstrating the adverse impact of the examination scores. In a landmark case involving discriminatory selection criteria, the U.S. Supreme Court rejected the so-called "bottom line" defense, in which an employer defended a discriminatory selection criterion by adducing evidence that the net result – i.e., the bottom line – was a racially balanced workforce. Connecticut v. Teal, 457 U.S. 440 (1982). The Court held: "The suggestion that disparate impact should be measured only at the bottom line ignores the fact that Title VII guarantees these individual respondents the *opportunity* to compete equally with white workers on the basis of job-related criteria." Id. at 451.

H.      In adopting and construing the Supreme Court's rationale in Teal, the First Circuit held that in such cases, "[t]he Court's focus must be on the first step in the employment process that produces an adverse impact on a group protected by Title VII, not the end result of the employment process as a whole." Costa v. Markey, 706 F.2d 1, 5 (1st Cir. 1983). See also Donahue v. City of Boston, 304 F.3d 110, 119 (1st Cir. 2002) (reaffirming that the relevant injury in adverse impact cases is the "inability to compete on an equal footing.")[2]

---

[2]      In addition, given the widespread knowledge that one must score very high on the exam in order to be hired, it is clear that many minorities likely self-select themselves out of the hiring process by not even taking the exam. The Supreme Court has recognized that discrimination affects those who have been deterred from applying for a job as well as those who have actually been rejected. In International Brotherhood of Teamsters v. United States, 431 U.S. 324, 365 (1977), the Court explained:

I.      In any event, it is clear that, as predicted by all the experts, HRD's 2002 and 2004 entry level firefighter exams showed adverse impact in the actual hiring data as well.  Although HRD first attempted to argue that the adverse impact was the result of the veteran preference rather than the exam, the hiring data showed significant adverse impact both with respect to overall hiring and when veteran status was held constant.  Specifically, in those municipalities which reached past veterans in their hiring, the data showed adverse impact against minority non-veterans.  *See* Facts, at 11-13.  Likewise, in those municipalities that reached only veterans, there was adverse impact against minority veterans.  *See* Facts, at 13-14.

J.      Thus, although the veteran preference may contribute to adverse impact, it does not even come close to accounting for all the adverse impact in hiring.  That adverse impact can only be explained by virtue of the prominence of the rank-ordered written cognitive ability exam used as the first hurdle in the selection process.  When a selection mechanism such as an examination leads to "bunching" of minority candidates at the bottom of a selection list, not only does the bunching itself lead to a cognizable claim of adverse action, see Waisome, 948 F.2d at 1378, but strict rank-order hiring off of that list will necessarily lead to loss of selection opportunities for minority candidates at the bottom of the list, or at the very least, the potential for delay in opportunities for selection.  Indeed, because strict rank-order hiring can exacerbate the problems

---

If an employer should announce his policy of discrimination by a sign reading "Whites Only" on the hiring-office door, his victims would not be limited to the few who ignored the sign and subjected themselves to personal rebuffs.  The same message can be communicated to potential applicants more subtly but just as clearly by an employer's actual practices by his consistent discriminatory treatment of actual applicants, by the manner in which he publicizes vacancies, his recruitment techniques, his responses to casual or tentative inquiries, and even by the racial or ethnic composition of that part of his work force from which he has discriminatorily excluded members of minority groups.

associated with a discriminatory examination, the Uniform Guidelines require that selection procedures be validated for use as a rank-ordering system. 29 C.F.R. § 1607.14(B)(6).[3]

K.    During the course of the trial, after the plaintiffs had defeated HRD's argument that the veteran preference was responsible for the clear adverse impact in the hiring data, HRD attempted to suggest that other factors as well were responsible for adverse impact in hiring such that it was not possible to tell what the actual effect was of the exam itself.  In particular, HRD claimed through its expert, Dr. Jacobs, that minorities "drop out," or are screened out, of the hiring process at a greater rate than whites and thus this difference accounts for the differential hiring rates for minorities and whites.  However, a review of the actual data presented in this case, both for Boston and statewide hiring, show that there is no real difference between the "drop out" rates for minorities and whites.  The difference from the Boston 2004 hiring is not statistically significant, and statewide (excluding Boston) whites actually drop out at a higher rate than minorities; combining Boston with the rest of the statewide data for 2004 shows practically identical drop-out rates for minorities and whites.[4]  Thus, this factor is a wash

---

[3]    Moreover, the problems associated with strict rank-order selection procedures have been recognized in cases at every level.  See, e.g., U.S. v. Paradise, 480 U.S. 149, 160 (1987) (considering government's concern that rank-ordered promotion decisions would result in adverse impact against black candidates); Cotter, 323 F.3d 160; Kirkland v. N.Y.S. Dept. of Correctional Serv., 711 F.2d 1117, 1133 (2d Cir. 1983) (accepting zone-banding approach to "eliminate[] the central cause of the adverse impact, i.e., the rank-ordering system, while assuring appointments on the basis of merit."); Brunet v. City of Columbus, 1 F.3d 390, 412 (6th Cir. 1995) (remanding case to district court to explore alternatives to rank-order hiring that would adversely impact female firefighter candidates).

[4]    Dr. Landy has performed this data analysis and explained it in a supplemental affidavit filed yesterday with the Court.  HRD has moved to strike this affidavit, and plaintiffs will respond to that motion shortly.  However, it should be noted that this analysis can be performed by the Court directly from the data in evidence, specifically Exhibits 20 and 33H, and Dr. Landy's affidavit is simply offered to provide assistance in that analysis.  His affidavit also confirms that his analysis of the "drop out" rate data from Massachusetts is consistent with the scientific literature on this topic, which has found there to be generally no differences between whites and minorities in "drop out" rates.

and does not in any way undermine the plaintiffs' overwhelming proof that the exam is responsible for adverse impact in hiring.

L.     Essentially, HRD attempted to undermine the plaintiffs' clearly having established their prima facie case of demonstrating adverse impact by claiming that they had not conducted a multiple regression analysis to account for exactly what proportion of the adverse impact in firefighter hiring is caused by the exam. However, HRD misconstrues the plaintiffs' burden. The plaintiffs do not have to prove that the exam is the sole factor responsible for adverse impact in firefighter hiring. If they can demonstrate that the exam caused *any* adverse impact, they have satisfied their prima facie burden. Neither the courts nor the EEOC require a multiple-regression analysis in the construct of adverse impact employment challenges. Allen v. Seidman, 881 F.2d 375 (7th Cir. 1989). As Judge Posner explained in Allen, plaintiffs in this context are not required to perform such an analysis, because under Wards Cove Packing Co., Inc. v. Atonio, 490 U.S. 642 (1989), "[a]ll the plaintiff is required to present is enough evidence to warrant a finding that, *more likely than not*, the challenged test, criterion, or practice has a disparate impact." Allen, 881 F.2d at 380 (emphasis added). In this case, as in Allen, the racial disparity in test results is very large, so a "simple statistical comparison will support a finding that the test had a disparate impact." Id. See also EEOC v. Joint Apprenticeship Committee, 164 F.3d 89, 95 (2nd Cir. 1998) ("Because statistical analysis, by its very nature, can never scientifically prove discrimination, a disparate impact plaintiff need not prove causation to a scientific degree of certainty.").[5]

---

[5]     Clearly, and inescapably, the plaintiffs have demonstrated that the exam itself is responsible for massive adverse impact. The exam alone is the only way to explain why such a high rate of minority non-veterans (compared to whites) have not been appointed to firefighter positions in municipalities that hired non-veterans; the exam alone is the only way to explain why such a high rate of minority veterans

M.     While HRD has admitted that there is adverse impact in hiring (which it unsuccessfully attempted to explain away, first through the veteran preference and then through the "drop out" rate analysis), HRD has also, contradictorily, come up with two creative, yet unavailing ways, to claim that there is actually no discernable adverse impact in firefighter hiring.  First, HRD has argued that the adverse impact is not statistically significant when evaluated municipality by municipality.  Second, HRD has suggested that perhaps, miraculously, in Boston, the one municipality with large enough hiring numbers to show statistical significance by itself, when hiring is complete from the 2004 list there will be no adverse impact.  Neither of these contentions undermines the plaintiffs' clear showing of adverse impact in this case.

N.     First, with respect to HRD's argument regarding statistical signficance, the EEOC Uniform Guidelines and the case law are clear that proving adverse impact does not require a showing of statistical significance.  Although such a showing can be helpful to an analysis, the courts and EEOC have recognized that sample sizes are not always large enough to show statistical signficance, and employers cannot escape findings of adverse impact based simply on a lack of statistical signficance.[6]  As the Supreme Court has recognized, statistics "come in infinite variety and . . . their usefulness depends on all of the surrounding facts and circumstances."  Int'l Bhd. of

---

(compared to whites) have not been appointed to firefighter positions in municipalities that have hired only veterans; and the exam alone explains why Jacob Bradley has not been hired as a firefighter in the City of Lynn.

[6]     Courts "cannot permit an employer to escape liability for discriminatory tactics merely because his work force is not vast enough to provide meaningful data for a sophisticated statistical evaluation."  Bunch v. Bullard, 795 F.2d 384, 395 (5th Cir. 1986).  Rather, courts can use their general powers of observation to find adverse impact based on observed disparities and "decisive pattern[s] emerging from a history of experiences."  Rivera v. City of Wichita Falls, 665 F.2d 531, 536 (5th Cir. 1982), abrogated on other grounds by Patterson v. McLean Credit Union, 491 U.S. 164 (1989).

Teamsters v. U.S., 431 U.S. 324, 340 (1977).  Therefore, "courts generally appear to have judged the 'significance' or 'substantiality' of numerical disputes on a case-by-case basis."  Watson v. Fort Worth Bank and Trust, 487 U.S. 977, 995-96 n.3 (1988). "Courts should take a 'case-by-case approach' in judging the significance or substantiality of disparities, one that considers not only statistics but also all the surrounding facts and circumstances."  Waisome v. Port Auth. of N.Y. & N.J., 948 F.2d 1370 (2d Cir. 1991).[7]

     O.     When the data are not large enough to show statistical significance, other factors are considered, such as an analysis of reasonable aggregation of data, impact of the test over time, and the EEOC 80% rule.[8]  All of these factors demonstrate massive adverse impact of the exam.[9]

     P.     In fact, the EEOC created the 80% rule of thumb precisely as another way of considering adverse impact, since data do not always allow for statistical significance

---

[7]     The First Circuit has emphasized that "in a case involving a claim that a screening test for admission to employment imposes a disparate and adverse impact on blacks, the initial inquiry must be whether there is a discrepancy in the rate of passage as between whites and blacks.  If so, an *intuitive judicial judgment* must next be made whether the discrepancy is substantial."  Fudge v. City of Providence Fire Dep't, 766 F.2d 650, 657 (1st Cir. 1985) (emphasis added).

[8]     The EEOC's Uniform Guidelines state that "[a] selection rate for any race, sex, or ethnic group which is less than four-fifths (4/5) (or eighty percent) of the rate for the group with the highest rate will generally be regarded by the Federal enforcement agencies as evidence of adverse impact."  29 C.F.R. § 1607.4(D).  However, the four-fifths rule proves only a "rule of thumb" to assist courts in determining whether an employment practice has a disparate impact and is not the only statistical model or even the only factors a court may consider in making a determination of adverse impact.  See, e.g., Watson v. Forth Worth Bank and Trust, 487 U.S. 977-995-996 n. 3 (1988) (recognizing that courts judge these types of numerical disputes on a "case-by-case basis.").

[9]     The EEOC's Uniform Guidelines recognize that statistical evidence regarding selection procedures might suffer from "numbers which are too small to be reliable" as evidence of adverse impact.  29 C.F.R. § 1607.4(D).  In those circumstances, the Uniform Guidelines suggest looking at the impact of the selection procedure over a longer period of time and/or looking at the impact of the same selection procedure as applied in the same manner in other locations.  Id.  In this way, the sample size can be increased and a more reliable measure of adverse impact may be obtained.  See Bouman v. Pitchess, 1985 WL 9428 (C.D. Cal. 1985), citing Uniform Guidelines, 29 C.F.R. § 1607.4(D).

testing.  Here, the plaintiffs have shown 80% rule violations every possible way the data

can be analyzed (test scores, non-veteran hiring municipality by muncipality and in the

aggregate, veteran hiring, Lynn hiring, and Boston hiring.).  Wherever the data have

been large enough to conduct statistical significance testing, the plaintiffs have shown

that the adverse impact is statistically significant (test scores, veteran hiring, Boston

hiring).

      Q.    HRD argues that in the plaintiffs' analysis of statewide hiring outside of

Boston, the plaintiffs should not have been permitted to aggregate the data.  It argues

that the proper analysis would consider each municipality separately.[10]  Thus, under

HRD's scenario, statistical significance of adverse impact outside of Boston could not

be measured because the data are too small.  HRD would also have the court apply the

EEOC "small numbers" rule to each municipality separately and conclude that there is

no adverse impact because if one additional minority were hired in each municipality it

would change the analysis for each municipality.  This proposed analysis entirely

undermines the purpose behind the "small numbers" rule, which is merely an

---

[10]     Not only would HRD have the Court ignore the consistency and the statistical significance of the statewide data and consider each municipality independently, but HRD's expert, Dr. Jacobs, also presented a far-fetched explanation as to why the aggregate data could be seen as not having adverse impact.  Through his so-called "roll-up" analysis, which has no basis in established statistical practices in his field nor in the EEOC guidelines or caselaw, he essentially determined the adverse impact of each municipality separately (including Beecher communities, for which the exam obviously does not create adverse impact in hiring since those communities must hire minorities in set ratios) and then "standardized" the results before aggregating them, so that small communities would be given the same weight as larger communities.  By doing this, he ignored that this method would magnify the random variations that are more likely from smaller data sets and significantly downplay the greater, more significant adverse impact from larger communities, thus attempting to minimize the real adverse impact the exam has created.  Dr. Landy and Dr. Wiesen thoroughly discredited this analysis as an attempt to ignore, or avoid, the facts in this case.  *See* Exhibit 33R (Landy report); Vol. 5, at 105-07 (Wiesen testimony).  Dr. Jacobs' own "shortfall" analysis, which is also not based on any established psychometric principles from the field of industrial pyschology, itself admits that there has been adverse impact in hiring, although Dr. Landy and Dr. Wiesen explained why Dr. Jacobs' "shortfall" analysis understates the adverse impact.  *See id.*

enforcement guideline for the EEOC to determine whether or not it will bring an enforcement action in a case where there are not big enough numbers to test for statistical significance.

R.    Here, however, the numbers are not too small because the Court can look to other evidence outside of each individual municipality -- specifically, the Court can look to the hiring data statewide.  Because the same exam is used across the state, this is not a case where the parties are limited to only a small sample.  The plaintiffs are aware of no cases in which the small numbers rule has been applied in order to find a lack of adverse impact, where such aggregate data are available.[11]

S.    In fact, this is exactly the type of case in which data should be aggregated. The plaintiffs have challenged a component of the firefighter selection system, namely the cognitive ability written exam, and that is an exam that is used statewise.  As noted above, the EEOC Uniform Guidelines recommend aggregation of data as a potential solution for small sample sizes affecting the statistical significance of adverse impact analyses.  In a similar line of cases involving a challenge to the statewide firefighter hiring system in New Jersey, the Court rejected a challenge the state defendants raised to the plaintiff's having aggregated test results across the state and across different tests.  Vulcan Pioneers, Inc. v. N.J. Dept. of Civil Service, 625 F. Supp. 527 (D.N.J. 1985) (emphasis added), affirmed 832 F.2d 811 (3d Cir. 1987).  In an earlier decision in the same case, the court had noted that such an approach was suggested by the

---

[11]    Moreover, HRD's scenario that one should consider an additional minority hire in *every* municipality in order to determine whether it would change the adverse impact analysis is beyond the bounds of reality because it is clear that hiring based on this exam will never lead to this many additional minorities being hired.  (In other words, the small numbers rule attempts to eliminate the possibility that adverse impact will be found based upon a chance outcome of the hiring decision, and so it adjusts the outcome by one hire in order to determine if chance could just as easily pushed the analysis the other way; here, there is no conceivable possibility that just by chance, *every* muncipality would, with this written cognitive ability rank-ordered first hurdle exam have hired an additional minority.)

Uniform Guidelines and had been taken by a number of different courts in a number of different ways, stating:

> [T]he cases, as well as the regulations . . . indicate that problems of statistically insignificant samples may be overcome by aggregating test results **over several administrations of a single examination**, *see, e.g., Chicano Police Officer Association v. Stover,* 526 F.2d 431, 438-49 and nn. 6, 8 (10th Cir. 1975), *remanded*, 426 U.S. 944 [96 S.Ct. 3161, 49 L.Ed.2d 1181] (1976), **on a state-wide basis**, *see, e.g., Kirkland v. New York State Department of Correctional Services,* 520 F.2d 420, 425 (2d Cir.1975), **based upon their preparation or utilization by a single employer**, *see, e.g., Ezell v. Mobile Housing Board,* 709 F.2d 1376, 1382 (11th Cir.1983), **or even upon the type of examination used**, *see, e.g., Boston Chapter N.A.A.C.P. v. Beecher,* 504 F.2d 1017, 1021 (1st Cir.1974), *cert. denied*, 421 U.S. 910, [95 S.Ct. 1561, 43 L.Ed.2d 775] (1975) . . . .

See Vulcan Pioneers, Inc., 625 F. Supp. at 544.   The court ultimately concluded that aggregation was appropriate even though there were different tests scored slightly differently, particularly since the tests resulted from the same job analysis, were of the "paper-and-pencil variety," were prepared for in the same way, and were used by the same employer, the New Jersey Department of Civil Service.  Id. at 544-545.[12]

T.     Next, with respect to the Boston hiring from the 2004 exam, HRD claims that it is impossible to know with any certainty whether, when all the hiring is done, there will be adverse impact.  First, the plaintiffs have shown that in the first two rounds of hiring from this exam (in June 2005 and January 2006), there was adverse impact against minority veterans on the Boston list.  This delay alone constitutes adverse impact.[13]  Nothing in the jurisprudence of employment discrimination limits the definition

---

[12]     Dr. Jacobs advocated for the statewide aggregation of data in a case involving the Pennsylvania Liquor Control Board where a statewide exam was challenged.  (*See* Testimony of Jacobs, Vol. 4, at 114-15).

[13]     Indeed, Dr. Jacobs himself admitted that candidates who experienced delay in hiring suffered some harm.  (*See* Testimony of Jacobs, Vol. 4, p. 124).  Moreover, as shown with what has happened with the Lynn list from the 2004 exam, a delay in hiring can very well mean that a candidate loses the

of adverse impact to those who never get hired or promoted.  The definition of adverse

impact in the EEOC Uniform Guidelines is much broader, encompassing any selection

rate that "works to the disadvantage" of minority candidates, 29 C.F.R. § 1607.16(B),

and such disadvantage plainly exists due to delays in selection for hire or promotion

caused by discriminatory selection processes.  See, e.g., Guinyard v. City of New York,

800 F.Supp. 1083 (E.D.N.Y. 1992) (finding adverse impact caused by delay in

promotions of minority candidates to police captain); Allen v. Isaac, 1986 WL 618 (N.D.

Ill. Jan. 3, 1986) (finding that the promotion of enough minority candidates over a four-

year period to avoid the four-fifths rule did not remove the adverse impact caused by the

delay in ultimately promoting the minority candidates), vacated on other grounds by

Allen v. Seidman, 881 F.2d 375 (7th Cir. 1989).  For example, some individuals may

choose to abandon their attempts at appointment or promotion because of the delay,

and an "illegal delay in promotion may still result in lost wages, benefits, and other types

of injuries." Guinyard, 800 F.Supp. at 1088-1089.[14]

    U.    In addition, it is clear that wherever the final hiring occurs on the 2004

Boston list, there will be adverse impact.  If Boston does not exhaust its veterans on the

list, then it will have not reached a clump of minority veterans at the bottom of the

veteran list.  (Indeed, five out of the seven veterans at the bottom of the veteran list who

---

opportunity to be hired.  Because newly minted veterans returning from military duty will be inserted onto the hiring lists ahead of non-veterans, a candidate who was previously at the top of the list for the next round of hiring can find himself bumped down.  Although Jacob Bradley was next on the list to be reached after hiring that occurred in Lynn in 2005, he has now been bumped down to twentieth on the list. *See* Facts, at 14-16.

[14]    In the Waisome case, the Court found that while there was no racial disparity in the overall exam pass rate for candidates for police sergeant, the representation of minority candidates was "disproportionately low at the top of the list and high at the bottom."  948 F.2d at 1378.  In so holding, the Court recognized the bedrock principle from Teal that discrimination can be present in each step of the promotion process.  Id.  The bunching of candidates at the bottom of an appointment or promotional list, particularly in a single-criterion selection system, will necessarily lead to a delay in selection and the resulting loss of wages, benefits, and promotion opportunities.

were not certified on the April 11, 2006, certification list were minorities.)  If Boston reaches into the non-veteran portion of the list, it will get no lower than candidates who scored 97 on the exam.  Only 3 of 46 veterans that were certified on the April 21, 2006, supplemental certification were minorities.  Given that, as Dr. Landy has shown, "drop out" rates are similar for minorities and whites, it is therefore evident that there will be adverse impact in hiring in Boston from the 2004 list.

V.      If there is not overall adverse impact in hiring from the 2004 Boston list, it would only be because by some very statistically improbable chance, in this particular hiring, Boston reached exactly the bottom of its veteran list, so that all adverse impact would be attributable to veteran status.  Such a chance occurrence would not undermine the fact that the exam has been shown to create adverse impact in so many different ways – in scores alone, in hiring throughout Massachusetts, and in delays in hiring.

## IV.    HRD HAS UTTERLY FAILED TO CARRY ITS BURDEN OF PROOF THAT THE 2002 AND 2004 ENTRANCE LEVEL FIRE FIGHTER EXAMINATIONS WERE VALID.

W.      If an employment practice or selection device has adverse impact on a protected class as provided in 42 U.S.C. §2000e-2(k)(1)(A)(i), the burden of proof shifts to the employer to prove that the test or selection device was "job related for the position in question" and "consistent with business necessity."  See 42 U.S.C. §2000e-2(k)(1)(A)(i).  If the employer can make this demonstration, better known as "validity," the burden shifts back to plaintiffs to prove that a similarly valid and less discriminatory alternative to the challenged practice was available but not employed.  42 U.S.C. §2000e-2(k)(1)(A)(ii).  See generally Lewis v. City of Chicago, 2005 W.L. 693618 (N.D.

Ill. 2005); Griggs v. Duke Power Company, 401 U.S. 424 (1971); Bew v. City of

Chicago, 252 F.3d 891, 894 (7th Cir. 2001); Lanning v. SEPTA, 181 F.3d 478, 485 (3rd

Cir. 1999); Pipa v. City of East Providence, 492 F.Supp. 1240, 1246-47 (D. R.I. 1980);

Guardians Association v. Civil Service Commission, 630 F.2d 79, 101 (2nd Cir. 1980).

  X. Where, as here, an employer seeks to use a test or examination as a

scored ranking device, the employer faces an added hurdle.  It is not enough to prove

that the selection device "bares a demonstrable relationship to successful performance

of the jobs for which it was used."  Griggs, 401 U.S. 531; Bew, 252 F.3d 891, 894 (7th

Cir. 2001).  The employer must also show whether differences in scores "properly

discriminate between those who can and cannot perform the job well."  Bew, supra, at

895; see also Allen v. City of Chicago, 2002 U.S. Dist. LEXIS 18973 at fn. 10 (N.D. Ill.

2002); Lewis v. City of Chicago, 2005 WL 693618 (N.D. Ill. 2005) ("even assuming that

the 1995 (Chicago fire test) reliably measured the skills it is supposed to measure . . .

the City failed to prove that the test results could be used to predict fire fighter

performance, i.e. those who scored 89 or higher on the 1995 test were more qualified

for the job than those who scored between 65 and 89").  See also 29 CFR §1607.5,

1607.14; Vanguard Justice Society v. Hughes, supra, 592 F.Supp. 245, 267 (D. Md.

1984).

  Y. The plaintiffs stress that demonstrating validity pursuant to the Uniform

Guidelines, 29 CFR §1607.5, requires technical expert proof and not anecdotal

testimony by lay witnesses.  See, e.g., Zottola v. City of Oakland, 2002 WL 463695 (9th

Cir. 2002) (because the plaintiff's proffered witness was not an expert witness, she

could not testify about the validity of the fire fighter examination).  The Court of Appeals

stressed, as do all other courts, that:

> The question whether a test has been validated properly is primarily a
> factual question which depends on underlying factual determinations
> regarding the content and reliability of the validation studies that a
> defendant utilized.  Association of Mexican American Educators v.
> California, 231 F.3d 572, 585 (9th Cir. 2000) (en banc).  In cases that
> involve a scored test, as this case does, we "require that the test be job-
> related – that is, that it actually measures skills, knowledge or ability
> required for successful performance of the job [cites omitted].
> Demonstrating job-relatedness is a three-step process:  The employer
> must first specify the particular trait or characteristic which the selection
> device is being used to identify or measure.  The employer must then
> determine that the particular trait or characteristic is an important element
> of work behavior.  Finally, the employer must demonstrate by professional
> acceptable methods that the selection device is predictive of or
> significantly correlated with the element of work behavior identified in the
> second step.  (Cites omitted.)

Zottola v. City of Oakland, supra, 32 Fed.Appx. at 311-312.

      Z.      To prove job-relatedness and business necessity, an employer may only

use one of three types of studies to validate an employee selection procedure:  Content,

construct, or criterion-related validity studies.  See 29 CFR §1607.5(A); see also Isabel

v. City of Memphis, 404 F.3d 404, 413 (6th Cir. 2005).

      AA.      In assessing any professional validation study, particularly one that seeks

to validate a test as a ranked instrument, the court will give close scrutiny to selection

procedures which, although properly validated, have a low coefficient of correlation, and

where such test relates to only one of the many job duties or aspects of job

performance involved.  See United States of America v. State of Delaware, 2004 WL

609331 (D. Del. 2004).[15]  Thus, the Uniform Guidelines specifically provide:

> Reliance upon a selection procedure which is significantly related to a
> criterion measure but which is based upon a study involving a large
> number of subjects and has a low correlation coefficient will be subject to
> close review if it has a large adverse impact.  Sole reliance upon a single
> selection instrument which is related to only one of many job duties or
> aspects of job performance will also be subject to close review.

29 CFR §1607.14.

BB.    Thus, in holding that the Delaware State Police examination had not been

properly validated, the court was guided by the fact that certain aspects of the cognitive

ability test, while having large adverse impact, had relatively "low correlations."  Id.

Similarly, in Vulcan Pioneers, Inc. v. New Jersey Department of Civil Service, 832 F.2d

811 (1987), the Third Circuit affirmed a district court finding that the State of New

Jersey's statewide promotion exams for fire officers was in violation of a prior consent

decree requiring those examinations to be "consistent with the uniformed guidelines on

employee selection procedures . . . and other professionally accepted standards."  832

F.2d at 813.  The Third Circuit affirmed that the selection procedure which consisted of

a written test which counted for 80% of the overall score and was used as a rank order

selection device did not meet validity standards.[16]

---

[15]    The plaintiffs recommend the Court read the extensive findings of fact and conclusions of law
recently made by Judge Jordan in this Delaware case.  The case cited above is a 54-page decision solely
on the question of validity of the Delaware State Police examination.  In a prior decision, the Court had
previously held that the test had adverse impact.  Id.

[16]    There, the state attempted to justify its test as being "content valid."  The state hired an
independent consultant who, after studying the exam, found that it met content validity standards.  The
district court disagreed, finding that the tests in question "were not appropriate for ranking candidates."
Id. at 815.  The court further found numerous shortcomings in the methodology used to support the
validity study.  Like in the current case, where the Beecher decree is still applicable, the Third Circuit did
not have to address the issue of adverse impact on minority candidates because the state defendants
were "obligated under the specific language of the consent decree to develop a selection procedure that
is job related."  Id. at fn.4.

CC.     The starting point for why the 2002 and 2004 entry-level fire fighter

examination administered by HRD is not valid starts with an analysis of Boston Chapter,

NAACP v. Beecher, 504 F.2d 1017 (1st Cir. 1974), affirming Boston Chapter, NAACP v.

Beecher, 371 F.Supp. 507 (D. Ma. 1974).  The First Circuit affirmed the district court's

decision that the entry-level fire fighter examination given at that time had not been

shown to "demonstrably select people who will perform better the required on-the-job

behaviors after they have been hired and trained."  Id. at 1021-1022.  In affirming the

district court's decision that the Commonwealth's entry-level fire fighter test was not

valid, the court agreed that:

> Too many doubts persist concerning the validity of this test, the format of
> which has persisted for years to make a convincing case for its unaltered
> use in fire departments notable for the absence of minority employees.
> Although perfect tests are goals as illusory as perfect schools . . . the
> evidence justifies compelling defendants to attempt to fashion a more
> sensitive test, one that will not needlessly serve as a built-in head wind to
> competent minority members depriving both them and the Commonwealth
> of an opportunity for which they are qualified.

Id. at 1022.

DD.     The court noted that the tests had not been professionally developed and

that the civil service examiner who wrote the latest versions was "without professional

training in employment or psychological testing, and did not consult anyone who had

such training." Id. at 1023.

EE.     In the district court, in Judge Freedman's thoughtful decision, he, too, was

faced with competing expert opinions about the validity of the examination.  Curiously,

---

Most importantly, the Third Circuit, quoting the Uniform Guidelines, also found that to be properly job-related and consistent with business necessity "the work behavior selected for measurement should be critical work behaviors and/or important work behaviors constituting most of the job." Id. at 815. Accord, Ensley Branch of the NAACP v. Seibels, 616 F.2d 812, 816 (5th Cir. 1980), cert. denied 449 U.S. 1061 (1980) (while a test may have some validity, it may still be insufficient to justify the manner in which the test is utilized by the City).  See also Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1117-1119 (11th Cir. 1993) (employers must present convincing expert testimony of business necessity of examination).

in <u>Beecher</u>, the Commonwealth attempted to do a criterion-related validity study which actually found that several components of a fire fighter's job correlated with the test scores. However, both Judge Freedman and, ultimately, the First Circuit rejected the validity of the exam. Significantly, Judge Freedman recognized that both sides' experts in the case "<u>agreed that as a rule of thumb a coefficient of 0.3 would be the minimum level to indicate a satisfactory relationship [between job performance and test score] a lower coefficient would not be practically significant and would not justify use of the test</u>." 371 F.Supp. at 516.

FF.    Ultimately, Judge Freedman issued an injunction ordering that:

The Massachusetts Division of Civil Service shall cease using written fire fighter entrance examinations of the type administered by the Division of Civil Service in August 1971. . . .  Should the Division desire to utilize entrance examinations in the future for the purpose of selecting fire fighters, such examinations shall be demonstrably job related and validated in accordance with the guidelines on employee selection procedures issued by the EEOC, 29 CFR §1607.1 <u>et</u>. <u>seq</u>. or otherwise shown to have no discriminatory impact. If the parties disagree as to whether a written examination has been shown to be valid within the meaning of the guidelines, the question of their validity and job relatedness shall be resolved by the court. . . .

371 F.Supp. at 521.

GG.    In this case, HRD has failed to even attempt to demonstrate that the 2002 and 2004 entrance level written fire fighter examination meets EEOC validity standards, when used as a scored rank-ordering device. First, as plaintiffs' previous motion in limine indicates, when the parties first exchange expert witness reports specifying what issues each side's experts would cover, the Commonwealth's expert, Dr. Jacobs, did not even pretend to defend the validity of the 2002 and 2004 examination. (See Exhibit 26.) Moreover, his failure to opine on the validity of the 2002 and 2004 examination is

understandable, since by that time Dr. Jacobs would never have recommended the use of an exam that only tested for cognitive ability.  (Testimony of Jacobs, Vol. 3, pp. 76-85; see also Exhibit 26, pp. 5-7.)  Indeed, in his several hours of testimony, Dr. Jacobs touched only briefly on the question of the validity of the 2002 and 2004 exam, never stating unequivocally that he believed that the examination met validity standards through one professionally accepted validity study.  (Testimony of Jacobs, Vol. 4, pp. 40-45.)

HH.    Moreover, even though the Commonwealth bore the burden of proof on this issue, it has never produced any study, data, or analysis of data demonstrating that the 2002 and 2004 entry-level fire fighter examination has been demonstrated to have content or criterion validity.  Indeed, the Commonwealth readily admits that it has never done a criterion validity study of the 2002 and 2004 examination and, indeed, the only study that it can point to is the one from Dr. Landy in 1992.  (See Exhibit 27.)[17]

II.    As described in Plaintiffs' Proposed Findings of Facts, HRD's feeble attempts to argue that the 2002 and 2004 examinations had been validated (for instance, by claiming it could rely on the transportability study from 1992, or that a validation study was conducted in 1995 or 2002) fail miserably.  See Facts, at 19-26.

JJ.    Though the Uniform Guidelines provide no specific time frame in which a new validity study must be performed, Dr. Landy testified without contradiction that such studies should be performed every five or six years.  This testimony is consistent with

---

[17]    HRD, despite being requested to do so, has never provided the underlying documentation or data to support the validity of its 2002 and 2004 exam.  It was requested to do so (see Exhibit 24, Attachments 1 and 2), but has never produced them.  Thus, there is nothing before this Court to support the validity of the examination, other than the summary report by Dr. Landy from 1992 which consists of conclusions and runs only 12 pages.  (See Exhibit 27.)  Thus, unlike literally every other case relating to validity, in this case the Commonwealth proffered no expert to demonstrate the test's validity and no underlying data to supports its analysis.

the decisions of courts that have addressed the issue of the currency of validation studies.  See Rudder v. District of Columbia, 890 F. Supp. 23, 41-42 (D.D.C. 1995) (finding 4-year-old study for firefighters acceptable when officials determined the job had not changed significantly); Hearn v. City of Jackson, 340 F. Supp. 2d 728, 738-739 (S.D. Miss. 2003) (finding 5-year-old study for police sergeants acceptable when officials determined the job had not changed significantly); Fickling v. N.Y.S. Dept. of Civil Service, 909 F. Supp. 185,191-192 (S.D.N.Y. 1995) (questioning the currency of a 15-year-old analysis for welfare eligibility examiners); see also Allen v. City of Mobile, 466 F.2d 122, 128 (5th Cir. 1972) (Goldberg, C.J., dissenting) (questioning the City's reliance on a 13-year-old job analysis for police sergeant).  The Commonwealth's own expert was in agreement on this point, admitting that it would not comport with professional principles to rely on a 15-year-old validation study and that he would not recommend such reliance.  (Vol. 4, p. 93.)

KK.     Moreover, there is overwhelming evidence that the manner in which the Commonwealth administered the 2002 and 2004 cognitive ability test, as the sole test device, was done in a way precluding the Commonwealth from demonstrating validity. This results from a myriad of failures by the Commonwealth to safeguard the integrity of the examination or to follow the advice of its own experts.  See Facts, at 19-26.

LL.     Also, as the cases cited above make clear, where a test instrument only tests for one component of a job, in this case cognitive ability, and given that cognitive ability at most accounts for one-third of the job, the other two being personality factors and physical ability, and given the dual problems of both reliability and validity, this test is not valid.  United States v. State of Delaware, supra; Lewis v. City of Chicago, supra.

Even if the exam met validity standards for use as a pass/fail system, it cannot pass muster as a rank order system.  See Facts, at 27-31.[18]

MM.    As the cases cites above make clear, validity is a technical concept that requires expert testimony, not lay testimony.  It cannot be assumed and it cannot be based upon a defendant's argument that it tried to do the right thing, or attempted to construct an exam that had validity.  Rather, it must be proved and it is the employer's burden of proof.  Here, HRD has failed in that proof miserably.

## V.    THE EVIDENCE DEMONSTRATES THAT AN EQUALLY VALID AND LESS DISCRIMINATORY ALTERNATIVE WAS AVAILABLE TO THE COMMONWEALTH.

NN.    HRD did not carry its burden of demonstrating that the 2004 firefighter entrance examination was "job related and consistent with business necessity," 42 U.S.C. § 2000e-2(k)(1)(A)(i).  Accordingly, the significantly disparate impact of the examination alone compels a finding in favor of the plaintiffs under Title VII.  However, even if HRD had successfully justified the disparate impact of the examination by a showing of business necessity, the plaintiffs must still prevail given the overwhelming evidence of the availability of equally valid and less discriminatory alternatives.

---

[18]    "If a test does not really predict meaningful differences in performance among those who pass, it can be unlawful to place the candidates in rank order because this usually aggravates the adverse impact of the test." Houston Chapter of the Int'l Ass'n of Black Professional Firefighters v. City of Houston, No. H-86-3553, 1991 WL 340296, at *39 (S.D. Tex. May 3, 1991).  Use of a test for ranking purposes "is justified only if there is evidence showing that those with a higher test score do better on the job than those with a lower test score."  Ensley Branch of NAACP v. Seibels, 616 F.2d 812, 822 (5th Cir.); see also Guardians Ass'n of New York City Police Dep't v. Civil Service Comm'n, 630 F.2d 79, 103 (2nd Cir. 1980) ("If test scores produce disparate racial results, an employer who wants to use rank-ordering of the scores for hiring decisions faces a substantial task in demonstrating that rank-ordering is sufficiently justified to be used."); Fire-fighters Institute v. City of St. Louis, 616 F.2d 350, 357 (8th Cir. 1980) ("Because these test results were used to rank candidates, St. Louis must prove that the results are associated with different levels of job performance.").

In fact, the EEOC's Uniform Guidelines require specific evidence to justify rank-ordering.  29 C.F.R. § 1607.5(G) ("Evidence which may be sufficient to support the use of a selection procedure on a pass/fail (screening) basis may be insufficient to support the use of the same procedure on a ranking basis under these guidelines. Thus, if a user decides to use a selection procedure on a ranking basis, and that method of use has a greater adverse impact than use on an appropriate pass/fail basis, the user should have sufficient evidence of validity and utility to support the use on a ranking basis.").

OO.    It is no exaggeration to say that almost any alternative would be less discriminatory than a rank order, cognitive ability only test, as HRD used for the entry-level firefighter examination in 2004 and prior years.[19]

PP.    In his initial report, Dr. Landy described many feasible alternative selection strategies that were available to HRD that would have either maintained or increased job relatedness of the selection process while reducing adverse impact.  (*See* Exhibit 1, pp. 71-74.)

QQ.    In addition, the evidence at trial demonstrates at least three alternatives to a rank order, cognitive ability only test.  There are surely others as well.[20]

RR.    A first such alternative would have been to use a random selection of applicants who passed the exam, instead of selecting in rank-order based upon exam score.  (Vol. 2, pp.18-19, 40 (testimony of Dr. Landy suggesting that a less discriminatory alternative would be to use the cognitive ability test as a pass-fail mechanism).)  See, e.g., Lewis v. City of Chicago, No. 98 C 5596, 2005 WL 693618, at *14-15 (Mar. 22, 2005 N.D. Ill.) (finding that "an equally valid and less discriminatory

---

[19]    Even HRD's expert agrees that such a test is essentially destined to lead to adverse impact.  As his own report states: "Relying strictly on cognitive abilities assessment does run the risk of inflating group differences and limiting validity."  (Ex. 26.  *See also* Tr. 4:79-80 (testimony of Dr. Jacobs acknowledging that the literature and his own work demonstrate that a rank-order cognitive abilities test will have adverse impact, and that the firefighter entry exam has "large group differences" and that the adverse impact numbers are "big"); 4:100 (testimony of Dr. Jacobs admitting that any jurisdiction that uses only a written cognitive ability test is "likely to have adverse impact"); 4:110 (testimony of Dr. Jacobs agreeing that adverse impact is "built in" to the hiring system in Massachusetts); 2:13-14 (testimony of Dr. Landy that the firefighter entry exam "does not have validity to be used as a rank order device").)  At best, the cognitive ability test has a meager correlation to firefighter job performance, roughly 0.2.  Equally significant, the cognitive ability test does not measure a host of qualities that are indisputably critical to the actual work a firefighter performs.  (Tr. 2:15 (testimony of Dr. Landy that the cognitive ability test "does not measure an awful lot of important things that are required for successful performance as a firefighter, including physical abilities and personality").)

[20]    Significantly, in determining that other feasible less discriminatory alternatives exist for establishing liability under Title VII, the Court is not required to rule at the stage as to what the proper remedy would be for this case.  If the Court finds that it is even necessary to reach this step of the analysis, it is sufficient merely that such an alternative does exist, and the question of remedy should be addressed separately.

alternative" available to the City of Chicago for firefighter hiring was a random selection policy among candidates who passed the exam).  Since the passing score of 70 is, not coincidentally, the same point at which there is no adverse impact under EEOC guidelines (Vol. 6, pp. 144-45 (testimony of Ms. McNeely explaining that she "suspect[s]" the Commonwealth "play[s] with the numbers to get to 70")), a random selection process would surely have been less discriminatory.

SS.     Random selection also would have been no less effective at achieving the goal of selecting competent firefighters.  Indeed, the Commonwealth acknowledges that any applicant who passed the exam by receiving a score higher than 70 possesses the necessary cognitive ability to perform the job of firefighter.  However, the Commonwealth presented absolutely no evidence to suggest that higher passing scores on the exam are more predictive of success as a firefighter than lower passing scores.  To the contrary, the experts agreed that the test had a large margin of error – approximately one standard deviation -- and therefore there is no psychometric basis (*i.e.*, a basis rooted in cognitive analysis) for distinguishing between candidates in a band of eight points.  (Testimony of Landy, Vol. 2, pp. 15-16; see also Vol. 4, p. 8 (testimony of Dr. Jacobs saying that Dr. Landy was "about right" that scores within an eight-point spread "really had no statistical significance").)  In other words, for example, a score of 100 is statistically no different from a score of 92.  (*Id.*)  Furthermore, the Commonwealth did not and could not present any evidence that candidates in the highest possible "band" of scores (*i.e.*, the highest set of scores with psychometric significance) were better qualified than candidates who passed with lower scores.  The historical evidence would appear to the contrary.  For decades, the cities and towns in

the Commonwealth have hired veterans who scored in the 70s and 80s on the exam.
(Vol. 2, p. 14 (testimony of Dr. Landy noting that "there are veterans appointed who
have scores in the low 70s, down to 70"); Vol. 6, pp. 106-07 (testimony of Ms. McNeely
that firefighter candidates with scores as low as 72 have been hired).)  The
Commonwealth's most recent certification list to the City of Boston shows that more
than fifty veterans who scored in the 70s and 80s on the 2004 exam will be offered
firefighter positions, subject to their passing a physical agility test, medical examination,
and background investigation.  (See Exhibit 33H.)  There is no evidence to suggest that
veterans hired in the past notwithstanding they scored in the 70s and 80s are any less
competent as firefighters than those who were hired based upon higher scores on the
same exam.

TT.    A second such alternative would have been either to use a banding
approach, whereby scores of similar statistical significance are treated as the same.
(Testimony of Landy, Vol. 2, pp. 18-19, 40 (testimony of Dr. Landy suggesting that the
cognitive ability test could be used as part of a banding approach); testimony of Jacobs,
Vol. 4, p. 125 (testimony of Dr. Jacobs that banding "would reduce the adverse impact
from what it is now to a much better level").)

UU.    A third such alternative would have been to use a physical abilities and/or
a personality test in combination with the cognitive abilities test.  See Zamlen v. City of
Cleveland, 906 F.2d 209 (6th Cir. 1990) (recognizing physical abilities test as a valid
means to test firefighter skills, even against challenges that test discriminates against
women).  The experts agree that these tests are critical predictors of firefighter job
performance, and their use would be likely to reduce the adverse impact of a cognitive-

skills-only exam.  (Testimony of Landy, Vol. 2, pp. 42-43 (testimony of Dr. Landy that

the adverse impact of the combination of tests would be less than using the cognitive

ability test alone as a rank order device); testimony of Jacobs, Vol. 4, p. 81 (testimony of

Dr. Jacobs that use of biodata and work styles would "substantially diminish" the

adverse impact from a cognitive abilities only test); testimony of Jacobs, Vol. 4, p. 96

(testimony of Dr. Jacobs agreeing that biographical and work style scales are

"extremely important" predictors of firefighter performance).)

VV.    The Commonwealth made no attempt to demonstrate any lack of

feasibility of a personality test.  And the Commonwealth's attempt to demonstrate the

lack of feasibility of the physical ability test in fact proved the opposite.  While the first

administration of the physical performance test in 1993 apparently suffered from design

flaws that led a small number of candidates to suffer medical injury (Vol. 6, pp. 17-19),

the Commonwealth immediately thereafter convened a panel of experts who concluded,

in the words of Marc Chavanne (who served in 1993 as HRD's Deputy Director of

Selection and Validation), "that the testing could resume with additional safeguards

relating to making water more accessible on the course, tightening the medical

screening, screening out candidates who had blood pressure over a certain level or a

heart rate over a certain level."  (Vol. 6, p. 20.)  With those reforms, there were no

incidents of medical problem.  In fact, in response to this Court's question, Mr.

Chavanne characterized the reforms as an unqualified "success."

## VI.    <u>CONCLUSION</u>

For the reasons explained here and in Plaintiffs' Post-Trial Proposed Findings of

Fact, the plaintiffs are entitled to judgment in their favor because (1) they have satisfied

their burden to make out a *prima facie* case that HRD's 2002 and 2004 entry-level firefighter exams had an adverse impact on minority candidates; (2) HRD has failed to meet its burden to prove that the exam and selection process meets validation guidelines as required by Title VII, caselaw (including this Court's ruling in <u>Beecher</u>), and the EEOC Uniform Guidelines; and (3) even if HRD could establish that the exam and selection process were somehow validated, the plaintiffs have demonstrated the existence of less discriminatory alternatives that have significantly less adverse impact.

Therefore, for these reasons and all the reasons stated herein, the Court must find HRD liable for discrimination on the basis of disparate impact under Title VII and <u>Beecher</u>.  The parties should then be ordered to next address the issue of remedy.

Respectfully submitted,

JACOB BRADLEY, NOAH BRADLEY, KEITH RIDLEY, and JARED THOMAS, individually and on behalf of a class of similarly situated individuals,

By their attorneys,

<u>   /s/ Shannon Liss-Riordan               </u>
Harold L. Lichten, BBO # 549689
Shannon Liss-Riordan, BBO # 640716
Alfred Gordon, BBO # 630456
Pyle, Rome, Lichten, Ehrenberg &
        Liss-Riordan, P.C.
18 Tremont Street, Suite 500
Boston, MA 02108
Date:     June 1, 2006          (617) 367-7200

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served on the attorneys of record for each party by electronic notice on June 1 2006.

<u>   /s/ Shannon Liss-Riordan            </u>
Shannon Liss-Riordan