**RESPONSE TO THE REPORT OF DR. FRANK LANDY OF MAY 31, 2006**

Rick R. Jacobs
EB Jacobs, LLC

**DROP OUT RATES: BOSTON**

**<u>Accuracy of Drop Out Rates</u>**

Dr. Landy concludes that because my computed drop out rates are different from his, my rates must be wrong. Mistakes do happen as Dr. Landy proved when he testified on April 13, 2006 that the Boston 2004 drop out rates were approximately 30% for minorities and 35% for non-minorities. Not only did Dr. Landy have the percentages wrong but he also got it backwards in testifying that minorities dropped out at a <u>lower</u> rate than non-minorities.

Dr. Landy is again incorrect in stating that I have made a mistake in my calculations. My rates are correct and the difference between my rates and his rates is due to the fact that I obtained race information from HRD for the four candidates appearing on exhibit 33-H who had no designation for race (Dr. Landy mistakenly says there are three). I did not, as Dr. Landy assumes, treat all four as minorities. I treated them according to the race information I obtained. Of these four candidates, one is Black, Nathalie F Delsoin (page 2, disabled veteran, drop out) and three are White including Patrick Hayden (page 1, disabled veteran, hire), Sean Connolly (page 1, disabled veteran, drop out) and Chris Perachi (page 3, veteran, hire). The correct and precise percentage of minority drop outs in Boston in 2004 is 58.8%, not 53%, when these four individuals are correctly included. It should also be noted that the entry at the second to last position on page 3, Matthew Vaitiskis, was not included in my calculation (contrary to another assumption by Dr. Landy), as he is designated as Indian, not part of the minority class in this litigation.

1

In reviewing Exhibit 33-H I found that there were a total of 17 minority group members (Black or Hispanic) on the list at or above the score of 84 which is the lowest score for a hired non-disabled, veteran candidate. The list included 4 Black and 3 Hispanic candidates who accepted the job and 8 Black and 2 Hispanic candidates who were not hired (drop outs). The following list is submitted to clarify my calculations:

| *Hired* | *Dropped Out* |
|---|---|
| Robert Anderson (B) | Kade Edwards (B) |
| Enrique Mehia (H) | David Moore (B) |
| Jonathan Hernandez (H) | Mariano Ramirez (H) |
| Scott Denson (B) | Nathalie Delsoin (B) |
| Shawn Hardiman (H) | James Holder (B) |
| Mark Williams (B) | Shakir Baaqee (B) |
| David Wade (B) | Bilal Shariff (B) |
|  | Eric Jacobs (H) |
|  | Marcquis Johnson (B) |
|  | Chiquita Foster (B) |

**Statistical Test**

Dr. Landy in his response conducted a Chi-Square test to examine the statistical significance of the relationship between race and the drop out rate in Boston in 2004. He found that the relationship was not significant whether he used his drop out rates (i.e., 41% and 53%) or ours (i.e., 41% and 58%). His significance calculations are accurate but the problem is that his analysis is both unnecessary and off the point.

A statistical significance test is used whenever we need to generalize from a sample to a population. For example such a test is used when we have a correlation between test performance and job performance (i.e., validity coefficient) determined on a single sample of candidates and we want to generalize how that correlation applies to the broader population of candidates, those beyond the validation sample. In that situation a statistical significance test is completely appropriate. However, when we have the entire population in our study, as is the case with the 2004 Boston applicants,

2

a statistical significance test is not needed. In the hiring of firefighters in Boston, the difference in drop out rates for Blacks versus Whites tells us directly about a factor that is influencing the job outcomes; no statistical test is needed.

**DROP OUT RATES:  OTHER THAN BOSTON**

Although we did not compute the drop out rates exactly the same way for jurisdictions other than Boston, I accept the direction of the difference in the minority and non-minority drop out rates.  More specifically, I accept that in jurisdictions other than Boston, the percentage of minority drop outs is less than the percentage of non-minority drop outs.  This point argues against aggregating the results of all of the jurisdictions together.  Obviously the different jurisdictions have different properties and need to be considered separately before aggregation.  The variation from jurisdiction to jurisdiction is yet another example of the complexity of the hiring process across the Commonwealth, one that cannot be easily described by a single value which ignores these differences.

**SCIENTIFIC LITERATURE RELATED TO DIFFERENTIAL DROP OUT RATES**

Dr. Landy cites scientific literature related to two issues:  1) the degree of differential drop out rates, and 2) the reasons for minority/non-minority differential drop out rates.  We will not argue the accuracy of Dr. Landy's descriptions of the research but rather their relevance.  First, the levels found in the literature have no relevance to the issue here.  The fact is that in Boston in 2004 there was a differential drop out rate where minorities were 43% more likely to drop out than non-minorities.  This is an observed fact not subject to interpretation based on the findings in other samples at other times in the research literature.  As such we are completely appropriate in adjusting its impact on the observed adverse impact ratio in Boston in 2004.

Second, Dr. Landy argues that minorities are more likely to drop out because they are waiting longer on the list due to their lower test scores. This is a plausible hypothetical argument but in light of actual data in Boston in 2004 it is not true. Examination of Exhibit 33-H quickly reveals that 2 minority group members who dropped out of the process appear at positions 2 (Kade Edwards) and 3 (David Moore). Four additional minority candidates who also dropped out of the process are found at positions 36, 50, 55, and 56, all easily reached within the first two hiring periods. Seven of the 17 minority candidates appear above the midpoint of the list of those considered for the job during the first two hiring periods. What this means is that minorities did not wait longer to be considered. What is also true is that only 1 of these top scoring 7 minorities (Robert Anderson, position 83) became a firefighter. Being at the top of the list does not have a major impact on dropping out of the process as Dr. Landy indicates. Thus, factors other than delay account for the higher minority drop out rate, contrary to Dr. Landy's assertion.

Third, Dr. Landy argues that the research indicates that "even when the drop out rate was varied to make the drop out rates of minority applicants considerably higher than that of their white counterparts, adverse impact as a result of the written test scores was still largely driven by test scores." That may well be true in the data for the Pennsylvania State Police from 1988 to 2000, but it is not true in the 2004 Boston data. With reference to those data, as I previously outlined in my report from May 19, 2006, Exhibit 33-S, and is undisputed by Dr. Landy, I stated:

"Returning to the Boston example, we used the drop out rate cited above to adjust the results of the first two waves of hiring in Boston (classes of 6/13/2005 and 1/30/2006). Overall there were 7 minority and 95 non-minority firefighters hired in Boston while we calculated a total of 17 minority and 161 non-minority candidates on the certification list at or above the score corresponding to the lowest scoring candidate hired. All 178 candidates, according to the hiring rules, would have been eligible for the job at the point of the process following the test. If the minority drop out rate had simply matched that of the non-minority drop out rate, we would have had 3 more

4

minority hires (i.e., 17 x .41 = 6.97 drop outs instead of the observed 10 drop outs). That simple change would have resulted in near parity of minority and non-minority hiring with an adverse impact ratio from 99.7% (minority rate = 10/17=58.8% and non-minority rate = 95/161=59.0%). The excessive drop out rate for minorities results in a corresponding figure of 67.0%."

This is a real adjustment on real data directly relevant to this case, not a data set used in a research paper which is at best indirectly relevant here. Apparently Dr. Landy would rather focus on data other than the data most directly relevant to this case since hypothetical arguments based on such data can be made to support his positions while the directly relevant data affords him no such comfort.

Finally, with respect to the literature cited, it should be clear that the study by Ryan, Sacco, McFarland & Kriska as well as the study by Tam, Murphy and Lyall are different from the current case in a very important way. Our drop out rates of 58% and 41% are very different from those reported in each study. In the Ryan, et al paper the minority drop out rate was set at 6.1% and white drop out rate at 9.4%. In the Tam et al study those rates were 18.5% and 13%, respectively. In Boston we are seeing drop out rates 3 to 9 times as high as those in the cited literature. It is difficult to argue for relevance with these very large differences in the critical measure of interest.

**CONCLUSION**

    I continue to see a strong impact of the drop out rate on the key consideration in this case, that of obtaining a job as a firefighter. As the data from Exhibit 33-H show, drop out rates explain the difference in hiring rates for the individuals appearing on the certification list. These differences in drop out rates are the result of actual data, not irrelevant statistical tests of significance or articles describing what happened in other jurisdictions where drop out rates were substantially lower. Our data are clear, directly applicable, and calculated properly.

_____

Rick Jacobs, PhD
President & CEO EB Jacobs

14 June 2006