## PYLE, ROME, LICHTEN, EHRENBERG & LISS-RIORDAN, P.C.
Attorneys at Law
18 Tremont Street, Suite 500
Boston, MA 02108

Telephone (617) 367-7200
Fax (617) 367-4820

Warren H. Pyle
David B. Rome
Harold L. Lichten*
Betsy Ehrenberg
Shannon Liss-Riordan**
Terence E. Coles
Katherine D. Shea
Alfred Gordon

Nicole Horberg Decter**
Rebecca G. Pontikes
Leah M. Barrault
Hillary Schwab**

*Also admitted in Maine
**Also admitted in New York

Tod A. Cochran
Of COUNSEL

June 23, 2006

**BY ELECTRONIC FILING**
The Honorable Patti B. Saris
United States District Court
One Courthouse Way
Boston, MA 02210

RE: <u>Jacob Bradley et al. v. City of Lynn et al.</u>
U.S. District Court, Civil Action No. 05-CV-10213-PBS

Dear Judge Saris:

At the closing argument on June 9, 2006, you suggested that the parties consider bringing the experts back for further clarification of their respective positions and differences on the issue of "drop-out" rates. I am writing to expand further upon the plaintiffs' answer as to why incurring that expense is not necessary.

First, the plaintiffs wish to note that HRD has now appeared to place almost all of its eggs in one basket: that basket being its claim that differential "drop-out" rates in hiring off of the Boston 2004 firefighter list proves that the civil service examination does not have adverse impact. Although the plaintiffs disagree heartily with that claim (as described further below), they wish to emphasize to the Court that this analysis is only one out of the myriad that the plaintiffs have conducted (as listed at the closing argument). Also, although HRD seems to be suggesting that the plaintiffs bear the burden of proving adverse impact "beyond a reasonable doubt," the standard is clearly that the plaintiffs prevail on establishing adverse impact if they show merely that it is "more likely than not" (the usual "preponderance of the evidence" standard that applies to parties that bear the burden in a civil case) that the exam had adverse impact in

**PYLE, ROME, LICHTEN, EHRENBERG & LISS-RIORDAN, P.C.**

some way on minority candidates. See Allen v. Seidman, 881 F.2d 375, 380 (7th Cir. 1989) (citing Wards Cove Packing Co., Inc. v. Atonio, 490 U.S. 642 (1989)).

Although late in the trial HRD began to focus on "drop-out" rates on the Boston 2004 list as though the entire case revolved around this point, the plaintiffs wish to remind the Court that they still prevail on showing adverse impact *even if* HRD is correct that in the hiring off of the Boston 2004 list, drop-out rates outweighed the exam in explaining the differential between white and minority hires. They prevail because they established by a preponderance of the evidence that the exam was responsible for adverse impact on minorities under so many different analyses, including: (1) the 2002 exam; (2) the 2004 exam; (3) veteran hiring; (4) non-veteran hiring; (5) aggregated data; (6) disaggregated data for a variety of municipalities; (7) Boston hiring; (8) Lynn hiring; (9) the nominal pass score; (10) effective cutoff scores; (11) the exam's use as a rank-order device; and (12) the delay in hiring resulting from minorities being bunched at the bottoms of hiring lists.

However, the plaintiffs do not agree that "drop-out" rates, rather than the exam, explain the adverse impact seen in the 2004 exam Boston hiring. Dr. Jacobs states in his new response filed on June 14, 2006 (Exhibit 33U), and his response of May 19, 2006 (Exhibit 33S) that because a higher proportion of minorities dropped out of this hiring, then in order to determine if there would have been adverse impact had there not been a differential drop-out rate, what should be done is an adverse impact analysis on the data using the fictitious assumption of what would have happened if the minority candidates had the same lower drop-out rate that the white candidates had. Using this fiction, he states that there would have been no adverse impact against minorities.

However, if the goal is to equalize drop-out rates for the purpose of determining whether the exam has an independent influence on adverse impact, there is no reason why that would have to be done by decreasing the minorities' drop-out rate to the level of the whites' drop-out rate. Just as logically, the rates could have been equalized by increasing the whites' drop-out rate to the level of the minorities' rate. But instead of analyzing these two fictions (i.e. the former imagines that three more minorities were hired who were not, and the latter imagines that some number of whites were not hired when in fact they were), it would seem to the plaintiffs to make much more sense to equalize the drop-out rates by assuming there had been *no* drop-outs, by either whites or minorities. This analysis would thus consider all candidates who were *reached* for consideration, regardless of whether or not they dropped out of the process (for whatever reason, voluntary or involuntary). This analysis not only avoids the dilemma of which fiction to choose for purposes of equalizing the drop-out rates (increase minority hires or decrease white hires), but the plaintiffs suggest that it is the most appropriate way of looking at this issue because its reasoning is exactly in line with the Supreme Court's analysis in Teal (and similarly, the First Circuit's analysis in Donahue).

**PYLE, ROME, LICHTEN, EHRENBERG & LISS-RIORDAN, P.C.**

In other words, by looking at those candidates *reached* for consideration, regardless of whether or not they were ultimately disqualified or dropped out, the Court can learn whether or not the *exam process* that the candidates were subjected to had an adverse impact on minorities. In Connecticut v. Teal, 457 U.S. 440 (1982), the Supreme Court emphasized that it was the challenged exam process that was relevant to the adverse impact claim, not the ultimate hiring that showed no adverse impact on the bottom line.[1]

In their post-trial briefing, the plaintiffs conducted this analysis from the data in evidence as to the adverse impact with respect to candidates who were *reached* for consideration from the 2004 Boston list. That analysis showed that the 80% rule was violated in the June 2005 Boston hiring and in the cumulative hiring through January 2006. See Plaintiffs' Post-Trial Proposed Findings of Fact, at 18-19, ¶ 57 & n. 14-16.

However, the plaintiffs realize that the analysis they conducted in those paragraphs was not the correct one. That analysis compared those candidates reached to all those certified, which mixed together veterans and non-veterans. In order to properly hold that variable constant (as the plaintiffs did in their previous analyses, see Exhibits 4 – 6, 33D – F), the correct calculation should be to measure the adverse impact ratio with respect to veterans who were reached.[2] This more proper analysis reveals an even greater adverse impact against minority candidates: it is .42 for the Boston hiring done in June 2005[3] and .62 for the cumulative hiring done through January 2006.[4] Moreover, there is no question that if Boston exhausts its veteran list and begins hiring non-veterans, there will be adverse impact among the non-veterans at whatever point on the list the hiring reaches. To illustrate this point, the plaintiffs have

---

[1] Here, of course, in contrast to Teal, the ultimate hiring *did* show an adverse impact on the bottom line. In Teal, the Supreme Court ruled that the employer was not saved from a finding of adverse impact by virtue of the fact that an affirmative action system ultimately resulted in more minorities being hired; here, HRD argues that it should be saved from a finding of adverse impact based upon a differential drop-out rate that, by HRD's own analysis, resulted in *fewer* (not more) minorities being hired off of the Boston 2004 list.

[2] In other words, because only veterans were hired in both the June 2005 and January 2006 hirings, despite the fact that the certification list got down to non-veterans for the January 2006 hiring, the proper analysis is whether there was adverse impact on minority veterans with respect to being reached for hire.

[3] As seen in Exhibit 33H, the number of white veterans reached in June 2005 (i.e. white candidates up to Phillip Skrabut) was 100, and there were 83 white veterans who were not reached. The number of minority veterans reached was 6, and there were 20 minority veterans not reached. Thus, the proportion of minority veterans reached was .23, while the proportion of white veterans reached was .55, which results in an adverse impact ratio of .42.

[4] As seen in Exhibit 33H, the number of white veterans reached by January 2006 (i.e. white candidates up to Daniel McDevitt) was 158, and there were 25 white veterans who were not reached. The number of minority veterans reached was 14, and there were 12 minority veterans not reached. Thus, the proportion of minority veterans reached was .54, while the proportion of white veterans reached was .86, which results in an adverse impact ratio of .62.

**PYLE, ROME, LICHTEN, EHRENBERG & LISS-RIORDAN, P.C.**

calculated the adverse impact ratio with respect to resident non-veterans that would result from every ten candidates that Boston could reach on the list, down to the 100th non-veteran. This analysis shows the adverse impact ratios being 0, .11, .07, .10, .14, .11, .10, .11, .10, and .11.[5]

Thus, even if drop-out rates are taken out of the equation, and the Court looks only at which candidates were reached for consideration for hiring (the proper analysis in light of Teal and Donahue), there was clear adverse impact on minority veterans on the 2004 Boston list. Because this adverse impact cannot be explained away by drop-out rates or veteran status or residency (or any other factor other than the exam), there can be no question but that this adverse impact was caused by the exam.

Although HRD argued that subsequent cases limited Teal to a challenge to a pass-fail disqualifier, the cases HRD cited do not limit Teal in a way that would make it inapplicable to this case. For example in Brunet v. City of Columbus, 642 F.Supp. 1214, 1225 (S.D. Ohio 1986), rev'd on other grounds, 1 F.3d 390 (6th Cir. 1993), the court held only that Teal would not apply "to multicomponent selection processes where *all candidates* complete *all components* of the process before the selection is made" (emphasis added). Here, of course, that is not the case; only those candidates who are certified are eligible to participate in other steps of the hiring process, and since the municipalities go down their lists in rank order in the hiring process, not even all certified candidates undergo any or all of the other steps (such as the physical abilities test, medical exam, and background check). In Reynolds v. Alabama Dept. of Transportation, 295 F.Supp.2d 1298, 1315-16 (M.D. Ala. 2003), the court held that Teal did not apply because the case was an action to enforce a consent decree only and Teal applies only to claims brought under Title VII; the court also emphasized that there were a number of factors in addition to the exam that went into whether a person was hired. Arnold v. UPS, 863 F.2d 994, 999 (D.C. Cir. 1988) was not a challenge to an exam but was instead a challenge to one aspect of a transfer policy and its reasoning does not translate to an exam challenge.

---

[5] The City of Boston submitted an affidavit in connection with the Intervenors' preliminary injunction motion that stated that 10 out of the current 60 candidates currently undergoing the hiring process are minorities. At stated at the argument, the plaintiffs do not believe this unsubstantiated hearsay affidavit should be considered as evidence in the record of this case that the Court could rely upon. The plaintiffs requested that HRD provide them with the back-up information upon which this affidavit was based, but this information was not produced. Moreover, the affidavit does not state what the races are of the "minority" candidates – while it specifically identifies two of them as Black, the others are unidentified and might not be minorities in the plaintiff class. Also, the information in the affidavit does not explain where these minority candidates fall on the list and thus whether they would likely be reached for hire. Since the plaintiffs requested this information and HRD failed to provide it, HRD should not be permitted to supplement the record.

74

**PYLE, ROME, LICHTEN, EHRENBERG & LISS-RIORDAN, P.C.**

In any event, here, as the plaintiffs have emphasized, even if <u>Teal</u> were interpreted to only apply to pass-fail test barriers to hiring, the plaintiffs have established adverse impact both at the 70 cutoff score for veterans[6] and separately at the higher effective cutoff scores for non-veterans. And for the Boston 2004 list, the rank-order use of the list resulted in adverse impact against minority veterans.

Finally, although the Court appeared to express some uncertainty as to whether aggregation of data among municipalities is warranted in this case, it is significant that HRD has not distinguished the most pertinent case on point to this question, <u>Vulcan Pioneers, Inc. v. N.J. Dept. of Civil Service</u>, 625 F. Supp. 527 (D.N.J. 1985), <u>affirmed</u> 832 F.2d 811 (3d Cir. 1987). Indeed, this case is an even stronger case for aggregation than the <u>Vulcan Society</u> case, where the court found aggregation proper even though the New Jersey municipalities were independent hiring agents and the challenged tests were not even identical among municipalities.

Thank you for your consideration.

Sincerely,

Shannon Liss-Riordan

cc:   Ron Kehoe, Esq.
      Nadine Cohen, Esq.

---

[6] At the closing argument, the Court brushed off the plaintiffs' argument that they had established adverse impact at the 70 cutoff score by showing a statistically significant difference in the proportions of whites and minorities who achieve that score. However, it is well established that adverse impact can be proved by statistical significance *or* violation of the 80% rule (which is used as a benchmark when the sample size is not large enough to show statistical significance). <u>See</u> Uniform Guidelines, 29 C.F.R. § 1607.4(D) ("Smaller differences [than 80%] in selection rate may nevertheless constitute adverse impact, where they are significant in both statistical and practical terms or where a user's actions have discouraged applicants disproportionately on grounds of race, sex, or ethnic group.") Also, the 2002 and 2004 exams violated the 80% rule at the 70 passing point with respect to Black applicants, a subset of the plaintiff class. The 80% rule is only met by those exams when Black and Hispanic candidates are aggregated.

This showing of adverse impact at the nominal 70 cutoff score was all explained in Dr. Landy's initial report (Exhibit 1, at 26-33), which is in evidence in this case. The Court intimated that because the plaintiffs had not emphasized the point that there was adverse impact at the nominal passing score of 70 through the trial, they could not rely on it in support of their argument that they had proven adverse impact. However, because the parties and the Court had agreed that the expert reports would be entered into evidence, the trial naturally focused on the most disputed points between the parties; the fact that the plaintiffs did not emphasize this point through the trial was not an indication that they did not intend to rely on it, when they had established it already through competent evidence in the record.

74