# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

———————————————————————

| | |
|---|---|
| JACOB BRADLEY, NOAH BRADLEY, KEITH RIDLEY, and JARED THOMAS, individually and on behalf of a class of similarly situated individuals,<br>Plaintiffs,<br><br>v.<br><br>CITY OF LYNN; EDWARD J. CLANCY, JR., in his capacity as Mayor of the City of Lynn; the COMMONWEALTH OF MASSACHUSETTS, DIVISION OF HUMAN RESOURCES; and RUTH BRAMSON, in her capacity as Personnel Administrator of the Division of Human Resources of the Commonwealth of Massachusetts,<br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No. 05-10213-PBS<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

———————————————————————

## PLAINTIFFS' MEMORANDUM OF LAW ON REMEDY

I.    INTRODUCTION

In accordance with the instructions of this Court on October 30, 2006, the Plaintiffs hereby submit their final proposed amended remedial order (filed herewith), and this memorandum of law in support of such order. The parties have been unable to resolve their differences. As described below, the Commonwealth's proposal with respect to remedial hiring would improperly limit the scope of such remedy. Conversely, the Plaintiffs' proposed remedial order, while still quite limited, is the only appropriate method for ensuring that identifiable victims of discrimination are made whole. Even if the Court were to adopt Plaintiffs' order on remedy, it would still not fully compensate for the many years that an unlawful and discriminatory exam was used. As described below,

the devil in the Commonwealth's proposal on remedy is in the details.  While

asserting before this Court on October 30 that it's proposed make whole remedy

on hiring was generous, the details reveal just the opposite.  The

Commonwealth's proposal will likely result in far fewer minorities being hired than

would have been the case in 2002 and 2004 had the exam not been

discriminatory.

Finally, as described below, the Court should adopt Plaintiffs' revised

proposal on a monetary remedy.  Plaintiffs have eliminated any request for

emotional distress, punitive damages or compensatory damages and seek only

make a whole remedy utilizing the traditional formula for back pay and lost

seniority.

II.    THE COURT SHOULD REJECT THE COMMONWEALTH'S PROPOSAL
       BECAUSE (1) IT AUTOMATICALLY REDUCES THE SHORTFALL FOR
       REMEDIAL HIRING BY 20 PRECENT; and (2) IT FAILS TO ALLOW A
       POOL OF MINORITY CANDIDATES WHO TOOK THE 2002 AND 2004
       EXAM SUFFICIENT TO INSURE REMEDIAL HIRING IN EACH
       AFFECTED COMMUNITY.

       A.    As It Is, The Remedial Order Proposed By The Plaintiffs Is
             Significantly Narrower In Scope Than Most Remedial Hiring
             Orders In Such Title VII Entry Level Examinations Cases.

Both the Defendants and the Plaintiffs propose a formula for remedial

hiring that is (1) based upon the actual applicant pool (not labor pool) and (2)

would only involve a one-time remedial preference program that would attempt to

mirror the number of hires that would likely have occurred had the 2002 and

2004 exams not been discriminatory.  The remedial hiring proposed by both

parties would neither fully compensate individuals who were hired later than they

would otherwise have been had it not been for the exam's discriminatory effect

nor correct the disparity between the relevant labor pool in a community and the resulting disparity in the percentage of minority firefighters in such community.[1]

Traditionally, once an exam or series of exams have been found to be discriminatory in entry level hiring for police and fire, a compensatory hiring system is ordered that is much broader in scope than that being discussed here. Numerous courts have required a compensatory hiring system over an extended period of time until the relative population of minority firefighters and police officers equal their numbers in the general population of the relevant community. See e.g., Boston Chapter, NAACP, Inc. v. Beecher, 371 F. Supp. 507 (D. Mass. 1974) (Civ. Act. Nos. 72-3060-F and 73-269-F); Castro v. Beecher, 365 F. Supp. 655 (D. Mass. 1973) (Civ. Act. No.70-1220); U.S. v. Paradise, 480 U.S. 149 (1987) (state trooper corporals in Alabama); Los Angeles County v. Davis, 440 U.S. 625 (1979) (firefighters in Lost Angeles); U.S. v. NAACP, 779 F.2d 881 (2d Cir. 1985) (police and firefighters in Buffalo, N.Y.); Dean v. City of Shreveport, 438 F.3d 448 (5th Cir. 2206) (firefighters in Shreveport, La.); Rutherford v. City of Cleveland, 179 Fed. Appx. 366 (6th Cir. 2006 (police officers in Cleveland); U.S. v. City of Chicago, 798 F.2d 969 (7th Cir. 1986) (firefighters in Chicago); Davis v. City and County of San Francisco, 890 F.2d 1438 (9th Cir. 1989) (firefighters in San Francisco).

---

[1]     As demonstrated by this Court's decision in cities like Lynn, who long ago were eliminated from the Beecher decree, the proportion of minority firefighters relative to their percentage in the city's labor pool is already disparate. Thus in Lynn, which got out of the Beecher decree in 1986, the number of minority firefighters on the Fire Department is quite small. (See Bradley v. City of Lynn, 443 F. Supp. 2d 145, 151 (D. Mass. 2006)). Moreover, as seen by the affidavit of Joel Wiesen attached hereto, perhaps because of the discouragement of regularly receiving low scores on the exam, or for other institutional reasons, the relative percentage of minorities taking the fire exam (utilizing the formula set forth in Quinn v. City of Boston, supra), is significantly less than their numbers in the relevant labor pool in that community. (See Affidavit of Wiesen, attached hereto as Exhibit A.)

The Plaintiffs are not seeking such a broad remedy here.

B.    The Court Should Not Multiply the Shortfall By 0.8.

The Plaintiffs are in agreement with the Court and the Defendants that where, because of the discriminatory effect of the exam, there is a shortfall in minority firefighters hired in 2002 and 2004, that shortfall must be remedied. However, under Defendants' proposal, that shortfall is automatically reduced by 20% simply by multiplying the shortfall by the fraction 0.8. This mathematical sleight of hand makes no sense.

In every case in which a court or the parties have sought to remedy the effects of discrimination in state or municipal hiring programs, the goal has always been to achieve parity – i.e. to achieve numbers in the underrepresented position that approximate the number of minority candidates in the appropriate labor pool.  See, e.g., Johnson v. Transportation Agency, 480 U.S. 616 (1987) (upholding promotion pursuant to affirmative action plan implemented to achieve a balanced work force); Local 28 of the Sheet Metal Workers Int'l Ass'n v. EEOC, 478 U.S. 421, 448-450 (1986) (describing instances when a court might order an employer 'to hire and to admit qualified minorities roughly in proportion to the number of qualified minorities in the work force'); United Steelworkers of America v. Weber, 443 U.S. 193 (1979) (upholding fifty percent hiring goal in order to accelerate hiring of black workers in proportion to their percentage in the local labor pool). See also consent decrees discussed in the following cases: Ass'n Against Discrimination In Employment, Inc. v. City of Bridgeport, 647 F.2d 256 (2d Cir. 1981); U.S. v. City of Chicago, 663 F.2d 1354 (6th Cir. 1981); Danskine

*v. Miami Dade Fire Dept.*, 253 F.3d 1288 (11th Cir. 2001); Martinez v. City of St.
Louis, 327 F. Supp. 2d 1002 (E.D.Mo. 2003).

As the Affidavit of Dr. Wiesen makes clear, and as the Court knows from
the litigation on liability, the four-fifths rule (0.8) is merely a guideline for looking
at the question whether or not an examination has resulted in adverse impact.  If
disparate impact is shown such burden shifts to the Defendant to prove the job
relatedness of the exam.  See, e.g., Bradley v. City of Lynn, 443 F. Supp. 2d 145,
171-174 (D. Mass. 2006).

Indeed, the four-fifths or 80 percent rule appears in the EEOC Uniform
Guidelines solely as a rule of thumb that federal enforcement agencies can use
as evidence of adverse impact.  29 C.F.R. § 1607(4)(D).  There is not one single
reported case in which any court has accepted this percentage as an
acceptable remedial goal.  It is merely one way to tell whether a hiring or
promotion system is so far out of whack that federal enforcement agencies
should be concerned and take action.  If a 79-percent hiring rate is considered so
opprobrious as to require federal government intervention, it is impossible to
imagine how an 80-percent hiring level can be the goal of an equal protection
remedy.

Moreover, nowhere in the Guidelines is the 80-percent rule provided as an
ideal target or goal for minority recruitment and hiring; indeed, the policy
statement sets the goal that such positions be "genuinely and equally accessible
to qualified persons."  Id. § 1607.17.  In addition, while the four-fifths rule is one
indicator of adverse impact, the Guidelines state that even "[s]maller differences

5

in selection rate may nevertheless constitute adverse impact." Id. § 1607.4.
See, e.g., Isabel v. City of Memphis, 404 F.3d 404, 412-413 (6th Cir. 2005)
(finding evidence of adverse impact using statistical testing even though the four-fifths rule was not violated); Bradley, 443 F. Supp. 2d at 162-167 (using alternative statistical analysis in addition to the four-fifths rule).

In short, the Guidelines – and every court to have considered the Guidelines – recognize that the Constitutional requirement of equal protection is not satisfied with a remedy that allows for only 80 percent of equality.  As Dr. Wiesen's Affidavit makes clear (Exhibit A), and as the Plaintiffs argued ad nausem in their brief on liability, the four-fifths rule is simply a guideline, not written in stone, and is simply a tool to look at the issue of adverse impact.  But in this case, adverse impact has already been found and the parties are now addressing the issue of remedy.  Having found adverse impact, the question now becomes what is the proper remedy to correct the discriminatory effects of the examination in 2002 and 2004.  Clearly, the only method to remedy that disparity is to require the hiring of minority candidates equal to what would have been expected if there was no discrimination to begin with.

As Dr. Wiesen states in his Affidavit, an appropriate analogy would be an equal pay claim.  If a court found on liability that a company had paid men relatively more for equal work than women, it would make no sense for the Court to require as a remedy that the employer only had to increase wages to bring women up to 80 cents on the dollar of what men are earning.  Similarly, if a court found that, as a result of sex discrimination, ten men were hired instead of ten

women, the remedy would not be to only require the hiring of eight of those women. Yet that is exactly what the Commonwealth is suggesting here. Under the Commonwealth's analysis, as made clear in its submissions, the Commonwealth has multiplied each shortfall by 0.8 to reduce the minorities entitled to relief in this case. The Court should not permit this unequal approach to an equal protection remedy.

      C.    Equally Erroneous Is The Commonwealth's Insistence On Significantly Limiting the Number of Minorities Certified For Consideration By The Municipality, Thereby Increasing The Likelihood That No Compensatory Hiring Will Occur In Some Shortfall Communities.

After artificially reducing the number of minorities who should be entitled to remedial hiring to remedy the finding of discrimination, the Commonwealth then significantly compounds the problem by attempting to severely limit the pool from which such compensatory hiring can occur. Sadly, the Defendants contend that they need only certify for consideration minority candidates who are residents of the municipality equaling 2n+1. (See Exhibit B attached hereto)[2] Thus, if a community's shortfall (even with the 0.8 calculation) is 2, meaning that 2 minority candidates should be hired, the Commonwealth proposes to only certify 5 minority candidates from the 2002 and 2004 exam for consideration to fill those positions. Yet by restricting the number of candidates certified to 5 (as opposed to certifying all minority candidates who passed the exam in 2002/2004 for this one time consideration) there is a virtual likelihood that the shortfall will never be

---

[2]    Exhibit B is the Commonwealth's final e-mail shortfall analysis and proposed certification. It has not been reviewed by Plaintiffs' expert Dr. Wiesen, and Plaintiffs' counsel have found at least one major omission in it (the absence of Plaintiff Noah Bradley, despite his having a score of 84 on the 2002 exam). It is attached hereto by the Plaintiffs just to illustrate the problems posed by the Commonwealth's proposal.

alleviated.  This is particularly true given that many of the candidates who would be certified under the Commonwealth's plan took the exam back in 2002 and 2004 and may well have moved on with their careers into something else, changed their residency, etc.  Moreover, as described below, many will be disqualified by way of the background check, or failure to meet the physical/medical standards.

As set forth in Quinn v. City of Boston, 325 F.3d. 18 (1st Cir. 2003), and as made clear at trial, being certified does not relate to being hired.  After one's name appears on the 2n+1 certification, the Commonwealth sends each person on such certification a card asking that person to indicate whether he or she remains interested in becoming a firefighter.  (Testimony of McNeeley from liability case).  A number of people will not sign the card because they have moved on in their careers or have a new job, etc.  (Id.)  For those people who do sign the cards, they must still go through background checks (for criminal records, etc.), and then if they make it through that process, they must still proceed through medical, psychological, and the physical agility tests.  At trial, the Defendants presented a lot of evidence regarding so called "knock-out" rates for minorities and it contended that in 2002/2004, 35 to 50 percent of certified minorities were either disqualified or did not pursue employment after being certified on the list.

In this case, given that the minority candidates to be certified under the Commonwealth's plan applied to be a firefighter as long as six years ago, and no more recently than three years ago, it is likely that the knock-out rate would be

higher given the passage of time.  Moreover, this passage of time, which can be directly attributed to the Defendants' discriminatory actions, cannot allow the Commonwealth to further diminish the candidate pool to be considered for hiring. Given all these knock-out factors, if (for example) a community has a shortfall in minorities of 2, it is as likely as not that if only five minority candidates are certified from the relevant examination (2002 or 2004), none will end up being hired, and therefore there will be no remediation of the discriminatory effects of the examination in that town.

The simple and fair way to prevent this problem is for the court to require that all qualified minorities who passed the 2002 and 2004 examination in the respective community where there is a shortfall, be placed on a certified list and that the municipality be permitted/required to consider each applicant on the list, ranked by their score on the exam and the year in which they took the exam, solely for the purpose of filling said shortfall vacancies.  After such vacancies are filled, this special certified list would be eliminated and not used again.

Again, the Plaintiffs stress that without this type of certified list there is every likelihood that no candidates will be hired as a result of this Court's remedial order, thereby frustrating the intent of the Court's remedial order in the first place.

Finally, with respect to this point, the Plaintiffs wish to point out that there is nothing magical about the 2n+1 formula proposed by the Commonwealth. Indeed, the Court will recall that in May of 2006, when Boston and Lynn needed to hire new firefighters, HRD certified many more candidates to both of those

cities than would normally have been needed to satisfy the 2n+1 rule. Ms.
McNeeley testified at trial that, recognizing that HRC was unlikely to get a
sufficient pool of qualified candidates from utilizing the 2n+1 certification list,
because more than two years had passed since these candidates had taken the
exam, HRD certified significantly more candidates than 2N+1 to fill those
certifications. (See Trial Exhibits 33p and 33 Q)  Thus, having taken this position
at trial, the Commonwealth can hardly pledge allegiance to a formula that they
themselves do not use when it will not produce a sufficient pool of qualified
candidates.

> D.    The Commonwealth's Attempt To Limit The Remedial Pool By
>        Residency Is Inappropriate, As It Will Ensure No Shortfall Hires
>        In Some Communities.

Finally, the third significant problem with the Commonwealth's proposal is
that in several towns and cities, the Commonwealth contends that it is unable to
even fill a 2n+1 certification for minority candidates because of the absence of
"resident" minority candidates left on the list, and that in those instances, it
proposes to not certify any minority candidates to fill even a 2n+1 list.  (See, for
example, Exhibit B, Towns of Brookline, Gardner and Revere.)   The Plaintiffs'
proposed remedial order would alleviate this problem in that it does not limit the
candidates by residency, only that their names were actually on the 2002 or 2004
list for that municipality.  If, after certifying all both resident and non-resident
minorities who passed each exam, a municipality still can not fill its shortfall, then
the municipality would be under no further obligation.  But it is unfair to cast off
the pool of qualified minorities  who originally appeared on a municipality's

eligibility list because of their residency. This would be particularly true in towns like Brookline, Revere and Gardner, where with such a residency restriction it is unlikely that there will be sufficient shortfall candidates under the Commonwealth's proposal.

The Plaintiffs' proposal here fosters the public interest. As is known from the Beecher communities, minority candidates have already been hired who have scored in the 70s or 80s on the exam. Further, it is in a municipality's interest to have the widest possible pool of candidates. The more minority candidates available to the municipality for selection, the more likely it is that (1) minority candidates will be hired, and (2) that the best candidates will be hired. Artificially reducing the number of minority candidates that a community can consider to conduct the shortfall hiring damages rather than furthers the public interest.

III.   BACKPAY IS AN APPROPRIATE AND ACCEPTED REMEDY IN A RULE 23(b)(2) CLASS ACTION, AND THE COURT SHOULD THEREFORE ADOPT THE PLAINTIFFS' PROPOSAL ON REMEDY THAT INCLUDES BACKPAY FOR THOSE HIRED AS A RESULT OF THE REMEDIAL HIRING PROCESS.

Because backpay is an equitable form of relief in this Title VII class action and does not predominate over the injunctive relief requested in this matter, backpay is a wholly acceptable and appropriate remedy in this case.

Rule 23(b)(2) states that class certification is acceptable wherever "final injunctive relief or corresponding declaratory relief" is appropriate "with respect to the class as a whole." Fed. R. Civ. P. 23(b)(2). Because backpay is recognized as form of equitable relief in the Title VII context, courts have traditionally allowed the inclusion of backpay claims in Rule 23(b)(2) class actions. See, e.g.,

*Albemarle Paper Co. v. Moody*, 422 U.S. 405, 416 (1975); Wetzel v. Liberty

Mutual Ins. Co., 508 F2d 239 (3d Cir. 1975); Pettway v. American Cast Iron Pipe

Co., 494 F.2d 211 (5th Cir. 1974), cited in Allison v. Citgo Petroleum Corp., 151

F.3d 402, 415-416 (5th Cir. 1998) ("If the instant case involved only claims for

equitable monetary relief, Pettway would control."); Alexander v. Aero Lodge No.

735, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO, 565 F.2d 1364,

1672 (6th Cir. 1977); Rich v. Martin Marietta Corp., 522 F.3d 333 (8th Cir. 1975);

see also Cooper v. Southern Co., 390 F.3d 695, 720 (11th Cir. 2004) ("Back pay

is considered equitable relief and can therefore be awarded in a case certified

under Rule 23(b)(2).")  This Court should therefore issue a backpay award in

conjunction with a remedial hiring program as the plaintiffs have requested.

Moreover, even without regard to the equitable nature of a Title VII

backpay award, the Court must still find backpay to be an appropriate form of

relief in this case because the requested injunctive relief predominates "despite

the presence of a request for back pay."  Thorn v. Jefferson-Pilot Life Ins. Co.,

445 F.3d 311, 331-332 (4th Cir. 2006) (emphasis in original).  As many courts

have noted, nothing in Rule 23(b)(2) precludes the possibility of monetary

damages for a class, and indeed, the Advisory Committee notes indicate that

class certification is unacceptable only when "the appropriate final relief relates

exclusively or predominantly to money damages."  Fed. R. Civ. P. 23(b)(2)

advisory cmte. notes; see, e.g., Reeb v. Ohio Dept. of Rehabilitation and

Correction, 435 F.3d 639, 645-651 (6th Cir. 2006) (discussing the text and history

of Rule 23(b)(2) and concluding that class certification was inappropriate in a

Title VII action seeking compensatory damages and not merely backpay).

    Here, any backpay the Court may award would clearly be predicated on

the remedial hiring program that the Court orders and is thus subordinate to any

further injunctive and declaratory relief that the Court will issue.  In addition, such

backpay flows directly from the liability suffered by the class as a whole and

would be easily calculated based on the objective standards applied in the

remedial hiring program.  See Allison, 151 F.3d at 415.  Therefore, the Court may

award backpay in conjunction with its prospective hiring order consistent with the

provisions of Rule 23(b)(2).

    For all of these reasons, the Court should adopt the Plaintiffs proposed

remedial order.


                                        Respectfully submitted,

                                        JACOB BRADLEY, NOAH BRADLEY,
                                        KEITH RIDLEY, and JARED THOMAS,

                                        By their attorneys,


                                         s/Harold L. Lichten
                                        Harold L. Lichten, BBO # 549689
                                        Shannon Liss-Riordan, BBO # 640716
                                        Alfred Gordon, BBO # 630456
                                        Pyle, Rome, Lichten, Ehrenberg &
                                            Liss-Riordan, P.C.
                                        18 Tremont Street, Suite 500
                                        Boston, MA 02108
Date:  November 16, 2006                (617) 367-7200

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served on the attorneys of record for each party by electronic notice on November 16, 2006.

_____s/Harold L. Lichten_____
Harold L. Lichten

# EXHIBIT A

**Expert Report Concerning Remedy in the Bradley Matter**

Joel P. Wiesen, Ph.D.
November 8, 2006

This affidavit presents my opinion and related information on two topics related to the remedy in Bradley et al.

1.      Comparison of the ethnic makeup of the 2004 firefighter exam candidates and the 2000 Census population figures

For 6 of 9 relevant municipalities, there were proportionally fewer minority candidates for the 2004 firefighter examination than would be expected based on the composition of the population as determined in the 2000 Census. For the City of Boston, this difference is statistically significant.

At the request of counsel, I compiled statistics to allow a comparison, for several municipalities, between the proportion of minority (black and Hispanic) candidates for the 2004 firefighter examination and the proportion of minority persons living in the municipalities. The 2000 Census figures were taken from the official web site for the US Census Bureau (www.census.gov). The 2004 examination minority figures were taken from data I received in March of 2006. Although the data I received in March 2006 came from Attorney Lichten, I think the information came from Dr. Jacobs.

The attached table shows a comparison for the 9 municipalities listed in an HRD shortfall analysis as having at least a .5 shortfall: Boston, Everett, Lynn, Milton, Natick, New Bedford, Randolph, Revere, and Taunton. Twice as many municipalities showed proportionally fewer minority candidates as did not (i.e., 6 versus 3).

For the City of Boston, which had over 2,000 candidates for the 2004 firefighter examination, the proportionally fewer minority candidates (as compared with the population of Boston) is statistically significant ($z = -3.8$, $p < .001$).

2.      The 80% rule of thumb

The HRD proposal, to multiply the shortfall of minority candidates by .8 is illogical and incorrect.

The 80% rule of thumb for adverse impact in personnel selection originated in federal guidelines related to employee selection procedures. The current version of those guidelines is called the Uniform Guidelines on Employee Selection Procedures (UGESP). The wording concerning the 80% rule that appears in the UGESP is in paragraph (a) of Section 15A2 which says, in part:

A selection rate for any race, sex, or ethnic group which is less than four-fifths (4/5) (or eighty percent) of the rate for the group with the highest rate will generally be regarded by the Federal enforcement agencies as evidence of adverse impact, while a greater than four-fifths rate will generally not be regarded by Federal enforcement agencies as evidence of adverse impact. Smaller differences in selection rate may nevertheless constitute adverse impact, where they are significant in both statistical and practical terms or where a user's actions have discouraged applicants disproportionately on grounds of race, sex, or ethnic group.

It is clear the UGESP do not consider 80% to indicate parity, since smaller differences in selection rate may be taken as evidence of adverse impact, as when those differences are statistically significant.

Statistically speaking, if minority and white applicants performed equally well on a firefighter exam, the adverse impact ratio would be expected to be 1.0. So, an adverse impact ratio of 1.0 indicates complete parity, while anything higher or lower does not. Certainly 80% does not reflect complete parity.

Concerning parity, consider this analogy. If, on average, the salary earned by women is 80% of the salary earned by men, that would not be an indication of parity. Rather, parity would be indicate if the ratio of the average salaries of women and men is 1.0.

Document 131, titled "Explanation of Shortfall Methodology" and prepared by HRD, calls for the "minority hiring number" to be multiplied by .8. That would not achieve parity for minority test takers. It is my opinion that this aspect of the shortfall calculation procedure suggested by the Commonwealth should be omitted. The "predicted minority hiring number" should not multiplied by .8 or any other number. The predicted minority hiring number is what it is.

Signature: _____          Date: November 8, 2006
                    Joel P. Wiesen, Ph.D.

## Comparison of 2000 Census Population and 2004 Firefighter Examination

Compiled by Joel Wiesen, 1/18/06

| A Muni | B Direct from Census Total Population | C Direct from Census Black (Not Hispanic) | D (J-I) Hispanic (Not Black) | E B-(C+D) All Other Residents | F (C+D) Minority (B&H) | G F/B % Minority | H Direct from Census Black (or w other race) | I (H-C) Black and Hispanic | J Direct from Census Hispanic | K f.data.03242006 | L (G-K) (Positive=Shortfall) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Boston | 589,141 | 151,246 | 73,329 | 364,566 | 224,575 | 0.381 | 163,006 | 11,760 | 85,089 | 0.341 | 0.04 |
| Everett | 38,037 | 2,675 | 3,457 | 31,905 | 6,132 | 0.161 | 2,835 | 160 | 3,517 | 0.145 | 0.02 |
| Lynn | 89,050 | 9,229 | 14,416 | 65,405 | 23,645 | 0.266 | 11,196 | 1,967 | 16,383 | 0.200 | 0.07 |
| Milton | 26,062 | 2,837 | 377 | 22,848 | 3,214 | 0.123 | 2,910 | 73 | 450 | 0.159 | -0.03 |
| Natick | 32,170 | 632 | 607 | 30,931 | 1,239 | 0.039 | 660 | 28 | 655 | 0.083 | -0.04 |
| New Bedford | 93,768 | 5,486 | 4,590 | 83,692 | 10,076 | 0.107 | 6,382 | 896 | 5,486 | 0.071 | 0.04 |
| Randolph | 30,963 | 6,997 | 832 | 23,134 | 7,829 | 0.283 | 7,171 | 174 | 1,006 | 0.200 | 0.05 |
| Revere | 47,283 | 1,540 | 4,299 | 41,444 | 5,839 | 0.123 | 1,706 | 166 | 4,465 | 0.089 | 0.03 |
| Taunton | 55,976 | 1,747 | 1,980 | 52,249 | 3,727 | 0.067 | 1,983 | 216 | 2,198 | 0.093 | -0.03 |

Notes:

Col. C. Black: figures taken directly from census website for Non-Hispanic Black

Col. D. Hispanic (cannot use figures from census website for Hispanic, since can be Black and Hispanic, or White and Hispanic, etc.):

  a. Calculate Hispanic and Black = (Black or Black in combination with other races) – (Black and non-Hispanic)

  b. Calculate Hispanic = Hispanic – (Hispanic and Black)

Col. E. Calculate All Other Residents = Total Population – (Non-Hispanic Black + Hispanic) [as defined above]

File: Bradley_2000-Census_Data.xls

# EXHIBIT B

## Harold Lichten

**From:** Ronald.Kehoe@ago.state.ma.us
**Sent:** Thursday, November 09, 2006 2:38 PM
**To:** harold@prle.com
**Subject:** Response re 3 issues

Harold,

Re the three issues you raised in your e-mail dated 11/5/06  we respond as follows:

**1.** Trial Exhibit 31 is the Jacobs shortfall formula (his declaration dated 3/6/06). It says at para. 10, **"In calculating the minority shortfall in each community, the minority passing rate should be set at 80% of the non-minority passing rate, consistent with the definition of no adverse impact."** HRD has calculated the shortfall in each community in accordance with that formula, as I think you acknowledge. Our proposed remedy would eliminate those shortfalls, and thereby would eliminate adverse impact as defined in the EEOC Guidelines. We see no basis for the remedy to extend beyond the elimination of adverse impact, which might be seen as crossing the line into impermissible affirmative action. If you have any case law that agrees with your position, please share it with us.

**2.** Your point here is that our 2n+1 proposal may, in some instance, not yield enough candidates to eliminate the shortfall, and you cite two reasons why this might happen: (1) there won't be enough candidates still interested in the job, and (2)  some candidates may be bypassed. We believe that the remedy should differentiate between these two possible reasons.

As to the first reason, HRD has sought to assure that there will be enough interested persons by proposing 2n+1.  In the real world, it is highly unlikely that Boston, for example, won't find at least 6 candidates out of 20 who are still interested. If so, adverse impact is eliminated, and the remedy should stop there.

As to the second reason, we have proposed to require a written statement of reasons for bypassing a minority candidate, with HRD review and Civil Service Commission appeal rights. If there is an acceptable reason for bypassing a candidate, he/she  has received the consideration for hiring to which he /she was entitled, and is no longer adversely impacted by the examination score. Again, the remedy should stop there.

**3.** We did, and do, agree with you that the '02 and '04 lists should be merged, with the candidates rank ordered by score. I am attaching the merged list for your review.

You asked for the data on which the shortfall lists are based.  The 2004 data for non-<u>Beecher</u> communities is shown on the second attachment. Joel has, and testified about, the 2002 data, which is shown on Trial Exhibit 32.

As for recruiting and the alleged shortfalls in test applicants, we will separately respond to Joel's data, and hope to show you and him that he has overstated the alleged shortfalls.

Finally, you proposed at the last hearing that candidates be given time to get EMT-certified if a municipality hires only EMTs. We do not think it is appropriate to require such a delay in the remedy order. However, if it will satisfy your concern, HRD is willing to send letters now to all the shortfall minority candidates, urging them to get certified if they want to be considered for EMT positions. Please advise if this is acceptable.


Ron Kehoe
Assistant Attorney General
(617) 727-2200 ext. 2619
FAX  (617) 727-3076
One Ashburton Place, Room 1801, Boston, MA  02108
ronald.kehoe@ago.state.ma.us

**2002/2004 Combined FF Shortfall**
**B/H Candidates for Consideration**

| Community | | Name | Race | Gender | Vet Status | Score |
|---|---|---|---|---|---|---|
| **Boston** | 1 | Matthews, Antone E | Black | Male | Non-Vet | 96% |
| | 2 | Cook, Edward B | Black | Male | Non-Vet | 95% |
| | 3 | Perez, Ruddy A | Hispanic | Male | Non-Vet | 95% |
| | 4 | Brooks, Jr., Arthur S | Black | Male | Non-Vet | 94% |
| | 5 | Gonzalez, Vincent M | Hispanic | Male | Non-Vet | 94% |
| | 6 | More, Senen M | Black | Male | Non-Vet | 94% |
| | 7 | Morris, Marcus L | Black | Male | Non-Vet | 94% |
| | 8 | Owens, Rodney | Black | Male | Non-Vet | 94% |
| | 9 | Almeida, Ismael L | Black | Male | Non-Vet | 93% |
| | 10 | Greene, II, Larentz O | Black | Male | Non-Vet | 93% |
| | 11 | Hernandez, Rafael | Hispanic | Male | Non-Vet | 93% |
| | 12 | Monteiro, Amos | Black | Male | Non-Vet | 93% |
| | 13 | Aquino, Simon | Hispanic | Male | Non-Vet | 92% |
| | 14 | Araujo, Diamantin E | Black | Male | Non-Vet | 92% |
| | 15 | Jones, Christiaa M | Black | Male | Non-Vet | 92% |
| | 16 | Powell, Lynneric P | Black | Male | Non-Vet | 92% |
| | 17 | Quinchia, Jeffrey J | Hispanic | Male | Non-Vet | 92% |
| | 18 | Silva-Leonard, Jafar A | Black | Male | Non-Vet | 92% |
| | 19 | Soto, Edward | Hispanic | Male | Non-Vet | 92% |
| | 20 | Williams, Kenneth W | Black | Male | Non-Vet | 92% |
| **Brookline** | 1 | Jones, Bradford H. | Black | Male | Non-Vet | 75% |
| | 2 | Arrington, Don Q | Black | Male | Non-Vet | 71% |
| | 3 | No remaining resident minority applicants | | | | |
| | 4 | No remaining resident minority applicants | | | | |
| | 5 | No remaining resident minority applicants | | | | |
| **Everett** | 1 | Flint, Quenton S | Black | Male | Non-Vet | 85% |
| | 2 | Bodden-Carr, Marva | Black | Female | Non-Vet | 84% |
| | 3 | Tosike, Ulysses D | Hispanic | Male | Non-Vet | 80% |
| **Gardner** | 1 | Colon, Jorge V | Hispanic | Male | Non-Vet | 83% |
| | 2 | Gibbons, Granville C | Black | Male | Non-Vet | 82% |
| | 3 | No remaining resident minority applicants | | | | |
| **Lynn** | 1 | Cintron, Luis E | Hispanic | Male | Veteran | 85% |
| | 2 | Lewis, Paul J | Black | Male | Veteran | 78% |
| | 3 | Machado, Joel E | Hispanic | Male | Veteran | 76% |
| | 4 | Christian, Jason | Black | Male | Non-Vet | 97% |
| | 5 | Bradley, Jacob | Black | Male | Non-Vet | 94% |
| | 6 | Anaya, Joel | Hispanic | Male | Non-Vet | 94% |
| | 7 | Thomas, Jared C | Black | Male | Non-Vet | 92% |
| | 8 | DeLeon, Gabriel | Hispanic | Male | Non-Vet | 90% |
| | 9 | Ridley, Keith J | Black | Male | Non-Vet | 90% |
| | 10 | Kimber, Jr, Robert L | Black | Male | Non-Vet | 79% |
| | 11 | Melendez, Lizbeth | Hispanic | Female | Non-Vet | 78% |

**2002/2004 Combined FF Shortfall**
**B/H Candidates for Consideration**

| Community | | Name | Race | Gender | Vet Status | Score |
|---|---|---|---|---|---|---|
| **Natick** | 1 | Fernandes, Adam D | Black | Male | Non-Vet | 93% |
| | 2 | Robinson,Christoph W | Black | Male | Non-Vet | 72% |
| | 3 | No remaining resident minority applicants | | | | |
| **New Bedford** | 1 | Conceicao, Jr., Daniel J | Black | Male | Non-Vet | 87% |
| | 2 | Orrico, Joseph J | Black | Male | Non-Vet | 78% |
| | 3 | Gomes, Alfred J | Black | Male | Non-Vet | 75% |
| **Randolph** | 1 | Lara, Jr., Carlos | Hispanic | Male | Non-Vet | 95% |
| **Must have EMT** | 2 | Aka, Albert | Black | Male | Non-Vet | 92% |
| **license before** | 3 | Monteiro, Amos | Black | Male | Non-Vet | 92% |
| **certification** | 4 | Hill, Charlie P. | Black | Male | Non-Vet | 91% |
| **from list.** | 5 | Chaney, Johnnie E | Black | Male | Non-Vet | 88% |
| | 6 | Deller, James S | Black | Male | Non-Vet | 85% |
| | 7 | Alexander, Bryan P | Black | Male | Non-Vet | 74% |
| | 8 | Allen, Shunae A | Black | Female | Non-Vet | 72% |
| **Revere** | 1 | Halas, John V | Hispanic | Male | Non-Vet | 87% |
| | 2 | No remaining resident minority applicants | | | | |
| | 3 | No remaining resident minority applicants | | | | |
| **Waltham** | 1 | Thomas, Jason | Black | Male | Non-Vet | 95% |
| | 2 | Cedeno,George | Hispanic | Male | Non-Vet | 85% |
| | 3 | Figueroa, Marybeth | Hispanic | Female | Non-Vet | 82% |
| | 4 | Menendez, Victor H | Hispanic | Male | Non-Vet | 82% |
| **Woburn** | 1 | Lucero, Jon-Paul | Hispanic | Male | Non-Vet | 94% |
| | 2 | Gomez, William | Hispanic | Male | Non-Vet | 93% |
| | 3 | Santiago, Ramon | Hispanic | Male | Non-Vet | 91% |

## 2004 FF Shortfall Data

| A | B/H Takers | White Takers | Total Takers | B/H Appt | White Appt | Total Appt | B/H Vet Appt | White Vet Appt | Total Vet Appt | B/H takers minus vts | W Takers minus vts | Total minus vets | B/H appts minus vets | W appts minus vets | Total appts minus vets | Appt Ratio B/H | Appt Ratio White | Predicted Hiring | Shortfall |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P | Q | R | S | T |
| Arlington | 4 | 43 | 47 | 0 | 4 | 4 | 0 | 3 | 3 | 4 | 40 | 44 | 0 | 1 | 1 | 0.00 | 0.03 | 0.10 | 0.08 |
| Belmont | 1 | 19 | 20 | 0 | 5 | 5 | 0 | 1 | 1 | 1 | 18 | 19 | 0 | 4 | 4 | 0.00 | 0.22 | 0.22 | 0.18 |
| Billerica | 3 | 81 | 84 | 0 | 3 | 3 | 0 | 3 | 3 | 3 | 78 | 81 | 0 | 0 | 0 | 0.00 | 0.00 | 0.00 | 0.00 |
| Boston | 231 | 621 | 852 | 11 | 139 | 150 | 11 | 121 | 132 | 220 | 500 | 720 | 0 | 18 | 18 | 0.00 | 0.04 | 7.92 | 6.34 |
| Brockton | 19 | 104 | 123 | 3 | 1 | 4 | 3 | 1 | 4 | 16 | 103 | 119 | 0 | 0 | 0 | 0.00 | 0.00 | 0.00 | 0.00 |
| Chicopee | 1 | 54 | 55 | 0 | 8 | 8 | 0 | 6 | 6 | 1 | 48 | 49 | 0 | 2 | 2 | 0.00 | 0.04 | 0.04 | 0.03 |
| Danvers | 2 | 34 | 36 | 0 | 4 | 4 | 0 | 2 | 2 | 2 | 32 | 34 | 0 | 2 | 2 | 0.00 | 0.06 | 0.13 | 0.10 |
| Dedham | 1 | 39 | 40 | 0 | 2 | 2 | 0 | 2 | 2 | 1 | 37 | 38 | 0 | 0 | 0 | 0.00 | 0.00 | 0.00 | 0.00 |
| Everett | 4 | 41 | 45 | 0 | 17 | 17 | 0 | 4 | 4 | 4 | 37 | 41 | 0 | 13 | 13 | 0.00 | 0.35 | 1.41 | 1.12 |
| Fall River | 1 | 67 | 68 | 0 | 10 | 10 | 0 | 8 | 8 | 1 | 59 | 60 | 0 | 2 | 2 | 0.00 | 0.03 | 0.03 | 0.03 |
| Gardner | 3 | 13 | 16 | 0 | 5 | 5 | 0 | 1 | 1 | 3 | 12 | 15 | 0 | 4 | 4 | 0.00 | 0.33 | 1.00 | 0.80 |
| Gloucester | 1 | 27 | 28 | 0 | 3 | 3 | 0 | 2 | 2 | 1 | 25 | 26 | 0 | 1 | 1 | 0.00 | 0.04 | 0.04 | 0.03 |
| Haverhill | 2 | 54 | 56 | 0 | 1 | 1 | 0 | 1 | 1 | 2 | 53 | 55 | 0 | 0 | 0 | 0.00 | 0.00 | 0.00 | 0.00 |
| Hudson | 2 | 15 | 17 | 0 | 2 | 2 | 0 | 0 | 0 | 2 | 15 | 17 | 0 | 2 | 2 | 0.00 | 0.13 | 0.27 | 0.21 |
| Leominster | 5 | 44 | 49 | 1 | 3 | 4 | 1 | 2 | 3 | 4 | 42 | 46 | 0 | 1 | 1 | 0.00 | 0.02 | 0.10 | 0.08 |
| Lynn | 16 | 70 | 86 | 3 | 14 | 17 | 0 | 3 | 3 | 16 | 67 | 83 | 3 | 11 | 14 | 0.19 | 0.16 | 2.63 | 2.10 |
| Malden | 2 | 44 | 46 | 0 | 11 | 11 | 0 | 6 | 6 | 2 | 38 | 40 | 0 | 5 | 5 | 0.00 | 0.13 | 0.26 | 0.21 |
| Methuen | 2 | 84 | 86 | 0 | 12 | 12 | 0 | 2 | 2 | 2 | 82 | 84 | 0 | 10 | 10 | 0.00 | 0.12 | 0.24 | 0.20 |
| Milton | 9 | 48 | 57 | 0 | 5 | 5 | 0 | 5 | 5 | 9 | 43 | 52 | 0 | 0 | 0 | 0.00 | 0.00 | 0.00 | 0.00 |
| Natick | 4 | 30 | 34 | 0 | 5 | 5 | 0 | 0 | 0 | 4 | 30 | 34 | 0 | 5 | 5 | 0.00 | 0.17 | 0.67 | 0.53 |
| New Bedford | 5 | 76 | 81 | 1 | 29 | 30 | 0 | 14 | 14 | 5 | 62 | 67 | 1 | 15 | 16 | 0.20 | 0.24 | 1.21 | 0.97 |
| Newton | 3 | 71 | 74 | 0 | 7 | 7 | 0 | 2 | 2 | 3 | 69 | 72 | 0 | 5 | 5 | 0.00 | 0.07 | 0.22 | 0.18 |
| Peabody | 2 | 71 | 73 | 0 | 10 | 10 | 0 | 0 | 0 | 2 | 71 | 73 | 0 | 10 | 10 | 0.00 | 0.14 | 0.28 | 0.23 |
| Plymouth | 2 | 95 | 97 | 0 | 3 | 3 | 0 | 3 | 3 | 2 | 92 | 94 | 0 | 0 | 0 | 0.00 | 0.00 | 0.00 | 0.00 |
| Quincy | 4 | 185 | 189 | 0 | 7 | 7 | 0 | 7 | 7 | 4 | 178 | 182 | 0 | 0 | 0 | 0.00 | 0.00 | 0.00 | 0.00 |
| Randolph | 6 | 29 | 35 | 0 | 3 | 3 | 0 | 0 | 0 | 6 | 29 | 35 | 0 | 3 | 3 | 0.00 | 0.10 | 0.62 | 0.50 |
| Revere | 4 | 49 | 53 | 2 | 10 | 12 | 0 | 2 | 2 | 4 | 47 | 51 | 2 | 8 | 10 | 0.50 | 0.17 | 0.68 | 0.54 |
| Taunton | 6 | 48 | 54 | 0 | 2 | 2 | 0 | 2 | 2 | 6 | 46 | 52 | 0 | 0 | 0 | 0.00 | 0.00 | 0.00 | 0.00 |
| Tewksbury | 2 | 76 | 78 | 0 | 2 | 2 | 0 | 2 | 2 | 2 | 74 | 76 | 0 | 0 | 0 | 0.00 | 0.00 | 0.00 | 0.00 |
| Wakefield | 1 | 63 | 64 | 0 | 8 | 8 | 0 | 7 | 7 | 1 | 56 | 57 | 0 | 1 | 1 | 0.00 | 0.02 | 0.02 | 0.01 |
| Waltham | 7 | 102 | 109 | 0 | 4 | 4 | 0 | 2 | 2 | 7 | 100 | 107 | 0 | 2 | 2 | 0.00 | 0.02 | 0.14 | 0.11 |
| Watertown | 2 | 49 | 51 | 0 | 6 | 6 | 0 | 2 | 2 | 2 | 47 | 49 | 0 | 4 | 4 | 0.00 | 0.09 | 0.17 | 0.14 |
| Weymouth | 5 | 89 | 94 | 1 | 12 | 13 | 1 | 12 | 13 | 4 | 77 | 81 | 0 | 0 | 0 | 0.00 | 0.00 | 0.00 | 0.00 |
| Whitman | 1 | 17 | 18 | 0 | 2 | 2 | 0 | 0 | 0 | 1 | 17 | 18 | 0 | 2 | 2 | 0.00 | 0.12 | 0.12 | 0.09 |
| Winthrop | 3 | 18 | 21 | 1 | 7 | 8 | 1 | 4 | 5 | 2 | 14 | 16 | 0 | 3 | 3 | 0.00 | 0.21 | 0.43 | 0.34 |
| Total |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  | 19.02 | 15.21 |

HRD Submission

11/9/2006